```
 1                 UNITED STATES OF AMERICA

 2        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

 3                  WASHINGTON FIELD OFFICE

 4     - - - - - - - - - - - - - - - x

 5     MARCIANN GRZADZINSKI,             :

 6          Complainant,                 :   EEOC No.

 7               v.                      :   570-2017-00720x

 8     JEFFERSON B. SESSIONS, III,       :

 9     Attorney General,                 :   Agency No.

10     Department of Justice,            :   FBI-2015-00176

11          Agency.                      :

12     - - - - - - - - - - - - - - - x

13                                   Washington, D.C.

14                                   Monday, April 8, 2018

15     Deposition of:

16                    JAMES A. BAKER,

17     called for examination by counsel for Complainant,

18     pursuant to notice, at the Law Offices of Kator

19     Parks Weiser & Harris, 1200 18th Street, NW, Suite

20     1000, Washington, D.C., commencing at 10:00 a.m.,

21     before Barbara A. Huber, CSR and Notary Public in

22     and for the District of Columbia
```

1   national security.

2        Q    And CDC stands for again?

3        A    Chief division counsel.

4        Q    Chief division counsel.

5             So I'm just curious as to why it was that

6   you chose her for investigative law rather than

7   national security law.

8        A    Because it seemed to me that that was the

9   best fit for her, given her experiences at WFO as

10  we discussed them.  And I mean I don't specifically

11  remember her resume or application packet at this

12  time, but I would have looked at it.  And that was

13  my -- that was my thought, that she was best suited

14  for that -- that particular job.

15       Q    And you don't recall specifically why you

16  thought that?

17       A    Well, because she had had responsibility

18  with respect to those -- so I guess -- let me back

19  up.  She had had responsibilities, especially with

20  respect to the portfolio that would be included in

21  the -- what you would call the investigative law

22  unit, which is the ongoing criminal activities,

1    giving -- giving legal advice to criminal

2    investigators, conducting criminal investigations

3    obviously.

4              And then I think Marcy also said that she

5    had responsibility for legal forfeiture in her

6    position at the Washington field office,

7    including -- which was included within that

8    portfolio.

9              Also then, because Marcy was a special

10   agent, I thought that she could bring that

11   experience to bear on those subject areas as well

12   as she was going to be responsible for the legal

13   training.  And that mainly meant legal training of

14   FBI agents as well as analysts.  And so I thought

15   that her experience in that area would be

16   beneficial as well, her experience as an agent and

17   that having been in the field office would be

18   beneficial as well.

19             And keep in mind, I'm also trying to

20   replace Elaine Lemert, who is -- or was -- an FBI

21   agent at the time.  So there was a synergy, at

22   least in my mind, to having another agent

1   responsible for that portfolio.  Excuse me,

2   which -- which is also something that Elaine had

3   recommended to me as well.

4       Q    Okay.  Do you recall if there was another

5   candidate, you know, that you had preferred ahead

6   of Marcy, maybe Marcy was not your first choice for

7   that?

8       A    Well, I looked at other candidates.  And

9   Marcy -- I did not select any other candidate, so

10  Marcy was my first choice at the end of the day.

11      Q    Right.  But prior to you coming to the

12  conclusion that you wanted to select her, was there

13  somebody else that you had wanted to select but

14  ultimately chose not to?

15      A    I had looked at other candidates who I

16  thought about selecting, and ultimately decided not

17  to select them.  Yes, there were a variety of them.

18      Q    Do you recall who?

19      A    There were two.  There was an individual

20  who was -- he might -- he was an AUSA in New York.

21  He might have been Eastern District of New York or

22  Southern District of New York.  I can't remember.

```
 1    And then there was also then ██████ -- and I'm

 2    drawing a blank on her last name, but she was the

 3    CDC in -- at the New York field office.  And I had

 4    thought about hiring her as well.

 5         Q    Why did you ultimately decide not to hire

 6    her?

 7         A    She got a negative reference -- or I got

 8    a negative reference with respect to her from her

 9    supervisor that made me decide not to hire her, or

10    to not continue with the hiring process with

11    respect to her.

12         Q    Okay.  So when you hired Ms. Grzadzinski,

13    she was out of the field office.  She was a 15.

14    This position was an SES.  Is that correct?

15         A    I think that's correct, yeah.

16         Q    And so you had to -- somebody had to jump

17    through all those hoops of the executive -- board?

18    What is it called?

19         A    Well, there's the SES board --

20         Q    Yeah.

21         A    -- within the FBI.

22         Q    Yeah.
```

```
 1        A     The FBI has a different SES selection

 2   system from -- it's different from other parts of

 3   the federal government and so -- for a number of

 4   positions.  I don't think it applies to all the

 5   positions.

 6              But in any event, so there is an FBI SES

 7   selection board that is responsible for making a

 8   recommendation to the director.  And the director

 9   has the authority to select SES members for the

10   FBI, without going to the -- I'm drawing a blank on

11   the name of it, but it's the outside panel.  I

12   think it's the OPM.

13        Q     Executive review board --

14        A     Yes.  Yeah.

15        Q     -- at OPM?

16        A     Right.  Which is what -- something I had

17   to go through when I was selected for the SES back

18   in --

19        Q     At Justice?

20        A     -- at Justice, yes.

21        Q     But for FBI, they didn't -- OPM didn't

22   have to sit, as far as you know?
```

```
 1        A     OPM played a role with respect to the

 2   FBI's SES system.  For example, doling out how many

 3   SES slots that the FBI could have, that kind of

 4   thing, and I think conducting overall supervision.

 5   But in terms of the ongoing selections, that was,

 6   to the best of my recollection, delegated to the

 7   FBI.

 8        Q     Umm --

 9        A     Excuse me.  And whether some paperwork

10   was sent on a regular basis after the director made

11   a selection, I'm not really sure.  I don't recall.

12   Sent to OPM.  It could have been.

13        Q     Okay.  So ultimately do you recall when

14   it was that you hired Marcy for that position?

15        A     I think it was early -- well, when did

16   she get -- it's late 2014, early 2015, somewhere in

17   that time frame, to the best of my recollection.

18        Q     Okay.  So you were January '14?

19        A     Correct.

20        Q     And she was maybe January '15 --

21        A     Something like that --

22        Q     -- somewhere --
```

1       A     -- yeah.

2       Q     -- somewhere in there?

3             And then at some point you did a

4    reorganization of the deputy general counsel of the

5    office of general counsel, correct?

6       A     We called it a realignment, but it was

7    a -- yes, it was a thorough review of the

8    operations of the office of general counsel, which

9    to my understanding had not been done in -- in

10   twenty years, since the office was founded.  And so

11   I thought it was time.  And that's what we did.

12      Q     So when was it that you embarked on -- or

13   began to consider, I should say, this notion of

14   doing a realignment?

15      A     I think it was right from the time that I

16   arrived.

17      Q     And so when is it that you effectuated

18   this realignment?

19      A     I don't remember the exact date.

20      Q     But it would have been after you hired

21   Marcy?

22      A     Yes.

Case 1:20-cv-01411-JEB   Document 26-7   Filed 12/09/21   Page 9 of 33

1        Q     And what took so long to put this

2    realignment in place?

3        A     Well, that was quite intentional, because

4    that -- and I explained to folks when I first got

5    there that I was going to take my time and not make

6    rash decisions, that I wanted to do a thorough

7    review of the operations of the office, get to know

8    the office, get to know the people, get to know

9    what we did, understand how the office functioned

10   within the FBI and within -- with our external

11   partners.

12            I had all -- I had worked with the office

13   of general counsel for many years in my various

14   positions at -- at DoJ, so I knew generally what it

15   did.  But this was the first time being on the

16   inside, and so I wanted to make sure that I had

17   conducted a thorough review of all its operations

18   before making design decisions, you know, that

19   would be significant.

20       Q     And so why was it that you filled that

21   vacant investigative law position if you were

22   contemplating a realignment at the time?

1       Q    Does that refresh your recollection as to

2   when --

3       A    Sure.  So it --

4       Q    -- you --

5       A    -- paragraph five says, After conducting

6   a thorough review of OGC's operations and design,

7   in or about May-June 2015, I determined that a

8   realignment of OGC's organizational structure was

9   necessary.

10      Q    And does that refresh your recollection

11  as to when you --

12      A    I don't --

13      Q    -- you made the decision?

14      A    -- I don't specifically remember, sitting

15  here today.  I'm relying on my document.  And I

16  believe it to be correct at the time that I signed

17  it.

18      Q    Okay.  And when was it that you signed

19  it?

20      A    When did I sign it?

21      Q    December 13, 2016 --

22      A    Yes.

1        Q      -- is that what it says?  Okay.

2               So when you made this realignment, you

3    ended up taking Marcy out of the deputy general

4    counsel position, correct?

5        A      Correct.

6        Q      Why was it that you did that?

7        A      Well, there were a number of reasons set

8    forth in this document and the attachment to it,

9    which is Exhibit 1.  So there are a number of

10   different reasons.

11       Q      Do you recall, sitting here today, what

12   those were?

13              I mean I don't -- you're welcome to read

14   that if you want, but I -- I'm not asking you what

15   the document says.  I'm just asking you what it is

16   you recall.

17       A      Sitting here today?

18       Q      Yeah.

19       A      Yeah.  And so I'm sorry, your question

20   was -- was with the realignment, or --

21       Q      Why, yeah, why is it that you --

22       A      Why move her out of that position?

1        Q     Correct.

2        A     Okay.  So the -- the realignment was

3   driven by me trying to determine what the

4   appropriate design was for the office without

5   regarding to personalities or the people that would

6   fill the different boxes in the organizational

7   chart.

8              So the question -- I -- I was -- knowing

9   that OGC had not been -- knowing that OGC's

10  organizational design had not been looked at in a

11  long time, I was trying to come up with a design

12  that would make sense for many years into the

13  future.  And -- and knowing that people come in and

14  go out, I was trying to come up with a design that

15  would make sense over a long period of time,

16  without regard to personalities.  That's number

17  one.

18             So the design that I came up with -- that

19  we came up with, the team came up with -- was based

20  on that basic principal.

21             Then the question was:  Okay, we'll look

22  at the design and what makes sense in terms of who

1    among the people available to us should be in what

2    role.  And following that idea and looking at the

3    responsibilities, the experience, the performance

4    of various people within the organization, I

5    determined that Marcy was struggling in her role as

6    a deputy general counsel.  And I thought that she

7    would be more successful in a position with fewer

8    responsibilities that -- but that was also within

9    her core area of expertise.  Because my objective

10   was to help Marcy succeed at her new job as a

11   section chief.

12        Q    So I guess I'm a little confused.

13             You said that you were trying to do it --

14   come up with an organization that made sense going

15   into the future that was agnostic to who occupied

16   various position, correct?

17        A    As much as possible, yes.

18        Q    But then you also said that you thought

19   that Marcy was struggling in that position and that

20   was part of the reason that you did it?

21        A    Part of --

22             MR. LEVIN:  Objection --

1    number of different factors.  There were a number

2    of different variables that were going into my

3    thinking about that.  I didn't want to have --

4    certainly didn't want to have one deputy, you know,

5    with one unit, for example, supervising ten people

6    and then somebody else supervising, you know, 200.

7    I didn't want to have something like that.

8              So I guess to some extent the -- you used

9    the word "balancing."  I mean to some extent I

10   wanted to make sure that the operational

11   responsibilities were aligned appropriately, that

12   the number of people that deputies were supervising

13   made sense, and that the deputies could succeed

14   with respect to what they were responsible for

15   and -- and how many people they had to manage and

16   supervise.

17       Q    Okay.  So I'm just -- and forgive me if

18   you've answered this, because I just -- I still

19   don't quite get it.

20             What role did Marcy's performance as

21   deputy play in your decision to make that

22   realignment that you did?

1          MS. GRAY:   Objection.   Asked and

2     answered.

3     BY MR. KATOR:

4          Q     Yeah, like I said, I -- you may have

5     answered it, but I'm just -- I'm not quite there.

6          A     So can you just repeat it again?   I'm

7     sorry.

8          Q     What role did your perception of Marcy's

9     struggles to perform in the deputy general counsel

10    position play in your decision to structure the

11    organization as you did?

12          MS. GRAY:   Same objection.

13          THE WITNESS:   I don't recall that being

14    a -- I mean sitting here today, I don't recall that

15    being a major factor.   Again, the decision -- the

16    design decision was main -- was made based -- was

17    based mainly on what the different units and

18    sections were doing, what the different branches

19    were doing, what they were responsible for, trying

20    to make sure that was a sensible design for the

21    organization, given what the -- what it was we were

22    trying to achieve.

1          And so the design was, again, intended to

2     be not focused on personalities of who had what

3     job, but to figure out what made sense for the

4     organization going forward.  And once the design

5     was set, then, to the extent people needed to be

6     moved around, we would move them around.

7     BY MR. KATOR:

8          Q    Okay.  And so it was a little, I mean,

9     like musical chairs:  You had four and then had to

10    go down to three, right?

11         A    In terms of deputies?

12         Q    Yeah.

13         A    Well, I don't know about musical chairs,

14    but yes, we -- I -- I had to -- somebody -- I had

15    to move somebody out of a deputy role.

16         Q    Right.

17         A    Correct.

18         Q    "Beondy," is that -- is there somebody

19    named --

20         A    Tom -- Tom -- Thomas Bondy.

21         Q    "Bondy."

22         A    B-O-N-D-Y.

1      Q    Bondy --

2      A    Uh-huh.

3      Q    -- Babcock, and Marcy.  Okay?  So those

4   are the four people.

5           The four slots were investigative?

6      A    Uh-huh.

7      Q    Litigation?

8      A    Uh-huh.

9      Q    National security -- and what's the

10  fourth one?

11     A    That's three, when you come down to

12  three.  The fourth one, before that, had been -- I

13  think it was called general law or something like

14  that.

15     Q    General law?

16     A    Yeah.

17     Q    Okay.  So general law was the one that

18  you subsumed into investigation or combined with

19  investigation?

20     A    Combined it, I -- I think, yeah.  I don't

21  have the organizational charts in front of me.  And

22  I can't remember exactly what unit was where at

1    what point in time, but --

2          Q    Right.  So --

3          A    Okay.

4          Q    -- so that's how it happened.

5                So I guess my question is you had the

6    three remaining deputy persons and three remaining

7    deputy slots, but you chose not to keep Marcy as a

8    deputy?

9          A    Okay.  There's a lot packed into your

10   question.  But no, I did not think that Marcy was

11   succeeding in her position as a deputy at that

12   point in time.  That was number one.

13               Number two, she was also the most junior

14   deputy at that point in time.  I think.  I can't

15   remember.  And I did not believe that she would be

16   able to succeed in the new -- newly designed

17   organization.  I was making a number of different

18   personnel moves at the time.  And, you know,

19   Mr. ████, with his position, had he not been

20   retiring, I would have considered removing him.  In

21   fact, I did consider removing him.

22         Q    Why were you going to remove him?

1    serving a probationary period.  You're aware that

2    it's up January, December, whatever.  You're

3    talking to Babcock.

4            At what point in your mind did you make a

5    decision to recommend that she not succeed in her

6    probationary period?

7        A    I don't remember specifically.  I know

8    that I had talked to Ernie about it.  I had talked

9    to Jim Turgal about it.  And I was struggling with

10   it.  I was struggling with it.

11       Q    Are there other section chiefs in the

12   office of general counsel?

13       A    Yes.

14       Q    And what grades are they?

15       A    Well, they're all SES.  Well, I think --

16   if they are actually in the SES, and not serving in

17   an acting position as a section chief.  We had

18   those, too.  And that could be a GS-15.  But if --

19   a person that holds the position of section chief

20   is in the SES.  You must be in the SES to be a

21   section chief.

22            Q    I see.  So after this taking her out of

1    probationary period, was she removed from her

2    section chief position?

3        A    I believe the answer is yes.

4        Q    You're not sure?

5        A    I think it happened right away, but I --

6    I can't remember right now.

7        Q    So then what --

8        A    Because I think that Turgal was -- excuse

9    me.  I'm sorry to interrupt you.

10       Q    No, no.

11       A    Turgal was trying to find a position for

12   Marcy at the outset.  So I guess she would have had

13   to have been removed from her section chief

14   position at the end of her probationary period, if

15   not before.  And then I think there was a period of

16   time where Turgal was looking for and talking to

17   Marcy about where to put her.

18            But I believe that Marcy, throughout this

19   period, retained, at my request, the -- her salary

20   as a DGC when she was moved to section chief, and

21   then retained the DGC position when she was moved

22   to the other responsibilities, but -- so I --

1      A    That's all I recall sitting here today.

2      Q    At the FBI, do you have sexual harassment

3   training, I mean, that -- that people in the

4   general counsel's office are required to take?

5      A    I believe there's -- yes.  I think it's

6   online training that everybody has to take.  I

7   think it's every year.

8      Q    All right.  You've mentioned the name

9   Trisha Anderson.

10         How did you know Trisha Anderson?

11      A    Trisha Anderson and I worked together at

12   the Department of Justice when I was in the deputy

13   attorney general's office and she was an attorney

14   in the office of legal counsel, in approximately

15   2009, 2010, 2011 time frame.  And we were working

16   on a variety of highly complicated, very difficult

17   national security matters, including a number of

18   very challenging cyber matters.  So I believe

19   that's when I first got to know Trisha.

20      Q    Were you friends with her?

21      A    At that point in time we were more

22   colleagues only.

1    board is chaired by the deputy director.  And the

2    associate director's on there, on the board, as

3    well as the executive assistant directors and a few

4    other officials.  Maybe eight to ten in total.  And

5    that board then reviews the request of the office

6    that wants to hire a particular person.  And

7    then -- then it goes the director.

8              With Trisha's selection, she -- because

9    she was already -- I think once -- I -- I believe,

10   to the best of my recollection sitting here today,

11   because she was already a member of the SES at the

12   Treasury Department, I believe that process was

13   short-circuited, now that I sit here and think

14   about it.

15             And now, let -- yes, I believe that we

16   were able to do a -- what was called a direct hire

17   for her.  Because she was in the SES already and

18   because of the needs for this particular position

19   and her qualifications, in consultation with HRD I

20   think we were able to do a direct hire for Trisha.

21   I'm not a hundred percent sure of that, but I think

22   that is right.

1      Q    Okay.  So I thought you were telling me

2   that you remembered interviewing her, but no?

3      A    I thought I did.  But as I'm sitting here

4   answering your question and thinking about it --

5   well, so I had had prior conversations with Trisha

6   about the position.  I had known Trisha at OLC.  We

7   also worked together briefly at the deputy attorney

8   general's office.

9           I had given her a positive recommendation

10  to Justice Kagan, on the Supreme Court, to take her

11  as law clerk.  And so I knew Trisha pretty well.

12  And so --

13     Q    When was that?

14     A    Prior to her going to clerk on the Court.

15  I don't remember that, when it -- what time period

16  it was.  It must have been after.  When I first got

17  to know Trisha was at OLC, so it must have been at

18  the end of that time.  Because I think she went off

19  and did that, and then came back and worked at the

20  deputy attorney general's office.  Then I left and

21  she essentially took my spot.  And then at some

22  point in time she went to Treasury.

1          And so I knew that it was in the interest

2    of the FBI to be able -- to be able to engage at

3    the highest levels with the highest levels of

4    complexity and intellectual challenge, with the

5    Justice Department, with the intelligence

6    community, with the U.S. military, with the White

7    House, with the Commerce Department, with a whole

8    range of actors inside the government, with Capitol

9    Hill, Congress I mean, and so I knew that we were

10   going to -- if we were going to represent the FBI

11   effectively across this full range of national

12   security and cyber issues, that we needed topnotch

13   legal advice on these questions.

14          And I knew that Trisha had done exactly

15   that in her various roles in OLC and at the -- when

16   she -- when she was working at the deputy attorney

17   general's office.  So that was the caliber of legal

18   skills and abilities that I really needed in that

19   position.

20      Q    And you testified that Ms. Grzadzinski

21   did have the national security in her -- in the

22   scope of her job as CDC at WFO, correct?

1        A     That's my understanding, yes.

2        Q     And so why did you think that she would

3    not have been prepared to deal with those issues at

4    that level of complexity?

5        A     Because of my understanding of the types

6    of issues that she had worked on as -- as CDC and

7    would have worked on as CDC, that she would not

8    have encountered these types of issues, that I was

9    much more familiar with the types of issues that I

10   thought we were encountering and that I knew we

11   were encountering and thought we would continue to

12   encounter and engage with.  And I just thought that

13   Marcy -- the -- the gap between what Trisha's

14   background and experience was and Marcy's was

15   substantial.

16       Q     Did you have an understanding of

17   Ms. Anderson's reputation in the national security

18   field?

19       A     Absolutely.  Yes.

20       Q     And --

21       A     She had a very high reputation.  And

22   people thought very highly of her who had

1    they would leave?

2         A    No.

3              As I said earlier, many of these moves

4    were intended to give people a fresh start and

5    enhance their career.  And I remember specifically

6    discussing that with Rick, for example:  You

7    could -- this is something good.  Don't hate this.

8    This is something good.

9              Same thing I discussed with Sherry:  This

10   is something good.  This is going to give you a

11   different perspective.  This is a good thing for

12   you.

13        Q    You provided some testimony to the effect

14   that you were dissatisfied with Ms. Grzadzinski's

15   communication, not communicating up to you,

16   something to that effect.

17             Did you ever specifically tell her that

18   you wanted her to keep you more informed as to what

19   her units were working on?

20        A    I believe the answer is yes.  I don't

21   recall a specific conversation as we're sitting

22   here right now, but we -- especially toward the end

1    of the time that Marcy was there, when Ernie and I

2    were meeting with -- were meeting with her

3    regularly, I brought up that issue.

4            And I think I also brought it up when --

5    earlier, when the issue of the -- of this CDC

6    conference came up.  And I felt like I was

7    blindsided by my -- by Marcy's decision not to

8    invite me in the first instance to the -- to the

9    conference.  And so I had con -- I had an extended

10   conversation with her about that topic.

11           And she explained to me that she had --

12   in her prior job as the CDC at WFO, the way she

13   operated there was that the -- her supervisors, you

14   know, the assistant director in charge or the

15   special agents in charge over various parts of

16   the -- of the organization, would give her

17   assignments, would assign her responsibilities, and

18   then she would just go off and do that.  And as

19   long as it was being done, they didn't really

20   follow up and ask to know what was going on, or

21   to -- or whether she was achieving her

22   responsibilities.

1          And so I tried to explain, well, look,

2     I'm different.  I think OGC is different.  And I

3     want more communication here, and so that does not

4     work in OGC.

5          Q     And do you recall, in general, what her

6     response was to your efforts to get her to

7     communicate more to you?

8          A     She -- as I recall, Marcy was not against

9     it.  She wasn't, you know, morally opposed to it,

10    but it never actually happened.  Well, it didn't

11    happen to the extent that I thought was

12    appropriate.

13         Q     You testified that you would hope that

14    Ms. Grzadzinski would help to bridge a divide

15    between the CDC and OGC.

16              Can you give some examples of the way --

17    of ways that she did not help to achieve that goal?

18         A     So this business about the SAC confer --

19    I'm sorry, about the CDC conference was one case in

20    particular.  So I was hoping -- or I -- so Marcy

21    set it up so that the conference would be in

22    Oklahoma City, not in Washington.  She had reasons

1   for that.  But what had ended up happening was

2   that -- the geographic separation made it

3   impossible to have social interactions after hours,

4   of happy hours or anything like that, with OGC

5   folks and the CDC community, to try to bring folks

6   together.

7          Remember, that the CDCs are dispersed

8   across the country.  And so there's a geographic

9   separation already between the OGC and -- and the

10  CDC community.  And it makes it hard for people to

11  get to know each other, to interact with each

12  other.  And so I was hoping that we could bridge

13  some of those gaps through the conference.  But

14  putting it out in Oklahoma City made that

15  effectively impossible.  Some people, to be sure,

16  from OGC did go out there as instructors.  But the

17  opportunities for interactions were substantially

18  less.

19          And I just found that Marcy was not

20  making any other concerted or well thought-out

21  efforts to try to bridge that gap.  If she was

22  doing it, she wasn't explaining to me.  I -- I

1    don't believe that I became aware of such things

2    that she was trying to do.

3         Q    Mr. Kator asked you when you settled

4    on -- when you did make the decision -- when you

5    first made the decision as to -- to demote

6    Ms. Grzadzinski from the DGC position.  You had

7    indicated that it was when you settled on the

8    design for the realignment.

9         A    Uh-huh.

10        Q    Was that the first time that you had

11   recognized any deficiencies in her performance or

12   had concerns about her performance?

13        A    No.

14        Q    Can you just give -- describe when you

15   first started having concerns about her performance

16   in the DGC role?

17        A    Well, at the outset, it was even before

18   she arrived.  Because to the best of my

19   recollection, prior to her showing up at OGC, we --

20   she came over and we had a conversation about what

21   office she was going to be in.  And so -- and I

22   think this is reflected in some of the documents.

1    But I -- I found that to be a strange decision that

2    she was making, to select an office that was

3    removed from her folks just because it was bigger.

4    And yet at the end of the day I thought, well,

5    Marcy, this is her decision to make.  I'm just

6    going to make let her make it, if -- you know,

7    hoping that it would not be a precursor of things

8    to come.  So I thought that was a questionable

9    decision.

10           And then her level of participation from

11   the outset in meetings with other parts -- in

12   meetings -- regular staff meetings within OGC, I

13   thought her participation was below the bar.  And

14   when we would have substantive meetings on a

15   variety of different legal topics, I thought her

16   participation was below the bar.  She just didn't

17   engage in the meeting in the right way with the

18   other leaders of the FBI.

19           And -- and that did not -- it started out

20   that way.  And I didn't see it improve over time.

21   I thought her legal analysis, in particular with

22   respect to this question of whether the CDCs are

1   engaged in the practice of law, was -- made no

2   sense whatsoever and was not well supported by any

3   reasonable type of legal analysis that I could

4   think of.  So that alarmed me.  So it was a series

5   of things over time, but it started pretty early

6   on.

7        Q    And why did you think it was strange that

8   she was selecting an office in a different

9   location?

10        A    Because I didn't think it reflected good

11   judgment with respect to the way she thought about

12   leadership.

13        Q    In what way?

14        A    She was overvaluing the prestige that she

15   perceived to be associated with the size of an

16   office or the proximity to me, the general counsel.

17   She was prioritizing those things over being with

18   her troops and sending a message that as a leader

19   you're there to serve other people, not to be

20   elevated up and be, frankly, exalted in some

21   fashion.  And I thought it was the wrong message.

22   I thought it was the wrong message that she was

```
 1   sending to her troops.

 2       Q    You testified that the ultimate decision

 3   to select Ms. Grzadzinski for the DGC position was

 4   the director's decision; is that accurate?

 5       A    At the end of the day, yes.

 6       Q    Okay.

 7       A    I believe the -- I believe the director

 8   has to make all final decisions on SES selections.

 9       Q    Was it your decision to recommend her for

10   that position?

11       A    Yes.

12       Q    Did anyone tell you you had to recommend

13   her or put any pressure on you to recommend her for

14   that position?

15       A    No, not at all.

16            MR. LEVIN:  I have no further questions.

17            EXAMINATION BY COUNSEL FOR COMPLAINANT

18   BY MR. KATOR:

19       Q    So let me just follow up on one thing.

20            You talked about McNally, right?

21       A    Uh-huh.

22       Q    He was -- what was the name of that
```