Page 1

1                  UNITED STATES OF AMERICA

2           EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3                    WASHINGTON FIELD OFFICE

4

5    MARCIANN GRZADZINSKI,          EEOC No. 570-2017-00720x

6             Complainant,      Agency No. FBI-2015-00176

7    v.

8    JEFFERSON B. SESSIONS, III,

9    Attorney General,

10   Department of Justice,

11   Federal Bureau of Investigation,

12             Agency.

13   --------------------------------/

14             The deposition of MARCIANN GRZADZINSKI, was

15   held on November 15, 2018, commencing at 9:21 a.m., at

16   the Veritext, 1250 Eye Street, North West, Suite 350,

17   Washington, D.C. 20005, before Jean M. Townsend, Notary

18   Public in and for the District of Columbia.

19

20   REPORTED BY:  Jean M. Townsend

21

22

Marciann Grzadzinski                              November 15, 2018

                                                        Page 11

1          A     It's an L.L.M. in corporate and finance.

2          Q     You entered on duty with the FBI as a

3     special agent on June 9th 1996; is that right?

4          A     Correct.

5          Q     And you became the chief division counsel

6     or CDC at the Washington Field Office in January

7     2008; is that right?

8          A     As best as I can remember dates, yes.

9          Q     The CDS position is a GS15 level position,

10    correct?

11         A     Correct.

12         Q     And you held that position until you

13    started as deputy general counsel in OGC, correct?

14         A     Correct.

15         Q     Prior to becoming CDC you had a couple of

16    two-month stints as an assistant legal attache; is

17    that right?

18         A     ADC or -- I did a couple stints overseas,

19    yes.  I went to Cairo and I went to Riyadh, and

20    before I even came to headquarters I went to Toronto

21    and worked with the RCMP for several months.

22         Q     Were those TDYs?

Marciann Grzadzinski                                          November 15, 2018

                                                              Page 17

1        Q    Okay.  I'd like to turn to the selection

2   process for the CGC position.  The job posting for

3   the NSL BECGC position and the ILCGC positions went

4   out on or around the same day; is that right?

5        A    Correct.

6        Q    And is it -- ILTB, is that how you refer

7   to that branch?

8        A    Yeah, it's about the best -- I mean,

9   they've changed the name a couple times since then,

10  but, yeah, I always called it the Investigative Law

11  Branch.

12       Q    Okay.  And you submitted an application

13  for both positions, correct?

14       A    Correct.

15       Q    Do you believe you were equally qualified

16  for both positions?

17       A    Yes.

18       Q    Do you think your background and

19  experience was more aligned with one of the two

20  positions?

21       A    I think it was equal.

22       Q    Did you have a preference for one job over

Marciann Grzadzinski                                      November 15, 2018

Page 18

1    the other?

2         A    Not necessarily.  I mean, I enjoy the

3    investigative law side a bit more, but, no, I was

4    hoping to get one of the two.

5         Q    Okay.  You would have been equally happy

6    to get either job?

7         A    Absolutely.

8              MR. HART:  Objection, form.

9    BY MS. GRAY:

10        Q    You were interviewed in late October 2014,

11   correct?

12        A    Correct.

13        Q    Do you recall who interviewed you?

14        A    It was Ernie Babcock, Tom Bondy and James

15   Baker.

16        Q    Had you ever met James Baker prior to your

17   interview?

18        A    Yes.

19        Q    How many times?

20        A    Two or three possibly, maybe.  Meeting

21   and -- I mean, knowing him, so I might have seen him

22   on -- just, you know, in the area, but I remember

Marciann Grzadzinski                                          November 15, 2018

Page 20

1    Law Branch or I was -- we referred to it as Elaine's

2    position.  Elaine Lammert held it for years, so I'm

3    not sure if he said Investigative Law or Elaine's

4    job.

5         Q    Is it possible that the interview was to

6    evaluate your candidacy for both positions?

7              MR. HART:  Objection, form, and calls for

8    speculation.

9    BY MS. GRAY:

10        Q    You can answer.

11        A    I have no idea.

12             (Grzadzinski Deposition Exhibit Number 1

13             was marked for identification.)

14   BY MS. GRAY:

15        Q    The court reporter jut handed you a

16   document that's been marked as Exhibit Number 1.

17             MR. HART:  I'm just going to generally

18   object to testimony about this document because Ms.

19   Grzadzinski was not included on it.

20   BY MS. GRAY:

21        Q    Okay.  So do you see that this an email

22   from Justin Schoolmaster to Mr. Baker, Mr. Babcock

Marciann Grzadzinski                                                November 15, 2018

                                                              Page 40

 1              MR. HART:  Objection, calls for
 2      speculation, and relevance.
 3              MS. GRAY:  It actually doesn't call for
 4      speculation.  I'm asking her opinion about
 5      something.
 6              MR. HART:  Right, and to speculate about
 7      the significance of it is speculative.
 8      BY MS. GRAY:
 9         Q    Go ahead.
10         A    I wouldn't necessarily say that there
11      needs to be more agents, I just feel that there
12      needs to be the right people in the position.  When
13      it comes to shooting investigations, I believe it's
14      important to have an agent perspective and it makes
15      sense to have an agent attorney.  And some of the
16      other issues that we deal with, it's -- it's helpful
17      to have an agent perspective because that's who
18      we're working with.
19         Q    Did you understand that there was a
20      one-year probationary period for new SES appointees?
21         A    Yes.
22         Q    So by the time you started at the DGC

Marciann Grzadzinski                    November 15, 2018

Page 66

1    about.  They expect you to do your job, you're at

2    that level, handle it.

3            And that's the way I operated for seven

4    years prior to that, and then prior to that I was in

5    the director's office and it was kind of the same

6    thing with that unit, you do your job and you handle

7    it, and you only go up the food chain if you feel

8    you need their top cover, I guess is the term we

9    used or if you needed them to weigh in on something.

10           That was not Jim, so that's where there

11   was a bit of -- I wouldn't say a rub, but that was a

12   learning curve for me.  But then when I sat back and

13   kind of looked around, it was easy for me to pick up

14   on the fact that it was more towards women and not

15   the men necessarily.

16       Q    So you had the sense or Jim explicitly

17   told you that he wanted more regular feedback from

18   you; is that right?

19       A    Not initially, but eventually that became

20   his theme, that I needed to give him more feedback

21   and more information.

22       Q    And that was different than your prior

Marciann Grzadzinski                    November 15, 2018

Page 67

1      experience with other supervisors, correct?

2           A    Correct.

3           Q    And do you feel that you adjusted to meet

4      that expectation?

5           A    I -- and this is where this becomes

6      difficult is because my tenure as DGC, just as I was

7      starting to really get into that groove, I was

8      reassigned, at which point in time my direct

9      supervisor became Ernie Babcock.  Nineteen years in

10     the Bureau, I follow my chain of command, and so my

11     chain of command was Ernie Babcock and that's who I

12     communicated with.

13          Q    Was the ADIC at WFO an agent?

14          A    Yes.

15          Q    Because you mentioned there were like nine

16     different ones, were they all agents?

17          A    Yeah.

18          Q    And when I say nine different ones, it was

19     one at a time.

20          A    Yes.

21          Q    But over your --

22          A    Yeah, every -- they have not -- there's

Marciann Grzadzinski                                          November 15, 2018

Page 90

1          Q    When you were a CDC did you have an active

2     bar license?

3          A    I -- it was my choice, I always was active

4     bar.  I was paranoid to ever let it lapse, so I

5     always just paid it and moved on.

6          Q    And what was your position as to whether

7     the CDCs had to have active bar licenses?

8          A    I felt it was -- I don't believe that it

9     was necessary, and there was more to it than not --

10    I firmly believe someone paying more money --

11    because that's basically what it comes down to is

12    either your active or inactive, and most

13    jurisdictions the only difference -- and Michigan's

14    one of them -- the only difference is you pay more

15    money.  And I don't believe being active or inactive

16    makes you a better lawyer.

17         Q    So is that basically -- did you -- is that

18    the position that you presented to Mr. Baker, that

19    you didn't believe that the CDCs needed to have

20    active bar licenses?

21         A    Correct.  But it also had to do with a

22    whole gamut of we have what were called legal

Marciann Grzadzinski                                    November 15, 2018

                                                        Page 93

1     I felt the direct legal advice that agents were

2     going to rely on when it came to the nuts of bolts

3     of things was always to rely on their AUSA.

4               Because their AUSA is going to be the one

5     who's going to make the call, so I would give my

6     general interpretation of it, but would oftentimes

7     refer them to their AUSA.

8          Q    In the end DOJ did require all CDs to

9     submit proof of active bar membership; is that

10    correct?

11         A    Correct.

12         Q    Did Mr. Baker ever express disappointment

13    with you over your advice on this issue?

14         A    He wouldn't even talk to me about it.  He

15    just went right past me.

16         Q    Okay.  And your impression is because he

17    was upset about the position you had taken?

18         A    I -- I have no idea.  He just -- he had

19    Catherine Chin do the legal research, which I -- it

20    didn't make any sense for me to have somebody in

21    procurement doing that legal research, it should

22    have been somebody in the Investigative Law Branch

1    because the other issue that this raised once our

2    folks go active is that it became a whole McDade

3    issue.

4              And my folks in the Investigative Law

5    Branch were very concerned about that, and also were

6    some of the CDCs and ADCs.

7        Q    What was Catherine Chin's position?

8        A    She was -- I don't recall if she was the

9    unit chief at the time or she might have been acting

10   unit chief or she might have been main unit chief

11   over the Procurement Law Unit.

12       Q    On or around May 22nd 2015, Mr. Baker

13   informed you that he was reorganizing OGC and that

14   your position would be eliminated; is that right?

15       A    Correct.

16       Q    Prior to that meeting in May, had Mr.

17   Baker had any discussions with you about an OGC

18   reorganization?

19       A    No.

20       Q    Were you aware that he had been

21   considering reorganizing OGC?

22       A    He mentioned it I know briefly in some

1    meetings that he had been wanting to re-org for the

2    last two years, but he just never got around to it.

3          Q    Do you contend that Mr. Baker orchestrated

4    the reorganization to remove you from the DGC

5    position?

6               MR. HART:  Objection to the extent that

7    calls for a legal conclusion.

8               THE WITNESS:  It is what it is.  I mean,

9    no one in the Bureau ever takes a branch, a unit, a

10   division, and shrinks down their SESers, people just

11   don't do that because it's so difficult to get SES

12   positions so -- yeah.

13   BY MS. GRAY:

14         Q    So would that be a yes, you believe that

15   he -- the purpose of the reorganization was to

16   remove your position?

17         A    Remove me, yes.

18         Q    Okay.  Couldn't he have just demoted you

19   if he wanted to remove you?

20              MR. HART:  Objection, calls for

21   speculation as to what he could have done.

22              THE WITNESS:  Yeah, I mean, he can do what

Marciann Grzadzinski                                    November 15, 2018

Page 109

1    that would leave that -- I don't know if he said --

2    I don't believe he said that I could move back up

3    into that position, but that that position would

4    become available again.

5         Q    Do you think he was implying that there

6    was a possibility that you'd be able to move back up

7    into the position?

8         A    No, I believe at that point in time he was

9    just trying to -- I don't know if placate is the

10   right word, but he was trying to -- it was

11   apparent -- he had to pick up that I was not happy,

12   so I think what he was trying to do was just trying

13   to smooth over the situation, I guess that's the

14   best word I can come up with.

15        Q    Okay.  After you were removed from the DGC

16   position, you were placed in the section chief

17   position over the investigative law and training

18   section, correct?

19        A    Correct.

20        Q    And that section was created during the

21   reorganization; is that right?

22        A    Correct.

Marciann Grzadzinski                                    November 15, 2018

                                                    Page 110

1          Q     Did your salary change?

2          A     No.

3          Q     Did your reporting location change?

4          A     No.

5          Q     Did you remain in the same office on the

6     tenth floor?

7          A     Yes.

8          Q     As the section chief you were responsible

9     for planning the CDC Conference; is that right?

10         A     Correct.

11         Q     And is it fair to say that Mr. Baker

12    expressed disappointment that he was not informed

13    about the plans of the conference until a few weeks

14    before the conference?

15         A     Correct.

16         Q     And is it true that he was not informed

17    about the plans until a few weeks before the

18    conference?

19         A     I reported up my chain of command, Ernie

20    Babcock knew every moment of every planning for the

21    CDC Conference, and he told me that he was going to

22    brief it to Jim.  I follow my chain of command, and

Marciann Grzadzinski                                   November 15, 2018

Page 111

1        I felt that it was up to Mr. Babcock to brief him.

2              Q     Had you at the time that you informed Mr.

3        Baker about the conference or that he learned about

4        the conference, he was not scheduled to speak at the

5        conference; is that right?

6              A     Correct.

7              Q     And why had you not scheduled him to speak

8        at the conference?

9              A     To be quite frank, the CDCs didn't want to

10       hear from him.

11             Q     As the general counsel, Mr. Baker was the

12       program manager for the CDC Program, correct?

13             A     Correct.

14             Q     So regardless of whether the CDCs liked

15       Mr. Baker, do you think it would be appropriate for

16       him to speak at the conference?

17                   MR. HART:  Objection, form.

18                   THE WITNESS:  In my recollection of going

19       to the CDC Conference, not -- the general counsel

20       didn't always address the CDCs, sometimes they did,

21       sometimes they didn't.  So it wasn't anything that I

22       was -- thought would be problematic.

Marciann Grzadzinski                                    November 15, 2018

Page 121

```
1          Q     And his name is ████████?

2          A     Correct.

3          Q     And you're still engaged?

4          A     As far as I know, yes.

5          Q     Okay.  So you were offered more than one

6    option for a position after you were removed from

7    the SES, correct?

8          A     No, I wasn't.

9          Q     You were offered only one?

10         A     That was the only position I was ever

11   offered.

12         Q     The unit chief position at the Terrorist

13   Screening Center, correct?

14         A     Correct.  There were two unit chief

15   positions open at the Terrorist Screening Center.

16   When I went to the Terrorist Screening Center, Chris

17   told me I don't have a slot for you, but come on

18   over, and I plan on making some changes in

19   management and we'll -- we will get you placed.

20               So I sat up in my office on the tenth

21   floor for I want to say two or three months, I want

22   to say it was around March -- in fact, I know it was
```

Marciann Grzadzinski                                    November 15, 2018

Page 122

1    March because I went on spring break with my

2    daughter right after I went to the TSC.  So

3    literally sat upstairs for three months without

4    anything to do.

5         Q    Okay.  The official transfer order

6    indicates May 16th, is that --

7         A    That's probably by the time I went over to

8    TSC and I sat there for several months, and then --

9    that seems about right because I believe it was the

10   end of May and I remember taking over the

11   international unit like the first week of June.

12        Q    Okay.  But had you gone over before May

13   16th?

14        A    Oh, yeah, I went over there I want to say

15   like the first of April.

16        Q    Okay.

17        A    End of March, right around the spring

18   break time.

19        Q    Okay.  So that's just when the official

20   document was --

21        A    Correct, the paperwork caught up to me

22   physically moving.

Marciann Grzadzinski                                    November 15, 2018

                                                        Page 190

1    them?

2          A    No.

3          Q    Have you ever spoken to any individuals

4    who filed an EEO complaint against ███████?

5          A    No.

6          Q    So you don't have any personal knowledge

7    of whether EEO complaints were filed against

8    ███████?

9          A    I know there were complaints brought

10   forward, but whether they filed them EEO or how they

11   addressed them, I do not know.

12         Q    Assuming there were complaints brought

13   forward, how do you know what Mr. Baker did about

14   them or did not do about them?

15         A    I know that he wasn't doing anything about

16   it until Elaine Lammert brought it to his attention.

17         Q    Is it your belief that Mr. Baker treated

18   Rick McNally more favorably than he treated you?

19         A    Yes.

20         Q    Is it your understanding that Mr. McNally

21   had been acting as the DGC of NSLB for approximately

22   two years at the time Ms. Anderson assumed the role?

Marciann Grzadzinski                          November 15, 2018

                                          Page 191

1          A     That timeframe seems about correct.

2          Q     Are you aware that he also applied to be

3     the DGS of NSLB?

4          A     Yes, I do know that.

5          Q     Do you think he was qualified to be the

6     DGC of NSLB?

7          A     Yes.

8          Q     Do you think he was more qualified than

9     Ms. Anderson?

10         A     Yes.

11         Q     Do you think he was treated unfairly in

12    being passed over for the role?

13         A     Yes.

14         Q     Do you think you were more qualified than

15    Rick McNally to assume the role?

16         A     I think we were equally qualified.

17         Q     Okay.  In your -- well, let's just look at

18    them, it's your supplemental interrogatory

19    responses, Exhibit Number 24 -- sorry, that's my

20    tab -- sixteen.  So your responses to the agency's

21    supplemental discovery request.

22         A     Yep, got it.

Marciann Grzadzinski                               November 15, 2018

                                              Page 196

1                 MR. HART:  Objection.  I'm going to state

2      for this record this is an email from Mr. McNally.

3                 THE WITNESS:  Right.

4                 MR. HART:  He's the one that is making

5      that contention.

6                 THE WITNESS:  The only thing I can think

7      of is if he was also including the fact that I was

8      now reporting to Ernie Babcock who had absolutely no

9      experience in The Bureau, and that would be the only

10     thing I could think he would be referring to was the

11     fact that I now was taken from deputy general

12     counsel and put down to section chief.

13     BY MS. GRAY:

14         Q    Do you think that in general Mr. Baker

15     prioritized subject matter expertise less than

16     management experience?

17         A    That, I don't know.

18         Q    Was that your impression?

19         A    I wouldn't know enough about the other

20     people's management experience to make that

21     comparison.

22         Q    Okay.  We're finished with that.  You

Marciann Grzadzinski                                    November 15, 2018

                                                   Page 197

1    retired effective December 31st 2017, correct?

2         A    Correct.

3              MS. GRAY:  Can we just go off the record

4    for a second?

5          (Whereupon, a short break was taken.)

6    BY MS. GRAY:

7         Q    And when did you make the decision to

8    retire at that time?

9         A    I know I filed my retirement paperwork the

10   middle of December.  I mean, I had been thinking

11   about it, but when I actually pulled the trigger on

12   it, I know it was like two weeks.  It was December

13   of something I think was when I actually filed.

14        Q    And for how long had you been thinking

15   about it?

16        A    Since -- I'm a Bureau agent, you start

17   thinking about it the day you become KMA.  That's

18   just what we do.

19        Q    And KMA is what?

20        A    Well, we refer to it as Kiss My Ass, but

21   the day that you can literally stand up and say,

22   yeah.