# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
MARCIANN GRZADZINSKI,                   )
                                        )
           Plaintiff,                   )
                                        )
      v.                                )        Civil Action No. 20-1411 (JEB)
                                        )
MERRICK GARLAND, in his official        )
Capacity as Attorney General of the     )
United States,                          )
                                        )
           Defendant.                   )
_____)

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

Plaintiff Marciann Grzadzinski experienced discriminatory treatment by Defendant at the hands of former General Counsel James Baker, based on her being a woman over the age of 40 who did not meet Mr. Baker's stereotype for such a person.  Mr. Baker's treatment of the women in his office is reflected in deposition testimony and the agreed-upon facts of his actions in not selecting Ms. Grzadzinski for a position, demoting her, and eventually drumming her out of the Senior Executive Service.  Given the nature of Mr. Baker's insidious discrimination, summary judgment is inappropriate.  The conflict between the blameless Mr. Baker Defendant presents, and the truth of his actions to get rid of Ms. Grzadzinski for daring to be an outspoken and strong-willed woman, require a jury review the evidence to make determinations of fact.

Defendant presents what amounts to a reductive argument: because Mr. Baker did not overtly discriminate against all women he encountered, he could not have discriminated against Ms. Grzadzinski based on her sex, her sex-plus-age, or her age.  This approach misses the point that Mr. Baker's disfavor of Ms. Grzadzinski was not just because she was a woman, not just because of her age, or even because she was an older woman, but because she did not conform to his stereotyped expectations of how such a woman should behave toward him.  Defendant holds up Trisha Anderson as its example of how Mr. Baker treats a woman without discriminating against her.  Yet Ms. Anderson's example only confirms the bias Plaintiff alleges—Ms. Anderson fit Mr. Baker's discriminatory stereotypes.  Mr. Baker's imposition of the several adverse employment actions upon Ms. Grzadzinski because she was not like Ms. Anderson in being deferential and accommodating of Mr. Baker's expectations, is evidence of his discriminatory animus toward Ms. Grzadzinski.  The nature of that animus, and the evidence thereof, are the subject of disputed facts that must be reserved for a jury, and cannot be decided on summary judgment.  Thus, Defendant's Motion should be denied on all three counts, and this matter must move forward to trial.

## II.        FACTUAL BACKGROUND

The evidence developed in the EEOC administrative process and discovery before this Court shows that, through former General Counsel James Baker and other management officials, Defendant engaged in protracted, intentional, and systemic discrimination against women within the leadership of the FBI's Office of General Counsel ("OGC").  In response to this conduct, in June 2015, Plaintiff Marciann Grzadzinski, initiated the process of a formal Equal Employment Opportunity complaint of discrimination, within Defendant's EEO administrative process, alleging sex and age discrimination.  Specifically, Ms. Grzadzinski alleged she was

discriminated against based on her sex and/or age when then-FBI General Counsel James Baker (1) in June 2015, demoted her from her position as Deputy General Counsel ("DGC") to Section Chief ("SC"); (2) rejected or non-selected her for another DGC position overseeing the National Security Law Branch ("NSLB"); and (3) in January 2016, removed her from the Senior Executive Service ("SES") based on specious, inherently discriminatory allegations about her performance.

Prior to her tenure as DGC, Ms. Grzadzinski performed decades of admirable service with the Federal Bureau of Investigation, including serving for eighteen years as a Special Agent, Unit Chief, Deputy Chief, and subsequently as the Chief Division Counsel ("CDC") for the Washington Field Office (D.C.) (the second largest field office in the Bureau, where Plaintiff supervised 5-7 attorneys, and was responsible legally for all legal matters in the Office ranging from administrative matters to being the Ethics Officer for the entire Office of about 500 agents and 1,200 support staff), before becoming Deputy General Counsel.  During her time as a CDC and as DGC, Ms. Grzadzinski continued to be well-regarded among employees throughout the Bureau as a manager with "excellent" input for operational and administrative concerns; someone capable of handling "challenging situations and personalities"; and an employee who "step[p]ed into the breach" for Defendant.  Ex. 4 (Plaintiff's application to NSLB, GRZ FBI 3834-40); Ex. 8 (Emails Regarding Plaintiff).  Despite Ms. Grzadzinski's consistently stellar performance record over decades of service, Mr. Baker took the several adverse actions at issue here, including non-selection for the NSLB DGC position, demoting Ms. Grzadzinski from DGC to SC, and ultimately having Ms. Grzadzinski removed from the SES.  This final action was generally regarded within OGC as a "huge loss."  Ex. 8.

As purported justification, Mr. Baker proffered various generalized critiques of Ms. Grzadzinski's performance.  His reasons were simultaneously so trivial that they cannot purport to be legitimate reasons, vague and without any support in the record, and/or supported by witnesses whose credibility is disputed.  The cited issues are largely minor administrative concerns, bearing virtually no relation to Defendant's law enforcement mission and Ms. Grzadzinski's myriad contributions to those goals.

The most glaring among the pretext substantiations of Mr. Baker's actions—a major dispute of fact that cannot be resolved on summary judgment—was Ms. Grzadzinski's input on the question of whether CDCs should be required to have active bar licenses (rather than be allowed to have their bar licenses in an "inactive" status).  Defendant alleges Mr. Baker solicited from Ms. Grzadzinski a legal opinion and that, because Mr. Baker rejected her recommendation and made a decision contrary to that opinion,  Ms. Grzadzinski was unfit for the SES.

Defendant portrays Ms. Grzadzinski's purported legal opinion (she did not, in fact, give one on the subject[1])—that CDCs did not need active law licenses—as so outlandish as to be obviously the work of an incompetent legal advisor.  This is evidently Defendant's position, and Mr. Baker's position, even though CDCs had not ever previously been required to have active bar licenses over the decades CDCs (and a predecessor position) had been a position within  the Bureau.

---

[1] It was Catherine Chen and Lisa DeShields who were working on the legal analysis to support the change to requiring CDCs have active bar licenses, an analysis that Ms. Chen and Ms. DeShields were still working on as of July 27, 2015.  Ex. 34 (CDC emails GRZ_FBI 4670-76, 4684-85, 4693-95, 4696-98); Ex. 1 (Grzadzinski Dep.) at 93-94.  As of August 13, 2015, Ms. Grzadzinski was still requesting of Mr. Babcock to send to another official the legal analysis or memos, establishing that she did not have the legal opinion on the CDC bar licenses topic, thus had not created it.  Ex. 34 at GRZ FBI 4696.

Ms. Grzadzinski's testimony includes that she was mostly left out of discussions about the CDC active/inactive license discussions, she was not asked for a legal opinion on the subject, and that she only raised for discussion potential disadvantages of enacting such a new requirement[2], which was her duty as a DGC. Mr. Baker's and Defendant's position that a DGC should lose her job for disagreeing with the General Counsel during discussion of the potential drawbacks of a changing a long-standing policy is contrary to the entire concept of legal counsel, and cannot be interpreted in Defendant's favor at this stage.

All of the reasons Mr. Baker raised are rooted in deeply discriminatory attitudes toward women such that they are not non-discriminatory reasons at all. Given the facts adduced in discovery, including genuine disputes of material fact highlighted herein[3], summary judgment is not appropriate and this case should proceed to trial.

## III.    ARGUMENT

Summary judgment is inappropriate for any of Ms. Grzadzinski's three claims because a determination on each would require resolving disputes of material fact, including evaluating the credibility of witnesses such as Mr. Baker. A jury's review of Mr. Baker's live testimony is particularly consequential in this case because each of the three claims revolve around his bias

---

[2] Principally, Ms. Grzadzinski suggested that requiring active bar admission for CDC positions would significantly limit the pool of applicants for such positions as many attorneys employed in the federal government, including those employed within the FBI, do not maintain active law licenses.

[3] Plaintiff files, and incorporates by reference here, her Response to the Defendant's Statement of Undisputed Material Facts, including additional exhibits not cited in this document. *See* Response to Defendant Statement of Undisputed Material Facts ("R. to SOF"). Defendant's Statement of Facts ("Def. SOF") is non-compliant with the summary judgment standard, relying largely on quotes from former General Counsel James Baker and presenting them as undisputed facts while omitting testimony and records that contradict those asserted facts.

against women like Ms. Grzadzinski and some of her former female colleagues—women who stood up for their ideas and were unwilling to sacrifice the quality or accuracy of their work only to placate Mr. Baker.  The thrust of Defendant's Motion is to make Mr. Baker out to be a feminist saint.  But this view was manifestly not shared by the several other of his female employees who initiated EEO complaints based on sex discrimination. Ms. Grzadzinski's claims that he treated her differently from men or more compliant women (*e.g.*, Ms. Anderson), presents an overarching genuine dispute of material fact that cannot be resolved in Defendant's favor on summary judgment.  For the reasons included herein, Defendant's Motion should be denied, and this matter should proceed to trial.

### A.     Sex-plus-age Claims Cognizable under Title VII

Defendant argues that this Court should not recognize a claim based on a combination of characteristics.  Def. Br. At 8.  While "sex-plus" claims have been recognized since at least 1971, *Phillips v. Martin Marietta Corp*., 400 U.S. 542 (1971), and while sex discrimination and age discrimination in federal government have been unlawful for half a century, Defendant nonetheless argues that this Court should not allow a jury to decide Ms. Grzadzinski's "sex-plus-age" discrimination complaint.  This argument has no merit.

Although the D.C. Circuit has not yet definitively ruled on whether a sex-plus-age claim may be heard, the prevailing case law from sister Circuits recognizes sex-plus claims under Title VII, including sex-plus-age claims.  *See Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038 (10th Cir. 2020); *Mulvihill v. Pac. Mar. Ass'n,* 587 F. App'x 422, 423 (9th Cir. 2014) (regarding "the 'sex-plus-age' theory of discrimination under Title VII . . . the district court did not err in this regard where it expressly considered the combination of both Mulvihill's age and sex when reaching its holding.").

In *Frappied*, the Tenth Circuit consider and rejected the arguments Defendant puts forth here.  The Court held that "sex-plus-age claims are cognizable under Title VII," *id.* at 1048, reasoning that because the "'plus-' characteristic" does not have to be protected under Title VII (*e.g.*, "marital status or having preschool-age children"), "[t]here is no material distinction between a sex-plus-age claim and the other sex-plus claims we have previously recognized for which the 'plus-' characteristic is not protected under Title VII."  *Id.*

 That is, sex-plus-age claims are cognizable under Title VII, separately from and regardless of the statutory protection based on age under the ADEA.  *Id.* at 1048 ("ADEA claims and Title VII sex-plus-age claims address different harms.").  This moots the concerns Defendant raises about mixing standards of causation or the unavailability of a jury trial under the ADEA.  Def. Br. at 8.  Plaintiff's claims of sex-plus-age discrimination are to be heard under Title VII alone, with its attendant standards and jury trial rights.

Further, the *Frappied* Court's application of *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020), as a requirement to "focus on individual discrimination," *Frappied*, 966 F.3d at 1047, is instructive in this case.  Defendant argues that because Mr. Baker did not discriminate overtly against all women within his reach, namely Ms. Anderson, that he could not have discriminated against Ms. Grzadzinski.  Def. Br. at 7.  The Tenth Circuit reasoned in *Frappied* as follows:

> In light of *Bostock*, we conclude that a sex-plus plaintiff does not need to show discrimination against a subclass of men or women. Instead, if a female plaintiff shows that she would not have been terminated if she had been a man—in other words, if she would not have been terminated but for her sex—this showing is sufficient to establish liability under Title VII.

*Frappied*, 966 F.3d at 1047. [4]

---

[4] Defendant's principal authority, *Best v. Johnson*, No. 1:15-CV-00086-NBB, 2018 U.S. Dist. LEXIS 147819 (N.D. Miss.), is really no authority at all.  As the Fifth Circuit explained . . .

In this case, the *Bostock* holding means the Court's analysis of the claims should be based on whether Mr. Baker discriminated against Ms. Grzadzinski because of her sex, her sex-plus-age, and/or her age, regardless of whether he discriminated against all people in any of those classes or subclasses.  This contradicts the sum of Defendant's arguments that because Mr. Baker did not overtly discriminate against Ms. Anderson, he could not have also been discriminating against Ms. Grzadzinski.

### B.   Defendant Discriminated Against Plaintiff by Removing Her from Deputy General Counsel Position

The most egregious of Mr. Baker's acts of discriminating against Ms. Grzadzinski was demoting her from her position as a DGC.  Defendant does not dispute that Ms. Grzadzinski is member of protected classes (based on her sex (including sex-plus-age), and her age), nor does it dispute she was subjected to an adverse employment action—demotion from DGC to SC. Defendant purports to deny that  Mr. Baker had a discriminatory motive.  Defendant relies heavily on the argument that because Mr. Baker recommended Ms. Grzadzinski for the DGC position, it is not possible that he then developed a sex-based and/or age-based discriminatory bias against her after actually working with her.  This simplistic argument ignores the gravamen of Ms. Grzadzinski's sex-plus-age claims—Mr. Baker does not necessarily dislike all women because they are women, he disliked Ms. Grzadzinski because she did not fit female stereotypes as he expected.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989).

---

. . . in its decision affirming the employer's verdict, Best had waived any argument concerning the district court's jury instructions on the "sex plus age" issue.  *Best v. Johnson*, 714 F. App'x 404, 405 (5th Cir. 2018).  Before trial, Best had agreed that only her sex discrimination would be decided by the jury and that her age claim would be decided by the court.  *Id.* at *407 and *409 ("Best agreed that instructions explaining sex-plus-age discrimination not be given to the jurors").  Moreover, the Fifth Circuit explicitly noted  it had "yet to decide whether sex-plus-age discrimination is gender discrimination under Title VII."  *Id* at *410.

The record is replete with evidence of Mr. Baker's animus toward women who did not fit his stereotype.  Evidence of pervasive sex-stereotyping by Mr. Baker towards women with strong personalities, including Ms. Grzadzinski, supports an inference of discrimination.  "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."  *Price Waterhouse*, 490 U.S. at 250.

Here, the record shows that Mr. Baker routinely criticized women for being too "aggressive" while condoning far more aggressive behavior by male employees.  Within OGC leadership alone, Mr. Baker criticized women as "disagreeable, toxic," Ex. 2 (Baker Dep.) at 186, while referring to Mr. McNally and other male subordinates as a "the good guys."  Ex. 14 (Sabol Depo.) at 13-14.  Mr. Baker was also known to disregard and even physically withdraw away from women who expressed strong opinions, and passed over women who attempted to provide input while accepting identical input from the male subordinates of the women in question.  Ex. 12 (Bruno Dep.) at 32-33, 45.  The record is clear that "Mr. Baker cut women off in meetings, oftentimes skip[ping] over the women, would routinely go to a subordinate male to ask the question as opposed to the female that was sitting directly next to him."  Ex. 1 (Grzadzinski Dep.) at 55-56; Ex. 13 (Miller Compl., GRZ FBI 3575-86) at 3579.  Section Chief Sherry Sabol (Science and Technology Law Office), who worked for Mr. Baker in OGC, stated "I believe Ms. Grzadzinski was removed from her position as DGC because she was a strong female that would challenge the decisions made by GC Baker on personnel and operational matters."  Ex. 36 (Sabol Decl.).

The work environment was so pervaded by Mr. Baker's sex stereotyping of women that his female subordinates started supporting each other on that basis.  Ms. Sabol shared with

Nancy McNamara (another OGC female employee of Defendant) an article about women in leadership roles, highlighting to Ms. McNamara the discussion about gender stereotypes that Ms. Sabol regarded as "dated" but was evidently just as applicable contemporaneously, and which highlights the discrimination at issue in this case:

> *Gender Stereotypes*
>
> One of the most intractable obstacles for women seeking positions of influence is the mismatch between the qualities traditionally associated both with women and with leadership. The "great man" model of leadership is still with us and the term is seldom used generically. Most characteristics associated with leaders are masculine: dominance, authority, assertiveness and so forth.
>
> In recent years, this disjuncture between femininity and leadership has lessened somewhat. Women are becoming more like men in their career aspirations and achievements, and are more willing to see themselves as having qualities associated with authority.
>
> More women now occupy highly visible leadership roles, and recent theories of leadership have stressed the importance of interpersonal qualities commonly attributed to women, such as cooperation and collaboration.
>
> **Yet despite these trends, traditional gender stereotypes still leave women with a double standard and a double bind. Men continue to be rated higher than women on most of the qualities associated with leadership.**
>
> **What is assertive in a man seems abrasive in a woman, and female leaders risk seeming too feminine or not feminine enough. On the one hand, they may appear too "soft" unable or unwilling to make the tough calls required in positions of greatest influence. On the other hand, those who mimic the "male model" are often viewed as strident and overly aggressive or ambitious. "Attila the Hen" and "the Dragon Lady" have difficulty enlisting respect, support, and cooperation from coworkers.**
>
> Indeed, some executive coaches have developed a market niche in rehabilitating "bully broads," female managers who come across as insufficiently feminine.

> An overview of more than a hundred studies confirms that women are rated lower as leaders when they adopt authoritative seemingly masculine styles, particularly when the evaluators are men, or when the role is one typically occupied by men.
>
> Yet other research finds that individuals with masculine styles are more likely to emerge as leaders than those with feminine styles. In effect, women face tradeoffs that men do not.  Aspiring female leaders can be liked but not respected, or respected but not liked, in settings that may require individuals to be both in order to succeed.

Ex. 35 (Sabol message to McNamara on "Women and Leadership," GRZ FBI 4440-4493) at 4440 (emphasis added in bold).

By contrast, Mr. Baker did not mistreat women who approached him with a "placid" demeanor, as he evidently expected, while showing no such expectation of similarly situated male employees.  Ex. 12 (Bruno Dep.) at 32-33, 45.  For example, Mr. Baker evidently tolerated Mr. McNally's confrontational and at times violent interactions with others, including Mr. Baker knew of "some incident involving [Mr. McNally] throwing something or shoving a chair or throwing a chair against a wall or something like that . . . ."  Ex. 2 (Baker Dep.) at 66-67; Ex. 14 (Sabol Dep.) at 27.  Mr. Baker's pattern of behavior is strong evidence that gender was the cause of or motivated his discriminatory treatment and assessment of Ms. Grzadzinski, particularly with respect to his criticism of her communication skills as compared to male employees like Mr. McNally and Mr. Bondy.  (It was the first instance in Ms. Grzadzinski's career with Defendant that her communication skills were raised as an issue).  This evidence conflicts with Defendant's attempts to whitewash Mr. Baker's record—such conflict of fact must be reserved for a jury.

There is also "me too" evidence of discrimination against women within OGC leadership. This evidence supports the conclusion that Defendant's decision to demote Ms. Grzadzinski was motivated by her sex, or sex-plus-age.  At the very least, it creates a dispute of material fact

critical to this claim (and her others).  For example, several other women filed complaints raising similar concerns to Ms. Grzadzinski's.  Ex. 15 (28 pages documenting additional EEO Complaints); Ex. 16 (Ms. Grzadzinski's Supp. Affidavit) at ¶¶ 12-15.  Both individually and collectively, this evidence is more than sufficient for Ms. Grzadzinski to surpass the "low bar for establishing a *prima facie* case[.]"  *Scheidemantle v. Slippery Rock Univ. State Sys. Of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

The other side of the coin is just as revealing—Mr. Baker held Ms. Grzadzinski to a high standard while allowing male subordinates to slide by with egregious misbehavior and serious performance problems.  First, even taking Defendant's assertions at face value, Ms. Grzadzinski's performance far exceeded that of then-DGC of Defendant's litigation branch, Tom Bondy.  Mr. Bondy was known to be generally failing as a manager, did not communicate appropriately, and sexually harassed at least two employees.  *See* Ex. 2 (Baker Dep.) at 57-58, 61, 62, 141-143; Ex. 18 (Wiegand Dep.) at 32-34 (Mr. Baker was told that two female attorneys had complained they were not  comfortable around Mr. Bondy).  Rather than demote Mr. Bondy for his poor performance and supervisory-related misconduct, Mr. Baker went so far as to relocate Defendant's entire Discovery Management Section away from Mr. Bondy to another DGC to help inflate Mr. Bondy's apparent successes.  *See* Ex. 2 (Baker Dep.) at 61-62; Ex. 24 (Babcock Dep.) at 31; Ex. 18 (Wiegand Dep.) at 21.  Mr. Baker also flatly refused to take meaningful action with respect to Mr. Bondy's harassment until a female subordinate demanded he do so.  Mr. Baker first refused to report the allegations to the FBI Inspection Division (INSD) because the sexual harassment victims wanted to remain anonymous.  *See* Ex. 14 (Sabol Dep.) at 35-36.  It was not until Ms. Grzadzinski's predecessor, Elaine Lammert, confronted Mr. Baker and "showed him the policy requiring him to report such allegations and then telling him if he

did not, the females involved would report him, that he finally relented and reported Bondy." Ex. 17 (Wiegand Complaint, GRZ FBI 3664-74) at 3671-72.  This evidence of uneven treatment of men and women under Mr. Baker's supervision must be presented to a jury.

Similarly, then-Acting NSLB DGC, Rick McNally, was generally regarded as having performance issues.  These included significantly worse concerns related to "communication" than those raised about Ms. Grzadzinski, such as *throwing a chair*, becoming so aggravated that an agent nearly drew his firearm, and engaging in nonsensical tirades towards Mr. Baker, including one where he "became very animated,  red in the face" and said, "something to the effect of that the Irish will rise again . . . ."   Ex. 2 (Baker Dep.) at 66-67, 180–181.  Mr. Baker was aware of Mr. McNally's reputation for throwing chairs in the workplace and about the incident when the agent almost drew their weapon.  Ex. 2 (Baker Dep.) at 66-67; Ex. 14 (Sabol Dep.) at 27.  These concerns are exponentially more serious than the best Defendant can muster about Ms. Grzadzinski's performance or communication skills.

Mr. Baker's motive for the reorganization is a material fact that cannot be resolved at summary judgment.  The facts of the timing Mr. Baker chose for the reorganization raise an inference that part of his motivation was to enact his discriminatory desire to demote Ms. Grzadzinski from her DGC position.  Mr. Baker could have easily retained Ms. Grzadzinski in a DGC role had he wanted to.  As discussed below, Mr. Baker proffered several contradictory explanations for the reorganization and why it was Ms. Grzadzinski who was the only DGC to lose her DGC role, including that it had nothing to do with anyone in OGC's performance.  Ex. 14 (Sabol Dep.) at 25.  Defendant also now makes the assertion that "Mr. Baker . . . considered that Plaintiff was the most junior Deputy General Counsel at the time of the reorganization. (Baker Dep. at 57)."  Def. SOF 40.  However, Mr. Baker knew there was a means of retaining

Ms. Grzadzinski in a DGC position.  Mr. Baker admitted during his deposition that "in the middle of the reorganization when I was still thinking about it, before I had announced it, Tom [Bondy] came to me and told me that he was going to retire."  Ex. 2 (Baker Dep.) at 53.  (Mr. Bondy's outrageous behavior, which Mr. Baker tolerated, is discussed herein).  Mr. Babcock was qualified to step into Mr. Bondy's role.  So, Mr. Babcock could have taken Mr. Bondy's DGC position, and Ms. Grzadzinski could have been assigned the DGC role in charge of the new branch Mr. Baker devised.  With Mr. Bondy vacating a DGC position, there would not have been a need to demote Ms. Grzadzinski from her DGC position, but Mr. Baker did so anyway.

These male DGCs are similarly situated because they and Ms. Grzadzinski all were Mr. Baker's subordinates.  Defendant relies on the fact that Ms. Grzadzinski was the only DGC in a probationary period during the reorganization.  This argument relies on the supposition that because they were not in a probationary period, Mr. Baker could not discipline or correct the performance of other subordinate employees, which is wrong.  The purported reasons for Ms. Grzadzinski's demotion were related to her performance, not her probationary status—the probationary status of individual DGCs was irrelevant to Mr. Baker's ability to reassign them to other SES positions (as he did to Ms. Grzadzinski) or address their performance.  These individuals were expected to meet the same performance standards as Ms. Grzadzinski.  Mr. Baker demoted Ms. Grzadzinski, a woman who pushed back too much, but rewarded and protected Mr. Bondy and Mr. McNally because they were men.  In sum, these male DGCs were held to less stringent standards than was Ms. Grzadzinski, the only female DGC at the time.

The evidence also includes similar mistreatment of other women who also failed to comport with Mr. Baker's stereotyped expectations of women.  For example, Mr. Baker simultaneously reassigned SC Sherry Sabol for being "disagreeable," while placing Mr. McNally

in her same position despite that Mr. McNally's interactions with others involved physical aggression and verbal insults—certainly more than "disagreeable" behavior.  *See* Ex. 2 (Baker Dep.) at 186.  Mr. Baker further endeavored to take similar actions against other women within OGC leadership as part of the reorganization, including Nancy Wiegand, Catherine Bruno, and Karen Davis-Miller.  *See* Ex. 13 (GRZ FBI 3575-86) at 3579.  It was not until these women laid bare that Mr. Baker's reasons for attempting those actions were false that Defendant avoided acting on Mr. Baker's discriminatory approach, largely through the intervention of then-Deputy Director Mark Giuliano.  For example, Ms. Wiegand rebutted each individual performance allegation Mr. Baker raised about her.  Ex. 18 (Wiegand Dep.) at 14-18.  Meanwhile, Ms. Davis-Miller and Ms. Bruno participated in details outside OGC.  Ex. 12 (Bruno Dep.) at 10-12, 24-27; Ex. 19 (Miller Dep.) at 7, 10.

These other women also filed their own EEO complaints challenging Mr. Baker's actions.  Such "me too" evidence gives rise to a strong inference of discrimination here. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008).  Defendant's own internal surveys also highlight gross disparities in women's ability to succeed in OGC leadership during Mr. Baker's tenure, and also support an inference of discrimination.  Ex. 20 (June 2018 Gender Equality Report) at 10, 14; Ex. 21 (FBI Gender Analysis Overview).  The cumulative effect of this evidence precludes summary judgment—inferences based on the evidence cannot be resolved in Defendant's favor at this stage.

This conflict of fact between Defendant's portrayal of Mr. Baker as blameless and without bias, confronted with facts of his discriminatory animus toward strong women, and an overall misogynist environment experienced by other subordinate women, cannot be resolved in favor of Defendant at this stage.  A jury must review the testimonies of Ms. Grzadzinski and

other women who worked for Mr. Baker, then compare that to Mr. Baker's testimony and demeanor.  Defendant's Motion must be denied *en toto*.

>    1.    **Defendant Failed to Identify Legitimate, Non-discriminatory Reasons for Ms. Grzadzinski's Demotion as DGC**

Defendant did not identify legitimate, non-discriminatory reasons for demoting Ms. Grzadzinski.  Defendant's stated reasons have no legitimate basis in the record and, even if true, are themselves indicative of Mr. Baker's discriminatory animus.  Defendant has the burden to provide a specific, clear, and individualized explanation.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  It does not carry this burden.

Defendant's managers cited purported performance concerns about Ms. Grzadzinski to justify demoting her, but failed to articulate them in a manner that provides the requisite specific, clear, and individualized explanation.  *See id.*  By and large, Mr. Baker relied upon high-level, vague, and conclusory statements about Ms. Grzadzinski's performance, but was consistently unable to provide specific explanations despite repeated requests before and during litigation of this matter.  Ex. 2 (Baker Dep.) at 116-28; R. to SOF ¶ 48.  Moreover, whether Mr. Baker's account of Ms. Grzadzinski's performance is accurate also depends heavily on his credibility, a subject of serious dispute.  *Id.*

Where a management official is incapable of identifying the specific facts supporting an employer's purported non-discriminatory reasons for his actions, the employer fails to meet its burden. *Burdine*, 450 U.S. at 255-256 (defendant must "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.").  The record does not support the factual allegations Defendant is able to muster.  Contrary to Defendant's description, for example, Def. SOF ¶ 40, Ms. Grzadzinski was not "the most junior DGC" at the time.  Rather, at the time, she was an actual incumbent of a DGC position, thus had

seniority over then-Acting DGC of NSLB Rick McNally. Ex. 1 (Grzadzinski Dep.) at 192. Ms. Grzadzinski also had seniority over Ms. Anderson, who had been selected to permanently occupy the DGC of NSLB position, but had not yet begun occupying the position. *Id.*

Mr. Baker's unsubstantiated concerns about Ms. Grzadzinski's performance are also without any substantive basis in the record, despite Mr. Baker receiving at least four distinct opportunities to present such an explanation. R. to SOF ¶ 48. Moreover, several of the scant specifics cited by Mr. Baker in his statements for this matter and in Defendant's Motion occurred *after* Defendant removed Ms. Grzadzinski from the DGC role, and thus could not be legitimate non-discriminatory reasons for that action at all. Ex. 1 (Grzadzinski Dep.) at 66:8-9 ("I was reassigned, at which point in time my direct supervisor became Ernie Babcock."); Ex. 2 (Baker Dep.) at 192:1-4 (discussing concerns regarding the CDC conference); Ex. 22 (CDC Conference Agenda, GRZ FBI 537) (noting CDC conference occurred in October 2015, months after Plaintiff's removal as DGC in June 2015); Ex. 23 (Email re CDC Bar Licensing, GRZ FBI 490-99). The allegations about Ms. Grzadzinski's "communication skills" were also not due to any conduct on her part, but rather Mr. Baker's discriminatory practice of ignoring input from women with strong personalities, such as Ms. Grzadzinski. Ex. 1 (Grzadzinski Dep.) at 55-56 ("Mr. Baker cut women off in meetings, oftentimes skip over the women, would routinely go to a subordinate male to ask the question as opposed to the female that was sitting directly next to him."); Ex. 14 (Sabol Dep.) at 13-14 (Sabol observed Baker's treatment of Sabol was plainly discriminatory, noting "I let him continue, go through his whole thing, tell me how none of the women fit, how all the guys are good guys."); Ex. 13 (GRZ FBI 3575-86) at GRZ FBI003579)(Miller alleged ". . . [Baker] decided to remove me from his executive staff because of age and sex," basing her deduction on "the adverse actions he took against 4 other SES

females over 40 (at the same time he acted against me) on his executive staff while insuring that my white male counterpart (Richard McNally) was taken care of when he wanted to reorganize NSLB."). *See also*, Ex. 18 (Wiegand Dep.) at 47 (Baker considered giving SC Wiegand lower performance rating in 2015 as part of his overall pattern of subjecting women with stronger personalities to unduly harsh criticisms, including Wiegand, as compared to men with similar or worse personalities); Ex. 1 (Grzadzinski Dep.) at 171 (same).  This is crucial because it represents a significant genuine dispute of material fact—Defendant purports that Ms. Grzadzinski was not living up to Mr. Baker's expectations for giving feedback, while Ms. Grzadzinski presents evidence that Mr. Baker's behaviors deterred her attempts to do just that, because he disfavored her (and others) as a strong-willed women.

The sole specific examples that arose prior to Ms. Grzadzinski's demotion (which generally relate to Ms. Grzadzinski deciding to reassign two employees over the objection of her subordinate, Sherry Sabol) support the conclusion that she *did* communicate appropriately and, in fact, received approval from Mr. Baker for her decisions.  The sole purported example Defendant had been able to point to of Ms. Grzadzinski failing to meet Mr. Baker's expectations regarding communication prior to her removal as DGC related to a disagreement with then-Section Chief Sabol.  Contrary to Defendant's allegations that Ms. Grzadzinski was not communicating with Mr. Baker, this incident reveals Ms. Grzadzinski *did* fulfil Mr. Baker's expectations, regularly updating him regarding the situation and, ultimately, receiving his approval for her response.  *See* Ex. 1 (Grzadzinski Dep.) at 151-58 ("I was keeping him abreast of the continuing situation between Jonathan and Sherry [Sabol]. . .").  Because Defendant has not established any specific, clear, or individualized explanation for the purported reasons to

demote Ms. Grzadzinski instead of a different DGC, this Court cannot stand as the decider of those facts before a jury hears this case.

### 2.    Defendant's Stated Non-discriminatory Reasons for Ms. Grzadzinski's Demotion as DGC Are a Pretext

To the extent the Court considers Defendant's stated non-discriminatory reasons, they are a pretext.  Defendant's reasons are inconsistent with the record.  Management officials provided shifting, inconsistent explanations for their actions and inconsistently applied the purported standards underlying stated reasons.  Other evidence also casts doubt on management officials' stated motives and, instead, suggests they were motivated by discrimination.

The indicators of pretext are abundant in this record.  The District of Columbia Circuit described as follows:

> A plaintiff may support an inference that her employer's stated reasons for undertaking the adverse employment action in question were pretextual by citing a number of possible sources of evidence, including "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, [] the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive."

*Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (2016) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (2015)).

For example, the record reveals that Mr. Baker shifted continually his explanations of reasons for the reorganization and the decision to demote Ms. Grzadzinski that followed.  Mr. Baker's explanation of why he included Ms. Grzadzinski and her position in the reorganization changed at least five times.  Mr. Baker asserted at different points each of the following: 1) the reorganization had nothing to do with the performance of anyone within OGC; 2) Ms.

Grzadzinski's performance was a factor; 3) the reorganization was conducted during Ms. Grzadzinski's tenure for no "specific reason"; 4) the decision to eliminate Ms. Grzadzinski's position and move her to "that particular section chief position" was justified by her performance; and 5) Ms. Grzadzinski's success in her position was a "number one" reason for conducting the reorganization in the manner it was. *See* Ex. 14 (Sabol Dep.) at 25; Ex. 1 (Grzadzinski Dep.) at 96; Ex. 24 (Babcock Dep.) at 81, 83-85; Ex. 2 (Baker Dep.) at 56-57, 90-91; Ex. 25 (Baker Decl.) at 3.  Mr. Baker was only consistent in his failure to find a story and stick to it.  This both creates strong evidence of discrimination and casts serious doubt on his credibility.

The stated reasons for removing Ms. Grzadzinski as a DGC, as opposed to any of the other male DGCs, are also a pretext.  Ms. Grzadzinski was one of four DGCs at the time of the reorganization, any one of whom could have been placed in a Section Chief role as part of the reorganization.  Ms. Grzadzinski's performance as DGC far exceeded that of two other male employees serving as DGCs during the reorganization including, according to an evaluation ratified by her supervisor, significant improvements in Defendant's forfeiture management, communication throughout the chain of command, and additional and improved training for attorneys.  Ex. 26 (Plaintiff 2015 Performance Evaluation, GRZ FBI 3490-92).  Mr. Baker demoted Ms. Grzadzinski, while tolerating far worse performance from male employees (discussed above).  This inconsistent application of performance expectations to DGCs, combined with evidence of Mr. Baker's bias against women with strong personalities, provides significant support for a finding of pretext.

Defendant claims further that Ms. Grzadzinski's opinion on whether CDCs should maintain active bar licenses was a reason indicating that she was a poor performer.  This is

another crucial dispute of material fact.  Further, rather than support its arguments, this issue lays

bare Defendant's claims as a pretext.  Contrary to Defendant's assertions, *Ms. Grzadzinski was*

*not asked to render a legal opinion on the question of whether CDCs OGC should start requiring*

*CDCs have active bar licenses.  Supra* note 1.  Compare that fact with Defendant's assertion that

"Mr. Baker believed that Plaintiff's analysis as to whether Chief Division Counsels required

active bar licenses, which was an analysis that Plaintiff had been tasked to undertake," Def. Br.

at 16—there could not be a clearer dispute of material fact.

Defendant's characterization that Ms. Grzadzinski's opinion about CDCs was "flat out

wrong," Def. Br. at 16, is misplaced.  First, it bears noting that the CDCs (and those in the

predecessor Principal Legal Advisor role) had not been required for decades to have active bar

licenses.  Ex. 1 (Grzadzinski Dep.) at 89-90; Ex. 24 (Babcock Dep.) at 36 (noting that they

"continued not to be required by the FBI to have an active bar license.").  If Ms. Grzadzinski's

points about the drawbacks of enacting such a new requirement were so far off base, it is more

an indictment of all prior General Counsel and their subordinates than it is of Ms. Grzadzinski

who merely dared point out some issues that might arise from changing this previously long-

standing accepted approach.

In reality, Ms. Grzadzinski was mostly kept out of the discussions about the CDCs' bar

license requirements.  Despite her applicable related experience, Mr. Baker excluded Ms.

Grzadzinski from such discussions.  *Supra* note 1.  When she did get a chance to offer input, Ms.

Grzadzinski merely pointed out facts meant to inform a decision on the topic, such as how it

would work for some (but not all) CDCs to have new requirements to attend and pay for

mandatory Continuing Legal Education.  *Supra* note 2.  Ms. Grzadzinski also voiced concerns

that implementing the new requirement for CDCs might deter otherwise qualified applicants, and reduce the number of applications Defendant received.  Ex. 1 (Grzadzinski Dep.) at 89–94.

Ms. Grzadzinski did not advocate a legally invalid position.  Rather, she merely gave reasons why diverging from the *status quo*, maintained officially for many years, might have drawbacks.  The notion that Ms. Grzadzinski should be demoted because Mr. Baker disagreed with Ms. Grzadzinski's input is contrary to both common sense and ignores that these concerns were shared by multiple of Defendant's employees.  Ex. 24 (Babcock Dep.) at 43.

Perhaps most telling, this purported concern about Ms. Grzadzinski's input on the CDC question did not arise until *after* the decision to demote Ms. Grzadzinski.  Where a management official relies on *post-hoc* reasons that could not possibly have factored into the decision, it is strong evidence of pretext.  *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1119 (2016) (reliance on after-the-fact explanations for adverse actions bolsters indication of pretext, as suggesting explanation shifted over time) (citing *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011)).  This issue did not arise until late June 2015—*after* Mr. Baker informed Ms. Grzadzinski he would be removing her as DGC on May 22, 2015.  *See* Ex. 23 (Email re CDC Bar Licensing, GRZ FBI 490-99); Def. SOF ¶ 38; R. to SOF ¶ 38.  Ms. Grzadzinski's involvement in this discussion therefore could not, in fact, have been an issue considered as part of her removal as DGC.

Defendant's reliance on Mr. Baker's initial selection of Ms. Grzadzinski to serve as a DGC to assert that he could not have also discriminated against her is also misplaced.  In the first place, the extent to which Mr. Baker made the underlying decision to select Ms. Grzadzinski is disputed.  Ex. 1 (Grzadzinski Dep.) at 22-23.  More importantly, much of Mr. Baker's discrimination against Ms. Grzadzinski arose after she started as a DGC and failed to meet his

stereotype of women that they should approach him in a placid manner—an issue that came after

Ms. Grzadzinski's selection and could not have factored into her initial selection.  *See Wheeler*,

812 F.3d at 1119.

>        **C.      Defendant Discriminated Against Plaintiff in Not Selecting Her for Deputy
>                General Counsel of National Security Branch**

>                **1.      Plaintiff Exhausted Administrative Requirements**

Plaintiff's claim regarding her non-selection is timely and satisfied the administrative

requirements.  Defendant raises now in its Motion for Summary Judgment, as it did before the

EEOC Administrative Judge, the proposition that Plaintiff did not initiate contact with an EEO

counselor within the 45 days as required by regulation.  Def. Br. at 5–6.

Although this Court is not bound by the findings made in the administrative processing of

his case, it is instructive that Defendant's own EEO counselor did not reject the claim as

untimely.  Nor did the EEOC Administrative Judge dismiss the claim for untimeliness.

Plaintiff's non-selection claim is also timely based on undisputed facts.  Although Ms.

Anderson's selection was initially announced in early May 2015, whether Ms. Anderson or Ms.

Grzadzinski would actually encumber the position was unclear until the June 2015

reorganization was finalized.  After Defendant notified Ms. Grzadzinski her own DGC position

was being eliminated on May 22, 2015, she attempted actively to find other positions to which

she could be reassigned *in lieu* of a demotion to SC.  Ex. 9 (Grzadzinski Decl.) at 1-3.  It

therefore was not clear with finality that Ms. Anderson would actually serve as the NSLB DGC

instead of Ms. Grzadzinski because of the then-pending reorganization.  Rather, Ms. Grzadzinski

was on notice she would not receive the NSLB position only after Ms. Anderson actually did so

on or about June 15, 2015.  *See* Ex. 10 (FBI EEO Report of Counseling) at 7.  Ms. Grzadzinski

therefore timely raised the non-selection claim when she made contact with an EEO Counselor on June 24, 2015.

### 2. Plaintiff Established *Prima Facie* Case

On the matter of whether there is a remediable adverse employment action, Defendant advances two factual allegations, the contradictions between which preclude summary judgment on the demotion claim. The first factual allegation is that the DGC position for the Investigative Law & Legal Training Branch ("ILTB"), and the DGC position for the NSLB are "equivalent." Def. Br. at 5 ("In late 2014, Plaintiff applied for two equivalent Deputy General Counsel positions within the FBI's Office of General Counsel . . . ."). The second factual allegation is that "[f]rom almost his first day in the job as General Counsel, Mr. Baker began considering reorganizing OGC. (Baker Dep. at 39; Babcock Dep. at 79)." Def. SOF ¶ 37.

This notion fails on the facts because at the time Ms. Anderson began in the NSLB DGC role, Ms. Grzadzinski had already been removed from the ILTB DGC position because it was eliminated. That is, the reorganization happened before Ms. Anderson actually sat in the NSLB DGC chair, so it had been open for Ms. Grzadzinski to take if Mr. Baker had so chosen. At the time Defendant actually filled the NSLB DGC position after the June 2015 reorganization, on or about June 16, 2015, Ex. 10 (FBI EEO Report of Counseling) at 7, Ms. Grzadzinski's ILTB position no longer existed.

### 3. Non-Selection Was Discriminatory

There is no dispute Plaintiff meets the first three prongs of her *prima facie* case for her non-selection claim. She is a member of protected classes (sex and age); she applied for and was deemed qualified for the NSLB DGC position; and Mr. Baker did not select her for the position. However, Defendant contends Plaintiff cannot meet the last prong "[b]ecause the selectee to the

other [equivalent] position was female," Ag. Br. at 7–8.  This argument has no basis in law.  *See*

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) (requirement in Title VII case to "focus on

individual discrimination").

Plaintiff is entitled to assert her "sex-plus" claims, or a combination of sex and age.  As

discussed above in Section III(A), sex-plus-age is a cognizable form for a Title VII claim.  As

the selectee, Ms. Anderson, was not within Ms. Grzadzinski's subset (*i.e.*, Ms. Anderson was a

younger woman), Defendant's contention fails.  Ex. 2 (Baker Dep.) at 26; Ex. 32 (*Trisha*

*Anderson, Charles Newman*, THE NY TIMES (Oct. 8, 2011)) (identifying Ms. Anderson's age).

Evidence of Mr. Baker's bias against women, including against Ms. Grzadzinski, and his

discriminatory assessments of her, raise an inference that Defendant not selecting Ms.

Grzadzinski was discriminatory.

To defend its selection, Defendant relies almost exclusively on the fact that Ms.

Grzadzinski instead occupied a position as ILTB DGC.  Def. Br. at 10–11.  However, at the time

the NSLB DGC position was filled after the June 2015 reorganization, on or about June 16,

2015, Ex. 10 (FBI EEO Report of Counseling) at 7, Ms. Grzadzinski did not occupy the ILTB

position as it no longer existed.  That Ms. Grzadzinski encumbered such a position therefore

could not have been a factor in the decision not to select her for the NSLB position.  To the

extent Defendant asserts that the selection for the NSLB DGC position had already been filled by

the time of the reorganization, this is a clear dispute of material fact that cannot be resolved at

this stage of the case.

With respect to Mr. Baker's additional contentions about the Ms. Anderson's experience,

the accuracy of his descriptions is disputed.  R. to SOF ¶¶ 15, 23.  Moreover, Mr. Baker's

contemporaneous purported reasons for the direct hire were the lack of qualifications of the

applicants, despite that Defendant does not dispute that Ms. Grzadzinski was qualified for the NSLB position.  Ex. 11 (Email requesting direct-hire authority, GRZ FBI002409); Ex. 3 (Oct. 27, 2014, Email regarding interviewing Plaintiff, GRZ FBI 2559); Ex. 4 (Plaintiff's application to NSLB; GRZ FBI 3834-40).  Ms. Grzadzinski had far superior qualifications based on her experience working for FBI.  Her decades of well-reviewed service, including eighteen as a Special Agent, then as the CDC for the Washington Field Office (D.C.), cannot be compared with other outside credentials when selecting for such a position that requires intimate knowledge of how the Bureau works.

That Mr. Baker now cites Ms. Anderson's qualifications instead is a shifting explanation and thus is inherently non-creditable at summary judgment.  *See Ames v. Nielsen*, 286 F. Supp. 3d 70, 93 (D.D.C. 2017) (shifting explanations from EEO investigation to subsequent litigation "only buttress the case for pretext").  Evidence of pretext, including procedural irregularities, shifting explanations for why Defendant did not select Ms. Grzadzinski, and Ms. Grzadzinski's far superior qualifications to that of the selectee, are sufficient for Plaintiff's non-selection claim to survive summary judgment.

The decision to select Ms. Anderson for the NSLB position using a direct-hire selection procedure purportedly because of a lack of qualified applicants is illogical and raises an inference of discrimination.  *See* Def. Br. at 10.  Defendant ended up hiring Ms. Anderson for the NSLB DGC position using a direct hire method rather than through the selection process it started prior, in which Ms. Grzadzinski was an applicant.  Ex. 2 (Baker Dep.) at 150–54. Mr. Baker's contemporaneous purported reasons for the direct hire were the lack of qualified applicants, although Defendant does not dispute that Ms. Grzadzinski was qualified for the NSLB position.  Def. SOF ¶ 14; Ex. 3 (Oct. 27, 2014, Email regarding interviewing Plaintiff,

GRZ FBI 2559); Ex. 4 (Plaintiff's application to NSLB, GRZ FBI 3834-40).  When pressed to

explain the efforts by Mr. Baker and others within management to deviate from Defendant's

regular selection procedures to hire Ms. Anderson, those involved in the selection were either

unable to provide an explanation or dissembled about the scope of their involvement.  R. to SOF

¶¶ 24, 26, 44.  These discrepancies, coupled with Mr. Baker's discrimination against Ms.

Grzadzinski prior to filling the NSLB position in June 2015, are enough to show Defendant's

stated reasons for Ms. Grzadzinski's non-selection are a pretext.  Compared to Ms. Grzadzinski's

application, the record further demonstrates Ms. Grzadzinski's superior qualifications, both in

the depth of her experience and provision of specific information to explain those qualifications.

*See* Ex. 4 (Plaintiff's application to NSLB; GRZ FBI 3834-40); Ex. 6 (Anderson Application

Submission, GRZ FBI 2469-71).

> **D.** **Defendant Discriminated Against Ms. Grzadzinski by Removing Her from the SES**

>> **1.** **Ms. Grzadzinski Established a *Prima Facie* Case of Sex and Sex-plus Discrimination**

Defendant erroneously contends that Ms. Grzadzinski cannot establish a *prima facie* case

with respect to her removal from the SES because she was in a probationary period.  This

misconstrues the relevant inquiry and fails to consider evidence that supports an inference of

discrimination.  At this stage, on summary judgment, such inferences cannot be resolved in

Defendant's favor.

Prior to removing Ms. Grzadzinski from the SES, her supervisors, including Mr. Baker,

conducted her annual performance evaluation.  *See* Ex. 26 (Plaintiff 2015 Performance

Evaluation, GRZ FBI 3490-92).  On October 24, 2015, Mr. Baker and Mr. Schoolmaster

discussed intervening in Mr. Babcock's evaluation because "[i]t would be tough to have [Mr.

Baker] throwing the caution flag and [Mr. Babcock] giving her a good rating . . ."  Ex. 27 (Email regarding Plaintiff's evaluation, GRZ FBI 813).  This, combined with Mr. Babcock's general practice of allowing Mr. Baker to conduct evaluations of Ms. Grzadzinski even where Mr. Babcock was required to do so, *see* R. to SOF ¶ 44, calls for the reasonable inference that Mr. Baker was, instead, responsible for Ms. Grzadzinski's overall rating.  In removing Ms. Grzadzinski from the SES, Defendant relied upon the results of that evaluation.  Ex. 28 (SES Performance Evaluation).  As both Ms. Grzadzinski and the male members of the SES were subject to the same performance evaluation process and standards, and the discriminatory assessment of Ms. Grzadzinski's performance led to her subsequent removal from the SES, the failure to hold the males to the same performance expectations as Ms. Grzadzinski (described above) is relevant to this issue.  Because all members of the SES in OGC were evaluated on the same basis, Ms. Grzadzinski being in a probationary status was irrelevant to the evaluation, and thus did not factor into her removal from the SES.

Notwithstanding these similarly situated employees, Ms. Grzadzinski may also rely on other evidence to give rise to an inference of discrimination and establish a *prima facie* case.  In defending Ms. Grzadzinski's removal from the SES, Defendant largely relied upon the same vague claims about Ms. Grzadzinski's communication skills and performance that were utilized for her demotion as DGC.  Mr. Baker was unable to articulate with any specificity what support he had for these alleged concerns.  The real reason for these "concerns" was Mr. Baker's pervasive discrimination against women, not Ms. Grzadzinski's performance.

### 2.  Defendant Failed to Identify Legitimate, Non-discriminatory Reasons for Ms. Grzadzinski's Removal from the SES

Defendant's purported non-discriminatory reasons for Ms. Grzadzinski's removal from the SES are largely the same as those cited as a basis for her removal as DGC and fail for the

same reasons described herein.  Defendant also relies upon various claims Mr. Baker wrote in a

six-page assessment used to remove Ms. Grzadzinski (written after the SES evaluation was

done), but fails to articulate any specific basis to substantiate Mr. Baker's vague statements (*i.e.*,

critiquing Ms. Grzadzinski's "business acumen" is essentially meaningless without explanation).

This fails to meet Defendant's burden to identify specific, clear, and individualized explanations.

*See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Defendant further contends Ms. Grzadzinski performed poorly in her execution of a 2015

CDC conference, including by failing to include Mr. Baker on the conference agenda.

Defendant's characterization of events is inaccurate.  Ms. Grzadzinski communicated effectively

about this issue by keeping her supervisor, Mr. Babcock, informed continually.  She

accomplished Mr. Baker's stated goal of attempting to "help bridge the divide between CDCs

and OGC" through the conference.  Ms. Grzadzinski did this in part by resolving a longstanding

complaint from CDCs that holding the conference in Washington, D.C., was not feasible.  *See*

Ex. 1 (Grzadzinski Dep.) at 114.

To the extent Mr. Baker attributes "communication concerns" to Ms. Grzadzinski, it is

undisputed that Ms. Grzadzinski *did* communicate as expected to her then-supervisor, Mr.

Babcock, and it was Mr. Babcock who unduly delayed informing Mr. Baker.  Ms. Grzadzinski

communicated about and worked with Mr. Babcock, her supervisor at the time, on whether to

include Mr. Baker in the conference.  Ex. 1 (Grzadzinski Dep.) 110-12.  Whether Mr. Babcock

failed to raise the issue with his supervisor, Mr. Baker, was not Ms. Grzadzinski's responsibility

and would have been inconsistent with Mr. Babcock's general expectation (and Defendant's)

that his employees follow the chain of command.  *See* Ex. 24 (Babcock Dep.) at 33-34.  To the

extent Mr. Baker attributed this to Ms. Grzadzinski rather than Mr. Babcock, is only further

evidence of Mr. Baker's discriminatory failure to hold Mr. Babcock (a male employee) to the

same standard as Ms. Grzadzinski (a female employee).  *See also* Ex. 29 (Ms. Grzadzinski

providing requested updates on work as SC); Ex. 26 (Plaintiff 2015 Performance Evaluation,

GRZ FBI 3490-92).

> **3.     Defendant's Stated Non-discriminatory Reasons for Ms.
> Grzadzinski's Removal from the SES Are Pretext**

Defendant's stated reasons for removing Ms. Grzadzinski from the SES are largely the

same as those cited for her demotion as DGC.  Those reasons are a pretext all the same for this

adverse action.  Mr. Baker attempted to pad his written assessment of Ms. Grzadzinski with

largely nonsensical statements that read more like a cheap business lingo book than a

performance assessment.  For example, Mr. Baker mentioned Ms. Grzadzinski's "organizational

vision," purported inability to "maximize employee potential," and her lacking "business

acumen," but did not provide any specific facts, incidents, or examples to support his

conclusions.  Ex. 25 (Baker Decl., Attachment).  Given a chance, Mr. Baker was unable

demonstrate any substantive examples supporting these vague and subjective assessments.  R. to

SOF ¶ 48.

It was an extraordinary outcome that Defendant removed Ms. Grzadzinski from the SES

based on Mr. Baker's recommendation.  Defendant identified 139 employees  (only 24 of whom

were female) who began a probationary period in the SES from January 1, 2013-December 31,

2015—only Ms. Grzadzinski and one other employee did not complete the SES probationary

period.  Ex. 33 (Def. Suppl. Response to Interrogatory No. 2).

These facts, and the disputes about Ms. Grzadzinski's performance compared to other

DGCs and SES employees, preclude summary judgment.  The Court must refer these and other

issues of factual determination to a jury.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court deny Defendant's Motion.

Respectfully submitted,

Date: January 18, 2022          /s/ Daniel Clark.
Michael J. Kator, D.C. Bar No. 366936
Daniel Clark, D.C. Bar No. 156052
KATOR, PARKS, WEISER & HARRIS, PLLC
1200 18th Street, N.W., Suite 1000
Washington, D.C.  20036
Phone: (202) 898-4800
Fax: (202) 289-1389
mkator@katorparks.com
dclark@katorparks.com
*Attorneys for Plaintiff*