Page 1

1              UNITED STATES OF AMERICA

2        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3              WASHINGTON FIELD OFFICE

4

5    MARCIANN GRZADZINSKI,          EEOC No. 570-2017-00720x

6            Complainant,       Agency No. FBI-2015-00176

7    v.

8    JEFFERSON B. SESSIONS, III,

9    Attorney General,

10   Department of Justice,

11   Federal Bureau of Investigation,

12            Agency.

13   --------------------------------/

14          The deposition of MARCIANN GRZADZINSKI, was

15   held on November 15, 2018, commencing at 9:21 a.m., at

16   the Veritext, 1250 Eye Street, North West, Suite 350,

17   Washington, D.C. 20005, before Jean M. Townsend, Notary

18   Public in and for the District of Columbia.

19

20   REPORTED BY:  Jean M. Townsend

21

22

**EXHIBIT**

**1**

Marciann Grzadzinski                          November 15, 2018

Page 2

1  APPEARANCES:

2          ON BEHALF OF THE AGENCY:

3      JULIET E. GRAY, ESQUIRE

4          Assistant General Counsel

5          Employment Law Unit II

6          Office of the General Counsel

7          Federal Bureau of Investigation

8          935 Pennsylvania Avenue, N.W.

9          Suite 10140

10         Washington, D.C. 20535

11         Telephone: 202-324-2714

12         Email: jgray2@fbi.gov

13

14         ON BEHALF OF THE CLAIMANT:

15     DAVID HART, ESQUIRE

16         Kator, Parks, Weiser & Harris, P.L.L.C.

17         1200 18th Street, N.W.

18         Suite 1000

19         Washington, D.C. 20036

20         Telephone: 202-898-4800

21         Email: dhart@katorparks.com

22

Page 4

1  EXHIBITS (Cont.)

2

3  Exhibit                         Marked

4  Exhibit 15 Email dated 5/5/15              128

5  Exhibit 16 Complainants Supplemental Responses  135

6  Exhibit 17 Complainants Signed Sworn Statement  146

7  Exhibit 18 Email dated 2/19/15             151

8  Exhibit 19 Lynx Messages                   159

9  Exhibit 20 Email dated 9/22/15             194

10 Exhibit 21 Email dated 6/9/14              198

11 Exhibit 22 June Calendar Page              200

12 Exhibit 23 Clinic Visit Note               203

13 Exhibit 24 INOVA Medical Record                213

14         (Exhibits copied and attached.)

15

16

17

18

19

20

21

22

Page 3

1              INDEX

2      Deposition of Marciann Grzadzinski

3          November 15, 2018

4

5  Examination By:                Page

6  Ms. Gray                        5

7

8  Exhibit                        Marked

9  Exhibit 1 Email dated 10/27/14            20

10 Exhibit 2 Email 8/29/14                   26

11 Exhibit 3 Email 11/18/14                  28

12 Exhibit 4 Email 1/26/15                   41

13 Exhibit 5 Complainants Resp. to Interrogs.   54

14 Exhibit 6 Email dated 2/19/15             63

15 Exhibit 7 Email dated1/20/15              70

16 Exhibit 8 Email dated 4/6/15              72

17 Exhibit 9 Email dated 5/28/15             73

18 Exhibit 10 Email dated 8/10/15            76

19 Exhibit 11 Email dated 8/21/15            78

20 Exhibit 12 Email dated 8/21/15            79

21 Exhibit 13 January Calendar Page          84

22 Exhibit 14 Email dated 3/17/16            123

Page 5

1          P R O C E E D I N G S

2  Whereupon,

3          Marciann Grzadzinski,

4  called as a witness, having been first duly sworn to

5  tell the truth, the whole truth, and nothing but the

6  truth, was examined and testified as follows:

7          EXAMINATION BY MS. GRAY

8  BY MS. GRAY:

9      Q   My name is Juliet Gray and I'm an attorney

10 with the FBI.  I'm the agency's representative in

11 this case and I'll be taking your deposition today.

12 The court reporter will be taking down everything

13 that we say, so it's very important that we try to

14 get a clear transcript.  So even if you think you

15 know what I'm going to ask you before I finish,

16 please just go ahead and wait until I'm finished

17 before you respond, and I'll try to do the same.  Is

18 that fair?

19     A   Fair.

20     Q   If at any point I say, wait, let me

21 finish, I'm not trying to be rude, I'm just trying

22 to make sure we have a clear transcript.  Do you

2 (Pages 2 - 5)

Marciann Grzadzinski                                          November 15, 2018

Page 6

1  understand that you're testifying under oath today?
2      A   Yes.
3      Q   And do you understand that even though
4  we're in this conference room here, it's the same
5  oath that you would take if we were in Federal
6  Court?
7      A   Yes.
8      Q   If at any point you don't understand a
9  question, please ask me to repeat it or rephrase it
10  and I'll be happy to do so.  If you answer the
11  question, I'll assume that you understood the
12  question as it was asked.  Is that fair?
13      A   Yes.
14      Q   If you need to take a break at any time,
15  please let me know, we can take a break as long as a
16  question is not pending.
17      A   Okay.
18      Q   I will be using the terms the FBI, the
19  bureau and the agency interchangeably today, and
20  they all refer to the Federal Bureau of
21  Investigations, does that make sense?
22      A   Yes.

Page 7

1      Q   Are you on any medications today that
2  would affect your ability to testify truthfully
3  today?
4      A   No.
5      Q   Any other reasons you would not be able to
6  fully and accurately answer my questions today?
7      A   No.
8      Q   I think it's very unlikely that classified
9  information will come up today, but if it does or if
10  you're not sure whether something is classified or
11  how to handle classified information, we can go off
12  the record and discuss that.
13      A   Okay.
14      Q   Have you ever been deposed before?
15      A   No.
16      Q   Have you ever been party to a lawsuit or
17  administrative proceeding before?
18      A   Just a divorce, and recently I went to
19  Michigan and testified as a character witness for my
20  girlfriend.
21      Q   Other than that --
22      A   I have one clarification.  Are we also

Page 8

1  talking about as an FBI agent in court?
2      Q   Okay.  Well, so other than that.
3      A   All right.
4      Q   I'm assuming you testified numerous times
5  in the capacity of your work at the FBI?
6      A   Yeah, that was the only clarification I
7  needed.
8      Q   Other than the testifying as an agent for
9  the FBI or for your girlfriend that you mentioned,
10  have you ever testified in a case before?
11      A   No.
12      Q   Have you ever been referred to the FBI's
13  Office of Professional Responsibility?
14      A   No.
15      Q   Have you ever had --
16      A   Can I -- I don't know if it was -- I don't
17  believe it was referred to the Office of
18  Responsibility.
19      Q   Okay.  What's the incident you're
20  referring to?
21      A   It was at WFO when it was a CDC and there
22  was a -- I thought he had hung up the phone, but

Page 9

1  there was a message that was inadvertently put on
2  someone else's cellphone.  My paralegal was the one
3  who heard it, she talked to another attorney in my
4  office, they went to the ADIC, and I'm not quite --
5  he just counseled me in making sure I hang up the
6  phone the next time.
7          And I don't -- I never got anything from
8  OPR, but I know sometimes they do a referral and
9  that's denied and nothing -- I never see anything
10  from OPR, so just -- I can't tell you specifically
11  whether they counseled with OPR or not.
12      Q   Okay.  Have you ever had any Giglio issues
13  raised regarding your ability to testify?
14      A   No.
15      Q   Did you speak with anyone other than your
16  attorney about today's deposition?
17      A   Just family members trying to get coverage
18  for my daughter, that type of thing.
19      Q   What is your home address?
20      A   4214 Pickering, P-I-C-K-E-R-I-N-G, Place,
21  Alexandria, Virginia 22309.
22      Q   And how long have you lived there?

3 (Pages 6 - 9)

Marciann Grzadzinski                                          November 15, 2018

Page 10

1    A    I moved there in I want to say 2012.

2    Q    Where did you attend college?

3    A    My undergraduate is from Wayne State

4  University; my J.D. is from Detroit College of Law,

5  which no longer exists, it's at Michigan State

6  University, and my L.L.M. is from Wayne State

7  University.

8    Q    And what year did you graduate from Wayne

9  State University?

10   A    Eighty-six, '87.

11   Q    And what was your degree in?

12   A    Bachelor of science, major in psychology.

13   Q    Did you graduate with honors of any kind?

14   A    No.

15   Q    What year did you graduate from law

16  school?

17   A    1991, I believe.

18   Q    Did you graduate with honors of any kind?

19   A    No.

20   Q    And what year did you obtain your L.L.M.?

21   A    Two thousand, I believe, possibly 2001.

22   Q    And in what area of law was that?

Page 11

1    A    It's an L.L.M. in corporate and finance.

2    Q    You entered on duty with the FBI as a

3  special agent on June 9th 1996; is that right?

4    A    Correct.

5    Q    And you became the chief division counsel

6  or CDC at the Washington Field Office in January

7  2008; is that right?

8    A    As best as I can remember dates, yes.

9    Q    The CDS position is a GS15 level position,

10  correct?

11   A    Correct.

12   Q    And you held that position until you

13  started as deputy general counsel in OGC, correct?

14   A    Correct.

15   Q    Prior to becoming CDC you had a couple of

16  two-month stints as an assistant legal attache; is

17  that right?

18   A    ADC or -- I did a couple stints overseas,

19  yes.  I went to Cairo and I went to Riyadh, and

20  before I even came to headquarters I went to Toronto

21  and worked with the RCMP for several months.

22   Q    Were those TDYs?

Page 12

1    A    Yes.

2    Q    Other than TDYs or acting roles, was the

3  CDS position your first attorney position at the

4  FBI?

5    A    I held a position in budget and finance,

6  which required me to have a law degree, but it was

7  not considered a job within OGC because it was in

8  finance.  I handled all the undercover and covert

9  contracting.

10   Q    As CDC how many employees did you

11  supervise?

12   A    It varied.  I had -- when I first got

13  there I believe it was five attorneys, by the time I

14  left I want to say I had seven, possibly an eighth

15  one might have been coming in or we were proposing

16  an eighth one at the time.  I had two paralegals and

17  what they called an -- at that time an OST, which

18  was like a secretary.  I started with that

19  compromise shortly after I was there four or five

20  months.

21       ADIC Persichini decided to then give me

22  the forfeiture unit, which bumped my compromise -- I

Page 13

1  think it added approximately another 15 people, 16

2  people to my compromise.  And I am purely guessing

3  on those numbers because we had contractors and

4  sometimes those were counted in my numbers and

5  sometimes they weren't.  So I'm just doing ballpark

6  numbers.

7    Q    Got it.  When you were assigned the

8  forfeiture unit, did you have that for the remainder

9  of your tenure as CDC?

10   A    No.  Well, it's a yes and no answer.  I

11  was supervising -- I actually was able to get a

12  supervising special agent to come in and take over

13  the immediate supervision of them, then I was their

14  supervisor.

15       And I believe -- to the best of my

16  recollection, I believe shortly before I left or

17  right around the time I left I was proposing that it

18  be moved back under the criminal branch at WFO

19  because it just makes more sense.  And so I cannot

20  remember specifically if I was able to convince the

21  current ADIC that that happened or -- it happened

22  right around the time I was leaving, and I'm not

4 (Pages 10 - 13)

Marciann Grzadzinski                                    November 15, 2018

Page 14

1  quite sure when it did happen.

2      Q    Were you for the five to seven attorneys,

3  those were assistant division counsels?

4      A    Yes.

5      Q    And were you their rating official?

6      A    Yes.

7      Q    And rating official means that you were

8  responsible for completing their performance

9  appraisal report or PAR; is that right?

10     A    Correct.

11     Q    Were you the rating official for the

12 paralegals?

13     A    No, they reported to one of the ADC, Stan

14 Pavlak, P-A-V-L-A-K.  He was their rating official

15 and then I became the reviewing official.  Now, with

16 that said, I believe there were possibly times,

17 depending on assignment, I might have done their

18 PARs, but I don't specifically remember when and if

19 I did.

20     Q    Other than the ADCs, were you the rating

21 official for any employees?

22     A    Once I had the forfeiture unit, then I was

Page 15

1  the rating official for all of the forfeiture folks.

2      Q    Was that even after you assigned the SSA

3  to --

4      A    No, no, then we went into the role of --

5  much like with Stan doing the paralegals, the SSA

6  became the rating official and I became the

7  reviewing official.

8      Q    So about -- you said that you were

9  assigned the forfeiture unit about four to five

10 months after you became the CDC; is that right?

11     A    Roughly.  I can't -- I know it was within

12 the first year.  It might have been a little later

13 than that, but I'm pretty positive it was within the

14 first year.

15     Q    And then for how long were you the rating

16 official before you assigned the SSA to be their

17 rating official?

18     A    I can't even begin to -- it was a while.

19 It was -- it was probably a couple, I would think --

20 I had to fight for it, and it -- it did not happen

21 until after Joe Persichini left as ADIC, but I

22 cannot remember.  I had in my seven-plus years --

Page 16

1  roughly seven years I was there, I had nine

2  different ADICs, so I cannot remember specifically

3  which ADIC that I convinced that it made sense to

4  give me an SSA.

5      Q    But it would have been at least one rating

6  cycle?

7      A    Yes, I remember that first year I spent

8  days in my office writing PARs because I had so

9  many.

10     Q    And were you the rating official for the

11 OST?

12     A    No, they do not -- according to the

13 structure at the Bureau, they do not -- even though

14 they work for me, they do not -- it's not a direct

15 report.  They report to somebody in the admin unit.

16 The admin -- their supervisor would usually ask me

17 for input, so I would provide like an email input of

18 how they were doing.

19     Q    So other than the individuals you've

20 mentioned, was there anyone else at WFO that was in

21 your chain of command below you?

22     A    Not that I recall, no.

Page 17

1      Q    Okay.  I'd like to turn to the selection

2  process for the CGC position.  The job posting for

3  the NSL BECGC position and the ILCGC positions went

4  out on or around the same day; is that right?

5      A    Correct.

6      Q    And is it -- ILTB, is that how you refer

7  to that branch?

8      A    Yeah, it's about the best -- I mean,

9  they've changed the name a couple times since then,

10 but, yeah, I always called it the Investigative Law

11 Branch.

12     Q    Okay.  And you submitted an application

13 for both positions, correct?

14     A    Correct.

15     Q    Do you believe you were equally qualified

16 for both positions?

17     A    Yes.

18     Q    Do you think your background and

19 experience was more aligned with one of the two

20 positions?

21     A    I think it was equal.

22     Q    Did you have a preference for one job over

5 (Pages 14 - 17)

Marciann Grzadzinski                                              November 15, 2018

Page 18

1 the other?

2    A   Not necessarily.  I mean, I enjoy the
3 investigative law side a bit more, but, no, I was
4 hoping to get one of the two.

5    Q   Okay.  You would have been equally happy
6 to get either job?

7    A   Absolutely.

8       MR. HART:  Objection, form.

9 BY MS. GRAY:

10   Q   You were interviewed in late October 2014,
11 correct?

12   A   Correct.

13   Q   Do you recall who interviewed you?

14   A   It was Ernie Babcock, Tom Bondy and James
15 Baker.

16   Q   Had you ever met James Baker prior to your
17 interview?

18   A   Yes.

19   Q   How many times?

20   A   Two or three possibly, maybe.  Meeting
21 and -- I mean, knowing him, so I might have seen him
22 on -- just, you know, in the area, but I remember

Page 19

1 vividly as the CDC going to Verizon and having a
2 fairly large meeting with him at Verizon when he
3 worked at Verizon.

4    Q   Okay.

5    A   But I had known him before that.

6    Q   And other than the meeting with him when
7 he was at Verizon, had you had interactions with him
8 once he was the General Counsel at the FBI prior to
9 your interviewing?

10   A   Other than email contact from -- because I
11 was a CDC, I don't recall having any specific
12 meetings with him when I was a CDC, but I might
13 have.

14   Q   Was it your understanding that the
15 interview was for one or both of the positions?

16   A   My understanding was that it was for the
17 Investigative Law Branch.

18   Q   And what made you think you were being
19 interviewed just for the Investigative Law Branch
20 position and not for both?

21   A   They -- I believe it was Justin
22 Schoolmaster either told me it was the Investigative

Page 20

1 Law Branch or I was -- we referred to it as Elaine's
2 position.  Elaine Lammert held it for years, so I'm
3 not sure if he said Investigative Law or Elaine's
4 job.

5    Q   Is it possible that the interview was to
6 evaluate your candidacy for both positions?

7       MR. HART:  Objection, form, and calls for
8 speculation.

9 BY MS. GRAY:

10   Q   You can answer.

11   A   I have no idea.

12      (Grzadzinski Deposition Exhibit Number 1
13       was marked for identification.)

14 BY MS. GRAY:

15   Q   The court reporter jut handed you a
16 document that's been marked as Exhibit Number 1.

17      MR. HART:  I'm just going to generally
18 object to testimony about this document because Ms.
19 Grzadzinski was not included on it.

20 BY MS. GRAY:

21   Q   Okay.  So do you see that this an email
22 from Justin Schoolmaster to Mr. Baker, Mr. Babcock

Page 21

1 and Mr. Bondy?

2    A   Correct.

3    Q   And the email reads, gents, this Wednesday
4 at 1:00 p.m. you will be interviewing Marci
5 Grzadzinski for the NSLB DGC position.  Do you see
6 that?

7    A   Yes.

8    Q   Having seen this email, do you have any
9 reason to dispute that the interview was intended at
10 least in part as an interview for the NSLB DCG
11 position?

12      MR. HART:  Objection, form and calls for
13 speculation.

14      THE WITNESS:  All I know is being in the
15 interview I do not recall any national security
16 questions.

17 BY MS. GRAY:

18   Q   Did they ask you specific questions about
19 investigative law?

20   A   For the most part, yes.

21   Q   Did you have more than one interview for
22 the DGC position?

6 (Pages 18 - 21)

Marciann Grzadzinski                                    November 15, 2018

Page 22

1    A   No.

2    Q   You didn't interview with an SES panel?

3    A   I don't recall.

4    Q   So to the best of your recollection, this

5  was your only interview for the DGC position?

6    A   Correct.

7    Q   In your EEO Complaint you state that your

8  selection came after some mysterious intrigues

9  involving the General Counsel's office, do you

10  recall that?

11        MR. HART:  Objection, form, and the

12  document speaks for itself.

13        THE WITNESS:  They -- I received a phone

14  call from Justin Schoolmaster when he called me to

15  do the interview, and he said that my application

16  was mysteriously lost or buried in Elaine's office,

17  and when they were cleaning out Elaine's office,

18  they found my application.  So he said he showed it

19  to Jim and Jim said he's like to interview me.

20        And then there were rumors after I was

21  chosen where -- what I was hearing was that the CDC

22  from New York City, Jennifer Wilson, was actually

Page 23

1  the person who was chosen, and that either the

2  deputy director forced Jim to make the change or

3  there was some other individual who made him make

4  the change.  And that was all rumors.

5        Jim called me shortly after I was chosen

6  and said all of those were, in fact, rumors and that

7  he chose me and he was the only one who chose me;

8  however, I also had a conversation with Jennifer

9  Wilson before my interview because there was rumors

10  that someone was chosen for the position.

11        And I called her and said, Jennifer, how

12  did the chose somebody when we didn't get

13  interviewed, and she says, well, I was interviewed.

14        So that's when it kind of made a little

15  more sense -- there was some merit to the rumor, I

16  guess.

17  BY MS. GRAY:

18    Q   And who told you this rumor?

19    A   I can't recall, but it was -- it was folks

20  from OGC, but I -- I heard it from several people

21  and I can't remember specifically who it was.

22    Q   When Mr. Baker called you to tell you that

Page 24

1  it was his decision to select you, do you think he

2  was lying?

3    A   I had no idea.  I can't -- I have no clue.

4    Q   Do you have any reason to believe he was

5  lying?

6        MR. HART:  Objection, form, and calls for

7  speculation.

8        THE WITNESS:  I have no idea.

9  BY MS. GRAY:

10    Q   So when you referred to mysterious

11  intrigues, is that the extent of it, what you've

12  described?

13    A   Correct.

14    Q   So it was Ms. Lammert's retirement that

15  created the job opening in the Investigative Law

16  Branch, correct?

17    A   Correct.

18    Q   Did you know Ms. Lammert?

19    A   Yes.

20    Q   What was your relationship with her?

21    A   I knew Elaine for several years.  As a CDC

22  for Washington Field Office we interacted on a

Page 25

1  regular basis.  I was often used, because I was

2  local, to sit on the career boards for the various

3  CDC ADC positions.  Whenever I had issues that I

4  needed to raise, at that time it was -- God, the

5  other general counsel, and I'm drawing a blank on

6  the name.  He's now a judge -- you always had to go

7  through Elaine.

8        And we would go to CDC conferences and her

9  significant other was an SAC at Washington Field

10  Office at one point in time, so I chatted with her

11  whenever I saw the two of them together.

12    Q   Did you have a good relationship with her?

13    A   It's difficult to say that anybody had a

14  good relationship with Elaine, and that's the best I

15  can say.

16    Q   So would that be a no, you did not have a

17  good relationship with her?

18    A   I did have -- as far as I know, I had a

19  good relationship with her.  When I found out that

20  my application was buried, slash, hidden, I was very

21  surprised by that.

22    Q   So do you doubt that that's what had

7 (Pages 22 - 25)

Page 26

1 happened?
2       MR. HART:  Objection, form, and calls for
3 speculation.
4       THE WITNESS:  I have no idea.
5 BY MS. GRAY:
6    Q    And you referenced that it would be
7 difficult to say anybody had a good relationship
8 with Elaine.  What was her reputation?
9    A    I hate to use -- it was a derogatory
10 female word they would use for her.  They -- and she
11 was -- Elaine is just a difficult person and that
12 was well known throughout OGC.
13       (Grzadzinski Deposition Exhibit Number 2
14         was marked for identification.)
15 BY MS. GRAY:
16    Q    The court reporter has just handed you
17 what's been marked as Exhibit Number 2, do you
18 recognize this document?
19    A    Yes, I guess I do.  Yeah, I must have
20 wrote it in 2014.
21    Q    Okay.  If you look at the bottom of this
22 email chain it looks like this is an email sending

Page 27

1 out an attachment related to Elaine Lammert's
2 retirement; is that right?
3    A    Correct.
4    Q    And then the next email up is an email
5 from Patricia Hund to you and another individual
6 which states, thinking Ms. Marci wouldn't miss this
7 one for the world.  And there's a reference to the
8 Wizard of Oz tune, Ding Dong the Witch is Dead.  Is
9 that --
10    A    Yep.
11    Q    Is that basically -- people referred to
12 Elaine as the Wicked Witch, correct?
13    A    That, I -- wicked witch I hadn't heard,
14 but there were a few others I had heard so, yeah, I
15 mean, that -- this doesn't -- I'm not shocked or
16 surprised by this email in any way, shape or form.
17    Q    Okay.  So and your response to that email
18 was LOL, I think I'm getting a root canal that day,
19 correct?
20    A    Yes.
21    Q    And what did you mean by that?
22    A    I really wanted to be anywhere else than

Page 28

1 Elaine's retirement; however, let me clarify, I did
2 go to Elaine's retirement.
3    Q    I think we're finished with that one.
4       (Grzadzinski Deposition Exhibit Number 3
5         was marked for identification.)
6 BY MS. GRAY:
7    Q    Do you recognize this document?
8       MR. HART:  Take your time if you need to.
9       THE WITNESS:  Yeah, once again, it's from
10 2014, so, I mean, I'm on the email chain so I'm
11 assuming yes.
12 BY MS. GRAY:
13    Q    Okay.  So the top email is an email from
14 you to a Ray Johnson; is that right?
15    A    Correct.
16    Q    And you write, oh, the rumor was just
17 confirmed by a bestie of Elaine's.  Do you see that?
18    A    Yes.
19    Q    What rumor were you referring to?
20    A    I have no earthly clue other than it's
21 coming after I was shortly named as Deputy General
22 Counsel.  So I would assume that's what it's

Page 29

1 referring to, but I do not recall who I meant by the
2 bestie of Elaine.
3    Q    Okay.  If you look on the second page, the
4 first email in the chain --
5    A    Yep.
6    Q    Is it fair to say that's essentially Pat
7 Kelly is congratulating you for getting the DGC
8 position, correct?
9    A    Correct.
10    Q    Okay.  And you then forward that email and
11 say, he has no idea how tough, correct?
12    A    It appears so.
13    Q    Okay.  He had been referencing that the
14 competition was tough, correct?
15    A    Correct.
16       MR. HART:  Objection, calls for
17 speculation and the document speaks for itself.
18 BY MS. GRAY:
19    Q    So what did you mean by that, he has no
20 idea how tough?
21    A    I was referring to the situation where I
22 was told that my application was lost, re-birthed,

Marciann Grzadzinski                                           November 15, 2018

Page 30

1  and the fact that Jennifer Wilson basically was told
2  by the Deputy Director -- it was my understanding
3  she was told by the Deputy Director that she had the
4  position.  So there was -- just referring to all the
5  things that we've already discussed.
6      Q   And you said that you do not recall who
7  this bestie of Elaine's is?
8      A   I have no clue.
9      Q   Does it surprise you that Elaine would
10  withhold your resume from Mr. Baker?
11      A   Yes, I stated that earlier, yes.
12      Q   Had she told you that you would be
13  interviewed for the position?
14      A   No.  She did tell me -- at one time I
15  remember running into her and she said they were
16  getting ready to do interviews, but that was the --
17  that was, I believe to the best of my recollection,
18  that's what was said at that time.
19      Q   After not initially being contacted for an
20  interview, did you ever contact anyone to inquire as
21  to why you hadn't been interviewed?
22          MR. HART:  Objection to form, and it's

Page 31

1  vague as to the timeframe.
2          THE WITNESS:  I had no clue they did the
3  interviews, so I wouldn't have known to contact them
4  to say, hey, you haven't interviewed me.
5  BY MS. GRAY:
6      Q   Okay.  You referenced earlier that you had
7  heard a rumor that executive management essentially
8  told Mr. Baker that you should be selected; is that
9  right?
10      A   Correct.
11      Q   And who were these members of executive
12  management?
13      A   It was my understanding that it came from
14  the deputy director.
15      Q   That was Mark Giuliano?
16      A   Yes.
17      Q   Did you ever speak to Mr. Giuliano about
18  this rumor?
19      A   No.
20          MR. HART:  Objection, form, and vague as
21  to the timeframe.
22          THE WITNESS:  I never give you a chance.

Page 32

1  I'm sorry.
2          MR. HART:  That's all right.
3  BY MS. GRAY:
4      Q   Did any member of executive management
5  ever tell you that Mr. Baker was told he had to
6  select you?
7      A   No.
8      Q   And you don't recall who told you about
9  this rumor?
10      A   No.
11      Q   Do you recall when you were told about
12  this rumor?
13      A   It was shortly after I was selected, to
14  the best of my recollection.  I mean, it was in that
15  timeframe of being announced and Jim calling and --
16  and that all happened within I'd probably say the
17  first three weeks or so of being named, up until the
18  point of the formal announcement, I do not recall
19  that I had heard any of this.
20      Q   Okay.  We can look at the document if
21  you'd like to refresh your recollection, but in your
22  EEO Complaint you stated that Mr. Baker told you it

Page 33

1  was your favorable climate surveys that had figured
2  prominently in his decision to select you as DGC.
3  Do you recall that?
4      A   I -- yes, that was part of the interview.
5  I know they talked fairly heavily about my climate
6  surveys, and that's why I don't believe the national
7  security stuff came up, they were more focused on
8  what I recall was my climate surveys.
9      Q   What else was discussed during the
10  interview?
11      A   Just my general background, what I had
12  done for about 18 and a half, 19 years with the
13  Bureau.
14      Q   When Mr. Baker told you that about the
15  favorable climate surveys, did you think he was
16  lying?
17      A   No, because I knew I had favorable climate
18  surveys.
19      Q   You had also stated in your EEO complaint
20  that Mr. Baker told you that you were ideally suited
21  for the DGC job and that you could assist him in
22  understanding the culture and workings of the FBI;

9 (Pages 30 - 33)

Marciann Grzadzinski                                      November 15, 2018

Page 34

1 is that right?

2    A   Correct.

3    Q   Do you think he was lying when he told you

4 that?

5    A   I have no idea.

6    Q   You don't have any basis to believe he was

7 lying?

8        MR. HART:  Objection, calls for

9 speculation, and form.

10       THE WITNESS:  I have no idea what Jim

11 Baker thinks, sorry.

12 BY MS. GRAY:

13   Q   No, I'm asking if you have the impression

14 that he was lying.

15   A   I have no clue.

16   Q   I'm asking for your own impression, not

17 what he was thinking.  I'm asking did you believe

18 that that was genuine when he said it to you?

19       MR. HART:  Same objection.

20       THE WITNESS:  Yeah, I -- he said it, so

21 you can only take it on face value.

22

Page 35

1 BY MS. GRAY:

2    Q   So you don't contend that he had no role

3 in the decision to select you, do you?

4        MR. HART:  Objection, calls for a legal

5 conclusion, form and vague, and calls for

6 speculation.

7 BY MS. GRAY:

8    Q   Do you contend that Mr. Baker had no role

9 in the decision to select you?

10   A   It's my understanding general counsel

11 picks deputies.

12   Q   Do you contend that he had an opposition

13 to selecting you?

14       MR. HART:  Same objections.

15       THE WITNESS:  I have no idea.

16 BY MS. GRAY:

17   Q   Why do you believe Mr. Baker would have

18 had to select you if he didn't personally want to

19 select you?

20   A   Knowing working for the Bureau for 19, 20

21 years, I know that there are people that are

22 selected purely on who they know and where they're

Page 36

1 placed.

2    Q   And why do you believe that Mr. Giuliano

3 would have wanted you selected rather than

4 Ms. Wilson?

5    A   I don't believe Mr. Giuliano wanted me

6 selected as opposed to Ms. Wilson.  He, according to

7 what I heard, is he told Jennifer that she had the

8 position before it was actually formally announced.

9    Q   Okay.  But you said that the rumor was

10 that he told Jim that he had to hire you.

11   A   Correct.  That's the rumor.

12   Q   So it sounds like the rumor doesn't make

13 any sense if he -- there's no reason he would have

14 wanted you hired over Jennifer.

15       MR. HART:  Objection, form.

16       THE WITNESS:  The problem is is there's

17 two rumors.  There's the rumor that he told Jen

18 ahead of time, saw her in the hall, thumbs up, and

19 then there's the rumor where -- I don't know which

20 rumor is true.  So I -- there is just a lot of

21 issues that were swirling about my selection.

22

Page 37

1 BY MS. GRAY:

2    Q   Do you know Ms. Wilson?

3    A   Yes.

4    Q   Have you met her in person?

5    A   Yes.

6    Q   And what do you believe her age to be?

7    A   All I know is she just retired.

8    Q   So you believe her to be over 40?

9    A   Absolutely, that much I know.

10   Q   And she was also a special agent?

11   A   Yes.

12   Q   And what was your relationship with the

13 Deputy Director, Mr. Giuliano?

14   A   I did not know Mark very well at all.

15   Q   Okay.  And we look at this document if

16 you'd like, but in your interrogatory response you

17 stated that GC Baker wanted to select a male chief

18 division counsel from New York.

19       MR. HART:  Objection, the document speaks

20 for itself and calls for speculation in so far as

21 she doesn't have the document in front of her.

22       THE WITNESS:  That's actually a typo which

Marciann Grzadzinski                                November 15, 2018

Page 38

1 I meant to -- I corrected it on the one copy earlier
2 on, and it wasn't corrected, she was a female.
3 BY MS. GRAY:
4    Q   Okay.
5    A   So that is an error in that document.
6    Q   There's only one CDC in a field office at
7 one time, correct?
8    A   Correct.
9    Q   And there was no male CDC in New York,
10 correct?
11    A   Not at that time, no.
12    Q   When you were hired into the DGC position,
13 that was your first position in the Senior Executive
14 Service or SES; is that right?
15    A   Correct.
16    Q   You were the only agent in the executive
17 ranks of OGC; is that right?
18    A   Correct.
19    Q   All CDS are agent attorneys; is that
20 right?
21    A   No.
22    Q   Is the CDC position open to non-agents?

Page 39

1    A   Yes.
2    Q   Do you know how many CDS at the time that
3 you were a CDC -- approximately do you know how many
4 CDCs were non-agents?
5       MR. HART:  Objection, calls for
6 speculation.
7       THE WITNESS:  All I know of is Craig King,
8 and I cannot remember if the Alaska CDC might have
9 been a non-agent.  But I know Craig King -- I'm
10 almost positive he was a CDC.
11 BY MS. GRAY:
12    Q   Okay.
13    A   Might have been an ADC, but I'm pretty
14 gosh darn sure he was the CDC of Springfield.
15    Q   Is it fair to say that the vast majority
16 of CDCs are agents?
17    A   Correct.
18       MR. HART:  Objection, calls for
19 speculation.
20 BY MS. GRAY:
21    Q   Do you think there should be more agent
22 attorneys in OGC?

Page 40

1       MR. HART:  Objection, calls for
2 speculation, and relevance.
3       MS. GRAY:  It actually doesn't call for
4 speculation.  I'm asking her opinion about
5 something.
6       MR. HART:  Right, and to speculate about
7 the significance of it is speculative.
8 BY MS. GRAY:
9    Q   Go ahead.
10    A   I wouldn't necessarily say that there
11 needs to be more agents, I just feel that there
12 needs to be the right people in the position.  When
13 it comes to shooting investigations, I believe it's
14 important to have an agent perspective and it makes
15 sense to have an agent attorney.  And some of the
16 other issues that we deal with, it's -- it's helpful
17 to have an agent perspective because that's who
18 we're working with.
19    Q   Did you understand that there was a
20 one-year probationary period for new SES appointees?
21    A   Yes.
22    Q   So by the time you started at the DGC

Page 41

1 position you already seemed to be having some
2 regrets about accepting the position; is that right?
3       MR. HART:  Objection, form.
4       THE WITNESS:  No.
5 BY MS. GRAY:
6    Q   No?
7       (Grzadzinski Deposition Exhibit Number 4
8       was marked for identification.)
9 BY MS. GRAY:
10    Q   Once you've had a chance to review the
11 document, my question is just do you recognize this
12 document.
13    A   Okay.
14    Q   This is an email from you to Ann Kalb; is
15 that correct?
16    A   Correct.
17    Q   And the date is January 26th 2015,
18 correct?
19    A   Correct.
20    Q   And was that the first day in the DGC
21 position?
22    A   That seems correct, yes.

11 (Pages 38 - 41)

Marciann Grzadzinski                                    November 15, 2018

Page 42

1    Q   So if you look at the second line of that
2  email, kind of that second half, do you see where it
3  says seriously rethinking this whole thing?
4    A   Yep.
5    Q   What did you mean by that?
6    A   I just spent 11 hours over the weekend
7  moving in and it's -- after reading his announcement
8  it didn't seem as -- that's pretty much what it says
9  there, it didn't seem like he really fleshed out the
10 whole rumor thing, so --
11   Q   What do you mean by that?
12   A   Well, no, it would be him, oh, well, we
13 will get there.  I think this was his way of doing
14 the, gee, I really picked her, but not sure he quite
15 got there.
16   Q   So you think there's something about his
17 announcement that indicates that he didn't really
18 want you for the position?
19   A   I mean, that's obviously what I meany by
20 saying that, I'm assuming.  Once again, it's 2015
21 and we're at 2018, but that's the best I can recall.
22   Q   Okay.  Well, take your time and review the

Page 43

1  email, his announcement, and let me know if there's
2  something in particular that you think was -- made
3  you think that.
4    A   I don't see anything specific.
5    Q   So when you said, seriously rethinking
6  this whole thing, you weren't referring to
7  rethinking accepting the DGC position?
8    A   Absolutely not.
9    Q   What were you rethinking?
10   A   It was an email to a friend, and I can't
11 imagine there's any individual who hasn't taken a
12 promotion who doesn't have a momentary what am I
13 doing, and that's all it was.
14   Q   So you were referring to the accepting of
15 the DGC position?
16       MR. HART:  Objection, asked and answered.
17       THE WITNESS:  I can't imagine any -- I
18 have no clue.
19 BY MS. GRAY:
20   Q   You have no clue what you were referring
21 to?
22   A   Once again, that was January of 2015.  I

Page 44

1  can only read it and make my own conclusions at this
2  time, but to have immediate recollection of
3  immediately what was I specifically thinking, I
4  don't have that.
5    Q   When you accepted the DGC position had you
6  assumed that you would get Ms. Lammert's old office?
7    A   Yes.
8    Q   And her office was located in the General
9  Counsel's Suite; is that right?
10   A   Correct.
11   Q   Can you describe the General Counsel's
12 Suite?
13   A   You walk into a central kind of office
14 area, there's two secretaries, a couple couches, to
15 the left is the General Counsel and to the right
16 forever, even before Elaine held the position, was
17 always the Deputy General Counsel's office.
18   Q   And were those two offices, the General
19 Counsel's office and Ms. Lammert's office of
20 generally equal size?
21   A   I would assume they -- I never measured
22 them, but they looked equal.

Page 45

1    Q   And there are no other offices in that
2  suite, correct?
3    A   No.
4    Q   There were four DGC positions, correct?
5    A   Correct.
6    Q   Do you think it makes sense that one of
7  the four DGCs would have the only other office
8  besides the General Counsel in the General Counsel's
9  Suite?
10   A   The DGC that was over investigative law
11 was also considered a primary DGC, and that's why
12 that individual was there.
13   Q   When you say the individual, are you
14 referring specifically to Ms. Lammert?
15   A   I don't recall the person who held it
16 before Elaine, whether they were also a primary
17 deputy general counsel or not.
18   Q   So when you say primary, do you mean
19 principle deputy general counsel?
20   A   Yes.
21   Q   But you were not becoming the principle
22 deputy general counsel, were you?

Marciann Grzadzinski                                    November 15, 2018

Page 46

1    A   I had -- no one told me I was or I wasn't.
2  I just assumed I was taking Elaine's position,
3  whatever that was.
4    Q   And to the best of your understanding, how
5  long had Elaine been in that position?
6    A   Years.  I mean, multiple years, but I
7  don't have a number.
8    Q   Okay.  Is it fair to say that it was over
9  ten years?
10   A   Sound possibly right.
11   Q   Were you aware that at times Ms. Lammert
12  also held the role of chief of staff?
13   A   Not that I recall.  It's possible but I
14  don't remember that specifically.
15   Q   But you were not going to have a chief of
16  staff role; is that right?
17   A   I -- like I said, I was just taking over
18  whatever Elaine's position was was my understanding.
19   Q   No one had told you that you were going to
20  be principle deputy general counsel?
21      MR. HART:  Objection, asked and answered.
22      THE WITNESS:  Once again, I was taking

Page 47

1  Elaine's position, that's all I know.
2      MS. GRAY:  So the answer is no?
3      MR. HART:  Same objection.
4      THE WITNESS:  I don't think it ever came
5  up.  I never asked.  I don't think -- I don't
6  recall, yeah.
7  BY MS. GRAY:
8    Q   You would have been the most junior deputy
9  counsel at that point; is that right?
10   A   Correct; however, had the most Bureau
11  experience out of all of them.
12   Q   At what point did you learn that you would
13  not be taking over that office?
14   A   When I went over to -- I got an email from
15  Justine about coming over -- I can't remember for
16  what purpose or reason -- and when I got there, you
17  know, at some point in time he said, let me show you
18  the offices we have available or we were discussing
19  it.  I possibly might have received an email prior
20  to that saying, you know, this is where we're trying
21  to find office space or something to that affect,
22  but I don't recall specifically.

Page 48

1      I do recall going over there and I was
2  shown which would have been Chris Costello's old
3  office.
4    Q   And what was Chris Costello's position?
5    A   She was a unit chief.
6    Q   And what suite was the office that you
7  were offered located in?
8    A   That -- I call it the contracting law
9  office or I think they call it procurement.  It was
10  next to Jerry Hyatt's office.
11   Q   Mr. Babcock's office was also located in
12  that suite; is that right?
13   A   Correct.  One of his offices, yes.
14   Q   And the office you were offered was
15  comparable in size to Mr. Babcock's office; is that
16  right?
17   A   No.
18   Q   Did you ever measure the two offices?
19   A   You could visually see that they
20  weren't -- they might have been the same square
21  footage, but Chris Costello's office was -- when you
22  put a desk in it, you could barely walk past it.

Page 49

1  And they offered to remove bookshelves, but it -- it
2  wasn't even close to the same type of layout as a
3  deputy general counsel's office.
4    Q   And you selected an office on the tenth
5  floor in the litigation suite, correct?
6    A   Correct.
7    Q   When did you move into that office?
8    A   It would have been that weekend.  I guess
9  according to this email it would have been like
10  January 24th or something.
11   Q   Okay.  So as of the first day on the job
12  you were working in that office?
13   A   I went in all weekend, and I am very -- I
14  don't know, type A, I'm not quite sure what you want
15  to call it, but when I start a job, I -- all my
16  pictures are hung, everything is in the office, and
17  all the boxes are removed and I look like I've been
18  there.
19   Q   And none of the employees you supervised
20  worked on the tenth floor; is that right?
21   A   Correct.
22   Q   And you didn't have any supervisor

Marciann Grzadzinski                                                November 15, 2018

Page 50

1  authority over any employees in the litigation
2  branch, correct?
3      A   Correct.
4      Q   As the DGC how many direct reports did you
5  have?
6      A   I had Sherry Sabol who was the section
7  chief over the science and technology branch, and
8  then I had Lisa Matsumoto who was over in
9  investigative law, I had the gentleman over
10 forfeiture, and I'm -- Steven -- and I cannot recall
11 his last name, and then I had Carl Benoit.  And I
12 will apologize if I've forgotten somebody, but
13 that's from what I remember, and I -- oh, and I had
14 cyber law.  When I first got there I was given cyber
15 law, and I believe those were my direct reports.
16     Because Sherry fit in there over the
17 science and technology law area.
18     Q   Was there also a special assistant that
19 reported directly to you, Jonathan Fills?
20     A   He -- yes, yeah, he was the -- and I knew
21 I was forgetting somebody, but, yeah, he was -- he
22 was in cyber but he was -- so he worked day-to-day

Page 51

1  with the cyber folks but, yes, he was somewhere in
2  that food chain.
3      Q   Sherry Sabol, where was her office
4  located?
5      A   Hers was directly next to Ernie Babcock's.
6      Q   In the suite on the seventh floor?
7      A   Correct.
8      Q   And the special assistant, Mr. Fills, was
9  he -- where was his office?
10     A   He had two spaces.  I know he had a space,
11 I believe, on the seventh floor, but he was mostly
12 out in Chantilly.  Occasionally he was downtown, but
13 very infrequently.
14     Q   And I know there's some locations that are
15 considered sensitive, so if that is the case, you
16 can just refer in general to an offsite if I ask you
17 a question about a certain location.
18     A   Okay.
19     Q   So Lisa Matsumoto, where was her office
20 located?
21     A   They were -- she was the only unit -- full
22 unit that I had located on the seventh floor.

Page 52

1      Q   And the legal forfeiture unit was located
2  offsite, correct?
3      A   Correct.
4      Q   And the legal instruction unit was located
5  offsite, correct?
6      A   Correct.
7      Q   At a separate offsite.
8      A   Right.  And so was the entire cyber was at
9  an offsite.
10     Q   Okay.  Were there actually -- I understand
11 the UC of the cyber law unit was at an offsite; is
12 that right?
13     A   Yes, the unit chief and everyone was out
14 at an offsite.
15     Q   Okay.  There weren't any of the members of
16 the cyber law unit who worked at headquarters?
17     A   They had -- a lot of them had kind of dual
18 offices because a lot of times they'd have meetings
19 at headquarters, and I know Sherry -- some of
20 Sherry's people were on the seventh floor within her
21 suite, but a bulk of them were down at Quantico
22 also.

Page 53

1      Q   Okay.
2      A   So they were kind of scattered all over.
3      Q   And the science and technology policy and
4  law unit, Joseph Mazel's unit, where was that
5  located?
6      A   Those were the folks that sat by Sherry.
7  But, again, they also had space down at Quantico so
8  they kind of --
9      Q   Okay.
10     A   They ping ponged back and forth.
11     Q   When you say sat by Sherry, you mean on
12 the seventh floor of headquarters?
13     A   In the same suite as Sherry.
14     Q   And that suite that Sherry sat in, that
15 was in the same suite as Mr. Babcock?
16     A   Correct.
17     Q   And then the science and technology law
18 unit, John King's unit, where was that located?
19     A   That was down at Quantico.
20     Q   And we can look at this document, but just
21 to move things along if you don't need to, in your
22 interrogatory responses you've stated that one of

14 (Pages 50 - 53)

Marciann Grzadzinski                                   November 15, 2018

Page 54

1  the reasons you selected an office on the tenth
2  floor was to deflect rumors that Mr. Baker did not
3  actually want you to be selected as DGC; is that
4  correct?
5      A   Correct.
6      Q   And you also stated that the rumors
7  resulted from GC Baker's treatment of you and his
8  reputation of not providing women opportunities for
9  advancement; is that correct?
10     A   That, I'd have to review, but that sounds
11  about --
12     Q   Okay.  Well, we can go ahead and review
13  it.
14         (Grzadzinski Deposition Exhibit Number 5
15          was marked for identification.)
16  BY MS. GRAY:
17     Q   Do you recognize this document?
18     A   I do.
19     Q   And these are your responses to the
20  agency's August 2nd 2018 interrogatories, correct?
21     A   Correct.
22     Q   Have you ever seen this document?

Page 55

1      A   Yes.
2      Q   And did you provide the answers in this
3  document?
4      A   With the --
5          MR. HART:  I'll object to the extent that
6  that calls for material covered by attorney-client
7  privilege.
8          THE WITNESS:  And I was just going to say
9  with assistance of counsel.
10  BY MS. GRAY:
11     Q   Okay.  Can you please turn to page seven?
12  And if you take a look at interrogatory number
13  eight, this interrogatory asks you to explain in
14  detail why you decided to occupy the office on the
15  tenth floor.  So if you would look at the third
16  paragraph of your response starting with after the
17  Complainant's selection, the second sentence there
18  reads, these rumors resulted from GC Baker's
19  treatment of Complainant and his reputation for not
20  providing women opportunities for advancement.  Do
21  you see that?
22     A   Yes.

Page 56

1      Q   And is that an accurate statement?
2      A   Yes.
3      Q   And what did you mean by Mr. Baker's
4  treatment of you?
5      A   Subsequently after sitting as the deputy
6  general counsel and then subsequently as the section
7  chief I would routinely see Mr. Baker cut women off
8  in meetings, oftentimes skip over the women, would
9  routinely go to a subordinate male to ask the
10  question as opposed to the female that was sitting
11  directly next to him.  So that's all my reflection
12  on my tenure in the general counsel's office.
13     Q   So that was after you started as DGC,
14  correct?
15     A   Correct.
16     Q   So that wouldn't have been a reason for
17  your having selected the office in the first place
18  because you selected it before you started, correct?
19     A   Correct.
20     Q   And you stated that Mr. Babcock had an
21  office on the tenth floor in addition to his office
22  on the seventh floor, correct?

Page 57

1      A   Correct.  I took -- he had two offices.  I
2  was told by Justin Schoolmaster there was no other
3  SES spaces available in all of OGC.  And I then
4  discovered that there was the SES office up on the
5  tenth floor, and when I was moving into the office,
6  actually one of the secretaries the Monday I was in
7  there came around the corner and said, where's Mr.
8  Babcock, and I said, well, he's down on the seventh
9  floor, and she goes, well, this is his office, too.
10         So that's when I discovered that Ernie had
11  not only the office on the seventh floor, but he
12  also had an office on the tenth floor.  And that
13  basically I was told there was no other SES offices
14  available when, in fact, Mr. Babcock was using two
15  of the SES offices.
16     Q   And Mr. Babcock was responsible for
17  overseeing the discovery management section at that
18  time, correct?
19     A   Correct.
20     Q   And the discovery management section is
21  located in the litigation suite on the tenth floor,
22  correct?

15 (Pages 54 - 57)

Marciann Grzadzinski                                      November 15, 2018

Page 58

1    A   Correct.

2    Q   And did he ever tell you, you can't move

3  into that office, that's my office?

4    A   No.

5    Q   So you basically just took the office?

6    A   I was told I could take the office.

7    Q   Who told you you could take the office?

8    A   Justin did.

9    Q   And Mr. Babcock moved into a smaller

10  office within the litigation suite, correct?

11   A   He -- he wasn't up there that often.  I

12  don't know if he used an extra space up there or

13  not.  There was a lot of swing space up in that area

14  at the time.  But he was rarely up on the tenth

15  floor.

16   Q   How many SES offices are there in the

17  litigation suite?

18   A   I'm aware of two, but I -- I believe Nancy

19  Wiegand's office probably qualifies as a tier two,

20  if that makes sense, a section chief size, which is

21  a bit smaller, and there may be another section

22  chief's office up there, but I don't -- it's been a

Page 59

1  while since I've been down that hallway.  Sorry.

2    Q   So there was -- Mr. Bondy's office was in

3  the litigation suite on the tenth floor, correct?

4    A   Correct.

5    Q   And other than yourself, Mr. Bondy, and

6  Nancy Wiegand, there were no other SES employees in

7  the litigation suite, correct?

8    A   Not that I recall.  There might have been

9  a vacant section chief position open, if that makes

10  any sense, but I don't recall any other section

11  chief up there at the time.

12   Q   So would it be consistent with your

13  recollection that there were three SES offices in

14  the litigation suite?

15   A   To the best of my recollection, yes.

16   Q   Do you think it make sense for Mr. Babcock

17  to have a spot to sit when he was up on the tenth

18  floor working with DMS?

19   A   I'm -- this is -- I don't know how to

20  explain this.  I am not -- sitting in proximity to

21  people doesn't -- is not a big issue for me, I go to

22  my people, so that's why it wasn't an issue for me.

Page 60

1  I was in -- you can ask my folks, I was down on -- I

2  go to my people, my people don't come to me, so

3  that's why I don't -- I don't think it's really

4  important for him to be up on the tenth floor.  If

5  you need to go the tenth floor, you walk up the

6  stairs and you go to the tenth floor.

7       I hope I explained that enough.

8    Q   Did you ever hear Mr. Baker use the term

9  serpent leader?

10   A   Not that I recall, no.

11   Q   That's not a term he would throw around?

12   A   I have no clue.

13   Q   Do you think it's fair to say that some

14  people might be turned off by your selecting a

15  larger office located in a branch in which you did

16  not work rather than a smaller office closer to your

17  subordinates?

18       MR. HART:  Objection, form, and calls for

19  speculation as to what other people might think.

20       THE WITNESS:  All I know is what the

21  people who told me that I needed to take an SES

22  office because you need to establish that appearance

Page 61

1  as an SES.  So I didn't hear it the reverse, as you

2  phrased it.  I heard just the opposite, that I

3  needed to be in a space that reflects my position.

4  BY MS. GRAY:

5    Q   Who told you that?

6    A   I know there was some folks in OGC when I

7  was there.  Looking at offices that day, a couple of

8  the folks in the procurement office came up to me

9  and said, they're not putting you in her office, are

10  they, and I said, well, that's what they're

11  proposing.  But who that specifically was -- I know

12  it was kind of like a group of people, so I don't --

13  I don't want to give names if I can't specifically

14  recall who that was.

15   Q   They were people in OGC?

16   A   Correct.

17   Q   So you weren't concerned that it would

18  give a negative impression?

19   A   No, because I know my management style and

20  I know the fact that I go to my people.  Oftentimes,

21  especially in the -- the legal instruction unit, I

22  was down at Quantico -- they saw me more than they

16 (Pages 58 - 61)

Page 62

1  had ever seen Elaine. I made trips down to the
2  science and technology folks, I went out to
3  Chantilly. Like I said, I was probably in Lisa
4  Matsumoto's office, if not daily, I know I talked to
5  her daily. When I was the CDC at WFO I had folks
6  sitting out at our RA and I -- I manage my -- I
7  don't need to sit next to my people to manage my
8  people, and my people know that.
9      Q   Did you have an office or desk at
10 Quantico?
11     A   I had a space at Quantico, yes.
12     Q   Was it an office?
13     A   No, because they didn't have the -- they
14 don't have the space down there for what they need
15 to do as it is, plus they were -- they've been under
16 construction for the last several years. So I had a
17 desk that sat in legal instruction, it was shared by
18 anybody who showed up, but that would be where I
19 would go to use the phone and what have you.
20     Q   Did you have an office or desk in any of
21 the other off-sites?
22     A   No, I didn't. I would usually use like

Page 63

1  swing space or a conference room. I had -- it
2  wasn't that long that I had the cyber because Jim
3  had promised giving cyber to Trish before she showed
4  up, so cyber was taken from and given to Trish when
5  she arrived.
6      Q   And after Ms. Lammert retired, her office
7  was converted into a conference room, correct?
8      A   Correct.
9      Q   Is that where the majority of your
10 meetings with Mr. Baker would occur?
11     A   Not initially. We had them in -- there's
12 two conference rooms down there, we had them in the
13 larger conference room for the longest time, and
14 eventually it took -- they got tables and what have
15 you, and then we moved the smaller meetings that we
16 would have in that small conference room.
17         (Grzadzinski Deposition Exhibit Number 6
18         was marked for identification.)
19 BY MS. GRAY:
20     Q   Do you recognize this email?
21     A   Yes.
22     Q   This is an exchange between you and James

Page 64

1  Turgal, correct?
2      A   Correct.
3      Q   And what was Mr. Turgal's role at this
4  time?
5      A   He was the AD of HRB.
6      Q   And the top email is an email from you to
7  him where you read, can I be your special assistant,
8  abbreviated, this gig sucks. What did you mean by
9  that?
10     A   It was already becoming apparent to me
11 that Jim wasn't receptive to anything I wished to
12 tell him about the Bureau.
13         And the only reason I recall this is
14 because I just read the previous email where he went
15 on about how I was supposed to assist him in briding
16 the gap and understanding historically the Bureau
17 and how things work. And it -- it just -- every
18 time I tried to tell him anything, I would get shut
19 down. So it was happening relatively early in my
20 tenure.
21     Q   And so this is less than a month into your
22 tenure?

Page 65

1      A   Correct.
2      Q   Do you think that it's possible others may
3  have picked up on your attitude towards the position
4  at this time?
5          MR. HART: Objection, calls for
6  speculation as to what others might have done.
7          THE WITNESS: I'm going to be frank with
8  you, when we sit around the large table waiting for
9  Jim to come in, everybody, and mainly -- well, I
10 can't say everybody, mainly it was women complaining
11 that it was just -- it was just horrible to work
12 there. So it would not -- I would not have been the
13 only individual, if that makes sense. It was a
14 feeling shared by several of the women in the
15 office.
16 BY MS. GRAY:
17     Q   Did you find the DGC job to be similar to
18 your job as CDC or different?
19     A   It was different from the standpoint of
20 Jim -- I was used to working for an ADIC. ADICs
21 don't want to hear from you unless things go bad or
22 there is something that you feel they need to know

Marciann Grzadzinski                                    November 15, 2018

Page 66

1  about.  They expect you to do your job, you're at
2  that level, handle it.
3        And that's the way I operated for seven
4  years prior to that, and then prior to that I was in
5  the director's office and it was kind of the same
6  thing with that unit, you do your job and you handle
7  it, and you only go up the food chain if you feel
8  you need their top cover, I guess is the term we
9  used or if you needed them to weigh in on something.
10        That was not Jim, so that's where there
11  was a bit of -- I wouldn't say a rub, but that was a
12  learning curve for me.  But then when I sat back and
13  kind of looked around, it was easy for me to pick up
14  on the fact that it was more towards women and not
15  the men necessarily.
16    Q   So you had the sense or Jim explicitly
17  told you that he wanted more regular feedback from
18  you; is that right?
19    A   Not initially, but eventually that became
20  his theme, that I needed to give him more feedback
21  and more information.
22    Q   And that was different than your prior

Page 67

1  experience with other supervisors, correct?
2    A   Correct.
3    Q   And do you feel that you adjusted to meet
4  that expectation?
5    A   I -- and this is where this becomes
6  difficult is because my tenure as DGC, just as I was
7  starting to really get into that groove, I was
8  reassigned, at which point in time my direct
9  supervisor became Ernie Babcock.  Nineteen years in
10  the Bureau, I follow my chain of command, and so my
11  chain of command was Ernie Babcock and that's who I
12  communicated with.
13    Q   Was the ADIC at WFO an agent?
14    A   Yes.
15    Q   Because you mentioned there were like nine
16  different ones, were they all agents?
17    A   Yeah.
18    Q   And when I say nine different ones, it was
19  one at a time.
20    A   Yes.
21    Q   But over your --
22    A   Yeah, every -- they have not -- there's

Page 68

1  never been an ADIC that's not an agent.  Just very
2  recently they discussed doing a senior analyst -- I
3  can't remember the exact term -- where they're going
4  to be considered an SAC, and that's a pilot project
5  in WFO.
6    Q   In any of your other positions at the FBI
7  had you ever reported to a non-agent?
8    A   Yes.  I'm sorry, I had to go through the
9  positions one by one.  Yes, for years when I was in
10  finance division.  All my years in the finance
11  division I reported to a non-agent.
12    Q   Is that the only position in which you
13  reported to a non-agent?
14    A   Yeah, I reported to the budget and finance
15  officer, who was a non-agent.  I worked up on
16  Capitol Hill for two years, non-agent, reported to
17  chief of staff there.  Then when I came back to
18  finance division, again my supervisor was a
19  non-agent, Marian Woodson.
20        And then when the deputy director of
21  finance moved me from budget over to the contracting
22  position, I reported for -- I can't give you exact

Page 69

1  years, but I reported for a few years to Jack
2  Cordis, who was the chief contracting officer until
3  he retired.  He was replaced by a non-agent chief
4  contracting officer.  God, and I can't recall his
5  name because he was walked out because he had an
6  incident with his wife, and I cannot remember his
7  name.  I'm sorry.
8        And then I reported to Walt Mesler at one
9  time, I reported to Jim Storens at one time.  There
10  were several -- as an agent, I probably in my tenure
11  as an agent probably reported just as must to a
12  non-agent as I did an agent.
13        MS. GRAY:  We've been going over an hour
14  now, so why don't we just take a quick break.
15        THE WITNESS:  Sure.
16        (Whereupon, a short break was taken.)
17  BY MS. GRAY:
18    Q   As a member of the SES you were
19  responsible for writing your own performance plan;
20  is that correct?
21    A   That was not my initial understanding.
22  When I first got there, Justin told -- I'll handle

18 (Pages 66 - 69)

Marciann Grzadzinski                                                November 15, 2018

1   it, I'll handle it, don't worry about it, and then
2   all of a sudden it was -- it kind of came out that
3   we were then all supposed to be writing our plans.
4        MS. GRAY:  Can you please mark this as
5   Exhibit Number 7?
6        (Grzadzinski Deposition Exhibit Number 7
7          was marked for identification.)
8   BY MS. GRAY:
9        Q   And you can actually turn to the second
10  page, it's the one that we're going to be looking
11  at.
12       A   Not the third, the second.
13       Q   Page 438.  And this is an email from Megan
14  Daly in HRD to you dated November 21st 2014; is that
15  correct?
16       A   Correct.
17       Q   And she's basically -- this is just after
18  you'd been appointed to the SES, correct?
19       A   Correct.
20       Q   And she's attaching some information and
21  documentation, correct?
22       A   Correct.

1        Q   Okay.  If you can look at the next page,
2   439, this is a message or memo, I guess, essentially
3   regarding the SES performance plan and performance
4   program, correct?
5        A   Correct.
6        Q   And on that fourth line, the re line says,
7   required completion of SES performance 30 days from
8   within official report date, correct?
9        A   Correct.
10       Q   Do you recall receiving this email?
11       A   Now that I review it, I recall that;
12  however, when I reported, I initially talked to
13  Justin and he said, don't worry about it, don't
14  worry about it, we -- Jim doesn't have his done yet,
15  and yours cascades from his, so don't worry about it
16  and when it gets to yours, we'll -- I'll handle it
17  is the best I can recall.
18       Q   Did you ever check in with HRD about
19  whether it would be okay to not comply with this
20  30-day deadline?
21       A   No, I was assuming that that was being
22  handled by the chief of staff because he was the one

1   who told me that it wasn't -- that I couldn't do it
2   because Jim hadn't done his yet.
3        Q   And when were you provided with Mr.
4   Baker's plan?
5        A   I don't ever recall being provided Mr.
6   Baker's plan.  Once again, that's the best of my
7   recollection, and that's what I recall.  I'm sure
8   possibly at one point in time, but I know most of us
9   in that position were struggling with we can't do
10  this stuff because we have to wait.
11       Q   We're finished with that.
12       A   Okay.
13       (Grzadzinski Deposition Exhibit Number 8
14          was marked for identification.)
15  BY MS. GRAY:
16       Q   Have you had time to review this?
17       A   I have.
18       Q   And this is an email from Alyssa Flocco;
19  is that right?
20       A   Correct.
21       Q   And what was Alyssa Flocco's role?
22       A   She was secretary, slash, assistant to Mr.

1   Baker.  She sat in the front office.
2        Q   And this email is dated April 6th 2015; is
3   that right?
4        A   Correct.
5        Q   And it's being sent to you and a few other
6   individuals in the SES, correct?
7        A   Correct.
8        Q   And basically she's attaching Jim's plan
9   for cascading down to your SES plan; is that right?
10       A   Correct.
11       Q   Okay.  So does that refresh your
12  recollection that you did have Mr. Baker's plan as
13  of April 6th?
14       A   Apparently I received it in an email.
15       Q   Did you start working on your plan at that
16  point?
17       A   Yes.  I mean, I'm sure if I received it, I
18  did something, yes.
19       Q   We're finished with that.
20       (Grzadzinski Deposition Exhibit Number 9
21          was marked for identification.)
22

19 (Pages 70 - 73)

Marciann Grzadzinski                                                          November 15, 2018

Page 74

BY MS. GRAY:

2     Q    If you could turn to the second page?
3  It's an email from Amanda Carrol dated May 28th
4  2015, to you and the other SES members of OGC; is
5  that correct?
6     A    Correct.
7     Q    Okay.  And the first line there is, as you
8  know, we are in crunch time to finish OGC's SES
9  plans for fiscal year 2015.  Do you see that?
10    A    Yes.
11    Q    Okay.  And then if you'll look, the next
12 email above that in the chain is an email from
13 Justin to the same individuals on the same date; is
14 that correct?
15    A    Yes.
16    Q    And his email reads, one further note,
17 when you have your plan ready, please bring it to me
18 so that it doesn't end up lost on Jim's desk.  I'll
19 have the plans signed as a batch and then we'll get
20 them turned into to SES.  Do you see that?
21    A    Yes.
22    Q    All right.  And then in the next email up

Page 75

1  you respond directly to Justin; is that correct?
2     A    Correct.
3     Q    And then you reference that Jim had told
4  you that Justin would be putting together the plan
5  for you?
6     A    Correct.
7     Q    That was your understanding?
8     A    Right.  And I also -- Justin stated that
9  he's be pulling it together.
10    Q    And then you state, I have nothing.
11    A    Correct.
12    Q    So at that point you had not started
13 working on your plan?
14    A    No.
15    Q    Okay.  And then Justin responds to you
16 basically saying, Jim is a little off the mark, and
17 explains that basically you need to work on your own
18 plan, correct?
19    A    Correct.
20    Q    So did you start working on your plan at
21 that point?
22    A    Yes.

Page 76

1     Q    Had you inquired with Justin or anyone
2  else prior to this whether they were working on your
3  plan?
4     A    I recall in passing I asked about the
5  plans, and every time I was told, Jim doesn't have
6  it done yet, Jim doesn't have it done yet, and that
7  was basically the response.
8     Q    Between the date in April when Jim's plan
9  was sent to you and May 28th when you were reminded
10 again about the plan, had you checked in with Justin
11 to see if he was working on your plan?
12    A    I have no specific recollection, but I
13 know it was -- it was on my radar.
14         MS. GRAY:  If we could mark this as
15 Exhibit Number 10?
16         (Grzadzinski Deposition Exhibit Number 10
17         was marked for identification.)
18 BY MS. GRAY:
19    Q    Do you recognize this document?
20    A    Now that you've handed it to me.  It's
21 from Justin to me.  I guess I received it.
22    Q    And it's dated August 10th 2015, correct?

Page 77

1     A    Correct.
2     Q    And Justin writes, hi, Marci, the SES unit
3  is still missing your fiscal year '15 performance
4  plan, which should be completed by you and signed by
5  Ernie; is that right?
6     A    Correct.
7     Q    Had you started working on your plan at
8  that point?
9     A    It was -- yes, I mean, I'm sure I was
10 doing something.  I don't have any specific
11 recollections because I was taken from the --
12 everything I had done up to then was for the deputy
13 general counsel's position, and then it completely
14 changed because I was changed to a section chief
15 position.  So I basically had to re-start the whole
16 process because then I had to work off of cascading
17 down from Ernie.
18    Q    And Ernie had given you his plan at that
19 point though, correct?
20    A    Not that I recall, but I'm sure you're
21 going to show me that he emailed it to me.  So,
22 yeah, I mean, I don't recall it now.

20 (Pages 74 - 77)

Marciann Grzadzinski                                         November 15, 2018

Page 78

1    Q   Do you recall -- once Ernie became your
2  supervisor, do you recall asking him for his plan so
3  that you could work on your own?
4    A   Not off the top of my head, no.
5         (Grzadzinski Deposition Exhibit Number 11
6         was marked for identification.)
7  BY MS. GRAY:
8    Q   You can actually start on the second page.
9  This is an email from you to Alyssa Flocco dated
10 August 20th, correct?
11   A   Yes.
12   Q   And you're basically asking Alyssa to help
13 you with your plan.  Is that fair to say?
14   A   Correct.
15   Q   So the best of your recollection, is this
16 when you first started working on your plan?
17   A   No.  I mean, I did my own notes and stuff,
18 but as far as getting into the format and putting it
19 in this -- from what I can recall from this email
20 was probably about the time I was getting it all put
21 together.
22   Q   And why did you ask Ms. Flocco to help you

Page 79

1  draft your plan?
2    A   Because I know she helped Jim's, and I
3  know she helped some of the other individuals draft
4  theirs, and it was more of a -- it was not an
5  assistance of writing the content, but more
6  assistance with getting it in the proper format and
7  how it was supposed to cascade, and she had been
8  helping other people with theirs.
9    Q   Okay.  We're finished with that.
10        (Grzadzinski Deposition Exhibit Number 12
11        was marked for identification.)
12 BY MS. GRAY:
13   Q   And you can start on the second page of
14 this email chain.
15   A   Okay.
16   Q   And this is an email from Alyssa Flocco to
17 you dated August 21st, correct?
18   A   Correct.
19   Q   I'll have you look at the fourth sentence
20 there, it starts with if your UCs.  Do you see that?
21   A   Yep.
22   Q   If your UCs have any metrics in their

Page 80

1  plans that reflect the unit's success, those should
2  also be in your plan, as you are the section chief
3  who makes sure those metrics are completed.  Do you
4  see that?
5    A   Yes.
6    Q   And then your response above is, nope,
7  there are no metrics in their plans, correct?
8    A   Yes.
9    Q   Had you reviewed your unit chief's plan
10 prior to that?
11   A   Sitting here direct recollection, no, I
12 don't recall.  But I'm assuming either, A, I
13 reviewed them or I called them and said, what are
14 your metrics.
15   Q   You would have called them upon receiving
16 this email or you would have done that before
17 drafting your plan?
18   A   Probably -- I'm assuming both if metrics
19 were required.  I mean, I can't -- I'm going to be
20 quite honest with you, at this stage I don't even
21 recall my plan, so I'm working off of what would I
22 have done.  I've done plans before for both my

Page 81

1  subordinates and myself, so whatever was required in
2  them, I would have provided to the best of what I
3  could provide.  And if there was metrics, I would
4  have -- had I had them, would have given them to
5  them.  But I don't -- I have no specific
6  recollection.
7    Q   Is it your understanding that part of the
8  purpose of this kind of plan is to include metrics
9  or measures so that you can then see if you've met
10 those measures?
11   A   SES plans were all new to me, so that
12 would have been -- I mean, I'm used to the agent
13 world where it's -- in the GS scale level where it's
14 check the box kind of thing and it's already
15 pre-populated for most of it.  So this would have
16 been a new adventure for me, so that's why I was
17 looking for a little bit more guidance.  But
18 that's -- that's the best I can recall.
19   Q   If you look at this first email from
20 Alyssa to you, it's dated 1:41 p.m.  Do you see
21 that?
22   A   Yes.

21 (Pages 78 - 81)

Marciann Grzadzinski                                                November 15, 2018

Page 82

1    Q   And then your response is -- if you look
2  on the prior page at the bottom -- is 1:42 p.m.
3    A   Correct.
4    Q   So just one minute later, correct?
5    A   Correct.
6    Q   Do you think it's fair to say you didn't
7  call your unit chief directly before you responded
8  to this email?
9    A   They -- for all I know, they might have
10 been in front of me.  I don't know.  I can't -- you
11 know, I can't recall.
12   Q   Okay.
13   A   But I would assume that I would have
14 either checked some notes or I would have had
15 some -- I'm basing that on, obviously, something, I
16 would thing, and possibly maybe I was relying on my
17 memory at the time, and my memory was faulty even at
18 that moment.  I don't recall.  But it's -- if I -- I
19 have no direct recollection.
20   Q   And do you recall that your plan was
21 initially returned by the senior executive service
22 unit in HRD because it was not sufficient?

Page 83

1    MR. HART:  Objection, form, and misstates
2  the record.
3    THE WITNESS:  I have no recollection of
4  that at all.
5    Q   We're finished with that one.  When you
6  were a DGC how often did you meet with Mr. Baker?
7    A   It varied.  When I initially started there
8  I was -- I had individual weekly meetings with him,
9  and then there was also deputy general counsel
10 meetings where it was Mr. Baker and the other DGCs.
11   That changed, I know at some point to
12 where we had larger meetings where it was Jim Baker
13 and the DGCs and all the section chiefs, and then
14 the two -- Katherine Bruno, because she was kind of
15 on an offshoot, she wasn't in a branch, so to speak,
16 she was involved in our meetings.
17   Oftentimes I had meetings scheduled with
18 Jim that either got canceled or moved, but most
19 weeks I probably met with him in a group setting at
20 least once or twice.  But once again, it all varied
21 on everybody's schedules.
22   Q   There were standing morning meetings with

Page 84

1  the deputies and Mr. Baker; is that correct?
2    A   Initially, yes.
3    Q   Okay.  And how often did those occur?
4    A   I can't remember if they were Tuesday,
5  Thursdays or Monday, Wednesday, Fridays, but there
6  was a -- there was a set schedule, but that set
7  schedule was often changed.
8    Q   Okay.  Why don't we just take a look at
9  this document and maybe this will help.
10   (Grzadzinski Deposition Exhibit Number 13
11     was marked for identification.)
12 BY MS. GRAY:
13   Q   Do you recognize this document?
14   A   Yes.
15   Q   And what is it?
16   A   It's out of my personal calendar.
17   Q   Okay.  And there's a Post-It -- it looks
18 like there was a Post-It on the fifth page entitled
19 standing meetings, correct?
20   A   Correct.
21   Q   And it indicates that there are deputy
22 meetings Monday and Friday; is that right?

Page 85

1    A   Correct.
2    Q   Would that have been meetings between the
3  deputies and Mr. Baker?
4    A   Initially -- this is the initial schedule,
5  but I know these deputy meetings shortly into my
6  tenure went away and we did just the deputy and
7  section chiefs.
8    Q   Okay.  And the deputies and section chiefs
9  was that once a week morning meeting, correct?
10   A   Correct.  But again, it changed from once
11 a week, I believe, to twice a week.
12   Q   Okay.
13   A   I know there was a change from this
14 standing meeting after I started.
15   Q   Okay.  Do you recall approximately how
16 long after you started?
17   A   I have -- I have no recollection.  It
18 wasn't -- it wasn't long because I only had that DGC
19 position for six months, so I know it was in within
20 a matter of a couple months, but I can't be specific
21 on days.
22   Q   Okay.  So when that change was made,

22 (Pages 82 - 85)

Marciann Grzadzinski                                    November 15, 2018

Page 86

1  rather than a deputy meeting twice a week and a
2  deputy and section chief meeting once a week, it was
3  the deputies and section chiefs twice a week?
4      A   I believe so.
5      Q   And then it indicates Thursday is an ITLB
6  meeting; is that right?
7      A   Correct, but those I know went away about
8  the same time as the standing meeting.  The Thursday
9  ITLB meeting was erratic at best, from what I
10 recall.
11     Q   And is that what you had referenced
12 previously about you would meet with him
13 approximately once a week on your own?  Was that
14 just you in the ITLB meeting or --
15     A   Yes, unless I needed like subject matter
16 expert or there was case specific, sometimes I would
17 invite my unit chief or section chief or whoever I
18 felt needed to backbench that meeting, but normally
19 that was considered an individual meeting with Jim
20 and I.  But that I know -- that Thursday meeting
21 lasted about as short as the other ones because then
22 it got changed in his schedule and it wasn't really

Page 87

1  a standard time at that point in time.
2      Q   And there may also have been additional
3  meetings about specific topics, is that --
4      A   Correct.  If there was -- if there were
5  case issues or if there was time that I needed -- if
6  something came up that needed to be briefed before
7  that, then I would request time.
8      Q   And we can look at this, if you'd like,
9  but you stated in your EEO Complaint that during
10 your first two months as DGC you only met with Mr.
11 Baker three times.  Do you recall that?
12     MR. HART:  If you need the document --
13     THE WITNESS:  Yeah, I'm sure that's what
14 the document says.
15 BY MS. GRAY:
16     Q   Okay.  But --
17     A   But as to three times, I guess I can't
18 recall why I said three times, if that makes any
19 sense.
20     Q   Okay.  So you did meet with him more than
21 three times, correct?
22     A   Individually, possibly not.

Page 88

1      Q   Okay.  So when you said three times, do
2  you have any idea why you said you only met with him
3  three times?
4      A   I would assume that I was relying the
5  calendar of some sort.
6      Q   Okay.
7      A   And that's -- yeah, that's the best I can
8  recall.
9      Q   And you were referring to just one-on-one
10 meetings?
11     A   Correct.  I know I had them -- they were
12 scheduled but they were -- like I said, they were
13 oftentimes canceled.
14     Q   And were you referring to one-on-one
15 meetings like these ILTB meetings or --
16     A   Correct.  Yeah, that would have been what
17 my reference point would have been.
18     Q   But during -- to be clear, during that
19 two-month period you met with Mr. Baker more than
20 three times, correct?
21     A   Yeah, in a group capacity or what have
22 you, yeah.

Page 89

1      Q   Did you ever request any additional
2  one-on-one meetings with Mr. Baker?
3      A   I would -- I guess the best I could say
4  is, yes, if I needed them.  If that makes -- but
5  unless I was looking specifically at my calendar,
6  and even then, if I wrote it in, it doesn't mean it
7  happened.  So that's the best I can remember.
8      Q   Okay.  We're done with that one.
9      A   Okay.
10     Q   One of the issues that came up during your
11 tenure as CGC was whether the CDCs were required to
12 maintain active bar licenses; is that correct?
13     A   Correct.
14     Q   Do you recall how early into your tenure
15 that issue came up?
16     A   That had been an issue that had been
17 bubbling for years, and it would bubble up
18 periodically and then it -- it would get kind of put
19 to bed and then it would bubble up.  And so I can't
20 recall specifically when in my DGC tenure it came
21 up, just because it was one of those things that
22 popped up periodically.

Page 90

1    Q   When you were a CDC did you have an active
2  bar license?
3    A   I -- it was my choice, I always was active
4  bar.  I was paranoid to ever let it lapse, so I
5  always just paid it and moved on.
6    Q   And what was your position as to whether
7  the CDCs had to have active bar licenses?
8    A   I felt it was -- I don't believe that it
9  was necessary, and there was more to it than not --
10  I firmly believe someone paying more money --
11  because that's basically what it comes down to is
12  either your active or inactive, and most
13  jurisdictions the only difference -- and Michigan's
14  one of them -- the only difference is you pay more
15  money.  And I don't believe being active or inactive
16  makes you a better lawyer.
17    Q   So is that basically -- did you -- is that
18  the position that you presented to Mr. Baker, that
19  you didn't believe that the CDCs needed to have
20  active bar licenses?
21    A   Correct.  But it also had to do with a
22  whole gamut of we have what were called legal

Page 91

1  advisers, which Jim did not have a -- the first time
2  I said, what about the legal advisers, he didn't
3  even have a clue what our legal advisers was.
4       And that's the bigger problem we would
5  have with our smaller offices, because most of our
6  field offices only have a chief division counsel,
7  and they rely on their legal advisers to cover
8  vacations or if there's a shooting and they need
9  somebody else to come into the office.  That would
10  change the whole dynamics of requiring all those
11  legal advisers potentially to also be active bar
12  members.
13       And there are some bars that require large
14  amounts of continuing legal education.  Most of the
15  time those continuing legal educations would never
16  assist us in our position anyway.
17    Q   Were these legal advisers agents who held
18  non-attorney positions but would need to step in at
19  times?
20    A   Correct.
21    Q   Is it fair to say that the CDC community
22  as a whole is concerned about the prospect of having

Page 92

1  to maintain active bar licenses?
2    A   Correct.
3    Q   And that was in part due to the increased
4  cost?
5    A   Increased cost, increased -- for some of
6  them -- CLEs.  A lot of the folks -- most of the
7  phone calls I received were their bar required them
8  to pay like all the back -- I mean, it was a
9  financial burden for some of them, that, I know.
10    Q   Did you take the position that CDCs did
11  not give legal advice?
12    A   That was the way Jim interpreted it.  I
13  was a sitting CDC for seven years, I know what the
14  day-to-day job of a CDC is.  Most of the advice that
15  I gave as a CDC dealt with the DIOG -- sorry for the
16  acronym -- and a lot of what I gave was ethics.  A
17  lot of it did not do with what I would deem directly
18  legal advice.
19       Whenever it came to direct legal advice on
20  a case, I would refer them to their AUSA.  So I
21  would give kind of what I thought was going to
22  happen or this is the way it generally happens, but

Page 93

1  I felt the direct legal advice that agents were
2  going to rely on when it came to the nuts of bolts
3  of things was always to rely on their AUSA.
4       Because their AUSA is going to be the one
5  who's going to make the call, so I would give my
6  general interpretation of it, but would oftentimes
7  refer them to their AUSA.
8    Q   In the end DOJ did require all CDs to
9  submit proof of active bar membership; is that
10  correct?
11    A   Correct.
12    Q   Did Mr. Baker ever express disappointment
13  with you over your advice on this issue?
14    A   He wouldn't even talk to me about it.  He
15  just went right past me.
16    Q   Okay.  And your impression is because he
17  was upset about the position you had taken?
18    A   I -- I have no idea.  He just -- he had
19  Catherine Chin do the legal research, which I -- it
20  didn't make any sense for me to have somebody in
21  procurement doing that legal research, it should
22  have been somebody in the Investigative Law Branch

Marciann Grzadzinski                                    November 15, 2018

Page 94

1  because the other issue that this raised once our
2  folks go active is that it became a whole McDade
3  issue.
4        And my folks in the Investigative Law
5  Branch were very concerned about that, and also were
6  some of the CDCs and ADCs.
7    Q   What was Catherine Chin's position?
8    A   She was -- I don't recall if she was the
9  unit chief at the time or she might have been acting
10 unit chief or she might have been main unit chief
11 over the Procurement Law Unit.
12   Q   On or around May 22nd 2015, Mr. Baker
13 informed you that he was reorganizing OGC and that
14 your position would be eliminated; is that right?
15   A   Correct.
16   Q   Prior to that meeting in May, had Mr.
17 Baker had any discussions with you about an OGC
18 reorganization?
19   A   No.
20   Q   Were you aware that he had been
21 considering reorganizing OGC?
22   A   He mentioned it I know briefly in some

Page 95

1  meetings that he had been wanting to re-org for the
2  last two years, but he just never got around to it.
3    Q   Do you contend that Mr. Baker orchestrated
4  the reorganization to remove you from the DGC
5  position?
6        MR. HART:  Objection to the extent that
7  calls for a legal conclusion.
8        THE WITNESS:  It is what it is.  I mean,
9  no one in the Bureau ever takes a branch, a unit, a
10 division, and shrinks down their SESers, people just
11 don't do that because it's so difficult to get SES
12 positions so -- yeah.
13 BY MS. GRAY:
14   Q   So would that be a yes, you believe that
15 he -- the purpose of the reorganization was to
16 remove your position?
17   A   Remove me, yes.
18   Q   Okay.  Couldn't he have just demoted you
19 if he wanted to remove you?
20       MR. HART:  Objection, calls for
21 speculation as to what he could have done.
22       THE WITNESS:  Yeah, I mean, he can do what

Page 96

1  he wants to do, but it was very obvious what had
2  happened to not just me, but to all the other
3  females in the General Counsel's Office.
4  BY MS. GRAY:
5    Q   Is it possible that the reorganization
6  itself had nothing to do with your performance but
7  your removal did?
8        MR. HART:  Objection, calls for
9  speculation as to what is not possible.
10       THE WITNESS:  I have no idea.
11 BY MS. GRAY:
12   Q   You stated in your signed sworn statement
13 that during the June 2015 all hands meeting Mr.
14 Baker said the reorganization had nothing to do with
15 personalities or anyone's job performance; is that
16 right?
17   A   Correct.
18   Q   Would you expect Mr. Baker to tell all of
19 OGC that you being removed based on your
20 performance?
21   A   I would expect him to tell what was true,
22 and if it -- if it was that issue, then I own it,

Page 97

1  but it wasn't -- that's not the way he portrayed it.
2    Q   Would you have wanted him to tell the
3  entirety of OGC in a meeting that you were being
4  removed based on your performance?
5    A   Once again, I think -- isn't that the same
6  question that you just -- I mean --
7    Q   No, it's a separate question.  Do you want
8  me to repeat it?
9    A   Yeah.
10   Q   Would you have wanted Mr. Baker to tell
11 all of OGC that you were being removed based on your
12 performance?
13   A   If that was, in fact, the truth, yes.
14   Q   The all hands meeting is essentially a
15 meeting for all of OGC, correct?
16   A   Correct.
17   Q   Have you ever removed an employee that you
18 supervised?
19   A   A long time ago.  I can't remember.  I
20 made -- I started to remove an individual and then
21 she subsequently found another position.
22   Q   Was that removal going to be based on

25 (Pages 94 - 97)

Marciann Grzadzinski                                    November 15, 2018

Page 98

1  performance reasons?

2      A   Correct.

3      Q   Would you have announced to the entire

4  unit that you were removing her based on performance

5  reasons?

6      A   Possibly, yes.

7      Q   You don't think that would violate some

8  kind of FBI policy to reveal, you know, another

9  employee's performance issues?

10     MR. HART:  Objection, form, and vague as

11 to what policy that we're referring to.

12     THE WITNESS:  I would not give specifics,

13 but I think the individual I'm remembering removing,

14 it would have been so obvious that I was removing

15 her for performance issues.

16 BY MS. GRAY:

17     Q   When you say removing, were you going to

18 remove her from the FBI in general or just from her

19 position?

20     A   My -- the goal was to remove her from her

21 position, yes.

22     Q   So she would have remained at the FBI --

Page 99

1      A   If she found something that was suitable.

2      Q   You stated in your signed sworn statement

3  that Mr. Baker frequently canceled or cut short

4  scheduled meetings with you; is that right?

5      A   Correct.

6      Q   Do you know how frequently he canceled or

7  cut short meetings with others?

8      A   I have no idea what their schedules were.

9      Q   And we can look at the exhibit if you'd

10 like to, but in your interrogatory responses you

11 stated that GC Baker routinely denied, cut short or

12 avoided opportunities to Complainant to participate

13 in agency activities and demonstrate her

14 contributions to the agency.  Do you recall that?

15     A   Correct.

16     Q   Can you provide an example of when Mr.

17 Baker denied you the opportunity to participate in

18 agency activities?

19     A   I do not have the specific dates or the

20 meetings, but I know there were a couple of meetings

21 that would have covered my branch or my expertise

22 that I wasn't scheduled to.

Page 100

1      Q   That you weren't at the meeting?

2      A   Right, I wasn't even invited to the

3  meeting.

4      Q   Okay.

5      A   And they were my subject matter expert

6  area, and I subsequently found out about the

7  meetings.

8      Q   Was that while you were at DGC or a

9  section chief?

10     A   I want to say both, but I can't be

11 specific.

12     Q   So are there any other examples?

13     A   Routinely in the meetings he would cut me

14 off or not -- there were times he would just skip

15 over me and go to the next person.  And that was

16 fairly frequently with all of the females in that

17 section chief, deputy meeting.

18     Q   So when you refer to agency activities in

19 your interrogatory responses, you are referring to

20 meetings?

21     A   Yeah, I can't remember if there was

22 anything else that -- it might have been a lunch, I

Page 101

1  don't -- I'm going to be honest, I can't remember,

2  but I know I was -- I recall being excluded.

3      Q   Can you provide of an example of when Mr.

4  Baker denied you the opportunity to demonstrate your

5  contributions to the agency?

6      A   It goes back to the CDCs being licensed

7  and not licensed.  I know he was having meetings

8  with Catherine Chin and other people in the

9  executive management and I wasn't included when, in

10 fact, that was my -- should have been my area of

11 contribution.

12     Q   Has your opinion about whether the CDCs

13 need their active bar licenses changed at all?

14     A   No.

15     Q   So you still believe that they don't have

16 to?

17     A   I -- no.

18     Q   But you understand that it's DOJ's

19 position that they do have to, correct?

20     A   It -- for years DOJ would always defer to

21 FBI.  And I spoke to Lisa Baker who was over the

22 unit chief's -- over the legal training unit before

26 (Pages 98 - 101)

Marciann Grzadzinski                                    November 15, 2018

Page 102

1  Carl Benoit took the position, and I ran into Lisa
2  Baker at Quantico because she would bring classes in
3  from NOVA, and I had a very lengthy discussion with
4  her, and she said, Marci, there is documentation in
5  OGC where we went to Department of Justice, and it's
6  all in there and it's all been laid out.
7       They will always defer to us if that is
8  our position.  So it became apparent to me that it
9  was more Jim Baker wanting us to be active bar
10 members than actually DOJ.
11     Q   Do you have any knowledge of whether OARM,
12 what their position was?
13     A   OARM came in afterwards and said that that
14 was something -- and I met with OARM and Ernie
15 Babcock a couple times on that.
16     Q   And OARM is the Office of Attorney
17 Recruitment and Management, correct?
18     A   Correct.
19     Q   You stated that Mr. Baker once canceled a
20 meeting with you to have lunch with former FBI
21 lawyer Lisa Page; is that right?
22     A   Correct.

Page 103

1      Q   At the time of that lunch she was not a
2  former lawyer --
3      A   Correct, she was --
4      Q   She was an FBI lawyer at that time.
5      A   Correct.
6      Q   You stated in your EEO Complaint that you
7  had heard that Justin Schoolmaster has openly stated
8  in meetings that we need to get rid of the older
9  attorneys and bring in younger attorneys; is that
10 right?
11     A   Correct.
12     Q   Did Mr. Schoolmaster say that in your
13 presence?
14     A   No.
15     Q   Did he ever say anything like that in your
16 presence?
17     A   There were certain individuals I know that
18 he wanted to get rid of.
19     Q   Did he ever say anything like that in your
20 presence?
21     A   No.
22     Q   And what individuals did you know of that

Page 104

1  he wanted to get rid of?
2      A   He wanted to get rid of Sherry Sabol.
3      Q   So who told you that Mr. Schoolmaster said
4  that?
5      A   I believe it was Nancy Wiegand and
6  possibly Sherry Sabol.  It was either both or one,
7  I'm not quite sure which one, but that was said in
8  an open meeting.
9      Q   And this was at an executive management
10 committee meeting; is that right?
11     A   Could have possibly been.
12     Q   Was Ms. Wiegand at that meeting?  Did she
13 personally hear it?
14     A   Yes, I believe so.
15     Q   Was Ms. Sabol at that meeting?  Did she
16 personally hear it?
17     A   To the best of my recollection, I believe
18 it was one of them, but I can't remember which one,
19 and possibly it might have been both of them, I just
20 can't remember who I specifically had that
21 conversation with.
22     Q   Wasn't the -- are you aware of what the

Page 105

1  executive management committee is?
2      A   Within OGC or within -- yes.
3      Q   And is that a committee -- and who would
4  be on that committee?
5      A   If I recall -- I remember going to it, and
6  I believe it was, again, deputies and section chiefs
7  possibly.  It's been a long time since we had them.
8  And it might have been -- well, they had so many
9  acting positions it was hard for me to tell if they
10 were there in their unit chief capacity of if they
11 were there in their acting position.
12     Q   Okay.  So I need to make a correction
13 because we're actually referring to the employment
14 management committee.  Are you familiar with the
15 employment management committee?
16     A   That one, I'm sorry, doesn't even ring a
17 bell.
18     Q   Okay.  So we don't need to enter this into
19 the record, it's the ROI and I want to show you this
20 tab 12 of the ROI.
21     A   Okay.
22     Q   This is Ms. Sabol's statement, so if you

27 (Pages 102 - 105)

Marciann Grzadzinski                                         November 15, 2018

Page 106

1  can just look at the top --

2        MR. HART:  Just for the record, what page

3  of her statement is this?

4        MS. GRAY:  Well, this version is not Bates

5  Stamped.  It's page six of her statement.

6        THE WITNESS:  Of Sherry Sabol?

7  BY MS. GRAY:

8     Q    Yes.

9     A    Okay.

10    Q    And Ms. Sabol is saying, I was advised by

11 others in OGC that sometime in May of 2015 Chief of

12 Staff Justin Schoolmaster stated to the OGC

13 employment management committee that they, OGC

14 leadership, wanted to change OGC.

15    A    I got that.

16    Q    And then there's a comment about get rid

17 of the old lawyers.

18    A    Right, right.

19    Q    So Ms. Sabol is not saying that she was in

20 this meeting, correct?

21    A    Yeah, that's why I'm saying I can't --

22    Q    Okay.

Page 107

1     A    When they told me it was not where they

2  declare, I have personal hand knowledge -- it was

3  repeated, so I don't know if it was because they

4  were sitting in the meeting or other folks told them

5  that.

6     Q    Okay.

7     A    So that's kind of where I was going with

8  the not quite sure --

9     Q    Okay.  Did you ever hear -- other than

10 this occasion, did you ever hear any similar

11 comments or rumors of any similar comments by

12 Mr. Schoolmaster?

13    A    And I -- and this is going back just on my

14 old memory, I somewhat remember him saying something

15 about also being females, but I can't -- I can't

16 specifically get into any specifics.

17    Q    Do you remember him saying that in your

18 presence?

19    A    No, but there was -- you said rumors or

20 discussions or what have you, that's all I recall.

21    Q    Who do you recall telling you that?

22    A    Again, it was probably one of either --

Page 108

1  the other females that we -- that I was talking --

2  Catherine Bruno or Sherry Sabol or Nancy Wiegand.

3     Q    Who were in the room when he said that?

4     A    All I know is there were discussions.  So

5  I don't know if they were in the room or not.

6     Q    And what did they tell you that he said?

7     A    That it was -- once again it was everyone

8  he was discussing were females.

9     Q    Okay.  But they're not saying that he

10 explicitly said, I want to get rid of females?

11    A    I can't remember the specifics of the

12 conversation.

13    Q    In your EEO complaint you stated that Mr.

14 Baker said that DGC Babcock was old and who knew how

15 long he would around.  Do you recall that?

16    A    Correct.

17    Q    What do you think he meant by that?

18    A    That he -- that he would be leaving.  When

19 he put -- drew up the new org chart where I was

20 under Ernie, he said, well, you know, Ernie's old

21 and he's not -- so you could easily move back up

22 into that position or something to that affect.  Or

Page 109

1  that would leave that -- I don't know if he said --

2  I don't believe he said that I could move back up

3  into that position, but that that position would

4  become available again.

5     Q    Do you think he was implying that there

6  was a possibility that you'd be able to move back up

7  into the position?

8     A    No, I believe at that point in time he was

9  just trying to -- I don't know if placate is the

10 right word, but he was trying to -- it was

11 apparent -- he had to pick up that I was not happy,

12 so I think what he was trying to do was just trying

13 to smooth over the situation, I guess that's the

14 best word I can come up with.

15    Q    Okay.  After you were removed from the DGC

16 position, you were placed in the section chief

17 position over the investigative law and training

18 section, correct?

19    A    Correct.

20    Q    And that section was created during the

21 reorganization; is that right?

22    A    Correct.

28 (Pages 106 - 109)

Marciann Grzadzinski                                    November 15, 2018

Page 110

1    Q   Did your salary change?

2    A   No.

3    Q   Did your reporting location change?

4    A   No.

5    Q   Did you remain in the same office on the

6  tenth floor?

7    A   Yes.

8    Q   As the section chief you were responsible

9  for planning the CDC Conference; is that right?

10    A   Correct.

11    Q   And is it fair to say that Mr. Baker

12  expressed disappointment that he was not informed

13  about the plans of the conference until a few weeks

14  before the conference?

15    A   Correct.

16    Q   And is it true that he was not informed

17  about the plans until a few weeks before the

18  conference?

19    A   I reported up my chain of command, Ernie

20  Babcock knew every moment of every planning for the

21  CDC Conference, and he told me that he was going to

22  brief it to Jim.  I follow my chain of command, and

Page 111

1  I felt that it was up to Mr. Babcock to brief him.

2    Q   Had you at the time that you informed Mr.

3  Baker about the conference or that he learned about

4  the conference, he was not scheduled to speak at the

5  conference; is that right?

6    A   Correct.

7    Q   And why had you not scheduled him to speak

8  at the conference?

9    A   To be quite frank, the CDCs didn't want to

10  hear from him.

11    Q   As the general counsel, Mr. Baker was the

12  program manager for the CDC Program, correct?

13    A   Correct.

14    Q   So regardless of whether the CDCs liked

15  Mr. Baker, do you think it would be appropriate for

16  him to speak at the conference?

17        MR. HART:  Objection, form.

18        THE WITNESS:  In my recollection of going

19  to the CDC Conference, not -- the general counsel

20  didn't always address the CDCs, sometimes they did,

21  sometimes they didn't.  So it wasn't anything that I

22  was -- thought would be problematic.

Page 112

1  BY MS. GRAY:

2    Q   Had you ever asked Mr. Baker if he wanted

3  to present at the conference?

4    A   I spoke to Mr. Babcock about it because it

5  was my chain of command.

6    Q   And what did you discuss with Mr. Babcock

7  about it?

8    A   Basically whether Jim should come or not,

9  and Ernie and I discussed very candidly that the

10  CDCs were not very receptive to him right now, and

11  that possibly should be an option not to have him

12  go.

13    Q   Is it your understanding that they were

14  not receptive to him because of the whole bar

15  license issue?

16    A   It was a lot of issues.  That wasn't the

17  one and only issue.

18    Q   Do you think it's fair to say that there's

19  sort of an us versus them between the CDC population

20  and the OGCs?

21        MR. HART:  Objection, form.

22        THE WITNESS:  No.

Page 113

1  BY MS. GRAY:

2    Q   During this time period, were you having

3  the regular deputies and section chief meetings with

4  Mr. Baker?

5    A   Yes.

6    Q   And those were twice weekly?

7    A   Again, if they were -- you know, if they

8  weren't canceled.

9    Q   And you never brought up the CDC

10  conference during one of those meetings?

11    A   I know I mentioned it once or twice about

12  it going to Oklahoma, but when that -- when I

13  mentioned it or when I discussed it, I don't know in

14  what timeframe.

15    Q   Has the CDC Conference traditionally been

16  held in D.C.?

17    A   Yes.

18    Q   And you scheduled the conference to be

19  held in Oklahoma City, correct?

20    A   Correct.

21    Q   Had you discussed that with Mr. Baker?

22    A   I discussed it with Ernie because he was

29 (Pages 110 - 113)

Marciann Grzadzinski                                                November 15, 2018

Page 114

1  my chain of command.

2      Q   And why did you move the conference to

3  Oklahoma?

4      A   It had been a complaint from the CDCs for

5  a long time that it was difficult for them to get to

6  Washington, it was more expensive for them to get to

7  Washington, it -- they would like to have it

8  somewhere else.  We had requested for years to have

9  it somewhere else, and Elaine would never entertain

10  that.

11      Q   You scheduled the conference during the

12  same time as the SAC Conference; is that right?

13      A   I had no clue that that was the SAC

14  Conference week.

15      Q   So you had not inquired about what else

16  might be going on during that week when you selected

17  that week?

18      A   No, not that I recall.

19      Q   Approximately how long did you spend

20  working on the conference?

21      A   Carl Benoit had the lead because that was

22  always handled by the legal training unit, so he had

Page 115

1  the lead on it, and then I just oversaw his -- his

2  work.  I know we probably had weekly discussions

3  about it, if not possibly daily, different things

4  would come up.  Like we had issues with Virtual

5  Academy, people couldn't get entry into Virtual

6  Academy and so there were -- it could have been

7  more, it could have been daily, could have been

8  weekly depending -- obviously when we got closer to

9  the conference, I know I talked to him more

10  frequently.

11      Q   You're referring to Carl Benoit?

12      A   Correct.

13      Q   Again, we can look at the Complaint, but

14  in your EEO Complaint you stated that most of the

15  time in your meetings with Mr. Baker was spent on

16  his vision of what he thought was the big picture --

17      A   Correct.

18      Q   -- for OGC and management, and at no time

19  did he ever say, Marci, this is what you should be

20  doing and this is what I want you to accomplish by

21  this date; is that correct?

22      A   Correct.

Page 116

1      Q   Did you expect Mr. Baker to give you

2  specific instructions as to what to do?

3      A   Not specific instructions that I -- what

4  to do, but if I obviously was not addressing

5  something that he felt needed to be addressed, I

6  think as a manager you need to clarify with your

7  folks to make sure that they understand what they

8  need to do to meet that mark.

9      Q   Do you think it's fair to expect an SES

10  level employee to take initiative to take steps to

11  achieve the stated big picture goal of a division?

12      A   Absolutely.

13      Q   Did Mr. Baker ever express to you that he

14  wanted to be more updated on what it was that you

15  and your teammates were working on?

16      A   That happened later on once it became --

17  the issue with the CDC Conference, and I sat in a

18  conference room with him and Mr. Babcock and I said,

19  I briefed my chain of command, and basically Jim

20  told me to go around my chain of command.

21      Q   And did you follow that instruction?

22      A   I started briefing things in the morning

Page 117

1  meeting because it became apparent to me that Ernie

2  Babcock wasn't going to tell him.

3      Q   Did Mr. Babcock ever say to you that he

4  thought you should be keeping Mr. Baker more

5  informed about what you were doing?

6      A   That came up in the meeting and he -- he

7  told me, we'll work on it and we'll handle it.

8      Q   In your signed sworn statement you stated

9  that Mr. Babcock rated you as unsatisfactory on your

10  PAR; is that right?

11      A   Correct.

12      Q   Your rating was actually minimally

13  satisfactory; isn't that correct?

14      A   Could be.  I -- yeah.

15      Q   And unsatisfactory is the rating below

16  minimally satisfactory; is that right?

17      A   I'd have to look at the form to know.

18      Q   Okay.  We're just looking at tab 15 of the

19  ROI, which is your Executive Performance Agreement,

20  correct?

21      A   Correct.

22      Q   Okay.  And this shows that you were rated

30 (Pages 114 - 117)

Marciann Grzadzinski                                    November 15, 2018

Page 118

1  minimally satisfactory, correct?

2      A   Correct.

3      Q   And the next level down, the lowest level

4  is unsatisfactory, correct?

5      A   Correct.

6      Q   So when you stated that in your signed

7  sworn statement, had you actually looked at this

8  document?

9      A   I -- probably not.

10      Q   Okay.  Did you write your signed sworn

11  statement based only on your memory?

12         MR. HART:  Objection, form.

13         THE WITNESS:  A lot of it, yes, was based

14  on memory.

15  BY MS. GRAY:

16      Q   At the time you were removed from the DGC

17  position, you were the only DGC who was on

18  probation, is that your understanding?

19      A   When I was removed -- okay, I'm sorry.

20  Can you restate --

21      Q   At the time that you were removed from the

22  DGC position, is it your understanding that you were

Page 119

1  the only DGC on probation?

2      A   Correct.  Trisha hadn't reported yet, and

3  I don't know if she would have been under the

4  probationary calendar anyways.

5      Q   And is that because it's your

6  understanding that she was already in the FBI?

7      A   As far as I know.  I believe she came over

8  and -- yeah.  And whether that would still require

9  her to complete an FBI probationary period, I'm not

10  sure.

11      Q   Upon your removal from the SES ranks, is

12  it correct that AD Turgal assisted you in finding

13  another position?

14      A   Jim did very little to assist me.  He said

15  he was going to assist me, but it was actually --

16  Jim ended up getting transferred to another

17  position, and I cannot recall where he -- I think he

18  went to ITLB, but I can't remember.  He went to the

19  technology side of the house.  He came out of HRD

20  and went to the technology side of the house.  And

21  it was actually AD -- oh, God, I call him Baby Dave,

22  and this is wrong.

Page 120

1      Q   Schlendorf?

2      A   Yes.  I actually gave Dave his tour of the

3  FBI when he was hired, so that's --

4      Q   So AD Schlendorf, he was the AD of HRD

5  that replaced Mr. Turgal?

6      A   I believe so.

7      Q   And so he assisted you in finding another

8  position?

9      A   Correct.  And I believe also there was --

10  I believe there also possibly -- well, possibly

11  might have been a phone call from my fiance to his

12  former supervisor Chris Pyota who worked out at the

13  TSC.  So I'm not quite sure how it came about, but

14  something tells me that someone else was involved as

15  well.

16      Q   And your fiance was also employed at the

17  FBI, correct?

18      A   Correct.

19      Q   But he's no longer employed there?

20      A   Correct, we're both retired.

21      Q   Was he an agent?

22      A   Yes, he was.

Page 121

1      Q   And his name is Craig Youman?

2      A   Correct.

3      Q   And you're still engaged?

4      A   As far as I know, yes.

5      Q   Okay.  So you were offered more than one

6  option for a position after you were removed from

7  the SES, correct?

8      A   No, I wasn't.

9      Q   You were offered only one?

10      A   That was the only position I was ever

11  offered.

12      Q   The unit chief position at the Terrorist

13  Screening Center, correct?

14      A   Correct.  There were two unit chief

15  positions open at the Terrorist Screening Center.

16  When I went to the Terrorist Screening Center, Chris

17  told me I don't have a slot for you, but come on

18  over, and I plan on making some changes in

19  management and we'll -- we will get you placed.

20         So I sat up in my office on the tenth

21  floor for I want to say two or three months, I want

22  to say it was around March -- in fact, I know it was

31 (Pages 118 - 121)

Page 122

1  March because I went on spring break with my
2  daughter right after I went to the TSC.  So
3  literally sat upstairs for three months without
4  anything to do.
5     Q   Okay.  The official transfer order
6  indicates May 16th, is that --
7     A   That's probably by the time I went over to
8  TSC and I sat there for several months, and then --
9  that seems about right because I believe it was the
10  end of May and I remember taking over the
11  international unit like the first week of June.
12    Q   Okay.  But had you gone over before May
13  16th?
14    A   Oh, yeah, I went over there I want to say
15  like the first of April.
16    Q   Okay.
17    A   End of March, right around the spring
18  break time.
19    Q   Okay.  So that's just when the official
20  document was --
21    A   Correct, the paperwork caught up to me
22  physically moving.

Page 123

1     Q   And it was your preference not to work at
2  headquarters; is that right?
3     A   I had no preference.  I would have worked
4  anywhere, but nothing was being -- nothing was
5  offered to me.  I made several trips down to
6  Quantico and met with folks in the OTD branch
7  because I had done a lot of work with them for many
8  years.  I was actually trying to get something over
9  there, and it never came to fruition.
10    (Grzadzinski Deposition Exhibit Number 14
11        was marked for identification.)
12  BY MS. GRAY:
13    Q   So this is an email from Stacie Schlendorf
14  to you dated March 17th, correct?
15    A   Yep.
16    Q   If you look at the second paragraph from
17  the bottom she writes, also I think we have a great
18  opportunity for you out at TSC with which both meet
19  your ask of being outside of JEH, and I think they
20  would really benefit from your legal and policy
21  expertise, correct?
22    A   Correct.

Page 124

1     Q   And JEH refers to the J. Edgar Hoover
2  Building.
3     A   Correct.
4     Q   Which is headquarters.
5     A   Correct.
6     Q   So at least Mr. Schlendorf had the
7  impression that you were looking for work outside of
8  headquarters.
9     A   I was if I had choice, if you were to say,
10  okay, he's a position at TSC or here's a position at
11  JEH, I'd take out at TSC; however, I would have been
12  open to any position that they would have offered
13  me, they just hadn't offered me anything.
14    Q   And why was it your preference to work
15  outside of JEH?
16    A   Because I was horribly embarrassed and
17  didn't necessarily want to run into everybody from
18  OGC every day. and the other executive management.
19        So in an ideal world, would it be lovely
20  to be out of JEH, yes, but, I mean, I would have
21  taken Quantico, I would have taken -- there was a
22  lot of -- as you know, a lot of outside places that

Page 125

1  we have would have been fine.  But if they would
2  have said, you know, the only position we have for
3  you is sitting two doors down from the Office of
4  General -- I would have taken it, but there was
5  never a discussion of any position.
6     Q   And where is the Terrorist Screening
7  Center located?
8     A   That is out in Vienna.
9     Q   And did your salary change when you became
10  a unit chief at the Terrorist Screening Center?
11    A   No.
12    Q   Did you feel that you were required to
13  accept that position or could you have held off for
14  something else?
15    A   No, I felt I had to take that position.  I
16  had been sitting there watching daytime TV for --
17  that's not why I go to work.  I go to work to do the
18  mission, and I sat there for two and a half, three
19  months with absolutely nothing.  I was going to take
20  whatever position they provided to me.
21    Q   And acknowledging the fact you didn't
22  necessarily want to be removed, were you interested

32 (Pages 122 - 125)

Marciann Grzadzinski                                      November 15, 2018

Page 126

1  in that position?

2      A   No.  I mean, that's not -- that's not what

3  I wanted to do.  I have been doing legal work for a

4  number of years for the Bureau and is that where I

5  wanted to go, no, but -- but I wanted a job.

6      Q   That position didn't require giving legal

7  advice?

8      A   Absolutely none.

9      Q   Were you aware that international travel

10 was required at the time you accepted that position?

11     A   It was the international unit, so I

12 assumed it was international travel.  The other unit

13 that was open at the time was a domestic unit, and

14 when I talked to both -- I can't remember if I

15 talked to the unit chiefs or if I talked to someone

16 in management, and they advised me that actually the

17 domestic one required more travel, it was just

18 shorter trips and you were gone a lot.

19         And that was my concern so I went with --

20 at the time I went with the international travel one

21 because at that time the unit chief wasn't required

22 to travel as much.  When I took the position and I

Page 127

1  started rocketing the team to success, they then

2  started requiring me to do more international

3  travel.

4      Q   All right.  So we're going to go backwards

5  in time a little bit, back to that NSLB selection.

6      A   Okay.

7      Q   When did you first learn that you were not

8  selected for the NSLB DGC position?

9      A   When I went over to general counsel's --

10 and obviously when I was chosen for the ITLB, I

11 assumed I wasn't picked for NSLB, if that make

12 sense.

13     Q   And do you recall getting an email

14 sometime around the time you started seeing that

15 that job posting had been canceled?

16     A   I know it had been canceled and reposted

17 several times.

18     Q   So you would have known by the time you

19 started your DGC position or before that that you

20 weren't selected for the NSLB position?

21         MR. HART:  Objection, form, and insofar as

22 it calls for a legal conclusion as to the timeliness

Page 128

1  of her Complaint.

2          THE WITNESS:  I would have -- yeah, I

3  mean, if they were going to put me in NSLB, I would

4  have assumed they would have put me in NSLB as

5  opposed to --

6  BY MS. GRAY:

7      Q   And when did you first learn that Trisha

8  Anderson had been selected as the DGC for NTLB?

9      A   It was sometime when I was over at DGC.

10         (Grzadzinski Deposition Exhibit Number 15

11          was marked for identification.)

12 BY MR. HART:

13     Q   Do you recognize this email?

14     A   I -- I'm going to be honest with you, I

15 was not included in the all OGC for 90 percent of my

16 tenure in OGC.  So I don't know if I necessarily

17 would have received this or if I would have gotten a

18 bootlegged copy from some of my staff because they

19 know I didn't get all OGC.  Does that make any

20 sense?

21     Q   Uh-huh.

22     A   But I know at some point in time he

Page 129

1  announced it.

2      Q   Okay.  Do you recall seeing this email?

3      A   To be quite honest with you, no.

4      Q   As a DGC do you think it's fair to say

5  that somebody would have let you know that a new DGC

6  had been selected at this time?

7      A   Absolutely.  I'm sure Jim mentioned it in

8  one of the Tuesday, Thursday meetings.

9      Q   Okay.

10     A   I would assume.  Or he would have

11 mentioned it to us in another executive meeting,

12 but, yeah.

13     Q   So is it fair to say that you would have

14 known on or around May 5th that Trisha Anderson had

15 been selected as the DGC?

16     A   Correct.

17         MR. HART:  Same objections as before.

18         THE WITNESS:  Yeah, I would assume that,

19 yes.

20 BY MS. GRAY:

21     Q   Okay.  At the time that you learned that

22 Ms. Anderson had been selected, did you know Trisha

33 (Pages 126 - 129)

Marciann Grzadzinski                                      November 15, 2018

Page 130

1  Anderson?

2      A   No.

3      Q   Were you at all familiar with her

4  background or qualifications when her selection was

5  announced?

6      A   No, because I will be -- I know I never

7  saw this email because I do not remember the

8  specifics of -- of the various offices.

9      Q   Were you aware at that time that she was

10  already in the FBI?

11     A   I knew that from -- I have a friend that

12  works over in Treasury, and as all good FBI agents

13  do, as soon as you hear someone's announced, you do

14  your due diligence, and I knew she worked over

15  there.

16     Q   And did you have any knowledge of the type

17  of work that she performed at the Department of

18  Treasury?

19     A   I was just told by this individual that

20  she did policy.

21     Q   Are you aware that Mr. Baker and Ms.

22  Anderson worked together at DOJ?

Page 131

1      A   I have no personal knowledge of that, no.

2      Q   But based on this email, he's -- you see

3  that he is basically announcing that he worked with

4  her.

5          MR. HART:  Objection, the document speaks

6  for itself.

7          THE WITNESS:  Yeah.

8  BY MS. GRAY:

9      Q   Do you have any knowledge of the type of

10  work she performed in DOJ's Office of Legal Counsel?

11     A   No.

12     Q   Are you familiar with the type of work

13  performed in DOJ's Office of Legal Counsel?

14     A   You'd have to be more specific as to which

15  office in DOJ.

16     Q   The Office of Legal Counsel.

17     A   I don't know of that office specifically,

18  but I've dealt with DOJ for numerous years.

19     Q   You've never dealt with anyone in the

20  Office of Legal Counsel?

21     A   Possibly, but I don't recall specifically.

22     Q   So you're not necessarily familiar with

Page 132

1  the type of work performed in that office?

2          MR. HART:  Objection, form.

3          THE WITNESS:  Yeah, I have no clue.  I

4  mean, I don't know the specifics.

5  BY MS. GRAY:

6      Q   Do you have any knowledge of the type of

7  work she performed as Associate Deputy Attorney

8  General at DOJ?

9      A   I have no knowledge of her background.

10     Q   Are you aware that Ms. Anderson succeeded

11  Mr. Baker in his position as Associate Deputy

12  Attorney General at DOJ?

13     A   No.

14     Q   Are you aware that Mr. Baker recommended

15  Ms. Anderson for her clerkship with the Supreme

16  Court?

17     A   Nope.

18     Q   Okay.  We're finished with that document.

19     A   Okay.

20     Q   In your interrogatory responses you stated

21  that Ms. Anderson had no comparable prior

22  experience.  Do you recall that?

Page 133

1      A   Yes.

2      Q   And what was the basis of your contention

3  Ms. Anderson had no comparable prior experience?

4          MR. HART:  Objection, it calls for

5  attorney-client priveledged information.  Don't

6  answer.

7  BY MS. GRAY:

8      Q   Do you believe today that Ms. Anderson had

9  no comparable prior experience?  That's not

10  privileged.

11     A   She didn't have my experience.

12     Q   Do you believe she had no comparable prior

13  experience?

14     A   Yes, she did not.  I did a double negative

15  there, I'm not quite sure -- no, she doesn't have my

16  experience.

17     Q   Okay.

18     A   She's not an FBI agent, she never did

19  counterterrorism investigations, she never did

20  counterintelligence investigations, those were the

21  types of experiences I was bringing to the table

22  that I know she could not bring to the table.

34 (Pages 130 - 133)

Marciann Grzadzinski
November 15, 2018

Page 134

1    Q   Was being an agent required for the
2  position?
3    A   No, but it gives you a definite -- I feel
4  a definite advantage for the position.
5    Q   Was law enforcement experience required
6  for the position?
7    A   I cannot remember the specifics of the
8  posting, but I -- I remember writing to law
9  enforcement experience, so I'm not quite sure what
10 the posting said about law enforcement experience.
11   Q   Do you believe that as a special agent
12 you're necessarily more qualified than a non-special
13 agent to be DGC over NSLB?
14   A   Again, I believe we bring a -- I'm not
15 saying it's more qualified or less qualified, we
16 bring a different perspective and a different set of
17 skills to it, if that makes sense.
18   Q   You stated in your response to the
19 agency's interrogatories that Ms. Anderson did not
20 have prior management experience similar to that
21 required to head an entire division of FBI OGCs; is
22 that right?

Page 135

1       MR. HART:  Objection, form.
2       THE WITNESS:  Yeah, I -- that, I -- I'm
3  trying to remember when I read that document whether
4  I --
5  BY MS. GRAY:
6    Q   I can show it to you because this is
7  actually your supplemental responses, so you can go
8  ahead and look at it.
9    A   Okay.
10      (Grzadzinski Deposition Exhibit Number 16
11      was marked for identification.)
12 BY MS. GRAY:
13   Q   Do you recognize this document?
14   A   Yes.
15   Q   And these are your responses to the
16 agency's supplemental discovery requests, correct?
17   A   Correct.
18   Q   Have you seen this document before?
19   A   I believe I have, yes.
20   Q   Okay.  Can you please -- okay.  If you
21 look at the first interrogatory there, which is
22 actually interrogatory number 26, it's just asking

Page 136

1  you to explain your understanding of Ms. Anderson's
2  qualifications, correct?  It's the bottom of the
3  first page.
4    A   Right, yeah, I saw that, yeah.
5    Q   And then if you go to the top of the
6  second page, that first paragraph there, the second
7  sentence you write, Ms. Anderson had no comparable
8  prior experience, acted only a deputy adviser in her
9  prior roles, did not have prior management
10 experience similar to that required to head an
11 entire division of FBI OGC.  Do you see that?
12   A   Yes.
13   Q   Do you believe that to be true?
14   A   Yes.
15   Q   And what is your basis for that
16 contention?
17      MR. HART:  Objection insofar as you're
18 asking her to explain why the interrogatory says
19 that, and that's covered by attorney-client
20 privilege.
21 BY MS. GRAY:
22   Q   No, I'm asking for the basis if your

Page 137

1  contention that Ms. Anderson did not have prior
2  management experience similar to that required to
3  run a division of OGC.
4       MR. HART:  To clarify, are you asking her
5  the basis of her belief or the basis of the
6  interrogatory?
7  BY MS. GRAY:
8    Q   Yeah, the basis for your belief.
9    A   Just looking at her prior experience, I
10 did not see where she had the ability to cover a
11 full branch like that.  I -- you know, that was my
12 belief.
13   Q   Okay.  And how were you familiar with
14 Ms. Anderson's prior management experience?
15   A   It was just what --
16      MR. HART:  Again, objection to the extent
17 that it calls for discussions between her and her
18 attorney.
19      THE WITNESS:  Right, I am no --
20      MR. HART:  Don't answer.
21      THE WITNESS:  Yeah, I have no
22 recollection.

35 (Pages 134 - 137)

Marciann Grzadzinski                                    November 15, 2018

Page 138

1      MS. GRAY:  I'm not asking for anything
2  about discussions, I'm asking what at the time of
3  the selection was her understanding of Ms.
4  Anderson's prior management experience.
5      MR. HART:  I don't think that was your
6  question, but I don't have an objection to that one.
7      THE WITNESS:  I did not know the fine
8  nuances.  No one shared with me her resume, no one
9  shared with me her curriculum vitae, so to speak.
10  But it was my understanding from talking to
11  individuals that she didn't have any of the
12  management experience that we -- we would think
13  would be appropriate for this position.
14  BY MS. GRAY:
15      Q   Can you name some of those individuals
16  that you spoke with?
17      MR. HART:  Other than counsel.
18      THE WITNESS:  Yeah, it would have been --
19  it was table discussions amongst the executive
20  management.  It would have been Rick McNally, it
21  would have been Sherry Sabol, it would have been
22  Nancy Wiegand.  God, I can't -- he's bald, he's

Page 139

1  bald, I can't remember his name -- Senate, Bob
2  Senate.  I think it's Bob Senate.
3      I mean, basically folks in NSLB also were
4  kind of taken aback that she was chosen.  So I guess
5  what I'm saying is it wasn't my own personal -- I
6  wasn't the only one going where did she come from.
7      Normally when there's a deputy general
8  counsel chosen, we've worked with them somewhere in
9  our past, our paths have crossed, we know them,
10  they've been involved in various parts of what we've
11  done historically, and she came literally --
12  everybody said, who's Trish Anderson, and that's
13  where most of the discussions started from because
14  nobody had ever heard of her.
15  BY MS. GRAY:
16      Q   Are you aware that others in NSLB had
17  actually worked with her?
18      A   Nobody I talked to ever said that they had
19  worked with her.
20      Q   You stated that Ms. Anderson was not
21  familiar with the internal policies and procedures
22  needed to perform in a DGC position; is that right?

Page 140

1      A   Correct.
2      Q   Wouldn't that be true of any external
3  candidate who had not previously worked at the FBI?
4      A   Not necessarily because a lot of them
5  sometimes will have interactions with us, yeah, not
6  necessarily.
7      Q   Isn't it true that at the DGC level you're
8  less involved in a specific subject matter of the
9  position that you oversee and have more of a
10  managerial role?
11      A   No.
12      Q   Can you turn to page four of your
13  supplemental responses?  So if you could look at
14  interrogatory 29?
15      A   Okay.
16      Q   If you would look at your response in the
17  third paragraph there.
18      A   Okay.
19      Q   The last sentence there reads, moreover,
20  DGC positions at the FBI have comparatively lesser
21  roles in the specific subject matter of the
22  divisions they oversee and instead take on largely

Page 141

1  managerial roles.  Do you see that?
2      A   Yes.
3      Q   Is that a true statement?
4      A   It is a true statement; however, the
5  subject matter expertise is still required.  I think
6  that's what I might have been referring to is that
7  you still need to have the subject matter expertise
8  to still manage your people.
9      Q   Okay.  But I clearly read this wording
10  before and you said, no, that that wasn't true when
11  you asked you the question.
12      MR. HART:  And she just clarified her
13  answer.
14      THE WITNESS:  I just clarified it so,
15  yeah.
16  BY MS. GRAY:
17      Q   Okay.  After having seen it in your
18  interrogatory response?
19      A   Well, no, I -- you know, I've -- yeah, I
20  was thinking -- I was thinking it, but it didn't
21  come out that way.
22      Q   Okay.  Are you aware that the EEO

36 (Pages 138 - 141)

Marciann Grzadzinski                                           November 15, 2018

1  investigator in this case contends that Mr. Baker
2  removed certain statements from the draft that you
3  prepared of the signed sworn statement?
4      A   I believe -- yes.
5          MS. GRAY:  I don't know that we need to
6  mark this as an exhibit, it's in the ROI.  If you
7  have a preference, we can put it in.
8          MR. HART:  Yeah, if we could just name the
9  ROI tab.
10         MS. GRAY:  And I can give it to you.  It's
11 tab --
12         MR. HART:  Yeah, just for clarity of the
13 record.
14         MS. GRAY:  It's tab 19 of the ROI.
15         MR. HART:  Okay.  That's fine.
16 BY MS. GRAY:
17     Q   So the EEO investigator placed in the ROI
18 basically discussing Baker's omission of information
19 in the signed sworn statement.
20     A   Correct.
21     Q   Can you please look at the second page?
22     A   Absolutely.

1      Q   Actually, the bottom of the first page it
2  says Mr. Baker removed the following statements from
3  the draft version of the statement, and then on the
4  next page she lists three things.
5      A   Correct.
6      Q   If you can look at that second statement?
7      A   Okay.
8      Q   I was Ms. Grzadzinski's rating official
9  while she served as DGC, but I did not rate her.  Do
10 you see that?
11     A   Yes.
12     Q   Now, in the FBI ratings are given out in
13 October of each year; is that correct?
14     A   Yes.
15     Q   And by October Mr. Baker was no longer
16 your rating official, correct?
17     A   Correct.
18     Q   Okay.  So he would not have had an
19 opportunity to rate you, correct?
20     A   Correct.
21     Q   Do you think that it's fair to say that
22 that statement might give someone not familiar with

1  the FBI's rating schedule the impression that he did
2  not fulfill his obligation to give you a rating?
3          MR. HART:  Objection, form and calls for
4  speculation as to the affect it could have on
5  somebody else.
6          THE WITNESS:  I have no idea.
7  BY MS. GRAY:
8      Q   The next sentence reads Ms. Grzadzinski
9  received -- am I pronouncing your name properly?
10     A   Oh, trust me, it's close enough.
11         MR. HART:  It's one of the best ones I've
12 seen so far.
13 BY MS. GRAY:
14     Q   How do you pronounce it?
15     A   We say Grzadzinski, we just forget the
16 first Z because it just kind of throws people.
17     Q   Okay.
18     A   But it's been a lot worse, trust me.
19     Q   Okay.  So the second sentence reads, Ms.
20 Grzadzinski received a performance appraisal review,
21 PAR; however, she did not receive it until October
22 2016, which was after she had been reassigned,

1  correct?
2      A   Correct.
3      Q   Okay.  You actually were given a PAR in
4  October 2015, correct?  That was the one that we
5  looked at --
6      A   Yeah.  Okay, yeah, yeah.
7      Q   So you were given a PAR in October 2015?
8      A   Yes, absolutely.  Yeah, I don't know why
9  -- yeah.
10     Q   So that's not an accurate statement?
11     A   No.
12     Q   Okay.  We're finished with that one.
13     A   Okay.
14     Q   During the investigation of your EEO
15 Complaint you were sent a draft of your signed sworn
16 statement; is that right?
17     A   Correct.
18     Q   Did you make any changes to the draft
19 statement?
20     A   I do not recall.
21     Q   Did you remove any statements from the
22 draft statement?

37 (Pages 142 - 145)

Marciann Grzadzinski                                          November 15, 2018

Page 146

1    A   I do not recall.
2        MS. GRAY:  This is the draft of the signed
3    sworn statement.
4        MR. HART:  Okay.
5        MS. GRAY:  This will be Exhibit 17.
6        (Grzadzinski Deposition Exhibit Number 17
7        was marked for identification.)
8        MR. HART:  And just -- because I think I
9    know what this is, this is the same one that the
10   investigation initially emailed?
11       MS. GRAY:  That's right.
12       MR. HART:  Got it, okay.
13   BY MS. GRAY:
14   Q   Do you recognize this as your draft signed
15   sworn statement?
16   A   It appears to be, yes.
17   Q   Okay.  Can you please look at page 4345,
18   the last two sentences there?
19   A   To only feedback, are we starting with
20   that?
21   Q   Right.
22   A   Okay.

Page 147

1    Q   So you can take as much time as you want
2    if you want to compare the statements.  We could
3    also -- the documents are in the record and they
4    speak for themselves, but this statement is not in
5    your final statement, do you recall removing this
6    statement, these last two sentences?
7    A   Possibly.
8        MR. HART:  And again, we'll just object
9    because they do speak for themselves.
10       THE WITNESS:  Yeah, possibly.
11   BY MS. GRAY:
12   Q   And why did you remove these statements?
13   A   I have no idea.
14   Q   Okay.  This is your statement, correct?
15   A   Correct.
16   Q   And you're entitled to make whatever
17   changes to it that you want to make it accurate,
18   correct?
19   A   Correct.
20       MR. HART:  Objection, it misstates the
21   record insofar as this draft was prepared by
22   somebody other than Ms. Grzadzinski.

Page 148

1        THE WITNESS:  Right.
2    BY MS. GRAY:
3    Q   So you're referring to feedback that GC
4    Baker provided you regarding your work performance
5    was that you failed to communicate with him about
6    what was going on.  Did he provide you that
7    feedback?
8    A   Other than just communicating to him?  I'm
9    sorry --
10   Q   No, I'm asking did -- so you wrote that
11   the only feedback that GC Baker provided to you was
12   that you failed to communicate with him.
13   A   Correct.
14       MR. HART:  Again, objection so far as this
15   was a document prepared by somebody other than Ms.
16   Grzadzinski.
17   BY MS. GRAY:
18   Q   Did GC Baker actually give you that
19   feedback?
20   A   That I failed to communicate with him?
21   Q   Yes.
22   A   Yes.

Page 149

1    Q   Okay.  And the next sentence you
2    indicate -- you reminded him that during the all
3    hands meeting you always communicated the projects
4    that you were working on; is that correct?
5    A   That sentence doesn't even make sense so
6    that's -- why this second sentence was removed is
7    because it's -- no one ever comments during an all
8    hands meeting, so it -- it was wrong.
9        And the only thing I can think of, to be
10   quite honest with you, was I told her to take out
11   this last one and somehow they both got taken out.
12   But I don't know why I would have taken out the
13   previous one, if that makes sense.  And that may
14   have been in error.  But the second sentence --
15   Q   Is not true?
16   A   Is not -- doesn't make any sense.
17   Q   We're finished with that document.
18   A   Okay.
19       MS. GRAY:  Why don't we take another
20   break?
21       MR. HART:  Okay.
22       (Whereupon, a short break was taken.)

38 (Pages 146 - 149)

Marciann Grzadzinski                                      November 15, 2018

Page 150

1  BY MS. GRAY:
2      Q   When you were DGC you were the direct
3  supervisor of Sherry Sabol; is that right?
4      A   Correct.
5      Q   She was the section chief of the Science
6  and Technology Law Office, correct?
7      A   Correct.
8      Q   What was your relationship with Ms. Sabol
9  like during that time period?
10     A   Sherry and I are both probably type A
11 dominant women, so I have known Sherry for years, so
12 it was -- in the very beginning I wouldn't say we
13 butted heads, but there was obviously a getting to
14 know each other's personality on a
15 supervisor-supervisee kind of relationship.
16     Q   How did you assess Ms. Sabol's
17 performance?
18     A   Sherry can have issues with individuals,
19 and I knew that there were some individuals within
20 her branch that she didn't get along with and were
21 having difficulties with.  I know a lot of people in
22 OGC didn't care for Sherry, so that was basically --

Page 151

1  she is an amazing lawyer, she's very bright, she's
2  very capable, she knows the law very well, but
3  Sherry -- I guess the best way --
4          She's kind of rough around the edges, so
5  Sherry doesn't know how to diplomatically tell
6  sometimes the correct -- she's right, but she just
7  doesn't know how to sometimes diplomatically say
8  that.
9          MS. GRAY:  Is it okay if I put like two
10 emails in one exhibit?
11         MR. HART:  That's fine.
12         MS. GRAY:  It's actually three.
13         (Grzadzinski Deposition Exhibit Number 18
14         was marked for identification.)
15         MR. HART:  Just for clarity, would you
16 mind just reading off the page numbers so the record
17 is clear?
18         MS. GRAY:  So Exhibit 18 consists of three
19 separate emails, the first one starts at 3422 and
20 goes to 3423, the second one is 3428 to 3429, and
21 the third one is 3434.
22

Page 152

1  BY MS. GRAY:
2      Q   So if we look at this first email, these
3  first two pages, it's kind of a chain.  Take your
4  time looking over this and just let me know what
5  this situation referred to.  And you don't have to
6  go -- the underlying --
7      A   Yeah.  Okay.
8      Q   So you're forwarding and email that Sherry
9  sent to you to Mr. Baker, correct?
10     A   Correct.
11     Q   And you write, I really can't find words
12 to put with the below email, correct?
13     A   Correct.
14     Q   What were you referring to?
15     A   I was referring to -- basically once
16 again, it goes back to what I just said, Sherry is
17 rough around the edges, Sherry, if she does not --
18 once Sherry doesn't like you or doesn't like -- it's
19 very difficult for her to then interact with you,
20 and she has had -- she and Joe Mazel both had issues
21 with Jonathan Frenkel long before I got there.
22         And that was -- her tone was what

Page 153

1  basically what I was referring to.  To me it was --
2  I don't know what -- harsh or what you'd want to --
3  I just think it was kind of inappropriate, her tone
4  of the email.  She may have -- I'm sure all of it
5  was factually true, it was just once again the way
6  she kind of goes about delivering messages.  Does
7  that make sense?
8      Q   Yes.  And why did you forward this email
9  to Mr. Baker?
10     A   Because Justin Schoolmaster routinely
11 would come to me that he wanted to get rid of
12 Sherry.  And so I -- like I said, at the beginning
13 we had issues, and this was February, so it was -- I
14 wasn't even there a month yet.  So this would have
15 been during that period when we were -- I wouldn't
16 say butting heads, but we were not always reaching
17 the same terms at the same time.
18         And this was one of those examples that I
19 wanted to forward to Jim, that I felt that Sherry
20 needed management training or management assistance
21 from me on how to better interact with people.
22     Q   So you mentioned that Justin had come to

Page 154

1  you many times saying he wanted to get rid of
2  Sherry?
3      A   Yes.
4      Q   Would he tell you the reasons why he
5  wanted to get rid of Sherry?
6      A   He was very vague about it, and I --
7  again, knowing Sherry's personality, it would be
8  easy to understand why he would have wanted to get
9  rid of her.  But it never had to do with the
10  underlying job performance as a lawyer, it was more
11  personality -- for me it was more personality with
12  Sherry that eventually we got on the same page very
13  quickly and started working very well together.
14     Q   Okay.  Can you look at the second email
15  which starts on page 3428?
16     A   Okay.
17     Q   And take your time looking at this.  But
18  this is essentially -- you're forwarding another --
19     A   Right.
20     Q   -- email to Jim.
21     A   Right.
22     Q   To Mr. Baker.

Page 155

1      A   Right.
2      Q   The subject line of the email is more
3  toxicity.
4      A   Yes.
5      Q   And why were you forwarding this to
6  Mr. Baker?
7      A   Again, this was -- it's kind of comical
8  because he said I never filled in him on stuff, but
9  then I did fill him in on stuff.  So I was keeping
10  him abreast of the continuing situation between
11  Jonathan and Sherry, and basically the fact that,
12  again, it was a situation I was dealing with and I
13  felt he needed to know.
14         Because I also know there was an
15  underlying -- I guess it wasn't underlying -- there
16  was another process where they were trying to get
17  Mr. Frenkel and another individual on PIPs, and so I
18  guess I was trying to show him that not necessarily
19  is PIP the right way to go, that this was more of
20  a -- not necessarily a performance issue on the
21  parts of these two individuals, but more of a
22  personality conflict.

Page 156

1      Q   And so Mr. Frenkel was -- he was Assistant
2  General Counsel, correct?
3      A   Correct.
4      Q   So he was below the unit chief?
5      A   Correct, he would have been two or three
6  layers below me, correct.
7      Q   So two levels below Sherry?
8      A   No, because Sherry is a section chief,
9  unit chief -- yeah, I guess if you count his spot as
10  the second one, yes.
11     Q   And you referenced that she had issues
12  with some other people in her branch?  Was there
13  anyone else besides Mr. Frenkel that she had kind of
14  ongoing personality issues with?
15     A   Yes.
16     Q   How many other people?
17     A   Well, she -- like I said, there's a lot of
18  attorneys in OGC that didn't care for working with
19  Sherry.  There was another individual she wanted to
20  remove, which was Kristin Vidivich -- I think it's
21  V-I -- it's just like it's spelled, V-I-D-I-V-I-C-H,
22  I believe -- she was another individual, and they

Page 157

1  had a horrible relationship.
2      Q   And so Mr. Baker responds, thanks, let's
3  discuss.
4      A   Right.
5      Q   Did you ever discuss this situation with
6  him?
7      A   I would make that assumption, but I
8  don't -- can't -- I know we talked about Sherry and
9  I know we talked about these two individuals, but
10  I -- whether we discussed it that same week or it
11  took a while to get to it because of meeting
12  schedules, I don't recall.
13     Q   Okay.  And then the final email, page
14  3434, is an email from Justin to you, copying
15  Mr. Baker, correct?
16     A   Yes.
17     Q   And this is a situation where Sherry
18  wanted somebody removed from the suite.
19     A   That would have been Jonathan Frenkel.
20     Q   Okay.  And Jim is saying, it seems a
21  little petty of Sherry, to be honest.  Do you see --
22  look at the last page?

Marciann Grzadzinski                                    November 15, 2018

Page 158

1   A   Yep, I see it.

2   Q   Did you agree that that was petty of her

3   to want to remove him from the suite?

4   A   To be quite frank with you, it was the

5   best thing to happen.  It was like -- they couldn't

6   even physically look at each other without things

7   just -- they just couldn't even -- so it made the

8   most sense, even though to Jim it may have seemed

9   petty.  I was ready to move him out of the suite

10  because it made the most sense.

11      I thought the best way to deal with them

12  was to physically just take them apart from each

13  other and let Jonathan do his job, which he was

14  capable of doing, and let Sherry, you know, not have

15  that every day of seeing him.  Because I know it

16  was -- he -- it just was better for him to move.

17  Q   As far as you were aware, did Mr. Frenkel

18  have these kind of issues with anyone else or was it

19  just unique to him and Sherry?

20  A   Well, Jonathan's, again, very bright --

21  he's an odd duck.  There's no other way to describe

22  him, he's kind of a loner, kind -- he's just a

Page 159

1   different individual.  So I know he -- he's not one

2   of the guys to hang around, you know, and chitchat,

3   he's very much a loner, very bright, knows his

4   stuff, but he's just different, but very capable of

5   doing his job.

6   Q   Do you think in this situation there was

7   one of the two parties to blame or was it just two

8   personalities that didn't get along?

9   A   I think it was two personalities that

10  didn't get along, and it had -- I guess I want to

11  say it festered for so long that it just became,

12  like I said earlier, it almost became toxic, that

13  they just couldn't be in the same suite together.

14  Q   Okay.  We're finished with that.

15      (Grzadzinski Deposition Exhibit Number 19

16      was marked for identification.)

17  BY MS. GRAY:

18  Q   I know.  I have a magnifying glass.

19  A   No, I'm good.

20  Q   These are your Lynx messages.

21  A   Okay.

22  Q   Or selected Lynx messages.

Page 160

1   A   I was going to say I know I did more than

2   that.

3   Q   Okay.  And Lynx is an internal messaging

4   function on FBI computers; is that correct?

5   A   Correct.

6      MS. GRAY:  And that's L-Y-N-C.

7   BY MS. GRAY:

8   Q   So can you please turn to page 4340?

9   These are the selected pages, so they're not --

10  they're in order but they're not --

11  A   Yep, they're all Bates Stamped.  Okay, got

12  it.

13  Q   And they actually, to make it more

14  interesting, go in reverse.

15  A   Okay.  It's the Bureau, so I'm with you.

16  Q   But they are time and date stamped so you

17  can follow the time.

18  A   Okay.

19  Q   So if you'll look at the bottom most text

20  there.

21  A   Yep.

22  Q   The first column there is the date.

Page 161

1   A   Yes.

2   Q   The second column is the from.

3   A   Yes.

4   Q   Third column is to.

5   A   Okay.

6   Q   You know, these are all in the records so

7   when you look at the first page, this will indicate

8   that, and then you've got the text.

9   A   Yep.

10  Q   So the first one is an email from you to

11  J. Kopac.

12  A   Yep.

13  Q   Who is that?

14  A   Julie Kopac.

15  Q   And does she work in OGC?

16  A   She's an associate division -- well, now

17  she does.  She started in OGC three weeks ago, four

18  weeks ago, but she in this capacity was an ADC at

19  WFO.

20  Q   Okay.  So she's a friend of yours?

21  A   Yes.

22  Q   So you say, can I come back.

41 (Pages 158 - 161)

Marciann Grzadzinski                                November 15, 2018

Page 162

1    A   Right.
2    Q   And her response is, yes, absolutely, I
3  will bring over boxes this afternoon.  And your
4  response is, hell, I'm so pissed, I am just going to
5  leave this job.  And then if you go on to the next
6  page --
7    A   Yep.
8    Q   Well, it gets confusing because in between
9  there's other messages, but kind of the second
10 message down there you say to her, Sherry Sabol is
11 showing her true colors.  Do you see that?
12   A   Yes.
13   Q   Okay.  What did you mean by that?
14 Basically what you've been referring to --
15   A   Yes, with the Jonathan Frenkel.  Because
16 if you look at the dates, it's all about the same
17 timeframe.
18   Q   Yeah, actually it's the same date of that
19 first email we looked at, February --
20   A   Okay, yep.
21   Q   So you were referring to like the
22 toxicity --

Page 163

1    A   Yes.
2    Q   Okay.  And then if you look at the next
3  page, 4338.
4    A   Yep.
5    Q   You were writing to A. Kalb, correct?
6    A   Anne Kalb, correct.  She's down in the
7  Legal Instruction Unit.
8    Q   Okay.  And you say, LOL, I must share with
9  you my candid conversation regarding Sherry that I
10 had with Pat Kelly today, correct?
11   A   Oh, yeah, yes.
12   Q   And what do you recall was that
13 conversation with Pat Kelly was about?
14   A   Specific conversation like word for word,
15 no.  But I remember going up to Pat Kelly's office
16 or running into -- I think I was up in office for
17 something, and I can't remember what it was, and he
18 asked me how it was going.  And I said, overall it's
19 going great except -- and he said, let me guess,
20 Sherry.  And I said, yes.  So I guess that's what I
21 was getting to earlier, that there were several
22 individuals in The Bureau that just did not work

Page 164

1  well with Sherry.
2    Q   Okay.  And that email -- we can look at if
3  you like -- that you looked at earlier that you had
4  to sent to AB Turgal where you said, this gig
5  sucks --
6    A   Yes.
7    Q   -- that was actually the same day.
8    A   Yep.
9    Q   Would it be fair to say or do you recall
10 if you were referring -- you were basically saying
11 that in reference to the situation?
12   A   More than likely.  I'm sure that's what it
13 was all involving.
14   Q   Okay.  That's all we have to look at
15 there.  So it was your understanding that Mr. Baker
16 was also aware of these issues with Ms. Sabol as
17 well, correct?
18   A   Correct.
19   Q   Okay.  So do you think that Mr. Baker may
20 have had legitimate reasons for removing Ms. Sabol
21 from the supervisory position?
22       MR. HART:  Objection, form.

Page 165

1        THE WITNESS:  No, because it's like I said
2  earlier, Sherry's very good at what she does.  Sherry
3  just -- she needed -- she needed someone to show her
4  how to interact with folks, and I was getting there
5  and we were working on it.  So I believe at the time
6  things were getting much better with Sherry.
7  BY MS. GRAY:
8    Q   And when Ms. Sabol was removed from her
9  section chief position, she was moved into a special
10 assistant position, correct?
11   A   That was -- I'm going to be honest with
12 you, when he drew the org chart, she wasn't even on
13 the org chart.  So at that time I had no clue where
14 she was going.
15   Q   But, I mean, you continued working in OGC,
16 was it your understanding that she was a special
17 assistant?
18   A   That's what she told me she was named as
19 was a special assistant.
20   Q   And as a special assistant, she didn't
21 have any direct reports, correct?
22   A   I can't recall.  She might -- I can't

Marciann Grzadzinski                                          November 15, 2018

Page 166

1  remember if somebody was working with her or not,
2  but I thought for some reason that -- and I don't
3  know why I remember this, but I thought there was
4  somebody that she was -- she was responsible for,
5  but I can't remember.
6      Q   All right.  We're finished with that.
7      A   Okay.
8      Q   So in your interrogatory responses, which
9  you can reference, if you'd like, I think it's
10  Exhibit 4 at page four, you stated that Ms. Wiegand
11  was informed by GC Baker that he believed that her
12  performance made her ability to remain a section
13  chief tenuous.  GC Baker told Ms. Wiegand that she
14  needed to improve and threatened to remove her from
15  her position.
16      A   Correct.
17      Q   Is that right?
18      A   Yes.
19      Q   What is your basis for saying that?
20      A   Nancy told me.
21      Q   She told you that Mr. Baker threatened to
22  remove her from her position?

Page 167

1      A   Correct.
2      Q   Do you believe that Ms. Wiegand's own
3  explanation of what Mr. Baker may have said or done
4  with respect to her would be more reliable than your
5  own version?
6          MR. HART:  Objection, form.
7          THE WITNESS:  I don't understand.
8  BY MS. GRAY:
9      Q   Between your understanding of what
10  Ms. Wiegand told you, and Ms. Wiegand's own
11  explanation of what Mr. Baker may have said to her,
12  do you think that her version would be more
13  reliable?
14      A   Yeah, because she had the direct
15  conversation.
16      Q   Isn't it true that the Litigation Branch
17  was essentially unaffected by the reorganization?
18          MR. HART:  Objection, form.
19          THE WITNESS:  I'm trying to remember.  As
20  far as I recall, I don't believe anything was
21  changed.
22

Page 168

1  BY MS. GRAY:
2      Q   Prior to the reorganization Ms. Wiegand
3  was the Section Chief of the Discovery Management
4  Section, correct?
5      A   I believe so, but for some reason I'm
6  thinking she had a broader scope, but I'm not sure.
7      Q   And following the reorganization, is it
8  your understanding that she was still the Section
9  Chief of the Discovery Management Section?
10      A   From what I recall -- yeah, I'm going to
11  be quite honest with you, I don't have the specifics
12  in my recollection.
13      Q   Do you recall that after Tom Bondy
14  retired, Ms. Wiegand was named Acting General
15  Counsel of the Litigation Branch?
16      A   I believe so, yes.
17      Q   At the time that you retired from The
18  Bureau, to the best of your knowledge, was
19  Ms. Wiegand still a section chief at DMS?
20      A   When I retired in 2017?  She's over -- no,
21  she's on a detail at OD and I.
22      Q   Okay.  Well, when you're on a detail, you

Page 169

1  still hold your official position with The Bureau,
2  correct?
3      A   I have no clue what they've done with OGC,
4  sorry.
5      Q   Do you know what rating Ms. Wiegand
6  received on her 2015 PAR?
7      A   No.
8      Q   In your interrogatory responses you stated
9  that GC Baker's acquisitions about Ms. Wiegand were
10  baseless.  Do you recall that?
11      A   I'm sure it's in there, yeah.
12      Q   Do you believe that to be true?
13      A   Yeah.
14      Q   Okay.  But you don't believe that
15  Mr. Baker would have any legitimate basis for
16  telling Ms. Wiegand that she needed to improve her
17  performance?
18      A   No.
19      Q   Now, you contend that Mr. Bondy had
20  performance issues, correct?
21      A   Correct.
22      Q   And as the DGC of the Lit Branch -- the

43 (Pages 166 - 169)

Marciann Grzadzinski                                November 15, 2018

Page 170

1  Discovery Management Section within the Lit Branch,
2  correct?
3      A   Correct.
4      Q   And part of your basis for saying that, if
5  I understand correctly, and correct me if I'm wrong,
6  is that he was doing such a poor job that Mr. Baker
7  took DMS from under him and gave it to Mr. Babcock,
8  correct?
9      A   Correct.
10     Q   Because DMS had a lot of issues at that
11 time, correct?
12     A   Correct.
13     Q   Okay.  As the Section Chief of DMS, do you
14 think it's fair to say that Ms. Wiegand shared some
15 of the responsibility for the poor performance of
16 DMS?
17         MR. HART:  Objection, calls for
18 speculation.  Answer to the extent you know.
19         THE WITNESS:  DMS is -- has been a
20 troubled area for quite some time, and I know --
21 what little I know about it, it had a lot more to do
22 with the technical part of it and trying to do a lot

Page 171

1  more in the technical field with the discovery
2  production.  So I know it was not necessarily Nancy,
3  there was a lot of issues that were revolving around
4  getting the project done.
5  BY MS. GRAY:
6      Q   So if Nancy, the section chief -- if the
7  issues, you know, with DMS couldn't be attributed to
8  her, why could they be attributed to her supervisor?
9      A   It was -- I think it had more to do -- it
10 cascades down, so you have the deputy general
11 counsel who is supposed to be shepherding this
12 project, and I -- my understanding was that he was
13 not shepherding it appropriately, and that's why
14 they gave it to Ernie, because it needed more
15 attention.
16     Q   And what's the basis of your understanding
17 as to whether or not Ms. Wiegand was shepherding it
18 appropriately?
19     A   I know Nancy, I've talked to Nancy, she
20 was telling me the issues and the problems they were
21 having, and a lot of the issues were not issues in
22 her control.

Page 172

1      Q   Okay.  Can you please look back at the
2  Lynx messages?
3      A   Oh, sure.
4      Q   And if you will go to page 4307.
5      A   Okay.
6      Q   The very first message on that page, do
7  you see that?
8      A   Yes.
9      Q   And that looks like it's a message from
10 Craig Youman to you, correct?  CS Youman --
11     A   Oh, up at the top.
12     Q   Yeah.
13     A   I was looking at the first one at the
14 bottom.  I was working backwards.  Okay, yep.
15     Q   And is that your fiance, Craig Youman?
16     A   Correct.
17     Q   And he writes to you, well, wasn't Nancy,
18 along with Sherry, potentially deserving of the
19 actions taken against them.  Do you see that?
20     A   Yes.
21     Q   And then if you flip over to page 4306 you
22 respond, yes.  Do you see that?

Page 173

1      A   Yes.
2      Q   Was this chain referring to Nancy Wiegand
3  and Sherry Sabol?
4      A   I'm trying to -- I'm trying to remember if
5  there was another -- I know I know a couple Nancys,
6  and that's what my concern is.
7      Q   Okay.  Why don't we -- to help kind of
8  place it, we can go down a little further.
9      A   Okay.
10     Q   The fourth text from the bottom.
11     A   Okay.
12     Q   You're writing to Mr. Youman.
13         MR. HART:  I'm sorry, which page are we
14 on?
15         MS. GRAY:  4307.
16         THE WITNESS:  Okay, yep.
17 BY MS. GRAY:
18     Q   Okay.  Just ran into Nancy Wiegand, one of
19 the five, she accepted their mediation offer, so she
20 is done.
21     A   Okay.
22     Q   She has also at a two-year detail to ODNI.

44 (Pages 170 - 173)

Marciann Grzadzinski                                                November 15, 2018

Page 174

1    A   Okay.

2    Q   Your next response to him is the one at

3  the top of the page.

4    A   Okay.

5    Q   Well, wasn't Nancy, along with Sherry,

6  potentially deserving of the actions taken against

7  them.

8    A   Okay.

9    Q   Does that refresh your recollection that

10  you were talking in the context of the EEOs, so that

11  you would be talking about Nancy Wiegand and Sherry

12  Sabol?

13    A   Yeah.

14    Q   And do you -- did you understand his

15  reference to the actions taken against them to the

16  actions Mr. Baker took?

17    A   I'm going to be honest and say, no, I

18  don't recall that being -- if you read it in this

19  context, yes, it sounds like it's in that context,

20  but I do not recall it exactly, if that's what we

21  were talking about.

22    Q   Well, what was Ms. Wiegand deserving of?

Page 175

1    A   It could have been the ODNI.  I mean, she

2  deserved to be out of OGC and get a break.  But I

3  don't know -- I mean, it's hard for me to put all of

4  these snippets together, if that makes -- but, yeah,

5  I don't recall.

6    Q   So her choice to go on a detail to ODNI is

7  an action taken against her, that's your position?

8    A   It could be.  I don't recall, I guess is

9  what I'm trying to get at.  I don't know

10  specifically these interspersed items.  And I'm

11  going to be honest with you, when I'm doing IMing,

12  the fact that I'm IMing with two different people at

13  the same time, I'm not sure -- I've been known to

14  answer one when I thought I was answering another.

15  Does that -- I just don't know.

16    Q   Well, do you see another chain of texts

17  there in which you would have been answering yes to?

18    MR. HART:  I'm going to say asked and

19  answered at this point.  I think she's explained

20  over and over again she doesn't know.

21    MS. GRAY:  I have not asked that question.

22  It's a brand new question.

Page 176

1    THE WITNESS:  Yeah, I can't -- I guess I'm

2  saying, yes, that could be the interpretation, but I

3  cannot sit here two years later and say that that's

4  exactly what we were discussing or what it meant.

5  BY MS. GRAY:

6    Q   Do you believe that Nancy Wiegand was

7  deserving of whatever action was taken against her?

8    A   No.

9    Q   Okay.  What action was taken against her

10  that you're aware of?

11    MR. HART:  Again, I'll object to form

12  insofar as whether you're referring to the document

13  or if it's a completely separate question.

14  BY MS. GRAY:

15    Q   No, I'm asking what do you believe is the

16  action that was taken against Ms. Wiegand.

17    A   She was threatened to be removed from her

18  position.

19    Q   And when you refer to the actions Ms.

20  Sabol is deserving of, what -- can you think of

21  anything you could have been referring to that

22  Ms. Sabol would have been deserving of in the

Page 177

1  context of discussing the EEOs?

2    A   Well -- and if you read this, it says --

3  and this is -- well, wasn't Nancy, along with

4  Sherry, potentially deserving of the actions taken

5  against them.  I'm agreeing with his statement, not

6  necessarily that the actions taken against them were

7  deserving.

8    Q   But that's his statement.

9    A   That's his statement, and I'm agreeing

10  with what he said.  So it's not --

11    Q   Okay.  I mean, it's clear what it says.

12    MR. HART:  Just because there was a lot of

13  cross talk there for a second, just to insert an

14  objection insofar that it stated the record that

15  it's potentially deserving.

16    THE WITNESS:  And that's his statement.

17  BY MS. GRAY:

18    Q   Right.  And you agreed with it?

19    A   I'm agreeing that -- what he said, but not

20  necessarily that that's my --

21    Q   Okay.  You stated in your interrogatory

22  responses that during the reorganization General

45 (Pages 174 - 177)

Marciann Grzadzinski
November 15, 2018

Page 178

1 Counsel Baker asserted that Ms. Bruno's position was
2 not needed, and told her to find another job.
3    A   Correct.
4    Q   You also stated that GC Baker eliminated
5 Ms. Bruno's position, correct?
6    A   Correct.
7    Q   What is your basis for saying that?
8    A   It was eliminated.
9    Q   Okay.  Well, wasn't it the former deputy
10 director who eliminated Ms. Bruno's position?
11    A   Not that I'm aware of.  He -- when he drew
12 it up on the board, he -- it wasn't there.
13    Q   Are you aware that Ms. Bruno herself
14 alleged that the Deputy Director eliminated her
15 position because he transferred her to another
16 division?
17    A   I do not know what's in her complaint.
18    Q   Okay.  Do you believe that Ms. Bruno's own
19 explanation of what Mr. Baker may have said or done
20 with respect to her would be more reliable than your
21 own version?
22    A   Yes.

Page 179

1    Q   Are you familiar with Ms. Bruno's
2 performance in her prior position?
3    A   I worked with her, I mean, that's my
4 basis.
5    Q   Her role was to liase with the DOJ's
6 Office of the Inspector General; is that correct?
7    A   Correct.
8    Q   Are you aware of her relationship with
9 OIG?
10    A   She worked with them daily.
11    Q   Are you aware of like how that
12 relationship went or whether there were issues with
13 that relationship?
14    A   I have no idea if there were issues with
15 their relationship.
16    Q   Are you aware of what position Ms. Bruno
17 currently holds in the FBI?
18    A   She's the Assistant Director of Office of
19 Integrity and Compliance.
20    Q   And the assistant director position would
21 be equivalent in rank to Mr. Baker's position as
22 General Counsel; is that right?

Page 180

1    A   Correct.
2    Q   Do you contend that Mr. Baker told Karen
3 Miller that she would have to compete for her
4 position if she wanted to return to it?
5    A   Correct.
6    Q   But he didn't impose similar restrictions
7 on male employees; is that right?
8    A   Correct.
9    Q   Do you believe that Ms. Miller's own
10 explanation of what Mr. Baker may have said or done
11 with respect to her would be more reliable than your
12 own version?
13    MR. HART:  I'm going to object to the
14 extent it calls for a legal conclusion as to the
15 reliability of certain accounts versus others.
16    THE WITNESS:  Yeah, she would have the
17 firsthand interaction.
18 BY MS. GRAY:
19    Q   At the time you retired from the FBI,
20 Ms. Miller, to the best of your understanding, still
21 held the position of section chief in OGC, correct?
22    A   Correct.

Page 181

1    Q   Are you familiar with Ms. Miller's
2 performance as a section chief in NSLB?
3    A   I'm only familiar from my interaction with
4 her.
5    Q   Okay.  The entire time that you were in
6 OGC, she was actually on detail to another agency;
7 is that right?
8    A   Correct, but I worked with her for years
9 when I was the CDC.
10    Q   Okay.  And what was your assessment of her
11 performance?
12    A   She was always very responsive, always
13 gave the right answers.  She was always very easy to
14 work with.
15    Q   Okay.  You stated in your interrogatory
16 responses that it was your understanding that
17 Ms. Bessee, Cecilia Bessee, also has knowledge of
18 her own EEO Complaint against GC Baker and the
19 circumstances surrounding that complaint.
20    A   Correct.
21    Q   What is your basis for believing that
22 Ms. Bessee has filed an EEO Complaint involving

46 (Pages 178 - 181)

Page 182

1 allegations against Mr. Baker?

2    A   We routinely -- when I say we, there was

3 multiple women that have filed against James Baker,

4 and we periodically would have cocktails together,

5 and Cecilia showed up because it was my

6 understanding she was invited because she was one of

7 these individuals.

8    Q   And did she tell you that she had filed an

9 EEO Complaint?

10   A   I do not recall specifically her telling

11 me that or whether I just made the assumption

12 because she showed up that somebody knew she had

13 filed.

14   Q   And do you have any knowledge what the

15 basis of her alleged complaint would be?

16   A   No.

17   Q   During these cocktail meetings would she

18 talk about what she was unhappy about that Mr. Baker

19 had done?

20   A   We were all talking about basically the

21 same thing, that Jim was not responsive to us, he

22 was not promoting us, he was not working with us.  I

Page 183

1 mean, that was kind of the general consensus.

2    Q   Did Ms. Bessee ever discuss a specific

3 position that she had applied for or a promotion

4 that she didn't get or anything like that?

5    A   I know that she was in for -- there was, I

6 think, another section chief position that was open

7 in litigation that I believe she might have put in

8 for, but I can't recall that specifically.

9    Q   And are you aware that Ms. Bessee is

10 currently the Section Chief of the Litigation

11 Section?

12   A   Yes.

13   Q   And do you have any knowledge of Ms.

14 Bessee's performance?

15   A   Other than just working with her.

16   Q   Any knowledge of whether she would be

17 deserving or a particular promotion or not?

18   A   Cecilia I love and adore personally, but

19 as the CDC, you could never get -- you could never

20 get her to return a phone call, that was always kind

21 of my issue with Cecilia was that you needed an

22 answer so you always went to her counterpart, and I

Page 184

1 know he left and I -- oh, Henry -- Henry -- and I

2 can't remember his last name.

3    Q   Okay.

4    A   He was always my go-to person because

5 trying to get ahold of Cecilia was difficult.

6    Q   Was he a unit chief?

7    A   Yes, they were both unit chiefs together.

8    Q   Can you look at your Lynx again, page

9 4302?

10   A   Okay.

11   Q   And the very first text there is a text

12 from you to Ann Kalb, correct?

13   A   Yes.

14   Q   And you write, my head is still exploding

15 that they made Babcock the acting AD at EEO, really,

16 the man who sat there and watched tank the career of

17 eight women.  And Cecilia as acting DGC, really, I

18 like Cecilia, but WTF.  Henry carried civil lit for

19 years, Cecilia never returns a phone call.

20       So you were surprised -- is it fair to say

21 you were surprised that Cecilia would be selected as

22 Acting Deputy Genral Counsel of the Litigation

Page 185

1 Branch?

2    A   Yes.

3    Q   And what was the basis of your surprise?

4    A   The fact -- I mean, it's true, I mean,

5 Cecilia, for years we could never get her to return

6 a phone call.  And like I said, personally I really

7 like Cecilia, but it was always a struggle trying to

8 get ahold of her and get a response.  And when

9 you're sitting out in the field and you need a quick

10 response, that was my -- that was always my

11 frustration with Cecilia.  If you could get her, the

12 response was right, it was just a matter of getting

13 her.

14   Q   Did Ms. Wiegand ever indicate to you that

15 she had wanted to be Section Chief of Litigation

16 Branch?

17   A   I don't recall.

18   Q   Did she ever indicate to you that that was

19 part of her complaint against Mr. Baker, that he

20 said she couldn't be Section Chief of Litigation

21 Branch or anything like that?

22   A   I vaguely remember something to that

Marciann Grzadzinski                                    November 15, 2018

Page 186

1  affect, that, you know, the -- that she had just as

2  much experience to be over that, but anything

3  specific, I don't recall.

4      Q   Do you know Ms. Bessee's age?

5      A   No.

6      Q   Do you perceive her to be over 40?

7      A   Yes.

8      Q   What do you perceive her race to be?

9      A   African American.

10     Q   This might be the last text.  If you can

11  just look again at page 4337, the third text up from

12  the bottom.

13     A   Okay.

14     Q   It's a text from you to J. Kopac.

15     A   Yep.

16     Q   And you can look at the second sentence

17  starting with and honestly.  Do you see that?

18     A   Okay.

19     Q   Well, actually there's two and honestly so

20  -- so at the very kind of end of the line before it

21  starts wrapping around is another and honestly, they

22  will not listen.  Do you see that?  And honestly,

Page 187

1  they will not listen to me on how to fix what needs

2  to be fixed, so I'm finding other projects that will

3  improve life in the field and moving on.  Do you see

4  that?

5      A   Yes.

6      Q   Okay.  And the date of this text was March

7  17th 2015, correct?

8      A   Yep.

9      Q   What did you mean by that?

10     A   I'm going to be honest with you, I have no

11  clue, other than the fact that I would sit there and

12  try to talk, like I said earlier, in the meetings,

13  and Jim would either just gloss over me or just not

14  even -- and so I kept running into brick walls on

15  trying to get my opinion across, so then I started

16  looking for things that I knew I could fix.

17     Q   Okay.  And what did you mean by moving on?

18     A   Not -- just focusing my efforts on things

19  that I know would be projects that would improve.

20     Q   And when you reference projects that will

21  improve life in the field, what does that refer to?

22     A   That was referring to a -- I was trying to

Page 188

1  get rotation for fill-in CDCs and ADCs, and trying

2  to get funding from headquarters to be able to do

3  those TDYs to get folks out to the field where we

4  needed them, and vice versa, to bring people from

5  the field into headquarters so that there could be

6  more cross pollination.

7      Q   Okay.  You contend that former DGC Tom

8  Bondy was a poor performer; is that right?

9      A   Correct.

10     Q   Mr. Bondy announced his retirement shortly

11  after the reorganization, correct?

12     A   Correct.

13     Q   Are you aware that Mr. Baker testified

14  that he was aware that Mr. Bondy was leaving at the

15  time he announced the reorganization?

16         MR. HART:  Objection, form.

17         THE WITNESS:  I don't recall that, no.

18  BY MS. GRAY:

19     Q   Okay.  If he testified to that in his

20  signed sworn statement, do you have any reason to

21  believe that he is lying?

22     A   No.

Page 189

1      Q   Do you contend that Mr. Baker should have

2  made you DGC at the Litigation Branch?

3      A   It was definitely a possibility, yes.

4      Q   Do you have substantial experience in the

5  Federal Court system?

6      A   No.

7      Q   Have you ever litigated in the Federal

8  Court?

9      A   No.

10     Q   In your interrogatory responses you also

11  stated that DGC Bondy sexually harassed numerous

12  agency employees resulting in several EEO

13  complaints; is that right?

14     A   Correct.

15     Q   Do you stand by that statement?

16     A   I know there were complaints, I don't know

17  if they rose to the level of actually filed EEOs.

18     Q   So what is your basis for saying that?

19     A   I'm making the assumption that, yes, there

20  were formal EEOs filed.

21     Q   Okay.  Have any agency employees ever

22  personally told you that Mr. Bondy sexually harassed

48 (Pages 186 - 189)

Marciann Grzadzinski                                November 15, 2018

Page 190

1   them?

2       A   No.

3       Q   Have you ever spoken to any individuals

4   who filed an EEO complaint against Mr. Bondy?

5       A   No.

6       Q   So you don't have any personal knowledge

7   of whether EEO complaints were filed against

8   Mr. Bondy?

9       A   I know there were complaints brought

10  forward, but whether they filed them EEO or how they

11  addressed them, I do not know.

12      Q   Assuming there were complaints brought

13  forward, how do you know what Mr. Baker did about

14  them or did not do about them?

15      A   I know that he wasn't doing anything about

16  it until Elaine Lammert brought it to his attention.

17      Q   Is it your belief that Mr. Baker treated

18  Rick McNally more favorably than he treated you?

19      A   Yes.

20      Q   Is it your understanding that Mr. McNally

21  had been acting as the DGC of NSLB for approximately

22  two years at the time Ms. Anderson assumed the role?

Page 191

1       A   That timeframe seems about correct.

2       Q   Are you aware that he also applied to be

3   the DGS of NSLB?

4       A   Yes, I do know that.

5       Q   Do you think he was qualified to be the

6   DGC of NSLB?

7       A   Yes.

8       Q   Do you think he was more qualified than

9   Ms. Anderson?

10      A   Yes.

11      Q   Do you think he was treated unfairly in

12  being passed over for the role?

13      A   Yes.

14      Q   Do you think you were more qualified than

15  Rick McNally to assume the role?

16      A   I think we were equally qualified.

17      Q   Okay.  In your -- well, let's just look at

18  them, it's your supplemental interrogatory

19  responses, Exhibit Number 24 -- sorry, that's my

20  tab -- sixteen.  So your responses to the agency's

21  supplemental discovery request.

22      A   Yep, got it.

Page 192

1       Q   Okay.  So if you look at page six, these

2   are your responses to the agency's request for

3   admissions, and if you look at the very last one,

4   admission number 30.

5       A   Okay.

6       Q   You deny and say, after Ms. Anderson was

7   hired as DGC NSLB she reported for training at

8   Quantico and Mr. McNally remained as acting DGC.

9       A   Correct.

10      Q   Okay.  You were referring to just the one

11  week that she was in orientation, correct?

12      A   Correct.

13      Q   Once she was in place the next week,

14  Mr. McNally did return to his position as Section

15  Chief in the Science and Technology Branch, correct?

16      A   That was part of the re-org, I believe,

17  yeah.  That was Sherry's position, yes.

18      Q   Okay.  So, yeah, as part of the re-org

19  Mr. McNally was moved to Ms. Sabol's prior role,

20  correct?

21      A   Correct.

22      Q   Did you ever discuss that move with

Page 193

1   Mr. McNally?

2       A   Yes.

3       Q   Was it your impression that he was happy

4   with that move?

5       A   I wouldn't use the term happy.  He was --

6   he was -- for him, he was happy to be out of NSLB,

7   especially after being passed over, and I'm not

8   exactly sure, but I think he asked to be moved out

9   of NSLB, but I may be remembering that incorrectly.

10  And it was just awkward for him, and that was most

11  of our conversation was that it just was incredibly

12  awkward for him to be put in that position.

13      Q   And that was because he had been acting

14  for so long and then wasn't selected?

15      A   No, the fact that he was now -- it was

16  awkward for him to be over in the Science and

17  Technology Branch.

18      Q   Okay.

19      A   That, you know, he -- Sherry's there, how

20  does -- he just felt incredibly awkward about the

21  whole thing.  He felt awkward about me being taken

22  from DGC down to section chief, couldn't believe it,

49 (Pages 190 - 193)

Marciann Grzadzinski                                    November 15, 2018

Page 194

1  that was the general crux of that conversation.
2       MS. GRAY:  Can you please mark this?
3       (Grzadzinski Deposition Exhibit Number 20
4       was marked for identification.)
5  BY MS. GRAY:
6     Q   Okay.  This is an email from Mr. McNally
7  to you, correct, dated September 22nd 2015, correct?
8  And take your time.
9     A   No, I'm just -- okay.
10    Q   We're really focused just on the top one.
11    A   Okay.  I was trying to figure if they all
12  went together or --
13    Q   I mean, it's just a long chain.
14    A   Okay.
15    Q   It starts with basically your being
16  informed about having to do this EDP.
17    A   Yep, yep.
18    Q   And how you do the EDP.
19    A   Right.
20    Q   And then he says to you, I definitely want
21  to talk first, I think looking for a new job is
22  probably not really what they are seeking in these

Page 195

1  things.  Do you see that?
2     A   Yeah.
3     Q   Okay.  So was it your impression that at
4  this time he was pretty unhappy with his situation?
5     A   Yeah, I would -- yeah.  I would make
6  that -- yeah, it seems obvious but I -- yeah.
7     Q   And he says, as you know, it is apparent
8  that less experience and less subject matter
9  expertise is being prioritized, and I'm not sure how
10  I can lose when I know that that's what he wants.
11  Correct?
12    A   Correct.
13    Q   Is it your understanding that when he says
14  what he wants, he's referring to Mr. Baker?
15    A   I guess you could make that assumption.
16  It's hard for me to say exactly what -- but I would
17  make -- yeah.
18    Q   Are there other situations in which you
19  think that there was this prioritization of less
20  experience or less subject matter expertise other
21  than this -- what you have contended happened in the
22  Trisha Anderson case?

Page 196

1       MR. HART:  Objection.  I'm going to state
2  for this record this is an email from Mr. McNally.
3       THE WITNESS:  Right.
4       MR. HART:  He's the one that is making
5  that contention.
6       THE WITNESS:  The only thing I can think
7  of is if he was also including the fact that I was
8  now reporting to Ernie Babcock who had absolutely no
9  experience in The Bureau, and that would be the only
10  thing I could think he would be referring to was the
11  fact that I now was taken from deputy general
12  counsel and put down to section chief.
13  BY MS. GRAY:
14    Q   Do you think that in general Mr. Baker
15  prioritized subject matter expertise less than
16  management experience?
17    A   That, I don't know.
18    Q   Was that your impression?
19    A   I wouldn't know enough about the other
20  people's management experience to make that
21  comparison.
22    Q   Okay.  We're finished with that.  You

Page 197

1  retired effective December 31st 2017, correct?
2     A   Correct.
3       MS. GRAY:  Can we just go off the record
4  for a second?
5       (Whereupon, a short break was taken.)
6  BY MS. GRAY:
7     Q   And when did you make the decision to
8  retire at that time?
9     A   I know I filed my retirement paperwork the
10  middle of December.  I mean, I had been thinking
11  about it, but when I actually pulled the trigger on
12  it, I know it was like two weeks.  It was December
13  of something I think was when I actually filed.
14    Q   And for how long had you been thinking
15  about it?
16    A   Since -- I'm a Bureau agent, you start
17  thinking about it the day you become KMA.  That's
18  just what we do.
19    Q   And KMA is what?
20    A   Well, we refer to it as Kiss My Ass, but
21  the day that you can literally stand up and say,
22  yeah.

50 (Pages 194 - 197)

Marciann Grzadzinski                                    November 15, 2018

Page 198

1    Q    And that's upon reaching 20 years with The

2  Bureau and 50 years of age; is that right?

3    A    Correct.

4    Q    So is it fair to say that even prior to

5  joining OGC, you had anticipated retiring upon

6  reaching your 20-year mark?

7    A    I didn't intend to retire when I

8  absolutely reached -- that would have been June of

9  2016 -- no.

10   Q    Okay.

11       MS. GRAY:  Can you please mark this as

12  Exhibit 21?

13       (Grzadzinski Deposition Exhibit Number 21

14         was marked for identification.)

15  BY MS. GRAY:

16   Q    Do you recognize this email?

17   A    Yes.

18   Q    And the subject line of this email is 18

19  down, two to go, correct?

20   A    Correct.

21   Q    And this is like an exchange between your

22  agent class -- is that fair to say?

Page 199

1    A    Yes, National Academy 96-16.

2    Q    Okay.  And your email to Mr. Spiker, if

3  you would look at the fourth line down.

4    A    Yep.

5    Q    And in the middle of that line where it

6  starts just looking.  Do you see that?

7    A    Yep.

8    Q    Just looking forward to pulling the plug

9  two years from now.

10   A    Yep.

11   Q    I have managed to establish myself, so no

12  plan for a retirement job.  Do you see that?

13   A    Correct.

14   Q    So this email was sent June 9th 2014,

15  correct?

16   A    Correct.

17   Q    So at that time you anticipated retiring

18  in two years; is that right?

19   A    We all talking about leaving the moment we

20  are eligible, but a lot happens in two years.  So,

21  no, at the time of 2016 I didn't intend to retire.

22   Q    But at least at this time that you sent

Page 200

1  this email, you anticipated that you would retire in

2  two years?

3    A    I was establishing myself financially,

4  hopefully to be able to retire.

5        (Grzadzinski Deposition Exhibit Number 22

6         was marked for identification.)

7  BY MS. GRAY:

8    Q    Do you recognize this document?

9    A    Yes.

10   Q    This is another page from your calendar,

11  correct?

12   A    Yes.

13   Q    Okay.  And if you look at the entry for

14  June 9th 2015, you've written last year, exclamation

15  point, correct?

16   A    Correct.

17   Q    Okay.  So what were you referring to

18  there?

19   A    It refers that I have one more year until

20  I'm eligible.

21   Q    Okay.

22   A    But being eligible and retiring are two

Page 201

1  different things.

2    Q    So what was it the last year of?

3    A    To becoming eligible.

4    Q    Are you currently employed?

5    A    No.

6    Q    Are you seeking employment?

7    A    No.

8    Q    Have you sought employment since your

9  retirement from the FBI?

10   A    I have.

11   Q    Where?

12   A    I went to a job fair for one of the -- oh,

13  one of the investigative companies.

14   Q    Okay.

15   A    I can't remember the name off the top of

16  my head.

17   Q    Did you apply?

18   A    I filled out their paperwork, yes.

19   Q    Okay.  How long ago was that?

20   A    Maybe March --

21   Q    Okay.

22   A    -- April of this year.

Marciann Grzadzinski                                    November 15, 2018

Page 202

1    Q    Are you still waiting to hear about that?
2    A    No, no.
3    Q    So it's your understanding that you
4 weren't selected for that position?
5    A    I didn't follow through.
6    Q    Do you have plans to continue to seek
7 employment?
8    A    At some point.  Right now my daughter is
9 having some issues, so I'm going to stay home with
10 my daughter for a little while longer.
11    Q    Okay.  In the email that we just looked at
12 you indicated that you'd set yourself up so that you
13 didn't have to have a job in retirement; is that
14 correct?
15    A    Yeah.
16    Q    Okay.  In your discovery responses you
17 describe an experience of chest pain that occurred
18 on September 15th 2015 which required your
19 hospitalization, correct?
20    A    Correct.
21    Q    And you claim that that chest pain was
22 caused by your removal as DGC?

Page 203

1    A    Correct.
2    Q    Had you ever experienced a similar episode
3 of chest pain prior to that incident?
4    A    Not that I recall.
5    Q    Actually, when you were being treated on
6 September 15th 2015 for the chest pain, did you not
7 tell the doctor that you had had a similar chest
8 pain episode approximately six years prior?
9    A    I don't -- I don't recall that.
10    Q    Okay.
11        (Grzadzinski Deposition Exhibit Number 23
12        was marked for identification.)
13 BY MS. GRAY:
14    Q    This is entitled a Clinic Visit Progress
15 Notes Report.
16    A    Okay.
17    Q    And this a Dr. Bruce Cohen, he was -- at
18 least was a doctor for the FBI; is that right?
19    A    I have no idea.
20    Q    Do you recall -- so if you look at the
21 top, the date of this is September 15th 2015.
22    A    Okay.  Yeah, he didn't introduce himself.

Page 204

1 I'm sorry.
2    Q    Okay.  So in the notes there at the top
3 he's discussing you were there for chest pains.
4    A    Okay.
5    Q    Then on the third line down, the first
6 sentence on that line, HX, which I think means
7 history --
8    A    Yeah.
9    Q    -- of similar chest pain episode
10 approximately six years ago.  Does that refresh your
11 recollection that you would have told him that you
12 had a similar episode six years prior?
13    A    I'm going to be quite honest with you, I
14 don't remember a similar episode six years ago, so
15 I'm not quite sure -- I'm not quite sure where that
16 came from.
17    Q    Okay.  Do you have any reason to believe
18 that Mr. Cohen like made that up?
19    A    No, I don't believe he made it up.  I
20 don't -- you know, I have no -- I cannot dispute
21 what he wrote, but I do not recall telling him at
22 that time.

Page 205

1    Q    Okay.  Do you recall having a similar
2 chest pain episode approximately six years prior to
3 this?
4    A    I do not -- no, I don't.  I mean, I
5 remember -- no, I don't.
6    Q    Okay.  Do you recall what you were doing
7 on September 15th 2015 at the time that you had the
8 episode?
9    A    I was sitting -- we discussed earlier
10 where I had that space in Legal Training Unit, and I
11 was sitting at my little desk spot and we had just
12 had a -- I linked in for a meeting with Jim, and I
13 can't remember if it was a full section chief,
14 deputy general counsel meeting or what the
15 compromise of the meeting was, but I remember
16 linking in for a meeting or a conversation, and then
17 sitting there finishing the conversation and then
18 just have the chest pains.  And that's -- I can't
19 even recall what the meeting was about.
20    Q    Okay.  Can you take a look at that
21 calendar page again?  Oh, I'm sorry, different
22 calendar.  My mistake.  Let me give you a new one.

52 (Pages 202 - 205)

Marciann Grzadzinski                                    November 15, 2018

Page 206

1  Well, let me just ask if you recall.  Do you recall
2  that you had gotten an allergy shot the prior day?
3      A   I'm going to honest with you, if it was on
4  my calendar, it doesn't necessarily mean I did it.
5      Q   Okay.
6      A   I might have scheduled it but not done it.
7      Q   Okay.  But if it's on your calendar, does
8  that indicate that it's at least possible that you
9  had, in fact, gotten an allergy shot the day before?
10     A   Could have possibly been, but I -- yeah.
11     Q   How often do you get allergy shots?
12     A   I was supposed to be getting them weekly.
13 I got them at the health unit at headquarters.
14     Q   Okay.  That wouldn't have been your first
15 allergy shot?
16     A   Oh, God, no.  No, I'd been getting allergy
17 shots probably by that point in time a year, if not
18 a year and a half, so it wouldn't have been
19 anything -- it wouldn't have been an allergy shot.
20     Q   Have you ever had a reaction to an allergy
21 shot?
22     A   None.

Page 207

1      Q   You have a family history of heart
2  disease, correct?
3      A   My brother does, yes.
4      Q   Okay.  You also indicated that you have
5  experienced depression and anxiety as a result of
6  your removal; is that right?
7      A   Correct.
8      Q   Have you ever been diagnosed with
9  depression?
10     A   No.
11     Q   Are you being treated for depression?
12     A   No.
13     Q   Have you ever been treated for depression?
14     A   No.
15     Q   Why not?
16     A   I take that back, I was treated -- well, I
17 don't know if I was treated for depression -- I had
18 multiple in vitros and multiple miscarriages, and I
19 know I sought counseling at that time.  I don't know
20 whether they deemed it was depression or just being
21 overwhelmed.  But I've never -- no one's ever said,
22 you have depression, and take this -- I've never

Page 208

1  been medicated for it, if that makes any sense.
2      Q   And that other -- those instances you were
3  just describing were well before this time period?
4      A   Absolutely.
5      Q   Have you been diagnosed with anxiety?
6      A   No.
7      Q   Are you being treated for anxiety?
8      A   My -- after this cardiac -- I guess you'd
9  call it a cardiac episode, which wasn't -- because
10 they deemed my heart was fine -- I was having issues
11 with blood pressure, and my general practitioner put
12 me on Lexapro to try to, I guess, keep me calmer so
13 that my blood pressure didn't fluctuate.
14     Q   Okay.  Are you still taking that
15 medication?
16     A   No.
17     Q   So you haven't sought treatment for
18 anxiety?
19     A   No.
20     Q   Why not?
21     A   I just haven't.
22     Q   You contend that your removal caused

Page 209

1  weight gain and appetite fluctuations; is that
2  right?
3      A   Correct.
4      Q   Hasn't your doctor attributed your weight
5  gain to medication you're taking?
6      A   I don't have any medication that would
7  have affected my weight gain that I know of.
8      Q   Okay.  Can you look at your Lynx again?
9  Exhibit 28, page 4311.
10     A   Exhibit 19?
11     Q   Oh, sorry, yes.
12     A   Okay.  I just wanted to make sure I was on
13 the right spot.
14     Q   Page 4311.
15     A   Okay.
16     Q   The fifth text down.
17     A   Okay.
18     Q   The date is June 22nd 2016.
19     A   Okay.
20     Q   This is a text from you to Ann Kalb.
21     A   Right.
22     Q   Okay.  And then the second sentence there

53 (Pages 206 - 209)

Marciann Grzadzinski                                    November 15, 2018

Page 210

1   starts with doctor.

2      A   Right.

3      Q   Doctor is taking -- weaning me off the

4   meds.

5      A   Right.

6      Q   She thinks that is why I have gained

7   weight and cannot get it off.  Do you see that?

8      A   Yes.

9      Q   Okay.  Does that refresh your recollection

10  that your doctor had attributed weight gain to some

11  medication that you were taking?

12     A   It might have been, but I -- I don't --

13  yeah, I don't -- I'm trying to think what medication

14  that was.

15     Q   Okay.

16     A   And I can't even imagine -- other than the

17  Lexapro, which she had put me on, would be the only

18  thing that I think that would have caused that

19  issue.

20     Q   You have hypothyroidism, correct?

21     A   Correct.

22     Q   And when were first diagnosed with

Page 211

1   hypothyroidism?

2      A   I'm sorry, I couldn't even tell you.

3      Q   Was it before you worked at OGC?

4      A   Yes.

5      Q   One of the symptoms of hypothyroidism is

6   weight gain, correct?

7      A   Correct.

8      Q   Are you aware that depression is also a

9   symptom of hypothyroidism?

10     A   No.

11     Q   You take  Armour Thyroid for your

12  hypothyroidism, correct?

13     A   I believe they might have just changed it

14  but, yes, I've taken  Armour Thyroid.

15     Q   When did you start taking that medication?

16     A   I can't -- I do not recall the exact date.

17     Q   One of the -- are you aware that one of

18  the possible side effects of Armour Thyroid is chest

19  pain?

20     A   No.

21     Q   Are you aware that one of the possible

22  side effects of Armour Thyroid is change in

Page 212

1   appetite?

2      A   No.

3      Q   You allege that you have high blood

4   pressure resulting from your removal as DGC and your

5   removal from the SES, correct?

6      A   Correct.

7      Q   Did you have high blood pressure prior to

8   your removal?

9      A   No.  Okay.  Can you -- because I think I

10  answered you too quick.  I'm sorry.

11     Q   I'll change the question.

12     A   Okay.

13     Q   Have you ever had high blood pressure

14  prior to your removal?

15     A   I had it when I was at Office of General

16  Counsel.

17     Q   Okay.  You actually have had high blood

18  pressure going back as early as 2010, correct?

19     A   Not that I recall.

20     Q   You actually have been diagnosed with

21  hypertension, correct?

22     A   Not that I recall.

Page 213

1      Q   Okay.

2      A   I have low blood pressure.  And I think if

3   you're going back to my medical form, I think they

4   put it on the same page.

5      Q   Okay.  This is actually two separate

6   documents in one exhibit.

7          (Grzadzinski Deposition Exhibit Number 24

8          was marked for identification.)

9   BY MS. GRAY:

10     Q   If you look at that first page, which is

11  an INOVA Mount Vernon Hospital lab radiology

12  results.

13     A   Okay.

14     Q   And the triage time -- it's the second

15  line there -- is indicated as June 30th 2010.  Do

16  you see that?

17     A   Yeah.

18     Q   And then if you go down to the results

19  section and go down several lines to history.  Do

20  you see that?

21     A   Yes.

22     Q   It says, patient is a 48-year-old female

54 (Pages 210 - 213)

Marciann Grzadzinski                                    November 15, 2018

Page 214

1  with hypertension.
2     A   I've never told anybody I had
3  hypertension.
4     Q   Would that possibly have been -- I mean,
5  would -- have you ever been told that you have high
6  blood pressure?
7     A   No, my problem has always been just the
8  opposite, I always had low blood pressure.  And that
9  was why when I was having the issues with blood
10  pressure, that my general practitioner put me on the
11  Lexapro because she couldn't put me on a
12  hypertension medicine because my blood pressure is
13  always too low.  And she said, if I give you a blood
14  pressure medicine, you're going to bottom out, so
15  we'll give you Lexapro to try to calm you down and
16  see if we can keep it in check.
17    Q   Do you recall this visit on June 30th
18  2010?
19    A   No.
20    Q   You also claim that your removal caused
21  emotional changes.
22    A   Correct.

Page 215

1     Q   Is that right?
2     A   Correct.
3     Q   So you sought medical care related to
4  weight gain and emotional changes as early as 2013;
5  is that right?
6     A   Possibly that when they put me on the
7  thyroid.  I don't recall.
8     Q   So there was weight gain issues around the
9  time that you got diagnosed with hypothyroidism?
10    A   Correct.
11    Q   You take the medication Singulair for
12  asthma, correct?
13    A   Correct.
14    Q   For how long have you been taking
15  Singular?
16    A   Years.
17    Q   Are you aware that upper respiratory
18  infection and other cold-type symptoms are a
19  possible side effect of taking Singulair?
20    A   No.
21    Q   You're taking a hormone replacement
22  therapy; is that correct?

Page 216

1     A   You have to be specific --
2     Q   Called Vagifem?
3     A   I don't use that now -- no longer.
4     Q   Okay.  What time period did you use that?
5     A   It was for probably six months of last
6  year.
7     Q   Okay.  Are you aware that that
8  medication -- one of the side effects is weight
9  changes.
10        MR. HART:  Object to the extent that it
11  falls outside the relevant period because it
12  occurred in 2017.
13        THE WITNESS:  I guess I -- if you say it
14  does.  I have no personal knowledge of that.
15  BY MS. GRAY:
16    Q   I'm just asking if you're aware.
17    A   No.
18    Q   Are you aware that a common side effect of
19  Vagifem is depression?
20    A   No.
21    Q   You contend that after your removal as DGC
22  you were forced to purchase a vehicle to commute to

Page 217

1  your new duty station; is that right?
2     A   Correct.
3     Q   But after you were removed from DGC, you
4  remained in your same office on the tenth floor,
5  correct?
6     A   Correct.
7     Q   So can you explain why in your
8  interrogatory responses you contended that you were
9  forced to purchase a vehicle to commute to a new
10  duty station after your removal as DGC?
11    A   I purchased a new vehicle in 2017.  The
12  reason I had to purchase a new vehicle was because I
13  was -- I was going -- it wasn't -- the purchase
14  didn't happen immediately after my removal, but
15  because I was no reporting to Vienna to a location
16  that ran 24 hours a day, seven days a week, as
17  opposed to a position at headquarters, which was
18  more of a Monday through Friday type of position
19  where I could always rely on the Metro if the
20  weather was bad.
21        I didn't have that opportunity once I went
22  out to the Terrorist Screening Center.

55 (Pages 214 - 217)

Marciann Grzadzinski                                                          November 15, 2018

Page 218

1    Q    When did you purchase the vehicle?

2    A    In 2017, January of 2017.

3    Q    And you started working out of the

4  Terrorist Screening Center, I think you testified,

5  back in early April of 2016?

6    A    Correct.  But as we know, the weather

7  doesn't start getting bad in -- it started getting

8  bad in December, and that's when I looked into

9  getting a different car.  I was using my fiance's

10  Volkswagen, which doesn't do well in snow, so it

11  became apparent to me that in order to be able to

12  get to my job reliably in the snow, because they

13  open during the snow, that I needed a vehicle that

14  had four-wheel drive.

15    Q    How did you get to work when you were

16  stationed at headquarters?

17    A    I used my personal vehicle, it was a -- I

18  have a two-seater BMW.

19    Q    And so that was between -- the entire year

20  of 2015 you commuted in your BMW to headquarters?

21    A    Sometimes I took the Metro, depending on

22  the weather.  Sometimes I borrowed my fiance's

Page 219

1  Volkswagen.  But I had other transportation options

2  because of being down at headquarters, and

3  headquarters when the government calls off, you

4  don't go in.  Where at the Terrorist Screening

5  Center, we have to be open regardless.  Because I

6  was over the International Unit, which, just because

7  it's snowing here, doesn't mean it's snowing across

8  the country or the world.

9    Q    Which Metro station did you originate from

10  when you took the Metro?

11    A    I would take -- well, I was between

12  Springfield and Huntington.

13    Q    Okay.  And did you have to drive to the

14  station?

15    A    Yes or there was also buses.  I usually

16  didn't use the bus because I didn't know when I was

17  going to get home.

18    Q    Okay.  Prior to purchasing the new vehicle

19  you actually owned two vehicles; is that right?

20    A    A 1988 Reliant Station Wagon, which my

21  nanny used, and my -- the BMW.

22    Q    When you purchased the new vehicle, did

Page 220

1  you sell your BMW?

2    A    No, it's still sitting at home.

3    Q    So when you stated in the interrogatory

4  responses that you were forced to purchase a new

5  vehicle after your removal of DGC, that's not

6  accurate, is it?

7    A    It should have been section chief, I guess

8  that would have been -- yes, correct.

9    Q    In your interrogatory responses you

10  discuss stress associated with fear for your

11  financial stability; is that right?

12    A    Yes.

13    Q    In what ways did your removal affect your

14  financial stability?

15    A    It was -- at the time I went and took --

16  one of the reasons why I took the deputy general

17  position was so that it would make me more

18  marketable after retirement.  Because the thought

19  was I would go to work for three to five years after

20  I retired, even though the goal always is to just

21  retire, the reason I took that position was that I

22  could actually make more of a lucrative jump to a

Page 221

1  full-time position afterwards.

2       So then at that point in time when that

3  was kind of taken away, that's when I kind of

4  shifted and decided to stay home with my daughter.

5  And I'm going to be quite honest with you, I'm just

6  embarrassed -- absolutely embarrassed about the

7  removal and having to put myself out there again is

8  a difficult prospect for me.

9    Q    Well, we had looked at that email that you

10  sent back in the middle of 2014 that you had

11  indicated that you didn't have plans to work after

12  your retirement; isn't that right?

13    A    That was -- that was before the deputy

14  general counsel spot came up.  The plan at that time

15  was potentially just to retire and stay retired.

16    Q    But when you were removed from the SES,

17  your salary and benefits didn't change, correct?

18    A    Correct.

19    Q    In your signed sworn statement you stated

20  that at or around May 2015 there was an open DGC

21  position in the National Security Branch, do you

22  recall that?  You can look at if you need --

56 (Pages 218 - 221)

Marciann Grzadzinski                                          November 15, 2018

Page 222

1    A   Correct, yeah.  That was the one that
2  Trisha -- right.
3    Q   Right.
4    A   I just wanted to make sure I have the
5  right timeframe in my mind.
6    Q   But in May -- on May 5th 2015, as we saw,
7  Mr. Baker announced that Ms. Anderson would be
8  starting the position; is that right?
9    A   Correct.
10   Q   And at The Bureau if he announced she
11 would be starting, that -- I mean, there's a
12 background check, correct, before anyone can start
13 working at the FBI?
14   A   Correct.
15   Q   So presumably, she would have been
16 selected some months before that, correct?
17       MR. HART:  Objection, form.
18       THE WITNESS:  Possibly.
19 BY MS. GRAY:
20   Q   So it's not really accurate to say that
21 there was an open position in the National Security
22 Branch in May 2015, is it?

Page 223

1    A   She hadn't reported, so that was the
2  way -- until somebody's actually sitting in the
3  seat, to me there's an open position.
4    Q   In your signed sworn statement you stated
5  that you were seeking to be restored to a position
6  comparable to a deputy assistant director; is that
7  right?
8    A   Correct.
9    Q   Are you still seeking to be restored?
10   A   If I could be, yes.
11   Q   So why did you retire if you still want to
12 work for the FBI?
13   A   Because the position I was in required me
14 to be away from my daughter too much.  I applied for
15 another position, it was the -- oh, God -- it was
16 possibly an AD -- I can't remember if it was the AD
17 or DAD of Congressional Affairs or Public Affairs --
18 I applied for and I didn't get -- Congressional
19 Affairs.
20   Q   Do you know who was selected for that
21 position?
22   A   Yes, the gentleman who was over -- was a

Page 224

1  DGS of litigation -- Brower -- I think it was
2  Brower.
3    Q   Greg Brower?
4    A   Yes.
5    Q   Do you have any other pending EEO
6  complaints against the FBI?
7    A   No.
8        MS. GRAY:  I have no further questions.
9        MR. HART:  Okay.  So just two minutes, and
10 I think I'll be able to say take a break or we're
11 done.
12       (Whereupon, a short break was taken.)
13       MR. HART:  I have no cross examination.
14 Yes, she'll read.  Yes, I'd like a copy, just etran.
15       MS. GRAY:  I'd like a PDF, mini and
16 regular -- or just a mini, whatever.
17       (Deposition concluded at 1:37 p.m.)
18
19
20
21
22

Page 225

1  A C K N O W L E D G E M E N T  O F  D E P O N E N T
2
3  I, Marciann Grzadzinski, do hereby acknowledge
4  I have read and examined the foregoing pages of
5  testimony, and the same is a true, correct and
6  complete transcription of the testimony given
7  by me, and any changes or corrections, if any,
8  appear in the attached errata sheet signed by me.
9
10
11
12
13
14
15
_____     _____
16 Date              Marciann Grzadzinski
17
18
19
20
21
22

Page 226

1  DAVID HART
   Kator, Parks, Weiser & Harris, P.L.L.C.
2  1200 18th Street, N.W.
   Washington, D.C. 20036
3
   IN RE:  Grzadzinski, Marciann v. DOJ
4
5
6  Dear DAVID HART:
7     Enclosed please find your copy of the
8  deposition of Marciann Grzadzinski, along with
9  the original signature page.  As agreed, you
10 will be responsible for contacting the witness
11 regarding signature.
12    Within 30 days of December 5, 2018, please
13 forward errata sheet and original signed signature
14 page to counsel for Plaintiff, JULIET E. GRAY.
15    If you have any questions, please do not
16 hesitate to call.  Thank you.
17
18 Yours,
19 Jean M. Townsend
   Reporter/Notary
20
21 cc:  JULIET E. GRAY
22

Page 228

1  District of Columbia, to wit:
2
3     I, Jean M. Townsend, a Notary Public of
4  the District of Columbia, do hereby certify that the
5  within-named witness, personally appeared before me
6  at the time and place herein set out, and after
7  having been duly sworn by me, according to law, was
8  examined by counsel.
9     I further certify that the examination was
10 recorded stenographically by me and this transcript
11 is a true record of the proceedings.
12    I further certify that I am not of counsel
13 to any of the parties, nor in any way interested in
14 the outcome of this action.
15    As witness m
16 November, 2018.
17
18              Jean M. Townsend
19                 Notary Public
20 My Commission expires:
21 May 14, 2020
22

Page 227

1     ERRATA SHEET
2  Case:  Grzadzinski V. Jefferson Sessions, III
3  Witness:  Marciann Grzadzinski     Date
4  PAGE/LINE     SHOULD READ     REASON FOR CHANGE
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21
22

58 (Pages 226 - 228)

Marciann Grzadzinski
November 15, 2018

## &

**&**   2:16 226:1

## 1

**1**   3:9 20:12,16
**1/26/15**   3:12
**10**   3:18 76:15,16
**10/27/14**   3:9
**1000**   2:18
**10140**   2:9
**10th**   76:22
**11**   3:19 42:6 78:5
**11/18/14**   3:11
**12**   3:20 79:10
   105:20
**1200**   2:17 226:2
**123**   3:22
**1250**   1:16
**128**   4:4
**13**   3:21 84:10
**135**   4:5
**14**   3:22 123:10
   228:21
**146**   4:6
**15**   1:15 3:3 4:4
   13:1 77:3 117:18
   128:10
**151**   4:7
**159**   4:8
**15th**   202:18 203:6
   203:21 205:7
   228:15
**16**   4:5 13:1 135:10
**16th**   122:6,13
**17**   4:6 146:5,6
**17807**   228:17
**17th**   123:14 187:7
**18**   4:7 33:12
   151:13,18 198:18
**18th**   2:17 226:2
**19**   4:8 33:12 35:20
   142:14 159:15
   209:10

**194**   4:9
**198**   4:10
**1988**   219:20
**1991**   10:17
**1996**   11:3
**1:00**   21:4
**1:37**   224:17
**1:41**   81:20
**1:42**   82:2

## 2

**2**   3:10 26:13,17
**2/19/15**   3:14 4:7
**20**   3:9 4:9 35:20
   194:3 198:1,6
**200**   4:11
**20005**   1:17
**2001**   10:21
**20036**   2:19 226:2
**2008**   11:7
**2010**   212:18
   213:15 214:18
**2012**   10:1
**2013**   215:4
**2014**   18:10 26:20
   28:10 70:14
   199:14 221:10
**2015**   41:17 42:20
   43:22 73:2 74:4,9
   76:22 94:12 96:13
   106:11 145:4,7
   169:6 187:7 194:7
   200:14 202:18
   203:6,21 205:7
   218:20 221:20
   222:6,22
**2015-00176**   1:6
**2016**   144:22 198:9
   199:21 209:18
   218:5
**2017**   168:20 197:1
   216:12 217:11
   218:2,2
**2018**   1:15 3:3
   42:21 54:20

   226:12 228:16
**202-324-2714**   2:11
**202-898-4800**   2:20
**2020**   228:21
**203**   4:12
**20535**   2:10
**20th**   78:10
**21**   4:10 198:12,13
**213**   4:13
**21st**   70:14 79:17
**22**   4:11 200:5
**22309**   9:21
**22nd**   94:12 194:7
   209:18
**23**   4:12 203:11
**24**   4:13 191:19
   213:7 217:16
**24th**   49:10
**26**   3:10 135:22
**26th**   41:17
**28**   3:11 209:9
**28th**   74:3 76:9
**29**   140:14
**2nd**   54:20

## 3

**3**   3:11 28:4
**3/17/16**   3:22
**30**   71:7,20 192:4
   226:12
**30th**   213:15
   214:17
**31st**   197:1
**3422**   151:19
**3423**   151:20
**3428**   151:20
   154:15
**3429**   151:20
**3434**   151:21
   157:14
**350**   1:16

## 4

**4**   3:12 41:7 166:10

**4/6/15**   3:16
**40**   37:8 186:6
**41**   3:12
**4214**   9:20
**4302**   184:9
**4306**   172:21
**4307**   172:4 173:15
**4311**   209:9,14
**4337**   186:11
**4338**   163:3
**4340**   160:8
**4345**   146:17
**438**   70:13
**439**   71:2
**48**   213:22

## 5

**5**   3:6,13 54:14
   226:12
**5/28/15**   3:17
**5/5/15**   4:4
**50**   198:2
**54**   3:13
**570-2017-00720x**
   1:5
**5th**   129:14 222:6

## 6

**6**   3:14 63:17
**6/9/14**   4:10
**63**   3:14
**6th**   73:2,13

## 7

**7**   3:15 70:5,6
**70**   3:15
**72**   3:16
**73**   3:17
**76**   3:18
**78**   3:19
**79**   3:20

## 8

**8**   3:16 72:13
**8/10/15**   3:18

Marciann Grzadzinski                                           November 15, 2018

**[8/21/15 - anderson]**                                                  Page 2

| | | | |
|---|---|---|---|
| **8/21/15**  3:19,20 | **accurately**  7:6 | **adics**  16:2 65:20 | 120:21 133:18 |
| **8/29/14**  3:10 | **achieve**  116:11 | **adjusted**  67:3 | 134:1,11,13 |
| **84**  3:21 | **acknowledge** | **admin**  16:15,16 | 197:16 198:22 |
| **87**  10:10 | 225:3 | **administrative** | **agents**  38:22 39:4 |
| **9** | **acknowledging** | 7:17 | 39:16 40:11 67:16 |
| | 125:21 | **admission**  192:4 | 91:17 93:1 130:12 |
| **9**  3:17 73:20 | **acquisitions**  169:9 | **admissions**  192:3 | **ago**  97:19 161:17 |
| **9/22/15**  4:9 | **acronym**  92:16 | **adore**  183:18 | 161:18 201:19 |
| **90**  128:15 | **acted**  136:8 | **advancement**  54:9 | 204:10,14 |
| **935**  2:8 | **acting**  12:2 94:9 | 55:20 | **agree**  158:2 |
| **96-16**  199:1 | 105:9,11 168:14 | **advantage**  134:4 | **agreed**  177:18 |
| **9:21**  1:15 | 184:15,17,22 | **adventure**  81:16 | 226:9 |
| **9th**  11:3 199:14 | 190:21 192:8 | **advice**  92:11,14 | **agreeing**  177:5,9 |
| 200:14 | 193:13 | 92:18,19 93:1,13 | 177:19 |
| **a** | **action**  175:7 176:7 | 126:7 | **agreement**  117:19 |
| | 176:9,16 228:14 | **advised**  106:10 | **ahead**  5:16 36:18 |
| **a.m.**  1:15 | **actions**  172:19 | 126:16 | 40:9 54:12 135:8 |
| **ab**  164:4 | 174:6,15,16 | **adviser**  136:8 | **ahold**  184:5 185:8 |
| **aback**  139:4 | 176:19 177:4,6 | **advisers**  91:1,2,3 | **alaska**  39:8 |
| **abbreviated**  64:8 | **active**  89:12 90:1 | 91:7,11,17 | **alexandria**  9:21 |
| **ability**  7:2 9:13 | 90:3,7,12,15,20 | **affairs**  223:17,17 | **aligned**  17:19 |
| 137:10 166:12 | 91:11 92:1 93:9 | 223:19 | **allegations**  182:1 |
| **able**  7:5 13:11,20 | 94:2 101:13 102:9 | **affect**  7:2 47:21 | **allege**  212:3 |
| 109:6 188:2 200:4 | **activities**  99:13,18 | 108:22 144:4 | **alleged**  178:14 |
| 218:11 224:10 | 100:18 | 186:1 220:13 | 182:15 |
| **abreast**  155:10 | **ad**  64:5 119:12,21 | **african**  186:9 | **allergy**  206:2,9,11 |
| **absolutely**  18:7 | 120:4,4 184:15 | **afternoon**  162:3 | 206:15,16,19,20 |
| 37:9 43:8 116:12 | 223:16,16 | **age**  37:6 186:4 | **alyssa**  72:18,21 |
| 125:19 126:8 | **adc**  11:18 14:13 | 198:2 | 78:9,12 79:16 |
| 129:7 142:22 | 25:3 39:13 161:18 | **agency**  1:6,12 2:2 | 81:20 |
| 145:8 162:2 196:8 | **adcs**  14:20 94:6 | 6:19 99:13,14,18 | **amanda**  74:3 |
| 198:8 208:4 221:6 | 188:1 | 100:18 101:5 | **amazing**  151:1 |
| **academy**  115:5,6 | **added**  13:1 | 181:6 189:12,21 | **america**  1:1 |
| 199:1 | **addition**  56:21 | **agency's**  5:10 | **american**  186:9 |
| **accept**  125:13 | **additional**  87:2 | 54:20 134:19 | **amounts**  91:14 |
| **accepted**  44:5 | 89:1 | 135:16 191:20 | **analyst**  68:2 |
| 126:10 173:19 | **address**  9:19 | 192:2 | **anderson**  128:8 |
| **accepting**  41:2 | 111:20 | **agent**  8:1,8 11:3 | 129:14,22 130:1 |
| 43:7,14 | **addressed**  116:5 | 13:12 37:10 38:16 | 130:22 132:10,15 |
| **accomplish** | 190:11 | 38:19 39:9,21 | 132:21 133:3,8 |
| 115:20 | **addressing**  116:4 | 40:14,15,17 67:13 | 134:19 136:7 |
| **accounts**  180:15 | **adic**  9:4 12:21 | 68:1,7,11,13,15 | 137:1 139:12,20 |
| **accurate**  56:1 | 13:21 15:21 16:3 | 68:16,19 69:3,10 | 190:22 191:9 |
| 145:10 147:17 | 65:20 67:13 68:1 | 69:11,12,12 81:12 | 192:6 195:22 |
| 220:6 222:20 | | | |

222:7
**anderson's** 136:1
   137:14 138:4
**ann** 41:14 184:12
   209:20
**anne** 163:6
**announced** 32:15
   36:8 98:3 129:1
   130:5,13 188:10
   188:15 222:7,10
**announcement**
   32:18 42:7,17
   43:1
**announcing** 131:3
**answer** 6:10 7:6
   13:10 20:10 47:2
   133:6 137:20
   141:13 170:18
   175:14 183:22
**answered** 43:16
   46:21 175:19
   212:10
**answering** 175:14
   175:17
**answers** 55:2
   181:13
**anticipated** 198:5
   199:17 200:1
**anxiety** 207:5
   208:5,7,18
**anybody** 25:13
   26:7 62:18 214:2
**anyone's** 96:15
**anyway** 91:16
**anyways** 119:4
**apart** 158:12
**apologize** 50:12
**apparent** 64:10
   102:8 109:11
   117:1 195:7
   218:11
**apparently** 73:14
**appear** 225:8

**appearance** 60:22
**appearances** 2:1
**appeared** 228:5
**appears** 29:12
   146:16
**appetite** 209:1
   212:1
**application** 17:12
   22:15,18 25:20
   29:22
**applied** 183:3
   191:2 223:14,18
**apply** 201:17
**appointed** 70:18
**appointees** 40:20
**appraisal** 14:9
   144:20
**appropriate**
   111:15 138:13
**appropriately**
   171:13,18
**approximately**
   13:1 39:3 85:15
   86:13 114:19
   190:21 203:8
   204:10 205:2
**april** 73:2,13 76:8
   122:15 201:22
   218:5
**area** 10:22 18:22
   44:14 50:17 58:13
   100:6 101:10
   170:20
**armour** 211:11,14
   211:18,22
**arrived** 63:5
**asked** 6:12 43:16
   46:21 47:5 76:4
   112:2 141:11
   163:18 175:18,21
   193:8
**asking** 34:13,16
   34:17 40:4 78:2
   78:12 135:22

136:18,22 137:4
138:1,2 148:10
176:15 216:16
**asks** 55:13
**ass** 197:20
**asserted** 178:1
**assess** 150:16
**assessment** 181:10
**assigned** 13:7 15:2
   15:9,16
**assignment** 14:17
**assist** 33:21 64:15
   91:16 119:14,15
**assistance** 55:9
   79:5,6 153:20
**assistant** 2:4 11:16
   14:3 50:18 51:8
   64:7 72:22 156:1
   165:10,17,19,20
   179:18,20 223:6
**assisted** 119:12
   120:7
**associate** 132:7,11
   161:16
**associated** 220:10
**assume** 6:11 28:22
   44:21 82:13 88:4
   129:10,18 191:15
**assumed** 44:6 46:2
   126:12 127:11
   128:4 190:22
**assuming** 8:4
   28:11 42:20 71:21
   80:12,18 190:12
**assumption** 157:7
   182:11 189:19
   195:15
**asthma** 215:12
**attache** 11:16
**attached** 4:14
   225:8
**attaching** 70:20
   73:8

**attachment** 27:1
**attend** 10:2
**attention** 171:15
   190:16
**attitude** 65:3
**attorney** 1:9 5:9
   9:3,16 12:3 40:15
   55:6 91:18 102:16
   132:7,12 133:5
   136:19 137:18
**attorneys** 12:13
   14:2 38:19 39:22
   103:9,9 156:18
**attributed** 171:7,8
   209:4 210:10
**august** 54:20
   76:22 78:10 79:17
**ausa** 92:20 93:3,4
   93:7
**authority** 50:1
**available** 47:18
   57:3,14 109:4
**avenue** 2:8
**avoided** 99:12
**aware** 46:11 58:18
   94:20 104:22
   126:9 130:9,21
   132:10,14 139:16
   141:22 158:17
   164:16 176:10
   178:11,13 179:8
   179:11,16 183:9
   188:13,14 191:2
   211:8,17,21
   215:17 216:7,16
   216:18
**awkward** 193:10
   193:12,16,20,21

|       b       |
|---------------|

**b** 1:8
**babcock** 18:14
   20:22 53:15 56:20
   57:8,14,16 58:9
   59:16 67:9,11

Marciann Grzadzinski
November 15, 2018

102:15 108:14
110:20 111:1
112:4,6 116:18
117:2,3,9 170:7
184:15 196:8
**babcock's** 48:11
48:15 51:5
**baby** 119:21
**bachelor** 10:12
**back** 13:18 53:10
66:12 68:17 92:8
101:6 107:13
108:21 109:2,6
127:5 152:16
161:22 172:1
207:16 212:18
213:3 218:5
221:10
**backbench** 86:18
**background** 17:18
33:11 130:4 132:9
222:12
**backwards** 127:4
172:14
**bad** 65:21 217:20
218:7,8
**baker** 18:15,16
20:22 23:22 30:10
31:8 32:5,22
33:14,20 34:11
35:8,17 37:17
54:2 56:7 60:8
63:10 73:1 83:6
83:10,12 84:1
85:3 87:11 88:19
89:2 90:18 93:12
94:12,17 95:3
96:14,18 97:10
99:3,11,17 101:4
101:21 102:2,9,19
108:14 110:11
111:3,11,15 112:2
113:4,21 115:15
116:1,13 117:4

130:21 132:11,14
142:1 143:2,15
148:4,11,18 152:9
153:9 154:22
155:6 157:2,15
164:15,19 166:11
166:13,21 167:3
167:11 169:15
170:6 174:16
178:1,4,19 180:2
180:10 181:18
182:1,3,18 185:19
188:13 189:1
190:13,17 195:14
196:14 222:7
**baker's** 54:7 55:18
56:3 72:4,6 73:12
142:18 169:9
179:21
**bald** 138:22 139:1
**ballpark** 13:5
**bar** 89:12 90:2,4,7
90:20 91:11 92:1
92:7 93:9 101:13
102:9 112:14
**barely** 48:22
**bars** 91:13
**based** 96:19 97:4
97:11,22 98:4
118:11,13 131:2
**baseless** 169:10
**basically** 27:11
30:1 57:13 58:5
70:17 73:8 75:16
75:17 76:7 77:15
78:12 90:11,17
112:8 116:19
131:3 139:3
142:18 150:22
152:15 153:1
155:11 162:14
164:10 182:20
194:15

**basing** 82:15
**basis** 25:1 34:6
133:2 136:15,22
137:5,5,8 166:19
169:15 170:4
171:16 178:7
179:4 181:21
182:15 185:3
189:18
**batch** 74:19
**bates** 106:4
160:11
**becgc** 17:3
**becoming** 11:15
45:21 64:10 201:3
**bed** 89:19
**beginning** 150:12
153:12
**behalf** 2:2,14
**belief** 137:5,8,12
190:17
**believe** 8:17 10:17
10:21 12:13 13:15
13:16 14:16 17:15
19:21 24:4 30:17
33:6 34:6,17
35:17 36:2,5 37:6
37:8 40:13 50:15
51:11 58:18 85:11
86:4 90:8,10,15
90:19 95:14
101:15 104:5,14
104:17 105:6
109:2,8 119:7
120:6,9,10 122:9
133:8,12 134:11
134:14 135:19
136:13 142:4
156:22 165:5
167:2,20 168:5,16
169:12,14 176:6
176:15 178:18
180:9 183:7
188:21 192:16

193:22 204:17,19
211:13
**believed** 166:11
**believing** 181:21
**bell** 105:17
**benefit** 123:20
**benefits** 221:17
**benoit** 50:11 102:1
114:21 115:11
**bessee** 181:17,17
181:22 183:2,9
**bessee's** 183:14
186:4
**best** 11:8 13:15
17:8 22:4 25:14
30:17 32:14 42:21
46:4 59:15 71:17
72:6 78:15 81:2
81:18 86:9 88:7
89:3,7 104:17
109:14 144:11
151:3 158:5,11
168:18 180:20
**bestie** 28:17 29:2
30:7
**better** 90:16
153:21 158:16
165:6
**big** 59:21 115:16
116:11
**bigger** 91:4
**birthed** 29:22
**bit** 18:3 58:21
66:11 81:17 127:5
**blame** 159:7
**blank** 25:5
**blood** 208:11,13
212:3,7,13,17
213:2 214:6,8,9
214:12,13
**bmw** 218:18,20
219:21 220:1
**board** 178:12

Marciann Grzadzinski                                November 15, 2018

**boards** 25:2
**bob** 139:1,2
**bolts** 93:2
**bondy** 18:14 21:1
  59:5 168:13
  169:19 188:8,10
  188:14 189:11,22
  190:4,8
**bondy's** 59:2
**bookshelves** 49:1
**bootlegged** 128:18
**borrowed** 218:22
**bottom** 26:21 82:2
  123:17 136:2
  143:1 160:19
  172:14 173:10
  186:12 214:14
**box** 81:14
**boxes** 49:17 162:3
**branch** 13:18 17:7
  17:11 19:17,19
  20:1 24:16 50:2,7
  60:15 83:15 93:22
  94:5 95:9 99:21
  123:6 137:11
  150:20 156:12
  167:16 168:15
  169:22 170:1
  185:1,16,21 189:2
  192:15 193:17
  221:21 222:22
**brand** 175:22
**break** 6:14,15
  69:14,16 122:1,18
  149:20,22 175:2
  197:5 224:10,12
**brick** 187:14
**briding** 64:15
**brief** 110:22 111:1
**briefed** 87:6
  116:19
**briefing** 116:22
**briefly** 94:22

**bright** 151:1
  158:20 159:3
**bring** 74:17 102:2
  103:9 133:22
  134:14,16 162:3
  188:4
**bringing** 133:21
**broader** 168:6
**brother** 207:3
**brought** 113:9
  190:9,12,16
**brower** 224:1,2,3
**bruce** 203:17
**bruno** 83:14 108:2
  178:13 179:16
**bruno's** 178:1,5
  178:10,18 179:1
**bubble** 89:17,19
**bubbling** 89:17
**budget** 12:5 68:14
  68:21
**building** 124:2
**bulk** 52:21
**bumped** 12:22
**burden** 92:9
**bureau** 1:11 2:7
  6:19,20 16:13
  33:13 35:20 47:10
  64:12,16 67:10
  95:9 126:4 160:15
  163:22 168:18
  169:1 196:9
  197:16 198:2
  222:10
**buried** 22:16
  25:20
**bus** 219:16
**buses** 219:15
**butted** 150:13
**butting** 153:16

**c**

**c** 5:1 9:20 156:21
  160:6 225:1

**cairo** 11:19
**calendar** 3:21
  4:11 84:16 88:5
  89:5 119:4 200:10
  205:21,22 206:4,7
**call** 22:14 40:3
  48:8,9 49:15 82:7
  93:5 119:21
  120:11 183:20
  184:19 185:6
  208:9 226:16
**called** 5:4 12:17
  17:10 22:14 23:5
  23:11,22 80:13,15
  90:22 216:2
**calling** 32:15
**calls** 20:7 21:12
  24:6 26:2 29:16
  34:8 35:4,5 37:20
  39:5,18 40:1 55:6
  60:18 65:5 92:7
  95:7,20 96:8
  127:22 133:4
  137:17 144:3
  170:17 180:14
  219:3
**calm** 214:15
**calmer** 208:12
**canal** 27:18
**canceled** 83:18
  88:13 99:3,6
  102:19 113:8
  127:15,16
**candid** 163:9
**candidacy** 20:6
**candidate** 140:3
**candidly** 112:9
**capable** 151:2
  158:14 159:4
**capacity** 8:5 88:21
  105:10 161:18
**capitol** 68:16
**car** 218:9

**cardiac** 208:8,9
**care** 150:22
  156:18 215:3
**career** 25:2
  184:16
**carl** 50:11 102:1
  114:21 115:11
**carried** 184:18
**carrol** 74:3
**cascade** 79:7
**cascades** 71:15
  171:10
**cascading** 73:9
  77:16
**case** 5:11 8:10
  51:15 86:16 87:5
  92:20 142:1
  195:22 227:2
**catherine** 93:19
  94:7 101:8 108:2
**caught** 122:21
**caused** 202:22
  208:22 210:18
  214:20
**cc** 226:21
**cdc** 8:21 11:6,15
  12:10 13:9 15:10
  19:1,11,12 22:21
  24:21 25:3,8 38:6
  38:9,22 39:3,8,10
  39:14 62:5 65:18
  90:1 91:21 92:13
  92:14,15 110:9,21
  111:12,19 112:19
  113:9,15 116:17
  181:9 183:19
**cdcs** 39:4,16 89:11
  90:7,19 92:10
  94:6 101:6,12
  111:9,14,20
  112:10 114:4
  188:1
**cds** 11:9 12:3
  38:19 39:2 93:8

Marciann Grzadzinski

November 15, 2018

**cecilia** 181:17 182:5 183:18,21 184:5,17,18,19,21 185:5,7,11
**cellphone** 9:2
**center** 121:13,15 121:16 125:7,10 217:22 218:4 219:5
**central** 44:13
**certain** 51:17 103:17 142:2 180:15
**certify** 228:4,9,12
**cgc** 17:2 89:11
**chain** 16:21 26:22 28:10 29:4 51:2 66:7 67:10,11 74:12 79:14 110:19,22 112:5 114:1 116:19,20 152:3 173:2 175:16 194:13
**chance** 31:22 41:10
**change** 23:2,4 85:13,22 91:10 106:14 110:1,3 125:9 211:22 212:11 221:17 227:4
**changed** 17:9 77:14,14 83:11 84:7 85:10 86:22 101:13 167:21 211:13
**changes** 121:18 145:18 147:17 214:21 215:4 216:9 225:7
**chantilly** 51:12 62:3
**character** 7:19

**chart** 108:19 165:12,13
**chatted** 25:10
**check** 71:18 81:14 214:16 222:12
**checked** 76:10 82:14
**chest** 202:17,21 203:3,6,7 204:3,9 205:2,18 211:18
**chief** 11:5 37:17 46:12,15 48:5 50:7 52:13 56:7 58:20 59:9,11 68:17 69:2,3 71:22 77:14 80:2 82:7 86:2,17,17 91:6 94:9,10,10 100:9,17 105:10 106:11 109:16 110:8 113:3 121:12,14 125:10 126:21 150:5 156:4,8,9 165:9 166:13 168:3,9,19 170:13 171:6 180:21 181:2 183:6,10 184:6 185:15,20 192:15 193:22 196:12 205:13 220:7
**chief's** 58:22 80:9 101:22
**chiefs** 83:13 85:7 85:8 86:3 105:6 126:15 184:7
**chin** 93:19 101:8
**chin's** 94:7
**chitchat** 159:2
**choice** 90:3 124:9 175:6
**chose** 23:7,7,12
**chosen** 22:21 23:1 23:5,10 127:10

139:4,8
**chris** 48:2,4,21 120:12 121:16
**circumstances** 181:19
**city** 22:22 113:19
**civil** 184:18
**claim** 202:21 214:20
**claimant** 2:14
**clarification** 7:22 8:6
**clarified** 141:12 141:14
**clarify** 28:1 116:6 137:4
**clarity** 142:12 151:15
**class** 198:22
**classes** 102:2
**classified** 7:8,10 7:11
**cleaning** 22:17
**clear** 5:14,22 88:18 151:17 177:11
**clearly** 141:9
**clerkship** 132:15
**cles** 92:6
**client** 55:6 133:5 136:19
**climate** 33:1,5,8 33:15,17
**clinic** 4:12 203:14
**close** 49:2 144:10
**closer** 60:16 115:8
**clue** 24:3 28:20 30:8 31:2 34:15 43:18,20 60:12 91:3 114:13 132:3 165:13 169:3 187:11
**cocktail** 182:17

**cocktails** 182:4
**cohen** 203:17 204:18
**cold** 215:18
**college** 10:2,4
**colors** 162:11
**columbia** 1:18 228:1,4
**column** 160:22 161:2,4
**come** 7:9 13:12 60:2 65:9 91:9 109:14 112:8 115:4 121:17 139:6 141:21 153:11,22 161:22
**comes** 40:13 90:11
**comical** 155:7
**coming** 12:15 28:21 47:15
**command** 16:21 67:10,11 110:19 110:22 112:5 114:1 116:19,20
**commencing** 1:15
**comment** 106:16
**comments** 107:11 107:11 149:7
**commission** 1:2 228:20
**committee** 104:10 105:1,3,4,14,15 106:13
**common** 216:18
**communicate** 148:5,12,20
**communicated** 67:12 149:3
**communicating** 148:8
**community** 91:21
**commute** 216:22 217:9

Marciann Grzadzinski                                      November 15, 2018

| | | | |
|---|---|---|---|
| **commuted** 218:20 | **computers** 160:4 | **contended** 195:21 | 38:7,8,10,15,18 |
| **companies** 201:13 | **concern** 126:19 | 217:8 | 39:17 41:15,16,18 |
| **comparable** 48:15 | 173:6 | **contends** 142:1 | 41:19,22 44:10 |
| 132:21 133:3,9,12 | **concerned** 61:17 | **content** 79:5 | 45:2,4,5 47:10 |
| 136:7 223:6 | 91:22 94:5 | **contention** 133:2 | 48:13 49:5,6,21 |
| **comparatively** | **concluded** 224:17 | 136:16 137:1 | 50:2,3 51:7 52:2,3 |
| 140:20 | **conclusion** 35:5 | 196:5 | 52:5,6 53:16 54:4 |
| **compare** 147:2 | 95:7 127:22 | **context** 174:10,19 | 54:5,9,20,21 |
| **comparison** | 180:14 | 174:19 177:1 | 56:14,15,18,19,22 |
| 196:21 | **conclusions** 44:1 | **continue** 202:6 | 57:1,18,19,22 |
| **compete** 180:3 | **conference** 6:4 | **continued** 165:15 | 58:1,10 59:3,4,7 |
| **competition** 29:14 | 63:1,7,12,13,16 | **continuing** 91:14 | 61:16 63:7,8 64:1 |
| **complainant** 1:6 | 110:9,13,14,18,21 | 91:15 155:10 | 64:2 65:1 67:1,2 |
| 55:19 99:12 | 111:3,4,5,8,16,19 | **contracting** 12:9 | 69:20 70:15,16,18 |
| **complainant's** | 112:3 113:10,15 | 48:8 68:21 69:2,4 | 70:19,21,22 71:4 |
| 55:17 | 113:18 114:2,11 | **contractors** 13:3 | 71:5,8,9 72:20 |
| **complainants** 3:13 | 114:12,14,20 | **contribution** | 73:4,6,7,10 74:5,6 |
| 4:5,6 | 115:9 116:17,18 | 101:11 | 74:14 75:1,2,6,11 |
| **complaining** | **conferences** 25:8 | **contributions** | 75:18,19 76:22 |
| 65:10 | **confirmed** 28:17 | 99:14 101:5 | 77:1,6,19 78:10 |
| **complaint** 22:7 | **conflict** 155:22 | **control** 171:22 | 78:14 79:17,18 |
| 32:22 33:19 87:9 | **confusing** 162:8 | **conversation** 23:8 | 80:7 82:3,4,5 84:1 |
| 103:6 108:13 | **congratulating** | 104:21 108:12 | 84:19,20 85:1,9 |
| 114:4 115:13,14 | 29:7 | 163:9,13,14 | 85:10 86:7 87:4 |
| 128:1 145:15 | **congressional** | 167:15 193:11 | 87:21 88:11,16,20 |
| 178:17 181:18,19 | 223:17,18 | 194:1 205:16,17 | 89:12,13 90:21 |
| 181:22 182:9,15 | **consensus** 183:1 | **converted** 63:7 | 91:20 92:2 93:10 |
| 185:19 190:4 | **considered** 12:7 | **convince** 13:20 | 93:11 94:15 96:17 |
| **complaints** 189:13 | 45:11 51:15 68:4 | **convinced** 16:3 | 97:15,16 98:2 |
| 189:16 190:7,9,12 | 86:19 | **copied** 4:14 | 99:5,15 101:19 |
| 224:6 | **considering** 94:21 | **copy** 38:1 128:18 | 102:17,18,22 |
| **complete** 119:9 | **consistent** 59:12 | 224:14 226:7 | 103:3,5,11 106:20 |
| 225:6 | **consists** 151:18 | **copying** 157:14 | 108:16 109:18,19 |
| **completed** 77:4 | **construction** | **cordis** 69:2 | 109:22 110:10,15 |
| 80:3 | 62:16 | **corner** 57:7 | 111:6,12,13 |
| **completely** 77:13 | **cont** 4:1 | **corporate** 11:1 | 113:19,20 115:12 |
| 176:13 | **contact** 19:10 | **correct** 11:4,10,11 | 115:17,21,22 |
| **completing** 14:8 | 30:20 31:3 | 11:13,14 14:10 | 117:11,13,20,21 |
| **completion** 71:7 | **contacted** 30:19 | 17:5,13,14 18:11 | 118:1,2,4,5 119:2 |
| **compliance** | **contacting** 226:10 | 18:12 21:2 22:6 | 119:12 120:9,17 |
| 179:19 | **contend** 35:2,8,12 | 24:13,16,17 27:3 | 120:18,20 121:2,7 |
| **comply** 71:19 | 95:3 169:19 180:2 | 27:12,19 28:15 | 121:13,14 122:21 |
| **compromise** 12:19 | 188:7 189:1 | 29:8,9,11,14,15 | 123:14,21,22 |
| 12:22 13:2 205:15 | 208:22 216:21 | 31:10 34:2 36:11 | 124:3,5 129:16 |

135:16,17 136:2
140:1 142:20
143:5,13,16,17,19
143:20 145:1,2,4
145:17 147:14,15
147:18,19 148:13
149:4 150:4,6,7
151:6 152:9,10,12
152:13 156:2,3,5
156:6 157:15
160:4,5 163:5,6
163:10 164:17,18
165:10,21 166:16
167:1 168:4 169:2
169:20,21 170:2,3
170:5,8,9,11,12
172:10,16 178:3,5
178:6 179:6,7
180:1,5,8,21,22
181:8,20 184:12
187:7 188:9,11,12
189:14 191:1
192:9,11,12,15,20
192:21 194:7,7
195:11,12 197:1,2
198:3,19,20
199:13,15,16
200:11,15,16
202:14,19,20
203:1 207:2,7
209:3 210:20,21
211:6,7,12 212:5
212:6,18,21
214:22 215:2,10
215:12,13,22
217:2,5,6 218:6
220:8 221:17,18
222:1,9,12,14,16
223:8 225:5
**corrected** 38:1,2
**correction** 105:12
**corrections** 225:7
**correctly** 170:5

**cost** 92:4,5
**costello's** 48:2,4
  48:21
**couches** 44:14
**counsel** 2:4,6 11:5
  11:13 19:8 25:5
  28:22 35:10 37:18
  44:15 45:8,17,19
  45:22 46:20 47:9
  55:9 56:6 83:9
  91:6 111:11,19
  131:10,13,16,20
  138:17 139:8
  156:2 168:15
  171:11 178:1
  179:22 184:22
  196:12 205:14
  212:16 221:14
  226:14 228:8,12
**counsel's** 22:9
  44:9,11,17,19
  45:8 49:3 56:12
  77:13 96:3 127:9
**counseled** 9:5,11
**counseling** 207:19
**counsels** 14:3
**count** 156:9
**counted** 13:4
**counterintellige...**
  133:20
**counterpart**
  183:22
**counterterrorism**
  133:19
**country** 219:8
**couple** 11:15,18
  15:19 17:9 44:14
  61:7 85:20 99:20
  102:15 173:5
**court** 5:12 6:6 8:1
  20:15 26:16
  132:16 189:5,8
**cover** 66:8 91:7
  137:10

**coverage** 9:17
**covered** 55:6
  99:21 136:19
**covert** 12:8
**craig** 39:7,9 121:1
  172:10,15
**created** 24:15
  109:20
**criminal** 13:18
**cross** 177:13 188:6
  224:13
**crossed** 139:9
**crunch** 74:8
**crux** 194:1
**cs** 172:10
**culture** 33:22
**current** 13:21
**currently** 179:17
  183:10 201:4
**curriculum** 138:9
**curve** 66:12
**cut** 56:7 99:3,7,11
  100:13
**cyber** 50:14,14,22
  51:1 52:8,11,16
  63:2,3,4
**cycle** 16:6

**d**

**d** 5:1 156:21 225:1
  225:1
**d.c.** 1:17 2:10,19
  113:16 226:2
**dad** 223:17
**daily** 62:4,5 115:3
  115:7 179:10
**daly** 70:14
**darn** 39:14
**date** 41:17 71:8
  74:13 76:8 115:21
  160:16,22 162:18
  187:6 203:21
  209:18 211:16
  225:16 227:3

**dated** 3:9,14,16,17
  3:18,19,20,22 4:4
  4:7,9,10 70:14
  73:2 74:3 76:22
  78:9 79:17 81:20
  123:14 194:7
**dated1/20/15** 3:15
**dates** 11:8 99:19
  162:16
**daughter** 9:18
  122:2 202:8,10
  221:4 223:14
**dave** 119:21 120:2
**david** 2:15 226:1,6
**day** 17:4 27:18
  41:20 49:11 50:22
  50:22 61:7 71:20
  92:14,14 124:18
  158:15 164:7
  197:17,21 206:2,9
  217:16 228:15
**days** 16:8 71:7
  85:21 217:16
  226:12
**daytime** 125:16
**dcg** 21:10
**dead** 27:8
**deadline** 71:20
**deal** 40:16 158:11
**dealing** 155:12
**dealt** 92:15 131:18
  131:19
**dear** 226:6
**december** 197:1
  197:10,12 218:8
  226:12
**decided** 12:21
  55:14 221:4
**decision** 24:1 33:2
  35:3,9 197:7
**declare** 107:2
**deem** 92:17
**deemed** 207:20
  208:10

Marciann Grzadzinski                                     November 15, 2018

**defer** 101:20
102:7
**definite** 134:3,4
**definitely** 189:3
194:20
**deflect** 54:2
**degree** 10:11 12:6
**delivering** 153:6
**demonstrate**
99:13 101:4
**demoted** 95:18
**denied** 9:9 99:11
99:17 101:4
**deny** 192:6
**department** 1:10
102:5 130:17
**depending** 14:17
115:8 218:21
**deposed** 7:14
**deposition** 1:14
3:2 5:11 9:16
20:12 26:13 28:4
41:7 54:14 63:17
70:6 72:13 73:20
76:16 78:5 79:10
84:10 123:10
128:10 135:10
146:6 151:13
159:15 194:3
198:13 200:5
203:11 213:7
224:17 226:8
**depression** 207:5
207:9,11,13,17,20
207:22 211:8
216:19
**deputies** 35:11
84:1 85:3,8 86:3
105:6 113:3
**deputy** 11:13 23:2
28:21 30:2,3
31:14 37:13 44:17
45:17,19,22 46:20
47:8 49:3 56:5

68:20 77:12 83:9
84:21 85:5,6 86:1
86:2 100:17 132:7
132:11 136:8
139:7 171:10
178:9,14 184:22
196:11 205:14
220:16 221:13
223:6
**derogatory** 26:9
**describe** 44:11
158:21 202:17
**described** 24:12
**describing** 208:3
**deserved** 175:2
**deserving** 172:18
174:6,22 176:7,20
176:22 177:4,7,15
183:17
**desk** 48:22 62:9
62:17,20 74:18
205:11
**detail** 55:14
168:21,22 173:22
175:6 181:6
**detroit** 10:4
**dgc** 21:5,22 22:5
29:7 33:2,21
38:12 40:22 41:20
43:7,15 44:5 45:4
45:10,11 50:4
54:3 56:13 65:17
67:6 83:6 85:18
87:10 89:20 95:4
100:8 108:14
109:15 118:16,17
118:22 119:1
127:8,19 128:8,9
129:4,5,15 134:13
139:22 140:7,20
143:9 150:2
169:22 184:17
188:7 189:2,11
190:21 191:6

192:7,8 193:22
202:22 212:4
216:21 217:3,10
220:5 221:20
**dgcs** 45:7 83:10,13
**dgs** 191:3 224:1
**dhart** 2:21
**diagnosed** 207:8
208:5 210:22
212:20 215:9
**difference** 90:13
90:14
**different** 16:2
65:18,19 66:22
67:16,18 115:3
134:16,16 159:1,4
175:12 201:1
205:21 218:9
**difficult** 25:13
26:7,11 67:6
95:11 114:5
152:19 184:5
221:8
**difficulties** 150:21
**diligence** 130:14
**ding** 27:8
**diog** 92:15
**diplomatically**
151:5,7
**direct** 16:14 50:4
50:15 67:8 80:11
82:19 92:19 93:1
150:2 165:21
167:14
**directly** 50:19
51:5 56:11 75:1
82:7 92:17
**director** 23:2 30:2
30:3 31:14 37:13
68:20 178:10,14
179:18,20 223:6
**director's** 66:5
**disappointment**
93:12 110:12

**discovered** 57:4
57:10
**discovery** 57:17
57:20 135:16
168:3,9 170:1
171:1 191:21
202:16
**discuss** 7:12 112:6
157:3,5 183:2
192:22 220:10
**discussed** 30:5
33:9 68:2 112:9
113:13,21,22
157:10 205:9
**discussing** 47:18
108:8 142:18
176:4 177:1 204:3
**discussion** 102:3
125:5
**discussions** 94:17
107:20 108:4
115:2 137:17
138:2,19 139:13
**disease** 207:2
**dispute** 21:9
204:20
**district** 1:18 228:1
228:4
**division** 11:5 14:3
37:18 68:10,11,18
91:6 95:10 116:11
134:21 136:11
137:3 161:16
178:16
**divisions** 140:22
**divorce** 7:18
**dms** 59:18 168:19
170:7,10,13,16,19
171:7
**doctor** 203:7,18
209:4 210:1,3,10
**document** 20:16
20:18 22:12 26:18
28:7 29:17 32:20

37:15,19,21 38:5
41:11,12 53:20
54:17,22 55:3
76:19 84:9,13
87:12,14 118:8
122:20 131:5
132:18 135:3,13
135:18 148:15
149:17 176:12
200:8
**documentation**
70:21 102:4
**documents** 147:3
213:6
**doing** 13:5 15:5
16:18 42:13 43:13
68:2 77:10 93:21
115:20 117:5
126:3 158:14
159:5 170:6
175:11 190:15
205:6
**doj** 93:8 101:20
102:10 130:22
131:15,18 132:8
132:12 226:3
**doj's** 101:18
131:10,13 179:5
**domestic** 126:13
126:17
**dominant** 150:11
**dong** 27:8
**doors** 125:3
**double** 133:14
**doubt** 25:22
**downtown** 51:12
**dr** 203:17
**draft** 79:1,3 142:2
143:3 145:15,18
145:22 146:2,14
147:21
**drafting** 80:17
**drawing** 25:5

**drew** 108:19
165:12 178:11
**drive** 218:14
219:13
**dual** 52:17
**duck** 158:21
**due** 92:3 130:14
**duly** 5:4 228:7
**duty** 11:2 217:1
217:10
**dynamics** 91:10

**e**

**e** 2:3 5:1,1 9:20
225:1,1,1,1,1
226:14,21
**earlier** 30:11 31:6
38:1 159:12
163:21 164:3
165:2 187:12
205:9
**early** 64:19 89:14
212:18 215:4
218:5
**earthly** 28:20
**easily** 108:21
**easy** 66:13 154:8
181:13
**edgar** 124:1
**edges** 151:4
152:17
**edp** 194:16,18
**education** 91:14
**educations** 91:15
**eeo** 22:7 32:22
33:19 87:9 103:6
108:13 115:14
141:22 142:17
145:14 181:18,22
182:9 184:15
189:12 190:4,7,10
224:5
**eeoc** 1:5
**eeos** 174:10 177:1
189:17,20

**effect** 215:19
216:18
**effective** 197:1
**effects** 211:18,22
216:8
**efforts** 187:18
**eight** 55:13 184:17
**eighth** 12:14,16
**eighty** 10:10
**either** 18:6 19:22
23:1 80:12 82:14
83:18 90:12 104:6
107:22 187:13
**elaine** 20:2 24:21
25:7,14 26:8,11
27:1,12 29:2 30:9
44:16 45:16 46:5
62:1 114:9 190:16
**elaine's** 20:1,3
22:16,17 28:1,2
28:17 30:7 46:2
46:18 47:1
**eligible** 199:20
200:20,22 201:3
**eliminated** 94:14
178:4,8,10,14
**else's** 9:2
**email** 2:12,21 3:9
3:10,11,12,14,15
3:16,17,18,19,20
3:22 4:4,7,9,10
16:17 19:10 20:21
21:3,8 26:22,22
27:4,4,16,17
28:10,13,13 29:4
29:10 41:14 42:2
43:1,10 47:14,19
49:9 63:20 64:6,6
64:14 70:13 71:10
72:18 73:2,14
74:3,12,12,16,22
78:9,19 79:14,16
80:16 81:19 82:8
123:13 127:13

128:13 129:2
130:7 131:2 152:2
152:8,12 153:4,8
154:14,20 155:2
157:13,14 161:10
162:19 164:2
194:6 196:2
198:16,18 199:2
199:14 200:1
202:11 221:9
**emailed** 77:21
146:10
**emails** 151:10,19
**embarrassed**
124:16 221:6,6
**emotional** 214:21
215:4
**employed** 120:16
120:19 201:4
**employee** 97:17
116:10
**employee's** 98:9
**employees** 12:10
14:21 49:19 50:1
59:6 180:7 189:12
189:21
**employment** 1:2
2:5 105:13,15
106:13 201:6,8
202:7
**enclosed** 226:7
**ended** 119:16
**enforcement**
134:5,9,10
**engaged** 121:3
**enjoy** 18:2
**enter** 105:18
**entered** 11:2
**entertain** 114:9
**entire** 52:8 98:3
134:21 136:11
181:5 218:19
**entirety** 97:3

Marciann Grzadzinski                                          November 15, 2018

**[entitled - fbi]**                                                    Page 11

| | | | |
|---|---|---|---|
| **entitled** 84:18 147:16 203:14 | **exactly** 174:20 176:4 193:8 195:16 | **expect** 66:1 96:18 96:21 116:1,9 | **extra** 58:12 |
| | | | **eye** 1:16 |

**entry** 115:5 200:13

**episode** 203:2,8 204:9,12,14 205:2 205:8 208:9

**equal** 1:2 17:21 44:20,22

**equally** 17:15 18:5 191:16

**equivalent** 179:21

**ernie** 18:14 51:5 57:10 67:9,11 77:5,17,18 78:1 102:14 108:20 110:19 112:9 113:22 117:1 171:14 196:8

**ernie's** 108:20

**errata** 225:8 226:13 227:1

**erratic** 86:9

**error** 38:5 149:14

**especially** 61:21 193:7

**esquire** 2:3,15

**essentially** 29:6 31:7 71:2 97:14 154:18 167:17

**establish** 60:22 199:11

**establishing** 200:3

**ethics** 92:16

**etran** 224:14

**evaluate** 20:6

**eventually** 63:14 66:19 154:12

**everybody** 65:9,10 124:17 139:12

**everybody's** 83:21

**exact** 68:3,22 211:16

**exactly** 174:20 176:4 193:8 195:16

**examination** 3:5 5:7 224:13 228:9

**examined** 5:6 225:4 228:8

**example** 99:16 101:3

**examples** 100:12 153:18

**exchange** 63:22 198:21

**exclamation** 200:14

**excluded** 101:2

**executive** 31:7,11 32:4 38:13,16 82:21 101:9 104:9 105:1 117:19 124:18 129:11 138:19

**exhibit** 3:8,9,10,11 3:12,13,14,15,16 3:17,18,19,20,21 3:22 4:3,4,5,6,7,8 4:9,10,11,12,13 20:12,16 26:13,17 28:4 41:7 54:14 63:17 70:5,6 72:13 73:20 76:15 76:16 78:5 79:10 84:10 99:9 123:10 128:10 135:10 142:6 146:5,6 151:10,13,18 159:15 166:10 191:19 194:3 198:12,13 200:5 203:11 209:9,10 213:6,7

**exhibits** 4:1,14

**exists** 10:5

**expect** 66:1 96:18 96:21 116:1,9

**expectation** 67:4

**expensive** 114:6

**experience** 17:19 47:11 67:1 132:22 133:3,9,11,13,16 134:5,9,10,20 136:8,10 137:2,9 137:14 138:4,12 186:2 189:4 195:8 195:20 196:9,16 196:20 202:17

**experienced** 203:2 207:5

**experiences** 133:21

**expert** 86:16 100:5

**expertise** 99:21 123:21 141:5,7 195:9,20 196:15

**expires** 228:20

**explain** 55:13 59:20 136:1,18 217:7

**explained** 60:7 175:19

**explains** 75:17

**explanation** 167:3 167:11 178:19 180:10

**explicitly** 66:16 108:10

**exploding** 184:14

**express** 93:12 116:13

**expressed** 110:12

**extent** 24:11 55:5 95:6 137:16 170:18 180:14 216:10

**external** 140:2

**f**

**f** 225:1

**face** 34:21

**fact** 23:6 30:1 57:14 61:20 66:14 97:13 101:10 121:22 125:21 155:11 175:12 185:4 187:11 193:15 196:7,11 206:9

**factually** 153:5

**failed** 148:5,12,20

**fair** 5:18,19 6:12 29:6 39:15 46:8 60:13 78:13 82:6 91:21 110:11 112:18 116:9 129:4,13 143:21 164:9 170:14 184:20 198:4,22 201:12

**fairly** 19:2 33:5 100:16

**falls** 216:11

**familiar** 105:14 130:3 131:12,22 137:13 139:21 143:22 179:1 181:1,3

**family** 9:17 207:1

**far** 25:18 37:20 78:18 119:7 121:4 144:12 148:14 158:17 167:20

**faulty** 82:17

**favorable** 33:1,15 33:17

**favorably** 190:18

**fbi** 1:6 5:10 6:18 8:1,5,9 11:2 12:4 19:8 33:22 68:6

98:8,18,22 101:21
102:20 103:4
119:6,9 120:3,17
130:10,12 133:18
134:21 136:11
140:3,20 143:12
160:4 179:17
180:19 201:9
203:18 222:13
223:12 224:6
**fbi's** 8:12 144:1
**fbi.gov** 2:12
**fear** 220:10
**february** 153:13
162:19
**federal** 1:11 2:7
6:5,20 189:5,7
**feedback** 66:17,20
146:19 148:3,7,11
148:19
**feel** 40:11 65:22
66:7 67:3 125:12
134:3
**feeling** 65:14
**felt** 86:18 90:8
93:1 111:1 116:5
125:15 153:19
155:13 193:20,21
**female** 26:10 38:2
56:10 213:22
**females** 96:3
100:16 107:15
108:1,8,10
**festered** 159:11
**fiance** 120:11,16
172:15
**fiance's** 218:9,22
**field** 1:3 11:6
24:22 25:9 38:6
91:6 171:1 185:9
187:3,21 188:3,5
**fifth** 84:18 209:16
**fight** 15:20

**figure** 194:11
**figured** 33:1
**filed** 181:22 182:3
182:8,13 189:17
189:20 190:4,7,10
197:9,13
**fill** 155:9 188:1
**filled** 155:8 201:18
**fills** 50:19 51:8
**final** 147:5 157:13
**finance** 11:1 12:5
12:8 68:10,10,14
68:18,21
**financial** 92:9
220:11,14
**financially** 200:3
**find** 47:21 65:17
152:11 178:2
226:7
**finding** 119:12
120:7 187:2
**fine** 125:1 138:7
142:15 151:11
208:10
**finish** 5:15,21 74:8
**finished** 5:16 28:3
72:11 73:19 79:9
83:5 132:18
145:12 149:17
159:14 166:6
196:22
**finishing** 205:17
**firmly** 90:10
**first** 5:4 12:3,12
15:12,14 16:7
29:4 32:17 38:13
41:20 49:11 50:14
56:17 69:22 74:7
78:16 81:19 87:10
91:1 122:11,15
127:7 128:7
135:21 136:3,6
143:1 144:16
151:19 152:2,3

160:22 161:7,10
162:19 172:6,13
184:11 194:21
204:5 206:14
210:22 213:10
**firsthand** 180:17
**fiscal** 74:9 77:3
**fit** 50:16
**five** 12:13,19 14:2
15:9 173:19
220:19
**fix** 187:1,16
**fixed** 187:2
**fleshed** 42:9
**flip** 172:21
**flocco** 72:18 78:9
78:22 79:16
**flocco's** 72:21
**floor** 49:5,20 51:6
51:11,22 52:20
53:12 54:2 55:15
56:21,22 57:5,9
57:11,12,21 58:15
59:3,18 60:4,5,6
110:6 121:21
217:4
**fluctuate** 208:13
**fluctuations** 209:1
**focused** 33:7
194:10
**focusing** 187:18
**folks** 15:1 23:19
51:1 53:6 60:1
61:6,8 62:2,5 92:6
94:2,4 107:4
116:7 123:6 139:3
165:4 188:3
**follow** 67:10
110:22 116:21
160:17 202:5
**following** 143:2
168:7
**follows** 5:6

**food** 51:2 66:7
**footage** 48:21
**forced** 23:2
216:22 217:9
220:4
**foregoing** 225:4
**forever** 44:16
**forfeiture** 12:22
13:8 14:22 15:1,9
50:10 52:1
**forget** 144:15
**forgetting** 50:21
**forgotten** 50:12
**form** 18:8 20:7
21:12 22:11 24:6
26:2 27:16 30:22
31:20 34:9 35:5
36:15 41:3 60:18
83:1 98:10 111:17
112:21 117:17
118:12 127:21
132:2 135:1 144:3
164:22 167:6,18
176:11 188:16
213:3 222:17
**formal** 32:18
189:20
**formally** 36:8
**format** 78:18 79:6
**former** 102:20
103:2 120:12
178:9 188:7
**forth** 53:10
**forward** 29:10
153:8,19 190:10
190:13 199:8
226:13
**forwarding** 152:8
154:18 155:5
**found** 22:18 25:19
97:21 99:1 100:6
**four** 12:19 15:9
45:4,7 140:12
161:17 166:10

Marciann Grzadzinski

November 15, 2018

**[four - gray]**

218:14

**fourth** 71:6 79:19
173:10 199:3

**frank** 65:7 111:9
158:4

**frenkel** 152:21
155:17 156:1,13
157:19 158:17
162:15

**frequently** 99:3,6
100:16 115:10

**friday** 84:22
217:18

**fridays** 84:5

**friend** 43:10
130:11 161:20

**front** 37:21 73:1
82:10

**fruition** 123:9

**frustration** 185:11

**fulfill** 144:2

**full** 51:21 137:11
205:13 221:1

**fully** 7:6

**function** 160:4

**funding** 188:2

**further** 74:16
173:8 224:8 228:9
228:12

**g**

**g** 5:1 9:20 225:1

**gain** 209:1,5,7
210:10 211:6
215:4,8

**gained** 210:6

**gamut** 90:22

**gap** 64:16

**gc** 37:17 54:7
55:18 99:11 148:3
148:11,18 166:11
166:13 169:9
178:4 181:18

**gee** 42:14

**general** 1:9 2:4,6
11:13 19:8 22:9
25:5 28:21 33:11
35:10 44:8,11,15
44:17,18 45:8,8
45:17,19,22 46:20
49:3 51:16 56:6
56:12 77:13 83:9
93:6 96:3 98:18
111:11,19 125:4
127:9 132:8,12
139:7 156:2
168:14 171:10
177:22 179:6,22
183:1 194:1
196:11,14 205:14
208:11 212:15
214:10 220:16
221:14

**generally** 20:17
44:20 92:22

**genral** 184:22

**gentleman** 50:9
223:22

**gents** 21:3

**genuine** 34:18

**getting** 27:18 29:7
30:16 78:18,20
79:6 119:16
127:13 150:13
163:21 165:4,6
171:4 185:12
206:12,16 218:7,7
218:9

**gig** 64:8 164:4

**giglio** 9:12

**girlfriend** 7:20 8:9

**giuliano** 31:15,17
36:2,5 37:13

**give** 12:21 16:4
31:22 61:13,18
66:20 68:22 92:11
92:21 93:5 98:12
116:1 142:10

143:22 144:2
148:18 205:22
214:13,15

**given** 50:14 63:4
77:18 81:4 143:12
145:3,7 225:6

**gives** 134:3

**giving** 63:3 126:6

**glass** 159:18

**gloss** 187:13

**go** 5:16 7:11 25:6
25:8 28:2 40:9
54:12 56:9 59:21
60:2,5,6 61:20
62:19 65:21 66:7
68:8 94:2 100:15
112:12 116:20
125:17,17 126:5
127:4 135:7 136:5
152:6 155:19
160:14 162:5
172:4 173:8 175:6
184:4 197:3
198:19 213:18,19
219:4 220:19

**goal** 98:20 116:11
220:20

**god** 25:4 69:4
119:21 138:22
206:16 223:15

**goes** 57:9 101:6
151:20 152:16
153:6

**going** 5:15 19:1
20:17 46:15,19
48:1 55:8 65:7
68:3 69:13 70:10
77:21 80:19 92:21
93:2,4,5 97:22
98:17 101:1 105:5
107:7,13 110:21
111:18 113:12
114:16 117:2
119:15 125:19

127:4 128:3,14
139:6 148:6 160:1
162:4 163:15,18
163:19 165:11,14
168:10 174:17
175:11,18 180:13
187:10 196:1
202:9 204:13
206:3 212:18
213:3 214:14
217:13 219:17
221:5

**good** 25:12,14,17
25:19 26:7 130:12
159:1 165:2

**gosh** 39:14

**gotten** 128:17
206:2,9

**government** 219:3

**graduate** 10:8,13
10:15,18

**gray** 2:3 3:6 5:7,8
5:9 18:9 20:9,14
20:20 21:17 23:17
24:9 26:5,15 28:6
28:12 29:18 31:5
32:3 34:12 35:1,7
35:16 37:1 38:3
39:11,20 40:3,8
41:5,9 43:19 47:2
47:7 54:16 55:10
61:4 63:19 65:16
69:13,17 70:4,8
72:15 74:1 76:14
76:18 78:7 79:12
84:12 87:15 95:13
96:4,11 98:16
106:4,7 112:1
113:1 118:15
123:12 128:6
129:20 131:8
132:5 133:7 135:5
135:12 136:21
137:7 138:1,14

139:15 141:16
142:5,10,14,16
144:7,13 146:2,5
146:11,13 147:11
148:2,17 149:19
150:1 151:9,12,18
152:1 159:17
160:6,7 165:7
167:8 168:1 171:5
173:15,17 175:21
176:5,14 177:17
180:18 188:18
194:2,5 196:13
197:3,6 198:11,15
200:7 203:13
213:9 216:15
222:19 224:8,15
226:14,21
**great** 123:17
163:19
**greg** 224:3
**groove** 67:7
**group** 61:12 83:19
88:21
**grzadzinski** 1:5,14
3:2 5:3 20:12,19
21:5 26:13 28:4
41:7 54:14 63:17
70:6 72:13 73:20
76:16 78:5 79:10
84:10 123:10
128:10 135:10
144:8,15,20 146:6
147:22 148:16
151:13 159:15
194:3 198:13
200:5 203:11
213:7 225:3,16
226:3,8 227:2,3
**grzadzinski's**
143:8
**gs** 81:13
**gs15** 11:9

**guess** 23:16 26:19
49:8 66:8 71:2
76:21 87:17 89:3
109:13 139:4
151:3 155:15,18
156:9 159:10
163:19,20 175:8
176:1 195:15
208:8,12 216:13
220:7
**guessing** 13:2
**guidance** 81:17
**guys** 159:2

**h**

**h** 156:21
**half** 33:12 42:2
125:18 206:18
**hall** 36:18
**hallway** 59:1
**hand** 107:2 228:15
**handed** 20:15
26:16 76:20
**handle** 7:11 66:2,6
69:22 70:1 71:16
117:7
**handled** 12:8
71:22 114:22
**hands** 96:13 97:14
149:3,8
**hang** 9:5 159:2
**happen** 14:1 15:20
92:22 158:5
217:14
**happened** 13:21
13:21 26:1 32:16
89:7 96:2 116:16
195:21
**happening** 64:19
**happens** 92:22
199:20
**happy** 6:10 18:5
109:11 193:3,5,6
**harassed** 189:11
189:22

**hard** 105:9 175:3
195:16
**harris** 2:16 226:1
**harsh** 153:2
**hart** 2:15 18:8
20:7,17 21:12
22:11 24:6 26:2
28:8 29:16 30:22
31:20 32:2 34:8
34:19 35:4,14
36:15 37:19 39:5
39:18 40:1,6 41:3
43:16 46:21 47:3
55:5 60:18 65:5
83:1 87:12 95:6
95:20 96:8 98:10
106:2 111:17
112:21 118:12
127:21 128:12
129:17 131:5
132:2 133:4 135:1
136:17 137:4,16
137:20 138:5,17
141:12 142:8,12
142:15 144:3,11
146:4,8,12 147:8
147:20 148:14
149:21 151:11,15
164:22 167:6,18
170:17 173:13
175:18 176:11
177:12 180:13
188:16 196:1,4
216:10 222:17
224:9,13 226:1,6
**hate** 26:9
**head** 78:4 134:21
136:10 184:14
201:16
**headquarters**
11:20 52:16,19
53:12 123:2 124:4
124:8 188:2,5
206:13 217:17

218:16,20 219:2,3
**heads** 150:13
153:16
**health** 206:13
**hear** 60:8 61:1
65:21 104:13,16
107:9,10 111:10
130:13 202:1
**heard** 9:3 23:20
27:13,14 31:7
32:19 36:7 61:2
103:7 139:14
**hearing** 22:21
**heart** 207:1
208:10
**heavily** 33:5
**held** 1:15 11:12
12:5 20:2 44:16
45:15 46:12 91:17
113:16,19 125:13
180:21
**hell** 162:4
**help** 78:12,22 84:9
173:7
**helped** 79:2,3
**helpful** 40:16
**helping** 79:8
**henry** 184:1,1,18
**hesitate** 226:16
**hey** 31:4
**hi** 77:2
**hidden** 25:20
**high** 212:3,7,13,17
214:5
**hill** 68:16
**hire** 36:10
**hired** 36:14 38:12
120:3 192:7
**historically** 64:16
139:11
**history** 204:7
207:1 213:19
**hold** 169:1

**holds** 179:17
**home** 9:19 202:9
   219:17 220:2
   221:4
**honest** 80:20
   101:1 128:14
   129:3 149:10
   157:21 165:11
   168:11 174:17
   175:11 187:10
   204:13 206:3
   221:5
**honestly** 186:17
   186:19,21,22
**honors** 10:13,18
**hoover** 124:1
**hope** 60:7
**hopefully** 200:4
**hoping** 18:4
**hormone** 215:21
**horrible** 65:11
   157:1
**horribly** 124:16
**hospital** 213:11
**hospitalization**
   202:19
**hour** 69:13
**hours** 42:6 217:16
**house** 119:19,20
**hrb** 64:5
**hrd** 70:14 71:18
   82:22 119:19
   120:4
**huh** 128:21
**hund** 27:5
**hung** 8:22 49:16
**huntington**
   219:12
**hx** 204:6
**hyatt's** 48:10
**hypertension**
   212:21 214:1,3,12
**hypothyroidism**
   210:20 211:1,5,9

211:12 215:9

**i**

**idea** 20:11 24:3,8
   26:4 29:11,20
   34:5,10 35:15
   88:2 93:18 96:10
   99:8 144:6 147:13
   179:14 203:19
**ideal** 124:19
**ideally** 33:20
**identification**
   20:13 26:14 28:5
   41:8 54:15 63:18
   70:7 72:14 73:21
   76:17 78:6 79:11
   84:11 123:11
   128:11 135:11
   146:7 151:14
   159:16 194:4
   198:14 200:6
   203:12 213:8
**ii** 2:5
**iii** 1:8 227:2
**ilcgc** 17:3
**iltb** 17:6 88:15
**imagine** 43:11,17
   210:16
**iming** 175:11,12
**immediate** 13:13
   44:2
**immediately** 44:3
   217:14
**implying** 109:5
**important** 5:13
   40:14 60:4
**impose** 180:6
**impression** 34:13
   34:16 61:18 93:16
   124:7 144:1 193:3
   195:3 196:18
**improve** 166:14
   169:16 187:3,19
   187:21

**inactive** 90:12,15
**inadvertently** 9:1
**inappropriate**
   153:3
**incident** 8:19 69:6
   203:3
**include** 81:8
**included** 20:19
   101:9 128:15
**including** 196:7
**incorrectly** 193:9
**increased** 92:3,5,5
**incredibly** 193:11
   193:20
**index** 3:1
**indicate** 149:2
   161:7 185:14,18
   206:8
**indicated** 202:12
   207:4 213:15
   221:11
**indicates** 42:17
   84:21 86:5 122:6
**individual** 23:3
   27:5 43:11 45:12
   45:13 65:13 83:8
   86:19 97:20 98:13
   130:19 155:17
   156:19,22 159:1
**individually** 87:22
**individuals** 16:19
   73:6 74:13 79:3
   103:17,22 138:11
   138:15 150:18,19
   155:21 157:9
   163:22 182:7
   190:3
**infection** 215:18
**information** 7:9
   7:11 66:21 70:20
   133:5 142:18
**informed** 94:13
   110:12,16 111:2
   117:5 166:11

194:16
**infrequently**
   51:13
**initial** 69:21 85:4
**initially** 30:19
   63:11 66:19 71:12
   82:21 83:7 84:2
   85:4 146:10
**initiative** 116:10
**inova** 4:13 213:11
**input** 16:17,17
**inquire** 30:20
**inquired** 76:1
   114:15
**insert** 177:13
**insofar** 127:21
   136:17 147:21
   176:12 177:14
**inspector** 179:6
**instances** 208:2
**instruction** 52:4
   61:21 62:17
   116:21 163:7
**instructions** 116:2
   116:3
**integrity** 179:19
**intend** 198:7
   199:21
**intended** 21:9
**interact** 152:19
   153:21 165:4
**interacted** 24:22
**interaction** 180:17
   181:3
**interactions** 19:7
   140:5
**interchangeably**
   6:19
**interested** 125:22
   228:13
**interesting** 160:14
**internal** 139:21
   160:3

Marciann Grzadzinski
November 15, 2018

**international** 122:11 126:9,11 126:12,20 127:2 219:6
**interpretation** 93:6 176:2
**interpreted** 92:12
**interrogatories** 54:20 134:19
**interrogatory** 37:16 53:22 55:12 55:13 99:10 100:19 132:20 135:21,22 136:18 137:6 140:14 141:18 166:8 169:8 177:21 181:15 189:10 191:18 217:8 220:3,9
**interrogs** 3:13
**interspersed** 175:10
**interview** 18:17 19:15 20:5 21:9 21:10,15,21 22:2 22:5,15,19 23:9 30:20 33:4,10
**interviewed** 18:10 18:13 19:19 23:13 23:13 30:13,21 31:4
**interviewing** 19:9 21:4
**interviews** 30:16 31:3
**intrigues** 22:8 24:11
**introduce** 203:22
**investigation** 1:11 2:7 145:14 146:10
**investigations** 6:21 40:13 133:19 133:20

**investigative** 17:10 18:3 19:17 19:19,22 20:3 21:19 24:15 45:10 50:9 93:22 94:4 109:17 201:13
**investigator** 142:1 142:17
**invite** 86:17
**invited** 100:2 182:6
**involved** 83:16 120:14 139:10 140:8
**involving** 22:9 164:13 181:22
**issue** 59:21,22 89:15,16 93:13 94:1,3 96:22 112:15,17 116:17 155:20 183:21 210:19
**issues** 9:12 25:3 36:21 40:16 87:5 89:10 98:9,15 112:16 115:4 150:18 152:20 153:13 156:11,14 158:18 164:16 169:20 170:10 171:3,7,20,21,21 179:12,14 202:9 208:10 214:9 215:8
**items** 175:10
**itlb** 86:5,9,14 119:18 127:10

**j**

**j** 124:1 161:11 186:14
**j.d.** 10:4
**jack** 69:1
**james** 18:14,16 63:22 182:3

**january** 3:21 11:6 41:17 43:22 49:10 218:2
**jean** 1:17,20 226:19 228:3,18
**jefferson** 1:8 227:2
**jeh** 123:19 124:1 124:11,15,20
**jen** 36:17
**jennifer** 22:22 23:8,11 30:1 36:7 36:14
**jerry** 48:10
**jgray2** 2:12
**jim** 22:19,19 23:2 23:5 32:15 34:10 36:10 63:2 64:11 65:9,20 66:10,16 69:9 71:14 72:2 75:3,16 76:5,6 83:12,18 86:19 91:1 92:12 102:9 110:22 112:8 116:19 119:14,16 129:7 153:19 154:20 157:20 158:8 182:21 187:13 205:12
**jim's** 73:8 74:18 76:8 79:2
**job** 12:7 17:2,22 18:6 20:4 24:15 33:21 49:11,15 65:17,18 66:1,6 92:14 96:15 126:5 127:15 154:10 158:13 159:5 162:5 170:6 178:2 194:21 199:12 201:12 202:13 218:12
**joe** 15:21 152:20

**john** 53:18
**johnson** 28:14
**joining** 198:5
**jonathan** 50:19 152:21 155:11 157:19 158:13 162:15
**jonathan's** 158:20
**joseph** 53:4
**judge** 25:6
**julie** 161:14
**juliet** 2:3 5:9 226:14,21
**jump** 220:22
**june** 4:11 11:3 96:13 122:11 198:8 199:14 200:14 209:18 213:15 214:17
**junior** 47:8
**jurisdictions** 90:13
**justice** 1:10 102:5
**justin** 19:21 20:22 22:14 57:2 58:8 69:22 71:13 74:13 75:1,4,8,15 76:1 76:10,21 77:2 103:7 106:12 153:10,22 157:14
**justine** 47:15
**jut** 20:15

**k**

**k** 9:20 14:14 225:1
**kalb** 41:14 163:5,6 184:12 209:20
**karen** 180:2
**katherine** 83:14
**kator** 2:16 226:1
**katorparks.com** 2:21
**keep** 208:12 214:16

**keeping** 117:4
155:9
**kelly** 29:7 163:10
163:13
**kelly's** 163:15
**kept** 187:14
**kind** 10:13,18
23:14 42:2 44:13
52:17 53:2,8
61:12 66:5,13
70:2 81:8,14
83:14 89:18 92:21
98:8 107:7 139:4
144:16 150:15
151:4 152:3 153:3
153:6 155:7
156:13 158:18,22
158:22 162:9
173:7 183:1,20
186:20 221:3,3
**king** 39:7,9
**king's** 53:18
**kiss** 197:20
**kma** 197:17,19
**knew** 24:21 33:17
50:20 108:14
110:20 130:11,14
150:19 182:12
187:16
**know** 5:15 6:15
8:16 9:8 15:11
18:22 21:14 24:18
25:18 33:5 35:21
35:22 36:19 37:2
37:7,9,14 39:2,3,7
39:9 43:1 47:1,17
47:20 49:14 51:10
51:14 52:19 58:12
59:19 60:20 61:6
61:11,19,20 62:4
62:8 65:22 72:8
74:8 76:13 79:2,3
82:9,10,11 83:11
85:5,13,19 86:7

86:20 88:11 92:9
92:13 94:22 98:8
99:6,20 101:2,7
103:17,22 107:3
108:4,5,20 109:1
109:9 113:7,11,13
115:2,9 117:17
119:3,7 121:4,22
124:22 125:2
127:16 128:16,19
128:22 129:5,22
130:6 131:17
132:4 133:22
137:11 138:7
139:9 141:19
142:5 145:8 146:9
149:12 150:14,21
151:5,7 152:4
153:2 155:13,14
157:8,9 158:14,15
159:1,2,18 160:1
161:6 166:3 169:5
170:18,20,21
171:2,7,19 173:5
173:5 175:3,9,15
175:20 178:17
183:5 184:1 186:1
186:4 187:19
189:16,16 190:9
190:11,13,15
191:4 193:19
195:7,10 196:17
196:19 197:9,12
204:20 207:17,19
207:19 209:7
218:6 219:16
223:20
**knowing** 18:21
35:20 154:7
**knowledge** 102:11
107:2 130:16
131:1,9 132:6,9
168:18 181:17
182:14 183:13,16

190:6 216:14
**known** 19:5 26:12
31:3 127:18
129:14 150:11
175:13
**knows** 151:2
159:3
**kopac** 161:11,14
186:14
**kristin** 156:20

**l**

**l** 14:14 160:6
225:1
**l.l.m.** 10:6,20 11:1
**lab** 213:11
**laid** 102:6
**lammert** 20:2
24:18 45:14 46:11
63:6 190:16
**lammert's** 24:14
27:1 44:6,19
**lapse** 90:4
**large** 19:2 65:8
91:13
**largely** 140:22
**larger** 60:15 63:13
83:12
**lasted** 86:21
**late** 18:10
**law** 2:5 10:4,15,22
12:6 17:10 18:3
19:17,19 20:1,3
21:19 24:15 45:10
48:8 50:9,14,15
50:17 52:11,16
53:4,17 93:22
94:4,11 109:17
134:5,8,10 150:6
151:2 228:7
**lawsuit** 7:16
**lawyer** 90:16
102:21 103:2,4
151:1 154:10

**lawyers** 106:17
**layers** 156:6
**layout** 49:2
**lead** 114:21 115:1
**leader** 60:9
**leadership** 106:14
**learn** 47:12 127:7
128:7
**learned** 111:3
129:21
**learning** 66:12
**leave** 109:1 162:5
**leaving** 13:22
108:18 188:14
199:19
**left** 12:14 13:16,17
15:21 44:15 184:1
**legal** 11:16 35:4
52:1,4 61:21
62:17 90:22 91:2
91:3,7,11,14,15
91:17 92:11,18,19
93:1,19,21 95:7
101:22 114:22
123:20 126:3,6
127:22 131:10,13
131:16,20 163:7
180:14 205:10
**legitimate** 164:20
169:15
**lengthy** 102:3
**lesser** 140:20
**level** 11:9 66:2
81:13 116:10
118:3,3 140:7
189:17
**levels** 156:7
**lexapro** 208:12
210:17 214:11,15
**liase** 179:5
**license** 90:2
112:15
**licensed** 101:6,7

licenses 89:12
90:7,20 92:1
101:13
life 187:3,21
liked 111:14
line 42:1 71:6,6
74:7 155:2 186:20
198:18 199:3,5
204:5,6 213:15
227:4
lines 213:19
linked 205:12
linking 205:16
lisa 50:8 51:19
62:3 101:21 102:1
102:21
listen 186:22
187:1
lists 143:4
lit 169:22 170:1
184:18
literally 122:3
139:11 197:21
litigated 189:7
litigation 49:5
50:1 57:21 58:10
58:17 59:3,7,14
167:16 168:15
183:7,10 184:22
185:15,20 189:2
224:1
little 15:12 23:14
75:16 81:17
119:14 127:5
157:21 170:21
173:8 202:10
205:11
lived 9:22
local 25:2
located 44:8 48:7
48:11 51:4,20,22
52:1,4 53:5,18
57:21 60:15 125:7

location 51:17
110:3 217:15
locations 51:14
lol 27:18 163:8
loner 158:22
159:3
long 6:15 9:22
15:15 46:5 63:2
85:16,18 97:19
105:7 108:15
114:5,19 152:21
159:11 193:14
194:13 197:14
201:19 215:14
longer 10:5
120:19 143:15
202:10 216:3
longest 63:13
look 26:21 29:3
32:20 37:15 42:1
49:17 53:20 55:12
55:15 71:1 74:11
79:19 81:19 82:1
84:8 87:8 99:9
106:1 115:13
117:17 123:16
135:8,21 140:13
140:16 142:21
143:6 146:17
152:2 154:14
157:22 158:6
160:19 161:7
162:16 163:2
164:2,14 172:1
184:8 186:11,16
191:17 192:1,3
199:3 200:13
203:20 205:20
209:8 213:10
221:22
looked 44:22
66:13 118:7 145:5
162:19 164:3
202:11 218:8

221:9
looking 61:7 70:10
81:17 89:5 117:18
124:7 137:9 152:4
154:17 172:13
187:16 194:21
199:6,8
looks 26:22 84:17
172:9
lose 195:10
lost 22:16 29:22
74:18
lot 36:20 52:17,18
58:13 92:6,16,17
112:16 118:13
123:7 124:22,22
126:18 140:4
144:18 150:21
156:17 170:10,21
170:22 171:3,21
177:12 199:20
love 183:18
lovely 124:19
low 213:2 214:8
214:13
lowest 118:3
lucrative 220:22
lunch 100:22
102:20 103:1
lying 24:2,5 33:16
34:3,7,14 188:21
lynx 4:8 159:20,22
160:3 172:2 184:8
209:8

m

m 1:17,20 225:1
226:19 228:3,18
magnifying
159:18
main 94:10
maintain 89:12
92:1
major 10:12

majority 39:15
63:9
making 9:5
121:18 189:19
196:4
male 37:17 38:9
56:9 180:7
man 184:16
manage 62:6,7
141:8
managed 199:11
management 31:7
31:12 32:4 57:17
57:20 61:19 101:9
102:17 104:9
105:1,14,15
106:13 115:18
121:19 124:18
126:16 134:20
136:9 137:2,14
138:4,12,20
153:20,20 168:3,9
170:1 196:16,20
manager 111:12
116:6
managerial
140:10 141:1
march 121:22
122:1,17 123:14
187:6 201:20
marci 21:4 27:6
77:2 102:4 115:19
marciann 1:5,14
3:2 5:3 225:3,16
226:3,8 227:3
marian 68:19
mark 31:15 37:14
70:4 75:16 76:14
116:8 142:6 194:2
198:6,11
marked 3:8 4:3
20:13,16 26:14,17
28:5 41:8 54:15
63:18 70:7 72:14

73:21 76:17 78:6
79:11 84:11
123:11 128:11
135:11 146:7
151:14 159:16
194:4 198:14
200:6 203:12
213:8
**marketable**
220:18
**material** 55:6
**matsumoto** 50:8
51:19
**matsumoto's** 62:4
**matter** 85:20
86:15 100:5 140:8
140:21 141:5,7
185:12 195:8,20
196:15
**mazel** 152:20
**mazel's** 53:4
**mcdade** 94:2
**mcnally** 138:20
190:18,20 191:15
192:8,14,19 193:1
194:6 196:2
**mean** 17:8 18:2,21
27:15,21 28:10
29:19 32:14 42:5
42:11,19 45:18
46:6 53:11 56:3
64:8 73:17 77:9
77:22 78:17 80:19
81:12 89:6 92:8
95:8,22 97:6
124:20 126:2
128:3 132:4 139:3
162:13 165:15
175:1,3 177:11
179:3 183:1 185:4
185:4 187:9,17
194:13 197:10
205:4 206:4 214:4
219:7 222:11

**means** 14:7 204:6
**meant** 29:1 38:1
108:17 176:4
**meany** 42:19
**measure** 48:18
**measured** 44:21
**measures** 81:9,10
**mediation** 173:19
**medical** 4:13
213:3 215:3
**medicated** 208:1
**medication** 208:15
209:5,6 210:11,13
211:15 215:11
216:8
**medications** 7:1
**medicine** 214:12
214:14
**meds** 210:4
**meet** 67:3 83:6
86:12 87:20 116:8
123:18
**meeting** 18:20
19:2,6 85:9,14
86:1,2,6,8,9,14,18
86:19,20 94:16
96:13 97:3,14,15
100:1,3,17 102:20
104:8,10,12,15
106:20 107:4
117:1,6 129:11
149:3,8 157:11
205:12,14,15,16
205:19
**meetings** 19:12
52:18 56:8 63:10
63:15 83:8,10,12
83:16,17,22 84:19
84:22 85:2,5 87:3
88:10,15,15 89:2
95:1 99:4,7,20,20
100:7,13,20 101:7
103:8 113:3,10
115:15 129:8

182:17 187:12
**megan** 70:13
**member** 32:4
69:18
**members** 9:17
31:11 52:15 74:4
91:12 102:10
**membership** 93:9
**memo** 71:2
**memory** 82:17,17
107:14 118:11,14
**men** 66:15
**mentioned** 8:9
16:20 67:15 94:22
113:11,13 129:7
129:11 153:22
**merit** 23:15
**mesler** 69:8
**message** 9:1 71:2
162:10 172:6,9
**messages** 4:8
153:6 159:20,22
162:9 172:2
**messaging** 160:3
**met** 18:16 37:4
81:9 83:19 87:10
88:2,19 102:14
123:6
**metrics** 79:22 80:3
80:7,14,18 81:3,8
**metro** 217:19
218:21 219:9,10
**michigan** 7:19
10:5
**michigan's** 90:13
**middle** 197:10
199:5 221:10
**miller** 180:3,20
**miller's** 180:9
181:1
**mind** 151:16
222:5
**mini** 224:15,16

**minimally** 117:12
117:16 118:1
**minute** 82:4
**minutes** 224:9
**miscarriages**
207:18
**missing** 77:3
**mission** 125:18
**misstates** 83:1
147:20
**mistake** 205:22
**moment** 82:18
110:20 199:19
**momentary** 43:12
**monday** 57:6 84:5
84:22 217:18
**money** 90:10,15
**month** 11:16
64:21 88:19
153:14
**months** 11:21
12:20 15:10 85:19
85:20 87:10
121:21 122:3,8
125:19 216:5
222:16
**morning** 83:22
85:9 116:22
**mount** 213:11
**move** 49:7 53:21
58:2 108:21 109:2
109:6 114:2 158:9
158:16 192:22
193:4
**moved** 10:1 13:18
58:9 63:15 68:21
83:18 90:5 165:9
192:19 193:8
**moving** 42:7 57:5
122:22 187:3,17
**multiple** 46:6
182:3 207:18,18
**mysterious** 22:8
24:10

**mysteriously** 22:16

**n**

**n** 5:1 9:20 160:6 225:1,1,1,1
**n.w.** 2:8,17 226:2
**name** 5:9 17:9 25:6 50:11 69:5,7 121:1 138:15 139:1 142:8 144:9 184:2 201:15
**named** 28:21 32:17 165:18 168:14 228:5
**names** 61:13
**nancy** 58:18 59:6 104:5 108:2 138:22 166:20 171:2,6,19,19 172:17 173:2,18 174:5,11 176:6 177:3
**nancys** 173:5
**nanny** 219:21
**national** 21:15 33:6 199:1 221:21 222:21
**necessarily** 18:2 40:10 66:15 124:17 125:22 128:16 131:22 134:12 140:4,6 155:18,20 171:2 177:6,20 206:4
**necessary** 90:9
**need** 6:14 28:8 53:21 60:5,22 62:7,14 65:22 66:8 75:17 87:12 91:8,18 101:13 103:8 105:12,18 116:6,8 141:7 142:5 185:9 221:22

**needed** 8:7 25:4 60:21 61:3 66:9 66:20 86:15,18 87:5,6 89:4 90:19 116:5 139:22 153:20 155:13 165:3,3 166:14 169:16 171:14 178:2 183:21 188:4 218:13
**needs** 40:11,12 187:1
**negative** 61:18 133:14
**never** 9:7,9 31:22 44:21 47:5 68:1 91:15 95:2 113:9 114:9 123:9 125:5 130:6 131:19 133:18,19 154:9 155:8 183:19,19 184:19 185:5 207:21,22 214:2
**new** 22:22 37:18 38:9 40:20 81:11 81:16 108:19 129:5 175:22 194:21 205:22 217:1,9,11,12 219:18,22 220:4
**nine** 16:1 67:15,18
**nineteen** 67:9
**non** 38:22 39:4,9 68:7,11,13,15,16 68:19 69:3,12 91:18 134:12
**nope** 80:6 132:17
**normally** 86:18 139:7
**north** 1:16
**notary** 1:17 226:19 228:3,19
**note** 4:12 74:16

**notes** 78:17 82:14 203:15 204:2
**nova** 102:3
**november** 1:15 3:3 70:14 228:16
**nsl** 17:3
**nslb** 21:5,10 127:5 127:8,11,20 128:3 128:4 134:13 139:3,16 181:2 190:21 191:3,6 192:7 193:6,9
**ntlb** 128:8
**nuances** 138:8
**number** 20:12,16 26:13,17 28:4 41:7 46:7 54:14 55:12 63:17 70:5 70:6 72:13 73:20 76:15,16 78:5 79:10 84:10 123:10 126:4 128:10 135:10,22 146:6 151:13 159:15 191:19 192:4 194:3 198:13 200:5 203:11 213:7
**numbers** 13:3,4,6 151:16
**numerous** 8:4 131:18 189:11
**nuts** 93:2

**o**

**o** 5:1 225:1,1,1
**oarm** 102:11,13 102:14,16
**oath** 6:1,5
**object** 20:18 55:5 147:8 176:11 180:13 216:10
**objection** 18:8 20:7 21:12 22:11 24:6 26:2 29:16

30:22 31:20 34:8 34:19 35:4 36:15 37:19 39:5,18 40:1 41:3 43:16 46:21 47:3 60:18 65:5 83:1 95:6,20 96:8 98:10 111:17 112:21 118:12 127:21 131:5 132:2 133:4 135:1 136:17 137:16 138:6 144:3 147:20 148:14 164:22 167:6,18 170:17 177:14 188:16 196:1 222:17
**objections** 35:14 129:17
**obligation** 144:2
**obtain** 10:20
**obvious** 96:1 98:14 195:6
**obviously** 42:19 82:15 115:8 116:4 127:10 150:13
**occasion** 107:10
**occasionally** 51:12
**occupy** 55:14
**occur** 63:10 84:3
**occurred** 202:17 216:12
**october** 18:10 143:13,15 144:21 145:4,7
**od** 168:21
**odd** 158:21
**odni** 173:22 175:1 175:6
**offer** 173:19
**offered** 48:7,14 49:1 121:5,9,11 123:5 124:12,13

**office** 1:3 2:6 8:13
8:17 9:4 11:6 16:8
22:9,16,17 24:22
25:10 38:6 44:6,8
44:13,17,19,19
45:7 47:13,21
48:3,6,9,10,11,14
48:15,21 49:3,4,7
49:12,16 51:3,9
51:19 54:1 55:14
56:12,17,21,21
57:4,5,9,11,12
58:3,3,5,6,7,10,19
58:22 59:2 60:15
60:16,22 61:8,9
62:4,9,12,20 63:6
65:15 66:5 73:1
91:9 96:3 102:16
110:5 121:20
125:3 131:10,13
131:15,16,17,20
132:1 150:6
163:15,16 179:6
179:18 212:15
217:4
**officer** 68:15 69:2
69:4
**offices** 44:18 45:1
47:18 48:13,18
52:18 57:1,13,15
58:16 59:13 61:7
91:5,6 130:8
**official** 14:5,7,11
14:14,15,21 15:1
15:6,7,16,17
16:10 71:8 122:5
122:19 143:8,16
169:1
**offshoot** 83:15
**offsite** 51:16 52:2
52:5,7,9,11,14
**oftentimes** 56:8
61:20 83:17 88:13
93:6

**ogc** 11:13 12:7
23:20 26:12 38:17
39:22 57:3 61:6
61:15 74:4 94:13
94:17,21 96:19
97:3,11,15 102:5
105:2 106:11,12
106:13,14 115:18
124:18 128:15,16
128:19 136:11
137:3 150:22
156:18 161:15,17
165:15 169:3
175:2 180:21
181:6 198:5 211:3
**ogc's** 74:8
**ogcs** 112:20
134:21
**oh** 28:16 42:12
50:13 119:21
122:14 144:10
163:11 172:3,11
184:1 201:12
205:21 206:16
209:11 223:15
**oig** 179:9
**okay** 6:17 7:13 8:2
8:19 9:12 17:1,12
18:5 19:4 20:21
26:21 27:17 28:13
29:3,10,13 31:6
32:20 36:9 37:15
38:4 39:12 41:13
42:22 46:8 49:11
51:18 52:10,15
53:1,9 54:12
55:11 71:1,19
72:12 73:11 74:7
74:11 75:15 79:9
79:15 82:12 84:3
84:8,17 85:8,12
85:15,22 87:16,20
88:1,6 89:8,9
93:16 95:18 100:4

105:12,18,21
106:9,22 107:6,9
108:9 109:15
117:18,22 118:10
118:19 121:5
122:5,12,16,19
124:10 127:6
129:2,9,21 132:18
132:19 133:17
135:9,20,20
137:13 140:15,18
141:9,17,22
142:15 143:7,18
144:17,19 145:3,6
145:12,13 146:4
146:12,17,22
147:14 149:1,18
149:21 151:9
152:7 154:14,16
157:13,20 159:14
159:21 160:3,11
160:15,18 161:5
161:20 162:13,20
163:2,8 164:2,14
164:19 166:7
168:22 169:14
170:13 172:1,5,14
173:7,9,11,16,18
173:21 174:1,4,8
176:9 177:11,21
178:9,18 181:5,10
181:15 184:3,10
186:13,18 187:6
187:17 188:7,19
189:21 191:17
192:1,5,10,18
193:18 194:6,9,11
194:14 195:3
196:22 198:10
199:2 200:13,17
200:21 201:14,19
201:21 202:11,16
203:10,16,22
204:2,4,17 205:1

205:6,20 206:5,7
206:14 207:4
208:14 209:8,12
209:15,17,19,22
210:9,15 212:9,12
212:17 213:1,5,13
216:4,7 219:13,18
224:9
**oklahoma** 113:12
113:19 114:3
**old** 44:6 48:2
106:17 107:14
108:14,20 213:22
**older** 103:8
**omission** 142:18
**once** 14:22 19:8
28:9 41:10 42:20
43:22 46:22 72:6
78:1 83:20,20
85:9,10 86:2,13
94:1 97:5 102:19
108:7 113:11
116:16 152:15,18
153:5 192:13
217:21
**one's** 207:21
**ones** 67:16,18
86:21 144:11
**ongoing** 156:14
**open** 38:22 59:9
104:8 121:15
124:12 126:13
183:6 218:13
219:5 221:20
222:21 223:3
**opening** 24:15
**openly** 103:7
**operated** 66:3
**opinion** 40:4
101:12 187:15
**opportunities**
54:8 55:20 99:12
**opportunity** 1:2
99:17 101:4

Marciann Grzadzinski                                    November 15, 2018

**[opportunity - phone]**                                         Page 22

123:18 143:19
217:21
**opposed** 36:6
56:10 128:5
217:17
**opposite** 61:2
214:8
**opposition** 35:12
**opr** 9:8,10,11
**option** 112:11
121:6
**options** 219:1
**orchestrated** 95:3
**order** 122:5
160:10 218:11
**org** 95:1 108:19
165:12,13 192:16
192:18
**orientation**
192:11
**original** 226:9,13
**originate** 219:9
**ost** 12:17 16:11
**otd** 123:6
**outcome** 228:14
**outside** 123:19
124:7,15,22
216:11
**overall** 163:18
**oversaw** 115:1
**overseas** 11:18
**oversee** 140:9,22
**overseeing** 57:17
**overwhelmed**
207:21
**owned** 219:19
**oz** 27:8

**p**

**p** 5:1 9:20 14:14
225:1
**p.l.l.c.** 2:16 226:1
**p.m.** 21:4 81:20
82:2 224:17

**page** 3:5,21 4:11
29:3 55:11 70:10
70:13 71:1 74:2
78:8 79:13 82:2
84:18 102:21
106:2,5 136:3,6
140:12 142:21
143:1,4 146:17
151:16 154:12,15
157:13,22 160:8
161:7 162:6 163:3
166:10 172:4,6,21
173:13 174:3
184:8 186:11
192:1 200:10
205:21 209:9,14
213:4,10 226:9,14
227:4
**pages** 152:3 160:9
225:4
**paid** 90:5
**pain** 202:17,21
203:3,6,8 204:9
205:2 211:19
**pains** 204:3
205:18
**panel** 22:2
**paperwork**
122:21 197:9
201:18
**par** 14:9 117:10
144:21 145:3,7
169:6
**paragraph** 55:16
123:16 136:6
140:17
**paralegal** 9:2
**paralegals** 12:16
14:12 15:5
**paranoid** 90:4
**parks** 2:16 226:1
**pars** 14:18 16:8
**part** 21:10,20 33:4
81:7 92:3 170:4

170:22 185:19
192:16,18
**participate** 99:12
99:17
**particular** 43:2
183:17
**parties** 159:7
228:13
**parts** 139:10
155:21
**party** 7:16
**passed** 191:12
193:7
**passing** 76:4
**pat** 29:6 163:10,13
163:15
**paths** 139:9
**patient** 213:22
**patricia** 27:5
**pavlak** 14:14
**pay** 90:14 92:8
**paying** 90:10
**pdf** 224:15
**pending** 6:16
224:5
**pennsylvania** 2:8
**people** 13:1,2
23:20 27:11 35:21
40:12 52:20 59:21
59:22 60:2,2,14
60:19,21 61:12,15
61:20 62:7,8,8
79:8 95:10 101:8
115:5 141:8
144:16 150:21
153:21 156:12,16
175:12 188:4
**people's** 196:20
**perceive** 186:6,8
**percent** 128:15
**perform** 139:22
**performance** 14:8
69:19 71:3,3,7
77:3 96:6,15,20

97:4,12 98:1,4,9
98:15 117:19
144:20 148:4
150:17 154:10
155:20 166:12
169:17,20 170:15
179:2 181:2,11
183:14
**performed** 130:17
131:10,13 132:1,7
**performer** 188:8
**period** 40:20
88:19 113:2 119:9
150:9 153:15
208:3 216:4,11
**periodically** 89:18
89:22 182:4
**persichini** 12:21
15:21
**person** 23:1 26:11
37:4 45:15 100:15
184:4
**personal** 84:16
107:2 131:1 139:5
190:6 216:14
218:17
**personalities**
96:15 159:8,9
**personality**
150:14 154:7,11
154:11 155:22
156:14
**personally** 35:18
104:13,16 183:18
185:6 189:22
228:5
**perspective** 40:14
40:17 134:16
**petty** 157:21 158:2
158:9
**phone** 8:22 9:6
22:13 62:19 92:7
120:11 183:20
184:19 185:6

Marciann Grzadzinski                                      November 15, 2018

**[phrased - prior]**                                                    Page 23

phrased  61:2
physically  122:22
  158:6,12
pick  66:13 109:11
picked  42:14 65:3
  127:11
pickering  9:20
picks  35:11
picture  115:16
  116:11
pictures  49:16
pilot  68:4
ping  53:10
pip  155:19
pips  155:17
pissed  162:4
placate  109:9
place  9:20 56:17
  173:8 192:13
  228:6
placed  36:1
  109:16 121:19
  142:17
places  124:22
plaintiff  226:14
plan  69:19 71:3
  72:4,6 73:8,9,12
  73:15 74:17 75:4
  75:13,18,20 76:3
  76:8,10,11 77:4,7
  77:18 78:2,13,16
  79:1 80:2,9,17,21
  81:8 82:20 121:18
  199:12 221:14
planning  110:9,20
plans  70:3 74:9,19
  76:5 80:1,7,22
  81:11 110:13,17
  202:6 221:11
please  5:16 6:9,15
  55:11 70:4 74:17
  135:20 142:21
  146:17 160:8
  172:1 194:2

198:11 226:7,12
  226:15
plug  199:8
plus  15:22 62:15
point  5:20 6:8
  25:10 32:18 47:9
  47:12,17 67:8
  72:8 73:16 75:12
  75:21 77:8,19
  83:11 87:1 88:17
  109:8 128:22
  175:19 200:15
  202:8 206:17
  221:2
policies  139:21
policy  53:3 98:8
  98:11 123:20
  130:20
pollination  188:6
ponged  53:10
poor  170:6,15
  188:8
popped  89:22
populated  81:15
population  112:19
portrayed  97:1
position  11:9,9,12
  12:3,3,5 17:2,3
  19:20 20:2 21:5
  21:11,22 22:5
  23:10 29:8 30:4
  30:13 36:8 38:12
  38:13,22 40:12
  41:1,2,21 42:18
  43:7,15 44:5,16
  46:2,5,18 47:1
  48:4 59:9 61:3
  65:3 68:12,22
  72:9 77:13,15
  85:19 90:6,18
  91:16 92:10 93:17
  94:7,14 95:5,16
  97:21 98:19,21
  101:19 102:1,8,12

105:11 108:22
  109:3,3,7,16,17
  118:17,22 119:13
  119:17 120:8
  121:6,10,12
  124:10,10,12
  125:2,5,13,15,20
  126:1,6,10,22
  127:8,19,20
  132:11 134:2,4,6
  138:13 139:22
  140:9 164:21
  165:9,10 166:15
  166:22 169:1
  175:7 176:18
  178:1,5,10,15
  179:2,16,20,21
  180:4,21 183:3,6
  192:14,17 193:12
  202:4 217:17,18
  220:17,21 221:1
  221:21 222:8,21
  223:3,5,13,15,21
positions  17:3,13
  17:16,20 19:15
  20:6 25:3 45:4
  68:6,9 91:18
  95:12 105:9
  121:15 140:20
positive  15:13
  39:10
possibility  109:6
  189:3
possible  20:5
  46:13 65:2 96:5,9
  206:8 211:18,21
  215:19
possibly  10:21
  12:14 14:16 18:20
  46:10 47:19 72:8
  82:16 87:22 98:6
  104:6,11,19 105:7
  112:11 115:3
  120:10,10 131:21

147:7,10 206:10
  214:4 215:6
  222:18 223:16
post  84:17,18
posting  17:2
  127:15 134:8,10
potentially  91:11
  172:18 174:6
  177:4,15 221:15
practitioner
  208:11 214:10
pre  81:15
preference  17:22
  123:1,3 124:14
  142:7
prepared  142:3
  147:21 148:15
presence  103:13
  103:16,20 107:18
present  112:3
presented  90:18
pressure  208:11
  208:13 212:4,7,13
  212:18 213:2
  214:6,8,10,12,14
presumably
  222:15
pretty  15:13 39:13
  42:8 195:4
previous  64:14
  149:13
previously  86:12
  140:3
primary  45:11,16
  45:18
principle  45:19,21
  46:20
prior  11:15 18:16
  19:8 47:19 66:4,4
  66:22 76:2 80:10
  82:2 94:16 132:21
  133:3,9,12 134:20
  136:8,9,9 137:1,9
  137:14 138:4

**[prior - ready]**                                                                 Page 24

168:2 179:2
192:19 198:4
203:3,8 204:12
205:2 206:2 212:7
212:14 219:18
**prioritization**
195:19
**prioritized** 195:9
196:15
**priveledged** 133:5
**privilege** 55:7
136:20
**privileged** 133:10
**probably** 15:19
32:16 58:19 62:3
69:10,11 78:20
80:18 83:19
107:22 115:2
118:9 122:7
150:10 194:22
206:17 216:5
**probation** 118:18
119:1
**probationary**
40:20 119:4,9
**problem** 36:16
91:4 214:7
**problematic**
111:22
**problems** 171:20
**procedures**
139:21
**proceeding** 7:17
**proceedings**
228:11
**process** 17:2 77:16
155:16
**procurement** 48:9
61:8 93:21 94:11
**production** 171:2
**professional** 8:13
**program** 71:4
111:12,12

**progress** 203:14
**project** 68:4 171:4
171:12
**projects** 149:3
187:2,19,20
**prominently** 33:2
**promised** 63:3
**promoting** 182:22
**promotion** 43:12
183:3,17
**pronounce** 144:14
**pronouncing**
144:9
**proof** 93:9
**proper** 79:6
**properly** 144:9
**proposing** 12:15
13:17 61:11
**prospect** 91:22
221:8
**provide** 16:17
55:2 81:3 99:16
101:3 148:6
**provided** 72:3,5
81:2 125:20 148:4
148:11
**providing** 54:8
55:20
**proximity** 59:20
**psychology** 10:12
**public** 1:18 223:17
228:3,19
**pulled** 197:11
**pulling** 75:9 199:8
**purchase** 216:22
217:9,12,13 218:1
220:4
**purchased** 217:11
219:22
**purchasing**
219:18
**purely** 13:2 35:22
**purpose** 47:16
81:8 95:15

**put** 9:1 48:22
78:20 89:18
108:19 128:3,4
142:7 151:9
152:12 175:3
183:7 193:12
196:12 208:11
210:17 213:4
214:10,11 215:6
221:7
**putting** 61:9 75:4
78:18
**pyota** 120:12

**q**

**qualifications**
130:4 136:2
**qualified** 17:15
134:12,15,15
191:5,8,14,16
**qualifies** 58:19
**quantico** 52:21
53:7,19 61:22
62:10,11 102:2
123:6 124:21
192:8
**question** 6:9,11,12
6:16 41:11 51:17
56:10 97:6,7
138:6 141:11
175:21,22 176:13
212:11
**questions** 7:6
21:16,18 224:8
226:15
**quick** 69:14 185:9
212:10
**quickly** 154:13
**quite** 9:4 14:1
42:14 49:14 80:20
104:7 107:8 111:9
120:13 129:3
133:15 134:9
149:10 158:4
168:11 170:20

204:13,15,15
221:5

**r**

**r** 5:1 9:20
**ra** 62:6
**race** 186:8
**radar** 76:13
**radiology** 213:11
**raise** 25:4
**raised** 9:13 94:1
**ran** 102:1 173:18
217:16
**rank** 179:21
**ranks** 38:17
119:11
**rarely** 58:14
**rate** 143:9,19
**rated** 117:9,22
**rating** 14:5,7,11
14:14,20 15:1,6
15:15,17 16:5,10
117:12,15 143:8
143:16 144:1,2
169:5
**ratings** 143:12
**ray** 28:14
**rcmp** 11:21
**reached** 198:8
**reaching** 153:16
198:1,6
**reaction** 206:20
**read** 44:1 64:7,14
135:3 141:9
174:18 177:2
224:14 225:4
227:4
**reading** 42:7
151:16
**reads** 21:3 55:18
74:16 140:19
144:8,19
**ready** 30:16 74:17
158:9

Marciann Grzadzinski
November 15, 2018

**[really - remember]**

Page 25

**really** 27:22 42:9
42:14,17 60:3
67:7 86:22 123:20
152:11 184:15,17
185:6 194:10,22
222:20
**reason** 21:9 24:4
36:13 47:16 56:16
64:13 166:2 168:5
188:20 204:17
217:12 220:21
227:4
**reasons** 7:5 54:1
98:1,5 154:4
164:20 220:16
**reassigned** 67:8
144:22
**recall** 16:22 18:13
19:11 21:15 22:3
22:10 23:19 29:1
30:6 32:8,11,18
33:3,8 42:21
45:15 46:13 47:6
47:22 48:1 50:10
59:8,10 60:10
61:14 64:13 69:4
71:10,11,17 72:5
72:7 76:4 77:20
77:22 78:1,2,19
80:12,21 81:18
82:11,18,20 85:15
86:10 87:11,18
88:8 89:14,20
94:8 99:14 101:2
105:5 107:20,21
108:15 114:18
119:17 127:13
129:2 131:21
132:22 145:20
146:1 147:5
157:12 163:12
164:9 165:22
167:20 168:10,13
169:10 174:18,20

175:5,8 182:10
183:8 185:17
186:3 188:17
203:4,9,20 204:21
205:1,6,19 206:1
206:1 211:16
212:19,22 214:17
215:7 221:22
**receive** 144:21
**received** 22:13
47:19 73:14,17
76:21 92:7 128:17
144:9,20 169:6
**receiving** 71:10
80:15
**receptive** 64:11
112:10,14
**recognize** 26:18
28:7 41:11 54:17
63:20 76:19 84:13
128:13 135:13
146:14 198:16
200:8
**recollection** 13:16
22:4 30:17 32:14
32:21 44:2 59:13
59:15 72:7 73:12
76:12 78:15 80:11
81:6 82:19 83:3
85:17 104:17
111:18 137:22
168:12 174:9
204:11 210:9
**recollections**
77:11
**recommended**
132:14
**record** 4:13 7:12
83:2 105:19 106:2
142:13 147:3,21
151:16 177:14
196:2 197:3
228:11

**recorded** 228:10
**records** 161:6
**recruitment**
102:17
**refer** 6:20 17:6
51:16 92:20 93:7
100:18 176:19
187:21 197:20
**reference** 27:7
75:3 88:17 164:11
166:9 174:15
187:20
**referenced** 26:6
31:6 86:11 156:11
**referencing** 29:13
**referral** 9:8
**referred** 8:12,17
20:1 24:10 27:11
152:5
**referring** 8:20
28:19 29:1,21
30:4 43:6,14,20
45:14 88:9,14
98:11 100:19
105:13 115:11
141:6 148:3
152:14,15 153:1
162:14,21 164:10
173:2 176:12,21
187:22 192:10
195:14 196:10
200:17
**refers** 124:1
200:19
**reflect** 80:1
**reflection** 56:11
**reflects** 61:3
**refresh** 32:21
73:11 174:9
204:10 210:9
**regarding** 9:13
71:3 148:4 163:9
226:11

**regardless** 111:14
219:5
**regrets** 41:2
**regular** 25:1 66:17
113:3 224:16
**related** 27:1 215:3
**relationship** 24:20
25:12,14,17,19
26:7 37:12 150:8
150:15 157:1
179:8,12,13,15
**relatively** 64:19
**relevance** 40:2
**relevant** 216:11
**reliability** 180:15
**reliable** 167:4,13
178:20 180:11
**reliably** 218:12
**reliant** 219:20
**rely** 91:7 93:2,3
217:19
**relying** 82:16 88:4
**remain** 110:5
166:12
**remainder** 13:8
**remained** 98:22
192:8 217:4
**remember** 11:8
13:20 14:18 15:22
16:2,7 18:22
23:21 30:15 39:8
46:14 47:15 50:13
68:3 69:6 84:4
89:7 97:19 100:21
101:1 104:18,20
105:5 107:14,17
108:11 119:18
122:10 126:14
130:7 134:7,8
135:3 139:1
163:15,17 166:1,3
166:5 167:19
173:4 184:2
185:22 201:15

Marciann Grzadzinski                                        November 15, 2018

204:14 205:5,13
205:15 223:16
**remembering**
98:13 193:9
**reminded**  76:9
149:2
**removal**  96:7
97:22 119:11
202:22 207:6
208:22 212:4,5,8
212:14 214:20
216:21 217:10,14
220:5,13 221:7
**remove**  49:1 95:4
95:16,17,19 97:20
98:18,20 145:21
147:12 156:20
158:3 166:14,22
**removed**  49:17
96:19 97:4,11,17
109:15 118:16,19
118:21 121:6
125:22 142:2
143:2 149:6
157:18 165:8
176:17 217:3
221:16
**removing**  98:4,13
98:14,17 147:5
164:20
**reorganization**
94:18 95:4,15
96:5,14 109:21
167:17 168:2,7
177:22 188:11,15
**reorganizing**
94:13,21
**repeat**  6:9 97:8
**repeated**  107:3
**rephrase**  6:9
**replaced**  69:3
120:5
**replacement**
215:21

**report**  14:9 16:15
16:15 71:8 203:15
**reported**  1:20
14:13 50:19 68:7
68:11,13,14,16,22
69:1,8,9,11 71:12
110:19 119:2
192:7 223:1
**reporter**  5:12
20:15 26:16
226:19
**reporting**  110:3
196:8 217:15
**reports**  50:4,15
165:21
**reposted**  127:16
**representative**
5:10
**reputation**  26:8
54:8 55:19
**request**  87:7 89:1
191:21 192:2
**requested**  114:8
**requests**  135:16
**require**  91:13 93:8
119:8 126:6
**required**  12:6
71:7 80:19 81:1
89:11 92:7 125:12
126:10,17,21
134:1,5,21 136:10
137:2 141:5
202:18 223:13
**requiring**  91:10
127:2
**research**  93:19,21
**resp**  3:13
**respect**  167:4
178:20 180:11
**respiratory**
215:17
**respond**  5:17 75:1
172:22

**responded**  82:7
**responds**  75:15
157:2
**response**  27:17
37:16 55:16 76:7
80:6 82:1 134:18
140:16 141:18
162:2,4 174:2
185:8,10,12
**responses**  4:5
53:22 54:19 99:10
100:19 132:20
135:7,15 140:13
166:8 169:8
177:22 181:16
189:10 191:19,20
192:2 202:16
217:8 220:4,9
**responsibility**
8:13,18 170:15
**responsible**  14:8
57:16 69:19 110:8
166:4 226:10
**responsive**  181:12
182:21
**restate**  118:20
**restored**  223:5,9
**restrictions**  180:6
**result**  207:5
**resulted**  54:7
55:18
**resulting**  189:12
212:4
**results**  213:12,18
**resume**  30:10
138:8
**rethinking**  42:3
43:5,7,9
**retire**  197:8 198:7
199:21 200:1,4
220:21 221:15
223:11
**retired**  37:7 63:6
69:3 120:20

168:14,17,20
180:19 197:1
220:20 221:15
**retirement**  24:14
27:2 28:1,2
188:10 197:9
199:12 201:9
202:13 220:18
221:12
**retiring**  198:5
199:17 200:22
**return**  180:4
183:20 185:5
192:14
**returned**  82:21
**returns**  184:19
**reveal**  98:8
**reverse**  61:1
160:14
**review**  41:10
42:22 54:10,12
71:11 72:16
144:20
**reviewed**  80:9,13
**reviewing**  14:15
15:7
**revolving**  171:3
**rick**  138:20
190:18 191:15
**rid**  103:8,18 104:1
104:2 106:16
108:10 153:11
154:1,5,9
**right**  8:3 11:3,7,17
13:17,22 14:9
15:10 17:4 27:2
28:14 31:9 32:2
34:1 38:14,17,20
40:6,12 41:2 44:9
44:15 46:10,16
47:9 48:12,16
49:20 52:8,12
66:18 72:19 73:3
73:9 74:22 75:8

**[right - see]**                                            Page 27

77:5 84:22 86:6
93:15 94:14 96:16
99:4 100:2 102:21
103:10 104:10
106:18,18 109:10
109:21 110:9
111:5 112:10
114:12 117:10,16
122:2,9,17 123:2
127:4 134:22
136:4 137:19
139:22 145:16
146:11,21 148:1
150:3 151:6
154:19,21 155:1
155:19 157:4
162:1 166:6,17
177:18 179:22
180:7 181:7,13
185:12 188:8
189:13 194:19
196:3 198:2
199:18 202:8
203:18 207:6
209:2,13,21 210:2
210:5 215:1,5
217:1 219:19
220:11 221:12
222:2,3,5,8 223:7
**ring** 105:16
**riyadh** 11:19
**rocketing** 127:1
**roi** 105:19,20
117:19 142:6,9,14
142:17
**role** 15:4 35:2,8
46:12,16 64:3
72:21 140:10
179:5 190:22
191:12,15 192:19
**roles** 12:2 136:9
140:21 141:1
**room** 6:4 63:1,7
63:13,16 108:3,5

116:18
**rooms** 63:12
**root** 27:18
**rose** 189:17
**rotation** 188:1
**rough** 151:4
152:17
**roughly** 15:11
16:1
**routinely** 56:7,9
99:11 100:13
153:10 182:2
**rub** 66:11
**rude** 5:21
**rumor** 23:15,18
28:16,19 31:7,18
32:9,12 36:9,11
36:12,17,19,20
42:10
**rumors** 22:20 23:4
23:6,9 36:17 54:2
54:6 55:18 107:11
107:19
**run** 124:17 137:3
**running** 30:15
163:16 187:14

**s**

**s** 5:1
**sabol** 50:6 51:3
104:2,6,15 106:6
106:10,19 108:2
138:21 150:3,8
162:10 164:16,20
165:8 173:3
174:12 176:20,22
**sabol's** 105:22
150:16 192:19
**sac** 25:9 68:4
114:12,13
**salary** 110:1 125:9
221:17
**sat** 53:6,11,14
62:17 66:12 73:1
116:17 121:20

122:3,8 125:18
184:16
**satisfactory**
117:13,16 118:1
**saw** 25:11 36:18
61:22 130:7 136:4
222:6
**saying** 42:20
47:20 75:16
106:10,19,21
107:14,17 108:9
134:15 139:5
154:1 157:20
164:10 166:19
170:4 176:2 178:7
189:18
**says** 23:13 42:3,8
71:6 87:14 136:18
143:2 177:2,11
194:20 195:7,13
213:22
**scale** 81:13
**scattered** 53:2
**schedule** 84:6,7
85:4 86:22 144:1
**scheduled** 83:17
88:12 99:4,22
111:4,7 113:18
114:11 206:6
**schedules** 83:21
99:8 157:12
**schlendorf** 120:1
120:4 123:13
124:6
**school** 10:16
**schoolmaster**
19:22 20:22 22:14
57:2 103:7,12
104:3 106:12
107:12 153:10
**science** 10:12 50:7
50:17 53:3,17
62:2 150:5 192:15
193:16

**scope** 168:6
**screening** 121:13
121:15,16 125:6
125:10 217:22
218:4 219:4
**seat** 223:3
**seater** 218:18
**second** 29:3 42:1,2
55:17 70:9,12
74:2 78:8 79:13
123:16 136:6,6
142:21 143:6
144:19 149:6,14
151:20 154:14
156:10 161:2
162:9 177:13
186:16 197:4
209:22 213:14
**secretaries** 44:14
57:6
**secretary** 12:18
72:22
**section** 50:6 56:6
57:17,20 58:20,21
59:9,10 77:14
80:2 83:13 85:7,8
86:2,3,17 100:9
100:17 105:6
109:16,18,20
110:8 113:3 150:5
156:8 165:9
166:12 168:3,4,8
168:9,19 170:1,13
171:6 180:21
181:2 183:6,10,11
185:15,20 192:14
193:22 196:12
205:13 213:19
220:7
**security** 21:15
33:7 221:21
222:21
**see** 9:9 20:21 21:5
28:17 42:2 43:4

Marciann Grzadzinski                                    November 15, 2018

48:19 55:21 56:7
74:9,20 76:11
79:20 80:4 81:9
81:20 131:2
136:11 137:10
141:1 143:10
157:21 158:1
162:11 172:7,19
172:22 175:16
186:17,22 187:3
195:1 199:6,12
210:7 213:16,20
214:16
**seeing**  127:14
129:2 158:15
**seek**  202:6
**seeking**  194:22
201:6 223:5,9
**seen**  18:21 21:8
54:22 62:1 135:18
141:17 144:12
**select**  24:1 32:6
33:2 35:3,9,18,19
37:17
**selected**  31:8
32:13 35:22 36:3
36:6 49:4 54:1,3
56:17,18 114:16
127:8,20 128:8
129:6,15,22
159:22 160:9
184:21 193:14
202:4 222:16
223:20
**selecting**  35:13
60:14
**selection**  17:1 22:8
36:21 55:17 127:5
130:4 138:3
**sell**  220:1
**senate**  139:1,2,2
**sending**  26:22
**senior**  38:13 68:2
82:21

**sense**  6:21 13:19
16:3 23:15 36:13
40:15 45:6 58:20
59:10,16 65:13
66:16 87:19 93:20
127:12 128:20
134:17 149:5,13
149:16 153:7
158:8,10 208:1
**sensitive**  51:15
**sent**  73:5 76:9
145:15 152:9
164:4 199:14,22
221:10
**sentence**  55:17
79:19 136:7
140:19 144:8,19
149:1,5,6,14
186:16 204:6
209:22
**sentences**  146:18
147:6
**separate**  52:7 97:7
151:19 176:13
213:5
**september**  194:7
202:18 203:6,21
205:7
**seriously**  42:3
43:5
**serpent**  60:9
**served**  143:9
**service**  38:14
82:21
**ses**  22:2 38:14
40:20 57:3,4,13
57:15 58:16 59:6
59:13 60:21 61:1
69:18 70:18 71:3
71:7 73:6,9 74:4,8
74:20 77:2 81:11
95:11 116:9
119:11 121:7
212:5 221:16

**sesers**  95:10
**sessions**  1:8 227:2
**set**  84:6,6 134:16
202:12 228:6
**setting**  83:19
**seven**  12:14 14:2
15:22 16:1 55:11
66:3 92:13 217:16
**seventh**  51:6,11
51:22 52:20 53:12
56:22 57:8,11
**sexually**  189:11,22
**shape**  27:16
**share**  163:8
**shared**  62:17
65:14 138:8,9
170:14
**she'll**  224:14
**sheet**  225:8 226:13
227:1
**shepherding**
171:11,13,17
**sherry**  50:6,16
51:3 52:19 53:6
53:11,13,14 104:2
104:6 106:6 108:2
138:21 150:3,10
150:11,18,22
151:3,5 152:8,16
152:17,18 153:12
153:19 154:2,5,12
155:11 156:7,8,19
157:8,17,21
158:14,19 162:10
163:9,20 164:1
165:2,6 172:18
173:3 174:5,11
177:4
**sherry's**  52:20
154:7 165:2
192:17 193:19
**shifted**  221:4
**shocked**  27:15

**shooting**  40:13
91:8
**short**  69:16 86:21
99:3,7,11 149:22
197:5 224:12
**shorter**  126:18
**shortly**  12:19
13:16 23:5 28:21
32:13 85:5 188:10
**shot**  206:2,9,15,19
206:21
**shots**  206:11,17
**show**  47:17 77:21
105:19 135:6
155:18 165:3
**showed**  22:18
62:18 63:3 182:5
182:12
**showing**  162:11
**shown**  48:2
**shows**  117:22
**shrinks**  95:10
**shut**  64:18
**side**  18:3 119:19
119:20 211:18,22
215:19 216:8,18
**signature**  226:9
226:11,13 228:17
**signed**  4:6 74:19
77:4 96:12 99:2
117:8 118:6,10
142:3,19 145:15
146:2,14 188:20
221:19 223:4
225:8 226:13
**significance**  40:7
**significant**  25:9
**similar**  65:17
107:10,11 134:20
136:10 137:2
180:6 203:2,7
204:9,12,14 205:1
**singulair**  215:11
215:19

singular 215:15
sit 25:2 59:17 62:7
  65:8 176:3 187:11
sites 62:21
sitting 56:5,10
  59:20 62:6 80:11
  92:13 107:4 125:3
  125:16 185:9
  205:9,11,17 220:2
  223:2
situation 29:21
  109:13 152:5
  155:10,12 157:5
  157:17 159:6
  164:11 195:4
situations 195:18
six 10:10 85:19
  106:5 192:1 203:8
  204:10,12,14
  205:2 216:5
sixteen 191:20
size 44:20 48:15
  58:20
skills 134:17
skip 56:8 100:14
slash 25:20 72:22
slot 121:17
small 63:16
smaller 58:9,21
  60:16 63:15 91:5
smooth 109:13
snippets 175:4
snow 218:10,12,13
snowing 219:7,7
somebody 16:15
  23:12 50:12,21
  91:9 93:20,22
  129:5 144:5
  147:22 148:15
  157:18 166:1,4
  182:12
somebody's 223:2
someone's 130:13

somewhat 107:14
soon 130:13
sorry 32:1 34:11
  59:1 68:8 69:7
  92:15 105:16
  118:19 148:9
  169:4 173:13
  191:19 204:1
  205:21 209:11
  211:2 212:10
sort 88:5 112:19
sought 201:8
  207:19 208:17
  215:3
sound 46:10
sounds 36:12
  54:10 174:19
space 47:21 51:10
  53:7 58:12,13
  61:3 62:11,14
  63:1 205:10
spaces 51:10 57:3
speak 9:15 31:17
  83:15 111:4,7,16
  138:9 147:4,9
speaks 22:12
  29:17 37:19 131:5
special 11:3 13:12
  37:10 50:18 51:8
  64:7 134:11,12
  165:9,16,19,20
specific 19:11
  21:18 43:4 76:12
  77:10 81:5 85:20
  86:16 87:3 99:19
  100:11 116:2,3
  131:14 140:8,21
  163:14 183:2
  186:3 216:1
specifically 9:10
  13:20 14:18 16:2
  23:21 44:3 45:14
  46:14 47:22 61:11
  61:13 89:5,20

104:20 107:16
  131:17,21 175:10
  182:10 183:8
specifics 98:12
  107:16 108:11
  130:8 132:4 134:7
  168:11
speculate 40:6
speculation 20:8
  21:13 24:7 26:3
  29:17 34:9 35:6
  37:20 39:6,19
  40:2,4 60:19 65:6
  95:21 96:9 144:4
  170:18
speculative 40:7
spelled 156:21
spend 114:19
spent 16:7 42:6
  115:15
spiker 199:2
spoke 101:21
  112:4 138:16
spoken 190:3
spot 59:17 156:9
  205:11 209:13
  221:14
spring 122:1,17
springfield 39:14
  219:12
square 48:20
ssa 15:2,5,16 16:4
stability 220:11,14
stacie 123:13
staff 46:12,16
  68:17 71:22
  106:12 128:18
stage 80:20
stairs 60:6
stamped 106:5
  160:11,16
stan 14:13 15:5
stand 189:15
  197:21

standard 87:1
standing 83:22
  84:19 85:14 86:8
standpoint 65:19
start 49:15 73:15
  75:20 77:15 78:8
  79:13 197:16
  211:15 218:7
  222:12
started 11:13
  12:18 40:22 56:13
  56:18 75:12 77:7
  78:16 83:7 85:14
  85:16 97:20
  116:22 127:1,2,14
  127:19 139:13
  154:13 161:17
  187:15 218:3,7
starting 55:16
  67:7 146:19
  186:17 222:8,11
starts 79:20
  151:19 154:15
  186:21 194:15
  199:6 210:1
state 10:3,5,6,9
  22:7 75:10 196:1
stated 30:11 32:22
  33:19 37:17 53:22
  54:6 56:20 75:8
  87:9 96:12 99:2
  99:11 102:19
  103:6,7 106:12
  108:13 115:14
  116:11 117:8
  118:6 132:20
  134:18 139:20
  166:10 169:8
  177:14,21 178:4
  181:15 189:11
  220:3 221:19
  223:4
statement 4:6 56:1
  96:12 99:2 105:22

Marciann Grzadzinski
November 15, 2018

106:3,5 117:8
118:7,11 141:3,4
142:3,19 143:3,6
143:22 145:10,16
145:19,22 146:3
146:15 147:4,5,6
147:14 177:5,8,9
177:16 188:20
189:15 221:19
223:4
**statements** 142:2
143:2 145:21
147:2,12
**states** 1:1 27:6
**station** 217:1,10
219:9,14,20
**stationed** 218:16
**stay** 202:9 221:4
221:15
**stenographically**
228:10
**step** 91:18
**steps** 116:10
**steven** 50:10
**stints** 11:16,18
**storens** 69:9
**street** 1:16 2:17
226:2
**stress** 220:10
**structure** 16:13
**struggle** 185:7
**struggling** 72:9
**stuff** 33:7 72:10
78:17 155:8,9
159:4
**style** 61:19
**subject** 86:15
100:5 140:8,21
141:5,7 155:2
195:8,20 196:15
198:18
**submit** 93:9
**submitted** 17:12

**subordinate** 56:9
**subordinates**
60:17 81:1
**subsequently** 56:5
56:6 97:21 100:6
**substantial** 189:4
**succeeded** 132:10
**success** 80:1 127:1
**sucks** 64:8 164:5
**sudden** 70:2
**sufficient** 82:22
**suitable** 99:1
**suite** 1:16 2:9,18
44:9,12 45:2,9
48:6,12 49:5 51:6
52:21 53:13,14,15
57:21 58:10,17
59:3,7,14 157:18
158:3,9 159:13
**suited** 33:20
**supervise** 12:11
**supervised** 49:19
97:18
**supervisee** 150:15
**supervising** 13:11
13:12
**supervision** 13:13
**supervisor** 13:14
16:16 49:22 67:9
68:18 78:2 120:12
150:3,15 171:8
**supervisors** 67:1
**supervisory**
164:21
**supplemental** 4:5
135:7,16 140:13
191:18,21
**supposed** 64:15
70:3 79:7 171:11
206:12
**supreme** 132:15
**sure** 5:22 7:10 9:5
14:1 20:3 39:14
42:14 49:14 69:15

72:7 73:17 77:9
77:20 80:3 87:13
104:7 107:8 116:7
119:10 120:13
129:7 133:15
134:9 153:4
164:12 168:6
169:11 172:3
175:13 193:8
195:9 204:15,15
209:12 222:4
**surprise** 30:9
185:3
**surprised** 25:21
27:16 184:20,21
**surrounding**
181:19
**surveys** 33:1,6,8
33:15,18
**swing** 58:13 63:1
**swirling** 36:21
**sworn** 4:6 5:4
96:12 99:2 117:8
118:7,10 142:3,19
145:15 146:3,15
188:20 221:19
223:4 228:7
**symptom** 211:9
**symptoms** 211:5
215:18
**system** 189:5

**t**

**t** 225:1,1
**tab** 105:20 117:18
142:9,11,14
191:20
**table** 65:8 133:21
133:22 138:19
**tables** 63:14
**take** 6:5,14,15
13:12 28:8 34:21
42:22 55:12 58:6
58:7 60:21 69:14
84:8 92:10 116:10

116:10 124:11
125:15,19 140:22
147:1 149:10,19
152:3 154:17
158:12 194:8
205:20 207:16,22
211:11 215:11
219:11 224:10
**taken** 43:11 63:4
69:16 77:11 93:17
124:21,21 125:4
139:4 149:11,12
149:22 172:19
174:6,15 175:7
176:7,9,16 177:4
177:6 193:21
196:11 197:5
211:14 221:3
224:12
**takes** 95:9
**talk** 93:14 177:13
182:18 187:12
194:21
**talked** 9:3 33:5
62:4 71:12 115:9
126:14,15,15
139:18 157:8,9
171:19
**talking** 8:1 108:1
138:10 174:10,11
174:21 182:20
199:19
**tank** 184:16
**tdys** 11:22 12:2
188:3
**team** 127:1
**teammates** 116:15
**technical** 170:22
171:1
**technology** 50:7
50:17 53:3,17
62:2 119:19,20
150:6 192:15
193:17

Marciann Grzadzinski
November 15, 2018

| | | | |
|---|---|---|---|
| **telephone** 2:11,20 | **thank** 226:16 | 224:1,10 | 72:16 74:8 76:5 |
| **tell** 5:5 9:10 23:22 | **thanks** 157:2 | **thinking** 27:6 | 78:20 82:17 86:8 |
| 30:14 32:5 58:2 | **theirs** 79:4,8 | 34:17 44:3 141:20 | 87:1,1,5,7 91:1,15 |
| 64:12,18 96:18,21 | **theme** 66:20 | 141:20 168:6 | 94:9 97:19 103:1 |
| 97:2,10 105:9 | **therapy** 215:22 | 197:10,14,17 | 103:4 105:7 109:8 |
| 108:6 117:2 151:5 | **thing** 9:18 42:3,10 | **thinks** 34:11 210:6 | 111:2 113:2 114:5 |
| 154:4 182:8 203:7 | 43:6 66:6 81:14 | **third** 55:15 70:12 | 114:12 115:15,18 |
| 211:2 | 82:16 149:9 158:5 | 140:17 151:21 | 118:16,21 122:7 |
| **telling** 107:21 | 182:21 193:21 | 161:4 186:11 | 122:18 126:10,13 |
| 169:16 171:20 | 196:6,10 210:18 | 204:5 | 126:20,21 127:5 |
| 182:10 204:21 | **things** 30:5 53:21 | **thought** 8:22 | 127:14,18 128:22 |
| **tells** 120:14 | 64:17 65:21 89:21 | 92:21 111:22 | 129:6,21 130:9 |
| **ten** 46:9 | 93:3 115:3 116:22 | 115:16 117:4 | 138:2 147:1 150:9 |
| **tenth** 49:4,20 54:1 | 143:4 158:6 165:6 | 158:11 166:2,3 | 152:4 153:17 |
| 55:15 56:21 57:5 | 187:16,18 195:1 | 175:14 220:18 | 154:17 160:16,17 |
| 57:12,21 58:14 | 201:1 | **thousand** 10:21 | 165:5,13 168:17 |
| 59:3,17 60:4,5,6 | **think** 5:14 7:8 | **threatened** 166:14 | 170:11,20 175:13 |
| 110:6 121:20 | 13:1 15:19 17:18 | 166:21 176:17 | 180:19 181:5 |
| 217:4 | 17:21 19:18 24:1 | **three** 18:20 32:17 | 188:15 190:22 |
| **tenuous** 166:13 | 27:18 28:3 33:15 | 59:13 87:11,17,18 | 194:8 195:4 197:8 |
| **tenure** 13:9 56:12 | 34:3 39:21 42:13 | 87:21 88:1,3,20 | 199:17,21,22 |
| 64:20,22 67:6 | 42:16 43:2,3 45:6 | 121:21 122:3 | 204:22 205:7 |
| 69:10 85:6 89:11 | 47:4,5 48:9 59:16 | 125:18 143:4 | 206:17 207:19 |
| 89:14,20 128:16 | 60:3,13,19 65:2 | 151:12,18 156:5 | 208:3 213:14 |
| **term** 60:8,11 66:8 | 82:6 97:5 98:7,13 | 161:17 220:19 | 215:9 216:4 |
| 68:3 193:5 | 108:17 109:5,12 | **throw** 60:11 | 220:15 221:1,2,14 |
| **terms** 6:18 153:17 | 111:15 112:18 | **throws** 144:16 | 228:6 |
| **terrorist** 121:12 | 116:6,9 119:17 | **thumbs** 36:18 | **timeframe** 31:1,21 |
| 121:15,16 125:6 | 123:17,19 129:4 | **thursday** 86:5,8 | 32:15 113:14 |
| 125:10 217:22 | 138:5,12 139:2 | 86:20 129:8 | 162:17 191:1 |
| 218:4 219:4 | 141:5 143:21 | **thursdays** 84:5 | 222:5 |
| **testified** 5:6 7:19 | 146:8 149:9 153:3 | **thyroid** 211:11,14 | **timeliness** 127:22 |
| 8:4,10 188:13,19 | 156:20 159:6,9 | 211:18,22 215:7 | **times** 8:4 14:16 |
| 218:4 | 163:16 164:19 | **tier** 58:19 | 17:9 18:19 46:11 |
| **testify** 7:2 9:13 | 166:9 167:12 | **time** 6:14 9:6 | 52:18 87:11,17,18 |
| **testifying** 6:1 8:8 | 170:14 171:9 | 12:13,16,17 13:17 | 87:21 88:1,3,20 |
| **testimony** 20:18 | 175:19 176:20 | 13:22 25:4,10 | 91:19 100:14 |
| 225:5,6 | 183:6 191:5,8,11 | 28:8 30:14,18 | 102:15 127:17 |
| **text** 160:19 161:8 | 191:14,16 193:8 | 36:18 38:7,11 | 154:1 |
| 173:10 184:11,11 | 194:21 195:19 | 39:2 40:22 42:22 | **today** 5:11 6:1,19 |
| 186:10,11,14 | 196:6,10,14 | 44:2 47:17 57:18 | 7:1,3,6,9 133:8 |
| 187:6 209:16,20 | 197:13 204:6 | 58:14 59:11 63:13 | 163:10 |
| **texts** 175:16 | 210:13,18 212:9 | 64:4,18 65:4 67:8 | **today's** 9:16 |
| | 213:2,3 218:4 | 67:19 69:9,9 72:8 | |

Marciann Grzadzinski                                November 15, 2018

**told** 19:22 23:18 29:22 30:1,3,12 31:8 32:5,8,11,22 33:14,20 34:3 36:7,10,17 46:1 46:19 57:2,13 58:6,7 60:21 61:5 66:17 69:22 72:1 75:3 76:5 104:3 107:1,4 110:21 116:20 117:7 121:17 130:19 149:10 165:18 166:13,20,21 167:10 178:2 180:2 189:22 204:11 214:2,5

**tom** 18:14 168:13 188:7

**tone** 152:22 153:3

**top** 28:13 64:6 66:8 78:4 106:1 136:5 172:11 174:3 194:10 201:15 203:21 204:2

**topics** 87:3

**toronto** 11:20

**tough** 29:11,14,20

**tour** 120:2

**townsend** 1:17,20 226:19 228:3,18

**toxic** 159:12

**toxicity** 155:3 162:22

**traditionally** 113:15

**training** 101:22 109:17 114:22 153:20 192:7 205:10

**transcript** 5:14,22 228:10

**transcription** 225:6

**transfer** 122:5

**transferred** 119:16 178:15

**transportation** 219:1

**travel** 126:9,12,17 126:20,22 127:3

**treasury** 130:12 130:18

**treated** 190:17,18 191:11 203:5 207:11,13,16,17 208:7

**treatment** 54:7 55:19 56:4 208:17

**triage** 213:14

**tried** 64:18

**trigger** 197:11

**trips** 62:1 123:5 126:18

**trish** 63:3,4 139:12

**trisha** 119:2 128:7 129:14,22 195:22 222:2

**troubled** 170:20

**true** 36:20 96:21 110:16 136:13 140:2,7 141:3,4 141:10 149:15 153:5 162:11 167:16 169:12 185:4 225:5 228:11

**trust** 144:10,18

**truth** 5:5,5,6 97:13

**truthfully** 7:2

**try** 5:13,17 187:12 208:12 214:15

**trying** 5:21,21 9:17 47:20 109:9

109:10,12,12 123:8 135:3 155:16,18 167:19 170:22 173:4,4 175:9 184:5 185:7 187:15,22 188:1 194:11 210:13

**tsc** 120:13 122:2,8 123:18 124:10,11

**tuesday** 84:4 129:8

**tune** 27:8

**turgal** 64:1 119:12 120:5 164:4

**turgal's** 64:3

**turn** 17:1 55:11 70:9 74:2 140:12 160:8

**turned** 60:14 74:20

**tv** 125:16

**twice** 83:20 85:11 86:1,3 113:6,11

**two** 10:21 11:16 12:16 17:19 18:4 18:20 25:11 36:17 44:14,18 48:18 51:10 57:1,14 58:18,19 63:12 68:16 83:14 87:10 88:19 95:2 121:14 121:21 125:3,18 146:18 147:6 151:9 152:3 155:21 156:5,7 157:9 159:7,7,9 173:22 175:12 176:3 186:19 190:22 197:12 198:19 199:9,18 199:20 200:2,22 213:5 218:18 219:19 224:9

**type** 9:18 49:2,14 130:16 131:9,12 132:1,6 150:10 215:18 217:18

**types** 133:21

**typo** 37:22

**u**

**uc** 52:11

**ucs** 79:20,22

**uh** 128:21

**unaffected** 167:17

**undercover** 12:8

**undergraduate** 10:3

**underlying** 152:6 154:10 155:15,15

**understand** 6:1,3 6:8 40:19 52:10 101:18 116:7 154:8 167:7 170:5 174:14

**understanding** 19:14,16 30:2 31:13 33:22 35:10 46:4,18 64:16 69:21 75:7 81:7 112:13 118:18,22 119:6 136:1 138:3 138:10 164:15 165:16 167:9 168:8 171:12,16 180:20 181:16 182:6 190:20 195:13 202:3

**understood** 6:11

**unfairly** 191:11

**unhappy** 182:18 195:4

**unique** 158:19

**unit** 2:5 12:22 13:8 14:22 15:9 16:15 48:5 51:21 51:22 52:1,4,11 52:13,16 53:4,4

Marciann Grzadzinski

November 15, 2018

**[unit - wiegand]**

Page 33

53:18,18 61:21
66:6 77:2 80:9
82:7,22 86:17
94:9,10,10,11
95:9 98:4 101:22
101:22 105:10
114:22 121:12,14
122:11 125:10
126:11,12,13,15
126:21 156:4,9
163:7 184:6,7
205:10 206:13
219:6
**unit's** 80:1
**united** 1:1
**university** 10:4,6
10:7,9
**unsatisfactory**
117:9,15 118:4
**updated** 116:14
**upper** 215:17
**upset** 93:17
**upstairs** 122:3
**use** 26:9,10 60:8
62:19,22 193:5
216:3,4 219:16
**usually** 16:16
62:22 219:15

**v**

**v** 1:7 14:14 156:21
156:21,21 226:3
227:2
**vacant** 59:9
**vacations** 91:8
**vagifem** 216:2,19
**vague** 31:1,20
35:5 98:10 154:6
**vaguely** 185:22
**value** 34:21
**varied** 12:12 83:7
83:20
**various** 25:2 130:8
139:10

**vast** 39:15
**vehicle** 216:22
217:9,11,12 218:1
218:13,17 219:18
219:22 220:5
**vehicles** 219:19
**veritext** 1:16
**verizon** 19:1,2,3,7
**vernon** 213:11
**versa** 188:4
**version** 106:4
143:3 167:5,12
178:21 180:12
**versus** 112:19
180:15
**vice** 188:4
**vidivich** 156:20
**vienna** 125:8
217:15
**violate** 98:7
**virginia** 9:21
**virtual** 115:4,5
**vision** 115:16
**visit** 4:12 203:14
214:17
**visually** 48:19
**vitae** 138:9
**vitros** 207:18
**vividly** 19:1
**volkswagen**
218:10 219:1

**w**

**w** 225:1
**wagon** 219:20
**wait** 5:16,20 72:10
**waiting** 65:8 202:1
**walk** 44:13 48:22
60:5
**walked** 69:5
**walls** 187:14
**walt** 69:8
**want** 10:1 12:14
35:18 42:18 49:14
54:3 61:13 65:21

97:7 100:10
105:19 108:10
111:9 115:20
121:21,21 122:14
124:17 125:22
147:1,2,17 153:2
158:3 159:10
194:20 223:11
**wanted** 27:22 36:3
36:5,14 37:17
66:17 95:19 97:2
97:10 103:18
104:1,2 106:14
112:2 116:14
126:3,5,5 153:11
153:19 154:1,5,8
156:19 157:18
180:4 185:15
209:12 222:4
**wanting** 95:1
102:9
**wants** 96:1 195:10
195:14
**washington** 1:3,17
2:10,19 11:6
24:22 25:9 114:6
114:7 226:2
**watched** 184:16
**watching** 125:16
**way** 27:16 42:13
66:3 92:12,22
97:1 141:21 151:3
153:5 155:19
158:11,21 223:2
228:13
**wayne** 10:3,6,8
**ways** 220:13
**we've** 30:5 69:13
139:8,10
**weaning** 210:3
**weather** 217:20
218:6,22
**wednesday** 21:3
84:5

**week** 85:9,11,11
86:1,2,3,13
114:14,16,17
122:11 157:10
192:11,13 217:16
**weekend** 42:6
49:8,13
**weekly** 83:8 113:6
115:2,8 206:12
**weeks** 32:17 83:19
110:13,17 161:17
161:18 197:12
**weigh** 66:9
**weight** 209:1,4,7
210:7,10 211:6
215:4,8 216:8
**weiser** 2:16 226:1
**went** 7:18 9:4
11:19,19,20 15:4
17:3 47:14 49:13
62:2 64:14 85:6
86:7 93:15 102:5
119:18,18,20
121:16 122:1,2,7
122:14 126:19,20
127:9 179:12
183:22 194:12
201:12 217:21
220:15
**west** 1:16
**wfo** 8:21 13:18
16:20 62:5 67:13
68:5 161:19
**wheel** 218:14
**wicked** 27:12,13
**wiegand** 59:6
104:5,12 108:2
138:22 166:10,13
167:10 168:2,14
168:19 169:5,9,16
170:14 171:17
173:2,18 174:11
174:22 176:6,16
185:14

Marciann Grzadzinski
November 15, 2018

**[wiegand's - z]**

**wiegand's** 58:19
167:2,10
**wife** 69:6
**wilson** 22:22 23:9
30:1 36:4,6 37:2
**wished** 64:11
**wit** 228:1
**witch** 27:8,12,13
**withhold** 30:10
**witness** 5:4 7:19
21:14 22:13 24:8
26:4 28:9 31:2,22
34:10,20 35:15
36:16 37:22 39:7
41:4 43:17 46:22
47:4 55:8 60:20
65:7 69:15 83:3
87:13 95:8,22
96:10 98:12 106:6
111:18 112:22
118:13 128:2
129:18 131:7
132:3 135:2
137:19,21 138:7
138:18 141:14
144:6 147:10
148:1 165:1 167:7
167:19 170:19
173:16 176:1
177:16 180:16
188:17 196:3,6
216:13 222:18
226:10 227:3
228:5,15
**wizard** 27:8
**women** 54:8 55:20
56:7,8 65:10,14
66:14 150:11
182:3 184:17
**woodson** 68:19
**word** 26:10
109:10,14 163:14
163:14

**wording** 141:9
**words** 152:11
**work** 8:5 16:14
60:16 64:17 65:11
75:17 77:16 78:3
115:2 117:7 123:1
123:7 124:7,14
125:17,17 126:3
130:17 131:10,12
132:1,7 148:4
161:15 163:22
181:14 218:15
220:19 221:11
223:12
**worked** 11:21
19:3 49:20 50:22
52:16 68:15
120:12 123:3
130:14,22 131:3
139:8,17,19 140:3
179:3,10 181:8
211:3
**working** 35:20
40:18 49:12 59:18
65:20 73:15 75:13
75:20 76:2,11
77:7 78:16 80:21
114:20 116:15
149:4 154:13
156:18 165:5,15
166:1 172:14
182:22 183:15
218:3 222:13
**workings** 33:22
**works** 130:12
**world** 27:7 81:13
124:19 219:8
**worry** 70:1 71:13
71:14,15
**worse** 144:18
**wrapping** 186:21
**write** 28:16
118:10 136:7
152:11 184:14

**writes** 77:2 123:17
172:17
**writing** 16:8 69:19
70:3 79:5 134:8
163:5 173:12
**written** 200:14
**wrong** 119:22
149:8 170:5
**wrote** 26:20 89:6
148:10 204:21
**wtf** 184:18

**y**

**y** 160:6
**yeah** 8:6 17:8,10
26:19 27:14 28:9
34:20 47:6 50:20
50:21 67:17,22
68:14 77:22 87:13
88:7,16,21,22
95:12,22 97:9
100:21 106:21
117:14 119:8
122:14 128:2
129:12,18 131:7
132:3 135:2 136:4
136:4 137:8,21
138:18 140:5
141:15,19 142:8
142:12 145:6,6,6
145:8,9 147:10
152:7 156:9
162:18 163:11
167:14 168:10
169:11,13 172:12
174:13 175:4
176:1 180:16
192:17,18 195:2,5
195:5,6,6,17
197:22 202:15
203:22 204:8
206:10 210:13
213:17 222:1
**year** 10:8,15,20
15:12,14 16:7

40:20 74:9 77:3
143:13 173:22
198:6 200:14,19
201:2,22 206:17
206:18 213:22
216:6 218:19
**years** 15:22 16:1
20:2 24:21 33:12
35:21 46:6,6,9
62:16 66:4 67:9
68:9,10,16 69:1,1
89:17 92:13 95:2
101:20 114:8
123:8 126:4
131:18 150:11
176:3 181:8
184:19 185:5
190:22 198:1,2
199:9,18,20 200:2
203:8 204:10,12
204:14 205:2
215:16 220:19
**yep** 27:10 29:5
42:4 79:21 123:15
158:1 160:11,21
161:9,12 162:7,20
163:4 164:8
172:14 173:16
186:15 187:8
191:22 194:17,17
199:4,7,10
**york** 22:22 37:18
38:9
**youman** 121:1
172:10,10,15
173:12
**younger** 103:9

**z**

**z** 144:16

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.