```
 1              UNITED STATES OF AMERICA

 2      U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

 3              WASHINGTON FIELD OFFICE

 4   - - - - - - - - - - - - - - - x

 5   MARCIANN GRZADZINSKI,           :

 6        Complainant,               :   EEOC No.

 7             v.                    :   570-2017-00720x

 8   JEFFERSON B. SESSIONS, III,     :

 9   Attorney General,               :   Agency No.

10   Department of Justice,          :   FBI-2015-00176

11        Agency.                    :

12   - - - - - - - - - - - - - - - x

13                             Washington, D.C.

14                             Monday, April 8, 2018

15   Deposition of:

16             JAMES A. BAKER,

17   called for examination by counsel for Complainant,

18   pursuant to notice, at the Law Offices of Kator

19   Parks Weiser & Harris, 1200 18th Street, NW, Suite

20   1000, Washington, D.C., commencing at 10:00 a.m.,

21   before Barbara A. Huber, CSR and Notary Public in

22   and for the District of Columbia
```

EXHIBIT
2

Page 2

1  Appearances:
2    On behalf of Complainant:
3      MICHAEL J. KATOR, ESQUIRE
4      DAVID A. HART, ESQUIRE
5      Kator Parks Weiser & Harris, PLLC
6      1200 18th Street, NW, Suite 1000
7      Washington, D.C. 20036
8      202.898.4800
9      mkator@katorparks.com
10     dhart@katorparks.com
11
12   On behalf of Agency:
13     JULIET E. GRAY, ESQUIRE
14     U.S. Department of Justice
15     Federal Bureau of Investigation
16     935 Pennsylvania Avenue, NW
17     Washington, D.C. 20535
18     202.324.2714
19     juliet.gray@ic.fbi.gov
20
21
22

Page 3

1  Appearances (continued):
2    On behalf of The Witness:
3      DANIEL LEVIN, ESQUIRE
4      White & Case, LLP
5      701 13th Street, NW
6      Washington, D.C. 20005
7      202.626.3583
8      daniel.levin@whitecase.com
9
10   Also Present:
11     Marciann Grzadzinski
12
13          *  *  *  *  *
14
15
16
17
18
19
20
21
22

Page 4

C O N T E N T S

1
2  EXAMINATION BY:                     PAGE
3    Mr. Kator                   5
4    Ms. Gray              168
5    Mr. Kator              197
6
7
8  DEPOSITION EXHIBITS:               PAGE
9  1:  Signed Sworn Statement         43
10 2:  Document Bates GRZ_FBI000813      136
11
12
13
14
15
16
17
18
19
20
21
22

Page 5

P R O C E E D I N G S
1
2          Whereupon,
              JAMES A. BAKER,
3  was called as a witness and, having been first duly
4  sworn, was examined and testified as follows:
5          EXAMINATION BY COUNSEL FOR COMPLAINANT
6  BY MR. KATOR:
7      Q   Would you state your name for the record,
8  please?
9      A   James A. Baker.
10     Q   Mr. Baker, I'm sure you're familiar with
11 these proceedings in general, so I won't waste a
12 lot of time.
13         Have you ever been deposed before?
14     A   No.
15     Q   Really?
16     A   (Nodding).
17     Q   Well, you're certainly familiar with how
18 depositions -- you've taken depositions?
19     A   I've taken -- I think it was Rule 15
20 depositions in the criminal context.
21     Q   Okay.  Well, I haven't, so --
22     A   Okay.

Page 6

1    Q   Let me just very briefly then explain
2  what we're doing today.  So it's a little unusual
3  only because you have two attorneys here today.
4  One is Agency counsel.  I understand Mr. Levin is
5  your personal counsel.
6    A   Yes, "Levin," yes.
7        MR. KATOR:  You know, it's one witness,
8  one lawyer, so you know only one of you will be
9  making objections, I assume; Ms. Gray, the Agency
10 counsel.
11 BY MR. KATOR:
12   Q   So if I ask questions, it's a -- it's a
13 conversation.  I'll ask questions.  You do your
14 best to give me your answer.  You're under oath so
15 your answers have to be true to the best of your
16 ability.  If you don't understand a question that I
17 ask you, please ask me to rephrase it.  I'm happy
18 to do so.
19       What may happen is that there may be an
20 objection raised by Ms. Gray.  As a general rule,
21 the objections are stated for the record.  And then
22 after that, you'll go ahead and answer the question

Page 7

1  unless you're instructed not to answer the
2  question, in which case we'll deal with that.
3        The most important rule, of course, is
4  that we make a clear record.  So I will do my best
5  to not talk over you.  It is a conversation; but
6  just the same, it should be we take turns talking.
7  That doesn't always happen, but we'll do our best.
8  The other thing that's very important is that we
9  avoid gestures that are not going to be capable of
10 being picked up by the court reporter.  So to the
11 extent possible, make sure that your answers are
12 audible and clear.
13       I think everything else -- if you need a
14 break at any time, just -- that's fine.  Let us
15 know.  If there's a question pending, please answer
16 the question.  Now, I guess it's conceivable that
17 your personal counsel may have something to say to
18 you.  And if you need to take a break to do that,
19 that's fine, too.
20       With that said, do you have any questions
21 before we get going?
22   A   I don't think so.

Page 8

1    Q   Okay.
2    A   No, I don't think so.
3    Q   So let me start with -- I understand that
4  at all times relevant to this proceeding you were
5  the general counsel of the FBI, correct?
6    A   Well, I was the general counsel of the
7  FBI from January of 2014 until January of 2018.
8    Q   Okay.  Before that, can you just take
9  me through your employment history?
10   A   My entire employment history?
11   Q   Well, I mean you don't need to go into
12 great detail, but sure tell me after law -- where
13 did you go to law school?
14   A   University of Michigan.
15   Q   Okay.  And after Michigan -- so were you
16 there with like Ann Coulter and -- was that about
17 the same time?
18   A   She was -- if I recall correctly, she was
19 in my class or around my class.  Yeah, she was
20 there at the same time.
21   Q   We probably have some other classmates in
22 common.  I did not go to Michigan.

Page 9

1        Okay.  So after you graduated from -- and
2  that would have been, what, like 1984, '5?
3    A   '88.  1988.
4    Q   I'm sorry, 1988.
5    A   Uh-huh.
6    Q   So what happened?  Where did you go?
7    A   I went to clerk for the U.S. District
8  Court in the Eastern District of Michigan.  Judge
9  Bernard Friedman was the judge of that court.
10   Q   And after that?
11   A   After that, I went to the Justice
12 Department.  I was selected through the Attorney
13 General's Honors Program, and joined DoJ in
14 around -- it was late 1990 -- late 1990.
15   Q   Honors Program.  And were you here in
16 D.C. for that?
17   A   Originally I started at the U.S.
18 Attorney's Office in Detroit.  And then later, in
19 early '91, came to the criminal division of the
20 Department of Justice and worked there in a variety
21 of different positions until late 1996.
22   Q   So you were in the criminal division from

Page 10

1 '90-ish to '96?

2    A   That's correct.

3    Q   And then after that?

4    A   After that, I went to -- so in late 1996

5 I went to the Office of Intelligence Policy and

6 Review, OIPR. It's an office that doesn't exist

7 anymore. It's been merged into the National

8 Security Division of the Department of Justice.

9 But I started there in 1996.

10    Q   Still within Justice?

11    A   Correct.

12    Q   Okay.

13    A   Different component.

14    Q   And how long were you there?

15    A   I was in OIPR from 1996 until sometime in

16 2007. I think the fall of 2007.

17    Q   Okay. So still at Justice after that?

18    A   No. I left Justice.

19    Q   In 2007?

20    A   2007. And I started -- so I went on

21 leave from the Department of Justice in early 2007

22 and started -- I did a fellowship at the Institute

Page 11

1 of Politics at the Kennedy School at Harvard

2 University. And at the same time I became a

3 lecturer on law at Harvard Law School. So I was

4 doing those through 2007, while I was on a leave of

5 absence with DoJ. And then I officially left DoJ

6 in the fall of 2007, continued my time with Harvard

7 till the end of the year.

8    Q   When you say your time with Harvard, you

9 mean as a lecturer, or in the --

10    A   I was a fellow and a lecturer in the

11 spring of 2007. And then in the fall, I was only a

12 lecturer, at the -- at the law school. I finished

13 my fellowship.

14    Q   Lecturer, is that a paid position?

15    A   Yes.

16    Q   Do you maintain that position still?

17    A   Basically, yes. I'm an employee half the

18 year. I only teach in the fall.

19    Q   And just out of curiosity, what does it

20 pay to be a lecturer at Harvard?

21    A   It depends how many credit hours you

22 teach. And so it's about $7,500 a credit hour.

Page 12

1    Q   So after you left Justice formally in --

2    A   Uh-huh.

3    Q   -- what, two thousand --

4    A   Seven.

5    Q   -- seven --

6    A   Uh-huh.

7    Q   -- what'd you do?

8    A   Well, I continued working for Harvard

9 till the end of 2007. And then in early 2008 -- if

10 I'm got my dates correct -- that's when I went to

11 Verizon, in the general counsel's office at

12 Verizon.

13    Q   And what was your position there?

14    A   I think the title was assistant general

15 counsel for national security. It may have been

16 associate general counsel, but I think assistant

17 general counsel.

18    Q   For national security?

19    A   Correct.

20    Q   And what kind of national security issues

21 was Verizon involved with?

22    A   So I guess I can't describe that any

Page 13

1 further right now.

2    Q   Okay.

3    A   There's a range of -- it was a range of

4 national security issues, and some issues on the --

5 on the commercial side as well.

6    Q   Okay. So how long did you stay with

7 Verizon?

8    A   Stayed with Verizon -- again, from early

9 two -- I think it was early 2008 until July of

10 2009.

11    Q   So 18 months?

12    A   Something like that, yeah.

13    Q   And then where from there?

14    A   Then back to the Department of Justice.

15    Q   And what was your role at Justice?

16    A   I was an associate deputy attorney

17 general in the Deputy Attorney General's office,

18 responsible for national security, a range of

19 national security matters.

20    Q   Is that the -- was that the -- who was

21 the -- what deputy was that?

22    A   David Ogden hired me. So he was the

Page 14

1  Deputy Attorney General at the time.

2     Q   And the --

3     A   Go ahead.  I'm sorry.

4     Q   The Deputy, so there was one Deputy?

5     A   There's one -- yeah, right.  There's the

6  Attorney General.  Then there's the Deputy Attorney

7  General.  And I worked directly for the Deputy

8  General Counsel.

9     Q   Okay.  So you weren't in one of the

10  divisions; you weren't like criminal division or --

11     A   Correct.  I was in the Deputy Attorney

12  General's office, his actual office.

13     Q   And how long were you there?

14     A   About two years.

15     Q   And did you tell me what your role was

16  there, if it --

17     A   It was a range of national security,

18  cyber security matters that I -- that I was

19  responsible for.  The portfolios of folks like that

20  are flexible.  And I took on whatever assignments

21  they gave me, basically.  But they were mostly

22  focused on national security.

Page 15

1     Q   So this was until when?

2     A   This was approximately from July of 2009

3  until sometime in 2011.  I'm drawing a blank on

4  when that was now.  Might have been the fall of

5  2011.

6     Q   And what did you do in the fall of 2011?

7     A   I'm trying to remember exactly what

8  happened then.  I can't remember when I started at

9  Bridgewater.  The next -- my next full-time job was

10  at Bridgewater.

11     Q   And Bridgewater is what?

12     A   Bridgewater Associates in Westport,

13  Connecticut.  Well, I was teaching at the time, I

14  think, also, I -- so I left -- I left DoJ in

15  October, but that semester I was teaching, if I

16  recall correctly, and then started at Bridgewater

17  in like January or February of -- what year would

18  that have been?  2012.

19     Q   And how long were you with Bridgewater?

20     A   I was at Bridgewater from about -- I

21  think it was January or February of 2012 until I

22  started at the FBI in January of 2014.

Page 16

1     Q   And how is it that you came to be the

2  general counsel at FBI?

3     A   Jim Comey, who was the director of the

4  FBI, offered me the job.

5     Q   Okay.  So he -- he's somebody you knew

6  previously?

7     A   Yes.  He had been my boss on two prior

8  occasions.

9     Q   At Justice?

10     A   Once at Justice, I reported -- when he

11  was the Deputy Attorney General, I reported

12  directly to him, as the head of OIPR.  And he was

13  also my boss at Bridgewater.

14     Q   Okay.  So the appointment, was it -- it's

15  not -- well, what is the appointment as general

16  counsel?  Do you know?  Is it advice and consent?

17  Is it political?  Is it career?  Do you know?

18     A   It's career SES.

19     Q   So did you have to jump through all the

20  OPM hoops and all that to get appointed?

21     A   I -- you know, I don't know what exactly

22  they did, but presumably yes.  OPM, I believe, had

Page 17

1  to approve it.  I don't recall.

2     Q   Did you apply?  I mean would -- would you

3  have to apply?

4     A   Yeah, no, I had -- I had to submit an

5  application, yes.

6     Q   Was there like a vacancy announcement and

7  all that kind of thing or --

8     A   I don't remember.

9     Q   Competitive selection?

10     A   Well, I knew, I know that they were

11  interviewing other candidates at the time.

12     Q   Were you, at your prior stints at Justice

13  were you SES?

14     A   I was SES -- I was career SES from

15  around -- well, I was acting career SES from

16  sometime in 1998, I think it was.  And then I think

17  I officially joined the SES formally in 1999.  So I

18  stayed in that until 2007.  I was career SES.  And

19  then when I came back in 2009 to 2011, I was SES

20  again.  That was a political appointment.  Schedule

21  C they call it.  And so -- not Senate-confirmed or

22  anything like that, so --

Page 18

1    Q    At some point did you retire from the
2    Justice Department, from federal service?
3    A    Yes.
4    Q    Prior to becoming general counsel?
5    A    No.
6    Q    So all the way through then you were not
7    drawing an annuity until you left FBI?
8    A    Correct.
9    Q    Okay.  Why did you leave the FBI?
10   A    I left -- left FBI because I had an
11   opportunity to go to the Brookings Foundation and
12   Lawfare.
13   Q    And are you employed there now?
14   A    No.
15   Q    So let's just go through what happened
16   after you left the FBI in two thousand -- sixteen?
17   A    No.  It was last year.  So it was two
18   thousand -- it was May of 2018.
19   Q    Oh.
20   A    Yeah.
21   Q    Okay.  So --
22        (Discussion off the record)

Page 19

1    BY MR. KATOR:
2    Q    So we were talking about what happened
3    after you left.
4        So you left in -- I'm sorry, May, did you
5    say?  July?
6    A    I think it was May.  I think it was May.
7    Q    May of 2018?
8    A    '18, correct.
9    Q    Okay.  And you said to go to Brookings?
10   A    Brookings and Lawfare.
11   Q    But you're no longer there?
12   A    Correct.
13   Q    So what happened?  Why are you no longer
14   there?
15   A    Because when I started, it was -- I was
16   hired as a visiting fellow.  And so I knew that it
17   would be a temporary appointment with both of them.
18   And it was intended originally only to go until the
19   early fall, I think it was.  And then it was
20   extended till the end of the year, both
21   appointments.
22   Q    Okay.  And are you currently employed?

Page 20

1    A    Yes.
2    Q    Where are you employed?
3    A    I'm employed at the R Street Institute,
4    the letter R Street Institute.  It's a think tank
5    here in Washington, D.C.
6    Q    Okay.  And what do they think about?
7    A    Well, I think about national security and
8    cyber security.  I'm the director of the national
9    security and cyber security program.
10   Q    Okay.
11   A    R Street has a number of scholars that
12   work on a variety of different topics.
13   Q    And are they on R Street?
14   A    Not right now, no.  They're on New York
15   Avenue.
16   Q    That would be too easy, wouldn't it?
17        Okay.  You don't have any intent to go
18   back to the FBI at any time, do you?
19   A    Not at this moment, no.
20   Q    Now, I understand -- and you correct me
21   if I'm wrong -- is there a current criminal
22   investigation involving you?  Are you aware of?

Page 21

1        MR. LEVIN:  You can answer.
2        THE WITNESS:  Yes.
3    BY MR. KATOR:
4    Q    Okay.  And are you the subject of an
5    investigation?
6        MR. LEVIN:  He's not going to answer any
7    more questions related to this one.
8        MR. KATOR:  Well --
9        MR. LEVIN:  I'm not going to argue about
10   it.  He's just not going to answer questions about
11   it.
12   BY MR. KATOR:
13   Q    Okay.  Well, I -- I'm just trying to
14   understand what the nature of it is, because -- and
15   I don't understand -- and you can help me
16   understand this generally -- the difference between
17   a subject and a target.  Is there a difference?
18        MS. GRAY:  Objection.
19        You can answer if you know.
20        MR. LEVIN:  There is a difference.  But
21   he's not going to answer questions about his
22   investigation.

Case 1:20-cv-01411-JEB   Document 27-4   Filed 01/18/22   Page 7 of 74

Page 22

1     MR. KATOR: I'm not asking him about his
2  investigation. And, again, let's not tag team,
3  okay?
4     MR. LEVIN: I'm going to say whatever I
5  need to say in the deposition.
6     MS. GRAY: And the Agency will also put
7  on the record that Mr. Baker's personal counsel has
8  made clear that he is not going to be answering
9  questions about an ongoing investigation.
10     Mr. Baker is here voluntarily to answer
11  questions related to Ms. Grzadzinski's EEO
12  complaint.
13     MR. KATOR: Okay. Well, that's fine.
14  BY MR. KATOR:
15     Q   So do you know the difference between --
16  or is there a difference between a target and a
17  subject?
18     A   As a general matter?
19     Q   Yes.
20     A   Yes.
21     Q   Could you explain that to me?
22     A   Well, generally speaking, a target is a

Page 23

1  person with respect to whom a prosecuting authority
2  has made a decision to indict or charge. And a
3  subject is a person whose conduct falls within the
4  scope of the matter that's under investigation.
5     Q   Okay. And now your counsel have said
6  that you're not going to answer any questions, but
7  let me get these questions out for the record and
8  you can just say, I'm not going to answer. Okay?
9     Are you the target of any investigation?
10     MS. GRAY: Same objection.
11     MR. LEVIN: He's not going to answer.
12  BY MR. KATOR:
13     Q   All right. Are you the subject of any
14  investigation?
15     MS. GRAY: Same objection.
16  BY MR. KATOR:
17     Q   Does this investigation have to do with
18  your tenure as general counsel of the FBI?
19     MS. GRAY: Same objection.
20  BY MR. KATOR:
21     Q   Do any of the issues in the criminal
22  investigation involve management of deputy general

Page 24

1  counsels of the FBI?
2     MS. GRAY: Same objection.
3     MR. LEVIN: Actually, one second. That
4  one, I think I'll let you answer.
5     THE WITNESS: Okay.
6     The answer is no.
7  BY MR. KATOR:
8     Q   Okay.
9     A   Not to my knowledge.
10     Q   Do any of the issues of the criminal
11  investigation involve your honesty?
12     MS. GRAY: Same objection.
13     MR. LEVIN: He's not going to answer any
14  questions.
15  BY MR. KATOR:
16     Q   Okay. Now, let's turn to talking about
17  Ms. Grzadzinski.
18     You know Ms. Grzadzinski, correct?
19     A   Yes.
20     MR. KATOR: Pardon me just one second.
21     (Discussion off the record)
22  BY MR. KATOR:

Page 25

1     Q   Okay. So when did you first meet
2  Ms. Grzadzinski?
3     A   To the best of my recollection, it's when
4  she came into the office for an interview. In
5  terms of meeting her in person, I think that's the
6  first time I met her.
7     Q   And did you know her before actually
8  meeting her?
9     A   I beg your pardon?
10     Q   Did you know of her?
11     A   I knew of her, yes.
12     Q   How did you know of her?
13     A   I knew of her as the chief division
14  counsel at the Washington field office of the FBI.
15  I had heard about her before.
16     Q   Okay. So how long had you been with the
17  FBI before you met her?
18     A   Huh. Well, I don't recall exactly when
19  the interview was. Huh. So I don't recall exactly
20  when the interview was. So probably a number of
21  months, I guess I would say.
22     Q   When you met her, just what was your

Page 26

1 impression of her when you met her?

2     A    In the interview?

3     Q    Yeah.

4     A    I had a positive impression.  I thought

5 she did a good job in the interview.

6     Q    And this is kind of a silly question, but

7 what -- did you think -- how old did you think she

8 was?

9     A    I'm not sure the thought crossed my mind

10 at the time.

11     Q    Yeah.

12     A    But I be -- I be -- I knew that she was

13 an ex -- I think, from having reviewed her

14 application, I knew that she had worked at the FBI

15 for a number of years.  I don't remember how many,

16 but -- so she wasn't, you know, somebody out of law

17 school or only having worked at the Bureau for a

18 few years.  She had worked there for a significant

19 period of time.  And I don't remember how many

20 years, though.

21     Q    Okay.  So how did you -- you had a

22 vacancy that you were trying to fill in the deputy

Page 27

1 general counsel position?

2     A    Well, we were going to have a vacancy,

3 yes.  I -- I -- the person who was leaving was

4 retiring.  And I was trying to fill that position.

5 I'm not sure that she had left -- actually left by

6 the time that we hired Marcy.  But we were

7 proactively hiring, knowing that this person was

8 going to retire.

9     Q    And which person was that?

10     A    Elaine Lemert.

11     Q    And wasn't there also a second vacancy on

12 the horizon?  Were there two at the time?

13     A    I don't recall specifically.  There may

14 have been.  We had a number of different vacancies

15 over time, but I don't remember.

16     Q    And so what -- was there a vacancy in the

17 National Security Law Branch?

18     A    At that particular time?

19     Q    Yeah.

20     A    I don't specifically recall.

21     Q    Do you recall --

22     A    There could -- yeah, let me back up.  I

Page 28

1 think there was.  Because if I recall correctly,

2 Rick McNally was serving in that position as an

3 acting.  So that meant that that position had not

4 been filled permanently at the time.  So the answer

5 to your question is yes.

6     Q    So were you searching for a permanent for

7 the national security branch?

8     A    At that particular moment, I don't

9 specifically recall.

10     Q    Okay.  So what --

11     A    We had been, at various points in time.

12     Q    What position then were you trying to --

13 seeking to fill when you interviewed

14 Ms. Grzadzinski?

15     A    I believe it was the position that Elaine

16 Lemert was vacating.  It could have been the other

17 one, but I don't specifically remember.  It -- in

18 other words, it could have been both.  But without

19 some documents to remind me, I don't -- I don't

20 recall.

21     Q    And what was the one that Elaine Lemert

22 had?

Page 29

1     A    It was another deputy general counsel

2 position covering a different subject area.  It was

3 not national security, with one possible exception.

4     Q    Do you recall what the subject matter

5 area was?

6     A    It was investigative law.  It was science

7 and technology law.  Elaine also had cyber, I think

8 at the time.  She may have had legal forfeiture.

9 And she had legal training, if I recall correctly.

10     Q    So this was -- deputy general counsel was

11 an SES position?

12     A    Correct.

13     Q    And so you had to go through a formal

14 interview process to fill the position?

15     A    Yes.

16     Q    So who participated in the interviews?

17     A    All of them?

18     Q    Well, were there different people who

19 participated in different interviews, other than,

20 obviously, the applicants?

21     A    I don't specifically remember who

22 participated in this group of interviews for this

Page 30

1  position.  I hired a number of different people
2  over time, and we would convene -- our standard
3  practice was to convene a small group of people.
4  They would, to the extent possible, if they weren't
5  absent, interview all the candidates.  And then we
6  would come together at the end and decide who to
7  hire.
8      I don't specifically remember who was on
9  that panel -- I guess you would say -- for this
10 particular selection.
11     Q   Do you recall anyone who was on that
12 panel?
13     A   I could guess, but I would be guessing at
14 this point.
15     Q   Well, don't guess.  That's okay.
16     So was there somebody from HR that like
17 marshaled this whole process?
18     A   Well, the human resources division is
19 responsible for handling all the paperwork and the
20 applications.  And we submit -- once we make a
21 selection, submit the forms to them and -- and so
22 on.  There's also an SES board that plays a role

Page 31

1  here.  And -- and I'm -- technically speaking, I
2  think that's the -- that's administered out of the
3  deputy director's office.
4      But in any event, so human resources
5  division, HRD, as well as I think the office SES
6  board; and then ultimately the selection is made by
7  the director.
8      Q   Okay.  So were there interview questions,
9  standard interview questions that you asked each of
10 the applicants?
11     A   I did have such questions.  I don't
12 remember if I had them for this particular
13 selection.  Eventually I did have a set of standard
14 questions that I asked -- or that we asked.  But I
15 don't remember if we had those for Marcy's
16 selection.
17     Q   Do you recall taking notes during the
18 interviews?
19     A   I do not recall taking notes.
20     Q   And so let me just follow-up.
21     You recall that you did not take notes,
22 or you do not recall whether you took notes?

Page 32

1      A   I do not recall whether I took notes.
2      Q   Are you aware of any other participants
3  who took -- may have taken notes?
4      A   Not off the top of my head, no.  I -- I
5  don't recall that at this moment.
6      Q   Did Ernest Babcock participate in these
7  interviews?
8      A   He may have.  But, again, I can't
9  specifically remember who was -- who was involved
10 in this particular selection.
11     Q   So what was your understanding of Marcy's
12 background at that time?
13     A   Well, my recollection today, the two main
14 facts are that she was a FBI special agent, and
15 that she had been the chief division counsel at the
16 Washington field office, the second largest field
17 office at the FBI, for a number of years.
18     Q   And just in that capacity, it was fair to
19 say that she had national security in her
20 portfolio?
21     A   Yes.  She would have had a wide range of
22 responsibilities in her portfolio as CDC, including

Page 33

1  national security.
2      Q   And CDC stands for again?
3      A   Chief division counsel.
4      Q   Chief division counsel.
5      So I'm just curious as to why it was that
6  you chose her for investigative law rather than
7  national security law.
8      A   Because it seemed to me that that was the
9  best fit for her, given her experiences at WFO as
10 we discussed them.  And I mean I don't specifically
11 remember her resume or application packet at this
12 time, but I would have looked at it.  And that was
13 my -- that was my thought, that she was best suited
14 for that -- that particular job.
15     Q   And you don't recall specifically why you
16 thought that?
17     A   Well, because she had had responsibility
18 with respect to those -- so I guess -- let me back
19 up.  She had had responsibilities, especially with
20 respect to the portfolio that would be included in
21 the -- what you would call the investigative law
22 unit, which is the ongoing criminal activities,

Page 34

1 giving -- giving legal advice to criminal
2 investigators, conducting criminal investigations
3 obviously.
4         And then I think Marcy also said that she
5 had responsibility for legal forfeiture in her
6 position at the Washington field office,
7 including -- which was included within that
8 portfolio.
9         Also then, because Marcy was a special
10 agent, I thought that she could bring that
11 experience to bear on those subject areas as well
12 as she was going to be responsible for the legal
13 training. And that mainly meant legal training of
14 FBI agents as well as analysts. And so I thought
15 that her experience in that area would be
16 beneficial as well, her experience as an agent and
17 that having been in the field office would be
18 beneficial as well.
19         And keep in mind, I'm also trying to
20 replace Elaine Lemert, who is -- or was -- an FBI
21 agent at the time. So there was a synergy, at
22 least in my mind, to having another agent

Page 35

1 responsible for that portfolio. Excuse me,
2 which -- which is also something that Elaine had
3 recommended to me as well.
4     Q   Okay. Do you recall if there was another
5 candidate, you know, that you had preferred ahead
6 of Marcy, maybe Marcy was not your first choice for
7 that?
8     A   Well, I looked at other candidates. And
9 Marcy -- I did not select any other candidate, so
10 Marcy was my first choice at the end of the day.
11     Q   Right. But prior to you coming to the
12 conclusion that you wanted to select her, was there
13 somebody else that you had wanted to select but
14 ultimately chose not to?
15     A   I had looked at other candidates who I
16 thought about selecting, and ultimately decided not
17 to select them. Yes, there were a variety of them.
18     Q   Do you recall who?
19     A   There were two. There was an individual
20 who was -- he might -- he was an AUSA in New York.
21 He might have been Eastern District of New York or
22 Southern District of New York. I can't remember.

Page 36

1 And then there was also then Jennifer -- and I'm
2 drawing a blank on her last name, but she was the
3 CDC in -- at the New York field office. And I had
4 thought about hiring her as well.
5     Q   Why did you ultimately decide not to hire
6 her?
7     A   She got a negative reference -- or I got
8 a negative reference with respect to her from her
9 supervisor that made me decide not to hire her, or
10 to not continue with the hiring process with
11 respect to her.
12     Q   Okay. So when you hired Ms. Grzadzinski,
13 she was out of the field office. She was a 15.
14 This position was an SES. Is that correct?
15     A   I think that's correct, yeah.
16     Q   And so you had to -- somebody had to jump
17 through all those hoops of the executive -- board?
18 What is it called?
19     A   Well, there's the SES board --
20     Q   Yeah.
21     A   -- within the FBI.
22     Q   Yeah.

Page 37

1     A   The FBI has a different SES selection
2 system from -- it's different from other parts of
3 the federal government and so -- for a number of
4 positions. I don't think it applies to all the
5 positions.
6         But in any event, so there is an FBI SES
7 selection board that is responsible for making a
8 recommendation to the director. And the director
9 has the authority to select SES members for the
10 FBI, without going to the -- I'm drawing a blank on
11 the name of it, but it's the outside panel. I
12 think it's the OPM.
13     Q   Executive review board --
14     A   Yes. Yeah.
15     Q   -- at OPM?
16     A   Right. Which is what -- something I had
17 to go through when I was selected for the SES back
18 in --
19     Q   At Justice?
20     A   -- at Justice, yes.
21     Q   But for FBI, they didn't -- OPM didn't
22 have to sit, as far as you know?

Page 38

1    A   OPM played a role with respect to the
2  FBI's SES system.  For example, doling out how many
3  SES slots that the FBI could have, that kind of
4  thing, and I think conducting overall supervision.
5  But in terms of the ongoing selections, that was,
6  to the best of my recollection, delegated to the
7  FBI.
8    Q   Umm --
9    A   Excuse me.  And whether some paperwork
10 was sent on a regular basis after the director made
11 a selection, I'm not really sure.  I don't recall.
12 Sent to OPM.  It could have been.
13   Q   Okay.  So ultimately do you recall when
14 it was that you hired Marcy for that position?
15   A   I think it was early -- well, when did
16 she get -- it's late 2014, early 2015, somewhere in
17 that time frame, to the best of my recollection.
18   Q   Okay.  So you were January '14?
19   A   Correct.
20   Q   And she was maybe January '15 --
21   A   Something like that --
22   Q   -- somewhere --

Page 39

1    A   -- yeah.
2    Q   -- somewhere in there?
3         And then at some point you did a
4  reorganization of the deputy general counsel of the
5  office of general counsel, correct?
6    A   We called it a realignment, but it was
7  a -- yes, it was a thorough review of the
8  operations of the office of general counsel, which
9  to my understanding had not been done in -- in
10 twenty years, since the office was founded.  And so
11 I thought it was time.  And that's what we did.
12   Q   So when was it that you embarked on -- or
13 began to consider, I should say, this notion of
14 doing a realignment?
15   A   I think it was right from the time that I
16 arrived.
17   Q   And so when is it that you effectuated
18 this realignment?
19   A   I don't remember the exact date.
20   Q   But it would have been after you hired
21 Marcy?
22   A   Yes.

Page 40

1    Q   And what took so long to put this
2  realignment in place?
3    A   Well, that was quite intentional, because
4  that -- and I explained to folks when I first got
5  there that I was going to take my time and not make
6  rash decisions, that I wanted to do a thorough
7  review of the operations of the office, get to know
8  the office, get to know the people, get to know
9  what we did, understand how the office functioned
10 within the FBI and within -- with our external
11 partners.
12        I had all -- I had worked with the office
13 of general counsel for many years in my various
14 positions at -- at DoJ, so I knew generally what it
15 did.  But this was the first time being on the
16 inside, and so I wanted to make sure that I had
17 conducted a thorough review of all its operations
18 before making design decisions, you know, that
19 would be significant.
20   Q   And so why was it that you filled that
21 vacant investigative law position if you were
22 contemplating a realignment at the time?

Page 41

1    A   Because I hadn't -- because Elaine was
2  leaving.  Elaine was retiring.  And so I needed
3  somebody to do the job.  And so that's number one.
4         And number two is I didn't know exactly
5  what the realignment would look like.  I hadn't
6  finished it at that point in time.  And I was still
7  trying to figure out what to do.  And I thought
8  that at such point in time if I needed to move
9  people around, you can move SES people around.  And
10 if that needed to be done, then that's what would
11 be done.
12   Q   Right.
13   A   So it was better -- with Elaine leaving
14 and us not having a senior agent on the team and
15 Elaine and I having had long conversations about
16 the importance of that, I decided -- at that time,
17 I decided to go ahead and look for someone and
18 found Marcy and got a positive referral or --
19 what -- what do you call it? -- recommendation from
20 her then-supervisor at the time, or had recently
21 left supervisor, Val Parlave, and so decided to
22 move forward.

Page 42

1   Q   Yet you could have put somebody in as
2   acting.
3   A   I could have put somebody in that's
4   acting.  That's true.
5   Q   I mean it -- I mean she didn't move from
6   New York, for example.  But still, to move out of
7   her job, take a new job, and then essentially have
8   it change six months later was a little bit of a
9   hardship.
10      Do you agree that that was the case?
11   A   I'm not sure what you're asking me:  What
12   I thought about at the time when I hired Marcy, or
13   what I thought about at the time when the
14   realignment took place.
15   Q   Well, did you think that it may be
16   problematic to bring somebody into this position
17   knowing that perhaps in your -- as you developed
18   this in your mind you were going to eliminate that
19   position?
20   A   I didn't know at the time -- to the best
21   of my recollection, I didn't know at the time when
22   I hired Marcy what I was going to do, so I didn't

Page 43

1   know that I was going to eliminate a position.  In
2   other words, I don't remember exactly when it was
3   that I first thought about realigning the
4   organization with one fewer deputy.
5   Q   Do you recall when it was that you made
6   the decision to do the realignment?
7   A   Not specifically; in other words, I don't
8   recall specifically when it was.
9   Q   Pardon me just one moment.
10      Okay.  So let me show you a document.
11      MR. KATOR:  We'll go ahead and mark it
12   Exhibit 1.
13      (Deposition Exhibit No. 1 marked for
14       identification.)
15   BY MR. KATOR:
16   Q   And I just ask if you recognize that
17   document.
18   A   (Witness looked at document).  Yes.
19   Q   Okay.  So could you take a look at
20   paragraph five on the first page -- or it's the
21   second page.
22   A   Okay.

Page 44

1   Q   Does that refresh your recollection as to
2   when --
3   A   Sure.  So it --
4   Q   -- you --
5   A   -- paragraph five says, After conducting
6   a thorough review of OGC's operations and design,
7   in or about May-June 2015, I determined that a
8   realignment of OGC's organizational structure was
9   necessary.
10   Q   And does that refresh your recollection
11   as to when you --
12   A   I don't --
13   Q   -- you made the decision?
14   A   -- I don't specifically remember, sitting
15   here today.  I'm relying on my document.  And I
16   believe it to be correct at the time that I signed
17   it.
18   Q   Okay.  And when was it that you signed
19   it?
20   A   When did I sign it?
21   Q   December 13, 2016 --
22   A   Yes.

Page 45

1   Q   -- is that what it says?  Okay.
2      So when you made this realignment, you
3   ended up taking Marcy out of the deputy general
4   counsel position, correct?
5   A   Correct.
6   Q   Why was it that you did that?
7   A   Well, there were a number of reasons set
8   forth in this document and the attachment to it,
9   which is Exhibit 1.  So there are a number of
10   different reasons.
11   Q   Do you recall, sitting here today, what
12   those were?
13      I mean I don't -- you're welcome to read
14   that if you want, but I -- I'm not asking you what
15   the document says.  I'm just asking you what it is
16   you recall.
17   A   Sitting here today?
18   Q   Yeah.
19   A   Yeah.  And so I'm sorry, your question
20   was -- was with the realignment, or --
21   Q   Why, yeah, why is it that you --
22   A   Why move her out of that position?

Page 46

1   Q   Correct.

2   A   Okay.  So the -- the realignment was
3 driven by me trying to determine what the
4 appropriate design was for the office without
5 regarding to personalities or the people that would
6 fill the different boxes in the organizational
7 chart.

8       So the question -- I -- I was -- knowing
9 that OGC had not been -- knowing that OGC's
10 organizational design had not been looked at in a
11 long time, I was trying to come up with a design
12 that would make sense for many years into the
13 future.  And -- and knowing that people come in and
14 go out, I was trying to come up with a design that
15 would make sense over a long period of time,
16 without regard to personalities.  That's number
17 one.

18       So the design that I came up with -- that
19 we came up with, the team came up with -- was based
20 on that basic principal.

21       Then the question was:  Okay, we'll look
22 at the design and what makes sense in terms of who

Page 47

1 among the people available to us should be in what
2 role.  And following that idea and looking at the
3 responsibilities, the experience, the performance
4 of various people within the organization, I
5 determined that Marcy was struggling in her role as
6 a deputy general counsel.  And I thought that she
7 would be more successful in a position with fewer
8 responsibilities that -- but that was also within
9 her core area of expertise.  Because my objective
10 was to help Marcy succeed at her new job as a
11 section chief.

12   Q   So I guess I'm a little confused.

13       You said that you were trying to do it --
14 come up with an organization that made sense going
15 into the future that was agnostic to who occupied
16 various position, correct?

17   A   As much as possible, yes.

18   Q   But then you also said that you thought
19 that Marcy was struggling in that position and that
20 was part of the reason that you did it?

21   A   Part of --

22       MR. LEVIN:  Objection --

Page 48

1       THE WITNESS:  -- the reason I --

2       MS. GRAY:  -- misstates --

3       THE WITNESS:  -- did what?

4       MS. GRAY:  -- testimony.

5       MR. KATOR:  Well, I'm asking.

6 BY MR. KATOR:

7   Q   Part of reason you did the realignment.

8   A   Could you rephrase that?  I'm sorry.

9   Q   Okay.  So as I understood your answer,
10 you were saying that you were trying to do
11 something that was to make an alignment that would
12 make sense going into the future, irrespective of
13 who the occupants of those particular positions
14 would be, correct?

15   A   Yes.  Generally.

16   Q   Okay.  But you also said that you thought
17 that Marcy was struggling in that position,
18 correct?

19   A   Marcy was struggling in her -- the
20 position that she took initially upon arriving at
21 OGC, as a deputy.

22   Q   Okay.  Did that factor into your decision

Page 49

1 in coming up with the realignment?

2   A   Not in coming up with the design.

3   Q   Okay.  In what way did it factor into
4 your decision?

5   A   It factored into my decision with respect
6 to who was going to take what position once the
7 design was settled.

8   Q   I see.  So you went from four deputies to
9 three, correct?

10   A   Correct.

11   Q   And was it your feeling that there was
12 asymmetry with respect to the -- what was
13 underneath each particular deputy?

14       Was that a concern that you expressed?

15   A   I'm not sure what you mean by asymmetry.

16   Q   That it was -- that the organization was
17 unbalanced, that perhaps there were more
18 responsibilities under some deputies and other
19 deputies were light and you were trying to balance
20 that out, was that part of your thought process?

21   A   I'm not sure I would say it that way.  I
22 was trying to figure out what made sense on a

Page 50

1 number of different factors. There were a number
2 of different variables that were going into my
3 thinking about that. I didn't want to have --
4 certainly didn't want to have one deputy, you know,
5 with one unit, for example, supervising ten people
6 and then somebody else supervising, you know, 200.
7 I didn't want to have something like that.
8     So I guess to some extent the -- you used
9 the word "balancing." I mean to some extent I
10 wanted to make sure that the operational
11 responsibilities were aligned appropriately, that
12 the number of people that deputies were supervising
13 made sense, and that the deputies could succeed
14 with respect to what they were responsible for
15 and -- and how many people they had to manage and
16 supervise.
17    Q   Okay. So I'm just -- and forgive me if
18 you've answered this, because I just -- I still
19 don't quite get it.
20     What role did Marcy's performance as
21 deputy play in your decision to make that
22 realignment that you did?

Page 51

1     MS. GRAY: Objection. Asked and
2 answered.
3 BY MR. KATOR:
4    Q   Yeah, like I said, I -- you may have
5 answered it, but I'm just -- I'm not quite there.
6    A   So can you just repeat it again? I'm
7 sorry.
8    Q   What role did your perception of Marcy's
9 struggles to perform in the deputy general counsel
10 position play in your decision to structure the
11 organization as you did?
12     MS. GRAY: Same objection.
13     THE WITNESS: I don't recall that being
14 a -- I mean sitting here today, I don't recall that
15 being a major factor. Again, the decision -- the
16 design decision was main -- was made based -- was
17 based mainly on what the different units and
18 sections were doing, what the different branches
19 were doing, what they were responsible for, trying
20 to make sure that was a sensible design for the
21 organization, given what the -- what it was we were
22 trying to achieve.

Page 52

1     And so the design was, again, intended to
2 be not focused on personalities of who had what
3 job, but to figure out what made sense for the
4 organization going forward. And once the design
5 was set, then, to the extent people needed to be
6 moved around, we would move them around.
7 BY MR. KATOR:
8    Q   Okay. And so it was a little, I mean,
9 like musical chairs: You had four and then had to
10 go down to three, right?
11    A   In terms of deputies?
12    Q   Yeah.
13    A   Well, I don't know about musical chairs,
14 but yes, we -- I -- I had to -- somebody -- I had
15 to move somebody out of a deputy role.
16    Q   Right.
17    A   Correct.
18    Q   "Beondy," is that -- is there somebody
19 named --
20    A   Tom -- Tom -- Thomas Bondy.
21    Q   "Bondy."
22    A   B-O-N-D-Y.

Page 53

1    Q   B-O-N-D-Y. Was retiring?
2    A   Well, in the middle of the reorganization
3 when I was still thinking about it, before I had
4 announced it, Tom came to me and told me that he
5 was going to retire.
6    Q   So there was one obvious -- you know, you
7 had four people for three slots; now you had three
8 people for three slots, right?
9    A   I'm not sure I understand your question.
10    Q   So you started with four deputies?
11    A   Correct.
12    Q   You made the decision to eliminate one
13 deputy position?
14    A   Yes.
15    Q   So then you had three remaining deputy
16 positions?
17    A   Yes.
18    Q   You had four people who were serving as
19 the deputies, but Bondy let you know that he was
20 leaving, he was planning on retiring, so that you
21 had now three existing deputies and three slots?
22    A   Okay. I still don't understand your

Page 54

1  question.  I'm sorry.

2      Q   Well, my question is:  Isn't it a fact

3  that you -- after your reorganization, you had

4  three slots for deputies?

5      A   Yes.

6      Q   And after Bondy announced his retirement,

7  you had three people who were serving as deputies

8  or -- you know, serving as deputies; if you

9  eliminate Bondy, assuming he retires, you now only

10 have three deputies; is that correct?

11     A   I'd only have three dep -- well, I

12 would -- I would have -- I guess I'm -- I have

13 slots, and then I have people in slots.

14     Q   Right.

15     A   And so I would still retain the same

16 number of slots.  I guess I'm just struggling to --

17     Q   Three slots?

18     A   Yes.

19     Q   They were --

20     A   I don't remember --

21     Q   -- going to be --

22     A   -- who exactly was in those slots at the

Page 55

1  time, right now.

2      Q   Bondy, Babcock, Marcy and -- who was the

3  fourth one?  Who was national security?

4      A   No, Rick McNally was acting for a period

5  of time, and then eventually Trisha Anderson took

6  the job for a time.

7      Q   What --

8      A   And I don't remember when Trisha came on

9  board.

10     Q   Yeah, so we'll get to that in a little

11 bit, but --

12         Do you recall, was that before or after

13 the reorganization?

14     A   I don't recall right now.

15     Q   Okay.  So those were the four people, you

16 know, acting McNally or Trish Anderson, Bondy,

17 Babcock, and Marcy, those four people originally --

18     A   Say that again.  McNally was at the time?

19     Q   McNally or Anderson, whoever.

20     A   Okay.

21     Q   Okay?

22     A   Okay.

Page 56

1      Q   Bondy --

2      A   Uh-huh.

3      Q   -- Babcock, and Marcy.  Okay?  So those

4  are the four people.

5          The four slots were investigative?

6      A   Uh-huh.

7      Q   Litigation?

8      A   Uh-huh.

9      Q   National security -- and what's the

10 fourth one?

11     A   That's three, when you come down to

12 three.  The fourth one, before that, had been -- I

13 think it was called general law or something like

14 that.

15     Q   General law?

16     A   Yeah.

17     Q   Okay.  So general law was the one that

18 you subsumed into investigation or combined with

19 investigation?

20     A   Combined it, I -- I think, yeah.  I don't

21 have the organizational charts in front of me.  And

22 I can't remember exactly what unit was where at

Page 57

1  what point in time, but --

2      Q   Right.  So --

3      A   Okay.

4      Q   -- so that's how it happened.

5          So I guess my question is you had the

6  three remaining deputy persons and three remaining

7  deputy slots, but you chose not to keep Marcy as a

8  deputy?

9      A   Okay.  There's a lot packed into your

10 question.  But no, I did not think that Marcy was

11 succeeding in her position as a deputy at that

12 point in time.  That was number one.

13         Number two, she was also the most junior

14 deputy at that point in time.  I think.  I can't

15 remember.  And I did not believe that she would be

16 able to succeed in the new -- newly designed

17 organization.  I was making a number of different

18 personnel moves at the time.  And, you know,

19 Mr. Bondy, with his position, had he not been

20 retiring, I would have considered removing him.  In

21 fact, I did consider removing him.

22     Q   Why were you going to remove him?

Page 58

1    A    Because I didn't think that he was
2  succeeding as a manager.  Tom was a topnotch
3  lawyer, but he had had a number of different
4  struggles as a manager.  And I was actively
5  considering moving him.  And when he determined --
6  when he told me that he was retiring, then I was
7  like, okay, I don't need to remove him, he's just
8  going to retire, and then I'll fill that spot with
9  somebody else.
10    Q    And I may be confusing him with somebody
11  else, but did he have a series of complaints
12  against him (sic) or aspect of complaints or
13  employment complaints, that you recall?
14    A    I recall them employment complaints
15  exactly.  I don't -- I don't know how to
16  characterize them beyond that.  But he had a few
17  complaints.  Informal, formal, I don't remember the
18  details right now.  But I definitely remember that
19  there were complaints.
20    Q    And that was part of your assessment that
21  he was struggling as a manager?
22    A    Well, he was struggling as a manager for

Page 59

1  a number of different reasons beyond that.
2    Q    Okay.  So we talked about McNally and
3  Trish Anderson.
4        So there was some point where she came in
5  and what happened to McNally?
6    A    After the realignment, you mean?
7    Q    Yeah, after Trish Anderson came in.
8    A    Well, I moved Rick from the position of
9  acting deputy general counsel for national security
10  to the position of section chief.  And I can't
11  remember exactly what we called it, but for science
12  and technology law, basically.
13    Q    Within national security, or was that
14  with --
15    A    Different branch.
16    Q    -- a different --
17    A    -- so I moved -- Rick's official slot was
18  as a section chief.  He was serving in a higher
19  role as an acting deputy general counsel.  So, in
20  effect, I placed him back into his actual role as a
21  section chief, but in a different section in a
22  different branch.

Page 60

1    Q    Okay.  Now, did you have any performance
2  issues with McNally?
3    A    Yes.
4    Q    What were your performance issues with
5  him?
6    A    Rick was also struggling as a manager, on
7  a number of different levels.  And I can go into
8  them if you want, but -- and so I thought Rick was
9  also burned out in his role in national security.
10  It's a very demanding job, as you can imagine.
11        I was also going to then move the cyber
12  law unit from where it had been, under Elaine
13  Lemert and then under Marcy, over to the national
14  security branch.  And eventually they were renamed
15  national security and cyber law branch.  And I
16  thought that, given the complexity of those issues
17  and the operational demands, the pace of
18  activities, the pace of the legal advice you have
19  to give -- and remember, those folks are also
20  giving advice on counterterrorism, so it was highly
21  demanding.
22        And I thought Rick was burned out and

Page 61

1  needed a fresh start, and so over his objections,
2  I -- vehement objections, I moved him to the
3  science and technology role with -- as I explained
4  to him, I thought it would be a fresh start for
5  him.
6    Q    Bondy you said had management issues
7  beyond the complaints?
8    A    Yes.
9    Q    What were they?
10    A    So there were several.  One of them -- one
11  of the most important ones that I can recall
12  sitting here today has to do with this organization
13  called the discovery management section that was
14  under the litigation branch, so under Tom Bondy.
15  And they're responsible for all of the discovery
16  matters for the FBI.
17        The FBI has approximately 800 to a
18  thousand lawsuits against it at any one moment, and
19  so that's a lot of cases.  And so --
20    Q    I'm happy to contribute.
21    A    I thought -- so the -- the DMS, discovery
22  management section, is responsible for, in

Page 62

1 particular, doing all the e-discoveries and pulling
2 all the emails, electronic documents, and so on,
3 but also the other discovery as well. And it's a
4 very, very demanding job that involves a lot of
5 document production, but it's also a highly
6 technical job.
7       At the time, they were running an
8 information technology system themselves. So you
9 had basically lawyers and paralegals trying to run
10 an IT system, which I thought made no sense. And
11 so that organization had been struggling for a long
12 time and was in danger of collapse when I arrived.
13 And Tom and others were unable to figure out how to
14 solve those problems.
15       And it became a crisis and required a lot
16 of action by me, by the deputy director. We had to
17 bring in other people to try to solve the problem.
18 I ended up moving DMS from under Tom over to Ernie
19 Babcock and had him run it for a period of time.
20 Evidently moved it back once some of the problems
21 got sorted out. So that was quite significant.
22       And then I thought that Tom's management

Page 63

1 of the caseload, the -- the -- so, you know, under
2 the litigation branch you have DMS. And then you
3 have a number of different units that actually
4 handle the litigation itself. So employment law
5 and -- oh, my gosh, I can't remember what we called
6 the other group -- civil litigation handling all
7 these cases. And I thought that those people
8 were -- those attorneys were strugglingly mightily
9 to keep up with their casework, and that management
10 changes need to be made -- needed to be made, and I
11 needed help from the deputy general counsel for
12 litigation to figure out what the right way to --
13 to improve the operations were. And Tom was unable
14 to do that.
15       Q   And so we've talked about three of your
16 deputies.
17       So how about Babcock, did you have
18 performance issues with him?
19       A   No, not at that time, no.
20       Q   Subsequently did you?
21       A   No.
22       Q   And he left the deputy general counsel

Page 64

1 role?  What happened?
2       A   He eventually left. I don't remember
3 when that --
4       Q   Before or after you?
5       A   I beg your pardon?
6       Q   Before or after you retired?
7       A   He left while I was still there.
8       Q   Okay. And do you recall why or do you
9 know why?
10       A   He was from Maine originally. And his
11 family remained in Maine. And he was commuting
12 back and forth between D.C., Washington, D.C., and
13 Maine. And so I think he had just had enough of it
14 and wanted to spend more time with his family and
15 his grandkids and so on.
16       Q   Has he returned to the FBI?
17       A   He's now returned to the FBI, yeah.
18       So no, I didn't have -- I -- I -- I saw
19 Ernie as a highly competent manager, spent a long
20 career in the private sector managing large legal
21 organizations, and thought that he was well-suited
22 to do that. And he was also an extremely smart

Page 65

1 lawyer and was a quick study and quick learn --
2 quick at learning the ropes within the FBI. And so
3 I thought he would be able to handle that
4 responsibility.
5       Q   Who's general counsel now?
6       A   Dana Boente.
7       Q   Oh, right, right.
8       A   B-O-E-N-T-E, I think is how Dana spells
9 his last name.
10       Q   Right. From the -- he used to be with
11 the Eastern District?
12       A   Correct. Of Virginia.
13       Q   Okay. So I know I'm bouncing around a
14 little bit and I apologize, but -- so McNally's
15 issues were that you thought he was burned out.
16       He apparently didn't agree, right?
17       A   He did not agree. He was quite angry at
18 me for removing him. He was burned out and then he
19 was also struggling as a manager, I thought. And
20 he was unable, similarly, to understand the nature
21 and scope of the -- well, he understood the nature
22 and scope of the work he was doing. He was unable

Page 66

1 to find ways to improve it, you know, from a
2 management perspective.
3   Q   So I mean --
4   A   Even though he had worked in the field
5 for a long time.
6   Q   Were there any conduct issues with
7 respect to McNally?
8   A   There was -- there were -- there was --
9 there was an incident that I can remember.  I'm
10 trying to remember when that was, though.  I don't
11 remember.
12     But yeah, there was a management
13 incident.  It must have been when he was still
14 acting as deputy, because I think he was out at
15 a -- we have an off-site location where a number of
16 our national security lawyers sit.  And I think he
17 was out there.
18     And there was some incident involving
19 throwing something or shoving a chair or throwing a
20 chair against a wall or something like that, being
21 frustrated.  And it alarmed a number of people.
22 And so I was -- I believe that was investigated by

Page 67

1 the inspection division and so on, so -- I don't
2 remember specifically when that was.
3     But as I say, Rick -- my assessment was
4 Rick was burned out.  He was tired.  He needed a
5 fresh start.  So it was time to move him.
6   Q   Okay.  And otherwise -- I mean in his
7 performance other than being burned out and this
8 chair incident, you felt his performance was
9 deficient?
10   A   As a manager.
11   Q   As a manager?
12   A   Rick's a -- Rick's an excellent national
13 security lawyer, very experienced.  He and I didn't
14 agree on every legal thing.  But he had done the
15 work for a long time and, as I said, was highly
16 experienced.
17   Q   Explain to me, if you can, how the -- his
18 deficiencies as a manager manifested themselves.
19   A   Well, as I described a moment ago, I mean
20 so he -- he struggled with a couple different
21 things.  One was figuring out ways to improve
22 his -- improve -- improve the operations of the

Page 68

1 units and sections for which he was responsible.
2 That's number one.  The other thing that Rick
3 struggles with is communication, so keeping
4 superiors, people up the food chain, apprised of
5 what it is that he's doing, coordinating well with
6 others.
7     One of the things that I tried to
8 accomplish when I was there to in -- was to
9 increase the amount of coordination and
10 consultation between the different branches.  That
11 had been a problem when I arrived.  And I did a lot
12 of different things -- we can talk about if you
13 want -- to try to increase that amount of
14 communication.  And Rick was not good with that
15 either.  So Rick had issues reporting up and
16 keeping people informed up the food chain.  He had
17 problems keeping other parts of OGC informed about
18 what he was doing.
19     And then he had difficulties also with --
20 I guess you would say -- I use this term loosely,
21 like the internal clients within the organization.
22 So the -- the senior leaders of the FBI who had

Page 69

1 responsibilities for, in his case, national
2 security matters, he struggled with building good
3 relationships with them, maintaining close contact
4 with them, making sure that they understood what he
5 was doing, that they knew what he was up to, and
6 that he was tied in with them.
7     So on those different levels, he just
8 seemed like he needed a new start.  And so I -- as
9 I said, I moved him.  And he was quite -- quite mad
10 at me.
11   Q   Okay.
12     MR. KATOR:  Let's take ten minutes now,
13 if that's okay.
14     (Recess)
15 BY MR. KATOR:
16   Q   All right.  So let me direct you back to
17 Exhibit 1 again.  And let me ask you some questions
18 about that.  This is the affidavit that you gave.
19     And I see that the investigator was a
20 senior special agent, or supervisory special agent?
21   A   I don't remember.
22   Q   Let's see if it says.  SSA Hill.

Page 70

1    Does SSA mean supervisor --

2    A   Supervisory special agent, yes.

3    Q   Okay.  We don't usually get supervisory

4 special agents investigating our EEO cases, so that

5 was refreshing to see.

6        Okay.  So, basically, you realize that

7 Ms. Grzadzinski had a couple of complaints that you

8 were involved with; you're aware of that, right?

9    A   I think there are three complaints.

10   Q   Tell me what you recall the complaints

11 being.

12   A   One having to do with the -- what we were

13 discussing earlier, the -- the movement from deputy

14 to section chief.  The second one had to do with

15 the removal from the SES.  And the third had to do

16 with the non-selection, I think, for the NSLB

17 position.

18   Q   And were you involved in that third one,

19 too?

20   A   Well, I don't know what you mean by that.

21   Q   Were you involved in --

22   A   In the --

Page 71

1    Q   -- the selection --

2    A   I was involved in the selection, yes.

3    Q   Okay.  So did you have an opportunity to

4 prepare for this deposition today?

5    A   Yes.

6    Q   What did you do to prepare?

7        MS. GRAY:  Objection.  I'm just going

8 to -- to the extent that it's not revealing

9 attorney-client privilege, you can answer.

10       THE WITNESS:  Okay.  I reviewed some --

11 in terms of like reviewing documents, is that what

12 you mean?

13 BY MR. KATOR:

14   Q   Yeah.

15   A   So I reviewed documents that the -- that

16 Ms. Gray had sent me.  And then I had a

17 conversation with her last week.

18   Q   Okay.  So do you recall what documents it

19 was that you reviewed?

20   A   Not all of them, no.

21   Q   Did you review this one?

22   A   I be -- I'm not sure if I reviewed this

Page 72

1 specific one.  I believe I reviewed the signed

2 sworn statement and this attachment, although I

3 think they were separate documents in what was sent

4 to me.  So the answer is yes, I did review it.

5    Q   Yeah, I'm sorry, I can't tell you if

6 these are separate documents.  My understanding is

7 that they were one document.

8    A   I don't recall, but --

9    Q   Yeah.

10   A   -- electronically, they came to me as

11 separate documents, that's all, so --

12   Q   Okay.  But I don't --

13   A   -- so -- and that's all I'm saying.

14   Q   I don't think there's any dispute as to

15 their authenticity, but we can start -- let me

16 start focusing on the affidavit.  And then, you

17 know, we'll talk about the following pages, so --

18       MS. GRAY:  I just do want to note for the

19 record that this version is not Bates stamped.  So

20 this is not the version that was produced in the

21 production.

22       MR. HART:  So this is the version

Page 73

1 extracted from the ROI.

2        MR. KATOR:  Okay.  Are we comfortable

3 with that?

4        MS. GRAY:  I mean it -- yes.

5        MR. KATOR:  Okay.

6        MS. GRAY:  I just wanted to find that out

7 for the record.

8        MR. KATOR:  Okay.  Well, if you want, we

9 can put the Bates stamped in and substitute it.  I

10 don't think that's necessary.

11       MS. GRAY:  No, that's fine.

12       MR. KATOR:  Okay.

13 BY MR. KATOR:

14   Q   All right.  So in this affidavit, you

15 address, beginning in paragraph seven, your reasons

16 for --

17   A   Paragraph seven?

18   Q   Yes.

19       This, I believe, is your discussion of

20 why you concluded she should no longer continue to

21 serve as deputy general counsel, correct?

22   A   Yes.

Page 74

1   Q   Okay.  So let me ask you, you say that
2   you did not believe that her performance had
3   demonstrated that she had the leadership and
4   management qualifications required to head any of
5   the three branches of OGC, correct?
6   A   That's what it says.
7   Q   Okay.  And is that what you believed at
8   the time?
9   A   At the time that I signed this, yes.
10  Q   Okay.  So why did you believe that?
11  A   Well, again, there's a -- the thing that
12  is attached here, this five- or six-page document,
13  has a lengthy discussion of it.  And I can't
14  remember every single thing in it, but -- but
15  basically -- so she -- I found that there were
16  deficiencies with respect to Marcy's ability to
17  develop a strategic vision for her branch.
18  Q   What does that mean?
19  A   That means to figure out what she wanted,
20  what her goals were for the branch, consistent with
21  the overall objectives and goals of OGC and the
22  Bureau, right.

Page 75

1   So she had -- had to figure out what
2   those were, generally speaking, that she would then
3   evaluate those goals, assess her -- the performance
4   of the organizations under her responsibility, that
5   she would determine what problems there were, that
6   she would figure out what the causes of those
7   problems were, what changes, therefore, needed to
8   be made in design or with respect to people or
9   whatever it needed to be, business processes and so
10  on, and then figure out a way to assess the
11  outcomes of the new design that -- that she would
12  come up with.  I didn't see her doing anything like
13  that, remotely close to it.  That was number one.
14      Number two --
15  Q   That's under strategic vision, or is this
16  all under strategic vision?
17  A   That's all under strategic vision.
18  Q   Okay.  The rest of your number two is
19  also strategic vision?
20  A   No.  It's sightly different.
21  Q   Okay.
22  A   They're all related to the general topic

Page 76

1   of leadership and management.
2   Q   Okay.
3   A   Which is what you asked me about in -- in
4   the document, or that I said in the document.
5       The second major part I guess would be
6   communications.  So Marcy also -- similar to what I
7   had described with respect to Rick McNally -- had
8   significant issues with respect to communicating to
9   me what it was that she was up to, what it was she
10  was doing, keeping me informed, keeping other FBI
11  leaders informed of what she was doing, and then
12  keeping other people within OGC informed about what
13  it was that she was doing, and coordinating with
14  them.  That was a significant issue as well.
15  Q   I mean is it possible to give me specific
16  examples of this communication lapse?
17  A   It was an ongoing issue over a prolonged
18  period of time in which Marcy's performance at
19  regular staff meetings -- for example, we had a
20  number of -- my objective -- one of my objective --
21  objectives was to increase the level of
22  communication between and among the leadership in

Page 77

1   OGC.
2       And so I scheduled a number of different
3   regular meetings to make that happen.  And I
4   thought that Marcy's performance was consistently
5   poor with respect to the amount of information that
6   she shared at those discussions, her level of
7   participation.  She just didn't participate in
8   those discussions.
9   Q   In staff meetings?
10  A   In staff meetings, for example.
11      And then, also, in terms of just keeping
12  me up to speed and informed on what it was that she
13  was doing, what it was that she was struggling
14  with, what it was that her folks were struggling
15  with, needed help with, what it was that was going
16  on in her area of responsibility, the legal issues,
17  the management issue and so on.  And so there was a
18  significant communications problem there.
19      Yeah, so there was that.  And I -- I
20  can't remember exactly.  I don't remember my timing
21  here.  But then there were, I thought, issues with
22  respect to her management of the CDC program.

Page 78

1    The general counsel is responsible for
2  managing the CDC program, and so I -- in -- in
3  terms of -- in an effort to execute those
4  responsibilities, I assigned that to Marcy in a way
5  that was similar to what Elaine had been
6  responsible for.  And I thought that her level of
7  management of that program was deficient as well.
8    Q   So specifically what was deficient about
9  her management of the CDC conference -- did you say
10 conference?
11   A   Well, there was a conference eventually.
12 But the CDC program.
13   Q   Program?
14   A   Yeah.
15     There were a number of different things,
16 having to do with -- again, I think mainly -- well,
17 two things I guess:  Communication, lack of
18 communication with me with respect to that; and
19 then also, again, developing a long-term vision to
20 try to figure out how to improve the program, what
21 design changes needed to be made, what resources
22 needed to be moved around or asked for or --

Page 79

1  eventually, later on, for example, we did a
2  systematic review of the CDC program to try to
3  assess what needed to be done to try to improve it.
4      And it was those kinds of things.  I
5  guess it was the lack of strategic thinking, the
6  lack -- lack of systemic thinking with respect to
7  her areas of responsibility that was of most
8  concern to me, with respect to the broad areas of
9  responsibility that Marcy had under her as -- in
10 her position as DGC, and then what would have been
11 under her had I selected her for the DGC of that
12 newly realigned branch.
13   Q   Just forgive me, because I've -- I've
14 never worked in the government.  And so I think a
15 lot of terms that are -- you're familiar with are
16 kind of foreign to me.
17   A   Uh-huh.
18   Q   So can you give me specific details of
19 what it is exactly that you're referring to?
20     Because I don't really understand.
21     MS. GRAY:  Objection.  Vague.
22     THE WITNESS:  So my statement to you is

Page 80

1  if you would like me to go through the longer
2  statement, I --
3  BY MR. KATOR:
4    Q   Well, we --
5    A   -- I believe that I put into this
6  statement a series of examples.  So I could go
7  through them.  And I don't -- I would need to look
8  at them to remember.  You asked me a very specific
9  question with respect to paragraph seven.  So I
10 wanna be sure not to conflate my thinking with
11 respect to Marcy prior to the -- prior to her
12 moving to her section chief position.  But I can't
13 remember the dates and times and so on and so
14 forth.
15   Q   Right.  Because --
16   A   So I'd like to go -- so, anyway, I'll do
17 what --
18   Q   Paragraph seven specifically deals with
19 your decision not to put her into the DGC --
20   A   Correct.
21   Q   -- and to assign her under Babcock?
22   A   Correct.

Page 81

1    Q   Okay.  To do a section chief position,
2  correct?
3    A   Correct.
4    Q   Okay.  And the subsequent document that
5  you're referring to is your explanation, your
6  justification, for taking her out of the SES,
7  correct?
8    A   Yes.
9    Q   Okay.
10   A   But my recollection is that I discussed
11 both of them in that document.
12   Q   Both in the document?
13   A   My recollection is, yeah.  But I could be
14 wrong.
15   Q   Okay.  Well, we'll get to that.  Let me
16 ask this question.
17     Is there anything -- any reason that you
18 had for taking her out of that DGC position that is
19 not explained either in this affidavit or in the
20 subsequent document?
21   A   Well, I'd have to review the documents
22 again, but I -- sitting here today, I don't believe

Page 82

1  so.

2     Q    Right.  And when you reviewed these in

3  preparation for this deposition, did anything come

4  to mind about what you may have omitted?

5     A    Something I may have omitted?

6     Q    I'm not suggesting that you did.  I'm

7  just asking if there's anything else out there.

8     A    Off the top of my head, I can't -- I

9  can't think of anything.

10     Q    Okay.  So, again, understanding that it

11  may be difficult for you to separate in your mind

12  the one action as opposed to the second, let me

13  focus again on paragraph seven and what you say.  I

14  think we talked about strategic vision.  And you

15  explained to me that the strategic vision, in your

16  mind, was -- well, I don't want to try to repeat it

17  because I couldn't.

18         Were you able to identify specific

19  examples of what it is you meant by "struggled

20  significantly with developing a strategic vision"?

21     A    Well, she didn't do it.  She wasn't able

22  to do it.  And when I would have conversations with

Page 83

1  her about it, she seemed to not get it.  And so I

2  tried to explain it to her on a variety of

3  occasions, to the best of my recollection.  And it

4  just did not make sense to her.  And so that's why

5  I believe I used to term "struggled."  She

6  struggled.

7         I think she was trying to do it.  It

8  wasn't like she -- I'm not accusing her of

9  insubordination or something of that nature.  But

10  she just struggled with being able to function at

11  the level that I thought was necessary in order to

12  be able to execute the broad responsibilities of

13  that position, and to do so in a manner that was

14  consistent with what I understood to be the

15  expectations of the FBI as an organization

16  regarding the performance of SES whole --

17  incumbents.

18     Q    Okay.  So who subsequently was

19  responsible for developing the strategic vision of

20  the functions that were under her purview?

21     A    Well, so some of them were moved.  So --

22     Q    Is cyber --

Page 84

1     A    -- cyber was moved, for example.  And,

2  you know, I'd have to sit with the chart, but I

3  believe most of the rest of them were left in the

4  branch that Ernie Babcock then took over.

5     Q    So was she a section chief responsible

6  for developing the strategic vision of her section?

7     A    She would have been once she became a

8  section chief, yes.

9     Q    And did she do that?

10     A    I didn't think so.

11     Q    Okay.  And what, if anything, did you do

12  about that?

13     A    Well, I think -- what, if anything, did I

14  do about that?  That's a broad question.  I'm not

15  sure I can answer it specifically.  I think I did a

16  number of things to try to address that.

17     Q    Well, did Babcock address it with her?

18     A    It was Babcock's responsibility to

19  address it with her.  Yes.  That's correct.

20     Q    So did Babcock then fail to develop the

21  strategic vision for his -- what would you call it,

22  division?

Page 85

1     A    Branch.

2     Q    -- branch?

3     A    Was he failing at that, too?  Well, to

4  the extent that he and Marcy together were not

5  succeeding, then, yes, he shared responsibility for

6  that.

7     Q    And did you convey that to him?

8     A    I talked to Ernie many times about what

9  to do to help Marcy succeed.  And I believe that I

10  tried to hold him accountable as well.

11     Q    I mean did --

12     A    But it was significant -- I mean, to be

13  honest, it was significant in my mind that, you

14  know, Marcy was in her probationary period

15  throughout all this.  And so as I saw this, I knew

16  that that deadline was coming.  I was alarmed and

17  wanted to try to find ways to help her succeed, and

18  wanted to work with Ernie to try to figure out ways

19  to help Marcy succeed.

20     Q    At what point did you conclude in your

21  mind that Marcy was failing as the deputy?

22     A    I don't specifically remember.

Page 86

1    Q   Well --

2    A   Like a date or something?

3    Q   Well, I mean just -- she showed up in

4  January.  I think we've discerned that the decision

5  was made sometime between May and June.

6        So where between January and May and June

7  did you conclude that this wasn't working out?

8    A   I don't recall specifically, but I guess

9  I would -- so I don't recall specifically.  It

10  would have been toward the end of that period,

11  though, I think, is the best of my recollection.

12    Q   And what was it?  Was there an event?

13  Was there something that triggered your conclusion

14  that you can say, yes, this is -- this is when I

15  know that I made the decision that this won't work?

16    A   I think it was when I settled on the new

17  design for the organization, and then had to figure

18  out who would take what job.  And I had to look

19  at -- I had -- I had to actually make a decision.

20  I had to finally make a decision who was going to

21  go in what position.  It was at that point in time.

22  So I think that was, again, toward the end.

Page 87

1        So there was not a triggering event, that

2  I recall, that Marcy did something and that led me

3  to conclude that I needed to change -- you know, you

4  remove her from the DGC.  It was that I had decided

5  to redesign the office.  I had to put people in

6  these different jobs.  Therefore, it was time to

7  make a decision.  And I had to make a decision.

8    Q   So how was it that you communicated your

9  expected -- your performance expectations to Marcy?

10    A   In ongoing conversations with her over

11  the whole period of time; on a regular basis, to my

12  recollection.

13    Q   Do you recall emails, documents, anything

14  in writing?

15    A   Oh, I'm sure there's emails, but I don't

16  recall specifically.  But I met with Marcy I think

17  every day.  I think we had a -- at that point in

18  time, a deputy's meeting every single day.  So I

19  would meet with her every day at least once a day.

20  And then often, if she had some substantive matter

21  to meet with me, I would meet with her on that as

22  well.  So I think through a series of oral

Page 88

1  conversations with her, that's my recollection.

2    Q   But specifically at these oral

3  conversations, you were saying you need to come up

4  with a strategic vision, and by strategic vision

5  this is what I mean?

6    A   I had conversations with -- so sitting

7  here today I don't remember a specific conversation

8  with Marcy about that.  But I had conversations

9  with the whole leadership team about that -- of

10  which Marcy was a part -- regarding that topic,

11  many times.

12    Q   And I think you also said -- was it

13  McNally you also thought was deficient in the

14  strategic vision department?

15    A   Yes.

16    Q   And Bondy?

17    A   Correct.

18    Q   So the only one who got it was Babcock?

19    A   The only one who got it?  Well --

20    Q   Well, did Babcock get it?

21    A   I thought so.

22    Q   Except when Marcy went --

Page 89

1    A   Once --

2    Q   -- took his section under his directorate

3  division, then he failed?

4    A   He was not succeeding because Marcy was

5  not succeeding.

6    Q   But before that, he was okay?

7    A   I thought so, yes.

8    Q   Okay.

9    A   As evidenced by my -- as I discussed

10  earlier, I moved the discovery management section

11  over to him when I thought Bondy was not succeeding

12  with -- with those responsibilities.  I thought

13  Ernie would succeed.  And he did.

14    Q   And the need to improve what you expected

15  of her, all of this was in oral conversations?

16        MS. GRAY:  Objection.  Misstates prior

17  testimony.

18        MR. KATOR:  Well, it's a question.

19        THE WITNESS:  I -- sitting here today, I

20  don't remember specific written documents that I

21  sent to Marcy.  I believe that most of this

22  discussion was in oral conversation, most of this

Page 90

1  conveying of this information was in oral
2  conversations.  But if you have emails, I'm happy
3  to look at them.
4  BY MR. KATOR:
5    Q    So in the documents that you reviewed in
6  preparation for this deposition, did you see
7  anything?
8    A    Did I see anything with respect to what?
9    Q    That would reflect written communications
10 about the expectations or her failure to meet your
11 expectations.
12   A    There's one document.  I can't remember
13 now.  It was -- I was -- I think I was criticizing
14 both Ernie and Marcy with respect to something.
15 That would have been obviously after Marcy had
16 moved under Ernie's supervision.  But, honestly,
17 I'm drawing a bit of a blank on what that document
18 was right now.
19   Q    Okay.  So let's take a look at paragraph
20 eight.
21   A    (Witness looked at document).  Okay.
22   Q    So this is part of your justification and

Page 91

1  explanation of your justification for moving her to
2  the section chief position?
3    A    I'm sorry, say that again.
4    Q    Is this part of your explanation for why
5  you believed it was appropriate for her to serve in
6  the section chief position?
7    A    In that particular section chief position
8  I think the answer is yes.
9    Q    And you say smaller portfolio, correct?
10   A    Yes.
11   Q    But the only thing that was smaller was,
12 right, that you took cyber away?
13   A    No.
14   Q    What else went away?
15   A    Well, I -- again, I don't recall the --
16 the organizational chart in front of me, but cyber
17 went away and I think science and technology went
18 away as well.  And that was an extremely
19 complicated portfolio.
20   Q    Okay.  And then you say that, Would
21 report to Babcock, who you assessed as a strong
22 leader and manager.

Page 92

1    Is that correct?  Did you believe that
2  Babcock was a strong leader and manager?
3    A    Yes.
4    Q    Why?
5    A    Why?  Because I had observed Ernie evolve
6  in his role at the FBI.  He arrived -- he and I
7  arrived at the FBI on the same day.  And I observed
8  his evolution as an FBI manager.  I had many
9  management -- management-related conversations with
10 him.  I understood his thinking about management
11 and leadership.
12   And I -- as I said, I don't remember
13 exactly when it happened but I had moved -- it was
14 a significant thing to move this DMS section.  I'm
15 sorry to keep coming back to it.  But I moved the
16 DMS section over to Ernie.  And I thought that was
17 a -- a reflection of how I thought about Ernie's
18 capabilities; but also, he proved himself in that
19 time period and managed -- was able to manage that
20 very complicated responsibility successfully.  So
21 that's why I assessed that.
22   I also found that Ernie was a strong

Page 93

1  partner for me in terms of helping run the entire
2  office of general counsel.  Ernie thought like a
3  leader and owner of the entire OGC and the entire
4  Bureau, and was constantly on the lookout for ways
5  to help me succeed in my responsibilities and to
6  help the Bureau succeed as an organization.
7    Q    Okay.  So let's flip then to the second
8  part of this document, which is captioned Senior
9  Executive Service Probationary Period Assessment.
10   And you've had an opportunity to review
11 that document?
12   A    Correct.
13   Q    Okay.  So what is this document?
14   A    Okay.  Well, so this document is an
15 attachment that has somehow ended up connected to
16 my signed sworn statement.  I don't -- I may have
17 attached it.  So that's one thing.  I don't
18 remember.  I'd have to look through the signed
19 sworn statement again.
20   But this document also was a -- I guess
21 you would say an attachment.  I had been asked --
22 to a -- to a document that I had to send to the

Page 94

1 human resources division.  At some point in time
2 toward the end of Marcy's probationary period I
3 received sort of -- I think I -- I construed it as
4 a standard form document from HRD to the head of
5 the office, me, that I had to -- because her
6 probationary period was ending, I had to make an
7 assessment of her.
8       And you see at the top of this document
9 that we're talking about it says, Supervisor's
10 Assessment, Level 2.  As I recall, there were maybe
11 three or four levels that I had to review and then
12 rate Marcy with respect to those levels.  This is
13 the one that I thought was the most accurate.  And
14 so I had to check a box, basically, respond, select
15 a level, and then provide a narrative description,
16 was my understanding, as well.
17       And so this was my assessment that I
18 attached to that document that went to the human
19 resources division.
20    Q    Okay.  So let me understand.  This is at
21 the point where she's the section chief?
22    A    Correct.

Page 95

1    Q    She's reporting directly to Babcock?
2    A    Correct.
3    Q    You're her second level supervisor?
4    A    Correct.
5    Q    So has Babcock done a performance review?
6       Has he done the first iteration of this
7 document?
8    A    Well, he had done a -- I don't want to
9 mess up my timing here.  I know that he did a
10 performance review of her around October of -- what
11 year are we in now?  This would be in 2015, I
12 think.
13    Q    Okay.
14    A    I could be wrong, but -- so I believe
15 Ernie did an evaluation of her as his supervisor --
16 as her supervisor, I'm sorry.  Ernie did an
17 evaluation of Marcy as her supervisor in -- in or
18 about October of 2015.
19       And then this document, I don't remember
20 when I got the directive from the human resources
21 division to fill out this form and send something
22 back.  I believe it would be after that.  And so --

Page 96

1 because Marcy -- Marcy's probationary period ended
2 in around January, I think, of 2016.  So Ernie had
3 evaluated her prior to this document being
4 generated, to the best of my recollection.
5    Q    So during the normal performance cycle?
6    A    I believe that's correct.
7    Q    Probably October or --
8    A    I think they usually end in October,
9 yeah.
10    Q    All right.  Do you recall what his rating
11 of her was?
12    A    Not specifically.  I've reviewed it.  I
13 reviewed it last week.  But I don't remember the
14 exact numerical designation.
15    Q    And did you also have to sign off on it
16 as a reviewing --
17    A    I think so.  I think so.
18    Q    And then when January rolls around and
19 it's December or whatever and it's time to -- HR
20 says it's time to evaluate the SES probationary
21 period, that came to you and not to Babcock?
22    A    Came to me.  I -- as I recall, like in an

Page 97

1 email.
2    Q    All right.  And so this document is,
3 what, you then -- did you do this, or did you ask
4 someone to do this for you?
5    A    So I typed a draft of it, I think.  Well,
6 Ernie reviewed it, is my recollection.  Other
7 people reviewed it as well.  And then I -- I
8 believe I may have been the one to actually
9 physically send it to HRD since their email came to
10 me.  And I had had conversations with the head of
11 HRD, the assistant director for HRD, Jim Turgal, to
12 let him know that this was coming, and what our
13 assessment was.
14    Q    So when you got the email communication
15 from HRD, did you go to Babcock and say:  What do
16 you think; she's your employee?
17    A    I think that we were having numerous
18 conversations about Marcy on an ongoing basis
19 anyway, so I -- I don't recall specifically sending
20 it to him.  I believe I did.  And I believe I
21 discussed it with him, that I had been levied with
22 this responsibility, so -- but by that point in

Page 98

1 time, I think we were meeting on a regular
2 basis
3 with Marcy in sort of counseling sessions, coaching
4 sessions, on a -- I think a weekly or a biweekly
5 basis.
6         So I was talking to Ernie -- my point to
7 you is I was talking to Ernie on a regular basis
8 about Marcy and her performance. And I believe in
9 the context of those conversations, this request
10 from HRD came up.
11     Q    So were you aware of this probationary
12 period issue before HRD sent you that email?
13     A    I'm -- I've been aware of it for a long
14 time with respect to SES people. Just like myself,
15 I was aware. When I was under the probationary
16 period, I remember that.
17     Q    So before you got the email from HRD, did
18 you have conversations with Babcock about whether
19 to continue Marcy past her probationary period?
20     A    I may have.
21     Q    When was the decision made not to?
22     A    Not to do what?
23     Q    Continue her to -- well, I'm not sure

Page 99

1 what the correct term is. To fail her? To not --
2     A    To remove her, yeah, to -- to not --
3 yeah, that's a good question. I'm not sure exactly
4 what the technical term is.
5         Well, so the decision is actually made by
6 the assistant director for the human resources
7 division. He's the one that makes the decision and
8 is the one that made the decision in this
9 particular case. So he has to actually exercise
10 his authority to make a decision. He asks for --
11 HRD asks for, on behalf of him, for input from the
12 component division where we were, OGC. And so
13 that's what we provided.
14     Q    Right. But I'm talking about before HRD
15 sent you the email.
16         So I take it that HRD has no firsthand
17 knowledge of Marcy's performance other than having
18 received her performance appraisal in October?
19     A    Yes. That's right. They would have
20 received that. Yes, they -- I believe those all go
21 to HRD.
22     Q    Okay. So you are aware that she is

Page 100

1 serving a probationary period. You're aware that
2 it's up January, December, whatever. You're
3 talking to Babcock.
4         At what point in your mind did you make a
5 decision to recommend that she not succeed in her
6 probationary period?
7     A    I don't remember specifically. I know
8 that I had talked to Ernie about it. I had talked
9 to Jim Turgal about it. And I was struggling with
10 it. I was struggling with it.
11     Q    Are there other section chiefs in the
12 office of general counsel?
13     A    Yes.
14     Q    And what grades are they?
15     A    Well, they're all SES. Well, I think --
16 if they are actually in the SES, and not serving in
17 an acting position as a section chief. We had
18 those, too. And that could be a GS-15. But if --
19 a person that holds the position of section chief
20 is in the SES. You must be in the SES to be a
21 section chief.
22     Q    I see. So after this taking her out of

Page 101

1 probationary period, was she removed from her
2 section chief position?
3     A    I believe the answer is yes.
4     Q    You're not sure?
5     A    I think it happened right away, but I --
6 I can't remember right now.
7     Q    So then what --
8     A    Because I think that Turgal was -- excuse
9 me. I'm sorry to interrupt you.
10     Q    No, no.
11     A    Turgal was trying to find a position for
12 Marcy at the outset. So I guess she would have had
13 to have been removed from her section chief
14 position at the end of her probationary period, if
15 not before. And then I think there was a period of
16 time where Turgal was looking for and talking to
17 Marcy about where to put her.
18         But I believe that Marcy, throughout this
19 period, retained, at my request, the -- her salary
20 as a DGC when she was moved to section chief, and
21 then retained the DGC position when she was moved
22 to the other responsibilities, but -- so I --

Page 102

1  I'm --

2      Q   So do you recall where she went after

3  section chief?

4      A   I think she went to be a unit chief at

5  the terrorist screening center, TSC.  I believe

6  that's where she went.

7      Q   Do you know why she didn't go back to the

8  Washington field office?

9      A   Well, I think they had filled the CDC

10  position by that point in time.  But I don't know

11  why she -- I mean I believe she would have been

12  eligible to go to another position at WFO.  I don't

13  know why she didn't go there.

14      Q   You were not involved in any effort to

15  keep her at headquarters?

16      A   I don't recall -- sitting here today, I

17  think that I -- I think that Jim Turgal and I had a

18  conversation about where he was thinking about

19  sending Marcy.  But beyond that, I wasn't -- I -- I

20  believe I was agnostic about where she went after

21  that.

22      Q   So let's turn to this.  And we may have

Page 103

1  covered some of this, so this will go faster than

2  perhaps -- but on page 2 --

3      A   I'm sorry, we're on the Probationary

4  Period Assessment document?

5      Q   Yes.

6      A   Okay.  Page 2.

7      Q   The narrative.

8      A   Yep.

9      Q   The second paragraph.

10      A   Okay.  Second full paragraph?

11      Q   Correct.  Or, well, yes, the second full

12  paragraph on that page.

13      A   (Witness looked at document).

14      Q   So the -- in that first -- I'm sorry, in

15  second full paragraph, you say, Marcy has struggled

16  in developing -- I'm sorry, to develop --

17      A   Sorry, where are you?  I'm sorry.

18      Q   The second full paragraph.

19      A   Okay.

20      Q   Second sentence.

21      A   Second --

22      Q   I'm sorry, first -- I'm sorry, I can't

Page 104

1  really read this very well.

2      It says, Marcy has struggled to develop

3  and implement an organizational vision that is

4  based on well-thought out and clearly established

5  organizational goals.

6      A   Uh-huh.

7      Q   All right.  Now, we've discussed that

8  already, correct?

9      A   Correct.

10      Q   Okay.  And you don't have any further

11  explanation for me as to what you meant by that?

12      A   No.  I mean it's -- I think I explained

13  it earlier at the general level.

14      Q   Well --

15      A   It was a consistent problem that I saw.

16      Q   Okay.

17      A   If I could just add, maybe to amplify.

18  It was -- having been in the SES for a long time,

19  having been at the Bureau and exposed to how they

20  were thinking about the SES, and also at some point

21  in time I served on the SES board, this ability to

22  think strategically was one of the critical

Page 105

1  elements of what made someone eligible for and

2  successful in the SES.

3      That was one of the key leaps that people

4  had to be able to make to go from executing your

5  responsibilities as developed and assigned to you

6  versus developing the vision and developing the --

7  the goals and objectives of the organization and

8  trying to figure out how to both run the

9  organization and simultaneously improve it.

10      Q   Okay.  You say, Marcy can develop and

11  implement solutions to a narrow range of problems

12  but those are strictly limited to issues regarding

13  matters with which she is already well familiar

14  based on her prior experience as chief division

15  counsel in the FBI.

16      Why do you say that?

17      A   I thought it was accurate.

18      Q   Well, in what -- what specific examples,

19  if any, can you give me that she was incapable of

20  handling a broader palette of issues?

21      A   When new matters would come to her, she

22  seemed to be -- to struggle to understand the

Page 106

1 complexity of the issues, whether they were

2 management or legal. And so that was the -- I mean

3 I guess that's the main thing at a high level.

4    Q   Do you have any specifics that you could

5 share with me?

6    A   I mean I -- it's been a while. I'd have

7 to sit and think about it for a few moments. I

8 mean eventually -- so, for example, when she was a

9 DAD -- I can't remember the specific legal issue.

10 But the cyber law unit, as one would imagine,

11 confronts a lot of novel and challenging legal

12 issues with respect to cyber.

13    And I thought that Marcy's response to

14 those kinds of legal questions were insufficient.

15 And I thought that she was struggling to figure out

16 how to manage that group of lawyers in a way that

17 would make them even more effective, given the --

18 within the organization, given the immense

19 importance of cyber to the FBI at that point in

20 time.

21    Q   There is little evidence that she has

22 contributed significantly to the development of a

Page 107

1 work environment that encourages creative thinking,

2 collaboration or transparency, or the establishment

3 and achievement of measurable performance

4 requirements.

5    What did you mean by that?

6    A   I -- same thing. I mean I guess it's --

7 I don't know. To me, it speaks for itself. I'm

8 not sure what -- I cannot say, to elaborate it.

9 She -- it was -- when I say little evidence, it

10 meant that I didn't see her doing this kind of

11 thing. That's what I was trying to convey.

12    Q   Create a work environment that encourages

13 creative thinking, collaboration or transparency.

14    I mean, it may be that that's clear to

15 you, but I would appreciate it if you could explain

16 it to me.

17    A   So FBI regularly confronts novel and

18 difficult legal questions and operational matters.

19 And so, for example, with creative thinking, you're

20 constantly confronting ambiguous situations.

21    And I thought that when Marcy confronted

22 a situation that you could go to one of the various

Page 108

1 compendiums of documents that we had within the FBI

2 and find the answer, because it had been a question

3 that had been asked before and for which there was

4 an answer in a book somewhere that you could go to,

5 she could handle that kind of thing. She knew the

6 internal processes and procedures of the FBI and

7 could go find the answer. If you asked a specific

8 question: Are we allowed to do "X" in this kind of

9 case? Marcy would be able to find the answer to

10 those kinds of questions, for example.

11    But when you -- as I said, just to pick

12 on the cyber one that I mentioned a moment ago.

13 The cyber -- some of the cyber issues that we were

14 confronting, there was no book that you could go

15 to. And so the folks in that law unit had to

16 constantly confront novel and challenging issues.

17 And in order to sort their way through that and be

18 able to work effectively with other parts of the

19 executive branch that they had to work with on

20 complicated cyber matters, they had to be creative

21 thinkers. They had to work collaboratively. And

22 they also had to be transparent about what they

Page 109

1 were doing. Because some of the work that they did

2 overlapped with what was happening in the national

3 security area.

4    And so that gap between what was

5 happening in the cyber law unit at the time and

6 what was happening at national security was

7 extremely challenging and problematic from an

8 organizational perspective, and one of the reasons

9 that I eventually moved cyber over to national

10 security branch.

11    Q   It had nothing to do with Marcy?

12    A   I beg your pardon?

13    Q   Your decision to move cyber to national

14 security had nothing to do with Marcy?

15    A   Well, had Marcy been some expert in cyber

16 or had shown a capacity early on to tackle those

17 issues and really excel, then I might have thought

18 about it. I would have kept an open mind about it.

19 I had a -- a belief that the issues that cyber were

20 confront -- the cyber law unit was confronting

21 aligned much better with the national security

22 branch; and so, therefore, I moved it. But had

Page 110

1 there been a different set of facts, I would have
2 been open-minded to a different organizational
3 design.
4        Q   So, basically, your impression was that
5 the cyber -- the lawyers in the cyber unit, when
6 Marcy was in charge of it, were not engaged in
7 creative thinking, collaboration, or transparency?
8        A   No.  That's not what it says.
9            It says, There's little evidence that she
10 has contributed significantly to the development of
11 a work environment.
12           So I didn't see Marcy adding to that.
13 Those guys already were topnotch.  And I didn't see
14 Marcy as adding anything to help them be
15 world-class.
16       Q   Okay.  Marcy has very limited ability to
17 design and implement strategies to maximize
18 employee potential and connect the FBI legal
19 community horizontally and vertically in areas
20 outside of the CDC program.
21           What did you mean by that?
22       A   Sorry, I just lost the place.  Let me

Page 111

1 just read that for a moment.
2        Q   Yeah, go ahead.
3        A   (Witness looked at document).  So I was
4 concerned significantly.  So one of -- one of
5 the -- one of my objectives was to try to figure
6 out how to bring the OGC community in tighter
7 alignment with the CDC community, which includes
8 paralegal specialists.
9            And so when I talk about connect the FBI
10 legal community horizontally and vertically, I was
11 trying to figure -- I -- I was looking to her for
12 assistance in bringing together those two
13 communities that had historically been in tension
14 with each other.  And so it was a bridge that I had
15 hoped to try to divide.
16           And one of the reasons that I thought
17 that hiring Marcy would be excellent was that Marcy
18 was a CDC and that, you know, bringing her into OGC
19 would send the message that:  No, OGC is not trying
20 to be anti-CDC.  We're trying to work together with
21 everybody.  And -- and I was bringing in the CDC
22 from one of the largest field offices in the

Page 112

1 country.  And I was hoping to convey that message,
2 that we needed to work together as a legal
3 community.  And so that's what I mean by
4 horizontally.
5            Vertically, again, as I said earlier,
6 it's in terms of helping people within the
7 organization know what's going on at various levels
8 throughout the -- throughout OGC, and then working
9 with others outside of OGC who were stakeholders in
10 our work.
11       Q   Okay.  You say in the next paragraph that
12 she had a persistent lack of engagement with other
13 OGC leaders in organizational meetings, in
14 particular with the OGC chief of staff on budget,
15 personnel, and other administrative matters.
16           Can you give me examples of her lack of
17 engagement?
18       A   Yeah, her consistent lack of engagement?
19       Q   Sure.
20       A   So she -- I had many complaints from the
21 chief of staff about his inability to communicate
22 with -- or let me put it differently.  Marcy's

Page 113

1 inability to communicate with him and respond to
2 requests that he had.  So the -- the chief of staff
3 was my designee to help me run the -- I guess you
4 would call administrative side of the organization.
5 So a lot of the personnel matters that had to be
6 done, the hiring, recruiting and hiring, that type
7 of thing.  And so --
8        Q   I'm sorry to interrupt.
9            When you say chief of staff, is that FBI
10 chief of staff or OGC chief of staff?
11       A   I'm sorry.  It's the -- in the document,
12 it says with OGC chief of staff.
13       Q   Okay.
14       A   That's what I'm focusing on right now.
15       Q   Okay.  And --
16       A   There is a chief of staff for a director.
17       Q   Right.  And what --
18       A   I'm talking about the O --
19       Q   -- what was the name of the OGC chief of
20 staff?
21       A   At this point in time?
22       Q   Yeah.

Page 114

1    A    It was Justin Schoolmaster.

2    Q    Schoolmaster.  Okay.  Go ahead.

3    A    I believe for the whole time --

4    Q    Okay.

5    A    -- that Marcy was there.

6        All right.  So focusing on that, that was
7    one of the -- that was a significant concern that I
8    had because, basically, Marcy just was not
9    responding to various requests that he had to her
10   because of all the responsibilities that he had to
11   try to execute across the board regarding budget --
12   well, as it says right there:  Budget, personnel,
13   other administrative matters, hiring, retention.

14   Q    And this --

15   A    Or hiring and recruitment.  I'm sorry.

16   Q    And this you knew how?

17   A    From having conversations with Justin.

18   Q    All right.  And in terms of documentation
19   of this, are you aware of any?

20   A    I don't know what emails exist.  I don't
21   know.

22   Q    All right.

Page 115

1        MS. GRAY:  We've been going for about an
2    hour.  So when you get to a stopping point, we'd
3    like to take a lunch break.

4        MR. KATOR:  Sure.  Okay.  I mean I still
5    have a lot more to do on this document, so if you
6    want to take a break now.  How long do you want?

7        MS. GRAY:  Thirty, forty minutes.  Just
8    to grab a quick bite.

9        MR. KATOR:  Okay.  Well, it's a quarter
10   after.  Why don't we aim for 1:00.

11       MS. GRAY:  Okay.

12       (Whereupon, at 12:15 p.m., a
13       luncheon recess was taken.)

14       A F T E R N O O N   S E S S I O N

15       (1:00 p.m.)

16   Whereupon,

17       JAMES A. BAKER,

18   was recalled as the witness and, having been

19   previously sworn, was examined and testified

20   further as follows:

21       EXAMINATION BY COUNSEL FOR COMPLAINANT

22       CONTINUED

Page 116

1    BY MR. KATOR:

2    Q    So I want to try and see if we can cut
3    through some of this.  So I know that you said you
4    had an opportunity to review these documents.  But
5    what I want you to do is just take a moment now --
6    or as long as you need -- to actually read them.
7    And then I'm going to ask you if there's anything
8    else that comes to your mind for a -- why you took
9    her out of the CDC, the chief deputy -- or the
10   deputy general counsel position; and, b, why you
11   took her out of the SES.  Okay?

12       So those are two separate questions based
13   on your review of this document.  So please take a
14   moment to read it.  However long you need.  And,
15   again, I'm going to ask you those questions.  Okay?

16   A    Okay.

17   Q    Thank you.

18   A    (Witness looked at document).

19       (Discussion off the record)

20       THE WITNESS:  Okay.

21   BY MR. KATOR:

22   Q    Okay.  So after having an opportunity to

Page 117

1    review what -- the entirety of Exhibit 1, is there
2    anything that you recall, as you're sitting here
3    today, about the reasons why you removed
4    Ms. Grzadzinski from the deputy general counsel
5    position that are not explained in that document?

6    A    So the way that I would answer that is
7    that these documents are a synthesis of a year's
8    worth of work with Marcy that was reflected in
9    numerous in-person encounters with her and a body
10   of email that I assume is available to you all.

11       And so this was an effort not to be sort
12   of a bill of particulars listing each and every
13   single interaction that I had with her.  It was
14   never intended to be that.  That's not what I
15   understood that I was being asked to do.  So this
16   is a synthesis of a year's worth of work.

17   Q    Okay.  So --

18   A    So the answer is I don't remember every
19   single interaction that I had with her nor every
20   single email.  But those would -- that body of
21   interactions would also comprise the reasons that I
22   made the decisions that I did.

Page 118

1    Q   Okay.  So in terms of specific instances
2   that might support your conclusions, you're saying
3   that --
4    A   I cannot recall, sitting here right now,
5   other specific instances to the best of my
6   recollection.
7    Q   Okay.  But in terms of the reasons that
8   you synthesized, are there any reasons other than
9   what's expressed in these documents?
10    A   Again, with the caveat that I just said,
11   I -- I can't think of any other synthesis of the
12   information and the year's worth of work off the
13   top of my head sitting here right now.
14    Q   Okay.  Is it fair to say that had there
15   been other reasons that you synthesized into a
16   conclusion, that you would have included that in
17   these documents when you wrote them?
18    A   I don't know how to answer that question
19   other than what I just said before, honestly.
20    Q   Well, when you wrote the documents --
21    A   Uh-huh.
22    Q   -- it was your intent to put together a

Page 119

1   synthesis of the events, the conversations, the
2   emails of the preceding year --
3    A   Right.
4    Q   -- to create a statement, a justification
5   for your decision.  And the decision we're talking
6   about right now is removal from the deputy general
7   counsel position.
8    A   Oh.  Well, no, these documents were not
9   intended to -- well, I guess -- let me back up.
10        The signed sworn statement is a short
11   statement about the -- my reasons with respect to
12   that particular decision.  In the other document,
13   the purpose of the other document was to explain
14   why I thought Marcy should be removed from the
15   SES --
16    Q   Okay.
17    A   -- not particularly focused on the deputy
18   general counseling decision; but that was -- I -- I
19   thought it was relevant to the overall request that
20   I was receiving from the human resources division.
21    Q   Okay.  So I'm trying to keep these clean
22   and separate, so let's just focus on the SES -- I'm

Page 120

1   sorry, the CDC --
2    A   DGC.
3    Q   DGC.  Thank you.
4        -- taking her out of that position.
5    A   Okay.
6    Q   You provided an affidavit subsequently;
7   in other words, after the fact?
8    A   Uh-huh.
9    Q   Okay.  And when you wrote that affidavit,
10   did you express what you thought were the principal
11   reasons for the actions that you took?
12    A   The principal reasons, yes.  It was a
13   synthesis of the principal reasons why I did that,
14   yes.
15    Q   All right.  And if there were other
16   principal reasons that you were aware of at that
17   time, do you believe you would have included those
18   in that affidavit?
19    A   I think so.  I mean I guess one could
20   have a discussion about what you mean by principal.
21   But I think this was an effort to provide, in a
22   relatively short format, the key reasons, the

Page 121

1   principal reasons -- however you want to phrase
2   it -- the main reasons --
3    Q   Well --
4    A   -- for the decision.
5    Q   So turn to paragraph 20, if you would,
6   please.
7    A   20?
8    Q   Yes.
9        All right.  So the scope of the inquiry
10   that -- you see paragraph 20?
11    A   Yes, I'm with you.
12    Q   Okay.  So the scope of the inquiry that
13   Supervisory Special Agent Hill described to you
14   was -- I think she states it on the very first
15   page, doesn't she?  Numbered one and two.
16        Do you see that?
17    A   Yes.
18    Q   Okay.  So did she describe these as being
19   the issues that were within the scope of her
20   inquiry?
21    A   Based on the document, I believe so, yes.
22   I mean I don't specifically recall right now,

Page 122

1  but --

2      Q    Okay.  So you said, in this affidavit, I

3  do not have knowledge of any additional information

4  that at this time I believe is relevant to the

5  scope of this inquiry as SSA Hill described it to

6  me.

7          Correct?  Is that what you said?

8      A    Yes, that's what I said.

9      Q    Okay.  So would it be fair then to say

10  that all relevant information that you had with

11  respect to the questions that she was posing to

12  you, you included in this statement?

13      A    No, that would not be correct.  Because

14  it says as she described it -- as SSA Hill

15  described it to me.  She told me to prepare a short

16  statement about -- describing the nature and scope

17  of the decisions and the key reasons for making the

18  decision.  But she certainly didn't tell me that I

19  had to include every single fact that was relevant

20  to the -- to her inquiry in this particular

21  document.

22      Q    Right.  But whatever her instructions to

Page 123

1  you might have been, you said, I do not have

2  knowledge of any additional information, correct?

3          MS. GRAY:  Objection.

4          THE WITNESS:  As --

5          MS. GRAY:  Asked and answered.

6          You can answer.

7          THE WITNESS:  As -- you know, as SSA Hill

8  described it to me.  She described her process,

9  what she was trying to do, what she was trying to

10  accomplish.  She was not involved in a massive

11  discovery inquiry requiring the production of

12  emails or a list -- you know, reviewing calendar

13  entries or anything of this nature.

14          This was intend -- as I understood it,

15  this was intended to be a short statement about the

16  key or principal reasons for the decision.  And so

17  that's why there -- that -- at least I believe that

18  qualifier is in there.  This is what she described

19  the scope of her inquiry, at that point in time

20  what she was doing.  And this was not intended to

21  be a list of everything that happened over the

22  course of a year.

Page 124

1  BY MR. KATOR:

2      Q    Right.  But we -- just so I understand,

3  it's your understanding, as you sit here today --

4  you have no specific recollection -- but it's your

5  understanding that she explained to you that the

6  scope of her inquiry was as is stated on the first

7  page of this document, correct?

8      A    Well, she -- it says, SSA Hill informed

9  me that the issues accepted for investigation

10  are -- and then -- then she lists them.

11      Q    Right.  So you understood that these were

12  the issues that she was investigating?

13      A    Yes.  And she met with me and orally

14  described what it was that she was looking for in

15  the context of a signed sworn statement.  And I

16  believe that I was fulfilling her request by

17  preparing a document that is the nature and scope

18  of what I prepared.

19      Q    Okay.  So is it your testimony today that

20  you do have additional information that is relevant

21  to the scope of the inquiry?

22      A    Well, there are emails, for certain, I

Page 125

1  would imagine, that are extant that -- and I've

2  seen a few of them in preparation from today --

3  that are relevant that I don't reference in this

4  document.

5          And I didn't understand it to be what SSA

6  Hill was looking for.  She never told me that.  And

7  based on the information that she gave me about how

8  to prepare a statement like this, I did not

9  understand that to be the task that I was asked to

10  undertake.

11      Q    Okay.  So in addition to emails, some of

12  which you have seen and some of which you assume

13  exist, what other additional information is there

14  that is relevant to the scope of -- well, let me

15  restrict myself to your decision to take her out of

16  the deputy general counsel position?

17      A    Well, so I have not made an effort at any

18  point in time, nor was I ever asked -- and I don't

19  think that was within the scope of what she was

20  asking me, SSA Hill -- to, you know, list every

21  meeting that you can recall that you ever had with

22  Marcy, list every discussion that you had, list

Page 126

1  every possible interaction in detail about that.  I
2  never tried to do that.  And I haven't done that.
3  And I don't believe I was asked to do that.  And I
4  don't believe that was what SSA Hill was asking me
5  to do.
6       Q   All right.  You understand that that's
7  what I'm asking you to do?  I'm asking you to tell
8  me every reason that you had for taking her out of
9  that position.  You understand that's what I need
10 to know, right?
11      MS. GRAY:  Objection.  Vague.  Asked and
12 answered.
13      THE WITNESS:  I'm honestly not sure what
14 you're asking.
15 BY MR. KATOR:
16      Q   I am asking you what additional
17 information is there that you have in your mind
18 today about why you removed her from that position?
19      A   So I believe there are -- I'm not sure
20 how to describe it.  In terms of main reasons for
21 making the decision that -- the decisions that I
22 made, I believe that they are reflected in this

Page 127

1  document.
2          However, these -- the documents are
3  relatively short, in -- in an effort to describe a
4  year's worth of interactions with Marcy that
5  included oral conversations, emails, her conduct at
6  meetings, her conduct, you know, one-on-one with
7  me.  And I have not endeavored to write all that
8  down or explain that or provide that information
9  because, A, I don't have the emails; and, B, I have
10 never been asked to sit down and write, to the best
11 of my recollection, every interaction I had with
12 her.
13      Q   Okay.  But in terms of the main reasons
14 or the principal reasons --
15      A   I believe they are reflected in this
16 document.
17      Q   Okay.  And if you had other main reasons
18 or principal reasons, you would have told that to
19 Agent Hill, correct?
20      A   I think so.
21      Q   Okay.  Let's turn then to the attachment.
22          And this is a justification that, as I

Page 128

1  understand it, you compiled with the help of --
2  human resources?  Is that what you testified?
3      A   No, I don't think that's what I said.
4      Q   Who -- you compiled it with the help of
5  whom?
6      A   To the best of my recollection, I drafted
7  this document -- at the request of HRD, I drafted
8  this document.  I got input from Ernie Babcock,
9  Justin Schoolmaster, and FBI counsel.
10     Q   Okay.  And does this document state the
11 main or principal reasons that you made the
12 decision to not extend -- or sorry that we keep
13 stumbling over the term -- but to remove
14 Ms. Grzadzinski from the SES or not continue her
15 probationary period -- past her probationary
16 period?
17     A   I'm sorry, you may -- I can't remember if
18 you used the word "recommend" or "decided."  I -- I
19 made a recommendation to HRD.  HRD made the
20 decision.
21     Q   Okay.
22     A   This is a -- as I said earlier, this is a

Page 129

1  synthesis of the main reasons.
2      Q   Okay.  Are there any other main reasons,
3  principal reasons, that are not synthesized into
4  this --
5      A   I don't believe so.
6      Q   Okay.  So I'm sorry that that was like
7  pulling teeth, but you understand that I'm trying
8  to get an understanding of your knowledge and to
9  have it extracted so that we know what it is that
10 you did and why you did it.  So if there are any
11 other reasons that you acted in the way that you
12 did that you haven't told me, please tell me now.
13     A   Not that --
14         MS. GRAY:  Objection.  Asked and
15 answered.  We have gone over this I think enough at
16 this point.  I think we can move on.
17 BY MR. KATOR:
18     Q   Okay.  Just say it.
19     A   Not that I recall sitting here at this
20 time.
21     Q   Okay.  That's fine.
22         So let me ask you about the -- and we

Page 130

1  started talking about this a little bit -- the

2  performance appraisal at the -- in the end of

3  October.

4       At the end of the -- it's October -- do

5  you recall, is it October 31st?  Is that when the

6  performance --

7     A   I don't --

8     Q   -- appraisal is?

9     A   -- remember.

10    Q   Whatever.

11       The end of October there's a performance

12 appraisal and you were the second level supervisor,

13 correct?

14    A   I believe that's correct.

15    Q   The reviewing official, is that what it's

16 called?

17    A   I think that's right.

18    Q   And Babcock would have been the rating

19 official?

20    A   I believe that's correct.

21    Q   Okay.  So what involvement, if any, did

22 you have with Babcock in terms of the actual

Page 131

1  creation of his rating?

2     A   To the best of my recollection, I believe

3  that Ernie and I had had conversations about it, in

4  general, prior to the time that he was -- that he

5  signed the -- the document.  I can't recall if we

6  discussed the numerical ratings that he gave her.

7     Q   Do you recall what the rating was?

8     A   I looked at it the other day.  And I -- I

9  saw some of them.  But, honestly, I -- sitting here

10 right now, I can't remember what they are.

11    Q   So, again, you said you had conversations

12 with him about the appraisal?

13    A   Well, I had conversations with Ernie

14 about, I believe, all the appraisals that he --

15    Q   But before they were signed?  Before he

16 signed them?

17    A   Well, there were -- so there were

18 numerous conversations about appraisals with all of

19 the super -- all of the supervisors.  Because I had

20 to tell people these are due, this is what -- you

21 know, the -- the time frame that we have to do

22 them.  And I would -- people didn't submit them on

Page 132

1  time, so I had to hound people sometimes for them.

2  Perhaps Justin or somebody else would hound them

3  for them.  And so I had many conversations with a

4  lot of supervisors about these.  In terms of the

5  specific rating --

6     Q   Or the --

7     A   -- with respect --

8     Q   -- substance of the appraisals?

9     A   Yes, I had conversations with supervisors

10 about the substance of appraisals of many

11 appraisals, at a high level.

12       With respect to Ernie's, I don't

13 specifically remember discussing with him the words

14 that he literally put in there.  But I may have.  I

15 just -- I don't remember sitting today.

16    Q   Well, what about the overall rating,

17 whether it should be good or bad or in the middle,

18 did you discuss that with him?

19    A   I think so, yes.

20    Q   And why did you discuss that with him?

21    A   Well, Ernie and I had been engaged in

22 a -- in a long-running conversation about Marcy's

Page 133

1  performance, as her supervisor.  He was her

2  supervisor.  And so we had discussed the problems

3  that we've been discussing earlier, earlier today.

4     Q   Did you discuss at that time your

5  intention to take her out of the -- or not continue

6  her past her probationary period?

7     A   I don't recall.  At that point in time, I

8  don't recall.

9     Q   Did you direct him to give any particular

10 ratings?

11    A   I don't believe so.  In fact, I thought

12 one of the ratings was higher than I would have

13 given, but that was his decision and so --

14    Q   Did you talk to Justin Schoolmaster about

15 the ratings for Marcy?

16    A   In general, I discussed ratings with all

17 of the folks with Justin.  He was the person

18 responsible for pulling all this together across

19 the office.  So I'm sure that I discussed it with

20 him at some point.

21    Q   Did you discuss -- or when I say -- did

22 you discuss with him specifically anything with

Page 134

1 respect to the relationship between the rating and
2 the decision to take her out of the SES, or not
3 continue her past her probationary period?
4     A    The relationship between the rating and
5 her ultimate --
6     Q    Yeah.  Because it was only three --
7     A    Yeah.
8     Q    -- months apart.
9     A    Well, again, it's a broad question.  Did
10 I discuss the rating in connection with the -- the
11 decision on the probationary period?  I may have.
12 I don't specifically remember, sitting today.
13 They -- they're related to each other, obviously.
14     Q    Is it fair to say that at the time
15 that -- of the rating, you had already concluded
16 that you wouldn't be taking her -- not continuing
17 her past her probationary period?
18     A    No, I don't think that's correct.  In
19 fact, the reason -- to the best of my recollection,
20 that one rating that Ernie gave Marcy that was
21 high, that I thought was high, I believe he said --
22 and we talked about the fact that we were trying to

Page 135

1 retain Marcy.  We were trying to see if we could
2 figure it out, to figure out a way forward, and
3 that if you gave her too low of a rating, that
4 would be demoralizing to her, and that we didn't
5 want to have -- if we decided at the end of the day
6 not to remove her, we didn't wanna have a
7 completely demoralized employee on our hands.
8        So Ernie lobbied in favor of that -- I
9 think it was a 4 that he gave her -- for that
10 reason.  That's my recollection.
11     Q    An overall rating of 4?
12     A    No, the -- there is one particular
13 element.  I can't remember which one it is.  But he
14 gave her a 4.  It seemed high to me.  But my
15 recollection is that he said that, that he wanted
16 to do that because he wanted to, as I say, not
17 demoralize Marcy completely.  And that is, in part,
18 because I don't -- I don't recall that at the time
19 of the rating any decision had been made about
20 removing her.
21     Q    Okay.  So let me show you a document that
22 we'll go ahead and mark as Exhibit 2.

Page 136

1        (Deposition Exhibit No. 2 marked for
2        identification.)
3 BY MR. KATOR:
4     Q    And let me ask if you can identify this
5 document.
6     A    (Witness looked at document).
7     Q    Do you recognize this document?
8     A    Only because I think I saw it the other
9 day.
10     Q    Okay.  And this document appears to be an
11 email from Schoolmaster to you, correct?
12     A    It appears to be, yes.
13     Q    And dated October 24, 2015, correct?
14     A    Correct.
15     Q    And the text of it is brief enough that I
16 can read it.
17        Did you talk with Ernie --
18        And "Ernie" would be Ernie Babcock,
19 correct?
20     A    I assume so.
21     Q    Okay.
22        -- about how he rated Marcy for the PAR?

Page 137

1 It would be tough to have you throwing the caution
2 flag and him giving her a good rating.
3        And then a parenthetical, which I -- do
4 you see that parenthetical?
5     A    Uh-huh.
6     Q    Do you understand what that parenthetical
7 is supposed to mean?
8     A    Not really, not with the -- there's a
9 redaction in the middle of it.  And it doesn't make
10 sense to me without the -- without seeing that
11 text.
12     Q    Right.
13        As I -- something -- last year, correct?
14     A    Yeah.  I don't know what that means.
15     Q    Okay.  So I guess it's -- what does it
16 mean to be throwing the caution flag?  Do you
17 understand that?
18     A    Not really.
19     Q    So is it your understanding -- is it your
20 recollection that Schoolmaster thought that it was
21 a possibility that Babcock would give her a good
22 rating?

Page 138

1    A    I assume so, from the text here.

2    Q    So what was your answer to Schoolmaster?

3 Do you recall?

4    A    I don't recall.

5    Q    Did you talk to Ernie about how he rated

6 Marcy for the performance -- his performance --

7 PAR, what's that stand for?

8    A    That's a good question.  Performance

9 assessment review, I think, maybe.

10    Q    Okay.

11    A    I'm not -- I'm not entirely sure.

12    Q    All right.

13    A    So I'm sorry, what's your question?

14    Q    His question:  Did you talk with Ernie

15 about how he rated Marcy for the PAR?

16        MS. GRAY:  Objection.  Asked and

17 answered.

18 BY MR. KATOR:

19    Q    Is it -- what was your answer?

20    A    The answer is yes.

21    Q    You did talk --

22    A    Well, how he rated her.  At some point in

Page 139

1 time, we had a conversation of -- what I remember,

2 sitting here today, is having a conversation with

3 him about the ratings.  And what sticks in my mind

4 is that -- the one high rating, that I thought it

5 was high for, and having a conversation about that.

6    Q    Do you recall having a conversation with

7 Ernie before he rated Marcy?

8    A    I assume it was before.  I'm not sure.

9    Q    Well --

10    A    I remember that when he was trying to do

11 the -- when he was finalizing the rating, I was out

12 of town at a conference or something.  And so he

13 and I were trying to talk over the phone or

14 connect.  It was difficult.  And so eventually we

15 did connect.  And I believe he told me his theory

16 or his thinking with respect to how he wanted to

17 rate Marcy.  And we had a discussion, to the best

18 of my recollection, about that number, and that I

19 deferred to him on it.

20    Q    And so then that was before -- this

21 discussion about the number was actually before you

22 signed off as the rating official -- or sorry, the

Page 140

1 reviewing official?

2    A    I believe so.  Because I -- I was out of

3 town and I -- I don't think I could sign until I

4 came back.  Or maybe they faxed it to me or

5 something.  I was at an FBI conference of some

6 sort.

7    Q    And you don't recall how you responded to

8 this email?

9    A    I believe -- as I say, I think -- well,

10 looking at the date, if this is toward the end of

11 October, and assuming that these things were due by

12 the end of October, and -- and recalling that I had

13 been out of town when Ernie and I had a

14 conversation about this, I'm thinking that -- like

15 I talked to him over the phone about this.  I don't

16 remember.

17        If you -- if they didn't -- if the FBI

18 didn't produce an email, I assume there's not an

19 email response.  But I remember talking to Ernie on

20 the phone, from wherever I was, about ratings in

21 general, including Marcy's.

22    Q    We talk -- thank you.  I appreciate that.

Page 141

1        We talked a little bit about Bondy?

2    A    Yes.

3    Q    And I'm sorry, but I think I -- what was

4 your understanding of what the complaints were

5 against Bondy?

6    A    So can I just ask for clarification?

7        THE WITNESS:  Am I allowed -- I just

8 don't know if I'm allowed to talk about that kind

9 of thing.  I assume I am, but I just want to look

10 to the Bureau counsel if I can go into that.

11        MS. GRAY:  Yes.  You can answer.

12        THE WITNESS:  Okay.

13        So I don't know how to describe it.  They

14 were -- at the highest level of generality, they

15 were -- they had to do with his interactions with

16 women and making women, at a minimum,

17 uncomfortable, in a couple of different contexts.

18 I'm not sure I remember the first one.

19        The second one had to do with being alone

20 in like a meeting room with a woman and sitting too

21 close to her instead of -- for example, you and I

22 are seated across a conference table.  And it's --

Page 142

1  instead of having a discussion like this, he would
2  pull his chair and sit immediately adjacent to her,
3  very close in physical proximity to her.  And so
4  that made her uncomfortable.  That's the one I
5  recall off the top of my head.
6       But they were -- I don't want to minimize
7  either one of them.  I believe there were two, but
8  I just can't recall the specifics of them.  But
9  they both had to do with behavior and comments that
10  he made that made women feel uncomfortable.
11  BY MR. KATOR:
12    Q   Do you recall anything about like asking
13  someone out on a date or anything like that?
14    A   I don't recall that.
15    Q   Touching, do you recall any touching,
16  complaints about touching?
17    A   I don't recall complaints about touching.
18  I recall being too close in certain circumstances,
19  and then maybe him -- and having made some comments
20  that were objectionable.  But I don't remember the
21  comments, though, that he made.
22    Q   That was my next question, comments.

Page 143

1    A   It was some type of comments that he
2  made.  And I just don't recall, sitting -- it's
3  been a long time.  I just don't recall what those
4  were.
5    Q   So what was your involvement in all of
6  that, if any?
7    A   As I recall, the first one, I counseled
8  him about it.  So I raised -- it was raised to me.
9  And I believe that the person in question did not
10  want to be identified, the woman in question.
11       And so I had a frank conversation with
12  Bondy and -- and it -- and tried to get his side of
13  the story, explained the concerns, told him that he
14  needed to be attentive to this type of matter, and
15  make sure that he's not making people feel
16  comfortable, that -- because my recollection is
17  that he claimed complete befuddlement about why
18  anybody would complain about that, about such a --
19  such behavior.
20       He didn't appreciate/understand/perceive
21  that he was doing anything to make anybody feel
22  uncomfortable.  He thanked me for raising it, but

Page 144

1  expressed remorse and regret that I, as his
2  supervisor, had to bring something up like this
3  with him.  Yeah, he was embarrassed and -- and said
4  that he would do a better job and would be
5  attentive to these kinds of things in the future.
6       The next time, though, when it was
7  raised -- and again, I don't remember the specifics
8  of it -- it was -- and I want to make sure I'm not
9  conflating this with another incident, but I -- I
10  believe what happened was that a -- a third party
11  came to me to raise a concern, because the person
12  didn't want to be identified, the person who -- the
13  complainant, if you will, didn't want to be a
14  identified.  A third person came to me.
15       I discussed that with -- with her, and
16  then determined that the appropriate thing to do --
17  if I recall correctly -- was refer it to the FBI's
18  inspection division, which is our internal
19  inspection organization to handle matters like
20  this.  And so my recollection is that it was sent
21  to them for review.
22    Q   And those are the only two you recall?

Page 145

1    A   That's all I recall sitting here today.
2    Q   At the FBI, do you have sexual harassment
3  training, I mean, that -- that people in the
4  general counsel's office are required to take?
5    A   I believe there's -- yes.  I think it's
6  online training that everybody has to take.  I
7  think it's every year.
8    Q   All right.  You've mentioned the name
9  Trisha Anderson.
10       How did you know Trisha Anderson?
11    A   Trisha Anderson and I worked together at
12  the Department of Justice when I was in the deputy
13  attorney general's office and she was an attorney
14  in the office of legal counsel, in approximately
15  2009, 2010, 2011 time frame.  And we were working
16  on a variety of highly complicated, very difficult
17  national security matters, including a number of
18  very challenging cyber matters.  So I believe
19  that's when I first got to know Trisha.
20    Q   Were you friends with her?
21    A   At that point in time we were more
22  colleagues only.

Page 146

1    Q   Did you become friendly with her at some
2  other time?
3    A   Yes.
4    Q   When was that?
5    A   I would say since we both left the FBI,
6  we've certainly become friends.
7    Q   Not before?
8    A   Well, no, actually, I take that back.
9  Well, friends.  I mean I guess it depends what you
10 mean by friends, but --
11   Q   Right.  I know.
12   A   -- we --
13   Q   Had a social relationship outside the
14 office workplace?
15   A   I'm trying to think.  I think the only
16 time that we had a social event during the time
17 that I was at the FBI with her was when -- I think
18 it was Justin invited several of the -- all -- I
19 think I, Ernie, Trisha, and I can't remember if
20 anybody else came.  He had us over to his house on
21 a Sunday.
22      I believe that when I was trying to see

Page 147

1  if Trisha was interested in coming to the office of
2  general counsel, I had coffee with her.  I think I
3  had lunch with her a few times like that.  But that
4  would be -- but that's -- that's what that is.
5    Q   So -- well, did you know her family?
6      Was she married?
7    A   She's married.
8    Q   Did you know her husband?
9    A   Her husband, yes, I know her husband.
10   Q   How do you know her husband?
11   A   I met her husband when he worked for me.
12 He was a detailee from another government agency to
13 the office of intelligence, policy, and review,
14 sometime in the -- well, sometime in the time that
15 I was working there.  I don't remember
16 specifically.  So I knew him then.
17      And I believe then I had interactions
18 with him subsequently, when he returned to his home
19 agency.  And then he was also assigned to -- when I
20 was in the deputy attorney general's office, her
21 husband, Charles, was assigned to the -- the office
22 of the legal advisor to the national security

Page 148

1  counsel.  And so when Charles was there, I worked
2  with him in that capacity as well.  And then I
3  think also when he went back to his agency after
4  that, I think we continued to have interactions.
5    Q   Did you --
6    A   In a professional -- legal, you know,
7  business interactions.
8    Q   Any interactions other than professional
9  legal business interactions?
10   A   With Charles?
11   Q   Yeah.
12   A   Well, I've kept in touch with him over
13 the years and -- but in terms of social
14 interactions, going out for drinks or something
15 like that, no, not until recently.  I mean I've had
16 drinks with him and dinner and so on.  And some of
17 which has been personal, some of which has been
18 business related.
19   Q   But just generally, any non-professional
20 business contacts?
21   A   With Charles?
22   Q   Yeah.

Page 149

1    A   What time period are you talking about?
2    Q   Prior to Trisha Anderson being hired.
3    A   Oh.  I don't think so.
4    Q   Okay.  So what was -- we talked briefly
5  about this, but what was the selection process for
6  that deputy general counsel position?
7    A   I'm not sure I can recall the details of
8  that, in part because that position had been posted
9  a couple of different times.  And I'm not sure that
10 I can remember or distinguish sitting here today
11 between the various times that it was posted and
12 the interviews were conducted.
13      I believe there are a couple of -- it was
14 posted once.  I believe there was a round of
15 interviews.  It was posted again.  I believe there
16 were another round of interviews.  But I can't --
17 I'm not sure I can sit here today and distinguish
18 between all of them for you.
19   Q   Okay.  Pardon me just one second.
20      So I understand, from what you said, that
21 you were -- is it fair to say you were recruiting
22 Ms. Anderson to take this position?

Page 150

1    A   I was certainly interested in having her

2   apply for the position, yes.

3    Q   And you say that it had been posted on

4   multiple occasions?

5    A   I believe that's correct.

6    Q   And you're aware that Ms. Grzadzinski had

7   applied for it, correct?

8    A   Well, I -- sitting here today, I don't

9   specifically remember that, but I believe that is

10  correct.

11   Q   Okay.  Is it your understanding that

12  Ms. Grzadzinski was qualified for that position?

13   A   I don't think she was qualified in the

14  way that I conceptualized the job.

15   Q   Is it your understanding that this was a

16  competitive selection?

17   A   I think so, yes.

18   Q   And who was the selecting official, you?

19   A   The director of the FBI.

20   Q   So you, what, recommended?

21      What was your role?

22   A   So the way it works is that since I was

Page 151

1   the head of the office that had the SES slot, we

2   posted it.  We got the resumes.  We reviewed the

3   resumes.  We decided who to interview.  We

4   interviewed people.  We then --

5    Q   When you say "we" --

6    A   There was a -- a panel of people that

7   interviewed.

8    Q   Were you part of that panel?

9    A   I believe so, yes.  I don't specifically

10  remember who was on the panel in this particular

11  instance when Trisha eventually got hired.

12   Q   Do you recall who was involved?

13   A   No.  I don't recall off the top of my

14  head.

15      So we then -- the panel then meets, has a

16  discussion, makes a determination.  It comes up

17  with a recommendation.  Then I -- I believe then

18  that I had -- well, the normal -- let me just

19  describe the normal process.  I don't specifically

20  remember in this case.

21      In the normal process, then the matter is

22  referred to the SES board within the FBI.  The SES

Page 152

1   board is chaired by the deputy director.  And the

2   associate director's on there, on the board, as

3   well as the executive assistant directors and a few

4   other officials.  Maybe eight to ten in total.  And

5   that board then reviews the request of the office

6   that wants to hire a particular person.  And

7   then -- then it goes the director.

8      With Trisha's selection, she -- because

9   she was already -- I think once -- I -- I believe,

10  to the best of my recollection sitting here today,

11  because she was already a member of the SES at the

12  Treasury Department, I believe that process was

13  short-circuited, now that I sit here and think

14  about it.

15      And now, let -- yes, I believe that we

16  were able to do a -- what was called a direct hire

17  for her.  Because she was in the SES already and

18  because of the needs for this particular position

19  and her qualifications, in consultation with HRD I

20  think we were able to do a direct hire for Trisha.

21  I'm not a hundred percent sure of that, but I think

22  that is right.

Page 153

1    Q   Okay.  So I thought you were telling me

2   that you remembered interviewing her, but no?

3    A   I thought I did.  But as I'm sitting here

4   answering your question and thinking about it --

5   well, so I had had prior conversations with Trisha

6   about the position.  I had known Trisha at OLC.  We

7   also worked together briefly at the deputy attorney

8   general's office.

9      I had given her a positive recommendation

10  to Justice Kagan, on the Supreme Court, to take her

11  as law clerk.  And so I knew Trisha pretty well.

12  And so --

13   Q   When was that?

14   A   Prior to her going to clerk on the Court.

15  I don't remember that, when it -- what time period

16  it was.  It must have been after.  When I first got

17  to know Trisha was at OLC, so it must have been at

18  the end of that time.  Because I think she went off

19  and did that, and then came back and worked at the

20  deputy attorney general's office.  Then I left and

21  she essentially took my spot.  And then at some

22  point in time she went to Treasury.

Page 154

1    But now that I think about it, I believe
2 that this was a direct hire.  And so there would
3 not have been the same process that I had described
4 earlier.  So I just want to correct that.  As I
5 think about it, I believe Trisha was a direct hire.
6    Q    At the time that -- when was she brought
7 in, Trisha Anderson, with respect to the -- to the
8 realignment?
9    A    I don't remember the exact time that --
10    Q    Before --
11    A    -- Trisha got there.
12    Q    -- or after.
13    A    I don't remember.  Honestly, I don't
14 remember.
15    Q    So you are aware of other EEO complaints
16 that have been filed in the office of general
17 counsel, correct?
18    A    Well, yes.
19    Q    Okay.  Are you aware of Sherry Sabol --
20 is that how you say it, "Sabol"?
21    A    "Sherry Sabol."
22    Q    Are you aware of any complaint that she

Page 155

1 filed?
2    A    Well, I don't know if she actually filed
3 a complaint or not.
4    Q    What is it that you know?
5    A    I don't know how to describe it.  At a
6 minimum, she raised concerns, I guess.  I can't
7 remember if she actually filed a formal complaint
8 with anyone.
9    Q    What concerns did she raise?
10    A    I'm not sure that I ever actually saw a
11 written document with those concerns.  I may have,
12 but I don't recall.
13    Q    What's your best understanding of what
14 those were, as --
15    A    That --
16    Q    -- you sit here today?
17    A    -- somehow a personnel action -- that a
18 personnel action was taken with respect to her that
19 she thought was improper in some way.
20    Q    Who took this personnel action?
21    A    I believe it was me.
22    Q    Okay.  So is it fair to say that your

Page 156

1 understanding is that she had a complaint against
2 you or about something that you did?
3    A    Yeah, I think the complaints are
4 technically not against --
5    Q    Right.
6    A    -- an official complaint, if she made
7 one.  It's actually against the attorney general,
8 not against any individual below that.
9    Q    Right.
10    A    So -- but yes, I believe it was -- she
11 was raising concerns about a decision that I had
12 made with respect to her and her job.
13    Q    What was the nature of the allegation, if
14 you recall?
15    A    I don't recall.
16    Q    You don't recall.  To the best of your
17 recollection, was it just that she disagreed with
18 the decision, or did she believe that your decision
19 was based on an impermissible factor?
20    A    I believe that she was alleging that it
21 was based on an impermissible factor.  I believe it
22 was gender.  I don't know if it was age as well, or

Page 157

1 some other kind of thing.
2    Q    Okay.  But you don't -- specifically, you
3 don't remember the specifics of --
4    A    I don't specifically remember seeing a
5 written complaint from Sherry.
6    Q    And as you sit here today, the best you
7 can tell me is that she didn't like something that
8 you did and she filed a -- she raised concerns
9 about gender discrimination?
10    A    She raised concerns, yes.
11    Q    Whether she filed a formal complaint or
12 not, you don't recall?
13    A    I can't recall.
14    Q    Do you recall ever having to respond to
15 her complaint or her issues?
16    A    Well, I responded to her about it.  I
17 responded to the deputy director about it.  I can't
18 remember if there was a mediation session with
19 respect to Sherry, which I think I'm not supposed
20 to talk about the details of.  But I can't remember
21 if there was a mediation session with respect to
22 Sherry.  There may have been.

Page 158

1    Q    Okay.

2    A    And I may have discussed it also with the

3  executive assistant director for human resources,

4  among other things, at the time.

5    Q    Do you recall what, if any, resolution

6  there was to her complaint?

7    A    I don't --

8        MS. GRAY:  Objection.

9  BY MR. KATOR:

10    Q    I keep calling it a complaint, because --

11        MS. GRAY:  Objection.  I'm just going to

12  instruct the witness not to answer to the extent

13  that the judge has indicated that the terms of any

14  settlement agreements reached on EEO matters are

15  not subject to discovery.

16  BY MR. KATOR:

17    Q    All right.  Well, I'm not asking about

18  the terms.  I just want to know if it was resolved,

19  to the best of --

20    A    I don't remember.

21    Q    Okay.  Nancy Wiegand -- "Wiegand"?

22  "Wiegand"?

Page 159

1    A    Yes.

2    Q    Do you know that person?

3    A    Yes.

4    Q    And did she file a complaint or raise

5  concerns, to the best of your knowledge?

6    A    Again, I don't believe she submitted an

7  actual complaint.  I think she raised concerns.

8    Q    And what's your best understanding of

9  what her concerns were?

10    A    That I was considering giving her a

11  performance evaluation that was lower than what she

12  wanted.

13    Q    Were you her rating official?

14    A    I can't remember at the time.  Eventually

15  I was, but I don't remember exactly at this point

16  in time.  I was certainly the reviewing official.

17    Q    What do you understand the nature of her

18  complaint was?

19        When I say that, I mean was it just she

20  didn't agree, or was it based on consideration of

21  an impermissible factor?

22    A    I don't know.  I never completely

Page 160

1  understood Nancy's complaint.

2    Q    Okay.  Do you know if you participated in

3  any mediation or any kind of resolution efforts

4  with her?

5    A    I think we did.

6    Q    Do you know if it was resolved?

7    A    I believe so, but I don't recall what.

8    Q    Okay.  Karen Davis Miller.

9    A    Yes?

10    Q    Who was she?

11    A    Karen was a section chief in the National

12  Security Law Branch, and still is.

13    Q    And did she raise some complaint or

14  concern, that you're aware of?

15    A    Yes.

16    Q    And did that involve action that you

17  took?

18    A    I guess you would say action that I

19  talked about me possibly taking.

20    Q    Well, why don't you tell me what it was.

21    A    Because I discussed with Karen -- so

22  Karen had -- to the best of my recollection in

Page 161

1  terms of timing, Karen was in the National Security

2  Law Branch.  As I had said earlier, it's a very

3  demanding job, any of the jobs in that section.

4  And when I got to OGC, Karen described that she was

5  burned out and needed break.

6        So I arranged for Karen to do a detail to

7  the CIA, in their general counsel's office, for --

8  I don't know if it was six months or a year.  And

9  while she was off doing that -- something she

10  really wanted to do -- we then were in the process

11  of doing the realignment.  And in that process, we

12  were going to substantially reconfigure the

13  office -- the National Security Law Branch.

14        And so we had discussed the possibility

15  of recompeting the positions within -- the section

16  chief positions within national security law.  And

17  so I was calling Karen to tell her that I was

18  thinking about doing that.  And she was unhappy

19  with that and complained about it.  Now, whether

20  she actually filed a complaint or not, I don't

21  know.

22    Q    And, again, was this, to the best of your

Page 162

1  knowledge, a sex discrimination complaint or
2  allegation?
3      A   I'm not sure if she ever actually alleged
4  that, but I don't know.  I don't know what she
5  actually ended up saying.
6      Q   All right.  And same thing:  Did you go
7  through some sort of mediation process?
8      A   I'm not sure that Karen's was mediated,
9  because I think -- evidently, I decided not to
10  recompete the positions and so there was no action
11  vis-à-vis her, so there was nothing to be done.  So
12  I don't believe that we ever went to mediation with
13  Karen.
14      Q   Okay.  Catherine Bruno.
15      A   Yes?
16      Q   Did she have a complaint or raise
17  concerns?
18      A   She raised concerns with the deputy
19  director, is my understanding.
20      Q   About you?
21      A   I believe so.
22      Q   What was the nature of her concerns or

Page 163

1  complaint?
2      A   That I had talked to her -- again, it was
3  a -- an action that -- the action that I took was
4  to talk to her about whether I would take an
5  action.  So I ultimately did not take an action.
6  And so Karen -- I mean -- I'm sorry --
7      Q   Catherine?
8      A   -- Catherine was concerned, because the
9  deputy attorney general had decided -- deputy
10  attorney general, strike that.
11          The deputy director of the FBI had
12  decided to change the way that the FBI was
13  organized with respect to interactions with the
14  inspector general of the Department of Justice.
15  And Catherine was performing the role up till that
16  time.  But once the deputy director made this
17  decision, then Catherine -- Catherine's role
18  essentially evaporated from underneath her.  And so
19  given that, we had a discussion about whether to
20  remove Catherine from the SES, and have her take
21  some other role within the organization.
22          So she then complained to the deputy

Page 164

1  director.  And eventually we decided not to do
2  that.  So Catherine was left in an SES position,
3  within OGC, performed other roles for a period of
4  time, and eventually moved on to another job in the
5  Bureau, in a different office.
6      Q   All right.  Formally mediated, or not?
7      A   I think so.  I think so.
8      Q   Lyn Brown.
9      A   Yes, I know who Lyn Brown is.  I'm trying
10  to think about an action.  I know she raised a
11  complaint, but honestly I'm drawing a blank as to
12  what her complaint was.  I can't remember off the
13  top of my head.  I think that one did -- whatever
14  it was, whether it was an actual complaint or not,
15  she did -- it did go to mediation, if I recall
16  correctly.
17      Q   Was it concerning an action that you did
18  or not take?
19      A   I can't remember.  I think so, but I
20  can't remember.
21      Q   Sarah Burkwit.
22      A   Uh-huh.

Page 165

1      Q   Do you know her?
2      A   Yes.
3      Q   Did she raise a complaint or a concern?
4      A   Yeah, but it was not about something that
5  I did.
6      Q   Was it --
7      A   No.
8      Q   -- somebody else?
9      A   Somebody else had done, I believe, yeah.
10      Q   Who is that?
11      A   To the best of my recollection.
12      Q   Do you recall who?
13      A   I know that I approved her going on an
14  extended detail, for family reasons, I think to
15  Hawaii.  And she was happy with that.  It's what
16  she wanted to do.  She did raise a complaint at
17  some point in time, but honestly, I can't remember,
18  sitting here today, who it was against.
19      Q   But to your recollection, it wasn't you?
20      A   To my recollection it was not me, because
21  I had done what she asked for.
22      Q   And do you recall how her complaint was

Page 166

1 resolved?

2    A    I don't remember, no.

3    Q    The process, I mean not --

4    A    I don't remember.

5    Q    -- not the substance?

6    A    I don't remember.

7    Q    Okay.

8    A    But a bigger part of -- we may have gone

9 to mediation with Sarah. And I may have been

10 there. But I don't remember -- I think I was

11 there. But I don't remember exactly, again, the

12 nature of her complaint; and I don't remember the

13 resolution. But I believe it was resolved. I

14 believe it was resolved through mediation.

15    Q    Were you aware of any other complaints

16 that were -- or let's call them complaints or

17 concerns, that were raised about decisions or

18 actions that you did or did not take by other OGC

19 staff?

20    A    By anybody?

21    Q    Other than the ones we've discussed,

22 yeah.

Page 167

1    A    There was one person who raised a

2 complaint in connection with -- I did not select

3 him for the position of chief of staff. And I

4 believe he raised a complaint. I don't know

5 whatever happened to it. I can't remember if I

6 gave a statement in that one. But it just

7 eventually disappeared. And I never saw anything

8 else about it.

9    Q    Anything else?

10    A    I'm sorry, can I ask you, could you

11 just -- so we talked about Karen, Sherry --

12    Q    Sherry, Nancy, Karen, Catherine, Lynn,

13 Sarah.

14    A    And then this other person.

15    Q    And this other person.

16    A    Off the top of my head, I can't recall

17 any other ones.

18    Q    Okay.

19        MR. KATOR: All right. We've been doing

20 this for another hour. Let's take a quick break.

21        (Recess)

22        (During the break Mr. Levin left the

Page 168

1        deposition and did not return.)

2        MR. KATOR: I have no further questions.

3        MS. GRAY: Okay. I have a few questions.

4        EXAMINATION BY COUNSEL FOR AGENCY

5 BY MS. GRAY:

6    Q    You testified that you did not think that

7 Ms. Grzadzinski was qualified for the DGC of NSLB

8 in the way that you conceptualize the position.

9    A    Correct.

10    Q    Can you explain that a little bit more?

11    A    Yes. From my prior experience at the

12 Justice Department, both in my role at IOPR and

13 then in the deputy attorney general's office, I

14 knew that national security issues and in

15 particular at that point in time cyber issues --

16 the national security issues and the cyber issues

17 that the FBI was engaging with during the time that

18 I was there and then that I anticipated we would be

19 engaging with were of the greatest complexity and

20 difficulty that I had encountered I think in my

21 legal career. And I knew we had some very

22 challenging issues to deal with.

Page 169

1        And so I knew that it was in the interest

2 of the FBI to be able to -- to be able to engage at

3 the highest levels with the highest levels of

4 complexity and intellectual challenge, with the

5 Justice Department, with the intelligence

6 community, with the U.S. military, with the White

7 House, with the Commerce Department, with a whole

8 range of actors inside the government, with Capitol

9 Hill, Congress I mean, and so I knew that we were

10 going to -- if we were going to represent the FBI

11 effectively across this full range of national

12 security and cyber issues, that we needed topnotch

13 legal advice on these questions.

14        And I knew that Trisha had done exactly

15 that in her various roles in OLC and at the -- when

16 she -- when she was working at the deputy attorney

17 general's office. So that was the caliber of legal

18 skills and abilities that I really needed in that

19 position.

20    Q    And you testified that Ms. Grzadzinski

21 did have the national security in her -- in the

22 scope of her job as CDC at WFO, correct?

Page 170

1    A    That's my understanding, yes.

2    Q    And so why did you think that she would

3  not have been prepared to deal with those issues at

4  that level of complexity?

5    A    Because of my understanding of the types

6  of issues that she had worked on as -- as CDC and

7  would have worked on as CDC, that she would not

8  have encountered these types of issues, that I was

9  much more familiar with the types of issues that I

10  thought we were encountering and that I knew we

11  were encountering and thought we would continue to

12  encounter and engage with.  And I just thought that

13  Marcy -- the -- the gap between what Trisha's

14  background and experience was and Marcy's was

15  substantial.

16    Q    Did you have an understanding of

17  Ms. Anderson's reputation in the national security

18  field?

19    A    Absolutely.  Yes.

20    Q    And --

21    A    She had a very high reputation.  And

22  people thought very highly of her who had

Page 171

1  interacted with her in -- at OLC, in the Justice

2  Department, in the criminal division at DoJ, and in

3  the -- with -- with the intelligence community.

4  Yes, she was very highly regarded.

5    Q    You were asked some questions as far as

6  whether you had a social relationship with either

7  Ms. Anderson or her husband.

8         Did you ever go running with

9  Ms. Anderson's husband?

10    A    I've never been running with Charles, to

11  my recollection.

12    Q    With respect to Catherine Bruno, you

13  testified that you talked to her about she may have

14  to consider being removed from the SES; is that

15  accurate?

16    A    That I was considering that her -- yes,

17  that her job had changed substantially, had been

18  eliminated.  Her job had been eliminated by the

19  deputy director, and that one of the options

20  available to us was to eliminate her position or

21  remove her from the SES.

22    Q    And did you -- so you said that the

Page 172

1  deputy director made this decision.

2         Was that a decision that you supported?

3         MR. KATOR:  So that mischaracterizes the

4  witness's testimony.

5         MS. GRAY:  Okay.

6  BY MS. GRAY:

7    Q    Is it your testimony that the deputy

8  director made the decision to transfer the IG

9  duties out of OGC?

10    A    Yes.

11    Q    And did you support that decision?

12    A    I -- not -- no.  Not originally.  I

13  eventually acquiesced in the decision, but it was

14  the deputy director's decision.

15    Q    Did you ever express concerns about OGC

16  handling IG matters?

17    A    I had expressed concerns about it,

18  certainly.  Yes.  And the IG had complained to me

19  on numerous occasions because -- because I had

20  those responsibilities -- Catherine was working for

21  me.  I had those responsibilities.  When there were

22  problems, I heard complaints from many people,

Page 173

1  including the inspector general himself, on the

2  numerous occasions about Catherine, including a

3  comment by him that he was considering whether to

4  investigate her for obstruction of justice in

5  connection with the difficulties that she was

6  posing in connection with her -- exercise of duties

7  on the behalf of the FBI.

8         And so Catherine was unable to manage

9  effectively the relationship between the FBI and

10  the inspector general, not -- even though we had to

11  comply with a variety of IG requests and that

12  Catherine would raise legitimate legal objections

13  from time to time, but her management of the

14  relationship between the two organizations was not

15  good.

16    Q    Once the IG duties were removed from OGC,

17  did you have any proposals as to what Ms. Bruno

18  could do in OGC or other roles she could have in

19  OGC?

20    A    Based on my interactions with Catherine

21  as well as feedback I had got from others who did

22  not like working with her, I found it very hard to

Page 174

1  find a place within OGC to put Catherine.  And I
2  believe that's what I told her, that I -- well, I
3  didn't tell her all of those details I just told
4  you.  But I told her that I was having a difficult
5  time figuring out a -- an appropriate location for
6  her to go, an appropriate job for her to take at an
7  SES level within OGC; in part, because of her lack
8  of abilities.
9      Q    Do you recall whether she had any
10  proposals as to what role she could fill within
11  OGC?
12      A    I think she did, but I can't remember
13  what those are right now.  I think -- I think she
14  did.
15      Q    And do you recall -- not recalling what
16  they were, do you have any recollection as to why
17  you did not consider them to be viable options?
18      A    I think I didn't -- I did not believe
19  that Catherine had the management skills or
20  abilities or experience to manage a significant
21  portion of the work within OGC, and that I had
22  had -- received negative feedback, from almost the

Page 175

1  first day that I got to OGC, that she was viewed as
2  a toxic figure within the organization.
3      Q    With regard to Ms. Wiegand, you testified
4  that you would consider giving her a lower PAR
5  rating; is that correct?
6      A    That's correct.
7      Q    And why did you consider giving her a
8  lower PAR rating?
9      A    Because I didn't think that her
10  performance was up to standards that it needed to
11  be.  She was responsible for this discovery
12  management section that I talked about earlier,
13  that it was having significant problems.  Nancy was
14  struggling significantly with being able to execute
15  those responsibilities.  And so I raised these
16  concerns.
17      I can't remember exactly how -- how it
18  happened with Nancy.  But then Nancy came to my
19  office.  We had a conversation.  I heard what she
20  had to say.  I heard her side of the story.  And I
21  ended up agreeing with her.  And I believe I did
22  not change the rating.

Page 176

1      Q    What was your general view on PAR ratings
2  for executives in SES?
3      A    My general view was that they should be
4  accurate.  And this is something I said repeatedly,
5  that they should accurate -- accurately reflect the
6  performance of the person during the rating period,
7  and that I had had any number of complaints --
8  that's not a correct -- I had had numerous
9  complaints from human resources division, from the
10  leadership of the FBI, complaining about -- I guess
11  you would call it grade inflation with respect to
12  performance evaluations, especially in the SES, and
13  that too many people were -- were receiving too
14  high of ratings, and that I as a leader needed to
15  make sure that the ratings in my organization were
16  accurate and that they weren't inflated.
17      And so -- and they -- and HRD was doing
18  statistical analysis of all this across the Bureau
19  and within various organizations.  And so I was
20  under pressure to make sure that they weren't
21  inflated.  And the way that I tried to do that was
22  to say that we needed to -- I instructed people at

Page 177

1  all levels, SES and below, many times, that the
2  ratings needed to be accurate.  And if they were
3  accurate, I would defend them.  And if somebody got
4  all 5s and that was accurate, then I would -- a 5
5  being the highest rating -- then I would defend
6  that.  But they needed to be accurate.
7      Q    Did you ever tell Ms. Wiegand that you
8  intended to remove her from her position as section
9  chief of DMS?
10      A    Not to my recollection.  Nancy and I had
11  many conversations about her desire to get out of
12  that position, how she did not like it, hated it.
13      And eventually I selected her to be the
14  acting deputy general counsel for the litigation
15  branch, which was effectively a promotion.  It was
16  an acting only, but it was still moving up one --
17  one rung.  And she was quite happy with that and
18  actually performed better at that role than she did
19  as a section chief and responsible for DMS.
20      Q    And why did you select her for that role?
21      A    Because she wanted to try to do it, to
22  see if she could do it, because she thought that

Page 178

1  she would be able to be more successful in a role
2  that did not involve direct management of DMS and
3  because she was burned out from -- from working on
4  that area for so long, and so I was willing to give
5  her a try.
6      Q   Did she ever express to you an interest
7  in being the section chief of the litigation
8  section?
9      A   Yes.
10     Q   And did you indicate to her that you did
11 not want her to have that role?
12     A   We talked about it off and on over an
13 extended period of time.  I thought about that,
14 creating that position, for a while.  I didn't do
15 it for a long time.
16         And then I eventually determined that I
17 didn't think that would be the right job for Nancy,
18 in part because I had had negative feedback from
19 the unit chiefs that she would be supervising,
20 about Nancy and how they desperately did not want
21 to work for her.  And so I had to take that into
22 consideration in evaluating whether to create that

Page 179

1  position and, if so, putting her in charge of it.
2  And so I was highly hesitant to do that.
3      Q   And what was the nature of the complaints
4  that you received about her?
5      A   Bluntly, she was a micromanager and not
6  that good of a lawyer, which, you know, I had to
7  evaluate.  As I said, I was willing to give Nancy a
8  shot at the -- at the deputy position and -- but I
9  had these other complaints that I was aware of and
10 had in my mind.
11     Q   Do you recall who you did select to be
12 the section chief of the litigation session?
13     A   I think that was the job that Cecilia
14 Bessee eventually got, if I recall correctly.
15     Q   Did you select her for that role?
16     A   Well, again, I -- there was an interview.
17 I believe this is correct with respect to Cecilia.
18 We interviewed a number of different people within
19 OGC.  Selected her.  I took -- I went to the SES
20 board with respect to Cecilia.  I recommended that
21 Cecilia be hired for that position.  Defended it in
22 front of the board.  And eventually the director

Page 180

1  made the decision to hire Cecilia based upon my
2  recommendation that he do so.
3      Q   With respect to your testimony about Rick
4  McNally, you testified that he was quite upset that
5  you removed him from NSLB and transferred him to
6  the section chief of the science and technology law
7  office; is that correct?
8      A   Correct.
9      Q   Okay.  Can you describe how he expressed
10 that dissatisfaction to you?
11     A   So Rick and I had a one-on-one meeting in
12 my office to discuss this.  And I explained what I
13 was doing with respect to the realignment.  And I
14 also explained that I was moving him from the NSLB
15 position over to the science and technology section
16 chief position.
17         And he became very animated, red in the
18 face.  He said statements that I did not completely
19 understand at the time and do not understand till
20 today, about -- something to the effect of that the
21 Irish will rise again, something along those lines,
22 which I found very odd, since I'm part Irish and

Page 181

1  went to Notre Dame.  I didn't understand what he
2  was meaning.
3         But Rick was extremely unhappy.  He
4  viewed NSLB as his baby, so to speak, that he had
5  devoted a substantial part of his career to that
6  office.  And he was not happy at all, in the way I
7  just explained, and expressed extreme displeasure
8  with it.  He -- I think stormed out of the office
9  might be a slight exaggeration, but he left the
10 office abruptly.  And I was left like not knowing
11 really what else to say to him at that point in
12 time.
13         So I -- I believed that he was burned
14 out, as I said, and needed a fresh start.  And I
15 was trying to give him a fresh start.  But he
16 was -- didn't perceive it that way, and was very
17 upset and very angry.
18     Q   Did either the deputy director or anyone
19 else tell you that you needed to place Rick in that
20 position or that you needed to do something to take
21 care of Rick?
22     A   No.

Page 182

1       I had briefed -- prior to making all --
2   prior -- prior to the -- prior to effectuating the
3   realignment, I had a briefing -- I -- I gave a
4   briefing for the deputy director and his chief of
5   staff at the time, in our office.  And I showed him
6   on the screen -- I pulled up on the screen the --
7   the graphic of how we were doing the organization,
8   the realignment.
9       I went through it with him, described it
10  to him.  And then described all the personnel moves
11  that I was going to be making and -- in an effort
12  to make sure that he understood it.  And I didn't
13  need to have him technically approve it, but I came
14  out of the meeting believing that he had approved
15  the realignment and the personnel moves that I was
16  going to make.
17      But he didn't say anything -- that I
18  recall -- specifically with respect to Rick.
19  Q   You testified about an incident where you
20  heard that Mr. McNally had thrown a chair or
21  something to --
22  A   He threw --

Page 183

1   Q   -- that effect?
2   A   -- something, yes.
3   Q   And you indicated that you believed that
4   the inspection division investigated it; is that
5   right?
6   A   I believe so.
7   Q   Okay.  What's the basis of that belief?
8   A   I think I referred it to the inspection
9   division.  I think so.  Or I -- I caused someone
10  else to refer it, but I -- I think I referred it,
11  because it was the quite alarming when I heard
12  about it.  That type of behavior is obviously
13  unacceptable.
14      And it disrupted -- part of the problem
15  was it -- it caused a lot of disruption out of the
16  office where he was.  It's an off-site location.
17  And people -- people there were upset and didn't
18  understand what was going on.  And it was
19  disturbing to them.
20  Q   When you transferred him to the science
21  and technology office to be the section chief, who
22  had previously held that role?

Page 184

1   A   Sherry Sabol.
2   Q   Okay.  So did that cause you to have to
3   reassign her from that position?
4   A   Yes.
5   Q   Okay.  And why did you reassign her from
6   that position?
7   A   For several reasons.  Sherry also was --
8   and she told me this.  She was burned out in that
9   job.  And she -- she was burned out.  That's what
10  she told me.  She was sick of dealing with the
11  personalities that she had to deal with.  She was
12  especially sick of dealing with all of the issues
13  that she had to deal with with respect to the FBI
14  laboratory.
15      The FBI laboratory fell under her
16  purview, so she had to give legal advice to them.
17  And there had been a long, multiyear problem with
18  the FBI's -- FBI laboratory's analysis of hair
19  evidence at -- at crime scenes, for example.  And
20  so it had been a very, very difficult process.  And
21  Sherry basically was sick of dealing with it, and
22  had expressed her desire to do something else

Page 185

1   within OGC.
2       She also expressed unhappiness with Marcy
3   and with me with respect to how we handled a
4   particular personnel -- a -- a set -- two personnel
5   actions.  Sherry was ready to put two of her
6   employees on performance improvement plans, PIP,
7   P-I-P.  And I had initially acquiesced in that and
8   deferred to -- to Sherry.
9       After Sherry and I had discussed that,
10  then Marcy came in.  I think Marcy had a
11  conversation with Sherry about that, came to a
12  different view, decided that the better course of
13  action was to do something else with those
14  employees.  I deferred to Marcy because it was her
15  branch.  And I thought she was making a reasonable
16  judgment in that particular situation.  But Sherry
17  was irate about it.
18      And so the lack of -- there was -- there
19  were issues between the level of communication
20  between Marcy and Sherry and Sherry and Marcy, and
21  Sherry was sick of the whole thing and wanted out.
22  Q   Had you ever heard complaints regarding

Page 186

1   Ms. Sabol?

2       A   I heard -- I heard numerous complaints

3   about Sherry, from the day I got to the FBI.

4       Q   What was the nature of the complaints?

5       A   That she was a highly -- highly toxic

6   personality, that she was difficult to deal with,

7   that people didn't like to deal with her, that she

8   was disruptive in meetings.  And I observed that on

9   numerous occasions myself.  Talked to Sherry about

10  it on several occasions, so -- that she was a

11  difficult, disagreeable, toxic person.

12      Q   Ms. Sabol has alleged that she thinks

13  that she was reassigned in part for raising

14  concerns about the issues at the lab division.

15          Did that play any part in your decision

16  to reassign her?

17      A   No.  Because on those points, I believe

18  that I was trying to be as supportive as I could,

19  for Sherry and for Elaine, who had held Marcy's job

20  before and then worked extensively on the hair

21  issues.  And I had been myself engaged with the lab

22  extensively, and raised concerns with them along

Page 187

1   the lines that Sherry was asserting.  I believe

2   that Sherry and I had similar views about the lab,

3   and so I certainly did not remove her for that

4   reason.

5       Q   What position did you transfer Ms. Sabol

6   to?

7       A   I transferred Sherry to -- I transferred

8   Sherry to a position to work, essentially, directly

9   for me on a variety of special projects, special

10  management projects.  My idea was that I needed to

11  get Sherry out of the situation she was in, give

12  her a fresh start or an opportunity for a fresh

13  start.

14          I had a number -- Sherry had been in the

15  office for a long time.  And I had a -- and knew

16  the office well.  And I had several overarching

17  policy issues that I needed help on, things that

18  did not fall squarely within the responsibilities

19  of any one of the deputies, but were really sort of

20  more my responsibility.  And so I wanted Sherry to

21  help me with those, because I just needed -- I

22  needed help.  And given her legal abilities and her

Page 188

1   knowledge of OGC, I thought she could help me with

2   those.

3       Q   Did you consider that an administrative

4   position?

5       A   No, it was a highly substantive position.

6       Q   Prior to implementing the realignment,

7   did you discuss the proposed realignment with your

8   supervisors?

9       A   Yes, I -- as I said earlier, I discussed

10  it with the deputy director and went through it

11  with him, you know, branch by branch, and then the

12  whole organization, up on the screen in the

13  conference room across from my office, and

14  described in detail what we were doing and why, the

15  same way that I articulated earlier today about

16  describing the designing and why I thought the

17  design made sense, and then describing the

18  personnel moves that I was going to make and why I

19  thought those made sense, explaining all that to

20  him.

21          And -- and as I said, I came away from

22  that believing that he had approved the -- the

Page 189

1   realignment and the personnel moves that I was

2   making.  I also discussed the realignment with the

3   director at various points in time.  In less detail

4   than I described to -- to the deputy director, but

5   I did describe it to the -- for the director as

6   well.  And he did not indicate concerns.  I think

7   he asked some questions, but seemed to indicate

8   that it made sense in his mind.

9       Q   Did you realign OGC for the purpose of

10  demoting Ms. Grzadzinski out of her position as

11  DGC?

12      A   No.

13      Q   Did you realign OGC for the purpose of

14  removing any employee from their position?

15      A   No.

16      Q   Do you recall hearing Mr. Schoolmaster

17  ever make a comment to the effect of making people

18  so miserable that they would leave, or did you ever

19  hear that he made such a comment?

20      A   No.

21      Q   Did you make any personnel changes within

22  OGC with the intent of making people so miserable

Page 190

1 they would leave?

2     A   No.

3        As I said earlier, many of these moves

4 were intended to give people a fresh start and

5 enhance their career.  And I remember specifically

6 discussing that with Rick, for example:  You

7 could -- this is something good.  Don't hate this.

8 This is something good.

9        Same thing I discussed with Sherry:  This

10 is something good.  This is going to give you a

11 different perspective.  This is a good thing for

12 you.

13     Q   You provided some testimony to the effect

14 that you were dissatisfied with Ms. Grzadzinski's

15 communication, not communicating up to you,

16 something to that effect.

17        Did you ever specifically tell her that

18 you wanted her to keep you more informed as to what

19 her units were working on?

20     A   I believe the answer is yes.  I don't

21 recall a specific conversation as we're sitting

22 here right now, but we -- especially toward the end

Page 191

1 of the time that Marcy was there, when Ernie and I

2 were meeting with -- were meeting with her

3 regularly, I brought up that issue.

4        And I think I also brought it up when --

5 earlier, when the issue of the -- of this CDC

6 conference came up.  And I felt like I was

7 blindsided by my -- by Marcy's decision not to

8 invite me in the first instance to the -- to the

9 conference.  And so I had con -- I had an extended

10 conversation with her about that topic.

11        And she explained to me that she had --

12 in her prior job as the CDC at WFO, the way she

13 operated there was that the -- her supervisors, you

14 know, the assistant director in charge or the

15 special agents in charge over various parts of

16 the -- of the organization, would give her

17 assignments, would assign her responsibilities, and

18 then she would just go off and do that.  And as

19 long as it was being done, they didn't really

20 follow up and ask to know what was going on, or

21 to -- or whether she was achieving her

22 responsibilities.

Page 192

1        And so I tried to explain, well, look,

2 I'm different.  I think OGC is different.  And I

3 want more communication here, and so that does not

4 work in OGC.

5     Q   And do you recall, in general, what her

6 response was to your efforts to get her to

7 communicate more to you?

8     A   She -- as I recall, Marcy was not against

9 it.  She wasn't, you know, morally opposed to it,

10 but it never actually happened.  Well, it didn't

11 happen to the extent that I thought was

12 appropriate.

13     Q   You testified that you would hope that

14 Ms. Grzadzinski would help to bridge a divide

15 between the CDC and OGC.

16        Can you give some examples of the way --

17 of ways that she did not help to achieve that goal?

18     A   So this business about the SAC confer --

19 I'm sorry, about the CDC conference was one case in

20 particular.  So I was hoping -- or I -- so Marcy

21 set it up so that the conference would be in

22 Oklahoma City, not in Washington.  She had reasons

Page 193

1 for that.  But what had ended up happening was

2 that -- the geographic separation made it

3 impossible to have social interactions after hours,

4 of happy hours or anything like that, with OGC

5 folks and the CDC community, to try to bring folks

6 together.

7        Remember, that the CDCs are dispersed

8 across the country.  And so there's a geographic

9 separation already between the OGC and -- and the

10 CDC community.  And it makes it hard for people to

11 get to know each other, to interact with each

12 other.  And so I was hoping that we could bridge

13 some of those gaps through the conference.  But

14 putting it out in Oklahoma City made that

15 effectively impossible.  Some people, to be sure,

16 from OGC did go out there as instructors.  But the

17 opportunities for interactions were substantially

18 less.

19        And I just found that Marcy was not

20 making any other concerted or well thought-out

21 efforts to try to bridge that gap.  If she was

22 doing it, she wasn't explaining to me.  I -- I

Page 194

1  don't believe that I became aware of such things
2  that she was trying to do.
3      Q   Mr. Kator asked you when you settled
4  on -- when you did make the decision -- when you
5  first made the decision as to -- to demote
6  Ms. Grzadzinski from the DGC position.  You had
7  indicated that it was when you settled on the
8  design for the realignment.
9      A   Uh-huh.
10      Q   Was that the first time that you had
11  recognized any deficiencies in her performance or
12  had concerns about her performance?
13      A   No.
14      Q   Can you just give -- describe when you
15  first started having concerns about her performance
16  in the DGC role?
17      A   Well, at the outset, it was even before
18  she arrived.  Because to the best of my
19  recollection, prior to her showing up at OGC, we --
20  she came over and we had a conversation about what
21  office she was going to be in.  And so -- and I
22  think this is reflected in some of the documents.

Page 195

1  But I -- I found that to be a strange decision that
2  she was making, to select an office that was
3  removed from her folks just because it was bigger.
4  And yet at the end of the day I thought, well,
5  Marcy, this is her decision to make.  I'm just
6  going to make let her make it, if -- you know,
7  hoping that it would not be a precursor of things
8  to come.  So I thought that was a questionable
9  decision.
10          And then her level of participation from
11  the outset in meetings with other parts -- in
12  meetings -- regular staff meetings within OGC, I
13  thought her participation was below the bar.  And
14  when we would have substantive meetings on a
15  variety of different legal topics, I thought her
16  participation was below the bar.  She just didn't
17  engage in the meeting in the right way with the
18  other leaders of the FBI.
19          And -- and that did not -- it started out
20  that way.  And I didn't see it improve over time.
21  I thought her legal analysis, in particular with
22  respect to this question of whether the CDCs are

Page 196

1  engaged in the practice of law, was -- made no
2  sense whatsoever and was not well supported by any
3  reasonable type of legal analysis that I could
4  think of.  So that alarmed me.  So it was a series
5  of things over time, but it started pretty early
6  on.
7      Q   And why did you think it was strange that
8  she was selecting an office in a different
9  location?
10      A   Because I didn't think it reflected good
11  judgment with respect to the way she thought about
12  leadership.
13      Q   In what way?
14      A   She was overvaluing the prestige that she
15  perceived to be associated with the size of an
16  office or the proximity to me, the general counsel.
17  She was prioritizing those things over being with
18  her troops and sending a message that as a leader
19  you're there to serve other people, not to be
20  elevated up and be, frankly, exalted in some
21  fashion.  And I thought it was the wrong message.
22  I thought it was the wrong message that she was

Page 197

1  sending to her troops.
2      Q   You testified that the ultimate decision
3  to select Ms. Grzadzinski for the DGC position was
4  the director's decision; is that accurate?
5      A   At the end of the day, yes.
6      Q   Okay.
7      A   I believe the -- I believe the director
8  has to make all final decisions on SES selections.
9      Q   Was it your decision to recommend her for
10  that position?
11      A   Yes.
12      Q   Did anyone tell you you had to recommend
13  her or put any pressure on you to recommend her for
14  that position?
15      A   No, not at all.
16          MR. LEVIN:  I have no further questions.
17          EXAMINATION BY COUNSEL FOR COMPLAINANT
18  BY MR. KATOR:
19      Q   So let me just follow up on one thing.
20          You talked about McNally, right?
21      A   Uh-huh.
22      Q   He was -- what was the name of that

Page 198

1 organization he was in?  Section chief?  EMS?

2    A   I'm sorry, the one he came from?

3    Q   Yeah.  The one where he started.

4    A   He started in NSLB, National Security Law

5 Branch.

6    Q   And within the branch he was a section

7 chief, correct?

8    A   He was technically a section chief.  He

9 was serving as the acting --

10    Q   He was acting --

11    A   -- deputy.

12    Q   -- as the deputy.  Okay.

13        And the event with the chair or whatever

14 it was, was while you were there?

15    A   Sometime when I was in OGC.  I don't

16 remember when.

17    Q   Before or after you reassigned him?

18    A   I don't remember.

19    Q   And then he was an SES, correct?

20    A   Excuse me, could we back up?  I believe

21 that it -- in my mind, it makes sense that the

22 chair incident was before I reassigned him.

Page 199

1 Because he was out at this off-site dealing with

2 counterterrorism.  And he would have no reason to

3 be out there if he had moved on to his new

4 position.

5    Q   Okay.

6    A   That's why I think it was when he was

7 still there.

8    Q   Okay.  So he throws the chair; you learn

9 about it; and you say somebody needs to investigate

10 it, correct?

11    A   I believe that's right.

12    Q   It goes to inspections; inspections looks

13 into it; and does anything come of it?

14    A   It came to -- to the best of my

15 recollection, they did some -- they did an analysis

16 of it.  I don't believe they, at the end of the

17 day, recommended any adverse personnel action

18 against him, but I -- I don't -- I don't remember.

19 It took a while before they came back, is my

20 recollection.  I could be wrong about that.

21    Q   And then you thought that he was burned

22 out in the national security branch?

Page 200

1    A   Correct.

2    Q   He disagreed?

3    A   I'm not sure he would disagree that he

4 was burned out.  I think so he would disagree that

5 he wanted to leave, or that the solution to that

6 was for him to leave.

7    Q   Okay.  You had a meeting with him where

8 you told him that you had decided to move him out

9 of that position?

10    A   Correct.

11    Q   And at this, he got irate?

12    A   Correct.

13    Q   Red in the face?

14    A   Correct.

15    Q   Said things that you didn't understand?

16    A   Something about the Irish.

17    Q   Something about the Irish.

18        Lost to Baylor last night.

19        And so then you said, sorry, this is the

20 way it's going to be, and you moved him to where?

21    A   To a different branch, so under -- it

22 would be under Ernie Babcock.  And he was being

Page 201

1 assigned to a different section, which I think we

2 called the science and technology law section,

3 something like that.  But it had responsibility for

4 the FBI lab and some other highly technical

5 scientific parts of the Bureau.

6    Q   And he maintained his SES grade in that

7 new position?

8    A   Yes.  As a section chief.  He was a

9 section chief.  He remained a section chief.

10        MR. KATOR:  Okay.  Thank you.  That's it.

11        MR. LEVIN:  I don't have any more

12 questions.

13

14

15        (Whereupon at 2:45 p.m., the deposition

16        of JAMES A. BAKER concluded.)

17

18

19

20

21

22

202

1      CERTIFICATE OF NOTARY PUBLIC
2         I, BARBARA A. HUBER, CSR, the officer
3    before whom the foregoing deposition was taken,
4    do hereby certify that the witness whose
5    testimony appears in the foregoing deposition
6    was duly sworn by me; that the testimony of
7    said witness was taken by me in stenotypy and
8    thereafter reduced to print under my direction;
9    that said deposition is a true record of the
10   testimony given by said witness; that I am
11   neither counsel for, related to, nor employed
12   by any of the parties to the action in which
13   this deposition was taken; and, furthermore,
14   that I am not a relative or employee of any
15   attorney or counsel employed by the parties
16   hereto, nor financially or otherwise interested
17   in the outcome of this action.
18
19
20   _____
     BARBARA A. HUBER, CSR
21   Notary Public, in and for
     the District of Columbia
22   My Commission Expires:  March 14, 2022

Notice Date: 04/22/2019

Deposition Date: 04/08/2019

Deponent: James A. Baker

Case Name: Grzadzinski v. Sessions

Page:Line          Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

Case 1:20-cv-01411-JEB   Document 27-4   Filed 01/18/22   Page 54 of 74

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this \_\_\_\_\_ day of _____, 20\_\_, and executed the above certificate in my presence.

_____

NOTARY PUBLIC IN AND FOR

_____

County Name

MY COMMISSION EXPIRES:

**WORD INDEX**

**< $ >**
**$7,500** 11:22

**< 1 >**
**1** 4:9 43:12, 13
45:9 69:17
117:1
**1:00** 115:10, 15
**10:00** 1:20
**1000** 1:20 2:6
**12:15** 115:12
**1200** 1:19 2:6
**13** 44:21
**136** 4:10
**13th** 3:5
**14** 38:18 202:22
**15** 5:19 36:13
38:20
**168** 4:4
**18** 13:11 19:8
**18th** 1:19 2:6
**197** 4:5
**1984** 9:2
**1988** 9:3, 4
**1990** 9:14, 14
**1996** 9:21 10:4,
9, 15
**1998** 17:16
**1999** 17:17

**< 2 >**
**2** 4:10 94:10
103:2, 6 135:22
136:1
**2:45** 201:15
**20** 121:5, 7, 10
**200** 50:6
**20005** 3:6
**20036** 2:7
**2007** 10:16, 16,
19, 20, 21 11:4, 6,
11 12:9 17:18
**2008** 12:9 13:9
**2009** 13:10 15:2
17:19 145:15
**2010** 145:15
**2011** 15:3, 5, 6
17:19 145:15
**2012** 15:18, 21
**2014** 8:7 15:22
38:16
**2015** 38:18 44:7
95:11, 18 136:13
**2016** 44:21 96:2
**2018** 1:14 8:7
18:18 19:7
**202** 202:1
**202.324.2714**

**2:18**
**202.626.3583** 3:7
**202.898.4800** 2:8
**2022** 202:22
**20535** 2:17
**24** 136:13

**< 3 >**
**31st** 130:5

**< 4 >**
**4** 135:9, 11, 14
**43** 4:9

**< 5 >**
**5** 4:3 9:2 177:4
**570-2017-00720x** 1:7
**5s** 177:4

**< 7 >**
**701** 3:5

**< 8 >**
**8** 1:14
**800** 61:17
**88** 9:3

**< 9 >**
**90-ish** 10:1
**91** 9:19
**935** 2:16
**96** 10:1

**< A >**
**a.m** 1:20
**abilities** 169:18
174:8, 20 187:22
**ability** 6:16
74:16 104:21
116:10
**able** 57:16 65:3
82:18, 21 83:10,
12 92:19 105:4
108:9, 18 152:16,
20 169:2, 2
175:14 178:1
**abruptly** 181:10
**absence** 11:5
**absent** 30:5
**Absolutely** 170:19
**accepted** 124:9
**accomplish** 68:8
123:10
**accountable** 85:10
**accurate** 94:13
105:17 171:15
176:4, 5, 16

**177:2, 3, 4, 6**
197:4
**accurately** 176:5
**accusing** 83:8
**achieve** 51:22
192:17
**achievement** 107:3
**achieving** 191:21
**acquiesced** 172:13 185:7
**acted** 129:11
**acting** 17:15
28:3 42:2, 4
55:4, 16 59:9, 19
66:14 100:17
177:14, 16 198:9,
10
**action** 62:16
82:12 155:17, 18,
20 160:16, 18
162:10 163:3, 3,
5, 5 164:10, 17
185:13 199:17
202:12, 17
**actions** 120:11
166:18 185:5
**actively** 58:4
**activities** 33:22
60:18
**actors** 169:8
**actual** 14:12
59:20 130:22
159:7 164:14
**add** 104:17
**adding** 110:12,
14
**addition** 125:11
**additional** 122:3
123:2 124:20
125:13 126:16
**address** 73:15
84:16, 17, 19
**adjacent** 142:2
**administered** 31:2
**administrative** 112:15 113:4
114:13 188:3
**adverse** 199:17
**advice** 16:16
34:1 60:18, 20
169:13 184:16
**advisor** 147:22
**affidavit** 69:18
72:16 73:14
81:19 120:6, 9,
18 122:2
**age** 156:22
**Agency** 1:9, 11
2:12 6:4, 9 22:6

**147:12, 19** 148:3
168:4
**agent** 32:14
34:10, 16, 21, 22
41:14 69:20, 20
70:2 121:13
127:19
**agents** 34:14
70:4 191:15
**agnostic** 47:15
102:20
**ago** 67:19
108:12
**agree** 42:10
65:16, 17 67:14
159:20
**agreeing** 175:21
**agreements** 158:14
**ahead** 6:22 14:3
35:5 41:17
43:11 111:2
114:2 135:22
**aim** 115:10
**alarmed** 66:21
85:16 196:4
**alarming** 183:11
**aligned** 50:11
109:21
**alignment** 48:11
111:7
**allegation** 156:13 162:2
**alleged** 162:3
186:12
**alleging** 156:20
**allowed** 108:8
141:7, 8
**ambiguous** 107:20
**AMERICA** 1:1
**amount** 68:9, 13
77:5
**amplify** 104:17
**analysis** 176:18
184:18 195:21
196:3 199:15
**analysts** 34:14
**Anderson** 55:5,
16, 19 59:3, 7
145:9, 10, 11
149:2, 22 154:7
171:7
**Anderson's** 170:17 171:9
**angry** 65:17
181:17
**animated** 180:17
**Ann** 8:16
**announced** 53:4
54:6

**announcement** 17:6
**annuity** 18:7
**answer** 6:14, 22
7:1, 15 21:1, 6,
10, 19, 21 22:10
23:6, 8, 11 24:4,
6, 13 28:4 48:9
71:9 72:4 84:15
91:8 101:3
108:2, 4, 7, 9
117:6, 18 118:18
123:6 138:2, 19,
20 141:11
158:12 190:20
**answered** 50:18
51:2, 5 123:5
126:12 129:15
138:17
**answering** 22:8
153:4
**answers** 6:15
7:11
**anti-CDC** 111:20
**anticipated** 168:18
**anybody** 143:18,
21 146:20
166:20
**anymore** 10:7
**anyway** 80:16
97:19
**apart** 134:8
**apologize** 65:14
**apparently** 65:16
**Appearances** 2:1
3:1
**appears** 136:10,
12 202:5
**applicants** 29:20
31:10
**application** 17:5
26:14 33:11
**applications** 30:20
**applied** 150:7
**applies** 37:4
**apply** 17:2, 3
150:2
**appointed** 16:20
**appointment** 16:14, 15 17:20
19:17
**appointments** 19:21
**appraisal** 99:18
130:2, 8, 12
131:12
**appraisals** 131:14, 18 132:8,
10, 11

appreciate
107:15  140:22
143:20
apprised  68:4
appropriate  46:4
91:5  144:16
174:5, 6  192:12
appropriately
50:11
approve  17:1
182:13
approved  165:13
182:14  188:22
approximately
15:2  61:17
145:14
April  1:14
area  29:2, 5
34:15  47:9
77:16  109:3
178:4
areas  34:11
79:7, 8  110:19
argue  21:9
arranged  161:6
arrived  39:16
62:12  68:11
92:6, 7  194:18
arriving  48:20
articulated
188:15
asked  31:9, 14,
14  51:1  76:3
78:22  80:8
93:21  108:3, 7
117:15  123:5
125:9, 18  126:3,
11  127:10
129:14  138:16
165:21  171:5
189:7  194:3
asking  22:1
42:11  45:14, 15
48:5  82:7
125:20  126:4, 7,
7, 14, 16  142:12
158:17
asks  99:10, 11
aspect  58:12
asserting  187:1
assess  75:3, 10
79:3
assessed  91:21
92:21
assessment
58:20  67:3  93:9
94:7, 10, 17
97:13  103:4
138:9
assign  80:21
191:17

assigned  78:4
105:5  147:19, 21
201:1
assignments
14:20  191:17
assistance  111:12
assistant  12:14,
16  97:11  99:6
152:3  158:3
191:14
associate  12:16
13:16  152:2
associated  196:15
Associates  15:12
assume  6:9
117:10  125:12
136:20  138:1
139:8  140:18
141:9
assuming  54:9
140:11
asymmetry
49:12, 15
attached  74:12
93:17  94:18
attachment  45:8
72:2  93:15, 21
127:21
attentive  143:14
144:5
Attorney  1:9
9:12  13:16, 17
14:1, 6, 6, 11
16:11  145:13, 13
147:20  153:7, 20
156:7  163:9, 10
168:13  169:16
202:15
attorney-client
71:9
attorneys  6:3
63:8
Attorney's  9:18
audible  7:12
AUSA  35:20
authenticity
72:15
authority  23:1
37:9  99:10
available  47:1
117:10  171:20
Avenue  2:16
20:15
avoid  7:9
aware  20:22
32:2  70:8  98:10,
12, 14  99:22
100:1  114:19
120:16  150:6
154:15, 19, 22

160:14  166:15
179:9  194:1

< B >
Babcock  32:6
55:2, 17  56:3
62:19  63:17
80:21  84:4, 17,
20  88:18, 20
91:21  92:2  95:1,
5  96:21  97:15
98:17  100:3
128:8  130:18, 22
136:18  137:21
200:22
Babcock's  84:18
baby  181:4
back  13:14
17:19  20:18
27:22  33:18
37:17  59:20
62:20  64:12
69:16  92:15
95:22  102:7
119:9  140:4
146:8  148:3
153:19  198:20
199:19
background
32:12  170:14
bad  132:17
BAKER  1:16
5:2, 9, 10  22:10
115:17  201:16
Baker's  22:7
balance  49:19
balancing  50:9
bar  195:13, 16
Barbara  1:21
202:2, 20
based  46:19
51:16, 17  104:4
105:14  116:12
121:21  125:7
156:19, 21
159:20  173:20
180:1
basic  46:20
Basically  11:17
14:21  59:12
62:9  70:6  74:15
94:14  110:4
114:8  184:21
basis  38:10
87:11  97:18
98:1, 4, 6  183:7
Bates  4:10
72:19  73:9
Baylor  200:18
bear  34:11
becoming  18:4

befuddlement
143:17
beg  25:9  64:5
109:12
began  39:13
beginning  73:3
behalf  2:2, 12
3:2  99:11  173:7
behavior  142:9
143:19  183:12
belief  109:19
183:7
believe  16:22
28:15  44:16
57:15  66:22
72:1  73:19  74:2,
10  80:5  81:22
83:5  84:3  85:9
89:21  92:1
95:14, 22  96:6
97:8, 20, 20  98:7
99:20  101:3, 18
102:5, 11, 20
114:3  120:17
121:21  122:4
123:17  124:16
126:3, 4, 19, 22
127:15  129:5
130:14, 20  131:2,
14  133:11
134:21  139:15
140:2, 9  142:7
143:9  144:10
145:5, 18  146:22
147:17  149:13,
14, 15  150:5, 9
151:9, 17  152:9,
12, 15  154:1, 5
155:21  156:10,
18, 20, 21  159:6
160:7  162:12, 21
165:9  166:13, 14
167:4  174:2, 18
175:21  179:17
183:6  186:17
187:1  190:20
194:1  197:7, 7
198:20  199:11,
16
believed  74:7
91:5  181:13
183:3
believing  182:14
188:22
beneficial  34:16,
18
Beondy,  52:18
Bernard  9:9
Bessee  179:14
best  6:14, 15
7:4, 7  25:3  33:9,

13  38:6, 17
42:20  83:3
86:11  96:4
118:5  127:10
128:6  131:2
134:19  139:17
152:10  155:13
156:16  157:6
158:19  159:5, 8
160:22  161:22
165:11  194:18
199:14
better  41:13
109:21  144:4
177:18  185:12
beyond  58:16
59:1  61:7
102:19
bigger  166:8
195:3
bill  117:12
bit  42:8  55:11
65:14  90:17
130:1  141:1
168:10
bite  115:8
biweekly  98:3
blank  15:3  36:2
37:10  90:17
164:11
blindsided  191:7
Bluntly  179:5
board  30:22
31:6  36:17, 19
37:7, 13  55:9
104:21  114:11
151:22  152:1, 2,
5  179:20, 22
body  117:9, 20
Boente  65:6
B-O-E-N-T-E
65:8
Bondy  52:20, 21
53:19  54:6, 9
55:2, 16  56:1
57:19  61:6, 14
88:16  89:11
141:1, 5  143:12
B-O-N-D-Y
52:22  53:1
book  108:4, 14
boss  16:7, 13
bouncing  65:13
box  94:14
boxes  46:6
Branch  27:17
28:7  59:15, 22
60:14, 15  61:14
63:2  74:17, 20
79:12  84:4  85:1,
2  108:19  109:10,

22 160:12 161:2,
13 177:15
185:15 188:11,
11 198:5, 6
199:22 200:21
**branches** 51:18
68:10 74:5
**break** 7:14, 18
115:3, 6 161:5
167:20, 22
**bridge** 111:14
192:14 193:12,
21
**Bridgewater**
15:9, 10, 11, 12,
16, 19, 20 16:13
**brief** 136:15
**briefed** 182:1
**briefing** 182:3, 4
**briefly** 6:1
149:4 153:7
**bring** 34:10
42:16 62:17
111:6 144:2
193:5
**bringing** 111:12,
18, 21
**broad** 79:8
83:12 84:14
134:9
**broader** 105:20
**Brookings** 18:11
19:9, 10
**brought** 154:6
191:3, 4
**Brown** 164:8, 9
**Bruno** 162:14
171:12 173:7
**budget** 112:14
114:11, 12
**building** 69:2
**Bureau** 2:15
26:17 74:22
93:4, 6 104:19
141:10 164:5
176:18 201:5
**Burkwit** 164:21
**burned** 60:9, 22
65:15, 18 67:4, 7
161:5 178:3
181:13 184:8, 9
199:21 200:4
**business** 75:9
148:7, 9, 18, 20
192:18

**< C >**
**calendar** 123:12
**caliber** 169:17
**call** 17:21 33:21
41:19 84:21

113:4 166:16
176:11
**called** 1:17 5:3
36:18 39:6
56:13 59:11
61:13 63:5
130:16 152:16
201:2
**calling** 158:10
161:17
**candidate** 35:5, 9
**candidates** 17:11
30:5 35:8, 15
**capabilities** 92:18
**capable** 7:9
**capacity** 32:18
109:16 148:2
**Capitol** 169:8
**captioned** 93:8
**care** 181:21
**career** 16:17, 18
17:14, 15, 18
64:20 168:21
181:5 190:5
**Case** 3:4 7:2
42:10 69:1 99:9
108:9 151:20
192:19
**caseload** 63:1
**cases** 61:19
63:7 70:4
**casework** 63:9
**Catherine**
162:14 163:7, 8,
15, 17, 20 164:2
167:12 171:12
172:20 173:2, 8,
12, 20 174:1, 19
**Catherine's**
163:17
**cause** 184:2
**caused** 183:9, 15
**causes** 75:6
**caution** 137:1, 16
**caveat** 118:10
**CDC** 32:22
33:2 36:3 77:22
78:2, 9, 12 79:2
102:9 110:20
111:7, 18, 21
116:9 120:1
169:22 170:6, 7
191:5, 12 192:15,
19 193:5, 10
**CDCs** 193:7
195:22
**Cecilia** 179:13,
17, 20, 21 180:1
**center** 102:5
**certain** 124:22
142:18

**certainly** 5:17
50:4 122:18
146:6 150:1
159:16 172:18
187:3
**CERTIFICATE**
202:1
**certify** 202:4
**chain** 68:4, 16
**chair** 66:19, 20
67:8 142:2
182:20 198:13,
22 199:8
**chaired** 152:1
**chairs** 52:9, 13
**challenge** 169:4
**challenging**
106:11 108:16
109:7 145:18
168:22
**change** 42:8
87:3 163:12
175:22
**changed** 171:17
**changes** 63:10
75:7 78:21
189:21
**characterize**
58:16
**charge** 23:2
110:6 179:1
191:14, 15
**Charles** 147:21
148:1, 10, 21
171:10
**chart** 46:7 84:2
91:16
**charts** 56:21
**check** 94:14
**chief** 25:13
32:15 33:3, 4
47:11 59:10, 18,
21 70:14 80:12
81:1 84:5, 8
91:2, 6, 7 94:21
100:17, 19, 21
101:2, 13, 20
102:3, 4 105:14
112:14, 21 113:2,
9, 10, 10, 12, 16,
19 116:9 160:11
161:16 167:3
177:9, 19 178:7
179:12 180:6, 16
182:4 183:21
198:1, 7, 8 201:8,
9, 9
**chiefs** 100:11
178:19
**choice** 35:6, 10

**chose** 33:6
35:14 57:7
**CIA** 161:7
**circumstances**
142:18
**City** 192:22
193:14
**civil** 63:6
**claimed** 143:17
**clarification**
141:6
**class** 8:19, 19
**classmates** 8:21
**clean** 119:21
**clear** 7:4, 12
22:8 107:14
**clearly** 104:4
**clerk** 9:7
153:11, 14
**clients** 68:21
**close** 69:3 75:13
141:21 142:3, 18
**coaching** 98:2
**coffee** 147:2
**collaboration**
107:2, 13 110:7
**collaboratively**
108:21
**collapse** 62:12
**colleagues** 145:22
**Columbia** 1:22
202:21
**combined** 56:18,
20
**come** 30:6
46:11, 13, 14
47:14 56:11
75:12 82:3 88:3
105:21 195:8
199:13
**comes** 116:8
151:16
**Comey** 16:3
**comfortable**
73:2 143:16
**coming** 35:11
49:1, 2 85:16
92:15 97:12
147:1
**commencing**
1:20
**comment** 173:3
189:17, 19
**comments** 142:9,
19, 21, 22 143:1
**Commerce** 169:7
**commercial** 13:5
**COMMISSION**
1:2 202:22
**common** 8:22

**communicate**
112:21 113:1
192:7
**communicated**
87:8
**communicating**
76:8 190:15
**communication**
68:3, 14 76:16,
22 78:17, 18
97:14 185:19
190:15 192:3
**communications**
76:6 77:18 90:9
**communities**
111:13
**community**
110:19 111:6, 7,
10 112:3 169:6
171:3 193:5, 10
**commuting** 64:11
**compendiums**
108:1
**competent** 64:19
**Competitive**
17:9 150:16
**compiled** 128:1,
4
**complain** 143:18
**Complainant** 1:6,
17 2:2 5:5
115:21 144:13
197:17
**complained**
161:19 163:22
172:18
**complaining**
176:10
**complaint** 22:12
154:22 155:3, 7
156:1, 6 157:5,
11, 15 158:6, 10
159:4, 7, 18
160:1, 13 161:20
162:1, 16 163:1
164:11, 12, 14
165:3, 16, 22
166:12 167:2, 4
**complaints**
58:11, 12, 13, 14,
17, 19 61:7 70:7,
9, 10 112:20
141:4 142:16, 17
154:15 156:3
166:15, 16
172:22 176:7, 9
179:3, 9 185:22
186:2, 4
**complete** 143:17

completely 135:7,
17 159:22
180:18
complexity
60:16 106:1
168:19 169:4
170:4
complicated
91:19 92:20
108:20 145:16
comply 173:11
component
10:13 99:12
comprise 117:21
con 191:9
conceivable 7:16
conceptualize
168:8
conceptualized
150:14
concern 49:14
79:8 114:7
144:11 160:14
165:3
concerned 111:4
163:8
concerning
164:17
concerns 143:13
155:6, 9, 11
156:11 157:8, 10
159:5, 7, 9
162:17, 18, 22
166:17 172:15,
17 175:16
186:14, 22 189:6
194:12, 15
concerted 193:20
conclude 85:20
86:7 87:3
concluded 73:20
134:15 201:16
conclusion 35:12
86:13 118:16
conclusions
118:2
conduct 23:3
66:6 127:5, 6
conducted 40:17
149:12
conducting 34:2
38:4 44:5
confer 192:18
conference 78:9,
10, 11 139:12
140:5 141:22
188:13 191:6, 9
192:19, 21
193:13
conflate 80:10
conflating 144:9

confront 108:16
109:20
confronted
107:21
confronting
107:20 108:14
109:20
confronts 106:11
107:17
confused 47:12
confusing 58:10
Congress 169:9
connect 110:18
111:9 139:14, 15
connected 93:15
Connecticut
15:13
connection
134:10 167:2
173:5, 6
consent 16:16
consider 39:13
57:21 171:14
174:17 175:4, 7
188:3
consideration
159:20 178:22
considered 57:20
considering 58:5
159:10 171:16
173:3
consistent 74:20
83:14 104:15
112:18
consistently 77:4
constantly 93:4
107:20 108:16
construed 94:3
consultation
68:10 152:19
contact 69:3
contacts 148:20
contemplating
40:22
context 5:20
98:8 124:15
contexts 141:17
continue 36:10
73:20 98:18, 22
128:14 133:5
134:3 170:11
continued 3:1
11:6 12:8
115:22 148:4
continuing
134:16
contribute 61:20
contributed
106:22 110:10
convene 30:2, 3

conversation
6:13 7:5 71:17
88:7 89:22
102:18 132:22
139:1, 2, 5, 6
140:14 143:11
175:19 185:11
190:21 191:10
194:20
conversations
41:15 82:22
87:10 88:1, 3, 6,
8 89:15 90:2
92:9 97:10, 18
98:8, 17 114:17
119:1 127:5
131:3, 11, 13, 18
132:3, 9 153:5
177:11
convey 85:7
107:11 112:1
conveying 90:1
coordinating
68:5 76:13
coordination
68:9
core 47:9
correct 8:5 10:2,
11 12:10, 19
14:11 18:8 19:8,
12 20:20 24:18
29:12 36:14, 15
38:19 39:5
44:16 45:4, 5
46:1 47:16
48:14, 18 49:9,
10 52:17 53:11
54:10 65:12
73:21 74:5
80:20, 22 81:2, 3,
7 84:19 88:17
91:9 92:1 93:12
94:22 95:2, 4
96:6 99:1
103:11 104:8, 9
122:7, 13 123:2
124:7 127:19
130:13, 14, 20
134:18 136:11,
13, 14, 19 137:13
150:5, 7, 10
154:4, 17 168:9
169:22 175:5, 6
176:8 179:17
180:7, 8 198:7,
19 199:10 200:1,
10, 12, 14
correctly 8:18
15:16 28:1 29:9
144:17 164:16

179:14
Coulter 8:16
counsel 1:17
5:5 6:4, 5, 10
7:17 8:5, 6
12:15, 16, 17
14:8 16:2, 16
18:4 22:7 23:5,
18 25:14 27:1
29:1, 10 32:15
33:3, 4 39:4, 5, 8
40:13 45:4 47:6
51:9 59:9, 19
63:11, 22 65:5
73:21 78:1 93:2
100:12 105:15
115:21 116:10
117:4 119:7
125:16 128:9
141:10 145:14
147:2 148:1
149:6 154:17
168:4 177:14
196:16 197:17
202:11, 15
counseled 143:7
counseling 98:2
119:18
counsels 24:1
counsel's 12:11
145:4 161:7
counterterrorism
60:20 199:2
country 112:1
193:8
couple 67:20
70:7 141:17
149:9, 13
course 7:3
123:22 185:12
court 7:10 9:8,
9 153:10, 14
covered 103:1
covering 29:2
Create 107:12
119:4 178:22
creating 178:14
creation 131:1
creative 107:1,
13, 19 108:20
110:7
credit 11:21, 22
crime 184:19
criminal 5:20
9:19, 22 14:10
20:21 23:21
24:10 33:22
34:1, 2 171:2
crisis 62:15
critical 104:22

criticizing 90:13
crossed 26:9
CSR 1:21 202:2,
20
curiosity 11:19
curious 33:5
current 20:21
currently 19:22
cut 116:2
cyber 14:18
20:8, 9 29:7
60:11, 15 83:22
84:1 91:12, 16
106:10, 12, 19
108:12, 13, 13, 20
109:5, 9, 13, 15,
19, 20 110:5, 5
145:18 168:15,
16 169:12
cycle 96:5

< D >
D.C 1:13, 20
2:7, 17 3:6 9:16
20:5 64:12, 12
DAD 106:9
Dame 181:1
Dana 65:6, 8
danger 62:12
DANIEL 3:3
daniel.levin@whit
ecase.com 3:8
date 39:19 86:2
140:10 142:13
dated 136:13
dates 12:10
80:13
DAVID 2:4
13:22
Davis 160:8
day 35:10 87:17,
18, 19, 19 92:7
131:8 135:5
136:9 175:1
186:3 195:4
197:5 199:17
deadline 85:16
deal 7:2 168:22
170:3 184:11, 13
186:6, 7
dealing 184:10,
12, 21 199:1
deals 80:18
December 44:21
96:19 100:2
decide 30:6
36:5, 9
decided 35:16
41:16, 17, 21
87:4 128:18
135:5 151:3

162:9  163:9, *12*
164:*1*  185:*12*
200:*8*
**decision**  23:2
43:6  44:*13*
48:22  49:*4, 5*
50:21  51:*10, 15,*
*16*  53:*12*  80:*19*
86:*4, 15, 19, 20*
87:7, *7*  98:*20*
99:*5, 7, 8, 10*
100:5  109:*13*
119:*5, 5, 12, 18*
121:*4*  122:*18*
123:*16*  125:*15*
126:*21*  128:*12,*
*20*  133:*13*  134:2,
*11*  135:*19*
156:*11, 18, 18*
163:*17*  172:*1, 2,*
*8, 11, 13, 14*
180:*1*  186:*15*
191:7  194:*4, 5*
195:*1, 5, 9*  197:2,
*4, 9*
**decisions**  40:6,
*18*  117:22
122:*17*  126:*21*
166:*17*  197:8
**defend**  177:*3, 5*
**Defended**  179:*21*
**deferred**  139:*19*
185:8, *14*
**deficiencies**
67:*18*  74:*16*
194:*11*
**deficient**  67:9
78:7, 8  88:*13*
**definitely**  58:*18*
**delegated**  38:6
**demanding**
60:*10, 21*  62:*4*
161:*3*
**demands**  60:*17*
**demonstrated**
74:*3*
**demoralize**
135:*17*
**demoralized**
135:7
**demoralizing**
135:*4*
**demote**  194:5
**demoting**  189:*10*
**dep**  54:*11*
**Department**
1:*10*  2:*14*  9:*12,*
*20*  10:8, *21*
13:*14*  18:2
88:*14*  145:*12*
152:*12*  163:*14*

168:*12*  169:*5, 7*
171:*2*
**depends**  11:*21*
146:9
**deposed**  5:*13*
**Deposition**  1:*15*
4:*8*  22:5  43:*13*
71:*4*  82:*3*  90:6
136:*1*  168:*1*
201:*15*  202:*3, 5,*
*9, 13*
**depositions**  5:*18,*
*18, 20*
**deputies**  49:8, *18,*
*19*  50:*12, 13*
52:*11*  53:*10, 19,*
*21*  54:*4, 7, 8, 10*
63:*16*  187:*19*
**deputy**  13:*16, 17,*
*21*  14:*1, 4, 4, 6, 7,*
*11*  16:*11*  23:22
26:22  29:*1, 10*
31:*3*  39:*4*  43:*4*
45:*3*  47:6  48:*21*
49:*13*  50:4, *21*
51:9  52:*15*
53:*13, 15*  57:6, *7,*
*8, 11, 14*  59:9, *19*
62:*16*  63:*11, 22*
66:*14*  70:*13*
73:*21*  85:*21*
116:9, *10*  117:*4*
119:6, *17*  125:*16*
145:*12*  147:*20*
149:6  152:*1*
153:7, *20*  157:*17*
162:*18*  163:9, *9,*
*11, 16, 22*  168:*13*
169:*16*  171:*19*
172:*1, 7, 14*
177:*14*  179:*8*
181:*18*  182:*4*
188:*10*  189:*4*
198:*11, 12*
**deputy's**  87:*18*
**describe**  12:22
121:*18*  126:*20*
127:*3*  141:*13*
151:*15*  155:5
180:9  189:5
194:*14*
**described**  67:*19*
76:7  121:*13*
122:5, *14, 15*
123:8, *8, 18*
124:*14*  154:*3*
161:*4*  182:9, *10*
188:*14*  189:*4*
**describing**
122:*16*  188:*16,*

*17*
**description**  94:*15*
**design**  40:*18*
44:6  46:*4, 10, 11,*
*14, 18, 22*  49:2, *7*
51:*16, 20*  52:*1, 4*
75:8, *11*  78:*21*
86:*17*  110:*3, 17*
188:*17*  194:*8*
**designation**
96:*14*
**designed**  57:*16*
**designee**  113:*3*
**designing**  188:*16*
**desire**  177:*11*
184:22
**desperately**
178:20
**detail**  8:*12*
126:*1*  161:6
165:*14*  188:*14*
189:*3*
**detailee**  147:*12*
**details**  58:*18*
79:*18*  149:7
157:*20*  174:*3*
**determination**
151:*16*
**determine**  46:*3*
75:5
**determined**  44:7
47:5  58:5
144:*16*  178:*16*
**Detroit**  9:*18*
**develop**  74:*17*
84:20  103:*16*
104:2  105:*10*
**developed**  42:*17*
105:5
**developing**  78:*19*
82:20  83:*19*
84:6  103:*16*
105:6, *6*
**development**
106:22  110:*10*
**devoted**  181:*5*
**DGC**  79:*10, 11*
80:*19*  81:*18*
87:*4*  101:*20, 21*
120:*2, 3*  168:*7*
189:*11*  194:6, *16*
197:*3*
**dhart@katorpark
s.com**  2:*10*
**difference**  21:*16,*
*17, 20*  22:*15, 16*
**different**  9:*21*
10:*13*  20:*12*
27:*14*  29:2, *18,*
*19*  30:*1*  37:*1, 2*
45:*10*  46:6  50:*1,*

2  51:*17, 18*
57:*17*  58:*3*  59:*1,*
*15, 16, 21, 22*
60:7  63:*3*  67:*20*
68:*10, 12*  69:7
75:*20*  77:2
78:*15*  87:6
110:*1, 2*  141:*17*
149:*9*  164:*5*
179:*18*  185:*12*
190:*11*  192:*2, 2*
195:*15*  196:*8*
200:*21*  201:*1*
**differently**
112:22
**difficult**  82:*11*
107:*18*  139:*14*
145:*16*  174:*4*
184:*20*  186:6, *11*
**difficulties**  68:*19*
173:5
**difficulty**  168:*20*
**dinner**  148:*16*
**direct**  69:*16*
133:9  152:*16, 20*
154:2, *5*  178:2
**direction**  202:*8*
**directive**  95:*20*
**directly**  14:7
16:*12*  95:*1*
187:*8*
**director**  16:*3*
20:8  31:7  37:8,
*8*  38:*10*  62:*16*
97:*11*  99:6
113:*16*  150:*19*
152:*1, 7*  157:*17*
158:*3*  162:*19*
163:*11, 16*  164:*1*
171:*19*  172:*1, 8*
179:22  181:*18*
182:*4*  188:*10*
189:*3, 4, 5*
191:*14*  197:*7*
**directorate**  89:2
**directors**  152:*3*
**director's**  31:*3*
152:2  172:*14*
197:*4*
**disagree**  200:*3, 4*
**disagreeable**
186:*11*
**disagreed**  156:*17*
200:2
**disappeared**
167:7
**discerned**  86:*4*
**discovery**  61:*13,*
*15, 21*  62:3
89:*10*  123:*11*
158:*15*  175:*11*

**discrimination**
157:9  162:*1*
**discuss**  132:*18,*
*20*  133:*4, 21, 22*
134:*10*  180:*12*
188:*7*
**discussed**  33:*10*
81:*10*  89:9
97:*21*  104:*7*
131:6  133:2, *16,*
*19*  144:*15*  158:2
160:*21*  161:*14*
166:*21*  185:*9*
188:9  189:2
190:9
**discussing**  70:*13*
132:*13*  133:*3*
190:6
**Discussion**  18:22
24:*21*  73:*19*
74:*13*  89:22
116:*19*  120:20
125:22  139:*17,*
*21*  142:*1*  151:*16*
163:*19*
**discussions**  77:6,
*8*
**dispersed**  193:7
**displeasure**  181:7
**dispute**  72:*14*
**disrupted**  183:*14*
**disruption**
183:*15*
**disruptive**  186:8
**dissatisfaction**
180:*10*
**dissatisfied**
190:*14*
**distinguish**
149:*10, 17*
**District**  1:22
9:7, 8  35:*21, 22*
65:*11*  202:*21*
**disturbing**
183:*19*
**divide**  111:*15*
192:*14*
**division**  9:*19, 22*
10:8  14:*10*
25:*13*  30:*18*
31:5  32:*15*  33:*3,*
*4*  67:*1*  84:22
89:*3*  94:*1, 19*
95:*21*  99:7, *12*
105:*14*  119:20
144:*18*  171:2
176:9  183:*4, 9*
186:*14*
**divisions**  14:*10*
**DMS**  61:*21*
62:*18*  63:2

92:*14, 16*  177:*9,
19*  178:2
**Document**  4:*10*
43:*10, 17, 18*
44:*15*  45:*8, 15*
62:5  72:7  74:*12*
76:*4, 4*  81:*4, 11,
12, 20*  90:*12, 17,
21*  93:*8, 11, 13,
14, 20, 22*  94:*4, 8,
18*  95:*7, 19*  96:*3*
97:2  103:*4, 13*
111:*3*  113:*11*
115:5  116:*13, 18*
117:5  119:*12, 13*
121:*21*  122:*21*
124:*7, 17*  125:*4*
127:*1, 16*  128:*7,
8, 10*  131:5
135:*21*  136:*5, 6,
7, 10*  155:*11*
**documentation**
114:*18*
**documents**  28:*19*
62:2  71:*11, 15,
18*  72:*3, 6, 11*
81:*21*  87:*13*
89:*20*  90:5
108:*1*  116:*4*
117:*7*  118:*9, 17,
20*  119:*8*  127:2
194:22
**doing**  6:2  11:*4*
39:*14*  51:*18, 19*
62:*1*  65:22  68:5,
*18*  69:5  75:*12*
76:*10, 11, 13*
77:*13*  107:*10*
109:*1*  123:*20*
143:*21*  161:*9, 11,
18*  167:*19*
176:*17*  180:*13*
182:7  188:*14*
193:22
**DoJ**  9:*13*  11:5,
5  15:*14*  40:*14*
171:2
**doing**  38:2
**draft**  97:5
**drafted**  128:*6, 7*
**drawing**  15:*3*
18:7  36:2  37:*10*
90:*17*  164:*11*
**drinks**  148:*14, 16*
**driven**  46:*3*
**due**  131:*20*
140:*11*
**duly**  5:*3*  202:6
**duties**  172:*9*
173:*6, 16*

< E >
**earlier**  70:*13*
89:*10*  104:*13*
112:5  128:22
133:*3, 3*  154:*4*
161:2  175:*12*
188:*9, 15*  190:*3*
191:5
**early**  9:*19*
10:*21*  12:9  13:8,
9  19:*19*  38:*15,
16*  109:*16*  196:5
**Eastern**  9:8
35:*21*  65:*11*
**easy**  20:*16*
**e-discoveries**
62:*1*
**EEO**  22:*11*
70:*4*  154:*15*
158:*14*
**EEOC**  1:6
**effect**  59:*20*
180:*20*  183:*1*
189:*17*  190:*13,
16*
**effective**  106:*17*
**effectively**
108:*18*  169:*11*
173:9  177:*15*
193:*15*
**effectuated**  39:*17*
**effectuating**
182:2
**effort**  78:*3*
102:*14*  117:*11*
120:*21*  125:*17*
127:3  182:*11*
**efforts**  160:*3*
192:6  193:*21*
**eight**  90:*20*
152:*4*
**either**  68:*15*
81:*19*  142:7
171:6  181:*18*
**elaborate**  107:8
**Elaine**  27:*10*
28:*15, 21*  29:7
34:*20*  35:2  41:*1,
2, 13, 15*  60:*12*
78:5  186:*19*
**electronic**  62:2
**electronically**
72:*10*
**element**  135:*13*
**elements**  105:*1*
**elevated**  196:*20*
**eligible**  102:*12*
105:*1*

**eliminate**  42:*18*
43:*1*  53:*12*  54:9
171:*20*
**eliminated**
171:*18, 18*
**email**  97:*1, 9, 14*
98:*11, 16*  99:*15*
117:*10, 20*
136:*11*  140:*8, 18,
19*
**emails**  62:2
87:*13, 15*  90:2
114:*20*  119:2
123:*12*  124:22
125:*11*  127:*5, 9*
**embarked**  39:*12*
**embarrassed**
144:*3*
**employed**  18:*13*
19:22  20:2, *3*
202:*11, 15*
**employee**  11:*17*
97:*16*  110:*18*
135:7  189:*14*
202:*14*
**employees**  185:*6,
14*
**EMPLOYMENT**
1:2  8:9, *10*
58:*13, 14*  63:*4*
**EMS**  198:*1*
**encounter**  170:*12*
**encountered**
168:*20*  170:8
**encountering**
170:*10, 11*
**encounters**  117:*9*
**encourages**
107:*1, 12*
**endeavored**
127:7
**ended**  45:*3*
62:*18*  93:*15*
96:*1*  162:5
175:*21*  193:*1*
**engage**  169:2
**engaged**  110:6
132:*21*  186:*21*
196:*1*
**engagement**
112:*12, 17, 18*
**engaging**  168:*17,
19*
**enhance**  190:5
**entire**  8:*10*  93:*1,
3, 3*
**entirely**  138:*11*
**entirety**  117:*1*
**entries**  123:*13*

**environment**
107:*1, 12*  110:*11*
**EQUAL**  1:2
**Ernest**  32:6
**Ernie**  62:*18*
64:*19*  84:*4*  85:8,
*18*  89:*13*  90:*14*
92:5, *16, 22*  93:2
95:*15, 16*  96:2
97:6  98:*5, 6*
100:8  128:8
131:*3, 13*  132:*21*
134:*20*  135:8
136:*17, 18, 18*
138:5, *14*  139:7
140:*13, 19*
146:*19*  191:*1*
200:22
**Ernie's**  90:*16*
92:*17*  132:*12*
**especially**  33:*19*
176:*12*  184:*12*
190:22
**ESQUIRE**  2:*3, 4,
13*  3:3
**essentially**  42:7
153:*21*  163:*18*
187:8
**established**  104:*4*
**establishment**
107:2
**evaluate**  75:*3*
96:*20*  179:7
**evaluated**  96:*3*
**evaluating**
178:22
**evaluation**  95:*15,
17*  159:*11*
**evaluations**
176:*12*
**evaporated**
163:*18*
**event**  31:*4*  37:6
86:*12*  87:*1*
146:*16*  198:*13*
**events**  119:*1*
**Eventually**  31:*13*
55:5  60:*14*  64:2
78:*11*  79:*1*
106:8  109:9
139:*14*  151:*11*
159:*14*  164:*1, 4*
167:7  172:*13*
177:*13*  178:*16*
179:*14, 22*
**everybody**
111:*21*  145:6
**evidence**  106:*21*
107:9  110:9
184:*19*
**evidenced**  89:9

**Evidently**  62:*20*
162:9
**evolution**  92:8
**evolve**  92:5
**ex**  26:*13*
**exact**  39:*19*
96:*14*  154:9
**exactly**  15:7
16:*21*  25:*18, 19*
41:*4*  43:2  54:22
56:22  58:*15*
59:*11*  77:*20*
79:*19*  92:*13*
99:*3*  159:*15*
166:*11*  169:*14*
175:*17*
**exaggeration**
181:9
**exalted**  196:*20*
**examination**
1:*17*  4:2  5:5
115:*21*  168:*4*
197:*17*
**examined**  5:*4*
115:*19*
**example**  38:2
42:6  50:5  76:*19*
77:*10*  79:*1*  84:*1*
106:8  107:*19*
108:*10*  141:*21*
184:*19*  190:6
**examples**  76:*16*
80:6  82:*19*
105:*18*  112:*16*
192:*16*
**excel**  109:*17*
**excellent**  67:*12*
111:*17*
**exception**  29:*3*
**Excuse**  35:*1*
38:9  101:8
198:*20*
**execute**  78:*3*
83:*12*  114:*11*
175:*14*
**executing**  105:*4*
**executive**  36:*17*
37:*13*  93:9
108:*19*  152:*3*
158:*3*
**executives**  176:2
**exercise**  99:9
173:6
**Exhibit**  43:*12,
13*  45:9  69:*17*
117:*1*  135:22
136:*1*
**EXHIBITS**  4:*8*
**exist**  10:6
114:*20*  125:*13*
**existing**  53:*21*

**expectations**
83:*15*  87:*9*
90:*10, 11*
**expected**  87:*9*
89:*14*
**experience**  34:*11,*
*15, 16*  47:*3*
105:*14*  168:*11*
170:*14*  174:*20*
**experienced**
67:*13, 16*
**experiences**  33:*9*
**expert**  109:*15*
**expertise**  47:*9*
**Expires**  202:*22*
**explain**  6:*1*
22:*21*  67:*17*
83:*2*  107:*15*
119:*13*  127:*8*
168:*10*  192:*1*
**explained**  40:*4*
61:*3*  81:*19*
82:*15*  104:*12*
117:*5*  124:*5*
143:*13*  180:*12,*
*14*  181:*7*  191:*11*
**explaining**
188:*19*  193:*22*
**explanation**  81:*5*
91:*1, 4*  104:*11*
**exposed**  104:*19*
**express**  120:*10*
172:*15*  178:*6*
**expressed**  49:*14*
118:*9*  144:*1*
172:*17*  180:*9*
181:*7*  184:*22*
185:*2*
**extant**  125:*1*
**extend**  128:*12*
**extended**  19:*20*
165:*14*  178:*13*
191:*9*
**extensively**
186:*20, 22*
**extent**  7:*11*
30:*4*  50:*8, 9*
52:*5*  71:*8*  85:*4*
158:*12*  192:*11*
**external**  40:*10*
**extracted**  73:*1*
129:*9*
**extreme**  181:*7*
**extremely**  64:*22*
91:*18*  109:*7*
181:*3*

**< F >**
**face**  180:*18*
200:*13*

**fact**  54:*2*  57:*21*
120:*7*  122:*19*
133:*11*  134:*19,*
*22*
**factor**  48:*22*
49:*3*  51:*15*
156:*19, 21*
159:*21*
**factored**  49:*5*
**factors**  50:*1*
**facts**  32:*14*
110:*1*
**fail**  84:*20*  99:*1*
**failed**  89:*3*
**failing**  85:*3, 21*
**failure**  90:*21*
**fair**  32:*18*
118:*14*  122:*9*
134:*14*  149:*21*
155:*22*
**fall**  10:*16*  11:*6,*
*11, 18*  15:*4, 6*
19:*19*  187:*18*
**falls**  23:*3*
**familiar**  5:*10, 17*
79:*15*  105:*13*
170:*9*
**family**  64:*11, 14*
147:*5*  165:*14*
**far**  37:*22*  171:*5*
**fashion**  196:*21*
**faster**  103:*1*
**favor**  135:*8*
**faxed**  140:*4*
**FBI**  8:*5, 7*
15:*22*  16:*2, 4*
18:*7, 9, 10, 16*
20:*18*  23:*18*
24:*1*  25:*14, 17*
26:*14*  32:*14, 17*
34:*14, 20*  36:*21*
37:*1, 6, 10, 21*
38:*3, 7*  40:*10*
61:*16, 17*  64:*16,*
*17*  65:*2*  68:*22*
76:*10*  83:*15*
92:*6, 7, 8*  105:*15*
106:*19*  107:*17*
108:*1, 6*  110:*18*
111:*9*  113:*9*
128:*9*  140:*5, 17*
145:*2*  146:*5, 17*
150:*19*  151:*22*
163:*11, 12*
168:*17*  169:*2, 10*
173:*7, 9*  176:*10*
184:*13, 15, 18*
186:*3*  195:*18*
201:*4*
**FBI000813**  4:*10*

**FBI-2015-00176**
1:*10*
**FBI's**  38:*2*
144:*17*  184:*18*
**February**  15:*17,*
*21*
**Federal**  2:*15*
18:*2*  37:*3*
**feedback**  173:*21*
174:*22*  178:*18*
**feel**  142:*10*
143:*15, 21*
**feeling**  49:*11*
**fell**  184:*15*
**fellow**  11:*10*
19:*16*
**fellowship**  10:*22*
11:*13*
**felt**  67:*8*  191:*6*
**fewer**  43:*4*  47:*7*
**FIELD**  1:*3*
25:*14*  32:*16, 16*
34:*6, 17*  36:*3, 13*
66:*4*  102:*8*
111:*22*  170:*18*
**figure**  41:*7*
49:*22*  52:*3*
62:*13*  63:*12*
74:*19*  75:*1, 6, 10*
78:*20*  85:*18*
86:*17*  105:*8*
106:*15*  111:*5, 11*
135:*2, 2*  175:*2*
**figuring**  67:*21*
174:*5*
**file**  159:*4*
**filed**  154:*16*
155:*1, 2, 7*  157:*8,*
*11*  161:*20*
**fill**  26:*22*  27:*4*
28:*13*  29:*14*
46:*6*  58:*8*  95:*21*
174:*10*
**filled**  28:*4*
40:*20*  102:*9*
**final**  197:*8*
**finalizing**  139:*11*
**finally**  86:*20*
**financially**
202:*16*
**find**  66:*1*  73:*6*
85:*17*  101:*11*
108:*2, 7, 9*  174:*1*
**fine**  7:*14, 19*
22:*13*  73:*11*
129:*21*
**finished**  11:*12*
41:*6*
**first**  5:*3*  25:*1, 6*
35:*6, 10*  40:*4, 15*
43:*3, 20*  95:*6*

103:*14, 22*
121:*14*  124:*6*
141:*18*  143:*7*
145:*19*  153:*16*
175:*1*  191:*8*
194:*5, 10, 15*
**firsthand**  99:*16*
**fit**  33:*9*
**five**  43:*20*  44:*5*
74:*12*
**flag**  137:*2, 16*
**flexible**  14:*20*
**flip**  93:*7*
**focus**  82:*13*
119:*22*
**focused**  14:*22*
52:*2*  119:*17*
**focusing**  72:*16*
113:*14*  114:*6*
**folks**  14:*19*  40:*4*
60:*19*  77:*14*
108:*15*  133:*17*
193:*5, 5*  195:*3*
**follow**  191:*20*
197:*19*
**following**  47:*2*
72:*17*
**follows**  5:*4*
115:*20*
**follow-up**  31:*20*
**food**  68:*4, 16*
**foregoing**  202:*3,*
*5*
**foreign**  79:*16*
**forfeiture**  29:*8*
34:*5*
**forgive**  50:*17*
79:*13*
**form**  94:*4*  95:*21*
**formal**  29:*13*
58:*17*  155:*7*
157:*11*
**formally**  12:*1*
17:*17*  164:*6*
**format**  120:*22*
**forms**  30:*21*
**forth**  45:*8*
64:*12*  80:*14*
**forty**  115:*7*
**forward**  41:*22*
52:*4*  135:*2*
**found**  41:*18*
74:*15*  92:*22*
173:*22*  180:*22*
193:*19*  195:*1*
**Foundation**
18:*11*
**founded**  39:*10*
**four**  49:*8*  52:*9*
53:*7, 10, 18*

55:*15, 17*  56:*4, 5*
94:*11*
**fourth**  55:*3*
56:*10, 12*
**frame**  38:*17*
131:*21*  145:*15*
**frank**  143:*11*
**frankly**  196:*20*
**fresh**  61:*1, 4*
67:*5*  181:*14, 15*
187:*12, 12*  190:*4*
**Friedman**  9:*9*
**friendly**  146:*1*
**friends**  145:*20*
146:*6, 9, 10*
**front**  56:*21*
91:*16*  179:*22*
**frustrated**  66:*21*
**fulfilling**  124:*16*
**full**  103:*10, 11,*
*15, 18*  169:*11*
**full-time**  15:*9*
**function**  83:*10*
**functioned**  40:*9*
**functions**  83:*20*
**further**  13:*1*
104:*10*  115:*20*
168:*2*  197:*16*
**furthermore**
202:*13*
**future**  46:*13*
47:*15*  48:*12*
144:*5*

**< G >**
**gap**  109:*4*
170:*13*  193:*21*
**gaps**  193:*13*
**gender**  156:*22*
157:*9*
**General**  1:*9*
5:*11*  6:*20*  8:*5, 6*
12:*11, 14, 16, 17*
13:*17*  14:*1, 6, 7,*
*8*  16:*2, 11, 15*
18:*4*  22:*18*
23:*18, 22*  27:*1*
29:*1, 10*  39:*4, 5,*
*8*  40:*13*  45:*3*
47:*6*  51:*9*  56:*13,*
*15, 17*  59:*9, 19*
63:*11, 22*  65:*5*
73:*21*  75:*22*
78:*1*  93:*2*
100:*12*  104:*13*
116:*10*  117:*4*
119:*6, 18*  125:*16*
131:*4*  133:*16*
140:*21*  145:*4*
147:*2*  149:*6*
154:*16*  156:*7*

161:7  163:9, 10,
14  173:1, 10
176:1, 3  177:14
192:5  196:16
**generality**  141:14
**generally**  21:16
22:22  40:14
48:15  75:2
148:19
**General's**  9:13
13:17  14:12
145:13  147:20
153:8, 20  168:13
169:17
**generated**  96:4
**geographic**
193:2, 8
**gestures**  7:9
**give**  6:14  60:19
76:15  79:18
105:19  112:16
133:9  137:21
178:4  179:7
181:15  184:16
187:11  190:4, 10
191:16  192:16
194:14
**given**  33:9
51:21  60:16
106:17, 18
133:13  153:9
163:19  187:22
202:10
**giving**  34:1, 1
60:20  137:2
159:10  175:4, 7
**go**  6:22  8:11, 13,
22  9:6  14:3
18:11, 15  19:9,
18  20:17  29:13
37:17  41:17
43:11  46:14
52:10  60:7  80:1,
6, 16  86:21
97:15  99:20
102:7, 12, 13
103:1  105:4
107:22  108:4, 7,
14  111:2  114:2
135:22  141:10
162:6  164:15
171:8  174:6
191:18  193:16
**goal**  192:17
**goals**  74:20, 21
75:3  104:5
105:7
**goes**  152:7
199:12
**going**  7:9, 21
21:6, 9, 10, 21

22:4, 8  23:6, 8,
11  24:13  27:2, 8
34:12  37:10
40:5  42:18, 22
43:1  47:14
48:12  49:6  50:2
52:4  53:5  54:21
57:22  58:8
60:11  71:7
77:15  86:20
112:7  115:1
116:7, 15  148:14
153:14  158:11
161:12  165:13
169:10, 10
182:11, 16
183:18  188:18
190:10  191:20
194:21  195:6
200:20
**good**  26:5  68:14
69:2  99:3
132:17  137:2, 21
138:8  173:15
179:6  190:7, 8,
10, 11  196:10
**gosh**  63:5
**government**  37:3
79:14  147:12
169:8
**grab**  115:8
**grade**  176:11
201:6
**grades**  100:14
**graduated**  9:1
**grandkids**  64:15
**graphic**  182:7
**GRAY**  2:13  4:4
6:9, 20  21:18
22:6  23:10, 15,
19  24:2, 12  48:2,
4  51:1, 12  71:7,
16  72:18  73:4, 6,
11  79:21  89:16
115:1, 7, 11
123:3, 5  126:11
129:14  138:16
141:11  158:8, 11
168:3, 5  172:5, 6
**great**  8:12
**greatest**  168:19
**group**  29:22
30:3  63:6
106:16
**GRZ**  4:10
**GRZADZINSKI**
1:5  3:11  24:17,
18  25:2  28:14
36:12  70:7
117:4  128:14
150:6, 12  168:7

169:20  189:10
192:14  194:6
197:3
**Grzadzinski's**
22:11  190:14
**GS-15**  100:18
**guess**  7:16
12:22  25:21
30:9, 13, 15
33:18  47:12
50:8  54:12, 16
57:5  68:20  76:5
78:17  79:5  86:8
93:20  101:12
106:3  107:6
113:3  119:9
120:19  137:15
146:9  155:6
160:18  176:10
**guessing**  30:13
**guys**  110:13

**< H >**
**hair**  184:18
186:20
**half**  11:17
**handle**  63:4
65:3  108:5
144:19
**handled**  185:3
**handling**  30:19
63:6  105:20
172:16
**hands**  135:7
**happen**  6:19
7:7  77:3  192:11
**happened**  9:6
15:8  18:15  19:2,
13  57:4  59:5
64:1  92:13
101:5  123:21
144:10  167:5
175:18  192:10
**happening**  109:2,
5, 6  193:1
**happy**  6:17
61:20  90:2
165:15  177:17
181:6  193:4
**harassment**
145:2
**hard**  173:22
193:10
**hardship**  42:9
**Harris**  1:19  2:5
**HART**  2:4
72:22
**Harvard**  11:1, 3,
6, 8, 20  12:8
**hate**  190:7

**hated**  177:12
**Hawaii**  165:15
**head**  16:12  32:4
74:4  82:8  94:4
97:10  118:13
142:5  151:1, 14
164:13  167:16
**headquarters**
102:15
**hear**  189:19
**heard**  25:15
172:22  175:19,
20  182:20
183:11  185:22
186:2, 2
**hearing**  189:16
**held**  183:22
186:19
**help**  21:15
47:10  63:11
77:15  85:9, 17,
19  93:5, 6
110:14  113:3
128:1, 4  187:17,
21, 22  188:1
192:14, 17
**helping**  93:1
112:6
**hereto**  202:16
**hesitant**  175:2
**high**  106:3
132:11  134:21,
21  135:14  139:4,
5  170:21  176:14
**higher**  59:18
133:12
**highest**  141:14
169:3, 3  177:5
**highly**  60:20
62:5  64:19
67:15  145:16
170:22  171:4
179:2  186:5, 5
188:5  201:4
**Hill**  69:22
121:13  122:5, 14
123:7  124:8
125:6, 20  126:4
127:19  169:9
**hire**  30:7  36:5,
9  152:6, 16, 20
154:2, 5  180:1
**hired**  13:22
19:16  27:6  30:1
36:12  38:14
39:20  42:12, 22
149:2  151:11
179:21
**hiring**  27:7
36:4, 10  111:17

113:6, 6  114:13,
15
**historically**
111:13
**history**  8:9, 10
**hold**  85:10
**holds**  100:19
**home**  147:18
**honest**  85:13
**honestly**  90:16
118:19  126:13
131:9  154:13
164:11  165:17
**honesty**  24:11
**Honors**  9:13, 15
**hoops**  16:20
36:17
**hope**  192:13
**hoped**  111:15
**hoping**  112:1
192:20  193:12
195:7
**horizon**  27:12
**horizontally**
110:19  111:10
112:4
**hound**  132:1, 2
**hour**  11:22
115:2  167:20
**hours**  11:21
193:3, 4
**house**  146:20
169:7
**HR**  30:16  96:19
**HRD**  31:5  94:4
97:9, 11, 11, 15
98:9, 11, 16
99:11, 14, 16, 21
128:7, 19, 19
152:19  176:17
**Huber**  1:21
202:2, 20
**Huh**  25:18, 19
**human**  30:18
31:4  94:1, 18
95:20  99:6
119:20  128:2
158:3  176:9
**hundred**  152:21
**husband**  147:8,
9, 9, 10, 11, 21
171:7, 9

**< I >**
**idea**  47:2  187:10
**identification**
43:14  136:2
**identified**  143:10
144:12, 14
**identify**  82:18
136:4

**IG** 172:8, 16, 18
173:11, 16
**III** 1:8
**imagine** 60:10
106:10 125:1
**immediately**
142:2
**immense** 106:18
**impermissible**
156:19, 21
159:21
**implement** 104:3
105:11 110:17
**implementing**
188:6
**importance**
41:16 106:19
**important** 7:3, 8
61:11
**impossible** 193:3,
15
**impression** 26:1,
4 110:4
**improper** 155:19
**improve** 63:13
66:1 67:21, 22,
22 78:20 79:3
89:14 105:9
195:20
**improvement**
185:6
**inability** 112:21
113:1
**incapable** 105:19
**incident** 66:9, 13,
18 67:8 144:9
182:19 198:22
**include** 122:19
**included** 33:20
34:7 118:16
120:17 122:12
127:5
**includes** 111:7
**including** 32:22
34:7 140:21
145:17 173:1, 2
**increase** 68:9, 13
76:21
**incumbents**
83:17
**indicate** 178:10
189:6, 7
**indicated** 158:13
183:3 194:7
**indict** 23:2
**individual** 35:19
156:8
**inflated** 176:16,
21
**inflation** 176:11
**Informal** 58:17

**information** 62:8
77:5 90:1
118:12 122:3, 10
123:2 124:20
125:7, 13 126:17
127:8
**informed** 68:16,
17 76:10, 11, 12
77:12 124:8
190:18
**initially** 48:20
185:7
**in-person** 117:9
**input** 99:11
128:8
**inquiry** 121:9,
12, 20 122:5, 20
123:11, 19 124:6,
21
**inside** 40:16
169:8
**inspection** 67:1
144:18, 19 183:4,
8
**inspections**
199:12, 12
**inspector** 163:14
173:1, 10
**instance** 151:11
191:8
**instances** 118:1,
5
**Institute** 10:22
20:3, 4
**instruct** 158:12
**instructed** 7:1
176:22
**instructions**
122:22
**instructors**
193:16
**insubordination**
83:9
**insufficient**
106:14
**intellectual** 169:4
**Intelligence** 10:5
147:13 169:5
171:3
**intend** 123:14
**intended** 19:18
52:1 117:14
119:9 123:15, 20
177:8 190:4
**intent** 20:17
118:22 189:22
**intention** 133:5
**intentional** 40:3
**interact** 193:11
**interacted** 171:1

**interaction**
117:13, 19 126:1
127:11
**interactions**
117:21 127:4
141:15 147:17
148:4, 7, 8, 9, 14
163:13 173:20
193:3, 17
**interest** 169:1
178:6
**interested** 147:1
150:1 202:16
**internal** 68:21
108:6 144:18
**interrupt** 101:9
113:8
**interview** 25:4,
19, 20 26:2, 5
29:14 30:5 31:8,
9 151:3 179:16
**interviewed**
28:13 151:4, 7
179:18
**interviewing**
17:11 153:2
**interviews** 29:16,
19, 22 31:18
32:7 149:12, 15,
16
**investigate** 173:4
199:9
**investigated**
66:22 183:4
**investigating**
70:4 124:12
**Investigation**
2:15 20:22 21:5,
22 22:2, 9 23:4,
9, 14, 17, 22
24:11 56:18, 19
124:9
**investigations**
34:2
**investigative**
29:6 33:6, 21
40:21 56:5
**investigator**
69:19
**investigators**
34:2
**invite** 191:8
**invited** 146:18
**involve** 23:22
24:11 160:16
178:2
**involved** 12:21
32:9 70:8, 18, 21
71:2 102:14
123:10 151:12

**involvement**
130:21 143:5
**involves** 62:4
**involving** 20:22
66:18
**IOPR** 168:12
**irate** 185:17
200:11
**Irish** 180:21, 22
200:16, 17
**irresponsible**
48:12
**issue** 76:14, 17
77:17 98:11
106:9 191:3, 5
**issues** 12:20
13:4, 4 23:21
24:10 60:2, 4, 16
61:6 63:18
65:15 66:6
68:15 76:8
77:16, 21 105:12,
20 106:1, 12
108:13, 16
109:17, 19
121:19 124:9, 12
157:15 168:14,
15, 16, 16, 22
169:12 170:3, 6,
8, 9 184:12
185:19 186:14,
21 187:17
**iteration** 95:6
**its** 40:17

**< J >**
**JAMES** 1:16
5:2, 9 115:17
201:16
**January** 8:7, 7
15:17, 21, 22
38:18, 20 86:4, 6
96:2, 18 100:2
**JEFFERSON** 1:8
**Jennifer** 36:1
**Jim** 16:3 97:11
100:9 102:17
**job** 15:9 16:4
26:5 33:14 41:3
42:7, 7 47:10
52:3 55:6 60:10
62:4, 6 86:18
144:4 150:14
156:12 161:3
164:4 169:22
171:17, 18 174:6
178:17 179:13
184:9 186:19
191:12
**jobs** 87:6 161:3

**joined** 9:13
17:17
**Judge** 9:8, 9
158:13
**judgment** 185:16
196:11
**JULIET** 2:13
juliet.gray@ic.fbi.
gov 2:19
**July** 13:9 15:2
19:5
**jump** 16:19
36:16
**June** 86:5, 6
**junior** 57:13
**Justice** 1:10
2:14 9:11, 20
10:8, 10, 17, 18,
21 12:1 13:14,
15 16:9, 10
17:12 18:2
37:19, 20 145:12
153:10 163:14
168:12 169:5
171:1 173:4
**justification** 81:6
90:22 91:1
119:4 127:22
**Justin** 114:1, 17
128:9 132:2
133:14, 17
146:18

**< K >**
**Kagan** 153:10
**Karen** 160:8, 11,
21, 22 161:1, 4, 6,
17 162:13 163:6
167:11, 12
**Karen's** 162:8
**Kator** 1:18 2:3,
5 4:3, 5 5:6 6:7,
11 19:1 21:3, 8,
12 22:1, 13, 14
23:12, 16, 20
24:7, 15, 20, 22
43:11, 15 48:5, 6
51:3 52:7 69:12,
15 71:13 73:2, 5,
8, 12, 13 80:3
89:18 90:4
115:4, 9 116:1,
21 124:1 126:15
129:17 136:3
138:18 142:11
158:9, 16 167:19
168:2 172:3
194:3 197:18
201:10
**keep** 34:19 57:7
63:9 92:15

102:15  119:21
128:12  158:10
190:18
**keeping**  68:3, 16,
17  76:10, 10, 12
77:11
**Kennedy**  11:1
**kept**  109:18
148:12
**key**  105:3
120:22  122:17
123:16
**kind**  12:20  17:7
26:6  38:3  79:16
107:10  108:5, 8
141:8  157:1
160:3
**kinds**  79:4
106:14  108:10
144:5
**knew**  16:5
17:10  19:16
25:11, 13  26:12,
14  40:14  69:5
85:15  108:5
114:16  147:16
153:11  168:14,
21  169:1, 9, 14
170:10  187:15
**know**  6:7, 8
7:15  16:16, 17,
21, 21  17:10
21:19  22:15
24:18  25:7, 10,
12  26:16  35:5
37:22  40:7, 8, 8,
18  41:4  42:20,
21  43:1  50:4, 6
52:13  53:6, 19
54:8  55:16
57:18  58:15
63:1  64:9  65:13
66:1  70:20
72:17  84:2
85:14  86:15
87:3  95:9  97:12
100:7  102:7, 10,
13  107:7  111:18
112:7  114:20, 21
116:3  118:18
123:7, 12  125:20
126:10  127:6
129:9  131:21
137:14  141:8, 13
145:10, 19
146:11  147:5, 8,
9, 10  148:6
153:17  155:2, 4,
5  156:22  158:18
159:2, 22  160:2,
6  161:8, 21

162:4, 4  164:9,
10  165:1, 13
167:4  179:6
188:11  191:14,
20  192:9  193:11
195:6
**knowing**  27:7
42:17  46:8, 9, 13
181:10
**knowledge**  24:9
99:17  122:3
123:2  129:8
159:5  162:1
188:1
**known**  153:6

< L >
**lab**  186:14, 21
187:2  201:4
**laboratory**
184:14, 15
**laboratory's**
184:18
**lack**  78:17  79:5,
6, 6  112:12, 16,
18  174:7  185:18
**lapse**  76:16
**large**  64:20
**largest**  32:16
111:22
**late**  9:14, 14, 21
10:4  38:16
**Law**  1:18  8:12,
13  11:3, 3, 12
26:16  27:17
29:6, 7  33:6, 7,
21  40:21  56:13,
15, 17  59:12
60:12, 15  63:4
106:10  108:15
109:5, 20  153:11
160:12  161:2, 13,
16  180:6  196:1
198:4  201:2
**Lawfare**  18:12
19:10
**lawsuits**  61:18
**lawyer**  6:8  58:3
65:1  67:13
179:6
**lawyers**  62:9
66:16  106:16
110:5
**leader**  91:22
92:2  93:3
176:14  196:18
**leaders**  68:22
76:11  112:13
195:18
**leadership**  74:3
76:1, 22  88:9

92:11  176:10
196:12
**leaps**  105:3
**learn**  65:1  199:8
**learning**  65:2
**leave**  10:21
11:4  18:9
189:18  190:1
200:5, 6
**leaving**  27:3
41:2, 13  53:20
**lecturer**  11:3, 9,
10, 12, 14, 20
**led**  87:2
**left**  10:18  11:5
12:1  15:14, 14
18:7, 10, 10, 16
19:3, 4  27:5, 5
41:21  63:22
64:2, 7  84:3
146:5  153:20
164:2  167:22
181:9, 10
**legal**  29:8, 9
34:1, 5, 12, 13
60:18  64:20
67:14  77:16
106:2, 9, 11, 14
107:18  110:18
111:10  112:2
145:14  147:22
148:6, 9  168:21
169:13, 17
173:12  184:16
187:22  195:15,
21  196:3
**legitimate**  173:12
**Lemert**  27:10
28:16, 21  34:20
60:13
**lengthy**  74:13
**letter**  20:4
**level**  76:21  77:6
78:6  83:11
94:10, 15  95:3
104:13  106:3
130:12  132:11
141:14  170:4
174:7  185:19
195:10
**levels**  60:7  69:7
94:11, 12  112:7
169:3, 3  177:1
**levied**  97:21
**LEVIN**  3:3  6:4
21:1, 6, 9, 20
22:4  23:11  24:3,
13  47:22  167:22
197:16  201:11
**Levin,**  6:6
**light**  49:19

**limited**  105:12
110:16
**lines**  180:21
187:1
**list**  123:12, 21
125:20, 22, 22
**listing**  117:12
**lists**  124:10
**literally**  132:14
**Litigation**  56:7
61:14  63:2, 4, 6,
12  177:14  178:7
179:12
**little**  6:2  42:8
47:12  52:8
55:10  65:14
106:21  107:9
110:9  130:1
141:1  168:10
**LLP**  3:4
**lobbied**  135:8
**location**  66:15
174:5  183:16
196:9
**long**  10:14  13:6
14:13  15:19
25:16  40:1
41:15  46:11, 15
62:11  64:19
66:5  67:15
98:12  104:18
115:6  116:6, 14
143:3  178:4, 15
184:17  187:15
191:19
**longer**  19:11, 13
73:20  80:1
**long-running**
132:22
**long-term**  78:19
**look**  41:5, 17
43:19  46:21
80:7  86:18  90:3,
19  93:18  141:9
192:1
**looked**  33:12
35:8, 15  43:18
46:10  90:21
103:13  111:3
116:18  131:8
136:6
**looking**  47:2
101:16  111:11
124:14  125:6
140:10
**lookout**  93:4
**looks**  199:12
**loosely**  68:20
**lost**  110:22
200:18

**lot**  5:12  57:9
61:19  62:4, 15
68:11  79:15
106:11  113:5
115:5  132:4
183:15
**low**  135:3
**lower**  159:11
175:4, 8
**lunch**  115:3
147:3
**luncheon**  115:13
**Lyn**  164:8, 9
**Lynn**  167:12

< M >
**mad**  69:9
**main**  32:13
51:16  106:3
121:2  126:20
127:13, 17
128:11  129:1, 2
**Maine**  64:10, 11,
13
**maintain**  11:16
**maintained**  201:6
**maintaining**  69:3
**major**  51:17
76:5
**making**  6:9
37:7  40:18
57:17  69:4
122:17  126:21
141:16  143:15
182:1, 11  185:15
189:2, 17, 22
193:20  195:2
**manage**  50:15
92:19  106:16
173:8  174:20
**managed**  92:19
**management**
23:22  61:6, 13,
22  62:22  63:9
66:2, 12  74:4
76:1  77:17, 22
78:7, 9  89:10
92:9, 10  106:2
173:13  174:19
175:12  178:2
187:10
**management-relat
ed**  92:9
**manager**  58:2, 4,
21, 22  60:6
64:19  65:19
67:10, 11, 18
91:22  92:2, 8
**managing**  64:20
78:2

manifested 67:18
manner 83:13
March 202:22
MARCIANN
1:5 3:11
Marcy 27:6
34:4, 9 35:6, 6, 9,
10 38:14 39:21
41:18 42:12, 22
45:3 47:5, 10, 19
48:17, 19 55:2,
17 56:3 57:7, 10
60:13 76:6 78:4
79:9 80:11 85:4,
9, 14, 19, 21 87:2,
9, 16 88:8, 10, 22
89:4, 21 90:14,
15 94:12 95:17
96:1 97:18 98:2,
7, 18 101:12, 17,
18 102:19
103:15 104:2
105:10 107:21
108:9 109:11, 14,
15 110:6, 12, 14,
16 111:17, 17
114:5, 8 117:8
119:14 125:22
127:4 133:15
134:20 135:1, 17
136:22 138:6, 15
139:7, 17 170:13
185:2, 10, 10, 14,
20, 20 191:1
192:8, 20 193:19
195:5
Marcy's 31:15
32:11 50:20
51:8 74:16
76:18 77:4 94:2
96:1 99:17
106:13 112:22
132:22 140:21
170:14 186:19
191:7
mark 43:11
135:22
marked 43:13
136:1
married 147:6, 7
marshaled 30:17
massive 123:10
matter 22:18
23:4 29:4 87:20
143:14 151:21
matters 13:19
14:18 61:16
69:2 105:13, 21
107:18 108:20
112:15 113:5
114:13 144:19

145:17, 18
158:14 172:16
maximize 110:17
May-June 44:7
McNally 28:2
55:4, 16, 18, 19
59:2, 5 60:2
66:7 76:7 88:13
180:4 182:20
197:20
McNally's 65:14
mean 8:11 11:9
17:2 33:10 42:5,
5 45:13 49:15
50:9 51:14 52:8
59:6 66:3 67:6,
19 70:1, 20
71:12 73:4
74:18 76:15
85:11, 12 86:3
88:5 102:11
104:12 106:2, 6,
8 107:5, 6, 14
110:21 112:3
115:4 120:19, 20
121:22 137:7, 16
145:3 146:9, 10
148:15 159:19
163:6 166:3
169:9
meaning 181:2
means 74:19
137:14
meant 28:3
34:13 82:19
104:11 107:10
measurable
107:3
mediated 162:8
164:6
mediation
157:18, 21 160:3
162:7, 12 164:15
166:9, 14
meet 25:1 87:19,
21, 21 90:10
meeting 25:5, 8
87:18 98:1
125:21 141:20
180:11 182:14
191:2, 2 195:17
200:7
meetings 76:19
77:3, 9, 10
112:13 127:6
186:8 195:11, 12,
12, 14
meets 151:15
member 152:11
members 37:9

mentioned
108:12 145:8
merged 10:7
mess 95:9
message 111:19
112:1 196:18, 21,
22
met 25:6, 17, 22
26:1 87:16
124:13 147:11
MICHAEL 2:3
Michigan 8:14,
15, 22 9:8
micromanager
179:5
middle 53:2
132:17 137:9
mightily 63:8
military 169:6
Miller 160:8
mind 26:9
34:19, 22 42:18
82:4, 11, 16
85:13, 21 100:4
109:18 116:8
126:17 139:3
179:10 189:8
198:21
minimize 142:6
minimum
141:16 155:6
minutes 69:12
115:7
mischaracterizes
172:3
miserable
189:18, 22
misstates 48:2
89:16
mkator@katorpa
rks.com 2:9
moment 20:19
28:8 32:5 43:9
61:18 67:19
108:12 111:1
116:5, 14
moments 106:7
Monday 1:14
months 13:11
25:21 42:8
134:8 161:8
morally 192:9
move 41:8, 9, 22
42:5, 6 45:22
52:6, 15 60:11
67:5 92:14
109:13 129:16
200:8
moved 52:6
59:8, 17 61:2
62:20 69:4

78:22 83:21
84:1 89:10
90:16 92:13, 15
101:20, 21 109:9,
22 164:4 199:3
200:20
movement 70:13
moves 57:18
182:10, 15
188:18 189:1
190:3
moving 58:5
62:18 80:12
91:1 177:16
180:14
multiple 150:4
multiyear 184:17
musical 52:9, 13

< N >
name 5:7 36:2
37:11 65:9
113:19 145:8
197:22
named 52:19
Nancy 158:21
167:12 175:13,
18, 18 177:10
178:17, 20 179:7
Nancy's 160:1
narrative 94:15
103:7
narrow 105:11
National 10:7
12:15, 18, 20
13:4, 18, 19
14:17, 22 20:7, 8
27:17 28:7 29:3
32:19 33:1, 7
55:3 56:9 59:9,
13 60:9, 13, 15
66:16 67:12
69:1 109:2, 6, 9,
13, 21 145:17
147:22 160:11
161:1, 13, 16
168:14, 16
169:11, 21
170:17 198:4
199:22
nature 21:14
65:20, 21 83:9
122:16 123:13
124:17 156:13
159:17 162:22
166:12 179:3
186:4
necessary 44:9
73:10 83:11
need 7:13, 18
8:11 22:5 58:7

63:10 80:7 88:3
89:14 116:6, 14
126:9 182:13
needed 41:2, 8,
10 52:5 61:1
63:10, 11 67:4
69:8 75:7, 9
77:15 78:21, 22
79:3 87:3 112:2
143:14 161:5
169:12, 18
175:10 176:14,
22 177:2, 6
181:14, 19, 20
187:10, 17, 21, 22
needs 152:18
199:9
negative 36:7, 8
174:22 178:18
neither 202:11
never 79:14
117:14 125:6
126:2 127:10
159:22 167:7
171:10 192:10
New 20:14
35:20, 21, 22
36:3 42:6, 7
47:10 57:16
69:8 75:11
86:16 105:21
199:3 201:7
newly 57:16
79:12
night 200:18
Nodding 5:16
non-professional
148:19
non-selection
70:16
normal 96:5
151:18, 19, 21
Notary 1:21
202:1, 20
note 72:18
notes 31:17, 19,
21, 22 32:1, 3
notice 1:18
notion 39:13
Notre 181:1
novel 106:11
107:17 108:16
NSLB 70:16
168:7 180:5, 14
181:4 198:4
number 20:11
25:20 26:15
27:14 30:1
32:17 37:3 41:3,
4 45:7, 9 46:16
50:1, 1, 12 54:16

57:12, 13, 17
58:3  59:1  60:7
63:3  66:15, 21
68:2  75:13, 14,
18  76:20  77:2
78:15  84:16
139:18, 21
145:17  176:7
179:18  187:14
**Numbered**
121:15
**numerical**  96:14
131:6
**numerous**  97:17
117:9  131:18
172:19  173:2
176:8  186:2, 9
**NW**  1:19  2:6,
16  3:5

**< O >**
**oath**  6:14
**objection**  6:20
21:18  23:10, 15,
19  24:2, 12
47:22  51:1, 12
71:7  79:21
89:16  123:3
126:11  129:14
138:16  158:8, 11
**objectionable**
142:20
**objections**  6:9,
21  61:1, 2
173:12
**objective**  47:9
76:20, 20
**objectives**  74:21
76:21  105:7
111:5
**observed**  92:5, 7
186:8
**obstruction**
173:4
**obvious**  53:6
**obviously**  29:20
34:3  90:15
134:13  183:12
**occasions**  16:8
83:3  150:4
172:19  173:2
186:9, 10
**occupants**  48:13
**occupied**  47:15
**October**  15:15
95:10, 18  96:7, 8
99:18  130:3, 4, 5,
11  136:13
140:11, 12
**odd**  180:22
**offered**  16:4

**OFFICE**  1:3
9:18  10:5, 6
12:11  13:17
14:12, 12  25:4,
14  31:3, 5  32:16,
17  34:6, 17  36:3,
13  39:5, 8, 10
40:7, 8, 9, 12
46:4  87:5  93:2
94:5  100:12
102:8  133:19
145:4, 13, 14
146:14  147:1, 13,
20, 21  151:1
152:5  153:8, 20
154:16  161:7, 13
164:5  168:13
169:17  175:19
180:7, 12  181:6,
8, 10  182:5
183:16, 21
187:15, 16
188:13  194:21
195:2  196:8, 16
**officer**  202:2
**Offices**  1:18
111:22
**official**  59:17
130:15, 19
139:22  140:1
150:18  156:6
159:13, 16
**officially**  11:5
17:17
**officials**  152:4
**off-site**  66:15
183:16  199:1
**OGC**  46:9
48:21  68:17
74:5, 21  76:12
77:1  93:3  99:12
111:6, 18, 19
112:8, 9, 13, 14
113:10, 12, 19
161:4  164:3
166:18  172:9, 15
173:16, 18, 19
174:1, 7, 11, 21
175:1  179:19
185:1  188:1
189:9, 13, 22
192:2, 4, 15
193:4, 9, 16
194:19  195:12
198:15
**OGC's**  44:6, 8
46:9
**Ogden**  13:22
**Oh**  18:19  63:5
65:7  87:15
119:8  149:3

**OIPR**  10:6, 15
16:12
**Okay**  5:21, 22
8:1, 8, 15  9:1
10:12, 17  13:2, 6
14:9  16:5, 14
18:9, 21  19:9, 22
20:6, 10, 17  21:4,
13  22:3, 13  23:5,
8  24:5, 8, 16
25:1, 16  26:21
28:10  30:15
31:8  35:4  36:12
38:13, 18  43:10,
19, 22  44:18
45:1  46:2, 21
48:9, 16, 22  49:3
50:17  52:8
53:22  55:15, 20,
21, 22  56:3, 17
57:3, 9  58:7
59:2  60:1  64:8
65:13  67:6
69:11, 13  70:3, 6
71:3, 10, 18
72:12  73:2, 5, 8,
12  74:1, 7, 10
75:18, 21  76:2
81:1, 4, 9, 15
82:10  83:18
84:11  89:6, 8
90:19, 21  91:20
93:7, 13, 14
94:20  95:13
99:22  103:6, 10,
19  104:10, 16
105:10  110:16
112:11  113:13,
15  114:2, 4
115:4, 9, 11
116:11, 15, 16, 20,
22  117:17  118:1,
7, 14  119:16, 21
120:5, 9  121:12,
18  122:2, 9
124:19  125:11
127:13, 17, 21
128:10, 21  129:2,
6, 18, 21  130:21
135:21  136:10,
21  137:15
138:10  141:12
149:4, 19  150:11
153:1  154:19
155:22  157:2
158:1, 21  160:2,
8  162:14  166:7
167:18  168:3
172:5  180:9
183:7  184:2, 5
197:6  198:12

199:5, 8  200:7
201:10
**Oklahoma**
192:22  193:14
**OLC**  153:6, 17
169:15  171:1
**old**  26:7
**omitted**  82:4, 5
**Once**  16:10
30:20  49:6  52:4
62:20  84:7
87:19  89:1
149:14  152:9
163:16  173:16
**one-on-one**
127:6  180:11
**ones**  61:11
166:21  167:17
**ongoing**  22:9
33:22  38:5
76:17  87:10
97:18
**online**  145:6
**open**  109:18
**open-minded**
110:2
**operated**  191:13
**operational**
50:10  60:17
107:18
**operations**  39:8
40:7, 17  44:6
63:13  67:22
**OPM**  16:20, 22
37:12, 15, 21
38:1, 12
**opportunities**
193:17
**OPPORTUNITY**
1:2  18:11  71:3
93:10  116:4, 22
187:12
**opposed**  82:12
192:9
**options**  171:19
174:17
**oral**  87:22  88:2
89:15, 22  90:1
127:5
**orally**  124:13
**order**  83:11
108:17
**organization**
43:4  47:4, 14
49:16  51:11, 21
52:4  57:17
61:12  62:11
68:21  83:15
86:17  93:6
105:7, 9  106:18
112:7  113:4

144:19  163:21
175:2  176:15
182:7  188:12
191:16  198:1
**organizational**
44:8  46:6, 10
56:21  91:16
104:3, 5  109:8
110:2  112:13
**organizations**
64:21  75:4
173:14  176:19
**organized**  163:13
**Originally**  9:17
19:18  55:17
64:10  172:12
**outcome**  202:17
**outcomes**  75:11
**outset**  101:12
194:17  195:17
**outside**  37:11
110:20  112:9
146:13
**overall**  38:4
74:21  119:19
132:16  135:11
**overarching**
187:16
**overlapped**  109:2
**overvaluing**
196:14
**owner**  93:3

**< P >**
**p.m**  115:12, 15
201:15
**pace**  60:17, 18
**packed**  57:9
**packet**  33:11
**PAGE**  4:2, 8
43:20, 21  103:2,
6, 12  121:15
124:7
**pages**  72:17
**paid**  11:14
**palette**  105:20
**panel**  30:9, 12
37:11  151:6, 8,
10, 15
**paperwork**
30:19  38:9
**PAR**  136:22
138:7, 15  175:4,
8  176:1
**paragraph**  43:20
44:5  73:15, 17
80:9, 18  82:13
90:19  103:9, 10,
12, 15, 18  112:11
121:5, 10

paralegal 111:8
paralegals 62:9
Pardon 24:20
25:9 43:9 64:5
109:12 149:19
parenthetical
137:3, 4, 6
Parks 1:19 2:5
Parlave 41:21
part 47:20, 21
48:7 49:20
58:20 76:5
88:10 90:22
91:4 93:8
135:17 149:8
151:8 166:8
174:7 178:18
180:22 181:5
183:14 186:13,
15
participants 32:2
participate 32:6
77:7
participated
29:16, 19, 22
160:2
participation
77:7 195:10, 13,
16
particular 27:18
28:8 30:10
31:12 32:10
33:14 48:13
49:13 62:1 91:7
99:9 112:14
119:12 122:20
133:9 135:12
151:10 152:6, 18
168:15 185:4, 16
192:20 195:21
particularly
119:17
particulars
117:12
parties 202:12,
15
partner 93:1
partners 40:11
parts 37:2
68:17 108:18
191:15 195:11
201:5
party 144:10
pay 11:20
pending 7:15
Pennsylvania
2:16
people 29:18
30:1, 3 40:8
41:9, 9 46:5, 13
47:1, 4 50:5, 12,

15 52:5 53:7, 8,
18 54:7, 13
55:15, 17 56:4
62:17 63:7
66:21 68:4, 16
75:8 76:12 87:5
97:7 98:13
105:3 112:6
131:20, 22 132:1
143:15 145:3
151:4, 6 170:22
172:22 176:13,
22 179:18
183:17, 17 186:7
189:17, 22 190:4
193:10, 15
196:19
perceive 143:20
181:16
perceived 196:15
percent 152:21
perception 51:8
perform 51:9
performance
47:3 50:20 60:1,
4 63:18 67:7, 8
74:2 75:3 76:18
77:4 83:16 87:9
95:5, 10 96:5
98:7 99:17, 18
107:3 130:2, 6,
11 133:1 138:6,
6, 8 159:11
175:10 176:6, 12
185:6 194:11, 12,
15
performed 164:3
177:18
performing
163:15
period 26:19
46:15 55:4
62:19 76:18
85:14 86:10
87:11 92:19
93:9 94:2, 6
96:1, 21 98:11,
15, 18 100:1, 6
101:1, 14, 15, 19
103:4 128:15, 16
133:6 134:3, 11,
17 149:1 153:15
164:3 176:6
178:13
permanent 28:6
permanently
28:4
persistent 112:12
person 23:1, 3
25:5 27:3, 7, 9
100:19 133:17

143:9 144:11, 12,
14 152:6 159:2
167:1, 14, 15
176:6 186:11
personal 6:5
7:17 22:7
148:17
personalities
46:5, 16 52:2
184:11
personality 186:6
personnel 57:18
112:15 113:5
114:12 155:17,
18, 20 182:10, 15
185:4, 4 188:18
189:1, 21 199:17
persons 57:6
perspective 66:2
109:8 190:11
phone 139:13
140:15, 20
phrase 121:1
physical 142:3
physically 97:9
pick 108:11
picked 7:10
PIP 185:6
P-I-P 185:7
place 40:2
42:14 110:22
174:1 181:19
placed 59:20
planning 53:20
plans 185:6
play 50:21
51:10 186:15
played 38:1
plays 30:22
please 5:8 6:17
7:15 116:13
121:6 129:12
PLLC 2:5
point 18:1
30:14 39:3 41:6,
8 57:1, 12, 14
59:4 85:20
86:21 87:17
94:1, 21 97:22
98:5 100:4
102:10 104:20
106:19 113:21
115:2 123:19
125:18 129:16
133:7, 20 138:22
145:21 153:22
159:15 165:17
168:15 181:11
points 28:11
186:17 189:3

Policy 10:5
147:13 187:17
political 16:17
17:20
Politics 11:1
poor 77:5
portfolio 32:20,
22 33:20 34:8
35:1 91:9, 19
portfolios 14:19
portion 174:21
posing 122:11
173:6
position 11:14,
16 12:13 27:1, 4
28:2, 3, 12, 15
29:2, 11, 14 30:1
34:6 36:14
38:14 40:21
42:16, 19 43:1
45:4, 22 47:7, 16,
19 48:17, 20
49:6 51:10
53:13 57:11, 19
59:8, 10 70:17
79:10 80:12
81:1, 18 83:13
86:21 91:2, 6, 7
100:17, 19 101:2,
11, 14, 21 102:10,
12 116:10 117:5
119:7 120:4
125:16 126:9, 18
149:6, 8, 22
150:2, 12 152:18
153:6 164:2
167:3 168:8
169:19 171:20
177:8, 12 178:14
179:1, 8, 21
180:15, 16
181:20 184:3, 6
187:5, 8 188:4, 5
189:10, 14 194:6
197:3, 10, 14
199:4 200:9
201:7
positions 9:21
37:4, 5 40:14
48:13 53:16
161:15, 16
162:10
positive 26:4
41:18 153:9
possibility
137:21 161:14
possible 7:11
29:3 30:4 47:17
76:15 126:1
possibly 160:19

posted 149:8, 11,
14, 15 150:3
151:2
potential 110:18
practice 30:3
196:1
preceding 119:2
precursor 195:7
preferred 35:5
preparation 82:3
90:6 125:2
prepare 71:4, 6
122:15 125:8
prepared 124:18
170:3
preparing 124:17
Present 3:10
pressure 176:20
197:13
prestige 196:14
presumably
16:22
pretty 153:11
196:5
previously 16:6
115:19 183:22
principal 46:20
120:10, 12, 13, 16,
20 121:1 123:16
127:14, 18
128:11 129:3
print 202:8
prior 16:7
17:12 18:4
35:11 80:11, 11
89:16 96:3
105:14 131:4
149:2 153:5, 14
168:11 182:1, 2,
2, 2 188:6
191:12 194:19
prioritizing
196:17
private 64:20
privilege 71:9
proactively 27:7
probably 8:21
25:20 96:7
probationary
85:14 93:9 94:2,
6 96:1, 20 98:10,
14, 18 100:1, 6
101:1, 14 103:3
128:15, 15 133:6
134:3, 11, 17
problem 62:17
68:11 77:18
104:15 183:14
184:17
problematic
42:16 109:7

**problems** 62:*14*, 20 68:*17* 75:5, 7 105:*11* 133:2 172:22 175:*13*
**procedures** 108:6
**proceeding** 8:*4*
**proceedings** 5:*11*
**process** 29:*14* 30:*17* 36:*10* 49:20 123:*8* 149:5 151:*19*, *21* 152:*12* 154:*3* 161:*10*, *11* 162:7 166:*3* 184:*20*
**processes** 75:9 108:6
**produce** 140:*18*
**produced** 72:20
**production** 62:5 72:*21* 123:*11*
**professional** 148:6, *8*
**Program** 9:*13*, *15* 20:9 77:22 78:2, 7, *12*, *13*, 20 79:2 110:*20*
**projects** 187:9, *10*
**prolonged** 76:*17*
**promotion** 177:*15*
**proposals** 173:*17* 174:*10*
**proposed** 188:7
**prosecuting** 23:*1*
**proved** 92:*18*
**provide** 94:*15* 120:*21* 127:*8*
**provided** 99:*13* 120:6 190:*13*
**proximity** 142:*3* 196:*16*
**Public** 1:*21* 202:*1*, 20
**pull** 142:2
**pulled** 182:6
**pulling** 62:*1* 129:7 133:*18*
**purpose** 119:*13* 189:9, *13*
**pursuant** 1:*18*
**purview** 83:20 184:*16*
**put** 22:6 40:*1* 42:*1*, *3* 73:9 80:5, *19* 87:5 101:*17* 112:22 118:22 132:*14* 174:*1* 185:5 197:*13*
**putting** 179:*1* 193:*14*

< Q >
**qualifications** 74:*4* 152:*19*
**qualified** 150:*12*, *13* 168:7
**qualifier** 123:*18*
**quarter** 115:9
**question** 6:*16*, 22 7:2, *15*, *16* 26:6 28:5 45:*19* 46:8, *21* 53:9 54:*1*, 2 57:5, *10* 80:9 81:*16* 84:*14* 89:*18* 99:*3* 108:2, *8* 118:*18* 134:9 138:8, *13*, *14* 142:22 143:9, *10* 153:*4* 195:22
**questionable** 195:8
**questions** 6:*12*, *13* 7:20 21:7, *10*, *21* 22:9, *11* 23:6, 7 24:*14* 31:8, 9, *11*, *14* 69:*17* 106:*14* 107:*18* 108:*10* 116:*12*, *15* 122:*11* 168:2, *3* 169:*13* 171:5 189:7 197:*16* 201:*12*
**quick** 65:*1*, *1*, 2 115:8 167:20
**quite** 40:*3* 50:*19* 51:5 62:*21* 65:*17* 69:9, 9 177:*17* 180:*4* 183:*11*

< R >
**raise** 144:*11* 155:9 159:*4* 160:*13* 162:*16* 165:*3*, *16* 173:*12*
**raised** 6:20 143:8, *8* 144:7 155:6 157:8, *10* 159:7 162:*18* 164:*10* 166:*17* 167:*1*, *4* 175:*15* 186:22
**raising** 143:22 156:*11* 186:*13*
**range** 13:*3*, *3*, *18* 14:*17* 32:*21* 105:*11* 169:8, *11*
**rash** 40:6
**rate** 94:*12* 139:*17*
**rated** 136:22 138:*5*, *15*, 22 139:7
**rating** 96:*10* 130:*18* 131:*1*, 7 132:5, *16* 134:*1*, *4*, *10*, *15*, *20* 135:*3*, *11*, *19* 137:2, 22 139:*4*, *11*, 22 159:*13* 175:*5*, 8, 22 176:6 177:5
**ratings** 131:6 133:*10*, *12*, *15*, *16* 139:*3* 140:20 176:*1*, *14*, *15* 177:2
**reached** 158:*14*
**read** 45:*13* 104:*1* 111:*1* 116:6, *14* 136:*16*
**ready** 185:5
**realign** 189:9, *13*
**realigned** 79:*12*
**realigning** 43:*3*
**realignment** 39:6, *14*, *18* 40:2, 22 41:5 42:*14* 43:6 44:8 45:2, 20 46:2 48:7 49:*1* 50:22 59:6 154:8 161:*11* 180:*13* 182:*3*, 8, *15* 188:6, 7 189:*1*, 2 194:8
**realize** 70:6
**Really** 5:*15* 38:*11* 79:20 104:*1* 109:*17* 137:8, *18* 161:*10* 169:*18* 181:*11* 187:*19* 191:*19*
**reason** 47:20 48:*1*, 7 81:*17* 126:8 134:*19* 135:*10* 187:*4* 199:2
**reasonable** 185:*15* 196:*3*
**reasons** 45:7, *10* 59:*1* 73:*15* 109:8 111:*16* 117:*3*, *21* 118:7, 8, *15* 119:*11* 120:*11*, *12*, *13*, *16*, 22 121:*1*, 2 122:*17* 123:*16* 126:20 127:*13*, *14*, *17*, *18* 128:*11*
**rate** 94:*12*
129:*1*, 2, *3*, *11* 165:*14* 184:7 192:22
**reassign** 184:*3*, 5 186:*16*
**reassigned** 186:*13* 198:*17*, 22
**recall** 8:*18* 15:*16* 17:*1* 25:*18*, *19* 27:*13*, 20, *21* 28:*1*, 9, 20 29:*4*, 9 30:*11* 31:*17*, *19*, *21*, 22 32:*1*, 5 33:*15* 35:*4*, *18* 38:*11*, *13* 43:5, 8 45:*11*, *16* 51:*13*, *14* 55:*12*, *14* 58:*13*, *14* 61:*11* 64:8 70:*10* 71:*18* 72:8 86:8, 9 87:2, *13*, *16* 91:*15* 94:*10* 96:*10*, 22 97:*19* 102:2, *16* 117:2 118:*4* 121:22 125:*21* 129:*19* 130:5 131:5, 7 133:7, 8 135:*18* 138:*3*, *4* 139:6 140:7 142:5, 8, *12*, *14*, *15*, *17*, *18* 143:2, 3, 7 144:*17*, 22 145:*1* 149:7 151:*12*, *13* 155:*12* 156:*14*, *15*, *16* 157:*12*, *13*, *14* 158:5 160:7 164:*15* 165:*12*, 22 167:*16* 174:9, *15* 179:*11*, *14* 182:*18* 189:*16* 190:*21* 192:5, 8
**recalled** 115:*18*
**recalling** 140:*12* 174:*15*
**received** 94:*3* 99:*18*, 20 174:22 179:*4*
**receiving** 119:20 176:*13*
**Recess** 69:*14* 115:*13* 167:*21*
**recognize** 43:*16* 136:7
**recognized** 194:*11*
**recollection** 25:*3* 32:*13* 38:6, *17* 42:*21* 44:*1*, *10*
81:*10*, *13* 83:*3* 86:*11* 87:*12* 88:*1* 96:*4* 97:6 118:6 124:*4* 127:*11* 128:6 131:2 134:*19* 135:*10*, *15* 137:20 139:*18* 143:*16* 144:20 152:*10* 156:*17* 160:22 165:*11*, *19*, 20 171:*11* 174:*16* 177:*10* 194:*19* 199:*15*, 20
**recommend** 100:5 128:*18* 197:9, *12*, *13*
**recommendation** 37:8 41:*19* 128:*19* 151:*17* 153:9 180:2
**recommended** 35:*3* 150:20 179:20 199:*17*
**recompete** 162:*10*
**recompeting** 161:*15*
**reconfigure** 161:*12*
**record** 5:7 6:*21* 7:*4* 18:22 22:7 23:7 24:*21* 72:*19* 73:7 116:*19* 202:9
**recruiting** 113:6 149:*21*
**recruitment** 114:*15*
**red** 180:*17* 200:*13*
**redaction** 137:9
**redesign** 87:5
**reduced** 202:8
**refer** 144:*17* 183:*10*
**reference** 36:7, 8 125:*3*
**referral** 41:*18*
**referred** 151:22 183:8, *10*
**referring** 79:*19* 81:5
**reflect** 90:9 176:5
**reflected** 117:8 126:22 127:*15* 194:22 196:*10*
**reflection** 92:*17*

**refresh** 44:*1, 10*
**refreshing** 70:*5*
**regard** 46:*16*
175:*3*
**regarded** 171:*4*
**regarding** 46:*5*
83:*16* 88:*10*
105:*12* 114:*11*
185:*22*
**regret** 144:*1*
**regular** 38:*10*
76:*19* 77:*3*
87:*11* 98:*1, 6*
195:*12*
**regularly** 107:*17*
191:*3*
**related** 21:*7*
22:*11* 75:*22*
134:*13* 148:*18*
202:*11*
**relationship**
134:*1, 4* 146:*13*
171:*6* 173:*9, 14*
**relationships**
69:*3*
**relative** 202:*14*
**relatively** 120:*22*
127:*3*
**relevant** 8:*4*
119:*19* 122:*4, 10,*
*19* 124:*20* 125:*3,*
*14*
**relying** 44:*15*
**remained** 64:*11*
201:*9*
**remaining** 53:*15*
57:*6, 6*
**remember** 15:*7,*
*8* 17:*8* 26:*15, 19*
27:*15* 28:*17*
29:*21* 30:*8*
31:*12, 15* 32:*9*
33:*11* 35:*22*
39:*19* 43:*2*
44:*14* 54:*20*
55:*8* 56:*22*
57:*15* 58:*17, 18*
59:*11* 60:*19*
63:*5* 64:*2* 66:*9,*
*10, 11* 67:*2*
69:*21* 74:*14*
77:*20, 20* 80:*8,*
*13* 85:*22* 88:*7*
89:*20* 90:*12*
92:*12* 93:*18*
95:*19* 96:*13*
98:*15* 100:*7*
101:*6* 106:*9*
117:*18* 128:*17*
130:*9* 131:*10*
132:*13, 15*

134:*12* 135:*13*
139:*1, 10* 140:*16,*
*19* 141:*18*
142:*20* 144:*7*
146:*19* 147:*15*
149:*10* 150:*9*
151:*10, 20*
153:*15* 154:*9, 13,*
*14* 155:*7* 157:*3,*
*4, 18, 20* 158:*20*
159:*14, 15*
164:*12, 19, 20*
165:*17* 166:*2, 4,*
*6, 10, 11, 12*
167:*5* 174:*12*
175:*17* 190:*5*
193:*7* 198:*16, 18*
199:*18*
**remembered**
153:*2*
**remind** 28:*19*
**remorse** 144:*1*
**remotely** 75:*13*
**removal** 70:*15*
119:*6*
**remove** 57:*22*
58:*7* 87:*4* 99:*2*
128:*13* 135:*6*
163:*20* 171:*21*
177:*8* 187:*3*
**removed** 101:*1,*
*13* 117:*3* 119:*14*
126:*18* 171:*14*
173:*16* 180:*5*
195:*3*
**removing** 57:*20,*
*21* 65:*18* 135:*20*
189:*14*
**renamed** 60:*14*
**reorganization**
39:*4* 53:*2* 54:*3*
55:*13*
**repeat** 51:*6*
82:*16*
**repeatedly** 176:*4*
**rephrase** 6:*17*
48:*8*
**replace** 34:*20*
**report** 91:*21*
**reported** 16:*10,*
*11*
**reporter** 7:*10*
**reporting** 68:*15*
95:*1*
**represent** 169:*10*
**reputation**
170:*17, 21*
**request** 98:*8*
101:*19* 119:*19*
124:*16* 128:*7*
152:*5*

**requests** 113:*2*
114:*9* 173:*11*
**required** 62:*15*
74:*4* 145:*4*
**requirements**
107:*4*
**requiring** 123:*11*
**resolution** 158:*5*
160:*3* 166:*13*
**resolved** 158:*18*
160:*6* 166:*1, 13,*
*14*
**resources** 30:*18*
31:*4* 78:*21* 94:*1,*
*19* 95:*20* 99:*6*
119:*20* 128:*2*
158:*3* 176:*9*
**respect** 23:*1*
33:*18, 20* 36:*8,*
*11* 38:*1* 49:*5, 12*
50:*14* 66:*7*
74:*16* 75:*8* 76:*7,*
*8* 77:*5, 22* 78:*18*
79:*6, 8* 80:*9, 11*
90:*8, 14* 94:*12*
98:*13* 106:*12*
119:*11* 122:*11*
132:*7, 12* 134:*1*
139:*16* 154:*7*
155:*18* 156:*12*
157:*19, 21*
163:*13* 171:*12*
176:*11* 179:*17,*
*20* 180:*3, 13*
182:*18* 184:*13*
185:*3* 195:*22*
196:*11*
**respond** 94:*14*
113:*1* 157:*14*
**responded** 140:*7*
157:*16, 17*
**responding** 114:*9*
**response** 106:*13*
140:*19* 192:*6*
**responsibilities**
32:*22* 33:*19*
47:*3, 8* 49:*18*
50:*11* 69:*1* 78:*4*
83:*12* 89:*12*
93:*5* 101:*22*
105:*5* 114:*10*
172:*20, 21*
175:*15* 187:*18*
191:*17, 22*
**responsibility**
33:*17* 34:*5* 65:*4*
75:*4* 77:*16* 79:*7,*
*9* 84:*18* 85:*5*
92:*20* 97:*22*
187:*20* 201:*3*

**responsible**
13:*18* 14:*19*
30:*19* 34:*12*
35:*1* 37:*7* 50:*14*
51:*19* 61:*15, 22*
68:*1* 78:*1, 6*
83:*19* 84:*5*
133:*18* 175:*11*
177:*19*
**rest** 75:*18* 84:*3*
**restrict** 125:*15*
**resume** 33:*11*
**resumes** 151:*2, 3*
**retain** 54:*15*
135:*1*
**retained** 101:*19,*
*21*
**retention** 114:*13*
**retire** 18:*1* 27:*8*
53:*5* 58:*8*
**retired** 64:*6*
**retirement** 54:*6*
**retires** 54:*9*
**retiring** 27:*4*
41:*2* 53:*1, 20*
57:*20* 58:*6*
**return** 168:*1*
**returned** 64:*16,*
*17* 147:*18*
**revealing** 71:*8*
**Review** 10:*6*
37:*13* 39:*7* 40:*7,*
*17* 44:*6* 71:*21*
72:*4* 79:*2* 81:*21*
93:*10* 94:*11*
95:*5, 10* 116:*4,*
*13* 117:*1* 138:*9*
144:*21* 147:*13*
**reviewed** 26:*13*
71:*10, 15, 19, 22*
72:*1* 82:*2* 90:*5*
96:*12, 13* 97:*6, 7*
151:*2*
**reviewing** 71:*11*
96:*16* 123:*12*
130:*15* 140:*1*
159:*16*
**reviews** 152:*5*
**Rick** 28:*2* 55:*4*
59:*8* 60:*6, 8, 22*
67:*3, 4* 68:*2, 14,*
*15* 76:*7* 180:*3,*
*11* 181:*3, 19, 21*
182:*18* 190:*6*
**Rick's** 59:*17*
67:*12, 12*
**right** 13:*1* 14:*5*
20:*14* 23:*13*
35:*11* 37:*16*
39:*15* 41:*12*
52:*10, 16* 53:*8*

54:*14* 55:*1, 14*
57:*2* 58:*18*
63:*12* 65:*7, 7, 10,*
*16* 69:*16* 70:*8*
73:*14* 74:*22*
80:*15* 82:*2*
90:*18* 91:*12*
96:*10* 97:*2*
99:*14, 19* 101:*5,*
*6* 104:*7* 113:*14,*
*17* 114:*6, 12, 18,*
*22* 118:*4, 13*
119:*3, 6* 120:*15*
121:*9, 22* 122:*22*
124:*2, 11* 126:*6,*
*10* 130:*17*
131:*10* 137:*12*
138:*12* 145:*8*
146:*11* 152:*22*
156:*5, 9* 158:*17*
162:*6* 164:*6*
167:*19* 174:*13*
178:*17* 183:*5*
190:*22* 195:*17*
197:*20* 199:*11*
**rise** 180:*21*
**ROI** 73:*1*
**role** 13:*15*
14:*15* 30:*22*
38:*1* 47:*2, 5*
50:*20* 51:*8*
52:*15* 59:*19, 20*
60:*9* 61:*3* 64:*1*
92:*6* 150:*21*
163:*15, 17, 21*
168:*12* 174:*10*
177:*18, 20* 178:*1,*
*11* 179:*15*
183:*22* 194:*16*
**roles** 164:*3*
169:*15* 173:*18*
**rolls** 96:*18*
**room** 141:*20*
188:*13*
**ropes** 65:*2*
**round** 149:*14, 16*
**Rule** 5:*19* 6:*20*
7:*3*
**run** 62:*9, 19*
93:*1* 105:*8*
113:*3*
**rung** 177:*17*
**running** 62:*7*
171:*8, 10*

**< S >**
**Sabol** 154:*19, 20,*
*21* 184:*1* 186:*1,*
*12* 187:*5*
**SAC** 192:*18*
**salary** 101:*19*

**Sarah** 164:*21*
166:*9* 167:*13*
**saw** 64:*18*
85:*15* 104:*15*
131:*9* 136:*8*
155:*10* 167:*7*
**saying** 48:*10*
72:*13* 88:*3*
118:2 162:5
**says** 44:5 45:*1,*
*15* 69:22 74:6
94:9 96:2*0*
104:2 110:8, *9*
113:*12* 114:*12*
122:*14* 124:8
**scenes** 184:*19*
**Schedule** 17:2*0*
**scheduled** 77:2
**scholars** 20:*11*
**school** 8:*13*
11:*1, 3, 12* 26:*17*
**Schoolmaster**
114:*1, 2* 128:*9*
133:*14* 136:*11*
137:20 138:2
189:*16*
**science** 29:6
59:*11* 61:*3*
91:*17* 180:6, *15*
183:20 201:2
**scientific** 201:5
**scope** 23:*4*
65:*21, 22* 121:*9,*
*12, 19* 122:5, *16*
123:*19* 124:6, *17,*
*21* 125:*14, 19*
169:22
**screen** 182:6, *6*
188:*12*
**screening** 102:5
**searching** 28:6
**seated** 141:22
**second** 24:*3, 20*
27:*11* 32:*16*
43:*21* 70:*14*
76:5 82:*12* 93:7
95:*3* 103:*9, 10,*
*11, 15, 18, 20, 21*
130:*12* 141:*19*
149:*19*
**section** 47:*11*
59:*10, 18, 21, 21*
61:*13, 22* 70:*14*
80:*12* 81:*1* 84:5,
*6, 8* 89:2, *10*
91:2, 6, *7* 92:*14,*
*16* 94:*21* 100:*11,*
*17, 19, 21* 101:2,
*13, 20* 102:*3*
160:*11* 161:*3, 15*
175:*12* 177:8, *19*

178:7, *8* 179:*12*
180:6, *15* 183:*21*
198:*1, 6, 8* 201:*1,*
*2, 8, 9, 9*
**sections** 51:*18*
68:*1*
**sector** 64:2*0*
**Security** 10:8
12:*15, 18, 20*
13:*4, 18, 19*
14:*17, 18, 22*
20:7, *8, 9, 9*
27:*17* 28:7 29:*3*
32:*19* 33:*1, 7*
55:*3* 56:9 59:*9,*
*13* 60:*9, 14, 15*
66:*16* 67:*13*
69:2 109:*3, 6, 10,*
*14, 21* 145:*17*
147:22 160:*12*
161:*1, 13, 16*
168:*14, 16*
169:*12, 21*
170:*17* 198:*4*
199:22
**see** 49:8 69:*19,*
*22* 70:5 75:*12*
90:6, *8* 94:8
100:22 107:*10*
110:*12, 13* 116:2
121:*10, 16* 135:*1*
137:*4* 146:22
177:22 195:2*0*
**seeing** 137:*10*
157:*4*
**seeking** 28:*13*
**seen** 125:2, *12*
**select** 35:9, *12,*
*13, 17* 37:9
94:*14* 167:2
177:2*0* 179:*11,*
*15* 195:2 197:*3*
**selected** 9:*12*
37:*17* 79:*11*
177:*13* 179:*19*
**selecting** 35:*16*
150:*18* 196:8
**selection** 17:9
30:*10, 21* 31:*6,*
*13, 16* 32:*10*
37:*1, 7* 38:*11*
71:*1, 2* 149:5
150:*16* 152:8
**selections** 38:5
197:8
**semester** 15:*15*
**Senate-confirmed**
17:*21*
**send** 93:22
95:*21* 97:9
111:*19*

**sending** 97:*19*
102:*19* 196:*18*
197:*1*
**senior** 41:*14*
68:22 69:2*0*
93:8
**sense** 46:*12, 15,*
*22* 47:*14* 48:*12*
49:22 50:*13*
52:*3* 62:*10* 83:*4*
137:*10* 188:*17,*
*19* 189:8 196:2
198:*21*
**sensible** 51:2*0*
**sent** 38:*10, 12*
71:*16* 72:*3*
89:*21* 98:*11*
99:*15* 144:2*0*
**sentence** 103:2*0*
**separate** 72:*3, 6,*
*11* 82:*11* 116:*12*
119:22
**separation** 193:2,
*9*
**series** 58:*11*
80:6 87:22
196:*4*
**serve** 73:2*1*
91:5 196:*19*
**served** 104:2*1*
**service** 18:2
93:9
**serving** 28:2
53:*18* 54:7, *8*
59:*18* 100:*1, 16*
198:9
**SES** 16:*18*
17:*13, 14, 14, 15,*
*17, 18, 19* 29:*11*
30:22 31:5
36:*14, 19* 37:*1, 6,*
*9, 17* 38:2, *3*
41:9 70:*15* 81:6
83:*16* 96:2*0*
98:*13* 100:*15, 16,*
*20, 20* 104:*18, 20,*
*21* 105:2 116:*11*
119:*15, 22*
128:*14* 134:2
151:*1, 22, 22*
152:*11, 17*
163:2*0* 164:2
171:*14, 21* 174:7
176:2, *12* 177:*1*
179:*19* 197:8
198:*19* 201:6
**session** 157:*18,*
*21* 179:*12*
**SESSIONS** 1:8
98:2, *3*

**set** 31:*13* 45:7
52:5 110:*1*
185:*4* 192:2*1*
**settled** 49:7
86:*16* 194:*3, 7*
**settlement**
158:*14*
**Seven** 12:4, 5
73:*15, 17* 80:9,
*18* 82:*13*
**sex** 162:*1*
**sexual** 145:2
**share** 166:5
**shared** 77:6
85:5
**Sherry** 154:*19,*
*21* 157:5, *19, 22*
167:*11, 12* 184:*1,*
*7, 21* 185:5, *8, 9,*
*11, 16, 20, 20, 21*
186:*3, 9, 19*
187:*1, 2, 7, 8, 11,*
*14, 20* 190:9
**short** 119:*10*
120:22 122:*15*
123:*15* 127:*3*
**short-circuited**
152:*13*
**shot** 179:8
**shoving** 66:*19*
**show** 43:*10*
135:2*1*
**showed** 86:*3*
182:5
**showing** 194:*19*
**shown** 109:*16*
**sic** 58:*12*
**sick** 184:*10, 12,*
*21* 185:2*1*
**side** 13:5 113:*4*
143:*12* 175:2*0*
**sightly** 75:2*0*
**sign** 44:2*0*
96:*15* 140:*3*
**Signed** 4:9
44:*16, 18* 72:*1*
74:9 93:*16, 18*
119:*10* 124:*15*
131:5, *15, 16*
139:22
**significant** 26:*18*
40:*19* 62:2*1*
76:8, *14* 77:*18*
85:*12, 13* 92:*14*
114:7 174:2*0*
175:*13*
**significantly**
82:2*0* 106:22
110:*10* 111:*4*
175:*14*
**silly** 26:6

**similar** 76:6
78:5 187:2
**similarly** 65:2*0*
**simultaneously**
105:9
**single** 74:*14*
87:*18* 117:*13, 19,*
*20* 122:*19*
**sit** 37:22 66:*16*
84:2 106:7
124:*3* 127:*10*
142:2 149:*17*
152:*13* 155:*16*
157:6
**sitting** 44:*14*
45:*11, 17* 51:*14*
61:*12* 81:22
88:6 89:*19*
102:*16* 117:2
118:*4, 13* 129:*19*
131:9 132:*15*
134:*12* 139:2
141:2*0* 143:2
145:*1* 149:*10*
150:8 152:*10*
153:*3* 165:*18*
190:2*1*
**situation** 107:22
185:*16* 187:*11*
**situations** 107:2*0*
**six** 42:8 161:8
**six-page** 74:*12*
**sixteen** 18:*16*
**size** 196:*15*
**skills** 169:*18*
174:*19*
**slight** 181:9
**slot** 59:*17* 151:*1*
**slots** 38:*3* 53:7,
*8, 21* 54:*4, 13, 13,*
*16, 17, 22* 56:5
57:7
**small** 30:*3*
**smaller** 91:9, *11*
**smart** 64:22
**social** 146:*13, 16*
148:*13* 171:6
193:*3*
**solution** 200:5
**solutions** 105:*11*
**solve** 62:*14, 17*
**somebody** 16:5
26:*16* 30:*16*
35:*13* 36:*16*
41:*3* 42:*1, 3, 16*
50:6 52:*14, 15,*
*18* 58:9, *10*
132:2 165:8, *9*
177:*3* 199:9
**sorry** 9:*4* 14:*3*
19:*4* 45:*19* 48:8

51:7  54:1  72:5
91:3  92:15
95:16  101:9
103:3, 14, 16, 17,
17, 22, 22  110:22
113:8, 11  114:15
120:1  128:12, 17
129:6  138:13
139:22  141:3
163:6  167:10
192:19  198:2
200:19
**sort**  94:3  98:2
108:17  117:11
140:6  162:7
187:19
**sorted**  62:21
**Southern**  35:22
**speak**  181:4
**speaking**  22:22
31:1  75:2
**speaks**  107:7
**special**  32:14
34:9  69:20, 20
70:2, 4  121:13
187:9, 9  191:15
**specialists**  111:8
**specific**  72:1
76:15  79:18
80:8  82:18  88:7
89:20  105:18
106:9  108:7
118:1, 5  124:4
132:5  190:21
**specifically**
27:13, 20  28:9,
17  29:21  30:8
32:9  33:10, 15
43:7, 8  44:14
67:2  78:8  80:18
84:15  85:22
86:8, 9  87:16
88:2  96:12
97:19  100:7
121:22  132:13
133:22  134:12
147:16  150:9
151:9, 19  157:2,
4  182:18  190:5,
17
**specifics**  106:4
142:8  144:7
157:3
**speed**  77:12
**spells**  65:8
**spend**  64:14
**spent**  64:19
**spot**  58:8  153:21
**spring**  11:11
**squarely**  187:18

**SSA**  69:22  70:1
122:5, 14  123:7
124:8  125:5, 20
126:4
**staff**  76:19  77:9,
10  112:14, 21
113:2, 9, 10, 10,
12, 16, 20  166:19
167:3  182:5
195:12
**stakeholders**
112:9
**stamped**  72:19
73:9
**stand**  138:7
**standard**  30:2
31:9, 13  94:4
**standards**  175:10
**stands**  33:2
**start**  8:3  61:1, 4
67:5  69:8  72:15,
16  181:14, 15
187:12, 13  190:4
**started**  9:17
10:9, 20, 22  15:8,
16, 22  19:15
53:10  130:1
194:15  195:19
196:5  198:3, 4
**state**  5:7  128:10
**stated**  6:21
124:6
**Statement**  4:9
72:2  79:22  80:2,
6  93:16, 19
119:4, 10, 11
122:12, 16
123:15  124:15
125:8  167:6
**statements**
180:18
**STATES**  1:1
121:14
**statistical**  176:18
**stay**  13:6
**Stayed**  13:8
17:18
**stenotypy**  202:7
**sticks**  139:3
**stints**  17:12
**stopping**  115:2
**stormed**  181:8
**story**  143:13
175:20
**strange**  195:1
196:7
**strategic**  74:17
75:15, 16, 17, 19
79:5  82:14, 15,
20  83:19  84:6,
21  88:4, 4, 14

**strategically**
104:22
**strategies**  110:17
**Street**  1:19  2:6
3:5  20:3, 4, 11,
13
**strictly**  105:12
**strike**  163:10
**strong**  91:21
92:2, 22
**structure**  44:8
51:10
**struggle**  105:22
**struggled**  67:20
69:2  82:19  83:5,
6, 10  103:15
104:2
**struggles**  51:9
58:4  68:3
**struggling**  47:5,
19  48:17, 19
54:16  58:21, 22
60:6  62:11
65:19  77:13, 14
100:9, 10  106:15
175:14
**strugglingly**  63:8
**study**  65:1
**stumbling**  128:13
**subject**  21:4, 17
22:17  23:3, 13
29:2, 4  34:11
158:15
**submit**  17:4
30:20, 21  131:22
**submitted**  159:6
**subsequent**  81:4,
20
**Subsequently**
63:20  83:18
120:6  147:18
**substance**  132:8,
10  166:5
**substantial**
170:15  181:5
**substantially**
161:12  171:17
193:17
**substantive**
87:20  188:5
195:14
**substitute**  73:9
**subsumed**  56:18
**succeed**  47:10
50:13  57:16
85:9, 17, 19
89:13  93:5, 6
100:5
**succeeding**  57:11
58:2  85:5  89:4,
5, 11

**successful**  47:7
105:2  178:1
**successfully**
92:20
**suggesting**  82:6
**Suite**  1:19  2:6
**suited**  33:13
**Sunday**  146:21
**super**  131:19
**superiors**  68:4
**supervise**  50:16
**supervising**  50:5,
6, 12  178:19
**supervision**  38:4
90:16
**supervisor**  36:9
41:21  70:1  95:3,
15, 16, 17  130:12
133:1, 2  144:2
**supervisors**
131:19  132:4, 9
188:8  191:13
**Supervisor's**  94:9
**supervisory**
69:20  70:2, 3
121:13
**support**  118:2
172:11
**supported**  172:2
196:2
**supportive**
186:18
**supposed**  137:7
157:19
**Supreme**  153:10
**sure**  5:10  7:11
8:12  26:9  27:5
38:11  40:16
42:11  44:3
49:15, 21  50:10
51:20  53:9  69:4
71:22  80:10
84:15  87:15
98:22  99:3
101:4  107:8
112:19  115:4
126:13, 19
133:19  138:11
139:8  141:18
143:15  144:8
149:7, 9, 17
152:21  155:10
162:3, 8  176:15,
20  182:12
193:15  200:3
**Sworn**  4:9  5:4
72:2  93:16, 19
115:19  119:10
124:15  202:6
**synergy**  34:21

**synthesis**  117:7,
16  118:11  119:1
120:13  129:1
**synthesized**
118:8, 15  129:3
**system**  37:2
38:2  62:8, 10
**systematic**  79:2
**systemic**  79:6

< T >
**table**  141:22
**tackle**  109:16
**tag**  22:2
**take**  7:6, 18  8:8
31:21  40:5  42:7
43:19  49:6
69:12  86:18
90:19  99:16
115:3, 6  116:5,
13  125:15  133:5
134:2  145:4, 6
146:8  149:22
153:10  163:4, 5,
20  164:18
166:18  167:20
174:6  178:21
181:20
**taken**  5:18, 19
32:3  115:13
155:18  202:3, 7,
13
**talk**  7:5  68:12
72:17  111:9
133:14  136:17
138:5, 14, 21
139:13  140:22
141:8  157:20
163:4
**talked**  59:2
63:15  82:14
85:8  100:8, 8
134:22  140:15
141:1  149:4
160:19  163:2
167:11  171:13
175:12  178:12
186:9  197:20
**talking**  7:6  19:2
24:16  94:9  98:5,
6  99:14  100:3
101:16  113:18
119:5  130:1
140:19  149:1
**tank**  20:4
**target**  21:17
22:16, 22  23:9
**task**  125:19
**teach**  11:18, 22
**teaching**  15:13,
15

team 22:2
41:14 46:19
88:9
technical 62:6
99:4 201:4
technically 31:1
156:4 182:13
198:8
technology 29:7
59:12 61:3 62:8
91:17 180:6, 15
183:21 201:2
teeth 129:7
tell 8:12 14:15
70:10 72:5
122:18 126:7
129:12 131:20
157:7 160:20
161:17 174:3
177:7 181:19
190:17 197:12
telling 153:1
temporary 19:17
ten 50:5 69:12
152:4
tension 111:13
tenure 23:18
term 68:20 83:5
99:1, 4 128:13
terms 25:5 38:5
46:22 52:11
71:11 77:11
78:3 79:15 93:1
112:6 114:18
118:1, 7 126:20
127:13 130:22
132:4 148:13
158:13, 18 161:1
terrorist 102:5
testified 5:4
115:19 128:2
168:6 169:20
171:13 175:3
180:4 182:19
192:13 197:2
testimony 48:4
89:17 124:19
172:4, 7 180:3
190:13 202:5, 6,
10
text 136:15
137:11 138:1
Thank 116:17
120:3 140:22
201:10
thanked 143:22
then-supervisor
41:20
theory 139:15
thing 7:8 17:7
38:4 67:14 68:2

74:11, 14 91:11
92:14 93:17
106:3 107:6, 11
108:5 113:7
141:9 144:16
157:1 162:6
185:21 190:9, 11
197:19
things 67:21
68:7, 12 78:15,
17 79:4 84:16
140:11 144:5
158:4 187:17
194:1 195:7
196:5, 17 200:15
think 5:19 7:13,
22 8:2 10:16
12:14, 16 13:9
15:14, 21 17:16,
16 19:6, 6, 19
20:4, 6, 7 24:4
25:5 26:7, 7, 13
28:1 29:7 31:2,
5 34:4 36:15
37:4, 12 38:4, 15
39:15 42:15
56:13, 20 57:10,
14 58:1 64:13
65:8 66:14, 16
70:9, 16 72:3, 14
73:10 78:16
79:14 82:9, 14
83:7 84:10, 13,
15 86:4, 11, 16,
22 87:16, 17, 22
88:12 90:13
91:8, 17 94:3
95:12 96:2, 8, 17,
17 97:5, 16, 17
98:1, 3 100:15
101:5, 8, 15
102:4, 9, 17, 17
104:12, 22 106:7
118:11 120:19,
21 121:14
125:19 127:20
128:3 129:15, 16
130:17 132:19
134:18 135:9
136:8 138:9
140:3, 9 141:3
145:5, 7 146:15,
15, 17, 19 147:2
148:3, 4 149:3
150:13, 17 152:9,
13, 20, 21 153:18
154:1, 5 156:3
157:19 159:7
160:5 162:9
164:7, 7, 10, 13,
19 165:14

166:10 168:6, 20
170:2 174:12, 13,
13, 18 175:9
178:17 179:13
181:8 183:8, 9,
10 185:10 189:6
191:4 192:2
194:22 196:4, 7,
10 199:6 200:4
201:1
thinkers 108:21
thinking 50:3
53:3 79:5, 6
80:10 92:10
102:18 104:20
107:1, 13, 19
110:7 139:16
140:14 153:4
161:18
thinks 186:12
third 70:15, 18
144:10, 14
Thirty 115:7
Thomas 82:11
thorough 39:7
40:6, 17 44:6
thought 26:4, 9
33:13, 16 34:10,
14 35:16 36:4
39:11 41:7
42:12, 13 43:3
47:6, 18 48:16
49:20 60:8, 16,
22 61:4, 21
62:10, 22 63:7
64:21 65:3, 15,
19 77:4, 21 78:6
83:11 88:13, 21
89:7, 11, 12
92:16, 17 93:2
94:13 105:17
106:13, 15
107:21 109:17
111:16 119:14,
19 120:10
133:11 134:21
137:20 139:4
153:1, 3 155:19
170:10, 11, 12, 22
177:22 178:13
185:15 188:1, 16,
19 192:11 195:4,
8, 13, 15, 21
196:11, 21, 22
199:21
thought-out
193:20
thousand 12:3
18:16, 18 61:18
three 49:9
52:10 53:7, 7, 8,

15, 21, 21 54:4, 7,
10, 11, 17 56:11,
12 57:6, 6 63:15
70:9 74:5 94:11
134:6
threw 182:22
throwing 66:19,
19 137:1, 16
thrown 182:20
throws 199:8
tied 69:6
tighter 111:6
till 11:7 12:9
19:20 163:15
180:19
time 5:12 7:14
8:17, 20 11:2, 6,
8 14:1 15:13
17:11 20:18
25:6 26:10, 19
27:6, 12, 15, 18
28:4, 11 29:8
30:2 32:12
33:12 34:21
38:17 39:11, 15
40:5, 15, 22 41:6,
8, 16, 20 42:12,
13, 20, 21 44:16
46:11, 15 55:1, 5,
6, 18 57:1, 12, 14,
18 62:7, 12, 19
63:19 64:14
66:5 67:5, 15
74:8, 9 76:18
86:21 87:6, 11,
18 92:19 94:1
96:19, 20 98:1,
13 101:16
102:10 104:18,
21 106:20 109:5
113:21 114:3
120:17 122:4
123:19 125:18
129:20 131:4, 21
132:1 133:4, 7
134:14 135:18
139:1 143:3
144:6 145:15, 21
146:2, 16, 16
147:14 149:1
153:15, 18, 22
154:6, 9 158:4
159:14, 16
163:16 164:4
165:17 168:15,
17 173:13, 13
174:5 178:13, 15
180:19 181:12
182:5 187:15
189:3 191:1

194:10 195:20
196:5
times 8:4 80:13
85:8 88:11
147:3 149:9, 11
177:1
timing 77:20
95:9 161:1
tired 67:4
title 12:14
today 6:2, 3
32:13 44:15
45:11, 17 51:14
61:12 71:4
81:22 88:7
89:19 102:16
117:3 124:3, 19
125:2 126:18
132:15 133:3
134:12 139:2
145:1 149:10, 17
150:8 152:10
155:16 157:6
165:18 180:20
188:15
told 53:4 58:6
122:15 125:6
127:18 129:12
139:15 143:13
174:2, 3, 4 184:8,
10 200:8
Tom 52:20, 20
53:4 58:2 61:14
62:13, 18 63:13
Tom's 62:22
top 32:4 82:8
94:8 118:13
142:5 151:13
164:13 167:16
topic 75:22
88:10 191:10
topics 20:12
195:15
topnotch 58:2
110:13 169:12
total 152:4
touch 148:12
Touching 142:15,
15, 16, 16
tough 137:1
town 139:12
140:3, 13
toxic 175:2
186:5, 11
training 29:9
34:13, 13 145:3,
6
transfer 172:8
187:5

**transferred** 180:5 183:20 187:7, 7
**transparency** 107:2, 13 110:7
**transparent** 108:22
Treasury 152:12 153:22
**tried** 68:7 83:2 85:10 126:2 143:12 176:21 192:1
**triggered** 86:13
**triggering** 87:1
**Trish** 55:16 59:3, 7
**Trisha** 55:5, 8 145:9, 10, 11, 19 146:19 147:1 149:2 151:11 152:20 153:5, 6, 11, 17 154:5, 7, 11 169:14
**Trisha's** 152:8 170:13
**troops** 196:18 197:1
**true** 6:15 42:4 202:9
**try** 62:17 68:13 78:20 79:2, 3 82:16 84:16 85:17, 18 111:5, 15 114:11 116:2 177:21 178:5 193:5, 21
**trying** 15:7 21:13 26:22 27:4 28:12 34:19 41:7 46:3, 11, 14 47:13 48:10 49:19, 22 51:19, 22 62:9 66:10 83:7 101:11 105:8 107:11 111:11, 19, 20 119:21 123:9, 9 129:7 134:22 135:1 139:10, 13 146:15, 22 164:9 181:15 186:18 194:2
**TSC** 102:5
**Turgal** 97:11 100:9 101:8, 11, 16 102:17
**turn** 24:16 102:22 121:5

127:21
**turns** 7:6
**twenty** 39:10
**two** 6:3 12:3 13:9 14:14 16:7 18:16, 17 27:12 32:13 35:19 41:4 57:13 75:14, 18 78:17 111:12 116:12 121:15 142:7 144:22 173:14 185:4, 5
**type** 113:6 143:1, 14 183:12 196:3
**typed** 97:5
**types** 170:5, 8, 9

< U >
**U.S** 1:2 2:14 9:7, 17 169:6
**Uh-huh** 9:5 12:2, 6 56:2, 6, 8 79:17 104:6 118:21 120:8 137:5 164:22 194:9 197:21
**ultimate** 134:5 197:2
**ultimately** 31:6 35:14, 16 36:5 38:13 163:5
**Umm** 38:8
**unable** 62:13 63:13 65:20, 22 173:8
**unacceptable** 183:13
**unbalanced** 49:17
**uncomfortable** 141:17 142:4, 10 143:22
**underneath** 49:13 163:18
**understand** 6:4, 16 8:3 20:20 21:14, 15, 16 40:9 53:9, 22 65:20 79:20 94:20 105:22 124:2 125:5, 9 126:6, 9 128:1 129:7 137:6, 17 143:20 149:20 159:17 180:19, 19 181:1 183:18 200:15
**understanding** 32:11 39:9 72:6

82:10 94:16 124:3, 5 129:8 137:19 141:4 150:11, 15 155:13 156:1 159:8 162:19 170:1, 5, 16
**understood** 48:9 65:21 69:4 83:14 92:10 117:15 123:14 124:11 160:1 182:12
**undertake** 125:10
**unhappiness** 185:2
**unhappy** 161:18 181:3
**unit** 33:22 50:5 56:22 60:12 102:4 106:10 108:15 109:5, 20 110:5 178:19
**UNITED** 1:1
**units** 51:17 63:3 68:1 190:19
**University** 8:14 11:2
**unusual** 6:2
**upset** 180:4 181:17 183:17
**use** 68:20
**usually** 70:3 96:8

< V >
**vacancies** 27:14
**vacancy** 17:6 26:22 27:2, 11, 16
**vacant** 40:21
**vacating** 28:16
**Vague** 79:21 126:11
**Val** 41:21
**variables** 50:2
**variety** 9:20 20:12 35:17 83:2 145:16 173:11 187:9 195:15
**various** 28:11 40:13 47:4, 16 107:22 112:7 114:9 149:11 169:15 176:19 189:3 191:15
**vehement** 61:2

Verizon 12:11, 12, 21 13:7, 8
**version** 72:19, 20, 22
**versus** 105:6
**vertically** 110:19 111:10 112:5
**viable** 174:17
**view** 176:1, 3 185:12
**viewed** 175:1 181:4
**views** 187:2
Virginia 65:12
**vis-à-vis** 162:11
**vision** 74:17 75:15, 16, 17, 19 78:19 82:14, 15, 20 83:19 84:6, 21 88:4, 4, 14 104:3 105:6
**visiting** 19:16
**voluntarily** 22:10

< W >
**wall** 66:20
**wanna** 80:10 135:6
**want** 45:14 50:3, 4, 7 60:8 68:13 72:18 73:8 82:16 95:8 115:6, 6 116:2, 5 121:1 135:5 141:9 142:6 143:10 144:8, 12, 13 154:4 158:18 178:11, 20 192:3
**wanted** 35:12, 13 40:6, 16 50:10 64:14 73:6 74:19 85:17, 18 135:15, 16 139:16 159:12 161:10 165:16 177:21 185:21 187:20 190:18 200:5
**wants** 152:6
WASHINGTON 1:3, 13, 20 2:7, 17 3:6 20:5 25:14 32:16 34:6 64:12 102:8 192:22
**waste** 5:11
**way** 18:6 49:3, 21 63:12 75:10 78:4 106:16 108:17 117:6 129:11 135:2

150:14, 22 155:19 163:12 168:8 176:21 181:6, 16 188:15 191:12 192:16 195:17, 20 196:11, 13 200:20
**ways** 66:1 67:21 85:17, 18 93:4 192:17
**week** 71:17 96:13
**weekly** 98:3
Weiser 1:19 2:5
**welcome** 45:13
**Well** 5:17, 21 8:6, 11 12:8 13:5 15:13 16:15 17:10, 15 20:7 21:8, 13 22:13, 22 25:18 27:2 29:18 30:15, 18 31:5 32:13 33:17 34:11, 14, 16, 18 35:3, 8 36:4, 19 38:15 40:3 42:15 45:7 48:5 52:13 53:2 54:2, 11 58:22 59:8 62:3 65:21 67:19 68:5 70:20 73:8 74:11 76:14 78:7, 11, 16 80:4 81:15, 21 82:16, 21 83:21 84:13, 17 85:3, 10 86:1, 3 87:22 88:19, 20 89:18 91:15, 18 93:14 94:16 95:8 97:5, 7 98:22 99:5 100:15, 15 102:9 103:11 104:1, 14 105:13, 18 109:15 114:12 115:9 118:20 119:8, 9 121:3 124:8, 22 125:14, 17 131:13, 17 132:16, 21 134:9 138:22 139:9 140:9 146:8, 9 147:5, 14 148:2, 12 150:8 151:18 152:3 153:5, 11 154:18 155:2 156:22 157:16 158:17 160:20

173:*21*  174:2
179:*16*  187:*16*
189:*6*  192:*1, 10*
193:20  194:*17*
195:*4*  196:2
**well-suited**  64:*21*
**well-thought**
104:*4*
**went**  9:*7, 11*
10:*4, 5, 20*  12:*10*
49:*8*  88:22
91:*14, 17, 17*
94:*18*  102:*2, 4, 6,*
*20*  148:*3*  153:*18,*
*22*  162:12
179:*19*  181:*1*
182:*9*  188:*10*
**we're**  6:2  94:*9*
103:*3*  111:*20*
119:*5*  190:*21*
**Westport**  15:*12*
**we've**  63:*15*
86:*4*  104:*7*
115:*1*  133:*3*
146:*6*  166:*21*
167:*19*
**WFO**  33:*9*
102:*12*  169:22
191:*12*
**what'd**  12:*7*
**whatsoever**  196:2
**White**  3:*4*  169:*6*
**wide**  32:*21*
**Wiegand**  158:*21,*
*21, 22*  175:*3*
177:*7*
**willing**  178:*4*
179:*7*
**Witness**  3:2  5:*3*
6:*7*  21:2  24:*5*
43:*18*  48:*1, 3*
51:*13*  71:*10*
79:22  89:*19*
90:*21*  103:*13*
111:*3*  115:*18*
116:*18, 20*  123:*4,*
*7*  126:*13*  136:*6*
141:*7, 12*  158:*12*
202:*4, 7, 10*
**witness's**  172:*4*
**woman**  141:*20*
143:*10*
**women**  141:*16,*
*16*  142:*10*
**word**  50:*9*
128:*18*
**words**  28:*18*
43:2, *7*  120:*7*
132:*13*
**work**  20:*12*
65:22  67:*15*

85:*18*  86:*15*
107:*1, 12*  108:*18,*
*19, 21*  109:*1*
110:*11*  111:*20*
112:2, *10*  117:*8,*
*16*  118:*12*
174:*21*  178:*21*
187:*8*  192:*4*
**worked**  9:*20*
14:*7*  26:*14, 17,*
*18*  40:*12*  66:*4*
79:*14*  145:*11*
147:*11*  148:*1*
153:*7, 19*  170:*6,*
*7*  186:*20*
**working**  12:*8*
86:*7*  112:*8*
145:*15*  147:*15*
169:*16*  172:*20*
173:22  178:*3*
190:*19*
**workplace**
146:*14*
**works**  150:22
**world-class**
110:*15*
**worth**  117:*8, 16*
118:*12*  127:*4*
**write**  127:*7, 10*
**writing**  87:*14*
**written**  89:*20*
90:*9*  155:*11*
157:*5*
**wrong**  20:*21*
81:*14*  95:*14*
196:*21, 22*
199:*20*
**wrote**  118:*17, 20*
120:*9*

**< Y >**
**Yeah**  8:*19*
13:*12*  14:*5*  17:*4*
18:*20*  26:*3, 11*
27:*19, 22*  36:*15,*
*20, 22*  37:*14*
39:*1*  45:*18, 19,*
*21*  51:*4*  52:*12*
55:*10*  56:*16, 20*
59:*7*  64:*17*
66:*12*  71:*14*
72:*5, 9*  77:*19*
78:*14*  81:*13*
96:*9*  99:2, *3*
111:2  112:*18*
113:22  134:*6, 7*
137:*14*  144:*3*
148:*11, 22*  156:*3*
165:*4, 9*  166:22
198:*3*

**year**  11:*7, 18*
15:*17*  18:*17*
19:*20*  95:*11*
119:2  123:22
137:*13*  145:*7*
161:*8*
**years**  14:*14*
26:*15, 18, 20*
32:*17*  39:*10*
40:*13*  46:*12*
148:*13*
**year's**  117:*7, 16*
118:*12*  127:*4*
**Yep**  103:*8*
**York**  20:*14*
35:*20, 21, 22*
36:*3*  42:*6*