1              UNITED STATES OF AMERICA

2        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3      - - - - - - - - - - - - - - x

4      MARCIANN GRZADZINSKI,         : Washington Field Office

5              Complainant       : EEOC No.:

6              VS.               : 570-2017-00720x

7      JEFFERSON B. SESSIONS, III, : Agency No.
       Attorney General, Department
8      of Justice,                : FBI-2015-00176

9              Agency            : Pages 1-142

10     - - - - - - - - - - - - - - x

11                                    Washington, DC

12                          Wednesday, December 12, 2018

13            Deposition of JUSTIN SCHOOLMASTER, a

14     witness herein, called for examination by counsel for

15     the Complainant in the above-entitled matter,

16     pursuant to notice, the witness being duly sworn by

17     SHERRY L. BROOKS, Certified LiveNote Reporter and a

18     Notary Public, in and for the State of Maryland,

19     taken at Kator, Parks, Weiser & Harris, PLLC, 1200

20     18th Street, Suite 1000, Washington, DC 20036, at

21     10:04 a.m., when were present on behalf of the

22     respective parties:

**EXHIBIT 7**

Page 2

1  APPEARANCES:

2     On behalf of the Complainant:

3        DAVID A. HART, ESQUIRE

4        KATOR, PARKS, WEISER & HARRIS, PLLC

5        1200 18th Street, NW

6        Suite 1000

7        Washington, DC  20036

8        (202) 898-4800

9        (202) 289-1389 (Fax)

10       E-mail:  Dhart@KatorParks.com

11

12    On behalf of the Agency:

13       JULIET E. GRAY, ESQUIRE

14       U.S. DEPARTMENT OF JUSTICE

15       935 Pennsylvania Avenue, NW

16       Washington, DC  20535

17       (202) 324-2714

18       (202) 323-3855 (Fax)

19       E-mail:  Juliet.Gray@ic.fbi.gov

20

21  ALSO PRESENT:

22     Marrisa Rose, Law Clerk - Kator, Parks

Page 3

1           C O N T E N T S

2  WITNESS                        PAGE

3  JUSTIN SCHOOLMASTER

4     BY MR. HART                 4, 136

5     BY MS. GRAY                    127

6

7  SCHOOLMASTER DEPOSITION EXHIBITS:          PAGE

8  1:  Memorandum Dated 10/22/14 to L. Castaneda    29

9  2:  Memorandum Dated 10/22/14 to J. Schoolmaster  31

10  3:  Memorandum Dated 10/27/14 to James A. Baker   36

11  4:  Memorandum Dated 11/18/14 to J. Schoolmaster  40

12  5:  Memorandum Dated 3/10/15 to J.  Schoolmaster  54

13  6:  Memorandum Dated 4/7/15 to Ernest Babcock    58

14  7:  Memorandum Dated 5/28/15 to M. Grzadzinski   63

15  8:  Memorandum Dated 5/26/15 to J. Schoolmaster  79

16  9:  Memorandum Dated 5/5/15 to J. Schoolmaster   96

17  10:  Memorandum Dated 10/24/15 to James A. Baker  105

18  11:  Memorandum Dated 1/4/16 to James A. Baker   110

19  12:  Memorandum Dated 1/6/16 to J. Schoolmaster  111

20  13:  Memorandum Dated 9/11/15 to James A. Baker  119

21  14:  Log Bates No. GRZ_FB1004276R          120

22       (Exhibits attached to transcript.)

Page 4

1        P R O C E E D I N G S

2            - - -

3  Whereupon,

4            JUSTIN SCHOOLMASTER

5  called as a witness by counsel for the plaintiff, and

6  having been duly sworn by the Notary Public, was

7  examined and testified as follows:

8            - - -

9        EXAMINATION BY COUNSEL FOR COMPLAINANT

10       BY MR. HART:

11       Q.   So good morning, Mr. Schoolmaster.  I

12  introduced myself before we got started.  But just

13  for the record, my name is David Hart.  I'm counsel

14  for Marciann Grzadzinski.  Also with me is one of our

15  law clerks, Marrisa Rose, and Ms. Grzadzinski is also

16  present.

17       If you'd like to introduce yourself?

18       MS. GRAY:  Juliet Gray, Agency counsel.

19       BY MR. HART:

20       Q.   So just to get started, could you state

21  and spell your name for the record?

22       A.   Sure.  Justin Schoolmaster, J-U-S-T-I-N.

Page 5

1  Last name, S-C-H-O-O-L-M-A-S-T-E-R.

2       Q.   Who is your current employer?

3       A.   Guidehouse Consulting.

4       Q.   Have you ever been deposed before?

5       A.   I have not.

6       Q.   So I'm just going to go through some

7  ground rules to kind of explain how the deposition

8  process works.  I'll just overall go through and make

9  sure we're all on the same page.

10       So it's a question-and-answer format.  I'm

11  going to be asking you questions and you're going to

12  be giving answers.

13       If at any point you need a break, please

14  just interrupt me and let me know.  One rule is that

15  if there's a question pending, you're expected to

16  answer the question before you take the break.

17       A.   Sure.

18       Q.   You're also under oath.  You were put

19  under oath just now, so it's just like you're

20  testifying in court, except there's not a judge

21  present.  So your testimony today is under the

22  penalty of perjury and it can be used later.

Case 1:20-cv-01411-JEB   Document 27-9   Filed 01/18/22   Page 3 of 52
12/12/2018

Page 6

1    Another very important aspect related to
2 that is the importance of clarity.  If there's ever a
3 time that you don't understand what I'm asking or if
4 there's something that you're saying that I'm not
5 understanding, just stop and interrupt me and say, I
6 think we're missing understanding each other, or ask
7 me for clarification.
8    Because if you answer a question, it's
9 more or less understood that you understood the
10 question, so it's important that you tie those two
11 together and understand my question fully.
12    A.   Got you.
13    Q.   And make sure you give verbal answers
14 only.  Things like uh-huh, huh-uh, shrugs of the
15 shoulders, a shake of the head don't translate well
16 for the court reporter.  So it's important that you
17 make sure that all of your answers are verbal.
18    I may ask you, if you do one of those, is
19 that a yes? is that a no?  It's not to be rude.  It's
20 just to prompt you for the court reporter.
21    A.   Sure.
22    Q.   So we also have to make sure that we don't

Page 7

1 talk over each other, talk too fast, or anything like
2 that, again, for the benefit of the court reporter.
3 I'm much more likely to be the problem than you are.
4    And then the last item on that is that the
5 agency will be making objections throughout the
6 deposition.  Unless you're specifically instructed by
7 counsel, you're still expected to answer the
8 question.  Okay?
9    A.   Okay.
10    Q.   Are you under the influence of any drugs,
11 alcohol, or medical conditions that currently affect
12 your memory?
13    A.   No.
14    Q.   Any drugs, alcohol, or medical conditions
15 that would affect your ability to testify fully and
16 truthfully today?
17    A.   No.
18    Q.   Is there any other reason that you
19 wouldn't be able to testify fully and truthfully
20 today?
21    A.   No.
22    Q.   What, if anything, did you do to prepare

Page 8

1 for your deposition?
2    A.   We spoke for a little bit yesterday,
3 Juliet and I, and that was it.  She just kind of
4 explained --
5    MS. GRAY:  Don't discuss what we talked
6 about.
7    BY MR. HART:
8    Q.   So other than counsel, did you discuss
9 your deposition with anybody else?
10    A.   No.
11    Q.   Did you review any documents in
12 preparation for your deposition?
13    A.   Yes.
14    Q.   What documents did you review?
15    A.   I'm not sure of the specific ones.
16    Q.   What is your general recollection of the
17 documents you reviewed?
18    A.   I think there were some emails and --
19 mainly just emails, and then there were also some
20 Lync conversations, IMs.
21    Q.   Do you recall what Lync conversations you
22 reviewed?

Page 9

1    A.   There were --
2    MS. GRAY:  I'm going to object.  This is
3 attorney/client privilege.
4    I instruct the witness not to answer.
5    MR. HART:  Were those reviews part of the
6 meeting with counsel?  If not, they're not
7 privileged.
8    MS. GRAY:  He can answer if he reviewed
9 them not as part of the meeting with counsel.
10    A.   I've only reviewed things with counsel.
11    BY MR. HART:
12    Q.   Okay.  So you said your current employer
13 is Guidehouse Consulting.  What is your position with
14 them?
15    A.   My title is director.
16    Q.   Can you just give me a general explanation
17 of what that position entails?
18    A.   I'm responsible for making sure that any
19 kind of client engagement is going well, supervising
20 other employees to make sure that they are providing
21 good consulting services.
22    Q.   Approximately, how many employees do you

Page 10

1 supervise?

2    A.    Four.

3    Q.    And do those four employees have employees
4 they, in turn, supervise as well?

5    A.    Yes.

6    Q.    Approximately, how many employees total
7 for all four?

8    A.    Two additional.

9    Q.    And when did you begin as a director for
10 Guidehouse?

11    A.    It would be July of last year as a
12 director.

13    Q.    And have you been a director ever since
14 July 2017?

15    A.    No.  There was a different title before
16 then.

17    Q.    Okay.  So before that director position,
18 what was your position with them?

19    A.    Title of manager.

20    Q.    And was that effectively the same
21 position, just with a different title?

22    A.    Yes.

Page 11

1    Q.    So how long -- for what period did you
2 have that manager title?

3    A.    February 29, 2016.

4    Q.    And that would be until they made you a
5 director in July?

6    A.    Yes, and it was the previous July, not
7 this past.

8    Q.    Okay.  So before you were a manager with
9 Guidehouse, what was your position?

10    A.    I was working for the FBI.

11    Q.    What was your position at that time?

12    A.    It was a management and program analyst.

13    Q.    For what time frame did you occupy that
14 position?

15    A.    I believe it was some period less than two
16 years, more than a year and a half.  I don't remember
17 the exact dates.

18    Q.    Can you give me an approximate -- just a
19 year range?

20    A.    I'll say sometime in 2014 and sometime in
21 -- until February of 2016.

22    Q.    So were you also referred to as the chief

Page 12

1 of staff while you were in that position?

2    A.    Yes.  It's a working title, an official
3 one.

4    Q.    Did you have that working title for your
5 entire time in that roughly two-year period?

6    A.    Yes.

7    Q.    What were some of your responsibilities in
8 that position?

9    A.    I was most things non-legal.  So the needs
10 of the division, be they IT, facilities, HR,
11 telephones.  It's all of the hiring.  It's all of the
12 non-legal functions or the administrative role.

13    Q.    What HR functions were you involved in?

14    A.    Hiring was the primary one, making sure
15 that we had the staff -- the vacancies filled.

16    Q.    Okay.  Any other HR functions you were
17 involved in?

18    A.    HR is pretty broad.  I'm not sure.

19    Q.    That you can recall participating in.

20    A.    Some staff had just concerns about their
21 workstream or their supervisor, and I could provide
22 them some guidance on how they could, you know, talk

Page 13

1 to their manager about some frustrations that they
2 had.  It was sort of an open-door policy for help
3 outside of -- I was not in the chain of command for
4 most of the legal functions, so I was helpfully
5 separate.

6    Q.    Was that something that was expected of
7 you or was that something you volunteered for, those
8 kinds of HR functions?

9    A.    The HR functions that I was hired to do
10 were to just make sure that the administrative
11 functions went well and were completed.

12    Q.    So from what you can recall, what
13 involvement did you have in the hiring procedures for
14 the agency?

15    A.    For attorneys or for non-attorneys?

16    Q.    Well, for attorneys first.

17    A.    For attorneys, I would be gathering the
18 requirements for the job posting, making sure that
19 they were posted on the correct site; when they were
20 -- when information was brought in, resumes
21 otherwise, that the agency HR department did not
22 exclude certain people because, you know, they forgot

## Page 14

1  to attach, you know, a resume or something like that.

2       I wanted to make sure we saw all things,

3  to the best of my ability.

4       Q.   And was that for all attorneys hired by

5  OGC or was that limited to some subset thereof?

6       A.   In general, it was my goal to help with

7  all of them.  There's a separate management group

8  that actually did that processing.  It was not me

9  personally, but I tried to make it more efficient and

10  more effective.

11       Q.   So that separate management group, who was

12  that?

13       A.   It's just a shared services group that

14  handles things for a few different small divisions at

15  the FBI.

16       Q.   Do you recall who was part of that shared

17  services group?

18       A.   I do.  They're not there anymore.

19       Q.   From who you can recall, who participated

20  in that shared services group?

21       A.   The unit chief was named Chrissie Wylie.

22  But, again, I was doing most of the work to, you

## Page 15

1  know, put out the job postings and things like that.

2       Q.   Okay.  Other than Chrissie Wylie, any

3  other individuals that you can recall that

4  participated in that group?

5       A.   I think Anthony Roque was another one.

6       Q.   Could you spell his last name?

7       A.   R-O-U-Q-E.

8       Q.   Okay.  Anyone else?

9       A.   Not that I can recall.

10       Q.   And so just to go back, so for

11  non-attorneys, what involvement did you have in their

12  hiring process?

13       A.   The same process.

14       Q.   And your involvement in that process was

15  the same?

16       A.   Yes.  I would approve the job postings

17  that would go online.  They would ingest them and

18  then just pass them to me.

19       Q.   Okay.  Was that for all non-attorneys

20  within OGC?

21       A.   All positions.

22       Q.   So those experiences that you had

## Page 16

1  involving the hiring processes for both the attorneys

2  and non-attorneys, was that consistent throughout

3  your tenure as chief of staff?

4       A.   Yes.

5       Q.   So other than the job functions that we've

6  already discussed, can you recall any other duties

7  that you had as chief of staff?

8       A.   I don't think so.

9       Q.   Okay.  So before you became chief of staff

10  for the FBI, what was your position?

11       A.   I was a special advisor.

12       Q.   What organization was that with?

13       A.   The FBI.

14       Q.   Any particular division within the FBI?

15       A.   Counterintelligence.

16       Q.   Can you describe for me generally what

17  your responsibilities were as a special advisor?

18       A.   Not to be cute, but to provide advice to

19  the management of that division.

20       Q.   That's okay.

21       A.   Nonoperational.

22       Q.   So from what time period did you occupy

## Page 17

1  that special advisor position, as best as you can

2  remember?

3       A.   July of 2012 to, I'm going to guess,

4  sometime in early 2014.

5       Q.   Was there any gap in your employment

6  between that special advisor position and becoming

7  chief of staff?

8       A.   I was considered a special advisor in OGC

9  for a few months in the middle.  That was just to

10  help out on a few special projects, but there was no

11  gap.  I was a special advisor and then I was an OGC

12  employee after that.

13       Q.   Okay.  So for the time period that you

14  were a special advisor, who were the management

15  officials that you were advising?

16       A.   Robert Anderson.

17       Q.   And what was Mr. Anderson's position at

18  that time, if you can remember?

19       A.   Assistant Director of Counterintelligence.

20       Q.   Any other officials, other than Mr.

21  Anderson?

22       A.   Other than Elaine Lammert and James Baker

Page 18

1  in OGC for a few months before I was hired formally.

2      Q.   And you advised Ms. Lammert and Mr. Baker

3  while you were still in that special advisor

4  position?

5      A.   The special advisor position is a general

6  advisory role, so yes, and it can be anywhere in the

7  Bureau.

8      Q.   And did you supervise any employees?

9      A.   No.

10     Q.   Before you were a special advisor, what

11 was your position?

12     A.   I was in school.

13     Q.   Where were you in school?

14     A.   Yale University.

15     Q.   Was that for graduate? undergraduate?

16     A.   Graduate.

17     Q.   What time frame did you attend for your

18 graduate degree?

19     A.   September of 2010 and June 2012.

20     Q.   And what -- did you receive a graduate

21 degree from them?

22     A.   I did.

Page 19

1      Q.   What was the degree in?

2      A.   Master of Business Administration.

3      Q.   And before you started that graduate

4  program, were you working? in school?

5      A.   Working.

6      Q.   Where were you working?

7      A.   Cambridge Mass.

8      Q.   What was your position?

9      A.   Director of Administration.

10     Q.   And who were you working for?

11     A.   Harvard University.

12     Q.   How long did you occupy that position?

13     A.   I don't remember exactly.  There was a

14 position just prior to it that was Director of

15 Development and then the Director of Administration

16 position.  I was asked to take on both, and there was

17 some merging in between.  So I don't have exact

18 dates, but we'll call it 2005 until 2010.

19     Q.   Okay.  And would that encompass both of

20 the positions that you just mentioned?

21     A.   Yes.

22     Q.   I see.  And both of those were with

Page 20

1  Harvard?

2      A.   Yes.

3      Q.   So in those two positions, did you

4  supervise any employees?

5      A.   Yes.

6      Q.   Approximately, how many?

7      A.   Twelve.

8      Q.   And those were as their direct supervisor?

9      A.   Yes.  There was some indirect, but

10 approximately 12.

11     Q.   So before that position in and around

12 2005, were you working or in school?

13     A.   Working.

14     Q.   Okay.  Where were you working?

15     A.   Apple.

16     Q.   And what was your position with them?

17     A.   I was called manager.

18     Q.   What kind of duties did you have in that

19 position?

20     A.   It was retail-focused.  Sales, customer

21 service, things like that.

22     Q.   For what time frame did you occupy that

Page 21

1  position, if you can remember?

2      A.   Probably 2004, call it March, through

3  sometime in 2005.  I'm not sure.  There was some

4  crossover with Harvard.

5      Q.   Okay.  So before that position, before you

6  joined Apple, what were you doing?

7      A.   Grad school.

8      Q.   What grad school were you in?

9      A.   Harvard.

10     Q.   What were you studying?

11     A.   Education.

12     Q.   Did you graduate with a degree?

13     A.   I did.

14     Q.   What was it?

15     A.   Master of education.  The irony of having

16 a Schoolmaster last name was deafening.

17     Q.   So what time frame did you attend Harvard

18 for that graduate degree?

19     A.   2003 to 2004.

20     Q.   Okay.  And prior to that graduate program,

21 were you working or in school?

22     A.   School.

Page 22

1    Q.   What were you in school for?

2    A.   Music composition.

3    Q.   And where was that at?

4    A.   Carleton College, Northfield, Minnesota.

5    Q.   So what time frame were you at Carleton

6    College?

7    A.   September 1999 to June 2003.

8    Q.   Okay.  So -- and just to walk -- oh, just

9    one other question.

10        Going back to your time with Harvard, can

11   you just give me a general description of what you

12   recall your duties were for them, in addition to

13   supervising those employees?

14   A.   Covering all of the administrative

15   functions again, so very similar:  All HR, all IT,

16   all facilities, anything that you need to keep the

17   things going.

18   Q.   Okay.  So returning to your experience at

19   the FBI, do you recall why you moved from the special

20   advisor position into the chief of staff position?

21   A.   Because I wanted to.  I'm not sure of your

22   question.

Page 23

1    Q.   So why did you want to?

2    A.   The special advisor program is -- it's not

3    term-limited, but it's meant to give an introduction

4    to different parts of the Bureau.  And then people

5    apply to permanent management positions after that.

6        So this was a permanent management

7    position that I wanted to take because it aligned

8    with my skills and goals.

9    Q.   And do you recall what hiring process you

10   went through for that?

11   A.   I think there was a job posting and I

12   applied online, interviews.

13   Q.   Do you recall who you interviewed with?

14   A.   Elaine Lammert, Jim Baker.  That's all I

15   remember.  There were probably more, but I don't

16   remember if there were.

17   Q.   Okay.  So did there come a time while you

18   were chief of staff that you met Ms. Grzadzinski?

19   A.   Yes.

20   Q.   Do you recall when you first met her?

21   A.   In person, I think it was after she was

22   hired.  And I believe she was stopping by the office

Page 24

1    for -- I don't really know what the reason was --

2    before she started in the role, but after she had

3    been selected.

4    Q.   Okay.  Do you recall when you first

5    interacted with her either in person or via email or

6    anything?

7    A.   There were probably emails before that

8    because I think we were probably going back and forth

9    on, you know, congratulations, things of that nature,

10   start dates, things like that.  I was a little bit

11   further removed from that because she was not going

12   to be reporting to me, so that was really up to her

13   and the general counsel to decide.

14   Q.   Okay.  Do you recall when you first became

15   aware of Ms. Grzadzinski, just that she was an FBI

16   employee, generally?

17   A.   During the hiring process.

18   Q.   Okay.  Do you recall how you became aware

19   of her?

20   A.   When I saw her name on the CERT list of

21   people who had applied to the SES position.

22   Q.   And CERT list, can you just explain what

Page 25

1    that is?

2    A.   It's the list of people who have applied.

3    That's a separate process from the one that I managed

4    before.  The SES process is not one that I oversee.

5    Q.   I see.  And would that include SES

6    attorneys?

7    A.   Anyone who is SES.

8    Q.   Okay.  So how did you come across that

9    CERT list then?

10   A.   I believe it was going to be going --

11   there were people on that list that were going to be

12   going to the SES board.  And I didn't recognize all

13   the names on there as resumes that I had seen.

14   Q.   So you mentioned SES board.  What is that?

15   A.   It's -- so SES hiring is very separate

16   from all other GS level hiring.  So it's outside of

17   my understanding of how the entire thing works.

18       So I'm not privy to the information and

19   how it works and how it comes in.  So the SES board

20   is the group that reviews the applications and does

21   interviews for SES-level positions in the government.

22   Q.   So do you recall who at that time was part

Page 26

1  of the SES board?

2    A.  I don't.

3    Q.  But they were expected to interview SES

4  applicants?

5    A.  That's their job, yes.

6    Q.  Other than Ms. Grzadzinski, do you recall

7  anyone else who applied for the same deputy general

8  counsel position?

9    A.  Which position?

10   Q.  So either the -- so it's -- an acronym

11  that's commonly used is the NSLB.  It's the head of

12  the National Security Law Branch or at that time the

13  Investigative Law Branch, if I'm getting my acronyms

14  correct.

15   A.  I think that works.  It was years ago, but

16  the people that I remember would be Rick McNally,

17  Marcy -- and I'll caveat this by saying I don't know

18  which position they applied for because there were

19  two open at the same time.

20     I did not see -- I'm not a part of that

21  process.  That's the one I mentioned before that I

22  handled, HR and hiring.  For SES positions, I'm out

Page 27

1  of that.  It's not something that really goes through

2  me anymore, so I'm a little bit more blind.

3     But Rick McNally, Marcy -- I don't

4  remember the person's name, but there was someone

5  from New York, a gentleman.  I don't recall the name.

6     Then there was another agent from New

7  York, a female.  I think Catherine Bruno also

8  applied.  I don't recall others.

9    Q.  And do you recall Ms. Grzadzinski

10  eventually interviewing for one or both of those

11  positions?

12   A.  I was not a part of the interviews, but I

13  recall that she was being interviewed.

14   Q.  What involvement, if any, did you have in

15  preparing for the interviews?

16   A.  I did not.

17   Q.  You didn't have any involvement in that?

18   A.  It may have been scheduling, but I don't

19  recall being involved in the interview process.

20   Q.  Do you recall ever discussing Ms.

21  Grzadzinski's application for one of those DGC

22  positions with Mr. Baker?

Page 28

1    A.  Yes.

2    Q.  What conversations do you recall with him

3  about that?

4    A.  I recall bringing him her application.

5    Q.  Do you recall why you brought him her

6  application?

7    A.  Because it had not been passed to him for

8  review.

9    Q.  Do you know why not?

10   A.  I don't know why.

11   Q.  Why did you decide to bring it to him

12  then?

13   A.  Because we needed qualified, good

14  candidates and I didn't know if he had seen all of

15  the candidates to -- he would make that decision.  So

16  I just wanted him to see everyone that had applied

17  and I didn't recognize her name as someone who had

18  been printed out.

19   Q.  Okay.  Other than Ms. Grzadzinski's, do

20  you recall bringing any other candidates'

21  applications to Mr. Baker for those positions?

22   A.  No.

Page 29

1    Q.  From what you can recall, was there any

2  particular aspect of Ms. Grzadzinski's application

3  that made you want to bring it to Mr. Baker?

4    A.  I'm not qualified to evaluate the

5  candidates.  It was just that she was a candidate

6  that wasn't in the pile of resumes that he was given.

7    Q.  Okay.

8      MR. HART:  Could you mark this as Exhibit

9  1?

10     (Exhibit Number 1 was marked for

11  identification and was attached to the deposition.)

12     BY MR. HART:

13   Q.  So just take a moment, if you could, look

14  at the document, and just let me know whenever you're

15  ready.  It actually looks like there are two

16  documents in here.  It's an initial email from Ms.

17  Castaneda and then your response.

18     MR. HART:  Is this fine with the agency to

19  just have this as one exhibit?

20     MS. GRAY:  Sure.

21     BY MR. HART:

22   A.  Again, let me know whenever you're ready.

Page 30

1    MS. GRAY:  Just to note, there's also a
2  third email later on.
3    MR. HART:  Alright.
4  A.  There's a lot in here.
5    BY MR. HART:
6  Q.  So just looking at the very first page, so
7  your -- it's a one-page email.  It's Bates No. 3832.
8  So this is your response to Ms. Castaneda.
9    Can you recall what the circumstances were
10  that you made a request to Ms. Castaneda for Ms.
11  Grzadzinski?
12  A.  It was a while back, but my recollection
13  is that I saw her name as one of the applicants.  But
14  I had not seen her resume, so I was asking to have
15  that resume.
16  Q.  I see.  So in the lower right-hand corner
17  it's Bates number -- it's the third email that's in
18  this packet here.  It's Bates No. 3841 in the lower
19  right-hand corner.
20  A.  Okay.
21  Q.  So do you see your email to Mr. Babcock at
22  the top of the page?

Page 31

1  A.  Um-hum.
2  Q.  Do you recall why you also sent this to
3  Mr. Babcock?
4  A.  I imagine if he were one of the deputy
5  general counsel's who would be interviewing for --
6  helping to interview for this position that he might
7  want to the see another candidate that was out there.
8  Q.  Okay.  Do you recall whether that was the
9  actual reason you sent that to him?
10  A.  I mean, I can't say exactly my intent from
11  that very moment, but I would -- that would seem
12  reasonable.
13    MR. HART:  So you can set that aside.
14    Would you mark this as Exhibit 2?
15    (Exhibit Number 2 was marked for
16  identification and was attached to the deposition.)
17    BY MR. HART:
18  Q.  So again, take a second to review it and
19  let me know whenever you're ready.
20  A.  Okay.
21  Q.  So I mostly just need your help in
22  understanding what it is I'm reading here.  So can

Page 32

1  you just -- if you know, just kind of describe for me
2  what exactly this is that Mr. Biscardi was sending
3  you?
4  A.  It looks like the names of the people who
5  have applied to certain positions held by the people
6  who are listed in bold.  So Jason Herring was the
7  previous deputy general counsel, and it's divided up
8  between agent applicants and professional staff,
9  which is the term used to describe non-agents.
10    And for the second position held at that
11  time currently, because she was still there, by
12  Elaine Lammert.  Those are the people who applied to
13  that position, both agent and non.
14  Q.  Okay.  So just to make sure I'm
15  understanding this fully, so the names listed under
16  Mr. Herring are the applicants to be his replacement
17  and the names listed under Ms. Lammert are the
18  applications to be her replacement?
19  A.  That's my understanding.
20  Q.  Okay.  So this might seem a little
21  tedious, but I'm going to have to go through the
22  applicants with you.

Page 33

1    So for Anthony Lang, do you recall whether
2  he was interviewed for that position?
3  A.  I don't know.
4  Q.  For Ms. Wilson, do you recall whether she
5  was interviewed for that position?
6  A.  I believe she was.
7  Q.  Do you recall whether there was any reason
8  she was not selected?
9  A.  I wasn't on the review committee, so I
10  don't know -- I don't know why.
11  Q.  Did you receive secondhand any explanation
12  for why she was not selected?
13  A.  I don't think Elaine Lammert thought that
14  she was a good candidate.  That's one thing that I
15  heard.  But, again, I wasn't a part of it.  So I
16  don't know if that was something that was actually
17  discussed, said, or otherwise.
18  Q.  Okay.  So who did you hear that from?
19  A.  I don't recall.
20  Q.  Other than that kind of secondhand
21  information, did you receive any other reasons why
22  Ms. Wilson was not selected?

Page 34

1    A.   No.

2    Q.   Were you aware at all who the officials
3  were involved in the decision to not select Ms.
4  Wilson?

5    A.   I don't know.

6    Q.   Okay.  So turning to the next page, so
7  Joseph Bender, do you recall whether he was
8  interviewed for that position?

9    A.   I can cut to the chase.  I don't know if
10  any of these people were interviewed.  I just don't
11  know.

12    Q.   Okay.  And just so we're on the same page
13  and clear for the record, so when you say, "any of
14  these people," are you referring to, on the second
15  page, Joseph Bender and through Sherry Sabol?  The
16  last name is S-A-B-O-L.

17    A.   I don't have any knowledge if any of these
18  people were interviewed.

19    Q.   Okay.  And just so -- when you say, "any
20  of these people," are you referring to that shorter
21  list of names at the top of this page?

22    A.   I'll go through each one to make it

Page 35

1  easier.  Joseph Bender, I do not know.  Jacqueline
2  Brown, I do not know.  Charles Choi, I'm not sure.
3  Patrice Kopistansky, I don't think so.  Lisa
4  Matsumoto, I don't know.

5      Richard McNally was probably interviewed,
6  but I don't know.  Sherry Sabol, I don't know.

7    Q.   Okay.  And then if you could do the same
8  for the applicants for Ms. Lammert's position.  If
9  you can just go through that list and -- do you
10  recall whether they were interviewed?

11    A.   Sure.  I don't know if -- I don't think
12  that these were always done separately as separate
13  positions because they were at the same time.  Some
14  people were just interviewed period.

15    Q.   I see.

16    A.   So I know that, obviously, Marcy was
17  interviewed.  I don't know about Anthony Lang.  I do
18  know that Jennifer Wilson was interviewed, but it
19  could have been for either position or both.  Joseph
20  Bender, I do not know.

21      Jacqueline Brown, I do not know.  Charles
22  Catherine Bruno I believe was interviewed.  Charles

Page 36

1  Choi, I do not know.  Margaret Davis, I do not know.
2  Edward Hong, I do not know.  Stephen Kelly, I do not
3  know.  Lisa Matsumoto, I do not know.

4      Richard McNally probably, but I do not
5  know.  Sherry Sabol, I do not know.  Jonathan Sills,
6  I do not know.  Nancy Wiegand, I do not know.

7    Q.   Thank you.  So you can set that aside.  I
8  appreciate you going through all of that.

9      So do you recall who the individuals were
10  that interviewed Ms. Grzadzinski?

11    A.   I do -- I just don't know.  I don't know.

12    Q.   That's okay.

13      MR. HART:  So if you could mark this as
14  Exhibit 3.

15      (Exhibit Number 3 was marked for
16  identification and was attached to the deposition.)

17  BY MR. HART:

18    Q.   And the same as before, just let me know
19  whenever you're ready.

20    A.   Ready.

21    Q.   So does this refresh your recollection at
22  all as to who interviewed Ms. Grzadzinski?

Page 37

1    A.   This would make sense.  Again, I wasn't in
2  the interview, so I don't recall from four or five
3  years ago who was actually there.

4    Q.   Okay.  So again, I just had to go through
5  all three of them.  Do you recall why Mr. Baker was
6  one of the individuals in that interview?

7    A.   He's the general counsel.

8    Q.   Okay.  And it seems obvious.  But can you
9  just explain why it would be important for him to be
10  in there?

11    A.   He's the supervisor of the position that's
12  open.

13    Q.   And Mr. Babcock, why was he one of the
14  interviewers?

15    A.   Mr. Babcock and Mr. Bondy would both be
16  peer deputy general counsels.

17    Q.   And do you recall why it would matter for
18  them to be in the interview --

19      MS. GRAY:  Objection.  Calls for
20  speculation.

21      BY MR. HART:

22    Q.   -- from your understanding?

Page 38

1    A.   I couldn't say.

2    Q.   Do you recall who made the decision to

3  have Mr. Babcock and Mr. Bondy be in the interview?

4    A.   I don't know.

5    Q.   Do you recall whether these three

6  individuals were on that SES board we were discussing

7  earlier?

8    A.   They would not be.

9    Q.   Do you recall whether Ms. Grzadzinski was

10  ever given an interview with that SES board?

11   A.   If she was given the position, then she

12  had to have been.  That's my understanding of how it

13  works.  But, again, I'm not sure of the system.

14   Q.   Okay.  But if the SES board was primarily

15  responsible for interviewing SES candidates, why were

16  these individuals that are not on the SES board

17  conducting an interview for an SES position?

18   A.   The way that it works in the Bureau, the

19  divisions will do interviews, and then whoever leads

20  that division will present that candidate to the SES

21  board.  And the SES board then decides.  That's the

22  actual hiring decision there, as far as I understand.

Page 39

1    Q.   In your experience at the FBI, did you

2  ever see the SES board disagree with a decision of

3  the division head to recommend a person for a given

4  position?

5    A.   I don't have experience with that.

6    Q.   Okay.  Was it something that you ever saw

7  happen?

8    A.   I was never in the SES board meetings.

9    Q.   Okay.  So just -- it's not something that

10  you've ever seen happen because you haven't

11  experienced that or you're not involved, but just

12  generally you haven't seen that?

13       MS. GRAY:  Objection.  Asked and answered.

14       BY MR. HART:

15   Q.   You can answer.

16   A.   It's not my experience.

17   Q.   Okay.  Was this -- I think you mentioned

18  before that you were sometimes involved in the

19  scheduling of these interviews?

20   A.   Um-hum.

21   Q.   So was this one of the examples where you

22  were just involved in the scheduling?

Page 40

1    A.   Yes.  From the email, it appears that way.

2    Q.   Okay.  From your recollection, with

3  respect to the interview of Ms. Grzadzinski, did you

4  have any involvement in her interview process or

5  selection, other than scheduling the arrangements for

6  her interview?

7    A.   I don't believe so.

8    Q.   Do you recall whether Mr. Baker ever asked

9  you for your opinion on Ms. Grzadzinski's application

10  or her qualifications?

11   A.   I can't recall a specific instance.

12   Q.   Okay.

13       MR. HART:  Could you mark this?  I think

14  we're up to Exhibit 4.

15       (Exhibit Number 4 was marked for

16  identification and was attached to the deposition.)

17       BY MR. HART:

18   Q.   So do you recall having this email

19  exchange with Ms. Grzadzinski?

20   A.   I do now.  I can see it.

21   Q.   So turning to your email -- so it's the

22  second email on the first page.  It's November 18th,

Page 41

1  2014, 11:57 a.m.

2       Do you recall the circumstances regarding

3  the -- using your words, where they divided up the

4  non-legal functions that Ms. Lammert had?

5    A.   Yes.

6    Q.   And just to be clear, when you say Elaine

7  in this email, is that referring to Elaine Lammert?

8    A.   It is.

9    Q.   Do you recall what the circumstances were

10  that led to the breaking up of her non-legal

11  functions?

12   A.   I think it was just too much, too much for

13  any person.

14   Q.   Do you recall who made the decision to

15  break up those functions?

16   A.   Jim Baker and Elaine, frankly.

17   Q.   Were you involved in any of those

18  discussions?

19   A.   Yes.

20   Q.   What was your involvement?

21   A.   I was just helping them think about best

22  practices for the administration.

Page 42

1    Q.    What kinds of best practices?

2    A.    Just span of control, workload.  As I

3  wrote here, Elaine had too much.

4    Q.    From what you can recall, were there any

5  issues before regarding Ms. Lammert being

6  overburdened with work or anything like that?

7    A.    What types of issues?

8    Q.    I mean, in terms of -- so to rephrase it

9  -- so was there any -- when all of these functions

10  were consolidated with Ms. Lammert, was -- did there

11  ever come a time that she -- that it became apparent,

12  as a practical matter, that she had too many

13  functions in this way?

14      MS. GRAY:  Objection.  Misstates the

15  record.  Assumes facts not in evidence.

16      BY MR. HART:

17    Q.    I guess what I'm trying to get at is, was

18  there any incidents or issues that led you to the

19  conclusion that this was too much for just Ms.

20  Lammert to be working on?

21    A.    So all of these things weren't under

22  Elaine.

Page 43

1    Q.    Okay.

2    A.    Does that change your question?

3    Q.    Yes, it does.  So from what you can

4  recall, the -- so were these just general non-legal

5  functions that had to be taken care of, only some of

6  which Ms. Lammert had?

7    A.    Yes.

8    Q.    I see.  So can you just describe for me

9  generally how -- if you were involved in the process

10  how the decision to redistribute those went as in who

11  was involved and how did you come to a conclusion of

12  who to give each assignment?

13    A.    To my recollection, I believe Jim and

14  Elaine were talking about her retirement and what

15  things would make OGC a more efficient -- a place

16  with an administrative perspective.

17      The primary driver of that was focusing

18  the DGC's role on legal, not the non-legal.  Many of

19  these things -- some of these things Elaine helped

20  with.  But I was just trying to make a laundry list

21  of things that I would be able to, you know, be

22  helpful with.

Page 44

1      Some of them were done by Ernie, by Tom,

2  by other groups beforehand.

3    Q.    I see.  And was there any particular rhyme

4  or reason behind why individuals were given certain

5  tasks over others?

6    A.    So the chief of staff role had been sort

7  of an auxiliary role prior to my arrival.  It was an

8  attorney who did attorney tasks and also did the

9  administrative tasks.

10      That didn't always have the best results

11  because there's sort of -- you know, you're dual

12  hatting.

13      When I started, one of the ideas behind,

14  frankly, them hiring me was to consolidate the

15  administrative tasks to one person so that there was

16  one accountable person for administrative issues.

17      That should answer your question about why

18  these things were sort of divvied up in this way.  It

19  was consolidated to keep attorneys doing more

20  attorney things and keep non-attorneys doing

21  non-attorney things.

22    Q.    I see.  So going towards the bottom of

Page 45

1  this list -- so still on the first page, though, at

2  Bates No. 3819, was there any particular reason Mr.

3  Babcock was given disciplinary matters?

4    A.    He already had that.  He wasn't given it.

5    Q.    I see.  So just either before or at that

6  time, was there any particular reason why Mr. Babcock

7  was the DGC that had those duties?

8    A.    I don't recall why that was the case.  But

9  in every -- I believe in every division there is

10  someone who is the point person for matters like

11  that.

12    Q.    I see.  So if you could just take a look

13  at that list there, so starting with the disciplinary

14  matters and proceeding on to the next page through

15  QFRs, for any of those, do you recall any particular

16  reason they were assigned to the particular person?

17    A.    These are historical.  They weren't --

18  they were just always that way.

19    Q.    I see.

20    A.    These aren't new things.

21    Q.    Yes.  I understand.  But was there -- so

22  either through this alignment or previously when they

Page 46

1  already had it, was there any particular reason each

2  of these individuals were given that particular task

3  that --

4       MS. GRAY: Objection. Calls for

5  speculation.

6       BY MR. HART:

7  Q.   -- you're aware of?

8  A.   I couldn't say.

9  Q.   So at the start of your email, it says --

10  you say: "I discovered late in the game that Jim

11  hadn't seen your resume." So is that still what you

12  were referring to before where --

13  A.   Yes.

14  Q.   Okay. So late in the game -- do you

15  recall approximately how long the solicitation had

16  been ongoing for these DGC positions?

17  A.   I couldn't tell you. It was -- I just

18  don't know the time frame.

19  Q.   Okay. You can set that aside. So after

20  Ms. Grzadzinski started as a DGC for the FBI,

21  approximately how often would you interact with her?

22  A.   There were regular staff meetings, so I

Page 47

1  think those were twice a week.

2  Q.   Okay. Who would be in attendance at those

3  meetings from what you can recall?

4  A.   The deputy general counsels, myself, and

5  the general counsel.

6  Q.   From what you can recall, would section

7  chiefs be present for that?

8  A.   I think one of the meetings per week had

9  section chiefs.

10  Q.   And just generally what kind of matters

11  would you discuss at those staff meetings?

12  A.   They were primarily legal.

13  Q.   I see. Would you discuss personnel

14  matters at those staff meetings?

15  A.   Unlikely. Those would be in a slimmed

16  down meeting with just the people that have a

17  need-to-know.

18  Q.   So other than these staff meetings, what

19  other interactions would you have with Ms.

20  Grzadzinski while she was in her deputy general

21  counsel role?

22  A.   Minimal.

Page 48

1  Q.   Any other specific examples that you can

2  think of?

3  A.   Not that I can recall.

4  Q.   Did you -- so again, while you were

5  interacting with -- while Ms. Grzadzinski was in her

6  deputy general counsel role, did you -- did former

7  general counsel James Baker ever discuss Ms.

8  Grzadzinski with you, just about her?

9  A.   Sure. Yes.

10  Q.   What kinds of discussions would you have

11  with Mr. Baker?

12  A.   They may not be specific to her, but he

13  discussed all of the deputy general counsels and

14  their workload, whether there were admin issues that

15  needed to be dealt with, things of that nature.

16  Q.   So specific to Ms. Grzadzinski, can you

17  recall any specific subject matters that -- either in

18  that realm or some other realm that General Counsel

19  Baker discussed with you?

20  A.   Again, it was five years ago, but I

21  believe the one -- the only one that I can recall was

22  the office that she would be sitting in at the very

Page 49

1  beginning.

2  Q.   Sorry. The office, as in her physical

3  location office?

4  A.   Yes.

5  Q.   I see. So what were those discussions?

6  A.   Where that would be.

7  Q.   What kind of -- did Mr. Baker express any

8  particular opinion about that issue or --

9  A.   I'm not sure if he had an opinion. I

10  can't speculate what he thought.

11  Q.   Yeah. So what were the substance of the

12  discussions that you were having with Mr. Baker about

13  that issue?

14  A.   About which office she would sit in.

15  Q.   Any particular issue related to which

16  office she was sitting in?

17  A.   Elaine Lammert had sat in a different

18  office, and Jim wanted all of the deputy general

19  counsels to be nearer to the people that work in

20  those branches and had assigned an office next to the

21  other deputy general counsel, Ernie Babcock, in a

22  different part of the office.

12/12/2018

Page 50

1    Q.   And your understanding was that Mr. Baker

2 had assigned that office to Ms. Grzadzinski?

3    A.   I don't recall, specifically, but that was

4 the plan.  We had already turned the old office into

5 a conference room prior to -- that was, I think, in

6 December of the year prior to her onboarding.

7    Q.   Okay.  And how did the assignment of Ms.

8 Grzadzinski's office become a subject of discussion?

9 Was there any precipitating event for it?

10    A.   No.  There was no event.  It was that's

11 just where he wanted her to sit.

12    Q.   Okay.  There eventually came a time where

13 Ms. Grzadzinski occupied a different office, other

14 than that one, right?

15    A.   That's correct.

16    Q.   Did you ever discuss Ms. Grzadzinski's

17 decision to occupy a different office with Mr. Baker?

18    A.   It probably came up.  It was an ongoing

19 discussion.

20    Q.   On approximately how many occasions do you

21 recall discussing that with Mr. Baker?

22    A.   I couldn't recall.

Page 51

1    Q.   Was it more than one?

2    A.   Sure.

3    Q.   More than five?

4    A.   I don't know.

5    Q.   Do you generally recall what the substance

6 of those discussions were?

7    A.   I think the general theme was that the

8 office was too small, the one that she had been

9 assigned.

10    Q.   And that's what you were discussing with

11 Mr. Baker?

12    A.   I believe so, yes.  I think it was just

13 her dissatisfaction with the office.

14    Q.   And did Mr. Baker express any opinion

15 about Ms. Grzadzinski's dissatisfaction?

16    A.   To me, an opinion, I don't recall.  I

17 think he said, you know, is it the same as Ernie

18 right next door.  Try to make it, you know -- see if

19 you can figure out what the deal is and make it work.

20    Q.   And did you take any action to try and

21 make it work?

22    A.   I think I went down there just to see the

Page 52

1 office.  I think I had actually cleared it out myself

2 prior to her onboarding and ended up -- I don't

3 recall, but I probably would have inquired about

4 furniture, a chair, desks, things of that nature,

5 heating.

6    Q.   But eventually Ms. Grzadzinski decided not

7 to occupy that office at all, though, right?

8    A.   I believe she went to a different office.

9    Q.   I see.  And so do you recall that the

10 office that Mr. Baker wanted her to be in was on the

11 seventh floor?

12    A.   Yes.

13    Q.   And do you recall that the office that Ms.

14 Grzadzinski actually occupied was actually on the

15 tenth floor?

16    A.   Yes.

17    Q.   Did Mr. Baker ever express an opinion as

18 to why Ms. Grzadzinski should be occupying an office

19 on the seventh floor versus the tenth floor?

20    A.   Because the people in her branch were on

21 the seventh floor, not the tenth floor.

22    Q.   And that's what Mr. Baker expressed?

Page 53

1    A.   To the best of my recollection, yes.

2    Q.   Did he ever provide you with an

3 explanation as to why that mattered?

4    A.   It was important because of Elaine

5 Lammert's displacement from the rest of her staff

6 that the leadership for the given branches were as

7 close to their people as reasonably possible.

8    Q.   Okay.  And is that what Mr. Baker

9 expressed to you?

10    A.   And to many people, yes.

11    Q.   Any other people, other than yourself,

12 that you can recall?

13    A.   Sorry.  I didn't mean about that specific

14 issue.  Just as a broader comment, I meant it was a

15 goal to have leaders near their -- the people that

16 are working with them.

17    Q.   So did you understand this as kind of an

18 overall goal for Mr. Baker to facilitate that for

19 everybody?

20    A.   Yes, when possible.

21    Q.   Was that your understanding?

22    A.   That's my understanding.

| Page 54 | Page 56 |
|---|---|

**Page 54**

1    Q.   Other than encouraging Ms. Grzadzinski to

2   occupy the seventh floor office, can you recall any

3   other efforts Mr. Baker engaged in to accomplish that

4   goal?

5    A.   I don't recall.

6    Q.   Do you recall him ever encouraging any

7   other employee to take a particular office over

8   another?

9    A.   No.

10    Q.   Do you recall whether there was ever a

11   resolution to this question of which office Ms.

12   Grzadzinski should occupy?

13    A.   I don't recall if there was a resolution.

14    MR. HART:  Exhibit No. 5.

15    (Exhibit Number 5 was marked for

16   identification and was attached to the deposition.)

17    BY MR. HART:

18    Q.   So if you could turn to the second page of

19   this document.  So SMS training, if you look at the

20   start of your email, what is -- can you describe for

21   me generally what SMS training was?

22    A.   Strategy.

**Page 56**

1   employees have to do some sort of training, and I

2   would periodically remind employees that there's a

3   required training to complete.

4    Q.   I see.  And that was just part of your

5   duties as chief of staff?

6    A.   Yes, just send out reminders.

7    Q.   Were you involved in tracking to make sure

8   people did, in fact, complete it or were you just

9   sending out those reminders?

10    A.   To the best of my recollection, just

11   sending out reminders.  I don't have a way to see if

12   people have completed them or not.

13    Q.   Okay.  So turning to your email on the

14   first page.  So it's Bates No. 2921 in the lower

15   right-hand corner.  So your email to Ms. Grzadzinski

16   says: "I think, you, Ernie, and Nancy" -- when you

17   say "Ernie," are you referring to Ernest Babcock?

18    A.   Yes.

19    Q.   And Nancy, is that Nancy Wiegand?

20    A.   Yes.

21    Q.   So again, turning to your prior email

22   that's on the next page, 2922, do you see -- so

**Page 55**

1    Q.   And what does that mean?  Like, strategy

2   for any particular thing?

3    A.   It's a broad term.  It can be for the

4   Bureau overall.  It can be for an individual

5   division.  It's just how are we thinking about

6   strategy.

7    Q.   Okay.  And so was there some sort of

8   training requirement for SES employees to relate it

9   to that or --

10    A.   It appears that way.

11    Q.   Do you have an understanding of why that

12   requirement existed?

13    A.   I'm not in the SES.  I'm not sure.

14    Q.   So what role did you have then in

15   facilitating this training for these SESrs?

16    A.   I didn't facilitate it.  I was just

17   reminding them that they have a required training to

18   complete.

19    Q.   Okay.  So why were you the one reminding

20   them, I guess is what I'm trying to get at?

21    A.   Because it's an administrative matter.

22   It's a compliance thing.  Everyone has to do -- all

**Page 57**

1   there's a statement in your email saying:  "We're

2   getting a little extra pressure to get these done."

3    Do you recall what that pressure was,

4   either whether it was somebody that had reached out

5   to you or a deadline?

6    A.   I'm going to take a guess from the email

7   that's below that I forwarded the email below to all

8   the SES people saying, I'm being reminded, so I'm

9   reminding you.

10    Q.   Okay.

11    A.   That's the group that tracks the strategy

12   management office.  That's the signature on the last

13   page.

14    Q.   I see.

15    A.   That gentleman -- it appears from the

16   email here that he sent out a tracker, and I then

17   said I just forwarded the reminder to the people

18   involved.

19    Q.   I see.  And so for Mr. Walsh's -- so his

20   signature says he's part of the strategy management

21   office?

22    A.   Um-hum.

Page 58

1    Q.    From what you can recall, was that part of

2  OGC or was that some other FBI component?

3    A.    An entirely different group.

4    Q.    Okay.  So this was some sort of external

5  expectation, not something that was coming from

6  inside OGC, as you understood it?

7    A.    Right, this was for all SES employees.

8    Q.    I see.  You can set that aside.

9        MR. HART:  If you could mark this as

10  Exhibit 6.

11        (Exhibit Number 6 was marked for

12  identification and was attached to the deposition.)

13        BY MR. HART:

14    Q.    So do you recall these discussions

15  regarding the branch plans?

16    A.    I think so.  It seems familiar.

17    Q.    So can you just describe for me generally

18  what the branch plans were?

19    A.    On the second page?

20    Q.    Or just as you understood them, like why

21  were you preparing these branch plans and what was

22  the goal with them?

Page 59

1    A.    I mean, I think Jim spells it out here.

2  He wants to get a better picture of the plans of the

3  respective branches for the remainder of the year:

4  What are the short, medium, and long-term goals?

5  Have they been prioritized?  Are they mitigating

6  legal risks for the FBI in their area of

7  responsibility?  What are some of the key problems

8  they face?  What are the opportunities they should

9  seize on? alignment?

10    Q.    Okay.  So as you see in Mr. Baker's email

11  -- it's at Bates No. 3439 -- at the very start, he

12  says:  "This is a follow-up to several conversations

13  we have been having."

14    A.    Um-hum.

15    Q.    Do you recall what those conversations

16  were leading up to this?

17    A.    Probably about all of this stuff here.

18    Q.    Okay.  So this outline that Mr. Baker

19  provides below, is that the result of those

20  conversations from what you can recall or --

21    A.    I imagine that they were verbal

22  conversations and that he wanted people to kind of

Page 60

1  warm up and get people to understand what they need

2  to be doing.  And this is the

3  now-he-wants-it-written-down exercise.

4    Q.    Alright.  Did you have any involvement in

5  those conversations?

6    A.    I was in the meetings when -- these were

7  the deputy -- the deputies and Jim and me (sic)

8  regular meetings weekly, so I was probably sitting

9  there.  And I did not create these here.  That was

10  most likely Jim.  But, yeah, I was present.

11    Q.    Okay.  And so if you just -- turning

12  towards the first page, it's Bates No. 3438.  You're

13  actually going to have to flip between the two of

14  them.  So it's Mr. Baker's email at the bottom to Mr.

15  Babcock on April 7th.

16        So his prior email was March 2nd, and it

17  looks like Mr. Baker is asking for where Mr. Babcock

18  is at that point.

19    A.    Um-hum.

20    Q.    Do you recall working on these branch

21  plans with Mr. Babcock anytime between March 2nd and

22  April 7th?

Page 61

1    A.    I couldn't tell you the dates.  I imagine

2  that many people, if they have questions about

3  assignments like this or, you know, things of that

4  nature, might ask me, hey, is this the way that

5  you're thinking about it as well?  Just kind of a

6  general reach out.

7    Q.    Okay.

8    A.    I wasn't assisting Ernie specifically on

9  doing his.

10    Q.    I see.  Do you have any specific

11  recollection of working with Mr. Babcock on this

12  during that time frame?

13    A.    Not specifically, no.

14    Q.    So turning towards your email at the very

15  start of this chain April 7th at 9:18, you say:

16  "It's a tough assignment to do on paper."  Why was

17  that?

18    A.    Anytime you're talking about strategy and

19  you're writing it down, it's a challenging process.

20  All of the things that are on here are important and

21  it's challenging.  It makes you really think.  It

22  makes you think outside of what you normally are

Page 62

1 doing in a given day. It's much more macro.

2       So sometimes it's -- I'm guessing the gist

3 of what I was saying was that it may be helpful to

4 talk about it as well, to give people a better idea

5 of what to write.

6       Q.    Okay. And do you recall whether there was

7 follow-up discussions after this email exchange?

8       A.    I don't recall. If it's strategy-related

9 and SMS, it still will be required. This is a

10 required exercise.

11       Q.    I see. So do you recall whether those

12 branch plans were eventually completed?

13       A.    I don't recall.

14       Q.    So who was primarily responsible for

15 preparing the branch plans?

16       A.    The deputy general counsels.

17       Q.    And would they each prepare the branch

18 plans for their own branch?

19       A.    Yes.

20       MR. HART: You can set that aside.

21       Actually, I think we're at a good pausing

22 point. I could use a ten-minute break. Off the

Page 63

1 record.

2       (A break was taken.)

3       MR. HART: If you could mark this as

4 Exhibit No. 7.

5       (Exhibit Number 7 was marked for

6 identification and was attached to the deposition.)

7       BY MR. HART:

8       Q.    So do you recall this exchange regarding

9 SES performance and plans?

10       A.    Yes.

11       Q.    So just generally, not just necessarily

12 limited to Mr. Baker's, do you recall what your

13 involvement was in the preparation of SES performance

14 plans generally as chief of staff?

15       A.    As a general matter, things involving the

16 SES employees, I am very removed from that just

17 because I was not an SES employee.

18       There are some things I can help with, and

19 I think it's spelled out in the email here. On the

20 second page, it says: "Please bring it to me so it

21 doesn't end up lost on Jim's desk."

22       So for example, I would have them signed

Page 64

1 by him and then I might myself take them where they

2 need to go just to help the process along, but I'm

3 not involved in the process.

4       Q.    I see. So in terms of the preparation of

5 the individual plans or anything like that, you

6 weren't --

7       A.    No, nothing I was ever supposed to do.

8       Q.    Well, if it -- is it ever something that

9 you did do?

10       A.    I don't recall. It's not part of my job.

11       Q.    So do you recall whether any other -- so

12 if you look at Ms. Grzadzinski's May 28th, 2015 email

13 to you -- it's on the first page, Bates No. 2976 --

14 do you recall any other SES employees having the same

15 concern regarding the preparation of their

16 performance plans?

17       A.    For the plans, no. Again, this was

18 outside of my responsibility. Similar to the

19 previous emails, I can nudge people about things

20 they're required to do, but with the SES matters,

21 it's not something that I'm sort of in the mix on.

22       I try to be helpful when possible, though.

Page 65

1       Q.    I see. So who would have been the person

2 that that would be through instead or group or

3 whoever it may be?

4       A.    For plans, usually that's limited to the

5 employee themselves. And if they have questions,

6 there's a unit in the HR department, the SESU, so SES

7 unit, that processes and does things for all SES

8 employees in the Bureau.

9       Q.    Okay. And do you recall whether there was

10 any particular employees within that SESU that were

11 responsible for that or --

12       A.    I couldn't name any. They do it for all

13 employees in the Bureau. And I was not an SES

14 employee, so I didn't have as much interaction with

15 them.

16       Q.    And so for -- what was your involvement in

17 the preparation of Mr. Baker's SES plan?

18       A.    Usually, it's just nudging him to do it.

19       Q.    And so when you say in your email -- it's

20 the very first email in this chain. It says: "I

21 helped get his plan fully vetted by the seventh

22 floor" -- what does that mean, "vetted by the seventh

Page 66

1  floor"?

2      A.   So his supervisor needs to sign off his

3  plan for the current year.  It makes sense.  It's

4  reasonable.  And so I make sure that whatever Jim has

5  prepared finds its way -- it's usually printed -- it

6  goes over and is seen by his supervisor.

7           And then if that is approved, then my job

8  is done.  It's not even my job really.  I just want

9  to make sure that the process -- they're both very,

10 very busy, so I want to make sure it gets done in as

11 timely a fashion as reasonable.

12     Q.   I see.  And so by the seventh floor, do

13 you mean his supervisor?

14     A.   Yes.

15     Q.   And who was that?

16     A.   Probably -- I believe it was Mark

17 Giuliano.  I don't believe it was the director, but I

18 believe it was Mark Giuliano, the deputy director.

19     Q.   And do you recall there being delays in

20 the completion of Mr. Baker's plan that year, 2015?

21     A.   I don't recall.

22     Q.   And just to -- I think it's obvious, but

Page 67

1  -- so was Mr. Baker, to your understanding, also a

2  member of the SES?

3      A.   Yes.

4      Q.   And do you recall, other than Ms.

5  Grzadzinski, just the time frame when the other

6  deputy general counsels were able to complete their

7  SES plans that year?

8      A.   I don't recall in general, but I could

9  probably guess from the email on the second page that

10 they were -- that it was crunch time, and that was on

11 May 28th.

12     Q.   And do you recall there being an issue

13 where the deputy general counsels had to have Mr.

14 Baker's plan in order to complete their own?

15     A.   What do you mean, "an issue"?

16     Q.   Or just basically where -- a matter -- I

17 don't mean to imply something by issue, just an event

18 where there was -- where the deputy general counsels

19 needed Mr. Baker's plan in order to prepare their

20 own.

21     A.   I don't recall.

22     Q.   Okay.  You can set that aside.  Eventually

Page 68

1  there came a time in mid 2015 that the Office of

2  General Counsel was reorganized.

3           Do you recall that?

4      A.   Yes.

5      Q.   So can you describe for me your general

6  understanding of what that reorganization did?

7      A.   The Office of the General Counsel was

8  aligned in a certain way for many years.  The Bureau

9  changed, and this was a realignment to more

10 specifically focus those resources in a different way

11 that made sense for the current Bureau at that time

12 in the future, the future Bureau.

13     Q.   I see.  And so in what way had the Bureau

14 changed that facilitated that?

15     A.   That structure probably didn't involve

16 cyber 20 years prior.  Just new threats, new -- the

17 Bureau had changed, had reorganized, had moved

18 divisions, branches, things like that around.  And it

19 was to align that as best as possible to what the

20 Bureau actually -- how it aligned itself.

21     Q.   And do you recall that as part of that

22 reorganization the Investigative Law Branch was moved

Page 69

1  underneath a different branch?

2      A.   I don't think it was moved underneath a

3  branch.

4      Q.   Consolidated, rather?

5      A.   Potentially merged.

6      Q.   Okay.  And that was with the General Law

7  Branch?

8      A.   Yes.

9      Q.   Okay.  So in what way did that merger or

10 consolidation affect that goal of responding to the

11 Bureau's changes?

12     A.   I'm not sure of the question.

13     Q.   So in terms of that aspect of the

14 reorganization, the merger of the Investigative Law

15 Branch and the General Law Branch, so in what way did

16 that serve the goals of the reorganization?

17          MS. GRAY:  Objection.  Calls for

18 speculation.

19     A.   I couldn't say.  I don't know.

20          BY MR. HART:

21     Q.   So what was your involvement in the

22 reorganization?

Page 70

1    A.  It was to help facilitate the process.

2    Q.  In what way?

3    A.  To try to figure out what the general

4 counsel wanted the structure to be and what made

5 sense to -- what made sense for the Bureau.

6    Q.  Okay.  And did you, in fact, do that?

7    A.  Yes.

8    Q.  So what was the structure that Mr. Baker

9 wanted?

10   A.  I think it was the one that was eventually

11 implemented.

12   Q.  Did you ever develop an understanding as

13 to why he wanted that structure?

14   A.  For the same reasons we mentioned before.

15 It was to better align and consolidate, you know, the

16 division itself.

17   Q.  Okay.  But did you ever develop an

18 understanding of how the specific reorganization that

19 was conducted facilitated that goal?

20   A.  I'm not sure how to answer the question.

21   Q.  What part of it do you need clarification

22 on?

Page 71

1    A.  Can you ask it again?

2    Q.  Yeah.  So what aspect -- so in what way

3 did the reorganization that was actually conducted --

4 or did you ever develop an understanding of how the

5 reorganization as it was conducted facilitated the

6 goal of servicing the Bureau better?

7    A.  So because of -- it's been a few years.

8 Do you have a copy of the structure?  I'm just not

9 able to recall offhand which things moved where at

10 this point because it's been a number of years.

11   Q.  I see.  I'll narrow it.  So specific to

12 the merger of the Investigative Law Branch and the

13 General Law Branch, did you ever develop an

14 understanding of how that facilitated that goal?

15   A.  Can you tell me which units were in each

16 of those branches?

17   Q.  Sitting here today, you just don't have a

18 recollection of what units were in those two

19 branches?

20   A.  I remember where some of them were prior

21 -- I can't recall exactly which ones were in which

22 place before or after.

Page 72

1    MR. HART:  I see.  Okay.  If we can take a

2 break, I can get that for you.

3    A.  Alright.

4    MR. HART:  Off the record.

5    (A break was taken.)

6    BY MR. HART:

7    Q.  So regarding this reorganization, do you

8 recall generally discussing it with Mr. Baker?

9    A.  Yes.

10   Q.  Do you recall what aspects of the

11 reorganization you discussed with Mr. Baker?

12   A.  I think just alignment of -- I think the

13 alignment of the Bureau itself to alignment within

14 OGC.  Some things will map well.  So things may not

15 map as well.

16   The general counsel's office supports all

17 parts of the FBI, so there are generally legal

18 functions that will map to all parts of the FBI.  So

19 in general, it should be, you know, fairly parallel,

20 if that makes sense.

21   Q.  Okay.

22   A.  So for example, if cyber didn't exist 20

Page 73

1 years ago and now cyber is a division, there should

2 be a cyber law component.  And where should that sit?

3 There are questions and I'll just elaborate here a

4 bit more so you have the context.

5   Cyber is not a -- it's not a -- it's not a

6 thing on its own, if you will.  Cyber can be a

7 terrorism issue.  It can be a criminal issue.  It can

8 be a variety of things.

9   So should cyber, as a blanket, sit with

10 the criminal group?  Should it sit with the

11 counterterrorism group?  Should it sit with -- it can

12 be a variety of things.

13   So that type of conversation makes sense

14 because you want to align things as best as possible,

15 but there are always going to be multiple right

16 answers.  Some you just have to make a call on.

17   Q.  I see.  So in your discussions with Mr.

18 Baker about the reorganization, generally did you

19 ever discuss the reorganization's impact on

20 particular employees?

21   A.  Yes.

22   Q.  What employees did you discuss with him?

Page 74

1   A.   Any employee that their position would be
2   moved or, frankly, the units.  So there are units
3   that were a part of one branch that was -- you know,
4   they were part of X branch, and the unit in whole was
5   moved somewhere else.
6       What is the impact on any kind of
7   reorganization to any type of employee?  Just general
8   practices.  People sometimes get nervous about, you
9   know, their thing has been moved.  What does that
10  mean for them, for their future, for the work that
11  they do?  So just broad context.
12  Q.   Okay.  Do you recall any specific
13  employees that you discussed with Mr. Baker?
14  A.   Sure.
15  Q.   Who were they?
16  A.   Marcy was one.
17  Q.   Any others?
18  A.   I think Sherry Sabol was another, and Rick
19  McNally was probably the third.
20  Q.   Okay.  With respect to Ms. Sabol, what
21  were those discussions?
22  A.   She was going to be moved from her section

Page 75

1   chief role in the science and technology group to a
2   role that would support Jim more closely -- I'm sorry
3   -- Jim Baker more closely in the front office doing
4   policy work and other projects, which he had been
5   looking -- which he had been in need of for quite
6   some time.
7       He had asked me on multiple occasions, you
8   know, can he have, you know, more people -- more
9   attorneys in the front office to do policy work,
10  broadly speaking.
11      And I said, you know, we didn't have -- we
12  didn't have enough people to be able to do that; he'd
13  have to wait; we couldn't get new people; he could
14  repurpose existing attorneys if he found people that
15  had that skill set.
16  Q.   So was Ms. Sabol's section chief position
17  being eliminated?
18  A.   No.
19  Q.   So who became the section chief after her?
20  A.   Rick McNally.
21  Q.   So why was Mr. McNally given Ms. Sabol's
22  position?

Page 76

1   A.   He had been serving as the acting deputy
2   general counsel for the National Security Law Branch
3   for quite some time, you know, well over a year.
4   That is an exhausting position.  And he was not
5   selected for the deputy general counsel position,
6   which he had been acting in.
7       So if it was going to be someone else -- I
8   think Rick probably wanted some relief from just that
9   pace and to go somewhere else.
10      Rick is a section chief.  He was acting in
11  a higher role temporarily, but his section chief role
12  was changed from one part of OGC to another when it
13  was related to where he had some understanding.
14  Q.   I see.  So -- and when you say he was a
15  section chief, does that mean, I guess, within agency
16  terms his position of record was section chief,
17  although he was acting as deputy general counsel?
18  A.   Yes.
19  Q.   Okay.  So as part of the reorganization,
20  from what you can recall, was his section chief
21  position of record eliminated under that
22  reorganization?

Page 77

1   A.   No.
2   Q.   So why was he not returned to that
3   position?
4   A.   Because there were two section chiefs in
5   the National Security Law Branch.  He was one of
6   them, but he was acting in the position that
7   supervised both of those two positions.
8       And if he didn't get that top position,
9   which he was acting in, he would return to the same
10  group of people who he's been leading for -- I don't
11  know -- quite some time.  And I believe he wanted
12  some just relief to take a break from that side of
13  the house.
14  Q.   I see.  So was it something that he
15  requested?
16  A.   I don't know, but that would make sense.
17  Q.   I see.  Did you understand that Ms. Sabol
18  wanted to remain in her section chief position?
19  A.   I wasn't a part of those conversations.
20  Q.   Did Mr. Baker ever express an opinion to
21  you or just express generally to you that Mr. McNally
22  would somehow be better suited for that section chief

Page 78

1 position than Ms. Sabol?

2    A.   The way I understand the SES in general is

3 that any SES employee can be moved to anywhere in

4 that agency or any agency, and that's just kind of

5 how it works.

6    Q.   Okay.

7    A.   So I don't think that -- he never had

8 conversations with me about being better suited.

9 That's just not something that I would be privy to.

10    Q.   So with respect to Ms. Grzadzinski, what

11 were the conversations you had with Mr. Baker about

12 her with respect to the reorganization?

13    A.   I think that one was the most challenging

14 because it was at the same time -- I believe I have

15 the timeline right -- but I believe at the same time

16 of the reorg she would be changed from the deputy

17 general counsel to serving in the section chief role

18 still in the SES.

19         And that is just -- that is a major change

20 for anyone.

21    Q.   I see.   So do you recall when that change

22 for Ms. Grzadzinski, changing her from a deputy

Page 79

1 general counsel to becoming a section chief, was

2 first discussed?

3    A.   I don't recall when it was first

4 discussed.

5    MR. HART:   Would you mark this as Exhibit

6 8?

7         (Exhibit Number 8 was marked for

8 identification and was attached to the deposition.)

9    BY MR. HART:

10    Q.   So do you recall having these discussions

11 with Mr. Babcock related to Ms. Grzadzinski?

12    A.   I recall there being emails.

13    Q.   Okay.   So in terms of the discussions

14 regarding when the decision was made to move Ms.

15 Grzadzinski from a deputy general counsel to a

16 section chief position, do you recall whether it was

17 before or after this exchange?

18    A.   I don't know the timing of the meetings

19 that may have taken place.   It sounds from the emails

20 that some of these things were happening at the same

21 time.

22    Q.   Do you recall approximately how long you

Page 80

1 were having those discussions?   That's not to say a

2 specific date range.   But I mean, was it over the

3 course of several weeks? months? years?

4    A.   It obviously wasn't years.   Sorry.   Can

5 you rephrase the question?

6    Q.   Yeah.   So in terms of these conversations

7 for how to conduct the reorganization, just

8 generally, do you recall approximately how long those

9 conversations were ongoing?

10    A.   That could be years.   There was a want to

11 reorganize OGC for quite some time.

12    Q.   I see.   And so then to narrow it a little

13 bit, these discussions regarding moving Ms.

14 Grzadzinski from a deputy general counsel position to

15 a section chief position, do you remember

16 approximately how long those conversations were

17 ongoing?

18    A.   That I don't know.

19    Q.   Do you recall whether there was ever a

20 discussion of -- that you were privy to of placing

21 Ms. Grzadzinski in a position, other than the section

22 chief position she was ultimately placed in?

Page 81

1    A.   I don't think so.   I think that was -- you

2 mean within OGC?

3    Q.   Yes.

4    A.   I don't recall if we had any nonfilled

5 openings at that time, so I don't recall.

6    Q.   Okay.   Did you have any -- were there any

7 discussions that you were aware of regarding placing

8 Ms. Grzadzinski at that time in a position outside of

9 OGC?

10    A.   I don't recall.

11    Q.   Do you recall at all Ms. Grzadzinski

12 asking to be returned to her position as chief

13 division counsel for the Washington Field Office?

14    A.   I was not asked about that.

15    Q.   Okay.   Did you become aware at any time

16 that Ms. Grzadzinski was asking for that?

17    A.   I don't recall the time frame.   It could

18 have been -- I mean, there could be a one-year span

19 between -- I'm just not sure when it happened.

20         That possibility was something that I

21 eventually heard about, but I couldn't tell you when

22 it was.

Page 82

1    Q.   That's okay.  So how did you hear about

2    that?

3    A.   I can't recall, but it was just one

4    option.  You know -- but I don't recall if it was

5    this time or if it was a later time.

6    Q.   Okay.  And do you recall whether that was

7    an option that you discussed with Mr. Baker?

8    A.   I don't think so.  Most of these

9    conversations were happening above my head.  So

10   again, with the SES positions, that is something that

11   I had much less involvement in.

12   Q.   So was there -- from what you can recall,

13   was there anything specific to Ms. Grzadzinski that

14   led Mr. -- in your conversations with him that he

15   expressed was specific to her with respect to this

16   reorganization, meaning was there anything he said in

17   terms of her performance or if somehow she would be

18   better suited as section chief or anything like that?

19   A.   I think in terms of alignment and fit the

20   units that, as a section chief, she would be

21   overseeing, some of them were more tailored to her

22   expertise, and that's why it would be a better fit.

Page 83

1    Q.   In what way were they more tailored to her

2    expertise, from what you can recall?

3    A.   If you had the org chart, I could say

4    more.  One was the Investigative Law Group,

5    specifically.  And then I believe the other one was a

6    training division, which is our legal training at

7    Quantico for new agents and others, but mainly new

8    agents.

9        And given the number of agents in OGC, she

10   was, you know, a better fit for that since she had

11   actually gone through it herself.

12   Q.   I see.  And were those things that you

13   actually discussed with Mr. Baker at that time?

14   A.   In terms of fit, sure.  Yes.

15   Q.   And did Mr. Baker agree with that

16   perspective that those would be a better fit for her?

17   A.   I can't remember exactly what he said.

18   Can I reference the documents?

19   Q.   Yeah.  That's fine.

20   A.   I think just in terms of alignment and

21   strategy, it made the most sense.

22   Q.   Okay.  But from what you can recall, did

Page 84

1    Mr. Baker agree with that perspective?

2    A.   Yes.  I think he agreed.

3    Q.   Other than the issues that we've already

4    gone over, either with Mr. Baker or some other agency

5    official involved in the reorganization, can you

6    recall anyone expressing any other reasons to move

7    Ms. Grzadzinski from a deputy general counsel

8    position to a section chief position?

9    A.   So are you talking about reorganization or

10   are you talking about the action to change her

11   position?

12   Q.   Both.  Either the action of changing her

13   position either independently or as part of the

14   reorganization.

15   A.   Okay.  For the position, I think there was

16   some concerns about performance in the deputy general

17   counsel role.

18   Q.   Okay.  And what were those concerns?

19   A.   I think some of them were span of control.

20   And then you have managing down, managing laterally,

21   and managing up.  I don't think, from my

22   understanding, all of those were meeting

Page 85

1    expectations.

2    Q.   So when you say, "span of control," what

3    does that mean?

4    A.   The breadth of responsibility.

5    Q.   Okay.  Do you recall with respect to Ms.

6    Grzadzinski what the concern was with respect to span

7    of control?

8    A.   I don't recall.

9    Q.   Okay.  And when you say, "managing

10   laterally," what does that mean?

11   A.   Keeping peers informed of, you know,

12   related relative -- relevant information.

13   Q.   Okay.  And with respect to Ms.

14   Grzadzinski, can you recall whether there was any

15   specific instance that implicated that managing

16   laterally concern?

17   A.   I don't have specific examples.  I'm not

18   sure.

19   Q.   So you can't recall any specific examples,

20   sitting here?

21   A.   It's just been a while, yeah.

22   Q.   And then with respect to "managing up,"

Page 86

1  what does that mean?

2      A.   It means just keeping informed supervisors

3  on issues that are bubbling below the surface within

4  your area of responsibility or issues that are major

5  issues.

6          I think, as I understand it, there was

7  some dissatisfaction of just briefing up to Mr. Baker

8  and others, that there wasn't enough information

9  being provided.

10     Q.   Okay.  And so with respect to Ms.

11 Grzadzinski, do you recall any other specific issues

12 that were coming up with respect to managing up at

13 that time?

14     A.   Not specific ones, no.

15     Q.   And then just generally, so for those

16 three issues, the span of control, managing

17 laterally, and managing up, were those all

18 conversations you had with Mr. Baker regarding those

19 matters?

20     A.   I think they probably came up, yes.  I

21 think there was also the issue of location.  That

22 goes back to the office location.

Page 87

1      Q.   In what way did that come up?

2      A.   I think there were people who were

3  dissatisfied with her choice of offices because of

4  the, you know -- it wasn't collocated with -- I mean,

5  her groups were spread around, but it wasn't

6  collocated.  It was specifically in a different

7  branch.

8      Q.   Okay.  So who were the people that were

9  dissatisfied?

10     A.   I don't recall specific individuals, but

11 it was more than one individual.

12     Q.   Okay.  Do you recall approximately how

13 many there were?

14     A.   I don't.  We'll say fewer than ten.

15     Q.   Okay.  And was that a matter that you also

16 discussed with Mr. Baker?

17     A.   It was an ongoing conversation regarding

18 the office that he originally wanted her to be in.

19     Q.   Okay.  So other than those four issues

20 that we just went over, the span of control, the

21 managing laterally, managing up, and the office

22 location, were there any other matters that came up

Page 88

1  with respect to Ms. Grzadzinski in the context of the

2  reorganization?

3      A.   In the context of the reorganization, no.

4      Q.   Okay.  So at the time of the

5  reorganization, do you recall who the other deputy

6  general counsels were?

7      A.   I believe it was Ernie Babcock, Tom Bondy,

8  and Rick McNally was acting at that time still.

9      Q.   Okay.  And do you recall whether there was

10 ever a discussion of placing Mr. Babcock in a

11 different position as part of the reorganization?

12     A.   Yes.

13     Q.   What were those discussions?

14     A.   To combine the two branches that were

15 combined.

16     Q.   I see.  So other than that merger, was

17 there ever any discussions that you were privy to

18 regarding either moving Mr. Babcock to a different

19 position or somehow altering his position?

20     A.   He had a litigation background, so there

21 was some talk of could he serve in the litigation

22 role.  But that was occupied by Tom Bondy, who later

Page 89

1  retired.  But Jim wanted to, you know, just align

2  people as best he could.

3      Q.   Okay.  So do you recall what those

4  discussions were any more specifically regarding Mr.

5  Babcock's potentially serving in the litigation

6  deputy general counsel role?

7      A.   I don't recall specifics, no.

8      Q.   Was that something that was discussed with

9  Mr. Baker that you can recall?

10     A.   Yes.

11     Q.   Do you recall, other than yourself and Mr.

12 Baker, if anybody else was involved in those

13 discussions?

14     A.   I don't think so.

15     Q.   And was there ever a conclusion reached as

16 to specifically why Mr. Babcock was not moved into

17 that litigation role?

18     A.   Tom Bondy was in that role.

19     Q.   I see.  So just because Mr. Bondy was

20 currently occupying it it was decided to not --

21     A.   Yep.  The idea behind it, in my view, good

22 reorganizations, is that you find the structure that

## Page 90

1 makes the most sense first. And the people will most
2 likely not align right away, but the people have to
3 trail you.
4       It's unlikely that a new structure will
5 map perfectly onto the people that are already there
6 or else it wouldn't be called a reorg.
7    Q. I see. So with respect to Mr. Bondy, was
8 there ever a discussion of moving him into a
9 different position that you were privy to?
10   A. Not to my knowledge.
11   Q. Was there any particular reason why he was
12 not being considered for a move --
13      MS. GRAY: Objection. Calls for
14 speculation.
15      BY MR. HART:
16   Q. -- that you're aware of?
17   A. Not that I'm aware of.
18   Q. So -- but Mr. Bondy retired shortly after
19 the reorganization?
20   A. Um-hum.
21   Q. Do you recall when he retired?
22   A. I don't.

## Page 91

1    Q. Do you recall when he informed either
2 yourself or Mr. Baker, if you were privy to those
3 conversations, that he would be retiring?
4    A. Yes.
5    Q. When was that?
6    A. I don't recall. The date, you mean?
7    Q. Yeah.
8    A. I couldn't say.
9    Q. Do you recall whether it was before or
10 after the reorganization was effected?
11   A. I don't recall exactly.
12   Q. If it helps at all, the reorganization was
13 in June 2015.
14   A. I don't recall when he retired.
15   Q. Okay. No. I don't mean when he retired.
16 But I mean when you learned that he would be
17 retiring?
18   A. I believe it was after that because he
19 stayed on -- I thought he stayed on for longer, but
20 it's been a while. I'm not sure of the exact dates.
21 Do you have his retirement date?
22   Q. Not off the top of my head, I don't.

## Page 92

1    A. It was a short turn, as far as I know.
2    Q. I see. So -- and after the
3 reorganization, a new deputy general counsel for
4 national security began occupying the position of
5 replacing Mr. McNally?
6    A. Yes.
7    Q. Who was that?
8    A. Tricia Anderson.
9    Q. And what involvement, if any, do you
10 recall having in the selection of Ms. Anderson for
11 that position?
12   A. I do not select people for those
13 positions.
14   Q. In the selection process, rather, did you
15 have any involvement?
16   A. Because it's SES, not as much. Frankly, I
17 don't think I had any. I may have had, you know,
18 advised Jim that if he doesn't have internal
19 candidates he can look externally because she was an
20 external candidate.
21      But aside from that, I don't recall much
22 involvement until it came time to do the actual

## Page 93

1 hiring logistic paperwork.
2    Q. And in terms of that hiring logistic
3 paperwork, do you recall what your involvement was in
4 that?
5    A. I had to process it.
6    Q. What kind of things needed to be done to
7 process it?
8    A. Well, I think she sends -- actually, I
9 don't think I processed it. She sends in -- as part
10 of an application process, I believe, all candidates
11 send in a resume and a copy of their degrees, you
12 know, and the usual application things. But that
13 doesn't come to me.
14   Q. Who would it go to?
15   A. Human resources.
16   Q. Okay.
17   A. It's the same SES unit.
18   Q. I see. So her submission of that wouldn't
19 have gone to you?
20   A. Hum-um.
21   Q. I see.
22   A. All submissions for all positions go

Page 94

1 through HR. I have some visibility into the non-SES

2 positions.

3    Q.   And did Mr. Baker ever express to you a

4 desire to hire Ms. Anderson for that position?

5    A.   Yes.

6    Q.   Can you just describe for me what those

7 conversations were?

8    A.   I think he said I want to hire this person

9 named Tricia Anderson.

10    Q.   I mean, did he ever provide an explanation

11 as to why like specific to Ms. Anderson he wanted to

12 hire her?

13    A.   I believe he was looking for a candidate

14 with some experience that Tricia had. So as I

15 understand it, she had a very good reputation and

16 worked in the national security realm and was willing

17 to entertain the idea of coming to the FBI.

18    Q.   Okay. So was it specific to that national

19 security realm experience, from your understanding,

20 that Mr. Baker was interested in?

21    A.   I can't say. I just don't know.

22    Q.   To what extent did you have these kinds of

Page 95

1 conversations with Mr. Baker about finding the new

2 deputy general counsel, that slot that Ms. Anderson

3 eventually filled?

4    A.   My job was to make sure that all the slots

5 were filled, so I think we made more progress on the

6 Investigative Law Branch when we hired Marcy. And

7 there was still the other position that was vacant at

8 that time, and so I reminded him that he needed to

9 find a way to fill it.

10    Q.   Okay. Do you recall whether there was any

11 specific issue or matter -- I'm not trying to imply

12 something by saying issue -- that was causing a delay

13 in finding a new deputy general counsel for the

14 position Ms. Anderson eventually occupied?

15    A.   For all of the positions, it's extremely

16 difficult to find -- it's hard to find attorney

17 candidates that have a TS clearance that are -- you

18 know, that want to work in that type of environment.

19 It's a gruelling pace.

20    Q.   I see. And then do you recall who -- I

21 understand you may not have been privy to these

22 conversations. But do you recall who eventually made

Page 96

1 the decision to hire Ms. Anderson --

2        MS. GRAY:  Objection. Calls for

3 speculation.

4        BY MR. HART:

5    Q.   -- if you know?

6    A.   I don't know.

7        MR. HART:  Can you mark this as Exhibit 9?

8        (Exhibit Number 9 was marked for

9 identification and was attached to the deposition.)

10        BY MR. HART:

11    Q.   So just a relatively simple question:

12 Other than this email exchange, do you ever recall

13 discussing this matter that Mr. Babcock was concerned

14 about after this email exchange regarding him --

15 whether or not Mr. Baker thanked Rick for acting?

16    A.   I think it was very quickly remedied.

17    Q.   Okay. And how was it remedied?

18    A.   He thanked him differently, just more --

19 instead of in this email form -- this email here is

20 about Tricia. So there was either a separate email

21 or, I believe, there was actually an in-person

22 conversation. I believe Rick was thanked

Page 97

1 appropriately.

2    Q.   Okay. And in your experience as Mr.

3 Baker's chief of staff, did he typically or not

4 typically thank people who had been acting in roles

5 once they left that role?

6    A.   It's hard to say. People are acting all

7 the time. There's not a -- it's not like there was

8 just one.

9        There could be a dozen at a time depending

10 on if -- if someone in a higher role -- so for

11 example, Rick was acting, which means someone was

12 acting in his section chief spot, which means some

13 unit chief was acting in Rick's spot, which means

14 someone had to be in the unit chief's spot.

15        It cascades, so there's not a way to --

16 maybe I'm overthinking the question, but generally

17 people get thanked.

18    Q.   Yeah. I just mean in your experience in

19 interacting with Mr. Baker, did you notice any trend,

20 one way or the other, as to whether or not he would

21 thank the person that was acting or not?

22    A.   No trends. Generally, he would thank

Page 98

1  them.

2      Q.    Now, returning to Mr. Bondy -- so that's

3  in reference to Tom Bondy, the other deputy general

4  counsel you were talking about before.

5          So during your time as chief of staff to

6  Mr. Baker, did you ever discuss any performance

7  issues related to Mr. Bondy with Mr. Baker?

8      A.    I think the only performance one that I

9  recall right now is that he leaned a little more on

10  the litigation side of his branch than the discovery

11  side of his branch.

12      Q.    What does that mean, "he leaned a little

13  more"?

14      A.    He was more -- he spent a larger

15  percentage of his time working with the litigation

16  units versus the discovery portion, which is the

17  other half of his branch.

18      Q.    I see.  So did you ever develop an

19  understanding of why that was a concern?

20      A.    I think in general you just -- I'd be

21  speculating.  I'm not sure exactly what you mean.

22      Q.    In your conversations, if you had them,

Page 99

1  with Mr. Baker, did you have an understanding as to

2  why that was becoming a problem or was an issue that

3  came up?

4      A.    I think just in general you want your

5  managers to -- if I have a manager, I want them to

6  give good attention to all the people that are under

7  their supervision.

8      Q.    I see.  Do you recall if there came a time

9  that the discovery unit was transferred to Mr.

10  Babcock's supervision?

11      A.    Yes.

12      Q.    Okay.  Do you recall -- were you involved

13  in the discussions regarding --

14      A.    No.

15      Q.    -- that?  Did you ever develop an

16  understanding as to why that decision was made?

17      A.    I believe that decision was made because

18  the discovery process itself is a very complicated

19  one.  And it just needed more help than the

20  management that was in place could provide.

21          Ernie had a background in discovery.  Tom

22  did not have as much of a background in discovery,

Page 100

1  and so I don't know if Jim asked or Ernie volunteered

2  or if Tom asked for help.

3          But the decision was made to have Ernie

4  spend some of his bandwidth, which he had at the time

5  because his branch was smaller, to help out with the

6  discovery issues because it's a complicated process.

7      Q.    And do you recall that the discovery unit

8  was on the tenth floor rather than on the seventh

9  floor?

10      A.    Yes.  Everything in the litigation branch

11  is on the tenth floor.

12      Q.    And after Mr. Babcock gained some

13  authority over the discovery unit, do you recall him

14  starting to occupy a second office on the tenth

15  floor?

16      A.    Definitely.

17      Q.    Do you recall what office that was?

18      A.    I don't think they have numbers outside of

19  them, but I know exactly where it is because I made

20  him a nametag.  Normally, there are nice nametags.

21  This one was somewhat of a joke because it was --

22  when I printed it out.

Page 101

1          But, yeah, it was next to the two

2  discovery unit chiefs in an office currently occupied

3  by a GS-13, 14 management and program analyst, admin

4  person.

5      Q.    Okay.  And do you recall just kind of

6  physically in the office where it was located in

7  terms of internal, a window office, things like that?

8      A.    Definitely no window.  It's one of the

9  smallest offices.  It's smaller than almost all of

10  the attorney offices there.  It's a non-attorney

11  office.  I can draw you a map.  I actually know that

12  floor pretty well.

13      Q.    That's alright.  So --

14      A.    It's not what I would call -- it's not a

15  great office.  We'll say that.

16      Q.    I see.  Do you recall how long Mr. Babcock

17  was in that role over the discovery unit?

18      A.    I don't recall.  Some number of months

19  because it took some time to get into the process

20  issues and have him work his magic.

21      Q.    I see.  Do you recall just approximately

22  when he started having that authority?

Page 102

1  A.  I couldn't tell you the dates.  I just
2  don't know.
3  Q.  Do you recall that it was while Mr. Bondy
4  was still with the FBI?
5  A.  I believe it was.
6  Q.  Do you recall there came a time that Ms.
7  Grzadzinski was eventually removed from the Senior
8  Executive Service?
9  A.  Yes.
10  Q.  So when was the first time you learned
11  that Ms. Grzadzinski would be removed from the SES?
12  A.  I think it was in December of whatever
13  year it was.
14  Q.  Okay.  And what involvement, if any, did
15  you have in those discussions regarding whether to
16  remove her from the SES?
17  A.  Minimal because that's well above my pay
18  grade.  That's -- again, with the SES issues, I am
19  far less involved.  It's a different process than for
20  the GS level employees.
21  Q.  I see.  So at any point, did you
22  familiarize yourself with the process for how to do

Page 103

1  that at all?
2  A.  I think I already knew, but it wasn't
3  something that -- I can't imagine I did a month's
4  worth of research on it.  It wasn't my process to
5  run.
6  Q.  So do you recall how those discussions --
7  if you were involved, how those discussions regarding
8  whether to remove Ms. Grzadzinski from the SES
9  started?
10  A.  How they started, no.  My job is not to --
11  because I was not able to evaluate performance
12  because I'm -- I wasn't her supervisor.
13  All I can do is inform someone of the
14  appropriate process and make sure that they are doing
15  it in the -- in the best way possible.
16  Q.  I see.  But you wouldn't have had any
17  involvement in the actual evaluation of Ms.
18  Grzadzinski's performance?
19  A.  No.
20  Q.  At any time did you discuss Ms.
21  Grzadzinski's performance with Mr. Baker specifically
22  in the context of removing her or potentially

Page 104

1  removing her from the SES?
2  A.  Yes.
3  Q.  Do you recall what those discussions were?
4  A.  I think if he was asking me, this is what
5  I'm thinking of doing, I would have follow-up
6  questions to say, Well, tell me more about what
7  you're thinking.  And if you feel that this is the
8  course of action that you want to pursue, here are
9  the steps that you would need to take; here are the
10  things that you would need to -- it's kind of -- you
11  know, I'm the process guy.
12  Q.  In those discussions with Mr. Baker, did
13  you ever discuss any specific performance matters to
14  -- that gave rise, I suppose, to these conversations?
15  To rephrase that, in these discussions
16  with Mr. Baker regarding whether to remove Ms.
17  Grzadzinski from the SES, did he ever discuss with
18  you his specific performance concerns about Ms.
19  Grzadzinski?
20  A.  I imagine so.  I don't know if I can
21  recall explicit examples.
22  Q.  So just to follow up on that.  Sitting

Page 105

1  here today, do you recall any specific examples of
2  performance concerns that came up in those
3  conversations with Mr. Baker?
4  A.  Before the removal from the SES, I can't
5  recall specifically anything.
6  MR. HART:  Can you mark this as 10?
7  (Exhibit Number 10 was marked for
8  identification and was attached to the deposition.)
9  BY MR. HART:
10  Q.  Okay.  So do you recall -- so just to
11  start with, in this email you say:  "It would be
12  tough to have you throwing the caution flag."
13  What does that mean?
14  A.  I imagine that -- I don't recall exactly.
15  But if I can take a guess as to that time period, if
16  that is at the -- I'm just going to call it November
17  1st just to round up there.
18  If he has concerns about her overall, then
19  he may be in conversations with someone in HR, the
20  SES unit, for example.
21  He could be having regular conversations
22  with his boss, the deputy director, because she's

Page 106

1  also an agent.  There's more -- that kind of line is

2  a little more open.

3      He could be saying, Hey, this isn't really

4  going well.  And I guess I'm reaching out here to ask

5  Jim, you know, Have you talked with him yet about how

6  he plans to do the rating or if -- kind of if, you

7  know, they've spoken about it.

8  Q.   In your experience as Mr. Baker's chief of

9  staff, did Mr. Baker for employees other than Ms.

10  Grzadzinski ask or talk to his people he supervised

11  about how they, in turn, were going to evaluate

12  people they supervised?

13  A.   Yes, of course.

14  Q.   Can you recall any other examples?

15  A.   Probably all of them.  Any other member of

16  the SES it's part of the standard process just to

17  check in to make sure that they are doing the

18  evaluations, that -- it's an ongoing conversation.

19  It's not just a one-time-a-year thing.

20      Jim was very good about having regular

21  check-ins with the deputy general counsels:  How are

22  your section chiefs doing; are there any ways we can

Page 107

1  support them; are there any areas that struggle,

2  things of that nature ongoing.

3  Q.   Specific -- so in those (sic) context,

4  other than for Ms. Grzadzinski, did you ever see Mr.

5  Baker suggest or indicate an outcome for the rating

6  that he thought would be appropriate?

7      MS. GRAY:  Objection.  Misstates the

8  record.

9      BY MR. HART:

10  Q.   I'm asking not specific to Ms.

11  Grzadzinski.

12  A.   But that's not what this is about.

13  Q.   But that's not my question.  I'm asking:

14  So in context other than Ms. Grzadzinski, did you

15  ever see Mr. Baker suggest or indicate a preference

16  for a rating that he believed one of his supervisees

17  should give one of their supervisees, other than --

18  well, I'll start over.

19      In your experience --

20  A.   I can say the answer is no.  Yeah.

21  Q.   Okay.  Just to repeat the question, and

22  you can reanswer if I misphrase it somehow or if your

Page 108

1  answer changes.

2      So in your experience as Mr. Baker's chief

3  of staff in the context of other -- other than Ms.

4  Grzadzinski, did you ever see him suggest or indicate

5  a preference that one of his supervisees should give

6  a given rating to one of their supervisees?

7  A.   I don't think so.

8  Q.   And to your knowledge, did Mr. Baker after

9  receiving this email from you have a conversation

10  with Mr. Babcock about Ms. Grzadzinski's rating?

11  A.   I don't know.

12  Q.   So in here you say -- so it says a good

13  rating.  It looks like it's about to say alla (sic)

14  blank last year.  Do you recall who that employee

15  was?

16  A.   I don't think it's alla (sic).  It must be

17  redacted.

18  Q.   Yeah.  But I'm asking you, do you recall

19  who that was?

20  A.   I don't think it's -- I don't think

21  there's a person there.  I don't think A-L is -- I'm

22  not sure how redaction works, but I don't -- I'm just

Page 109

1  trying to find another example.

2  Q.   Yeah.  So to clarify what I'm asking you,

3  do you recall what you were referring to in that

4  parenthetical there?

5  A.   I don't.  It's redacted.  I just don't

6  know what it means.

7  Q.   Okay.

8  A.   I'm sorry.

9  Q.   Okay.  You can set that aside.

10      MS. GRAY:  Just to clarify, the document

11  does not say, alla (sic).

12      MR. HART:  Sorry.  That was my

13  pronunciation of the letter L.  That was not meant to

14  imply something else.

15      BY MR. HART:

16  Q.   So with respect to Ms. Grzadzinski's

17  removal from the SES, do you recall approximately how

18  long those discussions were ongoing?  Again, if you

19  have specific dates --

20  A.   I mean, it's hard to say.  If there were

21  performance issues that started, you know, much

22  prior, it's hard -- it's a blurred line between when

---

Page 110

1 it moves from things aren't going in the right
2 direction to removal. There's not like a set date
3 and time.
4       MR. HART: Okay. Can you mark this as
5 Exhibit 11?
6       (Exhibit Number 11 was marked for
7 identification and was attached to the deposition.)
8       BY MR. HART:
9    Q.   So do you recall discussing the process of
10 removing Ms. Grzadzinski with Mr. Harding?
11   A.   I don't think I know Mr. Harding.
12   Q.   So do you recall ever discussing anything
13 with him regarding removing Ms. Grzadzinski from the
14 SES?
15   A.   I don't recall a specific instance. It
16 sounds like -- it appears that I called a gentleman
17 named Michael Harding at 10:20 that morning. I
18 believe he's -- well, he works in HR in the SES unit.
19   Q.   Oh, and is that the SES unit we were
20 talking about before?
21   A.   Yes. Actually, I remember him now. He
22 processes all the paperwork for all the SES

Page 111

1 employees. So things that get -- he just processes
2 paperwork. Hence, the supporting documentation.
3    Q.   I see. And do you recall why you were
4 sending this to Mr. Baker?
5    A.   I'm just reading it once more to see if
6 there's context that can help me remember.
7    Q.   Okay.
8    A.   I mean, it looks like HRD is trying to get
9 something submitted. So I am reminding him to do
10 something.
11   Q.   Okay. I guess my question is: Do you
12 recall whether there was something pending before Mr.
13 Baker that they were waiting on?
14   A.   It looks like there was some documentation
15 with OGC in the final editing stage.
16   Q.   Yes. But I mean, do you recall what that
17 documentation was?
18   A.   I don't know.
19   Q.   Okay. You can set that aside.
20      MR. HART: Can you mark this as Exhibit
21 12, please?
22      (Exhibit Number 12 was marked for

Page 112

1 identification and was attached to the deposition.)
2       BY MR. HART:
3    Q.   So just a clarifying question on this one.
4 So in Mary Ann's email to you, she says: "The
5 write-up provided into an EC for below file." What
6 does, "an EC for below file" mean, if you know?
7    A.   EC is just a -- it's a document of record
8 that just goes into the FBI's -- if I -- if I make
9 any change, if I do anything, EC -- electronic
10 communication is I think what it stands for. I can
11 be wrong on that. It's a formal document of some
12 sort.
13   Q.   Okay. And what does, "below file" mean,
14 if you know?
15   A.   It looks like there was a letter. So, for
16 example, if I have an email or if I have a Word
17 document, to make it an EC, I need to go into a
18 different program that we use internally. And I copy
19 and paste that information in there so that there's
20 some sort of record for it.
21   Q.   I see. So is it some sort of different
22 filing system then or --

Page 113

1    A.   It's the -- I'm not sure I can say the
2 name of it. There's a recordkeeping system that the
3 Bureau uses to manage active cases to administrative
4 matters, and it just gets copied into there so that
5 there's a record that something took place.
6    Q.   I see. And so in reference to this
7 write-up that Mary Ann was discussing, do you recall
8 whether you had any involvement in the preparation of
9 that write-up?
10   A.   No. If it's SES like that, I'm not
11 involved.
12   Q.   Okay. You can set that aside.
13      So did you -- going back to the
14 reorganization, at any time did you learn that around
15 that time Ms. Grzadzinski filed an EEO complaint?
16   A.   I don't recall the timing.
17   Q.   Okay. But did you eventually learn that
18 she had filed an EEO complaint?
19   A.   Eventually, yeah.
20   Q.   Do you recall in what context you learned
21 that?
22   A.   I don't know.

| Page 114 | Page 116 |
|---|---|

**Page 114**

1    Q.   Do you recall ever discussing Ms.
2 Grzadzinski's EEO complaint with Mr. Baker?
3    A.   I don't recall if I did or did not.  As a
4 general matter, Jim doesn't discuss things like that
5 because there are some things in my role as chief of
6 staff I have a need-to-know, which is a lot of
7 personnel matters.
8       But EEO is sometimes, in most cases,
9 outside of that because there's a separate office
10 that handles that privately.
11    Q.   I see.  So did there ever come a time that
12 you learned that Ms. Grzadzinski was one of five
13 women that filed similar EEO complaints?
14    A.   Yes.
15       MS. GRAY:  Objection.  Mischaracterizes
16 the record.
17       BY MR. HART:
18    Q.   Do you recall who those other four women
19 were?
20    A.   I do.
21    Q.   Who were they?
22    A.   Nancy Wiegand, W-I-E-G-A-N-D; Sherry

**Page 115**

1 Sabol; Karen Miller; Catherine Bruno.
2    Q.   That was three (sic).  I might have missed
3 one when I was writing them down, though.
4    A.   Sherry, Catherine, Nancy, Marcy (sic).
5    Q.   Was Karen Davis-Miller the fourth one?
6    A.   Yes.
7    Q.   Do you recall the context in which you
8 learned of their EEO complaints?
9    A.   Yeah.  I think there was -- I think -- I
10 don't recall the specifics, but there was some office
11 gossip on the tenth floor because one of those people
12 had told a variety of people about it, and so that
13 spread pretty quickly.
14    Q.   Do you recall which one of those people
15 that was?
16    A.   If I recall correctly, it was Nancy
17 Wiegand.
18    Q.   Do you recall who she had told about her
19 complaint?
20    A.   I don't know who specifically, but it
21 seemed to be a variety of people.
22    Q.   Do you recall what the nature of that

**Page 116**

1 office gossip was?
2    A.   I think it was her telling people about
3 the EEO complaint and that there were several others
4 who were -- you know, had talked to the deputy
5 director about something.  And then it kind of just
6 got spilled from there.
7    Q.   Okay.
8    A.   It became a -- it was not a secret for
9 very long.
10    Q.   Okay.  And do you recall how you became
11 aware of that office gossip?
12    A.   Many people told me.
13    Q.   Do you recall any specific people?
14    A.   I don't.  Probably too many to number.
15    Q.   Do you recall ever discussing that office
16 gossip with Mr. Baker?
17    A.   I would probably tend not to because if it
18 involves him, knowing him, he wouldn't really discuss
19 that.
20       I think there would be some acknowledgment
21 that there is something.  And he usually -- he
22 usually walls me off about things that -- he might

**Page 117**

1 say, Hey, there's a matter about, you know, X company
2 or things like that.
3       I'll give you an example.  I used to work
4 for Google for a very small amount of time.  There
5 was some FBI matter that involved Google in a very
6 mild way.  And he just said:  "Even though you have
7 nothing to do with this, I would just feel better if
8 you were walled off.  Just don't come to this
9 meeting."
10       So he keeps me walled off.  So if there
11 was something, some matter, EEO complaints, he would
12 say -- if I said, Hey, it sounds like there's some --
13 you know, some issue there, he would say:  "Can't
14 talk to you about that."  He's good about that.
15    Q.   Okay.  So -- and I understand you didn't
16 discuss it.  But to your understanding, was he made
17 aware of it?
18    A.   Was Jim made aware of it?
19       MS. GRAY:  Objection.  Calls for
20 speculation.
21       BY MR. HART:
22    Q.   Yes.

Page 118

1    A.   I couldn't say.

2    Q.   And from what you recall, did you ever

3 discuss those issues related to the office gossip

4 with Ernest Babcock?

5    A.   I don't recall, no.

6    Q.   And then one more.  Do you ever recall

7 discussing those office gossip issues with Kevin

8 Walker?

9    A.   Hum-um.

10       MS. GRAY:  Can you say your answer

11 verbally?

12   A.   I don't recall that.

13       BY MR. HART:

14   Q.   Okay.  So other than those five EEO

15 complaints that we just talked about, did you ever

16 become aware of any other EEO complaints filed that

17 named Mr. Baker as a responsible management official?

18   A.   No.

19       MR. HART:  Let's take another ten-minute

20 break.  Do you want to do lunch or do you --

21       MS. GRAY:  Yes, it's 12:45.  Off the

22 record.

Page 119

1        (Whereupon, at 12:45 p.m., a

2         luncheon recess was taken.)

3            - - -

4    A F T E R N O O N   S E S S I O N

5            (1:29 p.m.)

6 Whereupon,

7        JUSTIN SCHOOLMASTER

8 was called for continued examination, and having been

9 previously duly sworn was examined and testified

10 further as follows:

11       MR. HART:  So if you could mark this as

12 13.

13       (Exhibit Number 13 was marked for

14 identification and was attached to the deposition.)

15    EXAMINATION BY COUNSEL FOR COMPLAINANT

16       CONTINUED

17       BY MR. HART:

18   Q.   So this is an easy one.  To your

19 knowledge, was the attachment to this email that's

20 titled, SES Probationary Period -- and it's basically

21 a form.

22       To your knowledge, was this form ever

Page 120

1 completed with respect to Ms. Grzadzinski?

2    A.   I couldn't say.  I just don't know.  I

3 imagine -- I don't know.

4    Q.   Okay.  That's fine.  You can put that

5 aside.

6        So have you -- other than this EEO

7 complaint, have you ever been either a witness or a

8 responsible management official in any other

9 discrimination matter?

10   A.   No.

11   Q.   So to your knowledge, has anyone either

12 through a formal discrimination complaint or just

13 informally within their work unit ever alleged that

14 you somehow discriminated against somebody?

15   A.   That I did?

16   Q.   That you did personally.

17   A.   I don't recall that.

18       MR. HART:  Can you mark this as 14?

19       (Exhibit Number 14 was marked for

20 identification and was attached to the deposition.)

21       BY MR. HART:

22   Q.   And the font on this one is a little

Page 121

1 small.  I'm sorry.

2    A.   What is this here, like an IM

3 conversation?

4    Q.   So this is an excerpt that the agency

5 produced.  It's Lync messages, which I believe is the

6 agency's messaging system.

7    A.   Sure.  Okay.

8    Q.   And if it helps at all, so the second

9 column is, from my understanding, the sender and the

10 third column is the recipient.

11   A.   Okay.

12   Q.   So just generally, do you recall who AJ

13 Grauer is?

14   A.   Yes.

15   Q.   So I'm just looking specifically at -- if

16 you look -- if we count the lines --

17   A.   I know where you're going.  You can just

18 say it.

19   Q.   Okay.  So when you say MG, is that

20 referring to Marciann Grzadzinski?

21   A.   I honestly don't know.  Could be.

22   Q.   Do you recall meeting with Ms. Grzadzinski

Page 122

1 or about Ms. Grzadzinski around this time in -- dated
2 May 29th, 2015?
3     A.   I couldn't say.  I don't think so.  I
4 don't think I met with her very often at all.
5     Q.   Okay.  And then if you look a few lines
6 down, you say:  "Nancy and Catherine are probably
7 plotting Jim's death right now."
8          Who is Nancy?
9     A.   Nancy Wiegand, probably.
10     Q.   And who is Catherine?
11     A.   Catherine Bruno, most likely.
12     Q.   And do you recall why you made that
13 statement?
14     A.   I couldn't say.
15     Q.   Okay.  And then two lines further down --
16 so this is a message from Mr. Grauer to you.  But do
17 you know what ITB stands for?
18     A.   Internet Technology Branch, so IT.
19     Q.   Okay.  And is that some -- is that a
20 component of OGC?
21     A.   No.  It's just the IT division of the FBI.
22     Q.   I see.  And do you know whether there was

Page 123

1 any particular incident involving Ms. Bruno and ITB
2 that may have been underlining that comment?
3     A.   So I don't recall, specifically.  Nancy
4 and Catherine would frequently collaborate on
5 discovery matters because Nancy was over the
6 discovery group.  And Catherine had interactions with
7 the inspector general, which involved discovery.
8          Discovery is in FBI terms the overlap
9 between the IT division and OGC.  So that's for
10 relevance there.
11          I'm guessing that ITB wasn't happy with
12 Catherine about some request or whatever she was
13 making.  And it sounds like from this Nancy and
14 Catherine weren't happy with Jim about something.
15     Q.   Okay.  And if you look a few messages
16 further down, you say in a message to Mr. Grauer:
17 "Nancy's gay?"  And then in the next one, "I had my
18 suspicions."
19          Is that referring to Nancy Wiegand?
20     A.   Most likely, yeah.
21     Q.   Do you recall why you were questioning Ms.
22 Wiegand's sexual orientation?

Page 124

1     A.   I don't think I was questioning it.  I
2 think it was wordplay from the previous -- when Adam
3 said:  "I narrowly averted outing Nancy," that was
4 just wordplay.
5     Q.   Okay.  Then why after that did you say, "I
6 had my suspicions"?
7     A.   Again, wordplay, just a follow-on.
8     Q.   Okay.  In what way is the phrase, "I had
9 my suspicions," wordplay in reference to sexual
10 orientation?
11     A.   I'm not sure what you're going for.
12     Q.   What I'm trying to understand is how that
13 is wordplay, that line.
14     A.   I think I'm talking about the previous
15 ones.
16     Q.   And I'm talking about the next one where
17 you say:  "I had my suspicions."  How is that
18 wordplay?
19     A.   I'm saying wordplay was for the one that
20 came before that.
21     Q.   Okay.  Then why did you say, "I had my
22 suspicions"?

Page 125

1     A.   I don't know.  It was just conversation.
2     Q.   Okay.  Do you recall having suspicions
3 about Ms. Wiegand's sexual orientation?
4     A.   Probably not.  No.  I don't think I ever
5 thought about it.
6     Q.   Other than this conversation with Mr.
7 Grauer, did you ever discuss Ms. Wiegand's sexual
8 orientation with any other agency employee?
9     A.   No.  I don't talk about that with really
10 anyone.
11     Q.   Okay.  But you did talk about it with Mr.
12 Grauer here?
13     A.   That's what it says, yes.
14     Q.   And if you look further down in this
15 conversation, so it's a message from Mr. Grauer to
16 you.  And he says:  "Catherine is single-handedly
17 reopening wounds between ITB and OTC."  Is that from
18 your -- did you understand that to refer to the same
19 incident you described previously?
20     A.   I don't know what the incident is, but it
21 would make sense.  ITB and OGC combined forces in the
22 discovery unit, and Catherine and Nancy frequently

Page 126

1  worked together there.  So I'm guessing that she did

2  something that is pissing both of those groups off.

3      Q.   Okay.  And further below, you say in a

4  message to Mr. Grauer:  "Pender and Jim had lunch

5  today."  Who is Pender?

6      A.   I think his name was Jerome.

7      Q.   And was that in any way related to the

8  issues that you were talking about with Mr. Grauer?

9      A.   He was over ITB.  So to kind of fill in

10  what I'm guessing the blanks are here, ITB and OGC

11  have some friction.  Jim Baker is over OGC.  Jim

12  Pender is over ITB.  I'm guessing they had lunch

13  together to kind of figure out how they can, you

14  know, work better.

15      Q.   Okay.  And then further down in this, you

16  say:  "I try to get him to stay in touch with the

17  various EAD level people."  So who is him referring

18  to there?

19      A.   Jim, Jim Pender.  So it's me saying, they

20  had lunch today.  I tried to get him to stay in touch

21  with the people that run different parts of the

22  organization.

Page 127

1      Q.   I see.  You can set that aside.

2      A.   Okay.

3      Q.   So I apologize if I asked you this before,

4  but the -- so did you discuss -- in preparing for

5  your deposition today, did you discuss that you were

6  being deposed with anybody, other than the agency

7  counsel?

8      A.   No.  I mentioned to my wife something, but

9  she doesn't know the content because I never talk

10  about work with her.

11      Q.   Okay.  That's fine.  And the --

12      MR. HART:  I have no more questions.

13      MS. GRAY:  Okay.

14      EXAMINATION BY COUNSEL FOR THE AGENCY

15      BY MS. GRAY:

16      Q.   I just have a few questions.  Mr.

17  Schoolmaster, you testified about your role with

18  respect to hiring in OGC.  Did you actually make any

19  hiring decisions for the attorneys in OGC?

20      A.   No.  I'm not allowed to make attorney

21  hiring decisions.  Attorneys have to do that.

22      Q.   Okay.  The prior testimony, there was some

Page 128

1  discussion about the shared services group and

2  various individuals who worked in the shared services

3  group.

4      Is the shared services group part of OGC?

5      A.   No.

6      Q.   Do you recall -- do you know what

7  particular division or branch it's a part of?

8      A.   It's a part of a division outside of OGC

9  that is a resource planning office.  They do

10  resources, frankly.  And for some of the smaller

11  divisions -- OGC and other small divisions don't have

12  dedicated resources internally for HR, for IT, for

13  facilities.

14      This group of small people manages that

15  process for the smallest divisions in the FBI

16  together because it's inefficient for a seven-person

17  organization to have an HR department and IT

18  department, things like that.

19      Q.   Okay.  During the prior testimony

20  regarding the office that Ms. Grzadzinski was

21  assigned to, you made some reference to the office

22  being too small.  Was that your opinion or impression

Page 129

1  of the office that it was too small?

2      MR. HART:  Objection.  Form.

3      BY MS. GRAY:

4      Q.   You can answer.

5      A.   It was not my objection.  That was the one

6  that I actually had cleaned out and was preparing.  I

7  believe Marcy thought it was too small, but in

8  actuality, it was literally the same size.

9      The way the buildings work, there's --

10  well, it literally is the same size as the one that

11  was right next to it because there's 2 1/2 windows in

12  each of those.

13      Q.   And who occupied the office that was right

14  next to it?

15      A.   It's DGC, Ernie Babcock.

16      Q.   So the office that she was initially

17  assigned to -- correct me if I'm wrong.  You're

18  saying that the office that she was initially

19  assigned to was the same size as the one that Ernie

20  Babcock occupied; is that right?

21      A.   Yes.

22      Q.   What was the size of the office that Ms.

---

Page 130

1  Grzadzinski was assigned to in comparison to the size
2  of the office that DGC Bondy occupied?
3     A.   Bondy's was a bit larger, but that was
4  different because every part of the building is
5  completely different and was built decades ago.  It's
6  been, you know, rehabbed in different ways.
7        The tenth floor, no one occupied that a
8  few years prior because they were gutting it
9  completely and making it, you know, just new and
10  fresh.  And so they built offices differently than
11  they had in the ones that were in other parts of the
12  building.
13        So Tom's was built to be larger.  There
14  were three SES offices up there, and Tom had one of
15  them.  Everyone else had -- attorneys had offices
16  that were smaller than that.  And then there were a
17  few non-attorneys, admin people, who had their own
18  offices that were even smaller.
19        Ernie actually occupied one of those when
20  he was up there for a while.
21     Q.   Mr. Hart asked a question about whether
22  Mr. Baker had ever encouraged any other employee to

---

Page 131

1  take a particular office over another.
2        Do you recall any circumstance in which an
3  employee newly hired into a position asked to be
4  assigned to an office, other than the one that they
5  were assigned to?
6     MR. HART:  Objection.  Form.
7     BY MS. GRAY:
8     Q.   Go ahead and answer.
9     A.   I can't think of any time that's ever
10  happened.
11     Q.   There was some testimony concerning when
12  you first started hearing talk about the potential
13  reorganization of OGC, and I believe you referenced
14  something like it could be a year or a matter of
15  years.
16        Do you recall precisely when you first
17  heard Mr. Baker start discussing reorganizing OGC?
18     A.   Probably my first day even before being in
19  the chief of staff role.  When I was talking with Jim
20  and Elaine about a variety of things, they agreed
21  that the -- it wasn't aligned in the right kind of
22  way and that some of the -- the overall organization

---

Page 132

1  could be better aligned, but that it wasn't -- Elaine
2  didn't want that happening -- she didn't want a reorg
3  happening while she was still there because I think
4  there was some fear that the cyber group, which was
5  under her watch initially, would be moved to the
6  National Security Branch in an entirely different
7  branch outside of her control.
8        And I don't think she wanted to lose that
9  group, so she made it clear that any kind of reorg
10  would have to wait until after she had left.
11     Q.   You testified concerning various
12  discussions you had with Mr. Baker with regard to Ms.
13  Grzadzinski's performance in the context of the
14  reorganization.
15        Do you recall any discussions you had with
16  Mr. Baker with respect to Ms. Grzadzinski's
17  performance in the context of her demotion to the
18  section chief position, other than the ones that you
19  previously testified about?
20     MR. HART:  Objection to form.
21     A.   Sure.  I think the original question was
22  in the context of the reorg, which are sort of

---

Page 133

1  unrelated.  I think there was one big issue about --
2  it was bar licenses for attorneys in field offices.
3        There was concern from some of those --
4  the acronym is CDC, Chief Division Counsel, so legal
5  representation in a field office.  There was concern
6  within OGC and then concern from the Department of
7  Justice and concern from some of the CDCs as well
8  that their bar licenses weren't up-to-date.
9        Some of them were out of -- they needed
10  more, you know, learning credits.  They hadn't paid
11  dues, things of that nature.
12        Whether that was a major risk to the
13  organization, the -- I think the reasoning that was
14  given by Ms. Grzadzinski was that they didn't need to
15  have -- it wasn't as big of an issue as others
16  thought because they were giving advice, not legal
17  counsel.
18        And there was a distinction there that I
19  don't think others agreed with, and that right there
20  posed a big risk to the FBI -- to all the field
21  offices in the operations that they were running.
22  That was the perception from the department and from

---

Page 134

1 many executives in the FBI.

2    Q.   And did Mr. Baker ever discuss with you

3 his reaction to Ms. Grzadzinski's approach to this

4 issue?

5    A.   I don't -- he was not -- he was not

6 pleased with that opinion, that advice, because it

7 seemed to put a whole lot more risk on the

8 organization than was appropriate.

9         I think he and others, attorney and non,

10 thought it was actually just bad legal advice.

11    Q.   Do you have any knowledge of when Mr.

12 Baker learned that Mr. Bondy was going to be

13 retiring?

14    A.   I don't know when he learned of it.

15    Q.   There was some testimony concerning rumors

16 you heard about Ms. Wiegand discussing her own and

17 others EEO complaints.

18         Do you recall anything specific that you

19 heard with respect to these rumors about her EEO

20 complaints or what she was saying about the EEO

21 complaints?

22    A.   My recollection is that she was -- that

Page 135

1 she had told others about the other four women, that

2 they had, you know, banded together to have a joint

3 complaint and each had their own various issues.

4         And her issue really wasn't an issue.  I

5 think what was relayed to me by a few people was that

6 she was filing an EEO complaint so that if she

7 weren't given a promotion in the future she would

8 have grounds for a retaliation claim against not

9 getting a promotion, which clearly spread around

10 pretty quickly because that's not -- that didn't seem

11 -- that just was a strange thing to say.

12    Q.   Is it your understanding that Ms. Wiegand

13 had actually told people that that's what she was

14 doing or people were making assumptions?

15    A.   My understanding is that she told many

16 people that in a group setting.

17    Q.   Did Mr. Baker ever cancel or cut short

18 meetings with you?

19    A.   That was the expectation.  It was more

20 often than not that was the default.  He has to do

21 two different things.  He has to manage all of the

22 seventh floor executives and run the law firm that is

Page 136

1 OGC.  And so when the director or deputy director

2 asks me to do something, my meeting is over.

3         MS. GRAY:  I don't have any more

4 questions.

5         EXAMINATION BY COUNSEL FOR COMPLAINANT

6         BY MR. HART:

7    Q.   Okay.  So just one question.  So the

8 comment from Ms. Wiegand that you were discussing

9 earlier related to whether it would be grounds for a

10 retaliation complaint, I don't mean to misphrase

11 that.  So if you need to recharacterize that, that's

12 fine.

13         But just in reference to that, what you

14 were just discussing, the -- was that your

15 understanding of what she was doing, Ms. Wiegand?

16         MS. GRAY:  Objection.  Calls for

17 speculation.

18    A.   I'm not sure what you're asking.

19         BY MR. HART:

20    Q.   So was your understanding that Ms. Wiegand

21 was laying the foundation for a future retaliation

22 complaint in filing her EEO complaint?

Page 137

1         MS. GRAY:  Objection.  Calls for

2 speculation.

3         You can answer.

4    A.   That is what she told other people.  So

5 what she -- what her intent was, I couldn't say.  But

6 it seemed pretty clear by saying, my intent to do

7 this is so that in the future I can do that.  I mean,

8 it seemed pretty black and white.

9         BY MR. HART:

10    Q.   Okay.  And did you discuss that aspect of

11 Ms. Wiegand's discussions with Mr. Baker?

12    A.   I did.  And because it was spread around

13 very quickly, much of the office knew about that and

14 heard that, and it was concerning.  And so I gave him

15 a heads-up saying:  "Hey, listen, this is something

16 that's going around as having been said in a group

17 setting.  I need you to know that so that you have

18 awareness."

19         And he, again, walls me off from anything

20 that has to do with him.  But it's my job to inform

21 him of any potential staffing issues that may arise,

22 and that's a pretty -- that's a third rail right

Page 138

1  there.

2      Q.   Okay.  But did you understand that

3  regardless of Ms. Wiegand's motives she was entitled

4  to file an EEO compliant, if she so chose?

5      A.   Oh, of course.  You can always -- everyone

6  should feel that that's their right.  We never want

7  to keep anyone from that.

8          It's concerning to some people that

9  someone would file for the purpose of laying

10  groundwork -- for no apparent reason to file -- to

11  have the groundwork to have a follow-up complaint as

12  a method of not getting a promotion in the future.

13          That was explicitly what we understood was

14  said, so that's all I was informing him of.

15      Q.   Okay.  And did you personally feel that

16  was an improper motive for Ms. Wiegand filing an EEO

17  complaint?

18      A.   If anyone files an EEO complaint for that

19  reason, in my opinion, that's an abuse of the system

20  if there's no valid reason to file.  To have

21  something on record with no grounds, to use that as

22  something for the future, that doesn't seem like it's

Page 139

1  -- that's not something you would expect out of an

2  attorney to say.

3      Q.   Okay.  And with respect to the other four

4  women who filed EEO complaints, Ms. Sabol, Ms.

5  Davis-Miller, Ms. Bruno, and Ms. Grzadzinski, did you

6  at any time have the opinion that they were filing

7  their EEO complaints for similar reasons?

8          MS. GRAY:  Objection.  Calls for

9  speculation.

10      A.   For the reasons I discussed about Nancy, I

11  didn't have those same reasons about others.  But I

12  don't know.  I mean, I don't know enough about why

13  they were filing, so I couldn't say.

14          MR. HART:  Okay.  I have no more

15  questions.

16          THE REPORTER:  Reading and signing?

17          MS. GRAY:  Yes.

18          THE REPORTER:  Would you like a copy also,

19  Ms. Gray?

20          MS. GRAY:  Yes, please.

21          (Whereupon, at 1:54 p.m., signature

22          having not been waived, the taking

Page 140

of the instant deposition ceased.)

Page 141

1          CERTIFICATE OF REPORTER

2  UNITED STATES OF AMERICA ) ss:

3  DISTRICT OF COLUMBIA     )

4      I, SHERRY L. BROOKS, CLR, the officer before

5  whom the foregoing proceedings were taken, do hereby

6  certify that the foregoing transcript is a true and

7  correct record of the proceedings; that said

8  proceedings were taken by me stenographically to the

9  best of my ability and thereafter reduced to

10  typewriting under my supervision; and that I am

11  neither counsel for, related to, nor employed by any

12  parties to this case and have no interest, financial

13  or otherwise, in its outcome.

14

15          _____

16          SHERRY L. BROOKS

17          Notary Public in and for the

18          District of Columbia

19

20  My Commission Expires:  November 14, 2020

21

22

Notice Date: 12/24/2018

Deposition Date: 12/12/2018

Deponent: Justin Schoolmaster

Case Name: Grzadzinski v. Sessions

Page:Line          Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

**< 1 >**
**1**  3:8, 18, 19
29:9, 10  129:11
**1:29**  119:5
**1:54**  139:21
**10**  3:8, 9, 10, 12,
17, 17  105:6, 7
**10:04**  1:21
**10:20**  110:17
**1000**  1:20  2:6
**105**  3:17
**11**  3:11, 18, 20
110:5, 6
**11:57**  41:1
**110**  3:18
**111**  3:19
**1-142**  1:9
**119**  3:20
**12**  1:12  3:19
20:10  111:21, 22
**12:45**  118:21
119:1
**120**  3:21
**1200**  1:19  2:5
**127**  3:5
**13**  3:20  119:12,
13
**136**  3:4
**14**  3:8, 9, 10, 11,
21  101:3  120:18,
19  141:20
**15**  3:12, 13, 14,
15, 16, 17, 20
**16**  3:18, 19
**18**  3:11
**18th**  1:20  2:5
40:22
**1999**  22:7
**1st**  105:17

**< 2 >**
**2**  3:9  31:14, 15
129:11, 11
**20**  68:16  72:22
**2003**  21:19  22:7
**20036**  1:20  2:7
**2004**  21:2, 19
**2005**  19:18
20:12  21:3
**2010**  18:19
19:18
**2012**  17:3  18:19
**2014**  11:20  17:4
41:1
**2015**  64:12
66:20  68:1
91:13  122:2
**2016**  11:3, 21

**2017**  10:14
**2018**  1:12
**202**  2:8, 9, 17, 18
**2020**  141:20
**20535**  2:16
**22**  3:8, 9
**24**  3:17
**26**  3:15
**27**  3:10
**28**  3:14
**289-1389**  2:9
**28th**  64:12
67:11
**29**  3:8  11:3
**2921**  56:14
**2922**  56:22
**2976**  64:13
**29th**  122:2
**2nd**  60:16, 21

**< 3 >**
**3**  3:10, 12  36:14,
15
**31**  3:9
**323-3855**  2:18
**324-2714**  2:17
**3438**  60:12
**3439**  59:11
**36**  3:10
**3819**  45:2
**3832**  30:7
**3841**  30:18

**< 4 >**
**4**  3:4, 11, 13, 18
40:14, 15
**40**  3:11

**< 5 >**
**5**  3:12, 14, 15, 16,
16  54:14, 15
**54**  3:12
**570-2017-00720x**
1:6
**58**  3:13

**< 6 >**
**6**  3:13, 19  58:10,
11
**63**  3:14

**< 7 >**
**7**  3:13, 14  63:4,
5
**79**  3:15
**7th**  60:15, 22
61:15

**< 8 >**
**8**  3:15  79:6, 7

**898-4800**  2:8

**< 9 >**
**9**  3:16, 20  96:7,
8
**9:18**  61:15
**935**  2:15
**96**  3:16

**< A >**
**a.m**  1:21  41:1
**ability**  7:15
14:3  141:9
**able**  7:19  43:21
67:6  71:9  75:12
103:11
**above-entitled**
1:15
**abuse**  138:19
**accomplish**  54:3
**accountable**
44:16
**acknowledgment**
116:20
**acronym**  26:10
133:4
**acronyms**  26:13
**acting**  76:1, 6, 10,
17  77:6, 9  88:8
96:15  97:4, 6, 11,
12, 13, 21
**action**  51:20
84:10, 12  104:8
**active**  113:3
**actual**  31:9
38:22  92:22
103:17
**actuality**  129:8
**Adam**  124:2
**addition**  22:12
**additional**  10:8
**admin**  48:14
101:3  130:17
**Administration**
19:2, 9, 15  41:22
**administrative**
12:12  13:10
22:14  43:16
44:9, 15, 16
55:21  113:3
**advice**  16:18
133:16  134:6, 10
**advised**  18:2
92:18
**advising**  17:15
**advisor**  16:11,
17  17:1, 6, 8, 11,
14  18:3, 5, 10
22:20  23:2
**advisory**  18:6

**affect**  7:11, 15
69:10
**Agency**  1:7, 9
2:12  4:18  7:5
13:14, 21  29:18
76:15  78:4, 4
84:4  121:4
125:8  127:6, 14
**agency's**  121:6
**agent**  27:6  32:8,
13  106:1
**agents**  83:7, 8, 9
**ago**  26:15  37:3
48:20  73:1
130:5
**agree**  83:15  84:1
**agreed**  84:2
131:20  133:19
**ahead**  131:8
**AJ**  121:12
**A-L**  108:21
**alcohol**  7:11, 14
**align**  68:19
70:15  73:14
89:1  90:2
**aligned**  23:7
68:8, 20  131:21
132:1
**alignment**  45:22
59:9  72:12, 13,
13  82:19  83:20
**alla**  108:13, 16
109:11
**alleged**  120:13
**allowed**  127:20
**Alright**  30:3
60:4  72:3
101:13
**altering**  88:19
**AMERICA**  1:1
141:2
**amount**  117:4
**analyst**  11:12
101:3
**Anderson**  17:16,
21  92:8, 10  94:4,
9, 11  95:2, 14
96:1
**Anderson's**  17:17
**Ann**  113:7
**Ann's**  112:4
**answer**  5:16  6:8
7:7  9:4, 8  39:15
44:17  70:20
107:20  108:1
118:10  129:4
131:8  137:3
**answered**  39:13
**answers**  5:12
6:13, 17  73:16

**Anthony**  15:5
33:1  35:17
**anybody**  8:9
89:12  127:6
**anymore**  14:18
27:2
**anytime**  60:21
61:18
**apologize**  127:3
**apparent**  42:11
**APPEARANCES**
2:1
**appears**  40:1
55:10  57:15
110:16
**Apple**  20:15
21:6
**applicants**  26:4
30:13  32:8, 16,
22  35:8
**application**
27:21  28:4, 6
29:2  40:9  93:10,
12
**applications**
25:20  28:21
32:18
**applied**  23:12
24:21  25:2  26:7,
18  27:8  28:16
32:5, 12
**apply**  23:5
**appreciate**  36:8
**approach**  134:3
**appropriate**
103:14  107:6
134:8
**appropriately**
97:1
**approve**  15:16
**approved**  66:7
**approximate**
11:18
**Approximately**
9:22  10:6  20:6,
10  46:15, 21
50:20  79:22
80:8, 16  87:12
101:21  109:17
**April**  60:15, 22
61:15
**area**  59:6  86:4
**areas**  107:1
**arrangements**
40:5
**arrival**  44:7
**aside**  31:13
36:7  46:19  58:8
62:20  67:22
92:21  109:9

111:19  113:12
120:5  127:1
**asked**  19:16
39:13  40:8  75:7
81:14  100:1, 2
127:3  130:21
131:3
**asking**  5:11  6:3
30:14  60:17
81:12, 16  104:4
107:10, 13
108:18  109:2
136:18
**asks**  136:2
**aspect**  6:1  29:2
69:13  71:2
137:10
**aspects**  72:10
**assigned**  45:16
49:20  50:2  51:9
128:21  129:17,
19  130:1  131:4,
5
**assignment**
43:12  50:7
61:16
**assignments**  61:3
**Assistant**  17:19
**assisting**  61:8
**Assumes**  42:15
**assumptions**
135:14
**attach**  14:1
**attached**  3:22
29:11  31:16
36:16  40:16
54:16  58:12
63:6  79:8  96:9
105:8  110:7
112:1  119:14
120:20
**attachment**
119:19
**attend**  18:17
21:17
**attendance**  47:2
**attention**  99:6
**Attorney**  1:7
9:3  44:8, 8, 20
95:16  101:10
127:20  134:9
139:2
**attorneys**  13:15,
16, 17  14:4  16:1
25:6  44:19  75:9,
14  127:19, 21
130:15  133:2
**authority**  100:13
101:22
**auxiliary**  44:7

**Avenue**  2:15
**averted**  124:3
**aware**  24:15, 18
34:2  46:7  81:7,
15  90:16, 17
116:11  117:17,
18  118:16
**awareness**
137:18

< B >
**Babcock**  3:13
30:21  31:3
37:13, 15  38:3
45:3, 6  49:21
56:17  60:15, 17,
21  61:11  79:11
88:7, 10, 18
89:16  96:13
100:12  101:16
108:10  118:4
129:15, 20
**Babcock's**  89:5
99:10
**back**  15:10
22:10  24:8
30:12  86:22
113:13
**background**
88:20  99:21, 22
**bad**  134:10
**Baker**  3:10, 17,
18, 20  17:22
18:2  23:14
27:22  28:21
29:3  37:5  40:8
41:16  48:7, 11,
19  49:7, 12  50:1,
17, 21  51:11, 14
52:10, 17, 22
53:8, 18  54:3
59:18  60:17
67:1  70:8  72:8,
11  73:18  74:13
75:3  77:20
78:11  82:7
83:13, 15  84:1, 4
86:7, 18  87:16
89:9, 12  91:2
94:3, 20  95:1
96:15  97:19
98:6, 7  99:1
103:21  104:12,
16  105:3  106:9
107:5, 15  108:8
111:4, 13  114:2
116:16  118:17
126:11  130:22
131:17  132:12,
16  134:2, 12
135:17  137:11

**Baker's**  59:10
60:14  63:12
65:17  66:20
67:14, 19  97:3
106:8  108:2
**banded**  135:2
**bandwidth**  100:4
**bar**  133:2, 8
**basically**  67:16
119:20
**Bates**  3:21  30:7,
17, 18  45:2
56:14  59:11
60:12  64:13
**becoming**  17:6
79:1  99:2
**began**  92:4
**beginning**  49:1
**behalf**  1:21  2:2,
12
**believe**  11:15
23:22  25:10
33:6  35:22  40:7
43:13  45:9
48:21  51:12
52:8  66:16, 17,
18  77:11  78:14,
15  83:5  88:7
91:18  93:10
94:13  96:21, 22
99:17  102:5
110:18  121:5
129:7  131:13
**believed**  107:16
**Bender**  34:7, 15
35:1, 20
**benefit**  7:2
**best**  14:3  17:1
41:21  42:1
44:10  53:1
56:10  68:19
73:14  89:2
103:15  141:9
**better**  59:2  62:4
70:15  71:6
72:12  78:8
82:18, 22  83:10,
16  117:7  126:14
132:1
**big**  133:1, 15, 20
**Biscardi**  32:2
**bit**  8:2  24:10
27:2  73:4  80:13
130:3
**black**  137:8
**blank**  108:14
**blanket**  73:9
**blanks**  126:10
**blind**  27:2
**blurred**  109:22

**board**  25:12, 14,
19  26:1  38:6, 10,
14, 16, 21, 21
39:2, 8
**bold**  32:6
**Bondy**  37:15
38:3  88:7, 22
89:18, 19  90:7,
18  98:2, 3, 7
102:3  130:2
134:12
**Bondy's**  130:3
**boss**  105:22
**bottom**  44:22
60:14
**Branch**  26:12,
13  52:20  58:15,
18, 21  60:20
62:12, 15, 17, 18
68:22  69:1, 3, 7,
15, 15  71:12, 13
74:3, 4  76:2
77:5  87:7  95:6
98:10, 11, 17
100:5, 10  122:18
128:7  132:6, 7
**branches**  49:20
53:6  59:3  68:18
71:16, 19  88:14
**breadth**  85:4
**break**  5:13, 16
41:15  62:22
63:2  72:2, 5
77:12  118:20
**breaking**  41:10
**briefing**  86:7
**bring**  28:11
29:3  63:20
**bringing**  28:4, 20
**broad**  12:18
55:3  74:11
**broader**  53:14
**broadly**  75:10
**BROOKS**  1:17
141:4, 16
**brought**  13:20
28:5
**Brown**  35:2, 21
**Bruno**  27:7
35:22  115:1
122:11  123:1
139:5
**bubbling**  86:3
**building**  130:4,
12
**buildings**  129:9
**built**  130:5, 10,
13
**Bureau**  18:7
23:4  38:18  54:4
65:8, 13  68:8, 11,

12, 13, 17, 20
70:5  71:6  72:13
113:3
**Bureau's**  69:11
**Business**  19:2
**busy**  66:10

< C >
**call**  19:18  21:2
73:16  101:14
105:16
**called**  1:14  4:5
20:17  90:6
110:16  119:8
**Calls**  37:19
46:4  69:17
90:13  96:2
117:19  136:16
137:1  139:8
**Cambridge**  19:7
**cancel**  135:17
**candidate**  29:5
31:7  33:14
38:20  92:20
94:13
**candidates**  28:14,
15, 20  29:5
38:15  92:19
93:10  95:17
**care**  43:5
**Carleton**  22:4, 5
**cascades**  97:15
**case**  45:8  141:12
**cases**  113:3
114:8
**Castaneda**  3:8
29:17  30:8, 10
**Catherine**  27:7
35:22  115:1, 4
122:6, 10, 11
123:4, 6, 12, 14
125:16, 22
**causing**  95:12
**caution**  105:12
**caveat**  26:17
**CDC**  133:4
**CDCs**  133:7
**ceased**  140:1
**CERT**  24:20, 22
25:9
**certain**  13:22
32:5  44:4  68:8
**CERTIFICATE**
141:1
**Certified**  1:17
**certify**  141:6
**chain**  13:3
61:15  65:20
**chair**  52:4
**challenging**
61:19, 21  78:13

change 43:2 78:19, 21 84:10 112:9
changed 68:9, 14, 17 76:12 78:16
changes 69:11 108:1
changing 78:22 84:12
Charles 35:2, 22
chart 83:3
chase 34:9
check 106:17
check-ins 106:21
chief 11:22 14:21 16:3, 7, 9 17:7 22:20 23:18 44:6 56:5 63:14 75:1, 16, 19 76:10, 11, 15, 16, 20 77:18, 22 78:17 79:1, 16 80:15, 22 81:12 82:18, 20 84:8 97:3, 12, 13 98:5 106:8 108:2 114:5 131:19 132:18 133:4
chiefs 47:7, 9 77:4 101:2 106:22
chief's 97:14
Choi 35:2 36:1
choice 87:3
chose 138:4
Chrissie 14:21 15:2
circumstance 131:2
circumstances 30:9 41:2, 9
claim 135:8
clarification 6:7 70:21
clarify 109:2, 10
clarifying 112:3
clarity 6:2
cleaned 129:6
clear 34:13 41:6 132:9 137:6
clearance 95:17
cleared 52:1
clearly 135:9
Clerk 2:22
clerks 4:15
client 9:3, 19
close 53:7
closely 75:2, 3
CLR 141:4

collaborate 123:4
College 22:4, 6
collocated 87:4, 6
COLUMBIA 141:3, 18
column 121:9, 10
combine 88:14
combined 88:15 125:21
come 23:17 25:8 42:11 43:11 87:1 93:13 114:11 117:8
comes 25:19
coming 58:5 86:12 94:17
command 13:3
comment 53:14 123:2 136:8
COMMISSION 1:2 141:20
committee 33:9
commonly 26:11
communication 112:10
company 117:1
comparison 130:1
Complainant 1:5, 15 2:2 4:9 119:15 136:5
complaint 113:15, 18 114:2 115:19 116:3 120:7, 12 135:3, 6 136:10, 22, 22 138:11, 17, 18
complaints 114:13 115:8 117:11 118:15, 16 134:17, 20, 21 139:4, 7
complete 55:18 56:3, 8 67:6, 14
completed 13:11 56:12 62:12 120:1
completely 130:5, 9
completion 66:20
compliance 55:22
compliant 138:4
complicated 99:18 100:6
component 58:2 73:2 122:20
composition 22:2
concern 64:15 85:6, 16 98:19

133:3, 5, 6, 7
concerned 96:13
concerning 131:11 132:11 134:15 137:14 138:8
concerns 12:20 84:16, 18 104:18 105:2, 18
conclusion 42:19 43:11 89:15
conditions 7:11, 14
conduct 80:7
conducted 70:19 71:3, 5
conducting 38:17
conference 50:5
congratulations 24:9
considered 17:8 90:12
consistent 16:2
consolidate 44:14 70:15
consolidated 42:10 44:19 69:4
consolidation 69:10
Consulting 5:3 9:13, 21
content 127:9
context 73:4 74:11 88:1, 3 103:22 107:3, 14 108:3 111:6 113:20 115:7 132:13, 17, 22
continued 119:8, 16
control 42:2 84:19 85:7 86:16 87:20 132:7
control, 85:2
conversation 73:13 87:17 96:22 106:18 108:9 121:3 125:1, 6, 15
conversations 8:20, 21 28:2 59:12, 15, 20, 22 60:5 77:19 78:8, 11 80:6, 9, 16 82:9, 14 86:18 91:3 94:7 95:1, 22 98:22 104:14 105:3, 19, 21
copied 113:4

copy 71:8 93:11 112:18 139:18
corner 30:16, 19 56:15
correct 13:19 26:14 50:15 129:17 141:7
correctly 115:16
counsel 1:14 4:5, 9, 13, 18 7:7 8:8 9:6, 9, 10 24:13 26:8 32:7 37:7 47:5, 21 48:6, 7, 18 49:21 68:2, 7 70:4 76:2, 5, 17 78:17 79:1, 15 80:14 81:13 84:7, 17 89:6 92:3 95:2, 13 98:4 119:15 127:7, 14 133:4, 17 136:5 141:11
counsels 37:16 47:4 48:13 49:19 62:16 67:6, 13, 18 88:6 106:21
counsel's 31:5 72:16
count 121:16
Counterintelligence 16:15 17:19
counterterrorism 73:11
course 80:3 104:8 106:13 138:5
court 5:20 6:16, 20 7:2
Covering 22:14
create 60:9
credits 133:10
criminal 73:7, 10
crossover 21:4
crunch 67:10
current 5:2 9:12 66:3 68:11
currently 7:11 32:11 89:20 101:2
customer 20:20
cut 34:9 135:17
cute 16:18
cyber 68:16 72:22 73:1, 2, 5, 6, 9 132:4

< D >
date 80:2 91:6, 21 110:2

Dated 3:8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 122:1
dates 11:17 19:18 24:10 61:1 91:20 102:1 109:19
DAVID 2:3 4:13
Davis 36:1
Davis-Miller 115:5 139:5
day 62:1 131:18
DC 1:11, 20 2:7, 16
deadline 57:5
deafening 21:16
deal 51:19
dealt 48:15
death 122:7
decades 130:5
December 1:12 50:6 102:12
decide 24:13 28:11
decided 52:6 89:20
decides 38:21
decision 28:15 34:3 38:2, 22 39:2 41:14 43:10 50:17 79:14 96:1 99:16, 17 100:3
decisions 127:19, 21
dedicated 128:12
default 135:20
Definitely 100:16 101:8
degree 18:18, 21 19:1 21:12, 18
degrees 93:11
delay 95:12
delays 66:19
demotion 132:17
Department 1:7 2:14 13:21 65:6 128:17, 18 133:6, 22
depending 97:9
deposed 5:4 127:6
Deposition 1:13 3:7 5:7 7:6 8:1, 9, 12 29:11 31:16 36:16 40:16 54:16 58:12 63:6 79:8 96:9 105:8 110:7 112:1

119:14  120:20
127:5  140:1
**deputies**  60:7
**deputy**  26:7
31:4  32:7  37:16
47:4, 20  48:6, 13
49:18, 21  60:7
62:16  66:18
67:6, 13, 18  76:1,
5, 17  78:16, 22
79:15  80:14
84:7, 16  88:5
89:6  92:3  95:2,
13  98:3  105:22
106:21  116:4
136:1
**describe**  16:16
32:1, 9  43:8
54:20  58:17
68:5  94:6
**described**  125:19
**description**  22:11
**desire**  94:4
**desk**  63:21
**desks**  52:4
**develop**  70:12,
17  71:4, 13
98:18  99:15
**Development**
19:15
**DGC**  27:21
45:7  46:16, 20
129:15  130:2
**DGC's**  43:18
**Dhart@KatorPar
ks.com**  2:10
**different**  10:15,
21  14:14  23:4
49:17, 22  50:13,
17  52:8  58:3
68:10  69:1  87:6
88:11, 18  90:9
102:19  112:18,
21  126:21  130:4,
5, 6  132:6
135:21
**differently**  96:18
130:10
**difficult**  95:16
**direct**  20:8
**direction**  110:2
**director**  9:15
10:9, 12, 13, 17
11:5  17:19  19:9,
14, 15  66:17, 18
105:22  116:5
136:1, 1
**disagree**  39:2
**disciplinary**  45:3,
13
**discovered**  46:10

**discovery**  98:10,
16  99:9, 18, 21,
22  100:6, 7, 13
101:2, 17  123:5,
6, 7, 8  125:22
**discriminated**
120:14
**discrimination**
120:9, 12
**discuss**  8:5, 8
47:11, 13  48:7
50:16  73:19, 22
98:6  103:20
104:13, 17  114:4
116:18  117:16
118:3  125:7
127:4, 5  134:2
137:10
**discussed**  16:6
33:17  48:13, 19
72:11  74:13
79:2, 4  82:7
83:13  87:16
89:8  139:10
**discussing**  27:20
38:6  50:21
51:10  72:8
96:13  110:9, 12
113:7  114:1
116:15  118:7
131:17  134:16
136:8, 14
**discussion**  50:8,
19  80:20  88:10
90:8  128:1
**discussions**
41:18  48:10
49:5, 12  51:6
58:14  62:7
73:17  74:21
79:10, 13  80:1,
13  81:7  88:13,
17  89:4, 13
99:13  102:15
103:6, 7  104:3,
12, 15  109:18
132:12, 15
137:11
**displacement**
53:5
**dissatisfaction**
51:13, 15  86:7
**dissatisfied**  87:3,
9
**distinction**
133:18
**DISTRICT**
141:3, 18
**divided**  32:7
41:3

**division**  12:10
16:14, 19  38:20
39:3  45:9  55:5
70:16  73:1
81:13  83:6
122:21  123:9
128:7, 8  133:4
**divisions**  14:14
38:19  68:18
128:11, 11, 15
**divvied**  44:18
**document**  29:14
54:19  109:10
112:7, 11, 17
**documentation**
111:2, 14, 17
**documents**  8:11,
14, 17  29:16
83:18
**doing**  14:22
21:6  44:19, 20
60:2  61:9  62:1
75:3  103:14
104:5  106:17, 22
135:14  136:15
**door**  51:18
**dozen**  97:9
**draw**  101:11
**driver**  43:17
**drugs**  7:10, 14
**dual**  44:11
**dues**  133:11
**duly**  1:16  4:6
119:9
**duties**  16:6
20:18  22:12
45:7  56:5

**< E >**
**EAD**  126:17
**earlier**  38:7
136:9
**early**  17:4
**easier**  35:1
**easy**  119:18
**EC**  112:5, 6, 7, 9,
17
**editing**  111:15
**Education**  21:11,
15
**Edward**  36:2
**EEO**  113:15, 18
114:2, 8, 13
115:8  116:3
117:11  118:14,
16  120:6  134:17,
19, 20  135:6
136:22  138:4, 16,
18  139:4, 7
**EEOC**  1:5

**effected**  91:10
**effective**  14:10
**effectively**  10:20
**efficient**  14:9
43:15
**efforts**  54:3
**either**  24:5
26:10  35:19
45:5, 22  48:17
57:4  84:4, 12, 13
88:18  91:1
96:20  120:7, 11
**elaborate**  73:3
**Elaine**  17:22
23:14  32:12
33:13  41:6, 7, 16
42:3, 22  43:14,
19  49:17  53:4
131:20  132:1
**electronic**  112:9
**eliminated**  75:17
76:21
**email**  24:5
29:16  30:2, 7, 17,
21  40:1, 18, 21,
22  41:7  46:9
54:20  56:13, 15,
21  57:1, 6, 7, 16
59:10  60:14, 16
61:14  62:7
63:19  64:12
65:19, 20  67:9
96:12, 14, 19, 19,
20  105:11  108:9
112:4, 16  119:19
**E-mail**  2:10, 19
**emails**  8:18, 19
24:7  64:19
79:12, 19
**employed**  141:11
**employee**  17:12
24:16  54:7
63:17  65:5, 14
74:1, 7  78:3
108:14  125:8
130:22  131:3
**employees**  9:20,
22  10:3, 3, 6
18:8  20:4  22:13
55:8  56:1, 2
58:7  63:16
64:14  65:8, 10,
13  73:20, 22
74:13  102:20
106:9  111:1
**employer**  5:2
9:12
**EMPLOYMENT**
1:2  17:5
**encompass**  19:19

**encouraged**
130:22
**encouraging**
54:1, 6
**ended**  52:2
**engaged**  54:3
**engagement**  9:19
**entails**  9:17
**entertain**  94:17
**entire**  12:5
25:17
**entirely**  58:3
132:6
**entitled**  138:3
**environment**
95:18
**EQUAL**  1:2
**Ernest**  3:13
56:17  118:4
**Ernie**  44:1
49:21  51:17
56:16  61:8  88:7
99:21  100:1, 3
129:15, 19
130:19
**Ernie,**  56:17
**ESQUIRE**  2:3,
13
**evaluate**  29:4
103:11  106:11
**evaluation**
103:17
**evaluations**
106:18
**event**  50:9, 10
67:17
**eventually**  27:10
50:12  52:6
62:12  67:22
70:10  81:21
95:3, 14, 22
102:7  113:17, 19
**everybody**  53:19
**evidence**  42:15
**exact**  11:17
19:17  91:20
**exactly**  19:13
31:10  32:2
71:21  83:17
91:11  98:21
100:19  105:14
**examination**
1:14  4:9  119:8,
15  127:14  136:5
**examined**  4:7
119:9
**example**  63:22
72:22  97:11
105:20  109:1
112:16  117:3

examples 39:21
48:1 85:17, 19
104:21 105:1
106:14
excerpt 121:4
exchange 40:19
62:7 63:8 79:17
96:12, 14
exclude 13:22
Executive 102:8
executives 134:1
135:22
exercise 60:3
62:10
exhausting 76:4
Exhibit 29:8, 10,
19 31:14, 15
36:14, 15 40:14,
15 54:14, 15
58:10, 11 63:4, 5
79:5, 7 96:7, 8
105:7 110:5, 6
111:20, 22
119:13 120:19
EXHIBITS 3:7,
22
exist 72:22
existed 55:12
existing 75:14
expect 139:1
expectation 58:5
135:19
expectations 85:1
expected 5:15
7:7 13:6 26:3
experience 22:18
39:1, 5, 16 94:14,
19 97:2, 18
106:8 107:19
108:2
experienced
39:11
experiences
15:22
expertise 82:22
83:2
Expires 141:20
explain 5:7
24:22 37:9
explained 8:4
explanation 9:16
33:11 53:3
94:10
explicit 104:21
explicitly 138:13
express 49:7
51:14 52:17
77:20, 21 94:3
expressed 52:22
53:9 82:15

expressing 84:6
extent 94:22
external 58:4
92:20
externally 92:19
extra 57:2
extremely 95:15

< F >
face 59:8
facilitate 53:18
55:16 70:1
facilitated 68:14
70:19 71:5, 14
facilitating 55:15
facilities 12:10
22:16 128:13
fact 56:8 70:6
facts 42:15
fairly 72:19
familiar 58:16
familiarize
102:22
far 38:22 92:1
102:19
fashion 66:11
fast 7:1
Fax 2:9, 18
FB1004276R
3:21
FBI 11:10
14:15 16:10, 13,
14 22:19 24:15
39:1 46:20 58:2
59:6 72:17, 18
94:17 102:4
117:5 122:21
123:8 128:15
133:20 134:1
FBI-2015-00176
1:8
FBI's 112:8
fear 132:4
February 11:3,
21
feel 104:7 117:7
138:6, 15
female 27:7
fewer 87:14
Field 1:4 81:13
133:2, 5, 20
figure 51:19
70:3 126:13
file 112:5, 6, 13
138:4, 9, 10, 20
filed 113:15, 18
114:13 118:16
139:4
files 138:18

filing 112:22
135:6 136:22
138:16 139:6, 13
fill 95:9 126:9
filled 12:15
95:3, 5
final 111:15
financial 141:12
find 89:22 95:9,
16, 16 109:1
finding 95:1, 13
finds 66:5
fine 29:18
83:19 120:4
127:11 136:12
firm 135:22
first 13:16
23:20 24:4, 14
30:6 40:22 45:1
56:14 60:12
64:13 65:20
79:2, 3 90:1
102:10 131:12,
16, 18
fit 82:19, 22
83:10, 14, 16
five 37:2 48:20
51:3 114:12
118:14
flag 105:12
flip 60:13
floor 52:11, 15,
19, 19, 21, 21
54:2 65:22 66:1,
12 100:8, 9, 11,
15 101:12
115:11 130:7
135:22
focus 68:10
focusing 43:17
follow 104:22
follow-on 124:7
follows 4:7
119:10
follow-up 59:12
62:7 104:5
138:11
font 120:22
forces 125:21
foregoing 141:5,
6
forgot 13:22
form 96:19
119:21, 22 129:2
131:6 132:20
formal 112:11
120:12
formally 18:1
format 5:10
former 48:6
forth 24:8

forwarded 57:7,
17
found 75:14
foundation
136:21
Four 10:2, 3, 7
37:2 87:19
114:18 135:1
139:3
fourth 115:5
frame 11:13
18:17 20:22
21:17 22:5
46:18 61:12
67:5 81:17
frankly 41:16
44:14 74:2
92:16 128:10
frequently 123:4
125:22
fresh 130:10
friction 126:11
front 75:3, 9
frustrations 13:1
fully 6:11 7:15,
19 32:15 65:21
functions 12:12,
13, 16 13:4, 8, 9,
11 16:5 22:15
41:4, 11, 15 42:9,
13 43:5 72:18
furniture 52:4
further 24:11
119:10 122:15
123:16 125:14
126:3, 15
future 68:12, 12
74:10 135:7
136:21 137:7
138:12, 22

< G >
gained 100:12
game 46:10, 14
gap 17:5, 11
gathering 13:17
gay 123:17
General 1:7
8:16 9:16 14:6
18:5 22:11
24:13 26:7 31:5
32:7 37:7, 16
43:4 47:4, 5, 20
48:6, 7, 13, 18
49:18, 21 51:7
61:6 62:16
63:15 67:6, 8, 13,
18 68:2, 5, 7
69:6, 15 70:3
71:13 72:16, 19
74:7 76:2, 5, 17

78:2, 17 79:1, 15
80:14 84:7, 16
88:6 89:6 92:3
95:2, 13 98:3, 20
99:4 106:21
114:4 123:7
generally 16:16
24:16 39:12
43:9 47:10 51:5
54:21 58:17
63:11, 14 72:8,
17 73:18 77:21
80:8 86:15
97:16, 22 121:12
gentleman 27:5
57:15 110:16
getting 26:13
57:2 135:9
138:12
gist 62:2
Giuliano 66:17,
18
give 6:13 9:16
11:18 22:11
23:3 43:12 62:4
99:6 107:17
108:5 117:3
given 29:6
38:10, 11 39:3
44:4 45:3, 4
46:2 53:6 62:1
75:21 83:9
108:6 133:14
135:7
giving 5:12
133:16
go 5:6, 8 15:10,
17 32:21 34:22
35:9 37:4 64:2
76:9 93:14, 22
112:17 131:8
goal 14:6 53:15,
18 54:4 58:22
69:10 70:19
71:6, 14
goals 23:8 59:4
69:16
goes 27:1 66:6
86:22 112:8
going 5:6, 11, 11
9:2, 19 17:3
22:10, 17 24:8,
11 25:10, 10, 11,
12 32:21 36:8
44:22 57:6
60:13 73:15
74:22 76:7
105:16 106:4, 11
110:1 113:13
121:17 124:11
134:12 137:16

good 4:11 9:21
28:13 33:14
62:21 89:21
94:15 99:6
106:20 108:12
117:14
Google 117:4, 5
gossip 115:11
116:1, 11, 16
118:3, 7
government
25:21
Grad 21:7, 8
grade 102:18
graduate 18:15,
16, 18, 20 19:3
21:12, 18, 20
Grauer 121:13
122:16 123:16
125:7, 12, 15
126:4, 8
GRAY 2:13 3:5
4:18, 18 8:5 9:2,
8 29:20 30:1
37:19 39:13
42:14 46:4
69:17 90:13
96:2 107:7
109:10 114:15
117:19 118:10,
21 127:13, 15
129:3 131:7
136:3, 16 137:1
139:8, 17, 19, 20
great 101:15
ground 5:7
grounds 135:8
136:9 138:21
groundwork
138:10, 11
group 14:7, 11,
13, 17, 20 15:4
25:20 57:11
58:3 65:2 73:10,
11 75:1 77:10
83:4 123:6
128:1, 3, 4, 14
132:4, 9 135:16
137:16
groups 44:2
87:5 126:2
gruelling 95:19
GRZ 3:21
GRZADZINSKI
1:4 3:14 4:14,
15 23:18 24:15
26:6 27:9 30:11
36:10, 22 38:9
40:3, 19 46:20
47:20 48:5, 8, 16
50:2, 13 52:6, 14,

18 54:1, 12
56:15 67:5
78:10, 22 79:11,
15 80:14, 21
81:8, 11, 16
82:13 84:7 85:6,
14 86:11 88:1
102:7, 11 103:8
104:17, 19
106:10 107:4, 11,
14 108:4 110:10,
13 113:15
114:12 120:1
121:20, 22 122:1
128:20 130:1
133:14 139:5
Grzadzinski's
27:21 28:19
29:2 40:9 50:8,
16 51:15 64:12
103:18, 21
108:10 109:16
114:2 132:13, 16
134:3
GS 25:16 102:20
GS-13 101:3
guess 17:3
42:17 55:20
57:6 67:9 76:15
105:15 106:4
111:11
guessing 62:2
123:11 126:1, 10,
12
guidance 12:22
Guidehouse 5:3
9:13 10:10 11:9
gutting 130:8
guy 104:11

< H >
half 11:16 98:17
handled 26:22
handles 14:14
114:10
happen 39:7, 10
happened 81:19
131:10
happening 79:20
82:9 132:2, 3
happy 123:11, 14
hard 95:16 97:6
109:20, 22
Harding 110:10,
11, 17
Harris 1:19 2:4
HART 2:3 3:4
4:10, 13, 19 8:7
9:5, 11 29:8, 12,
18, 21 30:3, 5
31:13, 17 36:13,

17 37:21 39:14
40:13, 17 42:16
46:6 54:14, 17
58:9, 13 62:20
63:3, 7 69:20
72:1, 4, 6 79:5, 9
90:15 96:4, 7, 10
105:6, 9 107:9
109:12, 15 110:4,
8 111:20 112:2
114:17 117:21
118:13, 19
119:11, 17
120:18, 21
127:12 129:2
130:21 131:6
132:20 136:6, 19
137:9 139:14
Harvard 19:11
20:1 21:4, 9, 17
22:10
hatting 44:12
head 6:15 26:11
39:3 82:9 91:22
heads-up 137:15
hear 33:18 82:1
heard 33:15
81:21 131:17
134:16, 19
137:14
hearing 131:12
heating 52:5
he'd 75:12
held 32:5, 10
help 13:2 14:6
17:10 31:21
63:18 64:2 70:1
99:19 100:2, 5
111:6
helped 43:19
65:21
helpful 43:22
62:3 64:22
helpfully 13:4
helping 31:6
41:21
helps 91:12
121:8
Herring 32:6, 16
hey 61:4 106:3
117:1, 12 137:15
higher 76:11
97:10
hire 94:4, 8, 12
96:1
hired 13:9 14:4
18:1 23:22 95:6
131:3
hiring 12:11, 14
13:13 15:12
16:1 23:9 24:17

25:15, 16 26:22
38:22 44:14
93:1, 2 127:18,
19, 21
historical 45:17
honestly 121:21
Hong 36:2
house 77:13
HR 12:10, 13, 16,
18 13:8, 9, 21
22:15 26:22
65:6 94:1
105:19 110:18
128:12, 17
HRD 111:8
huh-uh 6:14
Human 93:15
Hum-um 93:20
118:9

< I >
idea 62:4 89:21
94:17
ideas 44:13
identification
29:11 31:16
36:16 40:16
54:16 58:12
63:6 79:8 96:9
105:8 110:7
112:1 119:14
120:20
III 1:7
IM 121:2
imagine 31:4
59:21 61:1
103:3 104:20
105:14 120:3
impact 73:19
74:6
implemented
70:11
implicated 85:15
imply 67:17
95:11 109:14
importance 6:2
important 6:1,
10, 16 37:9 53:4
61:20
impression
128:22
improper 138:16
IMs 8:20
incident 123:1
125:19, 20
incidents 42:18
include 25:5
independently
84:13
indicate 107:5,

15 108:4
indirect 20:9
individual 55:4
64:5 87:11
individuals 15:3
36:9 37:6 38:6,
16 44:4 46:2
87:10 128:2
inefficient 128:16
influence 7:10
inform 103:13
137:20
informally
120:13
information
13:20 25:18
33:21 85:12
86:8 112:19
informed 85:11
86:2 91:1
informing 138:14
ingest 15:17
initial 29:16
initially 129:16,
18 132:5
in-person 96:21
inquired 52:3
inside 58:6
inspector 123:7
instance 40:11
85:15 110:15
instant 140:1
instruct 9:4
instructed 7:6
intent 31:10
137:5, 6
interact 46:21
interacted 24:5
interacting 48:5
97:19
interaction 65:14
interactions
47:19 123:6
interest 141:12
interested 94:20
internal 92:18
101:7
internally
112:18 128:12
Internet 122:18
interrupt 5:14
6:5
interview 26:3
27:19 31:6 37:2,
6, 18 38:3, 10, 17
40:3, 4, 6
interviewed
23:13 27:13
33:2, 5 34:8, 10,
18 35:5, 10, 14,

17, 18, 22  36:10,
22
**interviewers**
37:14
**interviewing**
27:10  31:5
38:15
**interviews**  23:12
25:21  27:12, 15
38:19  39:19
**introduce**  4:17
**introduced**  4:12
**introduction**  23:3
**Investigative**
26:13  68:22
69:14  71:12
83:4  95:6
**involve**  68:15
**involved**  12:13,
17  27:19  34:3
39:11, 18, 22
41:17  43:9, 11
56:7  57:18  64:3
84:5  89:12
99:12  102:19
103:7  113:11
117:5  123:7
**involvement**
13:13  15:11, 14
27:14, 17  40:4
41:20  60:4
63:13  65:16
69:21  82:11
92:9, 15, 22  93:3
102:14  103:17
113:8
**involves**  116:18
**involving**  16:1
63:15  123:1
**irony**  21:15
**issue**  49:8, 13, 15
53:14  67:12, 15,
17  73:7, 7  86:21
95:11, 12  99:2
117:13  133:1, 15
134:4  135:4, 4
**issues**  42:5, 7, 18
44:16  48:14
84:3  86:3, 4, 5,
11, 16  87:19
98:7  100:6
101:20  102:18
109:21  118:3, 7
126:8  135:3
137:21
**ITB**  122:17
123:1, 11  125:17,
21  126:9, 10, 12
**item**  7:4
**its**  66:5  73:6

141:13

**< J >**
**Jacqueline**  35:1,
21
**James**  3:10, 17,
18, 20  17:22
48:7
**Jason**  32:6
**JEFFERSON**  1:7
**Jennifer**  35:18
**Jerome**  126:6
**Jim**  23:14
41:16  43:13
46:10  49:18
59:1  60:7, 10
66:4  75:2, 3
89:1  92:18
100:1  106:5, 20
114:4  117:18
123:14  126:4, 11,
11, 19, 19  131:19
**Jim's**  63:21
122:7
**job**  13:18  15:1,
16  16:5  23:11
26:5  64:10  66:7,
8  95:4  103:10
137:20
**joined**  21:6
**joint**  135:2
**joke**  100:21
**Jonathan**  36:5
**Joseph**  34:7, 15
35:1, 19
**judge**  5:20
**JULIET**  2:13
4:18  8:3
**Juliet.Gray@ic.fb**
**i.gov**  2:19
**July**  10:11, 14
11:5, 6  17:3
**June**  18:19  22:7
91:13
**Justice**  1:8  2:14
133:7
**JUSTIN**  1:13
3:3  4:4, 22
119:7
**J-U-S-T-I-N**  4:22

**< K >**
**Karen**  115:1, 5
**Kator**  1:19  2:4,
22
**keep**  22:16
44:19, 20  138:7
**Keeping**  85:11
86:2
**keeps**  117:10

**Kelly**  36:2
**Kevin**  118:7
**key**  59:7
**kind**  5:7  8:3
9:19  20:18  32:1
33:20  47:10
49:7  53:17
59:22  61:5  74:6
78:4  93:6  101:5
104:10  106:1, 6
116:5  126:9, 13
131:21  132:9
**kinds**  13:8  42:1
48:10  94:22
**knew**  103:2
137:13
**know**  5:14
12:22  13:22
14:1  15:1  24:1,
9  26:17  28:9, 10,
14  29:14, 22
31:19  32:1  33:3,
10, 10, 16  34:5, 9,
11  35:1, 2, 4, 6, 6,
11, 16, 17, 18, 20,
21  36:1, 1, 2, 3, 3,
5, 5, 6, 6, 11, 11,
18  38:4  43:21
44:11  46:18
51:4, 17, 18  61:3
69:19  70:15
72:19  74:3, 9
75:8, 8, 11  76:3
77:11, 16  79:18
80:18  82:4
83:10  85:11
87:4  89:1  92:1,
17  93:12  94:21
95:18  96:5, 6
100:1, 19  101:11
102:2  104:11, 20
106:5, 7  108:11
109:6, 21  110:11
111:18  112:6, 14
113:22  115:20
116:4  117:1, 13
120:2, 3  121:17,
21  122:17, 22
125:1, 20  126:14
127:9  128:6
130:6, 9  133:10
134:14  135:2
137:17  139:12,
12
**knowing**  116:18
**knowledge**  34:17
90:10  108:8
119:19, 22
120:11  134:11
**Kopistansky**  35:3

**< L >**
**Lammert**  17:22
18:2  23:14
32:12, 17  33:13
41:4, 7  42:5, 10,
20  43:6  49:17
**Lammert's**  35:8
53:5
**Lang**  33:1  35:17
**larger**  98:14
130:3, 13
**late**  46:10, 14
**laterally**  84:20
85:16  86:17
87:21
**laterally,**  85:10
**laundry**  43:20
**Law**  2:22  4:15
26:12, 13  68:22
69:6, 14, 15
71:12, 13  73:2
76:2  77:5  83:4
95:6  135:22
**laying**  136:21
138:9
**leaders**  53:15
**leadership**  53:6
**leading**  59:16
77:10
**leads**  38:19
**leaned**  98:9, 12
**learn**  113:14, 17
**learned**  91:16
102:10  113:20
114:12  115:8
134:12, 14
**learning**  133:10
**led**  41:10  42:18
82:14
**left**  97:5  132:10
**legal**  13:4  43:18
47:12  59:6
72:17  83:6
133:4, 16  134:10
**letter**  109:13
112:15
**level**  25:16
102:20  126:17
**licenses**  133:2, 8
**limited**  14:5
63:12  65:4
**line**  106:1
109:22  124:13
**lines**  121:16
122:5, 15
**Lisa**  35:3  36:3
**list**  24:20, 22
25:2, 9, 11  34:21
35:9  43:20  45:1,

13
**listed**  32:6, 15, 17
**listen**  137:15
**literally**  129:8, 10
**litigation**  88:20,
21  89:5, 11
98:10, 15  100:10
**little**  8:2  24:10
27:2  32:20  57:2
80:12  98:9, 12
106:2  120:22
**LiveNote**  1:17
**located**  101:6
**location**  49:3
86:21, 22  87:22
**Log**  3:21
**logistic**  93:1, 2
**long**  11:1  19:12
46:15  79:22
80:8, 16  101:16
109:18  116:9
**longer**  91:19
**long-term**  59:4
**look**  29:13
45:12  54:19
64:12  92:19
121:16  122:5
123:15  125:14
**looking**  30:6
75:5  94:13
121:15
**looks**  29:15
32:4  60:17
108:13  111:8, 14
112:15
**lose**  132:8
**lost**  63:21
**lot**  30:4  114:6
134:7
**lower**  30:16, 18
56:14
**lunch**  118:20
126:4, 12, 20
**luncheon**  119:2
**Lync**  8:20, 21
121:5

**< M >**
**macro**  62:1
**magic**  101:20
**major**  78:19
86:4  133:12
**making**  7:5
9:18  12:14
13:18  123:13
130:9  135:14
**manage**  113:3
135:21
**managed**  25:3
**management**
11:12  14:7, 11

16:*19*  17:*14*
23:5, *6*  57:*12, 20*
99:*20*  101:*3*
118:*17*  120:*8*
**manager**  10:*19*
11:2, *8*  13:*1*
20:*17*  99:5
**managers**  99:5
**manages**  128:*14*
**managing**  84:*20,*
*20, 21*  85:*9, 15,*
*22*  86:*12, 16, 17*
87:*21, 21*
**map**  72:*14, 15,*
*18*  90:5  101:*11*
**March**  21:2
60:*16, 21*
**MARCIANN**
1:*4*  4:*14*  121:*20*
**Marcy**  26:*17*
27:*3*  35:*16*
74:*16*  95:*6*
115:*4*  129:7
**Margaret**  36:*1*
**mark**  29:*8*
31:*14*  36:*13*
40:*13*  58:*9*  63:*3*
66:*16, 18*  79:*5*
96:*7*  105:*6*
110:*4*  111:*20*
119:*11*  120:*18*
**marked**  29:*10*
31:*15*  36:*15*
40:*15*  54:*15*
58:*11*  63:*5*  79:7
96:*8*  105:7
110:*6*  111:*22*
119:*13*  120:*14*
**Marrisa**  2:*22*
4:*15*
**Mary**  112:*4*
113:7
**Maryland**  1:*18*
**Mass**  19:7
**Master**  19:2
21:*15*
**Matsumoto**  35:*4*
36:*3*
**matter**  1:*15*
37:*17*  42:*12*
55:*21*  63:*15*
67:*16*  87:*15*
95:*11*  96:*13*
114:*4*  117:*1, 5,*
*11*  120:9  131:*14*
**mattered**  53:*3*
**matters**  45:*3, 10,*
*14*  47:*10, 14*
48:*17*  64:*20*
86:*19*  87:*22*

104:*13*  113:*4*
114:7  123:*5*
**McNally**  26:*16*
27:*3*  35:5  36:*4*
74:*19*  75:*20, 21*
77:*21*  88:*8*  92:*5*
**mean**  31:*10*
42:*8*  53:*13*  55:*1*
59:*1*  65:*22*
66:*13*  67:*15, 17*
74:*10*  76:*15*
80:2  81:*2, 18*
85:*3, 10*  86:*1*
87:*4*  91:*6, 15, 16*
94:*10*  97:*18*
98:*12, 21*  105:*13*
109:*20*  111:*8, 16*
112:*6, 13*  136:*10*
137:7  139:*12*
**meaning**  82:*16*
**means**  86:2
97:*11, 12, 13*
109:6
**meant**  23:*3*
53:*14*  109:*13*
**medical**  7:*11, 14*
**medium**  59:*4*
**meeting**  9:*6, 9*
47:*16*  84:*22*
117:9  121:*22*
136:2
**meetings**  39:*8*
46:*22*  47:*3, 8, 11,*
*14, 18*  60:*6, 8*
79:*18*  135:*18*
**member**  67:2
106:*15*
**Memorandum**
3:*8, 9, 10, 11, 12,*
*13, 14, 15, 16, 17,*
*18, 19, 20*
**memory**  7:*12*
**mentioned**  19:*20*
25:*14*  26:*21*
39:*17*  70:*14*
127:*8*
**merged**  69:*5*
**merger**  69:*9, 14*
71:*12*  88:*16*
**merging**  19:*17*
**message**  122:*16*
123:*16*  125:*15*
126:*4*
**messages**  121:*5*
123:*15*
**messaging**  121:*6*
**met**  23:*18, 20*
122:*4*
**method**  138:*12*
**MG**  121:*19*

**Michael**  110:*17*
**mid**  68:*1*
**middle**  17:*9*
**mild**  117:*6*
**Miller**  115:*1*
**Minimal**  47:*22*
102:*17*
**Minnesota**  22:*4*
**Mischaracterizes**
114:*15*
**misphrase**
107:*22*  136:*10*
**missed**  115:*2*
**missing**  6:*6*
**Misstates**  42:*14*
107:7
**mitigating**  59:*5*
**mix**  64:*21*
**moment**  29:*13*
31:*11*
**months**  17:*9*
18:*1*  80:*3*
101:*18*
**month's**  103:*3*
**morning**  4:*11*
110:*17*
**motive**  138:*16*
**motives**  138:*3*
**move**  79:*14*
84:6  90:*12*
**moved**  22:*19*
68:*17, 22*  69:2
71:9  74:*2, 5, 9,*
*22*  78:*3*  89:*16*
132:*5*
**moves**  110:*1*
**moving**  80:*13*
88:*18*  90:*8*
**multiple**  73:*15*
75:7
**Music**  22:*2*

**< N >**
**name**  4:*13, 21*
5:*1*  15:6  21:*16*
24:*20*  27:*4, 5*
28:*17*  30:*13*
34:*16*  65:*12*
113:2  126:6
**named**  14:*21*
94:9  110:*17*
118:*17*
**names**  25:*13*
32:*4, 15, 17*
34:*21*
**nametag**  100:*20*
**nametags**  100:*20*
**Nancy**  36:6
56:*16, 19, 19*
114:*22*  115:*4, 16*
122:*6, 8, 9*  123:*3,*

5, *13, 19*  125:*22*
139:*10*
**Nancy,**  124:*3*
**Nancy's**  123:*17*
**narrow**  71:*11*
80:*12*
**narrowly**  124:*3*
**National**  12:*12*
76:2  77:5  92:*4*
94:*16, 18*  132:6
**nature**  24:9
48:*15*  52:*4*  61:*4*
107:2  115:*22*
133:*11*
**near**  53:*15*
**nearer**  49:*19*
**necessarily**  63:*11*
**need**  5:*13*  22:*16*
31:*21*  60:*1*  64:2
70:*21*  75:5
104:*9, 10*  112:*17*
133:*14*  136:*11*
137:*17*
**needed**  28:*13*
48:*15*  67:*19*
93:6  95:*8*  99:*19*
133:9
**needs**  12:9  66:2
**need-to-know**
47:*17*  114:6
**neither**  141:*11*
**nervous**  74:*8*
**never**  39:*8*  78:7
127:9  138:6
**New**  27:5, *6*
45:*20*  68:*16, 16*
75:*13*  83:7, *7*
90:*4*  92:*3*  95:*1,*
*13*  130:9
**newly**  131:*3*
**nice**  100:*20*
**non**  32:*13*  134:9
**non-agents**  32:9
**non-attorney**
44:*21*  101:*10*
**non-attorneys**
13:*15*  15:*11, 19*
16:2  44:*20*
130:*17*
**nonfilled**  81:*4*
**non-legal**  12:*9,*
*12*  41:*4, 10*  43:*4,*
*18*
**Nonoperational**
16:*21*
**non-SES**  94:*1*
**normally**  61:*22*
100:*20*
**Northfield**  22:*4*
**Notary**  1:*18*  4:6

141:*17*
**note**  30:*1*
**notice**  1:*16*
97:*19*
**November**  40:*22*
105:*16*  141:*20*
**now-he-wants-it-**
**written-down**
60:*3*
**NSLB**  26:*11*
**nudge**  64:*19*
**nudging**  65:*18*
**Number**  29:*10*
30:*17*  31:*15*
36:*15*  40:*15*
54:*15*  58:*11*
63:*5*  71:*10*  79:7
83:9  96:*8*
101:*18*  105:7
110:*6*  111:*22*
116:*14*  119:*13*
120:*19*
**numbers**  100:*18*
**NW**  2:5, *15*

**< O >**
**oath**  5:*18, 19*
**object**  9:2
**Objection**  37:*19*
39:*13*  42:*14*
46:*4*  69:*17*
90:*13*  96:2
107:7  114:*15*
117:*19*  129:2, *5*
131:6  132:*20*
136:*16*  137:*1*
139:*8*
**objections**  7:*5*
**obvious**  37:*8*
66:*22*
**obviously**  35:*16*
80:*4*
**occasions**  50:*20*
75:7
**occupied**  50:*13*
52:*14*  88:*22*
95:*14*  101:2
129:*13, 20*  130:2,
*7, 19*
**occupy**  11:*13*
16:*22*  19:*12*
20:*22*  50:*17*
52:7  54:2, *12*
100:*14*
**occupying**  52:*18*
89:*20*  92:*4*
**offhand**  71:9
**Office**  1:*4*
23:*22*  48:*22*
49:*2, 3, 14, 16, 18,*
*20, 22*  50:*2, 4, 8,*

13, 17  51:8, 13
52:1, 7, 8, 10, 13,
18  54:2, 7, 11
57:12, 21  68:1, 7
72:16  75:3, 9
81:13  86:22
87:18, 21  100:14,
17  101:2, 6, 7, 11,
15  114:9  115:10
116:1, 11, 15
118:3, 7  128:9,
20, 21  129:1, 13,
16, 18, 22  130:2
131:1, 4  133:5
137:13
**officer** 141:4
**offices** 87:3
101:9, 10  130:10,
14, 15, 18  133:2,
21
**official** 12:2
84:5  118:17
120:8
**officials** 17:15,
20  34:2
**OGC** 14:5
15:20  17:8, 11
18:1  43:15  58:2,
6  72:14  76:12
80:11  81:2, 9
83:9  111:15
122:20  123:9
125:21  126:10,
11  127:18, 19
128:4, 8, 11
131:13, 17  133:6
136:1
**oh** 22:8  110:19
138:5
**Okay** 7:8, 9
9:12  10:17  11:8
12:16  15:2, 8, 19
16:9, 20  17:13
19:19  20:14
21:5, 20  22:8, 18
23:17  24:4, 14,
18  25:8  28:19
29:7  30:20  31:8,
20  32:14, 20
33:18  34:6, 12,
19  35:7  36:12
37:4, 8  38:14
39:6, 9, 17  40:2,
12  43:1  46:14,
19  47:2  50:7, 12
53:8  55:7, 19
56:13  57:10
58:4  59:10, 18
60:11  61:7  62:6
65:9  67:22  69:6,
9  70:6, 17  72:1,

21  74:12, 20
76:19  78:6
79:13  81:6, 15
82:1, 6  83:22
84:15, 18  85:5, 9,
13  86:10  87:8,
12, 15, 19  88:4, 9
89:3  91:15
93:16  94:18
95:10  96:17
97:2  99:12
101:5  102:14
105:10  107:21
109:7, 9  110:4
111:7, 11, 19
112:13  113:12,
17  116:7, 10
117:15  118:14
120:4  121:7, 11,
19  122:5, 15, 19
123:15  124:5, 8,
21  125:2, 11
126:3, 15  127:2,
11, 13, 22  128:19
136:7  137:10
138:2, 15  139:3,
14
**old** 50:4
**onboarding** 50:6
52:2
**once** 97:5  111:5
**one-page** 30:7
**ones** 8:15  71:21
86:14  124:15
130:11  132:18
**one-time-a-year**
106:19
**one-year** 81:18
**ongoing** 46:16
50:18  80:9, 17
87:17  106:18
107:2  109:18
**online** 15:17
23:12
**open** 26:19
37:12  106:2
**open-door** 13:2
**openings** 81:5
**operations**
133:21
**opinion** 40:9
49:8, 9  51:14, 16
52:17  77:20
128:22  134:6
138:19  139:6
**opportunities**
59:8
**OPPORTUNITY**
1:2
**option** 82:4, 7

**order** 67:14, 19
**org** 83:3
**organization**
16:12  126:22
128:17  131:22
133:13  134:8
**orientation**
123:22  124:10
125:3, 8
**original** 132:21
**originally** 87:18
**OTC** 125:17
**outcome** 107:5
141:13
**outing** 124:3
**outline** 59:18
**outside** 13:3
25:16  61:22
64:18  81:8
100:18  114:9
128:8  132:7
**overall** 5:8
53:18  55:4
105:18  131:22
**overburdened**
42:6
**overlap** 123:8
**oversee** 25:4
**overseeing** 82:21
**overthinking**
97:16

< P >
**p.m** 119:1, 5
139:21
**pace** 76:9  95:19
**packet** 30:18
**PAGE** 3:2, 7
5:9  30:6, 22
34:6, 12, 15, 21
40:22  45:1, 14
54:18  56:14, 22
57:13  58:19
60:12  63:20
64:13  67:9
**Pages** 1:9
**paid** 133:10
**paper** 61:16
**paperwork** 93:1,
3  110:22  111:2
**parallel** 72:19
**parenthetical**
109:4
**Parks** 1:19  2:4,
22
**part** 9:5, 9
14:16  25:22
26:20  27:12
33:15  49:22
56:4  57:20  58:1
64:10  68:21

70:21  74:3, 4
76:12, 19  77:19
84:13  88:11
93:9  106:16
128:4, 7, 8  130:4
**participated**
14:19  15:4
**participating**
12:19
**particular** 16:14
29:2  44:3  45:2,
6, 15, 16  46:1, 2
49:8, 15  54:7
55:2  65:10
73:20  90:11
123:1  128:7
131:1
**parties** 1:22
141:12
**parts** 23:4
72:17, 18  126:21
130:11
**pass** 15:18
**passed** 28:7
**paste** 112:19
**Patrice** 35:3
**pausing** 62:21
**pay** 102:17
**peer** 37:16
**peers** 85:11
**penalty** 5:22
**Pender** 126:4, 5,
12, 19
**pending** 5:15
111:12
**Pennsylvania**
2:15
**people** 13:22
23:4  24:21  25:2,
11  26:16  32:4, 5,
12  34:10, 18
35:14  47:16
49:19  52:20
53:7, 10, 11, 15
56:8, 12  57:8, 17
59:22  60:1  61:2
62:4  64:19  74:8
75:8, 12, 13, 14
77:10  87:2, 8
89:2  90:1, 2, 5
92:12  97:4, 6, 17
99:6  106:10, 12
115:11, 12, 14, 21
116:2, 12, 13
126:17, 21
128:14  130:17
135:5, 13, 14, 16
137:4  138:8
**people,** 34:14, 20
**percentage** 98:15

**perception**
133:22
**perfectly** 90:5
**performance**
63:9, 13  64:16
82:17  84:16
98:6, 8  103:11,
18, 21  104:13, 18
105:2  109:21
132:13, 17
**period** 11:1, 15
12:5  16:22
17:13  35:14
105:15  119:20
**periodically** 56:2
**perjury** 5:22
**permanent** 23:5,
6
**person** 23:21
24:5  39:3  41:13
44:15, 16  45:10,
16  65:1  94:8
97:21  101:4
108:21
**personally** 14:9
120:16  138:15
**personnel** 47:13
114:7
**person's** 27:4
**perspective**
43:16  83:16
84:1
**phrase** 124:8
**physical** 49:2
**physically** 101:6
**picture** 59:2
**pile** 29:6
**pissing** 126:2
**place** 43:15
71:22  79:19
99:20  113:5
**placed** 80:22
**placing** 80:20
81:7  88:10
**plaintiff** 4:5
**plan** 50:4  65:17,
21  66:3, 20
67:14, 19
**planning** 128:9
**plans** 58:15, 18,
21  59:2  60:21
62:12, 15, 18
63:9, 14  64:5, 16,
17  65:4  67:7
106:6
**please** 5:13
63:20  111:21
139:20
**pleased** 134:6
**PLLC** 1:19  2:4
**plotting** 122:7

**point** 5:13
45:10 60:18
62:22 71:10
102:21
**policy** 13:2 75:4,
9
**portion** 98:16
**posed** 133:20
**position** 9:13, 17
10:17, 18, 21
11:9, 11, 14 12:1,
8 16:10 17:1, 6,
17 18:4, 5, 11
19:8, 12, 14, 16
20:11, 16, 19
21:1, 5 22:20, 20
23:7 24:21 26:8,
9, 18 31:6 32:10,
13 33:2, 5 34:8
35:8, 19 37:11
38:11, 17 39:4
74:1 75:16, 22
76:4, 5, 16, 21
77:3, 6, 8, 18
78:1 79:16
80:14, 15, 21, 22
81:8, 12 84:8, 8,
11, 13, 15 88:11,
19, 19 90:9 92:4,
11 94:4 95:7, 14
131:3 132:18
**positions** 15:21
19:20 20:3 23:5
25:21 26:22
27:11, 22 28:21
32:5 35:13
46:16 77:7
82:10 92:13
93:22 94:2
95:15
**possibility** 81:20
**possible** 53:7, 20
64:22 68:19
73:14 103:15
**posted** 13:19
**posting** 13:18
23:11
**postings** 15:1, 16
**potential** 131:12
137:21
**Potentially** 69:5
89:5 103:22
**practical** 42:12
**practices** 41:22
42:1 74:8
**precipitating**
50:9
**precisely** 131:16
**preference**
107:15 108:5

**preparation** 8:12
63:13 64:4, 15
65:17 113:8
**prepare** 7:22
62:17 67:19
**prepared** 66:5
**preparing** 27:15
58:21 62:15
127:4 129:6
**present** 1:21
2:21 4:16 5:21
38:20 47:7
60:10
**pressure** 57:2, 3
**pretty** 12:18
101:12 115:13
135:10 137:6, 8,
22
**previous** 11:6
32:7 64:19
124:2, 14
**previously** 45:22
119:9 125:19
132:19
**primarily** 38:14
47:12 62:14
**primary** 12:14
43:17
**printed** 28:18
66:5 100:22
**prior** 19:14
21:20 44:7 50:5,
6 52:2 56:21
60:16 68:16
71:20 109:22
127:22 128:19
130:8
**prioritized** 59:5
**privately** 114:10
**privilege** 9:3
**privileged** 9:7
**privy** 25:18
78:9 80:20
88:17 90:9 91:2
95:21
**Probably** 21:2
23:15 24:7, 8
35:5 36:4 50:18
52:3 59:17 60:8
66:16 67:9
68:15 74:19
76:8 86:20
106:15 116:14,
17 122:6, 9
125:4 131:18
**Probationary**
119:20
**problem** 7:3
99:2
**problems** 59:7

**procedures** 13:13
**proceeding** 45:14
**proceedings**
141:5, 7, 8
**process** 5:8
15:12, 13, 14
23:9 24:17 25:3,
4 26:21 27:19
40:4 43:9 61:19
64:2, 3 66:9
70:1 92:14 93:5,
7, 10 99:18
100:6 101:19
102:19, 22 103:4,
14 104:11
106:16 110:9
128:15
**processed** 93:9
**processes** 16:1
65:7 110:22
111:1
**processing** 14:8
**produced** 121:5
**professional** 32:8
**program** 11:12
19:4 21:20 23:2
101:3 112:18
**progress** 95:5
**projects** 17:10
75:4
**promotion** 135:7,
9 138:12
**prompt** 6:20
**pronunciation**
109:13
**provide** 12:21
16:18 53:2
94:10 99:20
**provided** 86:9
112:5
**provides** 59:19
**providing** 9:20
**Public** 1:18 4:6
141:17
**purpose** 138:9
**pursuant** 1:16
**pursue** 104:8
**put** 5:18 15:1
120:4 134:7

**< Q >**
**QFRs** 45:15
**qualifications**
40:10
**qualified** 28:13
29:4
**Quantico** 83:7
**question** 5:15, 16
6:8, 10, 11 7:8
22:9, 22 43:2
44:17 54:11

69:12 70:20
80:5 96:11
97:16 107:13, 21
111:11 112:3
130:21 132:21
136:7
**question-and-ans**
**wer** 5:10
**questioning**
123:21 124:1
**questions** 5:11
61:2 65:5 73:3
104:6 127:12, 16
136:4 139:15
**quickly** 96:16
115:13 135:10
137:13
**quite** 75:5 76:3
77:11 80:11

**< R >**
**rail** 137:22
**range** 11:19
80:2
**rating** 106:6
107:5, 16 108:6,
10, 13
**reach** 61:6
**reached** 57:4
89:15
**reaching** 106:4
**reaction** 134:3
**reading** 31:22
111:5 139:16
**ready** 29:15, 22
31:19 36:19, 20
**realignment** 68:9
**really** 24:1, 12
27:1 61:21 66:8
106:3 116:18
125:9 135:4
**realm** 48:18, 18
94:16, 19
**reanswer** 107:22
**reason** 7:18
24:1 31:9 33:7
44:4 45:2, 6, 16
46:1 90:11
138:10, 19, 20
**reasonable** 31:12
66:4, 11
**reasonably** 53:7
**reasoning** 133:13
**reasons** 33:21
70:14 84:6
139:7, 10, 11
**recall** 8:21
12:19 13:12
14:16, 19 15:3, 9
16:6 22:12, 19
23:9, 13, 20 24:4,

14, 18 25:22
26:6 27:5, 8, 9,
13, 19, 20 28:2, 4,
5, 20 29:1 30:9
31:2, 8 33:1, 4, 7,
19 34:7 35:10
36:9 37:2, 5, 17
38:2, 5, 9 40:8,
11, 18 41:2, 9, 14
42:4 43:4 45:8,
15 46:15 47:3, 6
48:3, 17, 21 50:3,
21, 22 51:5, 16
52:3, 9, 13 53:12
54:2, 5, 6, 10, 13
57:3 58:1, 14
59:15, 20 60:20
62:6, 8, 11, 13
63:8, 12 64:10,
11, 14 65:9
66:19, 21 67:4, 8,
12, 21 68:3, 21
71:9, 21 72:8, 10
74:12 76:20
78:21 79:3, 10,
12, 16, 22 80:8,
19 81:4, 5, 10, 11,
17 82:3, 4, 6, 12
83:2, 22 84:6
85:5, 8, 14, 19
86:11 87:10, 12
88:5, 9 89:3, 7, 9,
11 90:21 91:1, 6,
9, 11, 14 92:10,
21 93:3 95:10,
20, 22 96:12
98:9 99:8, 12
100:7, 13, 17
101:5, 16, 18, 21
102:3, 6 103:6
104:3, 21 105:1,
5, 10, 14 106:14
108:14, 18 109:3,
17 110:9, 12, 15
111:3, 12, 16
113:7, 16, 20
114:1, 3, 18
115:7, 10, 14, 16,
18, 22 116:10, 13,
15 118:2, 5, 6, 12
120:17 121:12,
22 122:12 123:3,
21 125:2 128:6
131:2, 16 132:15
134:18
**receive** 18:20
33:11, 21
**receiving** 108:9
**recess** 119:2
**recharacterize**

136:*11*

**recipient** 121:*10*

**recognize** 25:*12*
28:*17*

**recollection** 8:*16*
30:*12* 36:*21*
40:2 43:*13* 53:*1*
56:*10* 61:*11*
71:*18* 134:*22*

**recommend** 39:*3*

**record** 4:*13*, 21
34:*13* 42:*15*
63:*1* 72:4 76:*16*,
21 107:8 112:7,
20 113:5 114:*16*
118:22 138:*21*
141:*7*

**recordkeeping**
113:*2*

**redacted** 108:*17*
109:*5*

**redaction** 108:*22*

**redistribute**
43:*10*

**reduced** 141:*9*

**refer** 125:*18*

**reference** 83:*18*
98:*3* 113:*6*
124:9 128:*21*
136:*13*

**referenced**
131:*13*

**referred** 11:*22*

**referring** 34:*14*,
20 41:7 46:*12*
56:*17* 109:*3*
121:20 123:*19*
126:*17*

**refresh** 36:*21*

**regard** 132:*12*

**regarding** 41:*2*
42:5 58:*15* 63:*8*
64:*15* 72:*7*
79:*14* 80:*13*
81:7 86:*18*
87:*17* 88:*18*
89:4 96:*14*
99:*13* 102:*15*
103:7 104:*16*
110:*13* 128:*20*

**regardless** 138:*3*

**regular** 46:*22*
60:8 105:*21*
106:*20*

**rehabbed** 130:*6*

**relate** 55:*8*

**related** 6:*1*
49:*15* 76:*13*
79:*11* 85:*12*
98:7 118:*3*

126:7 136:*9*
141:*11*

**relative** 85:*12*

**relatively** 96:*11*

**relayed** 135:*5*

**relevance** 123:*10*

**relevant** 85:*12*

**relief** 76:8 77:*12*

**remain** 77:*18*

**remainder** 59:*3*

**remedied** 96:*16*,
17

**remember** 11:*16*
17:2, *18* 19:*13*
21:*1* 23:*15*, 16
26:*16* 27:4
71:20 80:*15*
83:*17* 110:*21*
111:*6*

**remind** 56:*2*

**reminded** 57:*8*
95:*8*

**reminder** 57:*17*

**reminders** 56:*6*,
*9*, *11*

**reminding** 55:*17*,
*19* 57:*9* 111:*9*

**removal** 105:*4*
109:*17* 110:*2*

**remove** 102:*16*
103:*8* 104:*16*

**removed** 24:*11*
63:*16* 102:*7*, *11*

**removing** 103:*22*
104:*1* 110:*10*, *13*

**reopening** 125:*17*

**reorg** 78:*16*
90:6 132:2, 9, 22

**reorganization**
68:6, 22 69:*14*,
*16*, 22 70:*18*
71:*3*, 5 72:7, *11*
73:*18* 74:7
76:*19*, 22 78:*12*
80:7 82:*16* 84:5,
*9*, *14* 88:2, *3*, 5,
*11* 90:*19* 91:*10*,
*12* 92:3 113:*14*
131:*13* 132:*14*

**reorganizations**
89:*22*

**reorganization's**
73:*19*

**reorganize** 80:*11*

**reorganized** 68:2,
*17*

**reorganizing**
131:*17*

**repeat** 107:*21*

**rephrase** 42:*8*
80:5 104:*15*

**replacement**
32:*16*, 18

**replacing** 92:*5*

**Reporter** 1:*17*
6:*16*, 20 7:2
139:*16*, *18* 141:*1*

**reporting** 24:*12*

**representation**
133:*5*

**repurpose** 75:*14*

**reputation** 94:*15*

**request** 30:*10*
123:*12*

**requested** 77:*15*

**required** 55:*17*
56:3 62:9, *10*
64:20

**requirement**
55:8, *12*

**requirements**
13:*18*

**research** 103:*4*

**resolution** 54:*11*,
*13*

**resource** 128:*9*

**resources** 68:*10*
93:*15* 128:*10*, *12*

**respect** 40:*3*
74:20 78:*10*, *12*
82:*15* 85:5, 6, *13*,
22 86:*10*, *12*
88:*1* 90:*7*
109:*16* 120:*1*
127:*18* 132:*16*
134:*19* 139:*3*

**respective** 1:*22*
59:*3*

**responding** 69:*10*

**response** 29:*17*
30:*8*

**responsibilities**
12:7 16:*17*

**responsibility**
59:7 64:*18* 85:*4*
86:*4*

**responsible** 9:*18*
38:*15* 62:*14*
65:*11* 118:*17*
120:*8*

**rest** 53:*5*

**result** 59:*19*

**results** 44:*10*

**resume** 14:*1*
30:*14*, *15* 46:*11*
93:*11*

**resumes** 13:*20*
25:*13* 29:*6*

**retail-focused**
20:20

**retaliation** 135:*8*
136:*10*, 21

**retired** 89:*1*
90:*18*, 21 91:*14*,
15

**retirement** 43:*14*
91:*21*

**retiring** 91:*3*, 17
134:*13*

**return** 77:*9*

**returned** 77:2
81:*12*

**returning** 22:*18*
98:2

**review** 8:*11*, *14*
28:8 31:*18* 33:*9*

**reviewed** 8:*17*,
22 9:8, *10*

**reviews** 9:*5*
25:20

**rhyme** 44:*3*

**Richard** 35:*5*
36:*4*

**Rick** 26:*16* 27:*3*
74:*18* 75:20
76:*8*, *10* 88:*8*
96:*15*, 22 97:*11*

**Rick's** 97:*13*

**right** 50:*14*
51:*18* 52:*7* 58:*7*
73:*15* 78:*15*
90:2 98:*9* 110:*1*
122:7 129:*11*, *13*,
20 131:*21*
133:*19* 137:*22*
138:*6*

**right-hand** 30:*16*,
*19* 56:*15*

**rise** 104:*14*

**risk** 133:*12*, 20
134:*7*

**risks** 59:*6*

**Robert** 17:*16*

**role** 12:*12* 18:*6*
24:2 43:*18* 44:*6*,
7 47:*21* 48:*6*
55:*14* 75:*1*, 2
76:*11*, *11* 78:*17*
84:*17* 88:22
89:*6*, *17*, *18* 97:*5*,
*10* 101:*17* 114:*5*
127:*17* 131:*19*

**roles** 97:*4*

**room** 50:*5*

**Roque** 15:*5*

**Rose** 2:22 4:*15*

**roughly** 12:*5*

**round** 105:*17*

**R-O-U-Q-E** 15:*7*

**rude** 6:*19*

**rule** 5:*14*

**rules** 5:*7*

**rumors** 134:*15*,
19

**run** 103:*5*
126:*21* 135:22

**running** 133:*21*

**< S >**

**Sabol** 34:*15*
35:6 36:5 74:*18*,
20 77:*17* 78:*1*
115:*1* 139:*4*

**S-A-B-O-L** 34:*16*

**Sabol's** 75:*16*, 21

**Sales** 20:20

**sat** 49:*17*

**saw** 14:2 24:20
30:*13* 39:*6*

**saying** 6:*4*
26:*17* 57:*1*, *8*
62:*3* 95:*12*
106:*3* 124:*19*
126:*19* 129:*18*
134:20 137:6, *15*

**says** 46:*9* 56:*16*
57:20 59:*12*
63:20 65:20
108:*12* 112:*4*
125:*13*, 16

**scheduling** 27:*18*
39:*19*, 22 40:5

**school** 18:*12*, 13
19:4 20:*12* 21:*7*,
*8*, *21*, 22 22:*1*

**SCHOOLMASTE
R** 1:*13* 3:*3*, 7, 9,
*11*, *12*, *15*, *16*, 19
4:4, *11*, 22 21:*16*
119:7 127:*17*

**S-C-H-O-O-L-M-
A-S-T-E-R** 5:*1*

**science** 75:*1*

**second** 31:*18*
32:*10* 34:*14*
40:22 54:*18*
58:*19* 63:20
67:9 100:*14*
121:*8*

**secondhand**
33:*11*, 20

**secret** 116:*8*

**section** 47:6, *9*
74:22 75:*16*, *19*
76:*10*, *11*, *15*, *16*,
20 77:*4*, *18*, 22
78:*17* 79:*1*, *16*
80:*15*, *21* 82:*18*,
20 84:*8* 97:*12*
106:22 132:*18*

**Security** 26:*12*
76:2 77:5 92:*4*
94:*16*, *19* 132:*6*

see 19:22 25:5
26:20 28:16
30:16, 21 31:7
35:15 39:2
40:20 43:8 44:3,
22 45:5, 12, 19
47:13 49:5
51:18, 22 52:9
56:4, 11, 22
57:14, 19 58:8
59:10 61:10
62:11 64:4 65:1
66:12 68:13
71:11 72:1
73:17 76:14
77:14, 17 78:21
80:12 83:12
88:16 89:19
90:7 92:2 93:18,
21 95:20 98:18
99:8 101:16, 21
102:21 103:16
107:4, 15 108:4
111:3, 5 112:21
113:6 114:11
122:22 127:1
seen 25:13
28:14 30:14
39:10, 12 46:11
66:6
seize 59:9
select 34:3 92:12
selected 24:3
33:8, 12, 22 76:5
selection 40:5
92:10, 14
send 56:6 93:11
sender 121:9
sending 32:2
56:9, 11 111:4
sends 93:8, 9
Senior 102:7
sense 37:1 66:3
68:11 70:5, 5
72:20 73:13
77:16 83:21
90:1 125:21
sent 31:2, 9
57:16
separate 13:5
14:7, 11 25:3, 15
35:12 96:20
114:9
separately 35:12
September 18:19
22:7
serve 69:16
88:21
service 20:21
102:8

services 9:21
14:13, 17, 20
128:1, 2, 4
servicing 71:6
serving 76:1
78:17 89:5
SES 24:21 25:4,
5, 7, 12, 14, 15, 19
26:1, 3, 22 38:6,
10, 14, 15, 16, 17,
20, 21 39:2, 8
55:8, 13 57:8
58:7 63:9, 13, 16,
17 64:14, 20
65:6, 7, 13, 17
67:2, 7 78:2, 3,
18 82:10 92:16
93:17 102:11, 16,
18 103:8 104:1,
17 105:4, 20
106:16 109:17
110:14, 18, 19, 22
113:10 119:20
130:14
SES-level 25:21
SESrs 55:15
SESSIONS 1:7
SESU 65:6, 10
set 31:13 36:7
46:19 58:8
62:20 67:22
75:15 109:9
110:2 111:19
113:12 127:1
setting 135:16
137:17
seven-person
128:16
seventh 52:11,
19, 21 54:2
65:21, 22 66:12
100:8 135:22
sexual 123:22
124:9 125:3, 7
shake 6:15
shared 14:13, 16,
20 128:1, 2, 4
SHERRY 1:17
34:15 35:6 36:5
74:18 114:22
115:4 141:4, 16
short 59:4 92:1
135:17
shorter 34:20
shortly 90:18
shoulders 6:15
shrugs 6:14
sic 60:7 107:3
108:13, 16
109:11 115:2, 4

side 77:12
98:10, 11
sign 66:2
signature 57:12,
20 139:21
signed 63:22
signing 139:16
Sills 36:5
similar 22:15
64:18 114:13
139:7
simple 96:11
single-handedly
125:16
sit 49:14 50:11
73:2, 9, 10, 11
site 13:19
sitting 48:22
49:16 60:8
71:17 85:20
104:22
size 129:8, 10, 19,
22 130:1
skill 75:15
skills 23:8
slimmed 47:15
slot 95:2
slots 95:4
small 14:14
51:8 117:4
121:1 128:11, 14,
22 129:1, 7
smaller 100:5
101:9 128:10
130:16, 18
smallest 101:9
128:15
SMS 54:19, 21
62:9
solicitation 46:15
somebody 57:4
120:14
somewhat 100:21
Sorry 49:2
53:13 75:2 80:4
109:8, 12 121:1
sort 13:2 44:6,
11, 18 55:7 56:1
58:4 64:21
112:12, 20, 21
132:22
sounds 79:19
110:16 117:12
123:13
span 42:2 81:18
84:19 85:2, 6
86:16 87:20
speaking 75:10
special 16:11, 17
17:1, 6, 8, 10, 11,

14 18:3, 5, 10
22:19 23:2
specific 8:15
40:11 48:1, 12,
16, 17 53:13
61:10 70:18
71:11 74:12
80:2 82:13, 15
85:15, 17, 19
86:11, 14 87:10
94:11, 18 95:11
104:13, 18 105:1
107:3, 10 109:19
110:15 116:13
134:18
specifically 7:6
50:3 61:8, 13
68:10 83:5 87:6
89:4, 16 103:21
105:5 115:20
121:15 123:3
specifics 89:7
115:10
speculate 49:10
speculating 98:21
speculation
37:20 46:5
69:18 90:14
96:3 117:20
136:17 137:2
139:9
spell 4:21 15:6
spelled 63:19
spells 59:1
spend 100:4
spent 98:14
spilled 116:6
spoke 8:2
spoken 106:7
spot 97:12, 13, 14
spread 87:5
115:13 135:9
137:12
ss 141:2
staff 12:1, 15, 20
16:3, 7, 9 17:7
22:20 23:18
32:8 44:6 46:22
47:11, 14, 18
53:5 56:5 63:14
97:3 98:5 106:9
108:3 114:6
131:19
staffing 137:21
stage 111:15
standard 106:16
stands 112:10
122:17
start 24:10 46:9
54:20 59:11

61:15 105:11
107:18 131:17
started 4:12, 20
19:3 24:2 44:13
46:20 101:22
103:9, 10 109:21
131:12
starting 45:13
100:14
State 1:18 4:20
statement 57:1
122:13
STATES 1:1
141:2
stay 126:16, 20
stayed 91:19, 19
stenographically
141:8
Stephen 36:2
steps 104:9
stop 6:5
stopping 23:22
strange 135:11
Strategy 54:22
55:1, 6 57:11, 20
61:18 83:21
strategy-related
62:8
Street 1:20 2:5
structure 68:15
70:4, 8, 13 71:8
89:22 90:4
struggle 107:1
studying 21:10
stuff 59:17
subject 48:17
50:8
submission 93:18
submissions
93:22
submitted 111:9
subset 14:5
substance 49:11
51:5
suggest 107:5, 15
108:4
Suite 1:20 2:6
suited 77:22
78:8 82:18
supervise 10:1, 4
18:8 20:4
supervised 77:7
106:10, 12
supervisees
107:16, 17 108:5,
6
supervising 9:19
22:13
supervision 99:7,
10 141:10

supervisor 12:21
20:8 37:11 66:2,
6, 13 103:12
supervisors 86:2
support 75:2
107:1
supporting 111:2
supports 72:16
suppose 104:14
supposed 64:7
Sure 4:22 5:9,
17 6:13, 17, 21,
22 8:15 9:18, 20
12:14, 18 13:10,
18 14:2 21:3
22:21 29:20
32:14 35:2, 11
38:13 48:9 49:9
51:2 55:13 56:7
66:4, 9, 10 69:12
70:20 74:14
81:19 83:14
85:18 91:20
95:4 98:21
103:14 106:17
108:22 113:1
121:7 124:11
132:21 136:18
surface 86:3
suspicions
123:18 124:6, 17,
22 125:2
suspicions, 124:9
sworn 1:16 4:6
119:9
system 38:13
112:22 113:2
121:6 138:19

< T >
tailored 82:21
83:1
take 5:16 19:16
23:7 29:13
31:18 45:12
51:20 54:7 57:6
64:1 72:1 77:12
104:9 105:15
118:19 131:1
taken 1:19 43:5
63:2 72:5 79:19
119:2 141:5, 8
talk 7:1, 1
12:22 62:4
88:21 106:10
117:14 125:9, 11
127:9 131:12
talked 8:5
106:5 116:4
118:15

talking 43:14
61:18 84:9, 10
98:4 110:20
124:14, 16 126:8
131:19
task 46:2
tasks 44:5, 8, 9,
15
technology 75:1
122:18
tedious 32:21
telephones 12:11
tell 46:17 61:1
71:15 81:21
102:1 104:6
telling 116:2
temporarily
76:11
ten 87:14
tend 116:17
ten-minute
62:22 118:19
tenth 52:15, 19,
21 100:8, 11, 14
115:11 130:7
tenure 16:3
term 32:9 55:3
term-limited
23:3
terms 42:8 64:4
69:13 76:16
79:13 80:6
82:17, 19 83:14,
20 93:2 101:7
123:8
terrorism 73:7
testified 4:7
119:9 127:17
132:11, 19
testify 7:15, 19
testifying 5:20
testimony 5:21
127:22 128:19
131:11 134:15
Thank 36:7
97:4, 21, 22
thanked 96:15,
18, 22 97:17
theme 51:7
thereof 14:5
thing 25:17
33:14 55:2, 22
73:6 74:9
106:19 135:11
Things 6:14
9:10 12:9 14:2,
14 15:1 20:21
22:17 24:9, 10
42:21 43:15, 19,
19, 21 44:18, 20,
21 45:20 48:15

52:4 61:3, 20
63:15, 18 64:19
65:7 68:18 71:9
72:14, 14 73:8,
12, 14 79:20
83:12 93:6, 12
101:7 104:10
107:2 110:1
111:1 114:4, 5
116:22 117:2
128:18 131:20
133:11 135:21
think 6:6 8:18
15:5 16:8 23:11,
21 24:8 26:15
27:7 33:13 35:3,
11 39:17 40:13
41:12, 21 47:1, 8
48:2 50:5 51:7,
12, 17, 22 52:1
56:16 58:16
59:1 61:21, 22
62:21 63:19
66:22 69:2
70:10 72:12, 12
74:18 76:8 78:7,
13 81:1, 1 82:8,
19 83:20 84:2,
15, 19, 21 86:6,
20, 21 87:2
89:14 92:17
93:8, 9 94:8
95:5 96:16 98:8,
20 99:4 100:18
102:12 103:2
104:4 108:7, 16,
20, 20, 21 110:11
112:10 115:9, 9
116:2, 20 122:3,
4 124:1, 2, 14
125:4 126:6
131:9 132:3, 8,
21 133:1, 13, 19
134:9 135:5
thinking 55:5
61:5 104:5, 7
third 30:2, 17
74:19 121:10
137:22
thought 33:13
49:10 91:19
107:6 125:5
129:7 133:16
134:10
threats 68:16
three 37:5 38:5
86:16 115:2
130:14
throwing 105:12
tie 6:10

time 6:3 11:11,
13 12:5 16:22
17:13, 18 18:17
20:22 21:17
22:5, 10 23:17
25:22 26:12, 19
32:11 35:13
42:11 45:6
46:18 50:12
61:12 67:5, 10
68:1, 11 75:6
76:3 77:11
78:14, 15 79:21
80:11 81:5, 8, 15,
17 82:5, 5 83:13
86:13 88:4, 8
92:22 95:8 97:7,
9 98:5, 15 99:8
100:4 101:19
102:6, 10 103:20
105:15 110:3
113:14, 15
114:11 117:4
122:1 131:9
139:6
timeline 78:15
timely 66:11
timing 79:18
113:16
title 9:15 10:15,
19, 21 11:2 12:2,
4
titled 119:20
today 5:21 7:16,
20 71:17 105:1
126:5, 20 127:5
told 115:12, 18
116:12 135:1, 13,
15 137:4
Tom 44:1 88:7,
22 89:18 98:3
99:21 100:2
130:14
Tom's 130:13
top 30:22 34:21
77:8 91:22
total 10:6
touch 126:16, 20
tough 61:16
105:12
tracker 57:16
tracking 56:7
tracks 57:11
trail 90:3
training 54:19,
21 55:8, 15, 17
56:1, 3 83:6, 6
transcript 3:22
141:6
transferred 99:9

translate 6:15
trend 97:19
trends 97:22
Tricia 92:8
94:9, 14 96:20
tried 14:9
126:20
true 141:6
truthfully 7:16,
19
Try 51:18, 20
64:22 70:3
126:16
trying 42:17
43:20 55:20
95:11 109:1
111:8 124:12
TS 95:17
turn 10:4 54:18
92:1 106:11
turned 50:4
turning 34:6
40:21 56:13, 21
60:11 61:14
Twelve 20:7
twice 47:1
two 6:10 10:8
11:15 20:3
26:19 29:15
60:13 71:18
77:4, 7 88:14
101:1 122:15
135:21
two-year 12:5
type 73:13 74:7
95:18
types 42:7
typewriting
141:10
typically 97:3, 4

< U >
U.S 1:2 2:14
uh-huh 6:14
ultimately 80:22
Um-hum 31:1
39:20 57:22
59:14 60:19
90:20
undergraduate
18:15
underlining
123:2
underneath 69:1,
2
understand 6:3,
11 38:22 45:21
53:17 60:1
77:17 78:2 86:6
94:15 95:21

117:*15*  124:*12*
125:*18*  138:*2*
**understanding**
6:*5, 6*  25:*17*
31:*22*  32:*15, 19*
37:*22*  38:*12*
50:*1*  53:*21, 22*
55:*11*  67:*1*  68:*6*
70:*12, 18*  71:*4,
14*  76:*13*  84:*22*
94:*19*  98:*19*
99:*1, 16*  117:*16*
121:*9*  135:*12, 15*
136:*15, 20*
**understood**  6:*9,
9*  58:*6, 20*
138:*13*
**unit**  14:*21*  65:*6,
7*  74:*4*  93:*17*
97:*13, 14*  99:*9*
100:*7, 13*  101:*2,
17*  105:*20*
110:*18, 19*
120:*13*  125:*22*
**UNITED**  1:*1*
141:*2*
**units**  71:*15, 18*
74:*2, 2*  82:*20*
98:*16*
**University**  18:*14*
19:*11*
**unrelated**  133:*1*
**up,**  85:*22*
**up-to-date**  133:*8*
**use**  62:*22*
112:*18*  138:*21*
**uses**  113:*3*
**usual**  93:*12*
**usually**  65:*4, 18*
66:*5*  116:*21, 22*

**< V >**
**vacancies**  12:*15*
**vacant**  95:*7*
**valid**  138:*20*
**variety**  73:*8, 12*
115:*12, 21*
131:*20*
**various**  126:*17*
128:*2*  132:*11*
135:*3*
**verbal**  6:*13, 17*
59:*21*
**verbally**  118:*11*
**versus**  52:*19*
98:*16*
**vetted**  65:*21, 22*
**view**  89:*21*
**visibility**  94:*1*
**volunteered**  13:*7*

100:*1*
**VS**  1:*6*

**< W >**
**wait**  75:*13*
132:*10*
**waiting**  111:*13*
**waived**  139:*22*
**walk**  22:*8*
**Walker**  118:*8*
**walled**  117:*8, 10*
**walls**  116:*22*
137:*19*
**Walsh's**  57:*19*
**want**  23:*1*  29:*3*
31:*7*  66:*8, 10*
73:*14*  80:*10*
94:*8*  95:*18*  99:*4,
5*  104:*8*  118:*20*
132:*2, 2*  138:*6*
**wanted**  14:*2*
22:*21*  23:*7*
28:*16*  49:*18*
50:*11*  52:*10*
59:*22*  70:*4, 9, 13*
76:*8*  77:*11, 18*
87:*18*  89:*1*
94:*11*  132:*8*
**wants**  59:*2*
**warm**  60:*1*
**Washington**  1:*4,
11, 20*  2:*7, 16*
81:*13*
**watch**  132:*5*
**way**  38:*18*  40:*1*
42:*13*  44:*18*
45:*18*  55:*10*
56:*11*  61:*4*  66:*5*
68:*8, 10, 13*  69:*9,
15*  70:*2*  71:*2*
78:*2*  83:*1*  87:*1*
95:*9*  97:*15, 20*
103:*15*  117:*6*
124:*8*  126:*7*
129:*9*  131:*22*
**ways**  106:*22*
130:*6*
**Wednesday**  1:*12*
**week**  47:*1, 8*
**weekly**  60:*8*
**weeks**  80:*3*
**Weiser**  1:*19*  2:*4*
**well**  6:*15*  9:*19*
10:*4*  13:*11, 16*
61:*5*  62:*4*  64:*8*
72:*14, 15*  76:*3*
93:*8*  101:*12*
102:*17*  104:*6*
106:*4*  107:*18*
110:*18*  129:*10*
133:*7*

**went**  13:*11*
23:*10*  43:*10*
51:*22*  52:*8*
87:*20*
**we're**  5:*9*  6:*6*
34:*12*  40:*14*
57:*1*  62:*21*
**we've**  16:*5*  84:*3*
**white**  137:*8*
**Wiegand**  36:*6*
56:*19*  114:*22*
115:*17*  122:*9*
123:*19*  134:*16*
135:*12*  136:*8, 15,
20*  138:*16*
**W-I-E-G-A-N-D**
114:*22*
**Wiegand's**
123:*22*  125:*3, 7*
137:*11*  138:*3*
**wife**  127:*8*
**willing**  94:*16*
**Wilson**  33:*4, 22*
34:*4*  35:*18*
**window**  101:*7, 8*
**windows**  129:*11*
**witness**  1:*14, 16*
3:*2*  4:*5*  9:*4*
120:*7*
**women**  114:*13,
18*  135:*1*  139:*4*
**Word**  112:*16*
**wordplay**  124:*2,
4, 7, 9, 13, 18, 19*
**words**  41:*3*
**work**  14:*22*
42:*6*  49:*19*
51:*19, 21*  74:*10*
75:*4, 9*  95:*18*
101:*20*  117:*3*
120:*13*  126:*14*
127:*10*  129:*9*
**worked**  94:*16*
126:*1*  128:*2*
**working**  11:*10*
12:*2, 4*  19:*4, 5, 6,
10*  20:*12, 13, 14*
21:*21*  42:*20*
53:*16*  60:*20*
61:*11*  98:*15*
**workload**  42:*2*
48:*14*
**works**  5:*8*
25:*17, 19*  26:*15*
38:*13, 18*  78:*5*
108:*22*  110:*18*
**workstream**
12:*21*
**worth**  103:*4*
**wounds**  125:*17*
**write**  62:*5*

**write-up**  112:*5*
113:*7, 9*
**writing**  61:*19*
115:*3*
**wrong**  112:*11*
129:*17*
**wrote**  42:*3*
**Wylie**  14:*21*
15:*2*

**< Y >**
**Yale**  18:*14*
**Yeah**  49:*11*
60:*10*  71:*2*  80:*6*
83:*19*  85:*21*
91:*7*  97:*18*
101:*1*  107:*20*
108:*18*  109:*2*
113:*19*  115:*9*
123:*20*
**year**  10:*11*
11:*16, 19*  50:*6*
59:*3*  66:*3, 20*
67:*7*  76:*3*
102:*13*  108:*14*
131:*14*
**years**  11:*16*
26:*15*  37:*3*
48:*20*  68:*8, 16*
71:*7, 10*  73:*1*
80:*3, 4, 10*  130:*8*
131:*15*
**Yep**  89:*21*
**yesterday**  8:*2*
**York**  27:*5, 7*