```
 1                UNITED STATES OF AMERICA

 2          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

 3                 WASHINGTON FIELD OFFICE

 4    ---------------------------------
                                       :
 5    MARCIANN GRZADZINSKI,            :
                                       :
 6            Complainant,             :
                                       :
 7        v.                           :   EEOC No.
                                       :
 8    JEFFREY B. SESSION, III,         :   570-2017-00720X
                                       :
 9    Attorney General, U.S.           :   Agency No.
                                       :
10    Department of Justice,           :   FBI-2015-00176
                                       :
11            Agency.                  :
                                       :
12    ---------------------------------

13

14         Deposition of CATHERINE BRUNO, a witness

15    herein, at the law offices of Kator, Parks Weiser &

16    Harris, PLLC, 1200 18th Street, Suite 1000,

17    Washington, D.C., commencing at 1:42 p.m. on

18    Thursday, March 21, 2019 and the proceedings being

19    taken down by stenotype and transcribed by Catherine

20    B. Crump, a Notary Public in and for the District of

21    Columbia.

22
```

**EXHIBIT 12**

Page 2

1  APPEARANCES:

2  On behalf of the Complainant:

3    DAVID A. HART, ESQ.

4    Kator, Parks, Weiser & Harris, PLLC

5    1200 18th Street, N.W.

6    Suite 1000

7    Washington, D.C.  20036

8    (202) 898-4800

9    dhart@katorparks.com

10   Also Present:  Marciann Grzadzinski

11 On behalf of the Agency:

12   JULIET GRAY, ESQ.

13   Assistant General Counsel

14   Office of General Counsel

15   Federal Bureau of Investigation

16   935 Pennsylvania Avenue, N.W.

17   Room 10140

18   Washington, D.C.  20535

19   (202) 324-3000

20   Jgray2@fbi.gov

21

22

Page 3

1  APPEARANCES:  (Continued)

2  On behalf of the Witness:

3    DAVID M. WACHTEL, ESQ.

4    Trister, Ross, Schadler & Gold, PLLC

5    1666 Connecticut Avenue, N.W.

6    Fifth Floor

7    Washington, D.C.  20009

8    (202) 839-4486

9    dwachtel@tristerross.com

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 4

1          I N D E X

2  WITNESS:  Catherine Bruno

3  EXAMINATION              PAGE

4  By Mr. Hart:            5

5  By Ms. Gray:            44

6

7  EXHIBIT NO.      DESCRIPTION      IDENTIFIED

8  1 - EEO Statement of Catherine Bruno      15

9  2 - Performance Appraisal Narrative      70

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 5

1          P R O C E E D I N G S

2  Whereupon,

3          CATHERINE HART,

4      having first been duly sworn, was

5      examined and testified as follows:

6

7      EXAMINATION BY COUNSEL FOR COMPLAINANT

8  BY MR. HART:

9      Q.   Good morning, Ms. Bruno.  My name is

10 David Hart.  I introduced myself before we got

11 started, but just so we're clear for the record, I'm

12 one of Ms. Grzadzinski's attorneys and I represent

13 her in connection with her EEO complaint against the

14 Department of Justice.

15     So just to start with, could you please state

16 and spell your name for the record.

17     A.   Catherine, C-A-T-H-E-R-I-N-E, middle

18 initial "S", like Sam, Bruno, B-R-U-N-O.

19     Q.   To start with, I want to get some just

20 general employment history for you.

21     A.   Sure.

22     Q.   So where do currently work?

Page 6

1    A.   I work at the FBI, the Federal Bureau of
2  Investigation.
3    Q.   What is your position?
4    A.   I'm the assistant director for the
5  Office of Integrity and Compliance.
6    Q.   Can you, just generally, describe for me
7  what are your responsibilities in that role?
8    A.   I have responsibility to support the FBI
9  employees in their following the standards of conduct
10  applicable to all members of the Executive Branch and
11  I also support the FBI as a whole in having greater
12  compliance with laws, rules, regulations, and
13  policies.
14    Q.   Okay.  How long have been in that
15  position?
16    A.   I have been the assistant director since
17  August of 2018.
18    Q.   And before that position, where were you
19  working?
20    A.   I was the acting assistant director for
21  the Office of Integrity and Compliance from the end
22  of February of 2018 until August of 2018.

Page 7

1    Q.   And so since you were acting, what was
2  your official role that if you weren't acting, you
3  would have encumbered?
4    A.   I had the same responsibilities.  I just
5  didn't have the official title of assistant director,
6  because the assistant director, a man named Pat
7  Kelly, who had been in the position of assistant
8  director for approximately 10 years, he had just
9  retired at the end of February of 2018 and I was put
10  in the acting role to assume those responsibilities
11  until a new assistant director could be selected.
12    Q.   I see.  And so what was your position of
13  record, I guess, that you were no longer occupying
14  because you were acting?
15    A.   Section chief in the Office of Integrity
16  and Compliance.
17    Q.   How long were you a section chief?
18    A.   From December of 2016 until February of
19  2018.
20    Q.   Can you just give me a general
21  understanding of what your responsibilities were in
22  that job?

Page 8

1    A.   As section chief, I assisted Pat Kelly.
2  So Pat Kelly, A.D. Kelly -- we use those terms
3  interchangeably -- I assisted him in the management
4  of the division and office.  We use those terms also
5  interchangeably.  We also refer to it as OIC, the
6  Office of Integrity and Compliance.
7    So I assisted him in the management of OIC and
8  I also had a couple of particular jobs that fell in
9  my portfolio that he had taken on in the timeframe
10  when I became section chief, which was the Enterprise
11  Risk Management Program for FBI and something called
12  the Integrity Committee, which is a committee run by
13  the FBI at that time which has since transferred to
14  another organization, but it's called the Integrity
15  Committee.
16    So I helped with the general management of OIC
17  and with those two responsibilities in addition.
18    Q.   Got it.  And before that section chief
19  position, what was your role?
20    A.   My official title from January of 2009
21  until November -- until December of 2016 in the FBI
22  was special assistant to the general counsel for the

Page 9

1  Office of Inspector General and Government
2  Accountability Office matters, in other words,
3  special assistant for OIG and GAO matters.
4    Q.   Okay.  So you said that was your
5  official title.  Were you performing some other role
6  prior to December 2016?
7    A.   Yes.  Between January of 2009 and
8  December of 2016, I was in a variety of different
9  roles other than my official role of special
10  assistant for OIG and GAO matters.
11    Q.   Day.  So can you give me just kind of a
12  rough timeline, and it's okay if you can't remember
13  the specific dates, of what those different roles
14  were and when those transitions occurred from 2009
15  and 2016?
16    A.   I can approximate.
17    Q.   Okay.
18    A.   So I started in -- I came to the FBI in
19  January 2009 into the role of special assistant to
20  the general counsel for OIG and GAO matters when
21  Valerie Caproni was the general counsel and Robert
22  Mueller was the director, and I continued in that

Page 10

1  capacity through the tenure of Pat Kelly as acting
2  general counsel through Andrew Weissmann as general
3  counsel and then Pat Kelly again as acting general
4  counsel.
5      Q.   Okay.  So whenever Mr. Kelly ended his
6  role as acting general counsel, that's roughly when
7  that --
8      A.   Mr. Baker arrived.  Mr. Baker arrived, I
9  believe, in January of 2014.
10     At some point prior to Mr. Baker's arrival, it
11  was either Mr. Weissmann or Mr. Kelly -- I think it
12  was Mr. Kelly -- who put me in the role of acting
13  chief of staff for the General Counsel's Office.
14     Q.   Okay.
15     A.   So when Mr. Baker arrived, I was acting
16  chief of staff for the General Counsel's Office.
17     Q.   All right.  And when did that end,
18  roughly?
19     A.   When I left -- well, it officially
20  ended, I guess, when I left the General Counsel's
21  Office entirely in December of 2016 to join the
22  Office of Integrity and Compliance as a section

Page 11

1  chief.
2      Q.   Okay.
3      A.   But as a practical matter, it ended when
4  I went to do a detail in the International Operations
5  Division, which we refer to as IOD, in the Mutual
6  League Assistance Treaty Unit, which we refer to as
7  the MLAT unit, and that occurred approximately -- let
8  me think for moment so I can --
9      Q.   That's okay.  Take your time.
10     A.   -- try to remember the timeline.
11     The spring of 2015, I believe it was, and I'll
12  correct myself later if it turns out I'm wrong, but I
13  believe it was approximately March of -- March to
14  June of 2015 that I essentially detailed myself over
15  to the MLAT unit.
16     Q.   Okay.  If it helps at all, do you recall
17  whether that was before or after the 2015
18  reorganization of the FBI OGC?
19     A.   I believe it was just before.  I think
20  the -- if I had to pick a date for the official
21  reorg, I would put it at June 2015.
22     Q.   Okay.

Page 12

1      A.   But I could be off by a number of
2  months.
3      Q.   That's all right.
4      So after transitioning into that detail, did
5  you have any other roles between that detail transfer
6  and leaving OGC in December 2016?
7      A.   Yes.  I found myself a new detail
8  through connections that I had at the Department of
9  Justice and went to the Department of Justice Office
10  of Legislative Affairs, which we refer to as OLA,
11  from approximately June of 2015 until February of
12  2016, and then from February 2016 until December of
13  2016, I was detailed to the Office of Integrity and
14  Compliance.
15     Q.   Okay.  So before January 2009, then,
16  were you also at the FBI before then?
17     A.   No.  I was a deputy assistant inspector
18  general --
19     Q.   Okay.
20     A.   -- at the Department of Justice Office
21  of the Inspector General, the DOJ OIG, where I
22  managed and supervised a division.  I was a deputy.

Page 13

1  So I assisted in the management of a division of the
2  OIG, the Oversight and Review Division.
3      Q.   And how long did you have that job?
4      A.   I started at the Inspector General's
5  Office in 2002 and I was promoted to a management
6  position approximately a year later, to the deputy
7  position.
8      The name of the division changed from the
9  Office of Oversight and Review to the Oversight and
10  Review Division, but it was essentially the same
11  thing, and I was essentially a manager there from
12  2003 until 2009 when I went to the FBI.
13     Q.   Got it.  Before that position with DOJ
14  OIG, where were you employed?
15     A.   From the time I left my judicial
16  clerkship, I was an Assistant United States Attorney
17  for the District of Columbia at the U.S. Attorney's
18  Office for the District of Columbia.
19     Q.   Okay.  When did you leave your judicial
20  clerkship?
21     A.   I was a clerk from August of 1995 until
22  August of 1996 for the United States Circuit Court in

Page 14

1  the Sixth Circuit.  The chambers were in Nashville
2  and we heard oral argument in Cincinnati.
3      Q.   What judge did you work for?
4      A.   Chief Judge Gilbert Merritt,
5  M-E-R-R-I-T-T.
6      Q.   Before then, were you in law school?
7      A.   Yes.  I was at Boston College Law
8  School.  I graduated in May 1995.
9      Q.   So that does it for the employment and
10  education.  Thank you.
11      So moving back forward to 2015, do you recall
12  there eventually came a time that you filed an EEO
13  complaint?
14      A.   Yes.
15      Q.   Can you describe for me, generally, what
16  brought you to file that?
17      A.   The primary precipitating event was that
18  Mr. Baker had stated his intent to RIF me out of the
19  Senior Executive Service.  RIF means Reduction in
20  Force.
21      MR. HART:  I see.  I think this may help a
22  little bit.  If you could mark this as Exhibit 1.

Page 15

1          [Bruno Exhibit No. 1 was
2          marked for identification.]
3  BY MR. HART:
4      Q.   So just take a moment.  Take a look at
5  the document we just handed you and let me know
6  whenever you're ready.
7      A.   I am familiar with this document.
8      Q.   Do you recall if this was a statement
9  about -- a summary of an EEO complaint that you
10  submitted at that time?
11      A.   Yes.
12      Q.   And turning to the second page of this
13  document, it's Bates No. 3769 in the lower right-hand
14  corner.  Do you see that the first large paragraph
15  about midway down the page, it says "On May 27,
16  2015"?
17      A.   Yes.
18      Q.   Was that the conversation that you were
19  just referring to with Mr. Baker?
20      A.   Yes.
21      Q.   And do you recall what the GS-15
22  position he was referencing was?

Page 16

1      A.   He did not reference any specific
2  position.
3      Q.   Do you recall whether or not he
4  explained to you why it was necessary to remove you
5  from your position?
6      A.   He made a general statement about
7  sometimes having to take a step backwards to take a
8  step forwards or something of that nature and other
9  general statements of that sort.
10      Q.   Okay.
11      A.   I can't recall a lot of the specifics.
12  It was a very stressful moment.
13      Q.   That's okay.  And was this via an
14  in-person meeting or a phone call or how was this?
15      A.   It was in person in the
16  presence of Jim Baker and Justin Schoolmaster.
17      Q.   Okay.  Do you recall why you were asked
18  to come to that meeting that day?
19      A.   I don't know other than to provide that
20  information to me.
21      Q.   Okay.  I mean --
22      A.   I don't recall.  I don't know if there

Page 17

1  was another purported reason for the meeting.  I
2  don't recall.
3      Q.   That's okay.  So in terms of a reduction
4  in force procedure, was that the language that Mr.
5  Baker used with you?
6      A.   Yes.
7      Q.   Either in that conversation or
8  afterwards, to your recollection, did Mr. Baker
9  provide you a description of why it was necessary to
10  use a RIF procedure with respect to your position?
11      A.   He did not.
12      Q.   Okay.  And prior to this meeting, had
13  you received any indication that your position may or
14  may not be eliminated?
15      A.   No.  There had been a study done
16  regarding my specific job responsibilities moving to
17  another division, but I had never had any indication
18  that I would be moved out of the Senior Executive
19  Service.  That had not been my experience and
20  observation of how reorganizations were done within
21  the FBI.
22      Q.   And do you recall when that study was

Page 18

1 done or at least when you became aware of it?

2    A.   It was around the end of 2014 to the

3 beginning of 2015.

4    Q.   And, to your recollection, was that

5 study specific to your position or to the

6 reorganization generally?

7    A.   It was a general study to review how

8 responsibilities relating to the Office of the

9 Inspector General should be handled.

10    Q.   I see.  So, to your understanding, it

11 was not something related to all of OGC?

12    A.   No.

13    Q.   So you referenced -- in turning back to

14 the EEO complaint in front of you, so you reference

15 in here receiving performance appraisals from three

16 separate FBI general counsels.  Do you recall who the

17 three different ones were?

18    A.   Yes.  Valerie Caproni, Andrew Weissmann,

19 and Pat Kelly, who was in an acting capacity on two

20 occasions.  I can't say for certain that Pat

21 evaluated me both times he was acting, because I

22 don't recall if he was there during the final

Page 19

1 appraisal moment both times he was acting.  I don't

2 recall that, but I believe, based on what I've

3 written here, that he would have given me a

4 performance appraisal at least one of the two times

5 he was acting general counsel.

6    Q.   Do you recall whether there was a change

7 in the quality of your performance evaluations when

8 Mr. Baker became general counsel?

9    A.   Yes.

10    Q.   And what were those changes, to the best

11 of your recollection?  I know we don't have them in

12 front of you.

13    A.   He did not give me an outstanding.

14    Q.   Do you recall whether there were any

15 specific issues that he cited as a basis for that?

16    A.   I recall that there was some back and

17 forth with him about what my performance appraisal

18 would say exactly and I recall that the one criticism

19 that remained at the end of the day in at least one

20 was that he had concern about my ability to, quote,

21 build coalitions, unquote.

22    Q.   Did he explain what that meant, "build

Page 20

1 coalitions", to your recollection?

2    A.   It had to do with the fact that my work

3 involved interacting with the Inspector General's

4 Office and he wanted the relationship with the

5 Inspector General's Office to be very positive.

6    Q.   Okay.  And did he explain how that

7 related to him wanting you to build a coalition?  Was

8 it a coalition with them?

9    A.   Yes.

10    Q.   Other than that particular concern, do

11 you recall him mentioning anything else specific?

12    A.   In the performance appraisal?

13    Q.   Yes, in that context.

14    A.   As we sit here, I don't recall what was

15 in those performance appraisals exactly, but no.  I

16 don't recall anything more.

17    Q.   You mentioned there was some back and

18 forth regarding just what would go into the

19 performance appraisal.  Can you describe for me,

20 mechanically, what that looked like?  Was it that you

21 were drafting something and he was editing it?

22    A.   Yes.  I was drafting and he was sending

Page 21

1 something back, that kind of thing.

2    Q.   Was that your understanding, that that

3 was Mr. Baker's practice, that he would edit people's

4 performance evaluations like that?

5    A.   That can be the method of conducting --

6 the process of creating a performance appraisal at

7 the FBI, that the employee writes it in the first

8 draft and that the supervisor then either adopts it

9 in its entirety or may change it.

10    Q.   I see, but was it your understanding

11 that, ultimately, whatever the specific rating was

12 was up to your supervisor, not you personally?

13    A.   Yes.

14    Q.   So turning toward the next paragraph in

15 your EEO complaint, you said you received very

16 limited feedback on my performance; for example, "I

17 received no midyear performance appraisal this

18 spring".

19      Do you know when you would have expected to

20 receive that midyear performance appraisal that year?

21    A.   Generally, that should occur in April.

22    Q.   Specific to 2015, do you recall him

Page 22

1  giving you any either negative or positive feedback

2  leading up to that May 27th conversation?

3      A.   I do not.

4      Q.   I want to ask you after this, you

5  mentioned a few comments that he made.  So with

6  respect to his remark that you were too passionate

7  about your job, do you recall whether there were any

8  specific incidents that he cited in saying that you

9  were too passionate about it?

10     A.   I don't recall him citing specific

11  incidents.  He wasn't someone who really got into

12  specifics.

13     Q.   Okay.  And with respect to the next

14  comment, that you were too tenacious, do you remember

15  him citing any specific incidents that were a basis

16  for that?

17     A.   Not in that meeting, no, and I don't

18  recall him talking about specific incidents, no.

19     Q.   Okay.  And afterwards, you expressed a

20  concern that this represents gender bias.  Can you

21  explain what led you to that conclusion?

22     A.   I wasn't present when he provided

Page 23

1  feedback to male executives on a regular basis, but

2  it was not my impression that male executives were

3  being threatened with being RIF'd out of the Senior

4  Executive Service for being too passionate or

5  tenacious about their job.

6      At the FBI, we have a lot of male executives

7  who seemed to be getting awards and praise for being

8  very passionate about their jobs and very tenacious

9  about their cases.

10     Q.   Okay.  Can you think of a couple of

11  examples of the male executives?

12     A.   One just has to look in the brochure of

13  the director's awards every year to see all of the

14  men getting awards for being passionate and

15  tenacious.

16     Q.   Okay.  Is it your understanding that

17  that is something that is rewarded for male

18  executives as a result?

19     A.   Yes.

20     Q.   Was that consistent with your experience

21  with Mr. Baker, that he would reward male executives

22  who behaved that way?

Page 24

1      A.   I don't know that I saw him give out

2  specific awards, but I certainly saw him treat them

3  much better than he treated the female executives.

4      Q.   In what way?

5      A.   For example, one particular male

6  executive, Rick McNally, was transferred into a

7  position, although, he certainly behaved in a way

8  that one could describe as too passionate, as in

9  being -- you know, expressing anger; whereas, when my

10  job responsibilities were given to another division

11  or were moved away, no transfer into another position

12  was made available to me within OGC.

13     Q.   I think you mentioned before that you

14  actually -- I think you said you found yourself a

15  detail.

16     A.   Yes.

17     Q.   Okay.  What was that process like, you

18  finding yourself a detail?

19     A.   So I went to the International

20  Operations Division executives and said, I heard

21  you're starting up a new MLAT unit; could they use

22  some help?

Page 25

1      Q.   Okay.  And was that something that Mr.

2  Baker helped you with?

3      A.   Well, he was encouraging me to find work

4  outside of OGC.

5      Q.   But in the process of actually obtaining

6  that work outside of OGC, do you recall receiving

7  assistance from him?

8      A.   With regard to IOD, I do recall that he

9  encouraged me to meet with the assistant director of

10  OID, because I expressed to him that I had an

11  interest in things generally international.

12     Q.   And do you recall him attempting to aid

13  you at all in trying to find a position within OGC?

14     A.   Never.

15     Q.   Did he ever suggest that to you, that

16  you could remain in OGC?

17     A.   Never.  I asked repeatedly.

18     Q.   It was something that you made known to

19  him, that you wanted to remain in OGC?

20     A.   Absolutely.

21     Q.   On approximately how many occasions do

22  you recall making that known to him?

Page 26

1    A.   More than eight.

2    Q.   So after -- and then, eventually, that

3  first detail in the MLAT unit, you had another detail

4  after that that I think you mentioned you found for

5  yourself.  Did you receive any help from Mr. Baker at

6  that point in finding a detail?

7    A.   No.

8    Q.   What was your understanding of what

9  would have happened if you had not continued finding

10  yourself a detail?

11    MS. GRAY:  Objection, calls for speculation.

12  BY MR. HART:

13    Q.   Just what your understanding was.

14    A.   Well, I felt that the detail to the MLAT

15  unit was not SES-level work and that I needed to do

16  something that would be more career enhancing.  So I

17  reached out to the principal deputy attorney general,

18  who I knew from prior work I had done, and asked him

19  if he could find something more suitable.

20    So my feeling was that I needed to do

21  something to help preserve my career until I could

22  figure out a solution.

Page 27

1    I don't know if that answers your question.

2    Q.   It does.  So was that at all a concern

3  that you had before you ended up on those details and

4  you learned that your position may be eliminated?

5    A.   No.

6    Q.   So turning back to your EEO complaint,

7  if you look, there's several bullet points at the

8  bottom of page 3770.

9    So, actually, just prior to those in the

10  paragraph, you referenced there's three white males

11  and five females over 40 that were the eight

12  executives.  Do you recall who the three white males

13  were at that time?

14    A.   I believe it was Rick McNally, was one

15  white male, and Tom Highbarger was another white

16  male.  I'm trying to think of the third.

17    So Rick would have been section chief and then

18  Karen -- let me think a minute.

19    Q.   That's okay.  Take your time.

20    A.   I can't remember who the third white

21  male was.

22    Q.   That's okay.

Page 28

1    A.   I'm sure it would come back to me if I

2  looked at the organizational chart in that time.

3    Q.   Do you recall that Tom Bondy was a

4  deputy general counsel at that time?

5    A.   Oh, Highbarger is the wrong name.

6  Sorry.  Tom Highbarger was a supervisor at -- Tom

7  Bondy, that's what I meant.  Sorry.

8    Q.   So did you ever work with Mr. Bondy

9  during your time in OGC?

10    A.   I did.

11    Q.   In your experience, what was the quality

12  of his work?

13    To be more specific, what was the quality of

14  his work in relation to the other deputy general

15  counsels that you worked with, if you worked with

16  them?

17    A.   His background was an appellate

18  attorney, and my sense was that he was, most likely,

19  a highly-capable appellate lawyer, but that managing

20  was not his strong suit.

21    Q.   Okay.  And do you recall whether there

22  was anything that gave you that impression?

Page 29

1    A.   Well, I was acting chief of staff at the

2  time.

3    Q.   Okay.

4    A.   So I was interacting with various

5  deputies as an acting chief of staff and attempting,

6  for example, to have them provide me with information

7  about their branches and that kind of thing; and with

8  Tom, it was challenging because I got the sense that

9  he had a really good mind for appellate cases, but

10  maybe not for the management details of a branch.

11    Q.   Okay.  And do you recall ever becoming

12  aware of allegations that Mr. Bondy acted

13  inappropriately with respect to female employees?

14    A.   I was told that.

15    Q.   How did you become aware of those?

16    Actually, the easier question is what was your

17  understanding of what the allegations were?

18    A.   I don't recall the details.  My

19  understanding of the allegations was that he had, I

20  guess, been overly friendly with females in the

21  office in the manner of either asking them out or

22  making inappropriate comments or something that what

Page 30

1 I thought would be referred to in the Inspection
2 Division as sexual harassment.
3     Q.   Were you at all involved in the handling
4 of those allegations?
5     A.   I was not.
6     Q.   To your recollection, and if you don't
7 know, that's completely fine, was Mr. Baker ever made
8 aware of those allegations?
9     A.   I was told that he was.
10    Q.   And who told you about it?
11    A.   I believe I was told by either Marci or
12 Nancy or Karen or Sherry Sabol.  I'm sorry.  Marci
13 Grzadzinski, Nancy Wiegand, Karen Miller, or Sherry
14 Sabol.  I don't know who told me exactly.
15    Q.   To your recollection, and if you could
16 flip to the next page in the document.  So the first
17 paragraph after the first bullet, you say: "In
18 contrast to the uniform and unjustified lack of
19 support Mr. Baker has shown to his female executives
20 over 40, he has been highly supportive of his three
21 white executives despite their difficulty serving in
22 a management capacity."

Page 31

1     Did that include Mr. Bondy when you were
2 describing that?
3     A.   Yes.  Despite Mr. Bondy's troubles, Mr.
4 Baker seemed to have tremendous patience with him.
5     Q.   In what way?
6     A.   He expressed support for him at staff
7 meetings and wanting to work with him and, you know,
8 help him with his management of the branch.
9     Q.   Okay.  And those were things that, to
10 your understanding, Mr. Baker had offered to Mr.
11 Bondy?
12    A.   Yes.
13    Q.   So moving past your EEO complaint -- so
14 you can set this aside.
15    So do you recall around this same time that
16 Ms. Grzadzinski was first removed as deputy general
17 counsel, made a section chief, and then later removed
18 from the SES?
19    A.   I do recall.
20    Q.   So do you generally recall how you were
21 made aware of those events?
22    A.   I think Ms. Grzadzinski told me and

Page 32

1 others in the office told me what was happening.
2     Q.   Okay.  "Others in the office", do you
3 recall it, just generally, being discussed?
4     A.   Yes.
5     Q.   So other than Ms. Grzadzinski, do you
6 recall anybody expressing concerns about that
7 transition?
8     A.   Yes.
9     Q.   Can you describe to me what those
10 concerns were?
11    A.   Well, there were concerns about the
12 reorganization itself as being ill-conceived and then
13 there were concerns regarding how Ms. Grzadzinski was
14 being treated in addition to that.  So they're sort
15 of two separate things.
16    Q.   So with respect to Ms. Grzadzinski
17 specifically, we'll go through that first.  So what
18 were those concerns, to the best of your
19 recollection?
20    A.   Those of us who were dealing with Mr.
21 Baker came to recognize that he had trouble handling
22 interactions with women if they had any differing

Page 33

1 opinion from his.
2     Q.   Okay.  Can you remember an experience
3 that was bringing up that concern?
4     A.   Yes.  So, for example, if in my job
5 handling IG matters, if I was trying to explain to
6 him about why the IG was taking a position, we should
7 oppose the IG position, and I was arguing, you know,
8 with any assertiveness about that, you could see that
9 Mr. Baker's body language would get very -- he would
10 back away.  He would seem to get very tentative.
11    He just -- over time, we noticed a pattern
12 that he seemed uncomfortable around any woman who was
13 try to assert an argument around him.  That's the
14 best way I could describe it.
15    Q.   In your observations over the years that
16 you were working with Mr. Baker, was that behavior
17 that was specific to women?
18    A.   Yes.
19    Q.   Do you recall any male employees that
20 you observed similarly asserting themselves, but not
21 receiving a similar reaction by Mr. Baker?
22    A.   I do, yes.

Page 34

1    Q.   Who do you recall?

2    A.   People like Tom, people like Rick, in

3  particular, who is also a very assertive person.

4    Q.   Okay.  And now going back to just the

5  concerns that you were hearing, the concerns about

6  the reorganization generally, what were those

7  concerns, to the best of your recollection?

8    A.   Well, the FBI is the Federal Bureau of

9  Investigation and Mr. Baker was taking the

10 Investigative Law Branch of the FBI and merging it

11 with the Administrative Law Branch.

12    I'm sorry.  He was taking the Investigative

13 Law Branch of OGC -- I apologize -- the Office of the

14 General Counsel of OGC, and he was merging it with

15 the Administrative Law Branch of OGC under one

16 deputy, which made the span of control of that one

17 deputy larger and makes it harder for that one deputy

18 to do the job, and that's his decision.  He's the

19 general counsel.  He can do that, but there were a

20 lot of very significant concerns about him doing

21 that.

22    Q.   Okay.  And can you describe for me,

Page 35

1  generally, what those concerns were?

2    A.   That the person who would lead that now

3  combined branch would not have sufficient time and

4  attention to really focus on those very, very

5  important investigative law issues, which tend to be

6  very time sensitive, because they have to do with the

7  operations of the FBI, and often times in

8  investigations, you may have search warrant issues

9  that are very pressing; whereas, the administrative

10 law issues are more, you know, relating to contracts,

11 but also that branch has very -- has a big portfolio.

12 Privacy is within that branch.  It's a big portfolio.

13    So to merge those two together under one

14 deputy, he didn't have a very -- his explanation, we

15 had a tough time understanding his explanation.

16    Q.   What was your recollection of that

17 explanation?

18    A.   He stated that he wanted the org chart

19 to look symmetrical.

20    Q.   Do you recall him ever giving a reason

21 other than that?

22    A.   He thought that -- I mean, he thought

Page 36

1  that he could have three deputies and two section

2  chiefs under each deputy and then it would be three

3  and then six.  It would look more even.

4    Q.   I see.  In terms of a practical benefit

5  of that, other than just physically looking

6  symmetrical, do you recall him giving any explanation

7  on that end?

8    A.   Well, that there would still be a

9  section chief over Investigative Law.  So it would

10 still be the same.  In his mind, it would be the same

11 because there would be a section chief over

12 Investigative Law.

13    Q.   Okay.  And in your -- just in your

14 experience, either in your role as a special

15 assistant or as acting chief of staff, what was the

16 practical difference between a deputy general

17 counsel's authority and that of a section chief

18 within the FBI?

19    A.   The FBI is a very hierarchical

20 organization, and so having a deputy for

21 Investigative Law has a different -- carries a

22 different weight than having a second chief.

Page 37

1    Q.   And in terms of the practical authority

2  to actually being the person allowed to sign a

3  document or something like that, was there a

4  difference on that level?

5    A.   I don't know.  I don't know in terms of

6  specific authorities under the -- I'm not enough in

7  the weeds on that to know.

8    Q.   So stepping away from this a little bit,

9  so during this time that the reorganization was

10 happening and when Ms. Grzadzinski was eventually

11 removed from the SES, were you interacting with her

12 either during or outside of work?

13    A.   Yes.

14    Q.   In the course of those interactions, did

15 you have the opportunity to observe, more or less,

16 the effect that those transitions were having on

17 Ms. Grzadzinski?

18    A.   Yes.

19    Q.   What did you observe?

20    A.   It was stressful.

21    Q.   In what way?

22    A.   She had been brought over from the

Page 38

1  Washington Field Office on the understanding that she
2  would be a deputy general counsel and have that level
3  of authority to run the Investigative Law Branch of
4  the General Counsel's Office, and then relatively
5  shortly thereafter, the position had been,
6  essentially, downgraded. So that was very stressful
7  in terms of how she would manage that change.
8      Q.  Okay. In terms of her removal from the
9  SES, do you recall how that affected her, just from
10 what you observed?
11     A.  It was very stressful and upsetting
12 and --
13     Q.  Do you recall --
14     A.  -- embarrassing, probably. I mean, I
15 think she was just beside herself.
16     Q.  Do you recall anything in particular
17 that Ms. Grzadzinski was either saying or doing that
18 gave you that impression?
19     A.  She was expressing how upset she was.
20     Q.  How would she express that, from what
21 you remember?
22     A.  She was telling us it was awful, that

Page 39

1  she had been sent out to the TSC who told her she
2  wasn't even able to supervise anyone after having
3  supervised people for -- I'm not exactly sure how
4  long, but very successfully.
5      Q.  Do you recall her ever mentioning how it
6  was affecting her personal life?
7      A.  I do recall her mentioning that.
8      Q.  How did that come up?
9      A.  She said it was affecting her health
10 physically, that she was feeling well, that it was
11 just very, very bad.
12     Q.  Okay. And Ms. Grzadzinski has a young
13 child. Right?
14     A.  Yes.
15     Q.  Did she mention at all how it was
16 affecting her relationship with her daughter?
17     A.  She mentioned that it was causing
18 enormous stress and that, as a mom, it's incredibly
19 difficult to be a good mom when you're under that
20 much strain.
21     Q.  And in terms of her relationship with
22 her fiance, did that ever come up?

Page 40

1      A.  That came up.
2      Q.  In what way?
3      A.  In general terms, that it was -- again,
4  that it was impacting her in all facets of her life.
5  She was upset and stressed out, and it was -- I don't
6  know if she used the word "nightmare" or, you know,
7  "horrific" or what word she exactly used, but the
8  term, she was describing it in very strong terms and
9  very bleak terms, the situation.
10     Q.  Was Ms. Grzadzinski the type of person
11 to use those kinds of strong terms about her personal
12 life in other contexts?
13     A.  I had not heard her do that. She had
14 previously described always making her personal life
15 fit around her job, for example, having her child
16 ready with what she called the child's go bag to be
17 ready when she had to go into the office.
18     Q.  And was it your understanding that she
19 was happy to be living her life like that?
20     A.  Yes.
21     Q.  Then the change in that occurred around
22 the time she was removed as deputy general counsel

Page 41

1  and removed from the SES?
2      A.  It did seem like a dramatic change to
3  me.
4      Q.  You mentioned that Ms. Grzadzinski
5  referenced it affecting her health. Was there any
6  specific -- do you recall anything specific in that
7  context?
8      A.  She referenced going to doctors. I
9  don't know -- I don't recall the details of what
10 about.
11     MR. HART:  Okay. I am almost finished. So if
12 we could take a five-minute break.
13     THE WITNESS:  That would be great.
14     [Recess.]
15 BY MR. HART:
16     Q.  So moving to an entirely different
17 topic, so do you recall that while Mr. Baker was
18 general counsel, he would have periodic meetings with
19 himself, the deputy general counsels, and the section
20 chiefs?
21     A.  Yes.
22     Q.  Approximately how often, to your

Page 42

1  recollection, did those meetings happen?

2      A.  It was either weekly or every two weeks.

3  I think it was meant to be weekly.

4      Q.  And were those meetings that you were

5  present for?

6      A.  Generally speaking, I intended to go to

7  those unless I had some other commitment.

8      Q.  I see.  So then in those meetings, did

9  you observe any difference between Mr. Baker's

10  treatment of men in the room versus women?

11      A.  Yes.

12      Q.  In what way?

13      A.  He would listen to what the men had to

14  say more readily than what the women had to say.  If

15  a woman said something, he might not agree with it.

16  If the man said the same thing subsequently, he might

17  agree with it, those kinds of things.

18      Q.  Do you recall if Ms. Grzadzinski was in

19  those meetings as well?

20      A.  Yes.

21      Q.  Do you recall there eventually came a

22  time around the transition that she was deputy

Page 43

1  general counsel and was made a section chief that she

2  began participating in those meetings less?

3      A.  I don't recall that specifically, but

4  that does seem logical given who was invited to those

5  meetings.

6      Q.  I just mean in terms of the meetings

7  that she did attend, that she would not speak up as

8  often or participate as actively?

9      A.  I don't recall that specifically.

10      Q.  Okay.  Do you recall her, for example,

11  originally sitting at the table when she was the

12  deputy counsel and then, as a section chief, sitting

13  at a chair that's around the edge of the room

14  instead?

15      A.  I don't personally recall that.  I'm

16  sorry.

17      Q.  That's all right.  Moving past that, do

18  you recall there eventually came a time in 2015 that

19  a decision was made that chief division counsels --

20  they's call them CDCs -- it was decided that they

21  needed to maintain active bar licensing?

22      A.  I recall that decision was made.  I

Page 44

1  don't recall when it was made.

2      Q.  So do you recall that, at least prior to

3  that transition, for a long period of time, CDCs were

4  not required to maintain active bar licensing?

5      A.  Yes.  I do recall that.

6      Q.  And that was just the general

7  understanding within the OGC, that they were not

8  required to maintain that?

9      A.  Yes.

10      Q.  All right.  And then the last question,

11  relatively open-ended, with respect to

12  Ms. Grzadzinski's EEO complaint, is there anything

13  else that you can recall that you believe would be

14  important?

15      A.  I think you've touched on the major

16  points there are.

17      MR. HART:  All right.  I have no more

18  questions.

19      MS. GRAY:  I have a few questions for you.

20      THE WITNESS:  Okay.

21          EXAMINATION BY COUNSEL FOR THE AGENCY

22  BY MS. GRAY:

Page 45

1      Q.  Mr. Hart asked you some questions

2  regarding the differences between the way Mr. Baker

3  treated women versus men in meetings?

4      A.  Yes.

5      Q.  Did you -- can you provide an example of

6  that?

7      MR. HART:  Objection, asked and answered.

8      THE WITNESS:  Yes.  So if I was talking about

9  an issue and it was a little bit contentious, Mr.

10  Baker would back away or tend to shut down if it was

11  a woman.  That was just something that we noticed

12  about him.  He was just really uncomfortable with

13  women who were engaged in discussions that were other

14  than placid.

15  BY MS. GRAY:

16      Q.  Did you ever observe Mr. Baker act that

17  way with Tricia Anderson?

18      A.  No, ma'am.  Patricia is a very -- she is

19  very soft spoken and she has a very sort of librarian

20  kind of voice.

21      Q.  Did you observe him act that way to

22  Lorraine Lamert?

Page 46

1    A.   Absolutely, yeah.  Definitely.

2    Q.   Did you ever observe anyone else,

3  including women, respond that way to Ms. Lamert?

4    A.   Did I observe -- I'm sorry.  I don't

5  understand the question.

6    Q.   So you described how Mr. Baker would

7  react if a woman was being assertive.  Did you ever

8  observe women in those meetings react that way if

9  Ms. Lamert was being assertive, for example?

10    A.   Did I ever observe a woman sort of back

11  off if Elaine was being very assertive?  Well, not

12  myself or Marciann or Sherry or Nancy.

13    Q.   Anyone else?

14    A.   I'm trying to think.  There probably are

15  some women who would react that way to Elaine.

16    Q.   Mr. Hart asked you a question regarding

17  the issue of CDC's requiring bar licenses.  Did you

18  have any responsibility over that issue?

19    A.   No.

20    Q.   Were you ever asked to provide an

21  opinion on that issue?

22    A.   No.  I believe I did assist on that

Page 47

1  issue in one way, which is I asked a former colleague

2  from the U.S. Attorney's Office who was involved in

3  the Unauthorized Practice of Law Committee to send

4  some kind of information, and I forwarded it to maybe

5  Elaine.

6    Q.   And what was the substance of that

7  information?

8    A.   Maybe something about the model rules or

9  something.  I don't remember what it was.

10    Q.   Do you recall if the general advice was

11  that they do, in fact, have to maintain active bar

12  licenses?

13    A.   I don't remember what her position was.

14  I was just trying to put -- it might have been

15  Elaine.  It might have someone else -- someone in

16  touch with the folks in D.C., at the D.C. Bar, who

17  deal with that issue?

18    Q.   Okay.

19    A.   I'm just trying to -- because I happened

20  to know someone from the U.S. Attorney's Office who

21  dealt with that issue, but I was not involved in

22  deciding what should be done about it.

Page 48

1    Q.   Do you have any firsthand knowledge as

2  to how Ms. Grzadzinski performed as a deputy general

3  counsel?

4    A.   When you say "firsthand knowledge", do

5  you mean my interactions with her when I was chief of

6  staff?

7    Q.   Just in general, do you believe that you

8  have firsthand knowledge as to how she performed when

9  she was in the deputy general counsel position?

10    A.   A little bit.

11    Q.   Did you review her work product?

12    A.   Not in that sense, no.

13    Q.   Do you have any firsthand knowledge as

14  to how Ms. Grzadzinski performed as section chief of

15  the Investigative Law and Training Section?

16    A.   Again, in the sense of interacting with

17  her when I was chief of staff, needing to discuss

18  issues with her that would have related to that a

19  little bit, depending on the timeline of when that

20  occurred and whether I had gone to the MLAT unit yet

21  or not.

22    Q.   Right.  So you went to the MLAT unit

Page 49

1  when?

2    A.   I think it was approximately March.

3    Q.   Of 2015?

4    A.   Yes.

5    Q.   So if she was in the section chief role

6  for the second half of 2015, would you have any

7  interaction with her in her --

8    A.   No.

9    Q.   -- role as section chief?

10    A.   I don't think so then, no.

11    Q.   So then you wouldn't have any firsthand

12  knowledge of her performance in that role?

13    A.   No.  I was gone by then.

14    Q.   If you could take a look at Exhibit No.

15  1, please.  On Bates 3769, in that second full

16  paragraph, the third line down reads:  "Although Mr.

17  Baker's stated reason for this action is that my job

18  duties have been transferred to another division, a

19  decision the deputy made in order to streamline and

20  consolidate FBI functions."

21    Is that a true statement?

22    MR. WACHTEL:  Up to --

Page 50

1  BY MS. GRAY:
2      Q.  Let me make that clear.  I'm
3  specifically referring to the "a decision the deputy
4  made in order to streamline and consolidate FBI
5  functions".  Is that a true statement?
6      MR. WACHTEL:  Meaning is it true that the
7  deputy made the decision?
8      MS. GRAY:  Yes.
9      MR. WACHTEL:  Thank you.
10     THE WITNESS:  The deputy did officially make
11 the decision, because it was a decision about moving
12 between two divisions of the FBI, and so Mr. Baker
13 couldn't make that decision on his own.
14 BY MS. GRAY:
15     Q.  And is it also your understanding that
16 the decision -- that the reason he made the decision
17 was to streamline and consolidate FBI functions?
18     A.  That's the documented reason.
19     Q.  And so you don't believe that that's the
20 true reason?
21     A.  There are a lot of reasons, and the
22 organization is entitled to move functions.  It's the

Page 51

1  organization's decision.
2      Q.  So you do believe that that to be at least
3  one of the reasons that the decision was made?
4      A.  Yes.
5      Q.  So you indicated that you believe that
6  it was, at least in part, Mr. Baker's decision; is
7  that right?
8      A.  Mr. Baker brought about that change.
9      Q.  And what is your basis for believing
10 that?
11     A.  He's the one who requested the study.
12     [Interruption.]
13     MR. HART:  I'm sorry, Juliet.  Someone just
14 knocked on the door.
15     MS. GRAY:  We can go off the record.
16     [Recess.]
17 BY MS. GRAY:
18     Q.  Did Mr. Baker tell you that he requested
19 the study?
20     A.  Yes.
21     Q.  Did he tell you why he was requesting
22 the study?

Page 52

1      A.  Yes.
2      Q.  And what did he tell you?
3      A.  He didn't want OGC to be involved in OIG
4  matters anymore.
5      Q.  And I think you said this was sometime
6  in late 2014 or early 2015; is that right?
7      A.  Yes.
8      Q.  Did he give you a reason as to why he
9  didn't want OGC involved in IG matters?
10     A.  Yes.
11     Q.  What reason did he give you?
12     A.  He didn't like being in conflict with
13 the IG.
14     Q.  Do you know what division did the study?
15     A.  The Internal Advisor Group, which is
16 part of the Resource Planning Office.
17     Q.  Did you ever see the results of the
18 study?
19     A.  Yes.
20     Q.  And what were the results?
21     A.  It supported the decision that was made.
22     Q.  Did Mr. Baker -- in making this

Page 53

1  decision, did Mr. Baker ever mention to you or
2  discuss with you your relationship with the IG's
3  office?
4      A.  Yes.
5      Q.  And what, in specific, would he discuss
6  about your relationship with the IG's office?
7      A.  He wanted me to build coalitions with
8  them.
9      Q.  Did he feel that you were not doing
10 that?
11     A.  He wanted me to do more of that.
12     Q.  And how did you feel your relationship
13 with the IG's office was?
14     A.  My relationship with them was that I was
15 advocating for my clients, which was the FBI.
16     Q.  Would it sometimes be a contentious
17 relationship?
18     A.  It depended on the circumstances and it
19 had worked well under the prior general counsels.  It
20 didn't work well for Mr. Baker.
21     Q.  Was the IG the same from prior general
22 counsels through Mr. Baker or were their different

Page 54

1  IGs over the course of the various general counsels
2  at the FBI?
3      A.   It was the same IG as we had had under
4  Andrew Weissmann.  That didn't change between Andrew
5  Weissmann and Mr. Baker.
6      Q.   Did Mr. Baker ever tell you he had
7  received complaints from the IG about you?
8      A.   Undoubtedly.
9      Q.   How often would he tell you that?
10      A.   Once.
11      Q.   More than once?
12      A.   I don't recall him saying it more than
13  once, but it's possible that he did, because the IG
14  wanted the General Counsel's Office out of dealing
15  with the IG's office.
16      Q.   Do you recall when he told you that he
17  had received complaints about you from the IG?
18      A.   Prior to requesting the study.
19      Q.   Okay.  Did he indicate that that was the
20  reason he was requesting the study?
21      A.   That was one of the reasons.  As I said,
22  there were a number of reasons.  The IG's Office

Page 55

1  didn't want the General Counsel's Office involved
2  because they wanted the Inspection Division handling
3  everything, because it was preferable to them.
4      Q.   Did Mr. Baker ever tell you that the IG
5  told him he had considered whether to open an
6  investigation on you for obstruction?
7      A.   The IG actually testified in front of
8  Congress that the FBI was obstructing justice by
9  following the law and not providing 6(e) information
10  to the IG's Office.  The FBI's legal position was
11  that providing 6-6(e) information to the IG without
12  permission of the court wasn't legal, and the IG
13  objected to that.
14      OLC supported the IG and supported the FBI in
15  that position.  Mr. Baker was uncomfortable about
16  being in conflict with the IG.  Mr. Baker was someone
17  who was very uncomfortable with conflict.
18      Q.   Did Mr. Baker ever mention to you your
19  relationship with DPU, the Discovery Processing Unit
20  of the FBI?
21      A.   He did not.
22      Q.   Did he ever tell you he had received

Page 56

1  complaints from the DPU about you?
2      A.   He did not.
3      Q.   Did you ever discuss the transfer of
4  your job duties with Deputy Director Juliano?
5      A.   We had a large meeting about it.  Yes,
6  we did.
7      Q.   Did you discuss it with him one on one
8  or was Mr. Baker there?
9      A.   Mr. Baker was there.
10      Q.   So was the discussion about your job
11  duties being transferred a part of this May 27th
12  discussions you referenced in your complaint or was
13  that something that had happened prior?
14      A.   It was something that had happened
15  prior, and my job still exists.  Sherry Sabol
16  occupies that job.  It's still titled the special
17  assistant to the general counsel for OG and GAO
18  matters.  It's currently occupied by Sherry Sabol.
19  They haven't gotten rid of the position.
20      Q.   But do you have an understanding as to
21  whether she is handling IG matters or GAO matters?
22      A.   She is not.  The position still is

Page 57

1  sitting there.
2      Q.   So it was, I believe you said, sometime
3  around March that your job duties were transferred;
4  is that right, March of 2015?
5      A.   Approximately.  As I state in my
6  complaint, I worked very hard to assist in the
7  transfer of all of that work to the Inspection
8  Division.
9      Q.   Okay.  So it wasn't just an immediate
10  thing?
11      A.   Oh, no.  We had a lot of work to do to
12  make sure that was done responsibly and carefully.
13  At any given time, there are 100 ongoing OIG and GAO
14  matters at the FBI.  At the time that matter was
15  transferred, we were doing -- we, in OGC, in
16  conjunction with DPU were conducting all of the
17  document production to the OIG for all OIG document
18  requests, using Clearwell and doing the searches for
19  all grand jury information, all tax information, and
20  all other potentially legally restricted information
21  using E-discovery tools, and all of that had to be
22  transferred to the Inspection Division and it had to

Page 58

1 be done in a way that would ensure that the FBI
2 continued to follow the law.
3      Q.    About how long did that transfer process
4 go on?
5      A.    It took a few months.
6      Q.    Okay.
7      A.    Then that's why I went to the MLAT unit,
8 you know, after that was taken care of.
9      Q.    So during that transfer period and while
10 you were in the MLAT unit, you still officially held
11 the special assistant position in OGC; is that right?
12      A.    Correct.
13      Q.    There were just no job duties associated
14 with the; is that right?
15      A.    Correct.
16      Q.    So is it fair to say at that point, Mr.
17 Baker had to figure out what job duties to give you?
18      A.    He had no suggestions, no ideas for
19 anything for me within OGC.
20      Q.    Did you have any proposal as to what job
21 duties you could perform as special assistant?
22      A.    Yes.  I applied for multiple positions

Page 59

1 within OGC and was never selected.
2      Q.    Okay.
3      A.    And I proposed repeatedly that he direct
4 place me into section chief positions, and he refused
5 to do so.
6      Q.    Did you ever propose particular job
7 duties that he could assign you within the special
8 assistant position as opposed to applying to another
9 position?
10      A.    Absolutely, yes.  I recommended that
11 they create a position of -- a separate position of
12 privacy officer, and he wasn't really interested in
13 that.
14      Q.    Did you make any other proposals?
15      A.    Not that I can recall.  I might have.  I
16 was really trying to be creative to come up with a
17 solution for my career.
18      Q.    Did he explain to you why he didn't want
19 to create this privacy officer position?
20      A.    Jim wasn't a very direct person.  He
21 didn't like conflict.
22      Q.    So is that a no?

Page 60

1      A.    That's a no.
2      Q.    Were there any particular job duties you
3 wanted to be assigned other than the privacy officer
4 duties?
5      A.    The deputy general counsel for National
6 Security Law Branch, any of the section chief
7 positions.  Given my experience as a prosecutor and
8 as a manager at the IG's Office and as special
9 assistant, I felt that I was qualified for any of
10 those positions.
11      Q.    Well, at the time your job duties were
12 removed, though, was the deputy general counsel of
13 the National Security Law Branch, was there an
14 opening?
15      A.    Yes.  He hadn't hired Tricia yet.
16      Q.    Well, she hadn't started yet, but do you
17 know that he had not hired her?
18      A.    I don't think she had been hired yet,
19 but it was clear to him that he no longer wanted --
20 because it took a long time to do the study and all
21 of that, but it was clear from very early on, the
22 moment Michael Horowitz began to complain that he

Page 61

1 wanted OGC out of the IG liaison business, because he
2 wanted no lawyers to interfere in any way with
3 anything he wanted.  He wanted just the Inspection
4 Division to provide him with everything immediately
5 as soon as he asked, that Jim was going to get out of
6 the IG production business.
7      So it was pretty clear that my job
8 responsibilities were going to go away and the
9 writing was on the wall, but he went ahead and filled
10 those positions with other people.
11      Q.    And you applied for a section chief
12 position?
13      A.    I did.
14      Q.    Which positions?
15      A.    I don't have those applications with me,
16 but there are records in E-Pass.
17      Q.    Did you apply for a section chief
18 position in the Lit Branch?
19      A.    I don't think I applied for Lit Branch.
20 I'm not sure.  Mostly, it was investigative law and
21 national security.
22      Q.    Okay.  Other than this privacy officer

Page 62

1  position, were you aware of particular job duties
2  that needed to be performed in OGC that were not
3  already being performed by someone else?
4      A.  Well, he could have kept me on as chief
5  of staff, but, instead, he hired Justin Schoolmaster.
6      Q.  Well, Justin Schoolmaster was already
7  there.  Right?
8      A.  No.  He had me conduct a job search on a
9  panel to hire Justin Schoolmaster.
10     Q.  When was that?
11     A.  That was, I guess, the fall of 2014.
12     Q.  In your EEO complaint, you mentioned
13  that Mr. Baker said that he may have to place you in
14  a GS-15 position; is that right?
15     A.  Yes.
16     Q.  And you said he didn't mention a
17  specific position; is that right?
18     A.  Never.
19     Q.  Did you ask him what position it would
20  be?
21     A.  No.  I just vehemently objected right
22  off the bat and I contacted the Human Resources

Page 63

1  Division right away to find out what the meaning of
2  the RIF was.
3      Q.  And what reason did he give you as to
4  why you may need to go to the GS-15 position?
5      A.  Because he had no use for me as an SES
6  and you have to take a step backward to take a step
7  forward.
8      Q.  So prior to the OGC reorganization in
9  June 2015, you held the special assistant.  Correct?
10  Special assistant position.
11     A.  Yes.
12     Q.  And after the reorganization, you still
13  held that position, but were on a detail; is that
14  correct?
15     A.  I'm sorry?
16     Q.  After the June 2015 reorganization, you
17  still held the special assistant position; is that
18  right?
19     A.  Yes.
20     Q.  So were you ever removed from the SES?
21     A.  No.  I was never removed from the SES.
22  After the five of us met together with Deputy

Page 64

1  Director Juliano, at some point, Juliano decided that
2  there would be no RIF, I would not be RIF'd out of
3  the SES.
4      Q.  So you learned that in your first
5  meeting with Juliano?
6      A.  I think that was our second meeting with
7  Juliano where he determined that that was not going
8  to happen.
9      Q.  Do you recall around when that was?
10     A.  It was the summer of 2015, because in
11  the first meeting, he just listened to everything we
12  had to say, the five of us, and then he said he would
13  think it over.  In the second meeting, he said that
14  there would be no RIF.
15     Q.  Were you ever removed from OGC?
16     A.  I was permitted to transfer out of OGC.
17     Q.  Transfer to OIC?
18     A.  Yes.
19     Q.  So is that a, no, you were never removed
20  from OGC.
21     A.  I was not removed.
22     Q.  Were you ever removed from your special

Page 65

1  assistant position?
2      A.  I transferred out of it.
3      Q.  Okay.  And did you ever lose pay?
4      A.  I did not.
5      Q.  So you mentioned that you found your
6  detail.  Is it your testimony that FBI employees do
7  not typically find their own details?
8      A.  What typically happens is that a detail
9  is offered and people apply for it and then they're
10  permitted to go to it.  It's uncommon for someone's
11  job responsibilities to evaporate and for them to
12  have to then make their own way in the world.
13     Q.  So the detail that you went on to OID,
14  that wasn't a posted detail?
15     A.  No.  I just came up with that idea
16  because I had nothing to do.  I wanted to be busy and
17  I wanted to -- you know, I was being paid to work.  I
18  wanted to do something productive for the FBI.
19     Q.  And you went straight from your detail
20  at DOJ to OIC; is that right?
21     A.  Yes.  DOJ requested that I stay, but I
22  didn't feel that it was the best.  I wanted to get

Page 66

1 back to the FBI to try to get back on track with my
2 career.
3      Q.   So the A.D. position, in your
4 understanding, is that the equivalent of the general
5 counsel position in the FBI?
6      A.   It's technically at the same level.  It
7 doesn't have the same rank in the sense that I don't
8 supervise as many people and I don't have the same
9 span of control and the same -- I don't advise the
10 director on as many things as closely.
11      So I would say I'm not quite as high in the
12 pecking order.
13      Q.   Okay.  But it's your understanding that
14 the general counsel position is considered the
15 assistant director level position?
16      A.   It is, yes.
17      Q.   So the A.D. position was a promotion
18 from your special assistant position; is that right?
19      A.   [Pause.]
20      Q.   It's a higher level?
21      A.   So I went from special assistant in OGC
22 to section chief in OIC, which was basically a

Page 67

1 lateral.
2      Q.   Right.
3      A.   For the most part, although, one could
4 view that as somewhat of a promotion, not quite,
5 mostly lateral, and then to go from section chief in
6 OIC to assistant director in OIC was definitely a
7 promotion.
8      Q.   And did you receive a pay increase when
9 promoted to the AD?
10      A.   I did.
11      Q.   Do you recall when your mediation was
12 held?
13      A.   November 21, 2016, I believe.
14      Q.   Do you have any firsthand knowledge of
15 Sherry Sabol's performance as section chief of the
16 Science and Technology Law Office?
17      A.   Again, I worked with her and I was chief
18 of staff somewhat, but I don't know my chief of staff
19 time.  I think my chief of staff time was prior to --
20 I'm sorry.  I think my chief of staff time was
21 subsequent to when she was section chief.
22      So I was special assistant.  Now, would I have

Page 68

1 knowledge of her performance?  Again, I wasn't her
2 supervisor.  She wasn't reporting to me, but I would
3 have had dealings with her as special assistant to
4 the general counsel.  There would have been OIG
5 matters that would have related to her branch.  So I
6 would have had some interactions with her as -- you
7 know, in her job.
8      I don't know if that answers your question.
9      [Interruption.]
10      MR. HART:  I apologize.  Do you mind if I
11 just very quickly --
12      MS. GRAY:  Sure.
13      [Recess.]
14 BY MS. GRAY:
15      Q.   Do you have any firsthand knowledge of
16 Karen Miller's performance as section chief in the
17 National Security Law Branch?
18      A.   Again, there were many OIG reviews, many
19 that related to the National Security Law Branch.  So
20 I interacted with her a lot on that score.
21      Q.   Did you have any firsthand knowledge of
22 Nancy Wiegand's performance as section chief of the

Page 69

1 Discovery Management Section?
2      A.   Yes, because, in particular, when I was
3 doing discovery for the OIG, we were trying to
4 produce documents as quickly as we could from the
5 Discovery Management Section for the IG.
6      Q.   And what was your impression of her
7 performance as the section chief of DMS?
8      A.   That she was doing the best she could
9 under very trying circumstances.
10      Q.   If you can just take a look at the first
11 page of -- the page we were on, 333769 of Exhibit 1.
12 On the very last line there, you mentioned that Mr.
13 Baker noted in a negative way that you're tenacious.
14      A.   Yes.
15      Q.   What gave you the impression that he was
16 saying that in a negative way?
17      A.   Well, he RIFing me.  So the context
18 wasn't positive.  For Mr. Baker --
19      [Interruption.]
20      MS. GRAY:  We were in the middle of an answer.
21 Can we just finish the answer to this question?
22      MR. HART:  Yes.

Page 70

1    THE WITNESS:  For Mr. Baker, if you acted in
2  such a way that there was conflict about something,
3  then it was problematic.
4    MS. GRAY:  Okay.
5    [Recess; whereupon, Mr. Hart does not return
6  to the proceeding and Ms. Cathy Harris of Kator,
7  Parks enters the proceeding.]
8        [Bruno Exhibit No. 2 was
9           marked for identification.]
10   [Witness peruses exhibit.]
11  BY MS. GRAY:
12   Q.  Do you recognize this document?
13   A.  Yes, I do.
14   Q.  And what is this?
15   A.  This, I believe, is the second summary
16  narrative or the first summary narrative for my
17  performance appraisal, one of the two that I got from
18  Jim.
19   Q.  If you'll just look at the E-mail that's
20  Jim's writing, the second to the last sentence from
21  the bottom, it reads: "In all of her assignments,
22  she leverages her formidable intelligence, work

Page 71

1  ethic, superb writing skills, and tenacity in
2  furtherance of the mission of the organization."
3    Do you see that?
4    A.  Yes.
5    Q.  Did you think that he was using the word
6  "tenacity" in a negative way in this context?
7    A.  Not here.
8    Q.  You can put that aside.
9    You testified something to the effect that you
10  heard that Tom Bondy asked employees out.  Did you
11  ever actually hear that Mr. Bondy asked employees
12  out?
13   A.  No.  I was trying to describe in general
14  terms my general recollection, that there were some
15  kind of allegations against him that were of the
16  nature of sexual harassment.  I'm not clear on what
17  the exact nature of the allegations were.
18   Q.  Okay.  So you did not hear that specific
19  allegation?
20   A.  No.  It was allegations of a sexual
21  harassment kind of nature.
22   Q.  Do you know what Mr. Baker did in

Page 72

1  response to concerns raised about Mr. Bondy's
2  behavior?
3    A.  I don't know exactly what he did.
4    Q.  Mr. Hart asked you for an example of a
5  white male that Mr. Baker was highly supportive of,
6  and you mentioned Rick McNally; is that right?
7    A.  Yes.
8    Q.  Are you aware that Rick McNally was
9  removed from his position in the National Security
10  Law Branch?
11   A.  I am aware that he was moved from the
12  National Security Law Branch and placed in another
13  SES position.
14   Q.  Are you aware that he was nonselected to
15  be DGC twice?
16   A.  I'm aware of that, yes.
17   Q.  Did you consider that to be highly
18  supportive?
19   A.  Much more supportive than what happened
20  to me.
21   Q.  Did Ms. Grzadzinski or her counsel ask
22  you to submit a signed sworn statement or declaration

Page 73

1  in connection with this matter?
2    A.  No.
3    Q.  Did anybody at the FBI ever tell you you
4  could not testify on the matter?
5    A.  No.
6    MS. GRAY:  I have no further questions.
7    MR. HART:  No questions.
8    MS. GRAY:  Thank you.
9    [Whereupon, at 3:20 p.m., the deposition
10  concluded.]
11        [Signature not waived.]
12
13
14
15
16
17
18
19
20
21
22

Page 74

1        CERTIFICATE OF NOTARY PUBLIC

2

3        I, CATHERINE B. CRUMP, the officer before

4    whom the foregoing deposition was taken, do hereby

5    testify that the witness whose testimony appears in

6    the foregoing deposition was duly sworn by me; that

7    the testimony of said witness was taken by me

8    stenographically and thereafter reduced to

9    typewriting under my direction; that said deposition

10   is a true record of the testimony given by said

11   witness; that I am neither counsel for, related to,

12   nor employed by any of the parties to the action in

13   which this deposition was taken; and further, that I

14   am not a relative or employee of any attorney or

15   counsel employed by the parties hereto nor

16   financially or otherwise interested in the outcome of

17   the action.

18        _____

19             CATHERINE B. CRUMP

20             Notary Public in and for the

21             District of Columbia

My Commission Expires:  October 31, 2022

Case 1:20-cv-01411-JEB  Document 27-14  Filed 01/18/22  Page 21 of 30

3/21/2019

Notice Date: 03/27/2019

Deposition Date: 03/21/2019

Deponent: Catherine Bruno

Case Name: Grzadzinski v. Sessions

Page:Line          Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

        CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


                    _____

                     Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


                    _____

                     NOTARY PUBLIC IN AND FOR


                        _____

                          County Name

MY COMMISSION EXPIRES:

**WORD INDEX**

**< 1 >**
**1** 4:8 14:22 15:1 49:15 69:11
**1:42** 1:17
**10** 7:8
**100** 57:13
**1000** 1:16 2:6
**10140** 2:17
**1200** 1:16 2:5
**15** 4:8
**1666** 3:5
**18th** 1:16 2:5
**1995** 13:21 14:8
**1996** 13:22

**< 2 >**
**2** 4:9 70:8
**20009** 3:7
**2002** 13:5
**2003** 13:12
**20036** 2:7
**2009** 8:20 9:7, 14, 19 12:15 13:12
**2014** 10:9 18:2 52:6 62:11
**2015** 11:11, 14, 17, 21 12:11 14:11 15:16 18:3 21:22 43:18 49:3, 6 52:6 57:4 63:9, 16 64:10
**2016** 7:18 8:21 9:6, 8, 15 10:21 12:6, 12, 12, 13 67:13
**2018** 6:17, 22, 22 7:9, 19
**2019** 1:18
**202** 2:8, 19 3:8
**2022** 74:21
**20535** 2:18
**21** 1:18 67:13
**27** 15:15
**27th** 22:2 56:11

**< 3 >**
**3:20** 73:9
**31** 74:21
**324-3000** 2:19
**333769** 69:11
**3769** 15:13 49:15
**3770** 27:8

**< 4 >**

**40** 27:11 30:20
**44** 4:5

**< 5 >**
**5** 4:4
**570-2017-00720X** 1:8

**< 6 >**
**6** 55:9
**6-6** 55:11

**< 7 >**
**70** 4:9

**< 8 >**
**839-4486** 3:8
**898-4800** 2:8

**< 9 >**
**935** 2:16

**< A >**
**A.D** 8:2 66:3, 17
**ability** 19:20
**able** 39:2
**Absolutely** 25:20 46:1 59:10
**Accountability** 9:2
**act** 45:16, 21
**acted** 29:12 70:1
**acting** 6:20 7:1, 2, 10, 14 10:1, 3, 6, 12, 15 18:19, 21 19:1, 5 29:1, 5 36:15
**action** 49:17 74:12, 17
**active** 43:21 44:4 47:11
**actively** 43:8
**AD** 67:9
**addition** 8:17 32:14
**Administrative** 34:11, 15 35:9
**adopts** 21:8
**advice** 47:10
**advise** 66:9
**Advisor** 52:15
**advocating** 53:15
**Affairs** 12:10
**Agency** 1:9, 11 2:11 44:21
**agree** 42:15, 17
**ahead** 61:9
**aid** 25:12
**allegation** 71:19

**allegations** 29:12, 17, 19 30:4, 8 71:15, 17, 20
**allowed** 37:2
**AMERICA** 1:1
**Anderson** 45:17
**Andrew** 10:2 18:18 54:4, 4
**anger** 24:9
**answer** 69:20, 21
**answered** 45:7
**answers** 27:1 68:8
**anybody** 32:6 73:3
**anymore** 52:4
**apologize** 34:13 68:10
**APPEARANCES** 2:1 3:1
**appears** 74:5
**appellate** 28:17, 19 29:9
**applicable** 6:10
**applications** 61:15
**applied** 58:22 61:11, 19
**apply** 61:17 65:9
**applying** 59:8
**Appraisal** 4:9 19:1, 4, 17 20:12, 19 21:6, 17, 20 70:17
**appraisals** 18:15 20:15
**approximate** 9:16
**approximately** 7:8 11:7, 13 12:11 13:6 25:21 41:22 49:2 57:5
**April** 21:21
**arguing** 33:7
**argument** 14:2 33:13
**arrival** 10:10
**arrived** 10:8, 8, 15
**aside** 31:14 71:8
**asked** 16:17 25:17 26:18 45:1, 7 46:16, 20 47:1 61:5 71:10, 11 72:4
**asking** 29:21
**assert** 33:13
**asserting** 33:20

**assertive** 34:3 46:7, 9, 11
**assertiveness** 33:8
**assign** 59:7
**assigned** 60:3
**assignments** 70:21
**assist** 46:22 57:6
**Assistance** 11:6 25:7
**Assistant** 2:13 6:4, 16, 20 7:5, 6, 7, 11 8:22 9:3, 10, 19 12:17 13:16 25:9 36:15 56:17 58:11, 21 59:8 60:9 63:9, 10, 17 65:1 66:15, 18, 21 67:6, 22 68:3
**assisted** 8:1, 3, 7 13:1
**associated** 58:13
**assume** 7:10
**attempting** 25:12 29:5
**attend** 43:7
**attention** 35:4
**Attorney** 1:9 13:16 26:17 28:18 74:14
**attorneys** 5:12
**Attorney's** 13:17 47:2, 20
**August** 6:17, 22 13:21, 22
**authorities** 37:6
**authority** 36:17 37:1 38:3
**available** 24:12
**Avenue** 2:16 3:5
**awards** 23:7, 13, 14 24:2
**aware** 18:1 29:12, 15 30:8 31:21 62:1 72:8, 11, 14, 16
**awful** 38:22

**< B >**
**back** 14:11 18:13 19:16 20:17 21:1 27:6 28:1 33:10 34:4 45:10 46:10 66:1, 1
**background** 28:17
**backward** 63:6

**backwards** 16:7
**bad** 39:11
**bag** 40:16
**Baker** 10:8, 8, 15 14:18 15:19 16:16 17:5, 8 19:8 23:21 25:2 26:5 30:7, 19 31:4, 10 32:21 33:16, 21 34:9 41:17 45:2, 10, 16 46:6 50:12 51:8, 18 52:22 53:1, 20, 22 54:5, 6 55:4, 15, 16, 18 56:8, 9 58:17 62:13 69:13, 18 70:1 71:22 72:5
**Baker's** 10:9 21:3 33:9 42:9 49:17 51:6
**bar** 43:21 44:4 46:17 47:11, 16
**based** 19:2
**basically** 66:22
**basis** 19:15 22:15 23:1 51:9
**bat** 62:22
**Bates** 15:13 49:15
**becoming** 29:11
**began** 43:2 60:22
**beginning** 18:3
**behalf** 2:2, 11 3:2
**behaved** 23:22 24:7
**behavior** 33:16 72:2
**believe** 10:9 11:11, 13, 19 19:2 27:14 30:11 44:13 46:22 48:7 50:19 51:2, 5 57:2 67:13 70:15
**believing** 51:9
**benefit** 36:4
**best** 19:10 32:18 33:14 34:7 65:22 69:8
**better** 24:3
**bias** 22:20
**big** 35:11, 12
**bit** 14:22 37:8 45:9 48:10, 19
**bleak** 40:9
**body** 33:9

**Bondy** 28:*3, 7, 8*
29:*12* 31:*1, 11*
71:*10, 11*
**Bondy's** 31:*3*
72:*1*
**Boston** 14:*7*
**bottom** 27:*8*
70:*21*
**Branch** 6:*10*
29:*10* 31:*8*
34:*10, 11, 13, 15*
35:*3, 11, 12* 38:*3*
60:*6, 13* 61:*18,*
*19* 68:*5, 17, 19*
72:*10, 12*
**branches** 29:*7*
**break** 41:*12*
**bringing** 33:*3*
**brochure** 23:*12*
**brought** 14:*16*
37:*22* 51:*8*
**BRUNO** 1:*14*
4:*2, 8* 5:*9, 18*
15:*1* 70:*8*
**B-R-U-N-O** 5:*18*
**build** 19:*21, 22*
20:*7* 53:*7*
**bullet** 27:*7*
30:*17*
**Bureau** 2:*15*
6:*1* 34:*8*
**business** 61:*1, 6*
**busy** 65:*16*

< C >
**call** 16:*14* 43:*20*
**called** 8:*11, 14*
40:*16*
**calls** 26:*11*
**capacity** 10:*1*
18:*19* 30:*22*
**Caproni** 9:*21*
18:*18*
**care** 58:*8*
**career** 26:*16, 21*
59:*17* 66:*2*
**carefully** 57:*12*
**carries** 36:*21*
**cases** 23:*9* 29:*9*
**CATHERINE**
1:*14, 19* 4:*2, 8*
5:*3, 17* 74:*3, 19*
**C-A-T-H-E-R-I-N**
**-E** 5:*17*
**Cathy** 70:*6*
**causing** 39:*17*
**CDCs** 43:*20*
44:*3*
**CDC's** 46:*17*
**certain** 18:*20*
**certainly** 24:*2, 7*

**CERTIFICATE**
74:*1*
**chair** 43:*13*
**challenging** 29:*8*
**chambers** 14:*1*
**change** 19:*6*
21:*9* 38:*7* 40:*21*
41:*2* 51:*8* 54:*4*
**changed** 13:*8*
**changes** 19:*10*
**chart** 28:*2* 35:*18*
**chief** 7:*15, 17*
8:*1, 10, 18* 10:*13,*
*16* 11:*1* 14:*4*
27:*17* 29:*1, 5*
31:*17* 36:*9, 11,*
*15, 17, 22* 43:*1,*
*12, 19* 48:*5, 14,*
*17* 49:*5, 9* 59:*4*
60:*6* 61:*11, 17*
62:*4* 66:*22* 67:*5,*
*15, 17, 18, 19, 20,*
*21* 68:*16, 22*
69:*7*
**chiefs** 36:*2*
41:*20*
**child** 39:*13*
40:*15*
**child's** 40:*16*
**Cincinnati** 14:*2*
**Circuit** 13:*22*
14:*1*
**circumstances**
53:*18* 69:*9*
**cited** 19:*15* 22:*8*
**citing** 22:*10, 15*
**clear** 5:*11* 50:*2*
60:*19, 21* 61:*7*
71:*16*
**Clearwell** 57:*18*
**clerk** 13:*21*
**clerkship** 13:*16,*
*20*
**clients** 53:*15*
**closely** 66:*10*
**coalition** 20:*7, 8*
**coalitions** 19:*21*
20:*1* 53:*7*
**colleague** 47:*1*
**College** 14:*7*
**Columbia** 1:*21*
13:*17, 18* 74:*21*
**combined** 35:*3*
**come** 16:*18*
28:*1* 39:*8, 22*
59:*16*
**commencing**
1:*17*
**comment** 22:*14*
**comments** 22:*5*
29:*22*

**COMMISSION**
1:*2* 74:*21*
**commitment**
42:*7*
**Committee** 8:*12,*
*12, 15* 47:*3*
**complain** 60:*22*
**Complainant** 1:*6*
2:*2* 5:*7*
**complaint** 5:*13*
14:*13* 15:*9*
18:*14* 21:*15*
27:*6* 31:*13*
44:*12* 56:*12*
57:*6* 62:*12*
**complaints** 54:*7,*
*17* 56:*1*
**completely** 30:*7*
**Compliance** 6:*5,*
*12, 21* 7:*16* 8:*6*
10:*22* 12:*14*
**concern** 19:*20*
20:*10* 22:*20*
27:*2* 33:*3*
**concerns** 32:*6,*
*10, 11, 13, 18*
34:*5, 5, 7, 20*
35:*1* 72:*1*
**concluded** 73:*10*
**conclusion** 22:*21*
**conduct** 6:*9*
62:*8*
**conducting** 21:*5*
57:*16*
**conflict** 52:*12*
55:*16, 17* 59:*21*
70:*2*
**Congress** 55:*8*
**conjunction**
57:*16*
**Connecticut** 3:*5*
**connection** 5:*13*
73:*1*
**connections** 12:*8*
**consider** 72:*17*
**considered** 55:*5*
66:*14*
**consistent** 23:*20*
**consolidate**
49:*20* 50:*4, 17*
**contacted** 62:*22*
**contentious** 45:*9*
53:*16*
**context** 20:*13*
41:*7* 69:*17* 71:*6*
**contexts** 40:*12*
**Continued** 3:*1*
9:*22* 26:*9* 58:*2*
**contracts** 35:*10*
**contrast** 30:*18*

**control** 34:*16*
66:*9*
**conversation**
15:*18* 17:*7* 22:*2*
**corner** 15:*14*
**correct** 11:*12*
58:*12, 15* 63:*9,*
*14*
**Counsel** 2:*13, 14*
5:*7* 8:*22* 9:*20,*
*21* 10:*2, 3, 4, 6*
19:*5, 8* 28:*4*
31:*17* 34:*14, 19*
38:*2* 40:*22*
41:*18* 43:*1, 12*
44:*21* 48:*3, 9*
56:*17* 60:*5, 12*
66:*5, 14* 68:*4*
72:*21* 74:*11, 15*
**counsels** 18:*16*
28:*15* 41:*19*
43:*19* 53:*19, 22*
54:*1*
**Counsel's** 10:*13,*
*16, 20* 36:*17*
38:*4* 54:*14* 55:*1*
**couple** 8:*8* 23:*10*
**course** 37:*14*
54:*1*
**Court** 13:*22*
55:*12*
**create** 59:*11, 19*
**creating** 21:*6*
**creative** 59:*16*
**criticism** 19:*18*
**Crump** 1:*20*
74:*3, 19*
**currently** 5:*22*
56:*18*

< D >
**D.C** 1:*17* 2:*7,*
*18* 3:*7* 47:*16, 16*
**date** 11:*20*
**dates** 9:*13*
**daughter** 39:*16*
**DAVID** 2:*3* 3:*3*
5:*10*
**Day** 9:*11* 16:*18*
19:*19*
**deal** 47:*17*
**dealing** 32:*20*
54:*14*
**dealings** 68:*3*
**dealt** 47:*21*
**December** 7:*18*
8:*21* 9:*6, 8*
10:*21* 12:*6, 12*
**decided** 43:*20*
64:*1*
**deciding** 47:*22*

**decision** 34:*18*
43:*19, 22* 49:*19*
50:*3, 7, 11, 11, 13,*
*16, 16* 51:*1, 3, 6*
52:*21* 53:*1*
**declaration** 72:*22*
**Definitely** 46:*1*
**Department**
1:*10* 5:*14* 12:*8,*
*9, 20*
**depended** 53:*18*
**depending** 48:*19*
**Deposition** 1:*14*
73:*9* 74:*4, 6, 9,*
*13*
**deputies** 29:*5*
36:*1*
**deputy** 12:*17, 22*
13:*6* 26:*17* 28:*4,*
*14* 31:*16* 34:*16,*
*17, 17* 35:*14*
36:*2, 16, 20* 38:*2*
40:*22* 41:*19*
42:*22* 43:*12*
48:*2, 9* 49:*19*
50:*3, 7, 10* 56:*4*
60:*5, 12* 63:*22*
**describe** 6:*6*
14:*15* 20:*19*
24:*8* 32:*9* 33:*14*
34:*22* 71:*13*
**described** 40:*14*
46:*6*
**describing** 31:*2*
40:*8*
**DESCRIPTION**
4:*7* 17:*9*
**despite** 30:*21*
31:*3*
**detail** 11:*4* 12:*4,*
*5, 7* 24:*15, 18*
26:*3, 3, 6, 10, 14*
63:*13* 65:*6, 8, 13,*
*14, 19*
**detailed** 11:*14*
12:*13*
**details** 27:*3*
29:*10, 18* 41:*9*
65:*7*
**determined** 64:*7*
**DGC** 72:*15*
**dhart@katorpark**
**s.com** 2:*9*
**difference** 36:*16*
37:*4* 42:*9*
**differences** 45:*2*
**different** 9:*8, 13*
18:*17* 36:*21, 22*
41:*16* 53:*22*

differing 32:22
difficult 39:19
difficulty 30:21
direct 59:3, 20
direction 74:9
director 6:4, 16,
20  7:5, 6, 8, 11
9:22  25:9  56:4
64:1  66:10, 15
67:6
director's 23:13
Discovery 55:19
69:1, 3, 5
discuss 48:17
53:2, 5  56:3, 7
discussed 32:3
discussion 56:10
discussions
45:13  56:12
District 1:20
13:17, 18  74:21
division 8:4
11:5  12:22  13:1,
2, 8, 10  17:17
24:10, 20  30:2
43:19  49:18
52:14  55:2  57:8,
22  61:4  63:1
divisions 50:12
DMS 69:7
doctors 41:8
document 15:5,
7, 13  30:16  37:3
57:17, 17  70:12
documented
50:18
documents 69:4
doing 34:20
38:17  53:9
57:15, 18  69:3, 8
DOJ 12:21
13:13  65:20, 21
door 51:14
downgraded 38:6
DPU 55:19  56:1
57:16
draft 21:8
drafting 20:21,
22
dramatic 41:2
duly 5:4  74:6
duties 49:18
56:4, 11  57:3
58:13, 17, 21
59:7  60:2, 4, 11
62:1
dwachtel@tristerr
oss.com 3:9

< E >

early 52:6  60:21
easier 29:16
edge 43:13
E-discovery
57:21
edit 21:3
editing 20:21
education 14:10
EEO 4:8  5:13
14:12  15:9
18:14  21:15
27:6  31:13
44:12  62:12
EEOC 1:7
effect 37:16  71:9
eight 26:1  27:11
either 10:11
17:7  21:8  22:1
29:21  30:11
36:14  37:12
38:17  42:2
Elaine 46:11, 15
47:5, 15
eliminated 17:14
27:4
E-mail 70:19
embarrassing
38:14
employed 13:14
74:12, 15
employee 21:7
74:14
employees 6:9
29:13  33:19
65:6  71:10, 11
EMPLOYMENT
1:2  5:20  14:9
encouraged 25:9
encouraging 25:3
encumbered 7:3
ended 10:5, 20
11:3  27:3
engaged 45:13
enhancing 26:16
enormous 39:18
ensure 58:1
Enterprise 8:10
enters 70:7
entirely 10:21
41:16
entirety 21:9
entitled 50:22
E-Pass 61:16
EQUAL 1:2
equivalent 66:4
ESQ 2:3, 12  3:3
essentially 11:14
13:10, 11  38:6
ethic 71:1
evaluated 18:21

evaluations 19:7
21:4
evaporate 65:11
event 14:17
events 31:21
eventually 14:12
26:2  37:10
42:21  43:18
exact 71:17
exactly 19:18
20:15  30:14
39:3  40:7  72:3
EXAMINATION
4:3  5:7  44:21
examined 5:5
example 21:16
24:5  29:6  33:4
40:15  43:10
45:5  46:9  72:4
examples 23:11
Executive 6:10
14:19  17:18
23:4  24:6
executives 23:1,
2, 6, 11, 18, 21
24:3, 20  27:12
30:19, 21
EXHIBIT 4:7
14:22  15:1
49:14  69:11
70:8, 10
exists 56:15
expected 21:19
experience 17:19
23:20  28:11
33:2  36:14  60:7
Expires 74:21
explain 19:22
20:6  22:21  33:5
59:18
explained 16:4
explanation
35:14, 15, 17
36:6
express 38:20
expressed 22:19
25:10  31:6
expressing 24:9
32:6  38:19

< F >

facets 40:4
fact 20:2  47:11
fair 58:16
fall 62:11
familiar 15:7
FBI 6:1, 8, 11
8:11, 13, 21  9:18
11:18  12:16
13:12  17:21
18:16  21:7  23:6

34:8, 10  35:7
36:18, 19  49:20
50:4, 12, 17
53:15  54:2  55:8,
14, 20  57:14
58:1  65:6, 18
66:1, 5  73:3
FBI-2015-00176
1:10
FBI's 55:10
February 6:22
7:9, 18  12:11, 12
Federal 2:15
6:1  34:8
feedback 21:16
22:1  23:1
feel 53:9, 12
65:22
feeling 26:20
39:10
fell 8:8
felt 26:14  60:9
female 24:3
29:13  30:19
females 27:11
29:20
fiance 39:22
FIELD 1:3  38:1
Fifth 3:6
figure 26:22
58:17
file 14:16
filed 14:12
filled 61:9
final 18:22
financially 74:16
find 25:3, 13
26:19  63:1  65:7
finding 24:18
26:6, 9
fine 30:7
finish 69:21
finished 41:11
first 5:4  15:14
21:7  26:3  30:16,
17  31:16  32:17
64:4, 11  69:10
70:16
firsthand 48:1, 4,
8, 13  49:11
67:14  68:15, 21
fit 40:15
five 27:11  63:22
64:12
five-minute
41:12
flip 30:16
Floor 3:6
focus 35:4
folks 47:16
follow 58:2

following 6:9
55:9
follows 5:5
Force 14:20
17:4
foregoing 74:4, 6
former 47:1
formidable 70:22
forth 19:17
20:18
forward 14:11
63:7
forwarded 47:4
forwards 16:8
found 12:7
24:14  26:4  65:5
friendly 29:20
front 18:14
19:12  55:7
full 49:15
functions 49:20
50:5, 17, 22
further 73:6
74:13
furtherance 71:2

< G >

GAO 9:3, 10, 20
56:17, 21  57:13
gender 22:20
General 1:9
2:13, 14  5:20
7:20  8:16, 22
9:1, 20, 21  10:2,
3, 5, 6, 13, 16, 20
12:18, 21  16:6, 9
18:7, 9, 16  19:5,
8  26:17  28:4, 14
31:16  34:14, 19
36:16  38:2, 4
40:3, 22  41:18,
19  43:1  44:6
47:10  48:2, 7, 9
53:19, 21  54:1,
14  55:1  56:17
60:5, 12  66:4, 14
68:4  71:13, 14
generally 6:6
14:15  18:6
21:21  25:11
31:20  32:3  34:6
35:1  42:6
General's 13:4
20:3, 5
getting 23:7, 14
Gilbert 14:4
give 7:20  9:11
19:13  24:1  52:8,
11  58:17  63:3
given 19:3
24:10  43:4

57:13  60:7
74:10
**giving**  22:1
35:20  36:6
**go**  20:18  32:17
40:16, 17  42:6
51:15  58:4  61:8
63:4  65:10  67:5
**going**  34:4  41:8
61:5, 8  64:7
**Gold**  3:4
**Good**  5:9  29:9
39:19
**gotten**  56:19
**Government**  9:1
**graduated**  14:8
**grand**  57:19
**GRAY**  2:12  4:5
26:11  44:19, 22
45:15  50:1, 8, 14
51:15, 17  68:12,
14  69:20  70:4,
11  73:6, 8
**great**  41:13
**greater**  6:11
**Group**  52:15
**GRZADZINSKI**
1:5  2:10  30:13
31:16, 22  32:5,
13, 16  37:10, 17
38:17  39:12
40:10  41:4
42:18  48:2, 14
72:21
**Grzadzinski's**
5:12  44:12
**GS-15**  15:21
62:14  63:4
**guess**  7:13
10:20  29:20
62:11

**< H >**
**half**  49:6
**handed**  15:5
**handled**  18:9
**handling**  30:3
32:21  33:5  55:2
56:21
**happen**  42:1
64:8
**happened**  26:9
47:19  56:13, 14
72:19
**happening**  32:1
37:10
**happens**  65:8
**happy**  40:19
**harassment**  30:2
71:16, 21

**hard**  57:6
**harder**  34:17
**Harris**  1:16  2:4
70:6
**HART**  2:3  4:4
5:3, 8, 10  14:21
15:3  26:12
41:11, 15  44:17
45:1, 7  46:16
51:13  68:10
69:22  70:5  72:4
73:7
**health**  39:9  41:5
**hear**  71:11, 18
**heard**  14:2
24:20  40:13
71:10
**hearing**  34:5
**held**  58:10  63:9,
13, 17  67:12
**help**  14:21
24:22  26:5, 21
31:8
**helped**  8:16  25:2
**helps**  11:16
**hereto**  74:15
**hierarchical**
36:19
**high**  66:11
**Highbarger**
27:15  28:5, 6
**higher**  66:20
**highly**  30:20
72:5, 17
**highly-capable**
28:19
**hire**  62:9
**hired**  60:15, 17,
18  62:5
**history**  5:20
**Horowitz**  60:22
**horrific**  40:7
**Human**  62:22

**< I >**
**idea**  65:15
**ideas**  58:18
**identification**
15:2  70:9
**IDENTIFIED**
4:7
**IG**  33:5, 6, 7
52:9, 13  53:21
54:3, 7, 13, 17
55:4, 7, 11, 12, 14,
16  56:21  61:1, 6
69:5
**IGs**  54:1
**IG's**  53:2, 6, 13
54:15, 22  55:10

60:8
**III**  1:8
**ill-conceived**
32:12
**immediate**  57:9
**immediately**  61:4
**impacting**  40:4
**important**  35:5
44:14
**impression**  23:2
28:22  38:18
69:6, 15
**inappropriate**
29:22
**inappropriately**
29:13
**incidents**  22:8,
11, 15, 18
**include**  31:1
**including**  46:3
**increase**  67:8
**incredibly**  39:18
**indicate**  54:19
**indicated**  51:5
**indication**  17:13,
17
**information**
16:20  29:6  47:4,
7  55:9, 11  57:19,
19, 20
**initial**  5:18
**in-person**  16:14
**Inspection**  30:1
55:2  57:7, 22
61:3
**Inspector**  9:1
12:17, 21  13:4
18:9  20:3, 5
**Integrity**  6:5, 21
7:15  8:6, 12, 14
10:22  12:13
**intelligence**  70:22
**intended**  42:6
**intent**  14:18
**interacted**  68:20
**interacting**  20:3
29:4  37:11
48:16
**interaction**  49:7
**interactions**
32:22  37:14
48:5  68:6
**interchangeably**
8:3, 5
**interest**  25:11
**interested**  59:12
74:16
**interfere**  61:2
**Internal**  52:15

**International**
11:4  24:19
25:11
**Interruption**
51:12  68:9
69:19
**introduced**  5:10
**Investigation**
2:15  6:2  34:9
55:6
**investigations**
35:8
**Investigative**
34:10, 12  35:5
36:9, 12, 21  38:3
48:15  61:20
**invited**  43:4
**involved**  20:3
30:3  47:2, 21
52:3, 9  55:1
**IOD**  11:5  25:8
**issue**  45:9  46:17,
18, 21  47:1, 17,
21
**issues**  19:15
35:5, 8, 10  48:18
**its**  21:9

**< J >**
**January**  8:20
9:7, 19  10:9
12:15
**JEFFREY**  1:8
Jgray2@fbi.gov
2:20
**Jim**  16:16
59:20  61:5
70:18
**Jim's**  70:20
**job**  7:22  13:3
17:16  22:7  23:5
24:10  33:4
34:18  40:15
49:17  56:4, 10,
15, 16  57:3
58:13, 17, 20
59:6  60:2, 11
61:7  62:1, 8
65:11  68:7
**jobs**  8:8  23:8
**join**  10:21
**judge**  14:3, 4
**judicial**  13:15, 19
**Juliano**  56:4
64:1, 1, 5, 7
**JULIET**  2:12
51:13
**June**  11:14, 21
12:11  63:9, 16
**jury**  57:19

**Justice**  1:10
5:14  12:9, 9, 20
55:8
**Justin**  16:16
62:5, 6, 9

**< K >**
**Karen**  27:18
30:12, 13  68:16
**Kator**  1:15  2:4
70:6
**Kelly**  7:7  8:1, 2,
2  10:1, 3, 5, 11,
12  18:19
**kept**  62:4
**kind**  9:11  21:1
29:7  45:20  47:4
71:15, 21
**kinds**  40:11
42:17
**knew**  26:18
**knocked**  51:14
**know**  15:5
16:19, 22  19:11
21:19  24:1, 9
27:1  30:7, 14
31:7  33:7  35:10
37:5, 5, 7  40:6, 6
41:9  47:20
52:14  58:8
60:17  65:17
67:18  68:7, 8
71:22  72:3
**knowledge**  48:1,
4, 8, 13  49:12
67:14  68:1, 15,
21
**known**  25:18, 22

**< L >**
**lack**  30:18
**Lamert**  45:22
46:3, 9
**language**  17:4
33:9
**large**  15:14  56:5
**larger**  34:17
**late**  52:6
**lateral**  67:1, 5
**law**  1:15  14:6, 7
34:10, 11, 13, 15
35:5, 10  36:9, 12,
21  38:3  47:3
48:15  55:9  58:2
60:6, 13  61:20
67:16  68:17, 19
72:10, 12
**laws**  6:12
**lawyer**  28:19
**lawyers**  61:2

**lead** 35:2
**leading** 22:2
**League** 11:6
**learned** 27:4
64:4
**leave** 13:19
**leaving** 12:6
**led** 22:21
**left** 10:19, 20
13:15
**legal** 55:10, 12
**legally** 57:20
**Legislative** 12:10
**level** 37:4 38:2
66:6, 15, 20
**leverages** 70:22
**liaison** 61:1
**librarian** 45:19
**licenses** 46:17
47:12
**licensing** 43:21
44:4
**life** 39:6 40:4,
12, 14, 19
**limited** 21:16
**line** 49:16 69:12
**listen** 42:13
**listened** 64:11
**Lit** 61:18, 19
**little** 14:22 37:8
45:9 48:10, 19
**living** 40:19
**logical** 43:4
**long** 6:14 7:17
13:3 39:4 44:3
58:3 60:20
**longer** 7:13
60:19
**look** 15:4 23:12
27:7 35:19 36:3
49:14 69:10
70:19
**looked** 20:20
28:2
**looking** 36:5
**Lorraine** 45:22
**lose** 65:3
**lot** 16:11 23:6
34:20 50:21
57:11 68:20
**lower** 15:13

**< M >**
**ma'am** 45:18
**maintain** 43:21
44:4, 8 47:11
**major** 44:15
**making** 25:22
29:22 40:14
52:22

**male** 23:1, 2, 6,
11, 17, 21 24:5
27:15, 16, 21
33:19 72:5
**males** 27:10, 12
**man** 7:6 42:16
**manage** 38:7
**managed** 12:22
**management** 8:3,
7, 11, 16 13:1, 5
29:10 30:22
31:8 69:1, 5
**manager** 13:11
60:8
**managing** 28:19
**manner** 29:21
**March** 1:18
11:13, 13 49:2
57:3, 4
**Marci** 30:11, 12
**MARCIANN**
1:5 2:10 46:12
**mark** 14:22
**marked** 15:2
70:9
**matter** 11:3
57:14 73:1, 4
**matters** 9:2, 3,
10, 20 33:5 52:4,
9 56:18, 21, 21
57:14 68:5
**McNally** 24:6
27:14 72:6, 8
**mean** 16:21
35:22 38:14
43:6 48:5
**Meaning** 50:6
63:1
**means** 14:19
**meant** 19:22
28:7 42:3
**mechanically**
20:20
**mediation** 67:11
**meet** 25:9
**meeting** 16:14,
18 17:1, 12
22:17 56:5 64:5,
6, 11, 13
**meetings** 31:7
41:18 42:1, 4, 8,
19 43:2, 5, 6
45:3 46:8
**members** 6:10
**men** 23:14
42:10, 13 45:3
**mention** 39:15
53:1 55:18
62:16
**mentioned** 20:17
22:5 24:13 26:4

39:17 41:4
62:12 65:5
69:12 72:6
**mentioning**
20:11 39:5, 7
**merge** 35:13
**merging** 34:10,
14
**Merritt** 14:4
**M-E-R-R-I-T-T**
14:5
**met** 63:22
**method** 21:5
**Michael** 60:22
**middle** 5:17
69:20
**midway** 15:15
**midyear** 21:17,
20
**Miller** 30:13
**Miller's** 68:16
**mind** 29:9
36:10 68:10
**minute** 27:18
**mission** 71:2
**MLAT** 11:7, 15
24:21 26:3, 14
48:20, 22 58:7,
10
**model** 47:8
**mom** 39:18, 19
**moment** 11:8
15:4 16:12 19:1
60:22
**months** 12:2
58:5
**morning** 5:9
**move** 50:22
**moved** 17:18
24:11 72:11
**moving** 14:11
17:16 31:13
41:16 43:17
50:11
**Mueller** 9:22
**multiple** 58:22
**Mutual** 11:5

**< N >**
**N.W** 2:5, 16 3:5
**name** 5:9, 16
13:8 28:5
**named** 7:6
**Nancy** 30:12, 13
46:12 68:22
**Narrative** 4:9
70:16, 16
**Nashville** 14:1
**National** 60:5,
13 61:21 68:17,
19 72:9, 12

**nature** 16:8
71:16, 17, 21
**necessary** 16:4
17:9
**need** 63:4
**needed** 26:15, 20
43:21 62:2
**needing** 48:17
**negative** 22:1
69:13, 16 71:6
**neither** 74:11
**never** 17:17
25:14, 17 59:1
62:18 63:21
64:19
**new** 7:11 12:7
24:21
**nightmare** 40:6
**nonselected**
72:14
**Notary** 1:20
74:1, 20
**noted** 69:13
**noticed** 33:11
45:11
**November** 8:21
67:13
**number** 12:1
54:22

**< O >**
**objected** 55:13
62:21
**Objection** 26:11
45:7
**observation**
17:20
**observations**
33:15
**observe** 37:15,
19 42:9 45:16,
21 46:2, 4, 8, 10
**observed** 33:20
38:10
**obstructing** 55:8
**obstruction** 55:6
**obtaining** 25:5
**occasions** 18:20
25:21
**occupied** 56:18
**occupies** 56:16
**occupying** 7:13
**occur** 21:21
**occurred** 9:14
11:7 40:21
48:20
**October** 74:21
**offered** 31:10
65:9
**OFFICE** 1:3
2:14 6:5, 21

7:15 8:4, 6 9:1,
2 10:13, 16, 21,
22 12:9, 13, 20
13:5, 9, 18 16:15
18:8 20:4, 5
29:21 32:1, 2
34:13 38:1, 4
40:17 47:2, 20
52:16 53:3, 6, 13
54:14, 15, 22
55:1, 10 60:8
67:16
**officer** 59:12, 19
60:3 61:22 74:3
**offices** 1:15
**official** 7:2, 5
8:20 9:5, 9
11:20
**officially** 10:19
50:10 58:10
**OG** 56:17
**OGC** 11:18
12:6 18:11
24:12 25:4, 6, 13,
16, 19 28:9
34:13, 14, 15
44:7 52:3, 9
57:15 58:11, 19
59:1 61:1 62:2
63:8 64:15, 16,
20 66:21
**Oh** 28:5 57:11
**OIC** 8:5, 7, 16
64:17 65:20
66:22 67:6, 6
**OID** 25:10
65:13
**OIG** 9:3, 10, 20
12:21 13:2, 14
52:3 57:13, 17,
17 68:4, 18 69:3
**Okay** 6:14 9:4,
12, 17 10:5, 14
11:2, 9, 16, 22
12:15, 19 13:19
16:10, 13, 17, 21
17:3, 12 20:6
22:13, 19 23:10,
16 24:17 25:1
27:19, 22 28:21
29:3, 11 31:9
32:2 33:2 34:4,
22 36:13 38:8
39:12 41:11
43:10 44:20
47:18 54:19
57:9 58:6 59:2
61:22 65:3
66:13 70:4
71:18

OLA   12:10
OLC   55:14
Once   54:10, 11, 13
ones   18:17
ongoing   57:13
open   55:5
open-ended   44:11
opening   60:14
Operations   11:4 24:20   35:7
opinion   33:1 46:21
OPPORTUNITY   1:2   37:15
oppose   33:7
opposed   59:8
oral   14:2
order   49:19 50:4   66:12
org   35:18
organization   8:14   36:20 50:22   71:2
organizational   28:2
organization's   51:1
originally   43:11
outcome   74:16
outside   25:4, 6 37:12
outstanding   19:13
overly   29:20
Oversight   13:2, 9, 9

< P >
p.m   1:17   73:9
PAGE   4:3 15:12, 15   27:8 30:16   69:11, 11
paid   65:17
panel   62:9
paragraph   15:14 21:14   27:10 30:17   49:16
Parks   1:15   2:4 70:7
part   51:6   52:16 56:11   67:3
participate   43:8
participating   43:2
particular   8:8 20:10   24:5   34:3 38:16   59:6   60:2 62:1   69:2
parties   74:12, 15

passionate   22:6, 9   23:4, 8, 14 24:8
Pat   7:6   8:1, 2 10:1, 3   18:19, 20
patience   31:4
Patricia   45:18
pattern   33:11
Pause   66:19
pay   65:3   67:8
pecking   66:12
Pennsylvania   2:16
people   34:2, 2 39:3   61:10   65:9 66:8
people's   21:3
perform   58:21
Performance   4:9 18:15   19:4, 7, 17 20:12, 15, 19 21:4, 6, 16, 17, 20 49:12   67:15 68:1, 16, 22   69:7 70:17
performed   48:2, 8, 14   62:2, 3
performing   9:5
period   44:3   58:9
periodic   41:14
permission   55:12
permitted   64:16 65:10
person   16:15 34:3   35:2   37:2 40:10   59:20
personal   39:6 40:11, 14
personally   21:12 43:15
peruses   70:10
phone   16:14
physically   36:5 39:10
pick   11:20
place   59:4   62:13
placed   72:12
placid   45:14
Planning   52:16
please   5:15 49:15
PLLC   1:16   2:4 3:4
point   10:10 26:6   58:16   64:1
points   27:7 44:16
policies   6:13
portfolio   8:9 35:11, 12

position   6:3, 15, 18   7:7, 12   8:19 13:6, 7, 13   15:22 16:2, 5   17:10, 13 18:5   24:7, 11 25:13   27:4   33:6, 7   38:5   47:13 48:9   55:10, 15 56:19, 22   58:11 59:8, 9, 11, 11, 19 61:12, 18   62:1, 14, 17, 19   63:4, 10, 13, 17   65:1 66:3, 5, 14, 15, 17, 18   72:9, 13
positions   58:22 59:4   60:7, 10 61:10, 14
positive   20:5 22:1   69:18
possible   54:13
posted   65:14
potentially   57:20
practical   11:3 36:4, 16   37:1
practice   21:3 47:3
praise   23:7
precipitating   14:17
preferable   55:3
presence   16:16
Present   2:10 22:22   42:5
preserve   26:21
pressing   35:9
pretty   61:7
previously   40:14
primary   14:17
principal   26:17
prior   9:6   10:10 17:12   26:18 27:9   44:2   53:19, 21   54:18   56:13, 15   63:8   67:19
Privacy   35:12 59:12, 19   60:3 61:22
probably   38:14 46:14
problematic   70:3
procedure   17:4, 10
proceeding   70:6, 7
proceedings   1:18
process   21:6 24:17   25:5   58:3
Processing   55:19
produce   69:4
product   48:11

production   57:17   61:6
productive   65:18
Program   8:11
promoted   13:5 67:9
promotion   66:17 67:4, 7
proposal   58:20
proposals   59:14
propose   59:6
proposed   59:3
prosecutor   60:7
provide   16:19 17:9   29:6   45:5 46:20   61:4
provided   22:22
providing   55:9, 11
Public   1:20 74:1, 20
purported   17:1
put   7:9   10:12 11:21   47:14 71:8

< Q >
qualified   60:9
quality   19:7 28:11, 13
question   27:1 29:16   44:10 46:5, 16   68:8 69:21
questions   44:18, 19   45:1   73:6, 7
quickly   68:11 69:4
quite   66:11   67:4
quote   19:20

< R >
raised   72:1
rank   66:7
rating   21:11
reached   26:17
react   46:7, 8, 15
reaction   33:21
readily   42:14
reads   49:16 70:21
ready   15:6 40:16, 17
really   22:11 29:9   35:4   45:12 59:12, 16
reason   17:1 35:20   49:17 50:16, 18, 20 52:8, 11   54:20 63:3

reasons   50:21 51:3   54:21, 22
recall   11:16 14:11   15:8, 21 16:3, 11, 17, 22 17:2, 22   18:16, 22   19:2, 6, 14, 16, 18   20:11, 14, 16 21:22   22:7, 10, 18   25:6, 8, 12, 22 27:12   28:3, 21 29:11, 18   31:15, 19, 20   32:3, 6 33:19   34:1 35:20   36:6   38:9, 13, 16   39:5, 7 41:6, 9, 17   42:18, 21   43:3, 9, 10, 15, 18, 22   44:1, 2, 5, 13   47:10   54:12, 16   59:15   64:9 67:11
receive   21:20 26:5   67:8
received   17:13 21:15, 17   54:7, 17   55:22
receiving   18:15 25:6   33:21
Recess   41:14 51:16   68:13 70:5
recognize   32:21 70:12
recollection   17:8 18:4   19:11   20:1 30:6, 15   32:19 34:7   35:16   42:1 71:14
recommended   59:10
record   5:11, 16 7:13   51:15 74:10
records   61:16
reduced   74:8
Reduction   14:19 17:3
refer   8:5   11:5, 6   12:10
reference   16:1 18:14
referenced   18:13 27:10   41:5, 8 56:12
referencing   15:22
referred   30:1
referring   15:19 50:3

refused  59:4
regard  25:8
regarding  17:16
20:18  32:13
45:2  46:16
regular  23:1
regulations  6:12
related  18:11
20:7  48:18  68:5,
19  74:11
relating  18:8
35:10
relation  28:14
relationship  20:4
39:16, 21  53:2, 6,
12, 14, 17  55:19
relative  74:14
relatively  38:4
44:11
remain  25:16, 19
remained  19:19
remark  22:6
remember  9:12
11:10  22:14
27:20  33:2
38:21  47:9, 13
removal  38:8
remove  16:4
removed  31:16,
17  37:11  40:22
41:1  60:12
63:20, 21  64:15,
19, 21, 22  72:9
reorg  11:21
reorganization
11:18  18:6
32:12  34:6  37:9
63:8, 12, 16
reorganizations
17:20
repeatedly  25:17
59:3
reporting  68:2
represent  5:12
represents  22:20
requested  51:11,
18  65:21
requesting  51:21
54:18, 20
requests  57:18
required  44:4, 8
requiring  46:17
Resource  52:16
Resources  62:22
respect  17:10
22:6, 13  29:13
32:16  44:11
respond  46:3
response  72:1
responsibilities
6:7  7:4, 10, 21

8:17  17:16  18:8
24:10  61:8
65:11
responsibility
6:8  46:18
responsibly
57:12
restricted  57:20
result  23:18
results  52:17, 20
retired  7:9
return  70:5
Review  13:2, 9,
10  18:7  48:11
reviews  68:18
reward  23:21
rewarded  23:17
Rick  24:6  27:14,
17  34:2  72:6, 8
rid  56:19
RIF  14:18, 19
17:10  63:2  64:2,
14
RIF'd  23:3  64:2
RIFing  69:17
right  10:17
12:3  39:13
43:17  44:10, 17
48:22  51:7  52:6
57:4  58:11, 14
62:7, 14, 17, 21
63:1, 18  65:20
66:18  67:2  72:6
right-hand  15:13
Risk  8:11
Robert  9:21
role  6:7  7:2, 10
8:19  9:5, 9, 19
10:6, 12  36:14
49:5, 9, 12
roles  9:9, 13
12:5
Room  2:17
42:10  43:13
Ross  3:4
rough  9:12
roughly  10:6, 18
rules  6:12  47:8
run  8:12  38:3

< S >
Sabol  30:12, 14
56:15, 18
Sabol's  67:15
Sam  5:18
saw  24:1, 2
saying  22:8
38:17  54:12
69:16
says  15:15

Schadler  3:4
school  14:6, 8
Schoolmaster
16:16  62:5, 6, 9
Science  67:16
score  68:20
search  35:8  62:8
searches  57:18
second  15:12
36:22  49:6, 15
64:6, 13  70:15,
20
Section  7:15, 17
8:1, 10, 18  10:22
27:17  31:17
36:1, 9, 11, 17
41:19  43:1, 12
48:14, 15  49:5, 9
59:4  60:6  61:11,
17  66:22  67:5,
15, 21  68:16, 22
69:1, 5, 7
Security  60:6, 13
61:21  68:17, 19
72:9, 12
see  7:12  14:21
15:14  18:10
21:10  23:13
33:8  36:4  42:8
52:17  71:3
selected  7:11
59:1
send  47:3
sending  20:22
Senior  14:19
17:18  23:3
sense  28:18
29:8  48:12, 16
66:7
sensitive  35:6
sent  39:1
sentence  70:20
separate  18:16
32:15  59:11
Service  14:19
17:19  23:4
serving  30:21
SES  31:18
37:11  38:9  41:1
63:5, 20, 21  64:3
72:13
SES-level  26:15
SESSION  1:8
set  31:14
sexual  30:2
71:16, 20
Sherry  30:12, 13
46:12  56:15, 18
67:15
shortly  38:5

shown  30:19
shut  45:10
sign  37:2
Signature  73:11
signed  72:22
significant  34:20
similar  33:21
similarly  33:20
sit  20:14
sitting  43:11, 12
57:1
situation  40:9
six  36:3
Sixth  14:1
skills  71:1
soft  45:19
solution  26:22
59:17
someone's  65:10
somewhat  67:4,
18
soon  61:5
Sorry  28:6, 7
30:12  34:12
43:16  46:4
51:13  63:15
67:20
sort  16:9  32:14
45:19  46:10
span  34:16  66:9
speak  43:7
speaking  42:6
special  8:22  9:3,
9, 19  36:14
56:16  58:11, 21
59:7  60:8  63:9,
10, 17  64:22
66:18, 21  67:22
68:3
specific  9:13
16:1  17:16  18:5
19:15  20:11
21:11, 22  22:8,
10, 15, 18  24:2
28:13  33:17
37:6  41:6, 6
53:5  62:17
71:18
specifically
32:17  43:3, 9
50:3
specifics  16:11
22:12
speculation  26:11
spell  5:16
spoken  45:19
spring  11:11
21:18
staff  10:13, 16
29:1, 5  31:6
36:15  48:6, 17

62:5  67:18, 18,
19, 20
standards  6:9
start  5:15, 19
started  5:11
9:18  13:4  60:16
starting  24:21
state  5:15  57:5
stated  14:18
35:18  49:17
Statement  4:8
15:8  16:6  49:21
50:5  72:22
statements  16:9
STATES  1:1
13:16, 22
stay  65:21
stenographically
74:8
stenotype  1:19
step  16:7, 8
63:6, 6
stepping  37:8
straight  65:19
strain  39:20
streamline  49:19
50:4, 17
Street  1:16  2:5
stress  39:18
stressed  40:5
stressful  16:12
37:20  38:6, 11
strong  28:20
40:8, 11
study  17:15, 22
18:5, 7  51:11, 19,
22  52:14, 18
54:18, 20  60:20
submit  72:22
submitted  15:10
subsequent  67:21
subsequently
42:16
substance  47:6
successfully  39:4
sufficient  35:3
suggest  25:15
suggestions  58:18
suit  28:20
suitable  26:19
Suite  1:16  2:6
summary  15:9
70:15, 16
summer  64:10
superb  71:1
supervise  39:2
66:8
supervised  12:22
39:3
supervisor  21:8,
12  28:6  68:2

support 6:8, 11
30:19 31:6
supported 52:21
55:14, 14
supportive 30:20
72:5, 18, 19
Sure 5:21 28:1
39:3 57:12
61:20 68:12
sworn 5:4
72:22 74:6
symmetrical
35:19 36:6

< T >
table 43:11
Take 11:9 15:4,
4 16:7, 7 27:19
41:12 49:14
63:6, 6 69:10
taken 1:19 8:9
58:8 74:4, 7, 13
talking 22:18
45:8
tax 57:19
technically 66:6
Technology
67:16
tell 51:18, 21
52:2 54:6, 9
55:4, 22 73:3
telling 38:22
tenacious 22:14
23:5, 8, 15 69:13
tenacity 71:1, 6
tend 35:5 45:10
tentative 33:10
tenure 10:1
term 40:8
terms 8:2, 4
17:3 36:4 37:1,
5 38:7, 8 39:21
40:3, 8, 9, 11
43:6 71:14
testified 5:5
55:7 71:9
testify 73:4 74:5
testimony 65:6
74:5, 7, 10
Thank 14:10
50:9 73:8
they's 43:20
thing 13:11
21:1 29:7 42:16
57:10
things 25:11
31:9 32:15
42:17 66:10
think 10:11
11:8, 19 14:21
23:10 24:13, 14

26:4 27:16, 18
31:22 38:15
42:3 44:15
46:14 49:2, 10
52:5 60:18
61:19 64:6, 13
67:19, 20 71:5
third 27:16, 20
49:16
thought 30:1
35:22, 22
threatened 23:3
three 18:15, 17
27:10, 12 30:20
36:1, 2
Thursday 1:18
time 8:13 11:9
13:15 14:12
15:10 27:13, 19
28:2, 4, 9 29:2
31:15 33:11
35:3, 6, 15 37:9
40:22 42:22
43:18 44:3
57:13, 14 60:11,
20 67:19, 19, 20
timeframe 8:9
timeline 9:12
11:10 48:19
times 18:21
19:1, 4 35:7
title 7:5 8:20
9:5
titled 56:16
told 29:14 30:9,
10, 11, 14 31:22
32:1 39:1 54:16
55:5
Tom 27:15 28:3,
6, 6 29:8 34:2
71:10
tools 57:21
topic 41:17
touch 47:16
touched 44:15
tough 35:15
track 66:1
Training 48:15
transcribed 1:19
transfer 12:5
24:11 56:3 57:7
58:3, 9 64:16, 17
transferred 8:13
24:6 49:18
56:11 57:3, 15,
22 65:2
transition 32:7
42:22 44:3
transitioning
12:4

transitions 9:14
37:16
treat 24:2
treated 24:3
32:14 45:3
treatment 42:10
Treaty 11:6
tremendous 31:4
Tricia 45:17
60:15
Trister 3:4
trouble 32:21
troubles 31:3
true 49:21 50:5,
6, 20 74:10
try 11:10 33:13
66:1
trying 25:13
27:16 33:5
46:14 47:14, 19
59:16 69:3, 9
71:13
TSC 39:1
turning 15:12
18:13 21:14
27:6
turns 11:12
twice 72:15
two 8:17 18:19
19:4 32:15
35:13 36:1 42:2
50:12 70:17
type 40:10
typewriting 74:9
typically 65:7, 8

< U >
U.S 1:9 13:17
47:2, 20
ultimately 21:11
Unauthorized
47:3
uncomfortable
33:12 45:12
55:15, 17
uncommon 65:10
understand 46:5
understanding
7:21 18:10 21:2,
10 23:16 26:8,
13 29:17, 19
31:10 35:15
38:1 40:18 44:7
50:15 56:20
66:4, 13
Undoubtedly
54:8
uniform 30:18
Unit 11:6, 7, 15
24:21 26:3, 15

48:20, 22 55:19
58:7, 10
UNITED 1:1
13:16, 22
unjustified 30:18
unquote 19:21
upset 38:19 40:5
upsetting 38:11
use 8:2, 4 17:10
24:21 40:11
63:5

< V >
Valerie 9:21
18:18
variety 9:8
various 29:4
54:1
vehemently
62:21
versus 42:10
45:3
view 67:4
voice 45:20

< W >
WACHTEL 3:3
49:22 50:6, 9
waived 73:11
wall 61:9
want 5:19 22:4
52:3, 9 55:1
59:18
wanted 20:4
25:19 35:18
53:7, 11 54:14
55:2 60:3, 19
61:1, 2, 3, 3
65:16, 17, 18, 22
wanting 20:7
31:7
warrant 35:8
WASHINGTON
1:3, 17 2:7, 18
3:7 38:1
way 23:22 24:4,
7 31:5 33:14
37:21 40:2
42:12 45:2, 17,
21 46:3, 8, 15
47:1 58:1 61:2
65:12 69:13, 16
70:2 71:6
weeds 37:7
weekly 42:2, 3
weeks 42:2
weight 36:22
Weiser 1:15 2:4
Weissmann 10:2,
11 18:18 54:4, 5

well 10:19 25:3
26:14 29:1
32:11 34:8 36:8
39:10 42:19
46:11 53:19, 20
60:11, 16 62:4, 6
69:17
went 11:4 12:9
13:12 24:19
48:22 58:7 61:9
65:13, 19 66:21
we're 5:11
white 27:10, 12,
15, 15, 20 30:21
72:5
Wiegand 30:13
Wiegand's 68:22
witness 1:14
3:2 4:2 41:13
44:20 45:8
50:10 70:1, 10
74:5, 7, 11
woman 33:12
42:15 45:11
46:7, 10
women 32:22
33:17 42:10, 14
45:3, 13 46:3, 8,
15
word 40:6, 7
71:5
words 9:2
work 5:22 6:1
14:3 20:2 25:3,
6 26:15, 18 28:8,
12, 14 31:7
37:12 48:11
53:20 57:7, 11
65:17 70:22
worked 28:15,
15 53:19 57:6
67:17
working 6:19
33:16
world 65:12
writes 21:7
writing 61:9
70:20 71:1
written 19:3
wrong 11:12
28:5

< Y >
yeah 46:1
year 13:6 21:20
23:13
years 7:8 33:15
young 39:12