1                    UNITED STATES OF AMERICA

2          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3                    WASHINGTON FIELD OFFICE

4        - - - - - - - - - - - - - - - X

5        MARCIANN GRZADZINSKI,            :

6              Complainant,              :    EEOC No.

7          v.                            :    570-2017-00720x

8        JEFFERSON B. SESSIONS III,       :

9        Attorney General, Department    :    Agency No.

10        of Justice,                     :    FBI-2015-00176

11              Agency.                   :

12        - - - - - - - - - - - - - - - X

13                              Washington, DC

14                              Tuesday, March 19, 2019

15              Deposition of KAREN DAVIS MILLER, a

16        witness herein, called for examination by counsel for

17        Complainant in the above-entitled matter, pursuant to

18        notice, the witness being duly sworn by Rebecca L.

19        Stonerock, a Notary Public in and for the District of

20        Columbia, taken at the offices of Kator, Parks,

21        Weiser & Harris, 1200 18th Street NW, Washington, DC,

22        at 9:58 a.m., Tuesday, March 19, 2019, and the

 1    proceedings being taken down by Stenotype by Rebecca

 2    L. Stonerock, RPR, and transcribed under her

 3    direction.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
 1    APPEARANCES:

 2

 3        On behalf of the Complainant:

 4               DAVID A. HART, ESQ.

 5               Kator, Parks, Weiser & Harris

 6               1200 - 18th Street NW, Suite 1000

 7               Washington, DC  20036

 8               (202) 898-4800

 9               dhart@katorparks.com

10

11        On behalf of Agency:

12               JULIET GRAY, ESQ.

13               Assistant General Counsel

14               Office of General Counsel

15               Federal Bureau of Investigation

16               935 Pennsylvania Avenue NW, Room 10140

17               Washington, DC  20535

18               (202) 324-3000

19               jgray2@fbi.gov

20

21        Also Present:

22               Marciann Grzadzinski
```

```
 1                    C O N T E N T S

 2   WITNESS                    EXAMINATION BY COUNSEL FOR

 3   KAREN DAVIS MILLER         COMPLAINANT    AGENCY

 4        BY MR. HART           5

 5        BY MS. GRAY                          29

 6        BY MR. HART           39

 7

 8

 9                    E X H I B I T S

10   MILLER EXHIBIT NO.                        PAGE

11   Exhibit 1  6-3-15 E-mail, Miller to Baker,

12              GRZ_FBI 003373                 11

13   Exhibit 2  FBI OEEOA Intake Form - Aggrieved,

14              Miller, GRZ_FBI 003575 - 586   15

15   Exhibit 3  6-5-15 E-mail, McNally to Miller,

16              GRZ_FBI 004255 - 258           24

17   Exhibit 4  8-13-15 E-mail, Walker to Wiegand,

18              GRZ_FBI 003407 - 408           26

19

20   (Exhibits attached to transcript)

21                    -   -   -

22
```

```
 1                    P R O C E E D I N G S

 2    Whereupon,

 3                    KAREN DAVIS MILLER,

 4    was called as a witness by counsel for Complainant,

 5    and having been duly sworn by the Notary Public, was

 6    examined and testified as follows:

 7           EXAMINATION BY COUNSEL FOR COMPLAINANT

 8    BY MR. HART:

 9         Q.    Good morning, Ms. Miller.

10         A.    Good morning.

11         Q.    So I introduced myself before, but just

12    for the record, my name is David Hart.  I'm one of

13    Marcy Grzadzinski's attorneys --

14         A.    Okay.

15         Q.    -- in her EEO complaint against the

16    Department of Justice.  So just to start with, could

17    you please state and spell your name for the record?

18         A.    My name is Karen, K-A-R-E-N, middle name

19    Davis, D-A-V-I-S, Miller, M-I-L-L-E-R.

20         Q.    Okay.  And what do you do for a living,

21    Ms. Miller?

22         A.    I'm an attorney at the FBI.
```

Karen Davis Miller
Washington, DC

1         Q.    What is your role as an attorney there?

2         A.    I'm a section chief in our National

3    Security and Cyber Law branch.  So I'm an executive.

4         Q.    Can you just describe for us generally

5    what that entails?

6         A.    I am over -- I oversee our

7    counterintelligence and cyber law units and our FISA

8    unit.  So I oversee attorneys that are supporting

9    counterintelligence and cyber, and I oversee nonlegal

10   support, who are basically handling our warrants that

11   we get.

12        Q.    How long have you been in that role?

13        A.    I have been in this particular role where

14   I'm over those units since 2016.

15        Q.    Okay.  So before this position what was

16   your -- where were you employed?  Was that still with

17   the FBI?

18        A.    Yes.  I was -- actually I became a section

19   chief in 2010, but I was over different units.  I

20   was -- it was called the National Security Law Branch

21   back then, and I was over our policy law unit, our

22   legislative and review law unit, our classified

1    litigation law unit, and then the FISA law unit that

2    I referenced before.  So that was from 2010 to 2015.

3         Q.    Okay.  And were you over all of those

4    units for the whole time or were you over the

5    different units at different times?

6         A.    I was over those units from 2010

7    to 2015.  2015 -- the whole year 2015 I was on

8    detail, and then from 2016 to the present I was --

9    I'm in the present position.

10        Q.    And that 2015 detail, what position were

11   you detailed into?

12        A.    I was a temporary -- TDY'd over to the CIA

13   and I worked in their litigation unit.

14        Q.    Okay.  And so before 2010 where were you

15   employed?

16        A.    I was employed -- I started at the FBI

17   in 2004 and I've been with the National Security Law

18   Branch since I started at the FBI.  So from 2004

19   to 2007 I was just a line attorney, what they call

20   just a first-level attorney in our counterterrorism

21   law unit, and then I switched to our policy law unit.

22   And then in 2007 -- between 2007 and 2010 I was a

1    unit chief.  I got promoted to unit chief over our

2    policy unit I think it was called back then.  I don't

3    know.  The names have changed, but yeah, basically

4    over policy.

5         Q.    Okay.  And so before 2007 was that your

6    first federal employment?

7         A.    Before 2004?

8         Q.    Yes, 2004.

9         A.    No, I came to the FBI from the US

10   Attorney's Office in Washington, DC where I was a

11   federal -- criminal federal prosecutor from 1998

12   until 2004.  And prior to that I came -- I worked for

13   the tax division for the Department of Justice

14   from 1996 to 1998.  Do I need to keep going?  I'm

15   giving my age.  Do I need to keep going?

16        Q.    That's all right.

17        A.    Okay.

18        Q.    So we can go through the rest of it.  I

19   just want to --

20        A.    Okay.

21        Q.    So before 1996 where were you employed?

22        A.    I was with a law firm for a year doing

1   employment law, and then before that I was a law

2   clerk in US District Court for two years.

3        Q.   What was the name of the firm you worked

4   for doing employment law?

5        A.   Constangy, Brooks & Smith in Atlanta,

6   Georgia.  That's C-O-N-S-T-A-N-G-Y, Brooks & Smith.

7   I think that's what it was called.  Something like

8   that.

9        Q.   Okay.

10        A.   Yeah.

11        Q.   And so before those jobs was that when you

12   finished law school?

13        A.   Yes.

14        Q.   And where did you go to law school?

15        A.   Northwestern in Chicago.

16        Q.   So jumping ahead to your time as a section

17   chief, so the position that you had prior to

18   your 2015 detail as a section chief --

19        A.   Yes.

20        Q.   -- can you describe for me kind of what

21   your responsibilities were in that role?

22        A.   I was over attorneys who were writing

Karen Davis Miller                                          3/19/2019
                    Washington, DC                          Page 10

```
1   policy, legal policy.  Not only legal policy, but

2   helping with policy in general with the FBI.  I was

3   over attorneys that were doing legislative type work,

4   reviewing legislation and proposing legislation.  I

5   was over attorneys who were handling compliance work

6   seeing that -- going around dealing with compliance

7   issues, legal compliance issues.  And then there was

8   the FISA unit which is just the unit that handles our

9   warrants.

10       Q.    Okay.  And then in 2015 you went on that

11  detail.  Do you recall why you took that detail?

12       A.    I actually asked for the opportunity to go

13  to another agency and Jim Baker agreed to allow me to

14  do that and helped me get the detail.

15       Q.    And why did you want to go on a detail?

16       A.    I wanted to just kind of broaden my

17  experience and just do something a little different

18  for a while.

19       Q.    And do you recall in 2015 there came a

20  time that you filed an EEO complaint?

21       A.    Yes.

22       Q.    So do you recall why you filed that
```

1    complaint?

2       A.    I filed the complaint because in around

3    June -- in early June.  Jim let me know -- and I

4    can't remember, I think it was a phone call -- that

5    he was going to re -- I don't know, reorganize the

6    National Security Law Branch, and he felt that the

7    reorganization was significant such that I would have

8    to recompete for my job as section chief.

9       Q.    I see.  And did you have an understanding

10   from your conversation with Mr. Baker as to what

11   about the reorganization was requiring that you

12   recompete for your position?

13      A.    He did not articulate that very well for

14   me.

15             MR. HART:  So if you could mark this as

16   Exhibit 1.

17                  (Miller Exhibit No. 1 was marked for

18                  identification.)

19             THE WITNESS:  Just get my glasses out.

20             MS. GRZADZINSKI:  We're all showing our

21   age.  We're all grabbing our glasses.

22             THE WITNESS:  Yes, I sent this e-mail.

```
1   BY MR. HART:

2        Q.    Okay.  And was this e-mail in response to

3   that conversation that you had with Mr. Baker?

4        A.    Yes, it is.

5        Q.    So if you could just take a moment to read

6   it carefully and then just let me know whenever

7   you're ready.

8        A.    (Witness complies.)  Mm-hmm.

9        Q.    Okay.  So in here you reference -- around

10  the middle of the first paragraph you say that, "I am

11  planning to meet with the deputy director and HR."

12  So did you eventually meet with the deputy director?

13       A.    I didn't meet with the deputy director one

14  on one.  There was a meeting with the deputy

15  director -- the deputy director, and it was a group

16  meeting.

17       Q.    Okay.  And that was Mark Giuliano?

18       A.    Yes.

19       Q.    Who else was in that group meeting?

20       A.    Marcy was in there, I believe Sherry Sabol

21  was in there, and Nancy Wiegand.  I believe Jim was

22  there, but I can't say for sure.  I just don't
```

1    recall.  And I know Mark was in there and I can't

2    remember who else might have been there.

3         Q.    So do you recall -- I apologize if I'm

4    repeating some of the ones that you just listed --

5    that Sherry Sabol was in the meeting?

6         A.    Yes.

7         Q.    And you mentioned Nancy Wiegand?

8         A.    Uh-huh.

9         Q.    And Catherine Bruno?

10        A.    She probably was.  I just didn't remember.

11   She probably -- I mean, I can't for sure say that,

12   but --

13        Q.    That's okay.

14        A.    -- it was a group meeting and --

15        Q.    And do you recall what was discussed

16   during that meeting?

17        A.    I believe we all had complaints and that

18   was the discussion.  And forgive me if I just recall

19   my piece of the -- part of the meeting --

20        Q.    That's okay.

21        A.    -- which was that he announced that me --

22   and I think Nancy was in a similar position, but I

Karen Davis Miller                                                 3/19/2019
                        Washington, DC                              Page 14

```
 1   can't say for sure -- would not have to repeat for

 2   our positions, that we don't do that at the FBI.

 3        Q.    And do you recall any concerns regarding

 4   discrimination being raised in that meeting?

 5        A.    Yeah, because we were all at that -- all

 6   issued complaints, so --

 7        Q.    Do you recall what Mr. Giuliano's response

 8   was, at least to your concerns?

 9        A.    I don't recall him saying anything of

10   substance about the discrimination allegations.  I

11   think he was just trying to deal with the situation.

12   So the only thing I could say with regard to my

13   situation was what I already said, was that he was

14   not going to make -- I know at the meeting I

15   indicated my displeasure at that requirement, and he

16   said that I was not going to have to recompete for my

17   position.

18        Q.    Okay.  And that was deputy director

19   Giuliano who was saying that?

20        A.    Yes.

21        Q.    And do you recall that there was another

22   employee named Rick McNally whose position was also
```

1    going to be affected by the reorganization?

2        A.    I know that -- I don't know that -- I

3    can't -- I can't say that I can correlate Rick's

4    change in position with the reorganization.  I can

5    tell you that Rick was moved from one position to

6    another position.

7        Q.    Okay.

8            MR. HART:  So if you could mark this as

9    Exhibit 2.

10               (Miller Exhibit No. 2 was marked for

11               identification.)

12           THE WITNESS:  Do you want me to read the

13    whole thing or --

14    BY MR. HART:

15        Q.    You can if you'd like.  I actually have --

16    have a specific question regarding -- let me locate

17    it here myself.

18            So the specific paragraph I want to ask

19    you about, so in the lower right-hand corner it's

20    Bates number 3580.

21        A.    Okay.

22        Q.    And it's the first full paragraph starting

1    with the words, "In late October/mid-November 2014."

2         A.    Okay.

3         Q.    Yep.  So if you could just read that and

4    let me know when you're ready.

5         A.    (Witness complies.)  Okay.

6         Q.    Okay.  So this issue regarding your

7    midyear performance evaluation, this came before --

8         A.    Right.

9         Q.    -- your --

10        A.    Right.

11        Q.    -- the June 2015 events?

12        A.    Right.

13        Q.    The -- so regarding your conversation with

14   Mr. McNally about your performance evaluation, do you

15   recall whether you were ever provided an explanation

16   for why your rating had changed in the way you

17   described?

18        A.    I had a conversation with Jim and he

19   apologized and agreed that he did not have the

20   requisite knowledge or should not have changed the

21   rating, and he rerated me.

22        Q.    Okay.  And did he provide you any

```
 1   explanation as to why he rated you poorly -- or less

 2   well to begin with?

 3        A.    He couldn't because he had absolutely no

 4   idea what I did.  He -- let's just say he didn't.

 5        Q.    Okay.  So -- and then ultimately in

 6   June 2015 when the reorganization was being conducted

 7   you were told that you would eventually have to --

 8   you were going to be expected to recompete for your

 9   own position?

10        A.    Correct.

11        Q.    But that ultimately did not occur,

12   correct?

13        A.    Correct.

14        Q.    And do you recall why that changed?

15        A.    It changed -- well, I can only tell you

16   that there was a meeting with Mark Giuliano and he

17   told me that I did not have to recompete for my

18   position.

19        Q.    And your understanding before that

20   conversation with deputy director Giuliano was that

21   as Jim Baker's intent was to make you recompete for

22   that position?
```

```
 1          A.    Correct.

 2          Q.    And so the -- in terms of your recompeting

 3   for that position, were you ever told if you did not

 4   successfully recompete for that position, that you

 5   were going to be provided some other position,

 6   meaning that if you did not successfully obtain this

 7   other position, that there was another position that

 8   was available for you to kind of default into?

 9          A.    Well, I guess eventually if I didn't find

10   another SES position, I would just become a GS-15.

11          Q.    Okay.  So your understanding was that if

12   you did not successfully recompete for your position,

13   that you would have been removed from the SES and

14   placed in one of these other positions?

15          A.    That was my understanding.

16          Q.    And contemporaneous to these discussions

17   was when you filed this EEO complaint in Exhibit 3,

18   or Exhibit 2 rather?

19          A.    The -- this?

20          Q.    Yes.

21          A.    I filed this (indicating) after I sent the

22   e-mail to Jim I filed the complaint.  Sometime after.
```

1    I don't know if the date is on here, but yes.

2        Q.    Okay.  So in this complaint -- so you

3    alleged discrimination on several bases.  I just kind

4    of want to walk through each of them very briefly.

5        A.    Okay.

6        Q.    And you do describe it to a certain extent

7    in this complaint, so please let me know if you want

8    to read that instead, but can you just describe for

9    me generally why you believe that one of the reasons

10   you were -- you were discriminated against was on the

11   basis of your sex?

12       A.    I could not figure out why Jim was doing

13   what he was doing.  And at the same time I looked

14   around and saw he was doing the same thing to others.

15   And so I didn't know whether he was discriminating

16   against me based on sex or not because I couldn't get

17   in his head, but I had to assume that and take it

18   through its natural course.

19       Q.    Okay.  And the others that you referred to

20   were Marcy, Ms. Wiegand, Ms. Sabol and Ms. Bruno?

21       A.    Correct.

22       Q.    And they were all women as well?

```
 1        A.    Correct.

 2        Q.    And to your understanding, they were over

 3   the page of 40?

 4        A.    I believe they were.  I don't -- I don't

 5   have any personal knowledge, but it appeared that

 6   way.

 7        Q.    I understand.  So and from the confluence

 8   of all five of you being affected by this

 9   reorganization, your understanding was that there was

10   some -- or your thought was that there was some

11   discriminatory motive?

12        A.    I have no idea if everybody's situation

13   dealt with the reorganization of my branch.  I just

14   know around the same time we all were dealing with

15   negative issues.

16        Q.    Okay.  And on here you also reference that

17   you believe that it was on the basis of reprisal and

18   that you list opposition to unlawful employment

19   practice as November 1, 2014.  Was that the issues

20   regarding your performance evaluation in

21   November 2014?

22        A.    Correct.
```

1        Q.    And to your knowledge, other than

2   yourself, has Mr. Baker ever -- again, just in your

3   experience -- has Mr. Baker ever told any other

4   employee that they would have to recompete for their

5   own position as a result of that reorganization?

6              MS. GRAY:  Objection, you can answer if

7   you know.

8              THE WITNESS:  I don't have any personal

9   knowledge.  I was no present during any conversations

10  he had with anybody else.

11  BY MR. HART:

12       Q.    And that's because you were on detail for

13  most of the time frame that this was ongoing?

14       A.    I don't know why -- I assume he wouldn't

15  invite me to a conversation that he had with another

16  employee, but I was on detail.  I was at the CIA.

17       Q.    Okay.  And Ms. Grzadzinski was one of the

18  other women that filed an EEO complaint

19  contemporaneous to yours, correct?

20       A.    I don't know personally what Marcy did,

21  but Marcy was in a meeting with the rest of us with

22  the deputy director and I know that she had a -- she

1    had a complaint.  So I never saw a complaint.  She

2    never said, "Karen, I filed a complaint."  But we --

3    we -- it was not hard to figure that out.  But it was

4    not based on any kind of personal knowledge that I

5    sat with Marcy or anybody else and helped them with a

6    complaint or saw their complaint or knew the

7    specifics of any complaint.

8         Q.    And so do you recall shortly afterwards or

9    around that time Ms. Grzadzinski was removed as a

10   deputy general counsel and made a section chief?

11        A.    I don't know time frames.  I know that she

12   was moved from deputy general counsel to section

13   chief, but I cannot tell you from memory when it was

14   of the I know it was around -- these things going on,

15   but I can't tell you the dates.

16        Q.    That's all right.  And then sometime

17   thereafter are you aware that Ms. Grzadzinski was

18   also removed from the SES entirely?

19        A.    I know she was -- went to TSC.

20        Q.    Okay.  So just generally, I understand you

21   can't recall the specific dates?

22        A.    Right.

1      Q.    -- but when those events were occurring

2    when she moved to TSC and then when she became a

3    section chief did you witness at all the effects that

4    had on Ms. Grzadzinski?

5      A.    I did.

6      Q.    And what kind of effects did you observe?

7      A.    She was very stressed out, she was upset,

8    just looking at her like you could tell that she was

9    upset.  She was having a hard time.

10     Q.    What kind of things were you observing

11   that led you to that conclusion?

12     A.    Just her demeanor and she talked a little

13   bit about what she was going through.  I can't

14   remember any particulars, but it was -- she was

15   upset.  It was -- it appeared to be hard on her.

16     Q.    And if you have any experience with this,

17   how would you compare that to how Ms. Grzadzinski was

18   before when she was still deputy general counsel?

19     A.    I had never spent a lot of time with Marcy

20   before this, so that's a very hard question to

21   answer.

22     Q.    That's okay.

```
 1                  MR. HART:  So actually if we could go off

 2      the record for just a second.

 3                  (Discussion off the record.)

 4                  MR. HART:  Back on the record.  So if you

 5      could mark this as Exhibit 3.

 6                      (Miller Exhibit No. 3 was marked for

 7                      identification.)

 8      BY MR. HART:

 9          Q.    And if you could look at the -- so in the

10      lower right-hand corner it's Bates numbers 4257

11      to 4258.  You see in the header to the e-mails in

12      this exchange there's an e-mail that's Karen DM6.

13      Was that your e-mail account?

14          A.    That was.  That was my CIA unclassified

15      e-mail account.

16          Q.    And do you recall having this e-mail

17      exchange with Mr. McNally?

18          A.    I didn't recall before today, but yeah.

19      Yeah.

20          Q.    And so was -- just generally in this

21      e-mail are you discussing your conversation with

22      Mr. Baker regarding his intent to have you recompete
```

```
 1   for your own position?

 2         A.    I'd have to look.

 3         Q.    Take your time.

 4         A.    (Witness complies.)  So what was your

 5   question?  I apologize.

 6         Q.    So just in general in this e-mail exchange

 7   is having to recompete for your own position as part

 8   of the reorganization generally what you were

 9   discussing with Mr. McNally?

10         A.    We were discussing what was -- he was

11   telling me what was happening back at the -- at the

12   FBI, and I did indicate about the reduction in force,

13   talking about that.

14         Q.    And you were bringing that up in relation

15   to -- just to make sure I understand it, kind of

16   referencing with the reduction in force?

17         A.    It's the conversation I had -- well, I

18   don't know when I had the conversation with Jim.  It

19   had to be June 3 or before.  I'll look and see if

20   that -- I'm sorry, do you have a tissue?

21              MR. HART:  Yes.  I will be right back.

22   Off the record.
```

```
 1                 (Discussion off the record.)  Back on the

 2     record.

 3     BY MR. HART:

 4          Q.

 5          A.    So what was your question?  I'm sorry I

 6     keep --

 7          Q.    That's all right.  So just in general were

 8     you concerned about the reduction in force issue in

 9     relation to potentially having to recompete?

10          A.    Yes, I was concerned about my job.  Yes.

11          Q.    So you can set that aside for now.

12          A.    Okay.

13                MR. HART:  And if you could mark this as

14     Exhibit 4.

15                      (Miller Exhibit No. 4 was marked for

16                      identification.)

17     BY MR. HART:

18          Q.

19          A.    Yes, I remember this e-mail.

20     BY MR. HART:

21          Q.    Okay.  And so who is Kevin Walker, to your

22     recollection?
```

```
 1         A.    Kevin Walker, I believe he was the

 2    assistant director of EEO.

 3         Q.    Okay.

 4         A.    Yeah, EEO -- O EEO A -- I can't.

 5               MS. GRAY:  That's right.

 6    BY MR. HART:

 7         Q.    Terminal problem with acronyms.

 8         A.    Right.

 9         Q.    So do you recall that this was around the

10    time that you and the four other women referenced in

11    this e-mail had filed EEO complaints?

12         A.    Yes.

13         Q.    Okay.  And so after receiving this e-mail

14    what was your understanding of what you were allowed

15    to discuss with respect to your EEO complaints with

16    other employees?

17         A.    Nothing specific.

18         Q.    You didn't think you were allowed to

19    discuss anything specific or --

20         A.    About my EEO complaints.

21         Q.    Other than this e-mail exchange, did you

22    have any discussions with either Mr. Walker or
```

1   somebody else within the EEO office regarding your

2   ability to share information related to your EEO

3   complaint?

4        A.   I honestly don't recall.  I know I had an

5   EEO counselor.  I don't know if I -- I can't recall

6   whether I had one-on-one conversations with Kevin, so

7   I don't recall.  It's possible, but I just don't

8   recall.

9        Q.   Okay.  I think I'm almost done, we could

10  just take a five-minute break, we'll be right back.

11  Off the record?

12            (Recess.)

13            MR. HART:  Back on the record.

14  BY MR. HART:

15       Q.   So in your -- in the EEO complaint that we

16  just looked at the -- so you raised several concerns

17  in that complaint regarding potential retaliation by

18  the agency.  Is that a concern that you've had

19  outside of that EEO complaint?

20       A.   I don't understand the question.

21       Q.   Sorry.  So other than outside -- with

22  respect to your participation in Ms. Grzadzinski's

```
 1   EEO complaint here today as a witness, do you have

 2   any concerns regarding your ability to return to work

 3   without any negative influence for that

 4   participation?

 5        A.    I don't have any concerns.

 6              MR. HART:  Okay.  I have no more

 7   questions.

 8              EXAMINATION BY COUNSEL FOR AGENCY

 9   BY MS. GRAY:

10        Q.    I just have a question for us for you.  Do

11   you have any firsthand knowledge as to how

12   Ms. Grzadzinski performed as deputy general counsel?

13        A.    I don't.

14        Q.    Do you have any firsthand knowledge as to

15   how Ms. Grzadzinski performed as section chief of the

16   investigative law and training section?

17        A.    I don't.

18        Q.    When you were section chief while

19   Mr. Baker was the general counsel, did you ever feel

20   that Mr. Baker treated you differently in meetings

21   than he treated men?

22        A.    I did not pick up on anything.  No, I did
```

1    not have that feeling.

2         Q.    Okay.  At the time that you had the

3    initial conversation with Mr. Baker about where he

4    indicated that you may have to recompete for your

5    section chief position, at that time was it your

6    understanding that that plan had not yet been

7    finalized?

8         A.    It had not been finalized.  I don't

9    believe it had been finalized.

10        Q.    And he told you that he was actually

11   planning to recompete for both section chief

12   positions in NSLB; is that correct?

13        A.    Yes, because I don't believe there was a

14   permanent -- I don't know.  I don't know.  I'm sorry.

15        Q.    Can you take a look at Exhibit 1 again?

16        A.    Okay.  Which one is Exhibit 1?

17        Q.    It's Bates 3373.

18        A.    Okay.

19        Q.    If you can look at that second sentence,

20   you write, "If I understand things correctly, you

21   feel that you are going to reorganize NSLB so

22   extensively that you have to recompete the section

```
 1   chief positions."

 2        A.    Yes.

 3        Q.    Do you see that?

 4        A.    Yes.

 5        Q.    So you're referring to the positions

 6   plural?

 7        A.    Yes.

 8        Q.    So was it your understanding at that time

 9   that he was going to recompete for both the section

10   chief positions?

11        A.    I think so because I just get a little

12   confused because I don't think there was a

13   permanent -- I'm not sure what Rick was doing, but

14   yes.

15        Q.    Okay.

16        A.    For some reason I don't -- I didn't think

17   he was adversely affected, but I don't have any basis

18   to -- that's why I'm a little confused about.

19        Q.    Can you take a look again at Exhibit

20   Number 3?

21        A.    Okay.

22        Q.    This was the e-mail exchanged between you
```

Karen Davis Miller
Washington, DC

```
1    and Mr. McNally.

2         A.    Okay.

3         Q.    And if you look at the date of the top

4    e-mail it's June 5th, 2015; is that correct?

5         A.    Right.

6         Q.    So can you take your time, just take a

7    look at that email and let me know, what did you

8    interpret Rick's e-mail to mean as far as Jim's plan

9    with the reorg?

10        A.    Okay.  I'm sorry what was your question

11   again?  What was my understanding about the

12   reorganization?

13        Q.    Yes.

14        A.    That he was going to -- first he was going

15   to dissolve four units.

16        Q.    Let me ask you this question.

17        A.    Okay.

18        Q.    Was it your understanding upon reviewing

19   this e-mail that Mr. Baker had changed his intent

20   with regard to how he was going to reorganize NSLB's

21   since your conversation three days prior?

22        A.    I don't recall the specifics of what Jim
```

1    told me, how he was going to reorganize.  I just

2    remember that he -- that's not to say it didn't

3    happen.  I just don't recall the specific

4    conversation.  I just recall the conversation in

5    which he told me he was going to reorganize the

6    branch in such a fashion that I would have to

7    recompete.  And this e-mail, Rick was indicating that

8    they pushed back on that and he may have changed his

9    mind in terms of parts of the reorganization.

10        Q.    One of the things that Rick references in

11    this e-mail is that if Jim had proceeded with his

12    proposed plan, all of the unit chief positions would

13    also have to be recompeted.  Was that your

14    understanding?

15        A.    Just from the e-mail, but I wasn't part of

16    the conversation.  But that's what his e-mail related

17    to me.

18        Q.    And do you recall who held those unit

19    chief positions at the time?

20        A.    The people?

21        Q.    Yes.

22        A.    Dawn McCarthy was a unit chief, but she

Karen Davis Miller
Washington, DC

Page 34

```
1    was an acting section chief.  Charlie Choi was a unit

2    chief, Bob Sinton was a unit chief, although I think

3    he was an acting section chief.  Carter Wilkinson was

4    a unit chief.  There were so many actings going on.

5    I think Sally Moyer was an acting unit chief.  We had

6    at one point in time several people as acting unit

7    chiefs of the policy unit of the compliance unit, and

8    I believe John Nataro was a unit chief.  I may have

9    missed some people, but those are the people that

10   stand out in my mind.  Sean Farrell was a unit chief

11   of cyber law.  I think it was a law unit by then.

12   That's all I can recall.  Charlie and Carter were

13   counterterrorism.  Lyn Brown was I think the unit

14   chief of TSC, but I don't know when she got out of

15   that position.  So that's all I can remember.

16   There's -- I'm probably missing some people, but

17   that's all I -- what I recall.

18        Q.    Okay.  That's fine.  And Charlie Choi, was

19   that a man or a woman?

20        A.    Charles Choi.  It's a man.

21        Q.    And Sean Farrell, Carter Wilkinson, John

22   Taro and Bob Sinton are all men?
```

```
 1        A.    Right.

 2        Q.    So with this change that Mr. McNally is

 3   indicating in this e-mail, was it your understanding

 4   if Jim were to change it as Rick described in this

 5   e-mail that you would no longer have to recompete for

 6   your section chief position?

 7        A.    He thought that I shouldn't have to.

 8        Q.    Rick thought that?

 9        A.    In this e-mail.

10        Q.    But you weren't sure about that yet?

11        A.    I had not received any other calls from

12   Jim Baker.  So this is just a colleague telling me

13   what was happening back at headquarters from his

14   perspective with Jim.  So I didn't get any -- I never

15   got a return phone call from Jim saying, "You don't

16   have to recompete for your position."

17        Q.    Is it your understanding that this plan

18   that Rick is discussing in this e-mail, is that how

19   NSLB was ultimately being reorganized?

20        A.    I don't know because I wasn't there.  I

21   don't know.  It's close because it says both sections

22   will have operational units and both branches did
```

Karen Davis Miller
Washington, DC

3/19/2019
Page 36

1    have operational units, and adding cyber.  So it

2    probably is -- it's close or it could be the same,

3    but I didn't see the plans.  I mean, I have to go by

4    what he says.  But it sounds like it.  It's

5    ultimately what it ended up being.

6        Q.    When your detail was over you returned to

7    a section chief position at NSLB, correct?

8        A.    Correct.

9        Q.    But at that time is it correct to say that

10   the actual name of the section had changed but you

11   were still returning to a section chief position?

12       A.    I returned to a section chief position of

13   a different section, yes.

14       Q.    And did you have to recompete for their

15   position?

16       A.    I did not.

17       Q.    And you are in that position today,

18   correct?

19       A.    Correct.

20       Q.    Can you please take a look at the second

21   page of Exhibit 3, the e-mail all the way down at the

22   bottom from Rick McNally to you where he writes, "and

Karen Davis Miller

```
1    I still want out of here."

2          A.     Mm-hmm.

3          Q.     Do you see that?

4          A.     Yes.

5          Q.     What did you interpret that to mean?

6          A.     Whatever was going on he wasn't happy

7    about it.

8          Q.     Do you have any idea in particular what he

9    was unhappy about?

10         A.     I think he was unhappy because he wasn't

11   going to get the deputy general counsel position.

12         Q.     Did you ever discuss with Mr. McNally how

13   he felt about being removed from his position as

14   section chief in NSLB?

15         A.     I did.

16         Q.     And --

17         A.     I did.

18         Q.     And what was your understanding of how he

19   felt about that?

20         A.     He felt kind of bad because he knew he was

21   displacing Sherry.

22         Q.     What about apart from the factor of
```

1    displacing Sherry, do you have any understanding of

2    how he felt about the fact that he was being taken

3    out of NSLB and being put into a different section?

4        A.    I think that if I recall, he did not want

5    to work for another deputy general counsel because he

6    should have had that job.  So I can only tell you my

7    sense of the situation.  I don't believe that he

8    was -- I think he liked national security, but I

9    don't think that he -- he was upset that he didn't

10   get the DGC job.  And so I don't think he was unhappy

11   that he would be reporting to another DGC in NSLB, so

12   probably conflicted feelings.

13       Q.    Do you think Mr. McNally was qualified to

14   be DGC of NSLB?

15       A.    Yeah.  Yes.  He had his, like us all,

16   positives and negatives.  Whether he was best for the

17   job I can't say that but he certainly was qualified

18   for the job.

19       Q.    Did either Ms. Grzadzinski or her counsel

20   ask you to submit a sworn statement in connection

21   with this matter?

22       A.    No.

1       Q.    Did anyone at the FBI ever tell you that

2   you could not or should not testify in this matter?

3       A.    No.

4       Q.    Ms. Miller, you were not removed from OGC;

5   is that correct?

6       A.    I was not.

7       Q.    And you've never been removed from SES; is

8   that correct?

9       A.    I have not been removed.

10       Q.    And you were never removed from your

11   section chief position; is that correct?

12       A.    That's correct.

13          MS. GRAY:  I have no further questions.

14       EXAMINATION BY COUNSEL FOR COMPLAINANT

15   BY MR. HART:

16       Q.    Okay.  Just one briefly clarifying

17   question.  So if you could look at I think it was

18   Exhibit 3, the e-mail exchange with Mr. McNally:

19   Starts at Bates number 4255.  So regarding --

20   actually -- my apologies.  It's actually, I think it

21   was Exhibit 1, the e-mail to Mr. Baker, starts at

22   Bates number 3373.

```
 1        A.     Uh-huh.

 2        Q.     So just in this sentence where you're

 3   saying that you have to -- "so extensively that you

 4   have to recompete the section chief positions," the

 5   section chief positions you were referring to were

 6   your own and Mr. McNally's?

 7        A.     Yes, because he was technically a section

 8   chief at that time, I believe.

 9        Q.     Okay.  And Mr. McNally was eventually

10   given Ms. Sabol's position?

11        A.     He was.

12               MR. HART:  Okay.  No more questions.

13               MS. GRAY:  I don't have any more

14   questions.

15               (Whereupon, at 10:50 a.m., the taking of

16   the instant deposition ceased.)

17

18

19

20

21

22
```

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Rebecca L. Stonerock, Registered Professional

3    Reporter, the officer before whom the foregoing

4    proceedings were taken, do hereby certify that the

5    foregoing transcript is a true and correct record of

6    the proceedings; that said proceedings were taken by

7    me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12

13   My commission expires:

14   October 14, 2022

15

16

17

18                 NOTARY PUBLIC IN AND FOR

19                 THE DISTRICT OF COLUMBIA

20

21

22

Notice Date: 03/25/2019

Deposition Date: 03/19/2019

Deponent: Karen Davis Miller

Case Name: Grzadzinski v. Sessions

Page:Line            Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES: