

# Office of the Inspector General
## U.S. Department of Justice

### OVERSIGHT ★ INTEGRITY ★ GUIDANCE



# Review of Gender Equity in the Department's Law Enforcement Components

**EXHIBIT 20**

Evaluation and Inspections Division 18-03     June 2018

COMPLAINANT 00040



# Executive Summary

*Review of Gender Equity in the Department's Law Enforcement Components*

## Introduction

The U.S. Department of Justice (Department, DOJ) Office of the Inspector General (OIG) initiated this review after receiving several complaints from various sources, including Senator Charles E. Grassley and DOJ employees, expressing concerns about gender discrimination and harassment in the Department's law enforcement components. OIG assessed overall gender equity, based on both gender diversity in the workforce and employees' perceptions of gender equity and discrimination in the four law enforcement components.

It is the Department's policy to provide, ensure, and promote equal opportunity for all employees on the basis of merit. In Human Resources Order DOJ 1200.1, the Department directs every component to take actions to eliminate any policy, practice, or procedure that results in discrimination on the basis of a variety of demographics, including gender. Additionally, DOJ developed the Attorney General's Diversity Management Plan in 2010 to improve diversity among its employees, including the law enforcement staff. The leadership of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Drug Enforcement Administration (DEA); Federal Bureau of Investigation (FBI); and U.S. Marshal's Service (USMS) told us that a diverse workforce, which includes diversity in gender, is important to their mission.

The Office of the Inspector General assessed gender equity in the four law enforcement components from fiscal year (FY) 2011 through FY 2016. We analyzed component workforce demographics and sex-based discrimination complaints, including sexual harassment, and conducted a climate assessment to gauge employees' perceptions about whether all staff have the same career opportunities regardless of gender. As part of our review, we conducted 133 individual interviews as well as 57 focus groups with a total of 228 participants. Additionally, we interviewed the heads of each of the four components to gain their perspectives on the issues related to gender equity. We also deployed an anonymous online survey to all staff members of the four law enforcement components and received 8,140 survey responses, a 15 percent response rate of the total population. Out of the 8,140 responses, 34.4 percent were women, 50.8 percent were men, and 1.5 percent chose "other" or did not select a gender.

## Results in Brief

While 52 percent of all survey respondents reported that their agency had a gender equitable culture, our analyses of survey, focus group, and interview responses by gender and position revealed wide variations in perceptions about equity. One of our most striking findings is that women in Special Agent and Deputy U.S. Marshal (Criminal Investigator) positions consistently reported distinctly more negative perceptions of equity and experiences with differing treatment and discrimination than other staff in the four law enforcement components. These negative perceptions may be influenced by the low percentage of women in leadership and Criminal Investigator positions, promotion selections that reflect an underrepresentation of women, and the staff view that personnel decisions are based on personal relationships more than merit. While the components have taken steps to increase diversity, additional work is needed to address the concerns and negative perceptions related to gender equity and to promote an equitable culture within each component.

*Women Accounted for Only 16 percent of the Criminal Investigators in DOJ's Law Enforcement Components and Held Few Law Enforcement Executive Leadership Positions, and Components Have Taken Limited Actions to Increase the Number of Women in These Positions*

Based on interviews and focus group responses, we found that the representation of women forms an important part of staff perceptions about gender equity. In FY 2016, women composed only 16 percent of the Criminal Investigator population in the four law enforcement components. Women in these components were more likely to be Human Resources Specialists, Financial Specialists, or Program Analysts. Additionally, we found that between FY 2011 and FY 2016, women held few headquarters executive leadership positions and those positions were usually leading administrative or support units rather than operational units. Further, we found that women did not hold many of the top leadership positions in field offices, divisions, and districts.

Leadership of the law enforcement components told us that they were striving to increase the diversity, including gender, of staff to better represent the population the component serves. We found that the components were taking some steps to increase the diversity of their workforce through recruiting. However, the components have not fully identified all the barriers to recruiting women that may be specific to their respective component.

COMPLAINANT 00650



# Executive Summary

*Review of Gender Equity in the Department's Law Enforcement Components*

*Women Were Often Underrepresented in Criminal Investigator Promotions, while the Representation of Women and Men in Professional Staff Promotions Varied by Agency*

We heard from interview and focus group respondents at multiple components that there is a "glass ceiling" for women. We examined the distribution of women at the General Schedule (GS)-13 through 15 levels in all four law enforcement components and found that at DEA, FBI, and ATF the percentage of female Criminal Investigators mostly decreased as the grade level increased. At USMS, the proportion of women in the GS-13 population was more or less comparable to the GS-14 population, and USMS was the only component in which the proportion of women actually increased from GS-14 to GS-15. We believe that our analysis might indicate possible issues at ATF, DEA, and FBI for women advancing into supervisory positions.

Our analysis indicated ATF and DEA female Criminal Investigators were underrepresented in competitive promotions compared to their proportion of the population at the next lower grade level.

We did the same analysis on professional staff promotions and found that at ATF, DEA, and USMS, both genders within different sub-groups were underrepresented in promotions compared to their population size at the next lower GS level.

Receiving a promotion is a mark of success and career achievement. Our analysis of promotions data thus plays a key role in our assessment of gender equity. Numerous interviewees and focus group participants spoke about bias and inequity in promotion selections when describing how gender inequity manifests in the components. Their responses led us to conclude that promotion selections strongly influenced their perceptions of equity overall, and gender equity specifically, in their organization.

*Female Criminal Investigators Frequently Reported Gender Discrimination, and Both Men and Women Believed that Personnel Decisions, Including Promotions, Were Based on Personal Relationships More than Merit*

We found that a majority of male staff, but a minority of female staff, felt their component was gender equitable and/or that gender equity was improving. Specifically, female Criminal Investigators believed that there was ongoing gender discrimination in their agencies or offices. A significant number of women across agencies and position types reported in our survey, interviews, and focus groups that they had experienced gender discrimination and differing treatment in some form,

including in promotions and other workplace opportunities.

Also troubling to us was that all types of staff reported the perception that personnel decisions were driven more by "who you know" than by merit. Our analysis suggests that perceived bias and favoritism in personnel decisions affect staff's perceptions about gender equity. We believe that this could negatively affect staff's trust and belief about equity in an agency and possibly discourage qualified employees from applying for promotion.

We believe that these issues are of significant concern because gender discrimination, and specifically sexual harassment, can result in costs to the component, including reductions in morale and productivity, decreased staff well-being, and monetary costs from settlements of complaints. Focus group participants and interviewees who described their experiences with discrimination and sexual harassment also told us how these experiences negatively affected them personally, including physical illness, isolation, and fearfulness at work.

*Dissatisfaction with and Mistrust about the EEO Process and Fear of Retaliation May Limit the Utility of the Process as a Tool to Address Discrimination*

We found that staff of all genders, positions, supervisory status, and across agencies had negative perceptions about the EEO process. These perceptions included the stigma of filing an EEO complaint, fear of retaliation, lack of confidence or trust in an EEO office or the EEO process, and the significant time commitment involved in the EEO process. The stigma associated with filing an EEO complaint included being labeled as a "troublemaker" or a belief that some people file to cover up poor performance.

Many staff members reported to us that they had experienced discrimination and had not reported it and close to 45 percent of survey respondents said that they would not or were unsure whether they would use the EEO process if they experienced discrimination. We believe that negative perceptions of the EEO process may contribute to underreporting of discrimination and harassment to the EEO office. Underreporting could hinder the components' ability to address individual instances of discrimination and harassment and the conditions that allow such behavior to occur. Further, it could obscure the extent of the problem.

## Recommendations

We make six recommendations to address the concerns and negative perceptions related to gender equity in the law enforcement components.

COMPLAINANT 00651

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

    Background ................................................................................................... 1

RESULTS OF THE REVIEW.................................................................................. 7

    Women Accounted for Only 16 percent of the Criminal Investigators in DOJ's
    Law Enforcement Components and Held Few Law Enforcement Executive
    Leadership Positions, and Components Have Taken Limited Actions to
    Increase the Number of Women in These Positions ...................................... 7

    Women Were Often Underrepresented in Criminal Investigator Promotions,
    while the Representation of Women and Men in Professional Staff
    Promotions Varied by Agency ................................................................. 16

    Female Criminal Investigators Frequently Reported Gender Discrimination,
    and Both Men and Women Believed that Personnel Decisions, Including
    Promotions, Were Based on Personal Relationships More than Merit.......... 23

    Dissatisfaction with and Mistrust About the EEO Process and Fear of
    Retaliation May Limit the Utility of the Process as a Tool to Address
    Discrimination ..................................................................................... 36

CONCLUSION AND RECOMMENDATIONS........................................................ 44

    Conclusion..................................................................................................... 44

    Recommendations ...................................................................................... 45

APPENDIX 1:    THE OIG SURVEY TOOL.......................................................... 47

APPENDIX 2:    METHODOLOGY OF THE OIG REVIEW ...................................... 55

    Standards..................................................................................................... 55

    Interviews and Focus Groups.............................................................. 55

    Survey ....................................................................................................... 56

    Data Analysis ......................................................................................... 57

    Policy and Document Review................................................................ 58

    Prior Work Related to Gender Equity in Federal Law Enforcement
    Agencies ...................................................................................................... 58

APPENDIX 3:    THE SEVEN STAGES OF THE EQUAL EMPLOYMENT OPPORTUNITY
    COMPLAINT PROCESS.......................................................... 59

COMPLAINANT 00652

APPENDIX 4:   THE MERIT PROMOTION PROCESSES OF THE FOUR LAW
ENFORCEMENT COMPONENTS ................................................... 60

APPENDIX 5:   OIG SURVEY CRIMINAL INVESTIGATOR RESPONSES RELATED
TO DIFFERING TREATMENT....................................................... 61

APPENDIX 6:   ATF'S RESPONSE TO THE DRAFT REPORT ................................. 62

APPENDIX 7:   OIG ANALYSIS OF ATF'S RESPONSE........................................ 68

APPENDIX 8:   DEA'S RESPONSE TO THE DRAFT REPORT................................. 74

APPENDIX 9:   OIG ANALYSIS OF DEA'S RESPONSE ........................................ 77

APPENDIX 10: FBI'S RESPONSE TO THE DRAFT REPORT................................. 80

APPENDIX 11: OIG ANALYSIS OF FBI'S RESPONSE ......................................... 83

APPENDIX 12: USMS'S RESPONSE TO THE DRAFT REPORT ............................. 86

APPENDIX 13: OIG ANALYSIS OF USMS'S RESPONSE...................................... 91

COMPLAINANT 00653

# INTRODUCTION

**Background**

In April 2010, the U.S. Department of Justice (Department, DOJ) issued the Attorney General's Diversity Management Plan to improve diversity in the Department, including the four law enforcement components: the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Drug Enforcement Administration (DEA); Federal Bureau of Investigation (FBI); and U.S. Marshal's Service (USMS).[1] The plan, which is in effect as of the time of our review, calls for the Department to create a framework for managing and sustaining diversity in the Department over time. In the plan, former Attorney General Eric Holder stated that workforce diversity (including and beyond gender, race, ethnicity, or disability) makes the Department "stronger, more credible, and more effective."

The Department's efforts to increase diversity are an extension of the U.S. government's overall initiative "to develop and implement a more comprehensive, integrated, and strategic focus on diversity and inclusion" as a key component of human resources strategies for the federal workforce.[2] In the Government-wide Strategic Inclusive Diversity Plan of 2016, which can be found on the U.S. Office of Personnel Management's (OPM) Diversity & Inclusion webpage, OPM defines diversity as "a collection of individual attributes that together help agencies pursue organizational objectives efficiently and effectively."[3] OPM notes: "Government-wide, we have made important progress toward hiring a workforce that truly reflects America's diversity, and we will continue to pursue that goal. But merely hiring a diverse workforce is not enough. We must make our workplaces more inclusive as well."[4]

The DOJ Office of the Inspector General (OIG) initiated this review of gender equity in the Department's law enforcement components after receiving several complaints from various sources, including Senator Charles E. Grassley and DOJ employees, expressing concerns about gender discrimination and harassment in these agencies. Gender equity is commonly defined as fair treatment for both genders, according to their respective needs. This may include equal treatment or treatment that is different but considered equivalent in terms of benefits and opportunities. We assessed gender equity in the law enforcement components according to each gender's numerical representation in the workforce and

---

[1] Eric Holder, Attorney General, memorandum to Heads of Department Components and U.S. Attorneys, Diversity Management Plan for the Department of Justice, April 30, 2010. The Department considers the Federal Bureau of Prisons also to be a law enforcement component; however, we did not include it in this review.

[2] E.O. 13583 on Establishing a Coordinated Government-wide Initiative to Promote Diversity and Inclusion in the Federal Workforce.

[3] OPM, Government-wide Strategic Inclusive Diversity Plan of 2016, July 2016, 6.

[4] OPM, "Diversity & Inclusion," www.opm.gov/policy-data-oversight/diversity-and-inclusion (accessed May 30, 2018).

COMPLAINANT 00654

employees' perceptions about whether they had the same opportunities in their careers compared to others, regardless of their gender. Further, we used the experiences and perceptions about agencies and offices that staff members shared with us during interviews and focus groups to assess components' culture as it relates to gender and equity. Our review examined demographics, gender differences in various datasets, and sex-based (or gender) discrimination complaints from fiscal year (FY) 2011 through FY 2016.[5] Our climate assessment included a combination of complementary qualitative data collection tools— interviews, focus groups, and a survey—to determine staff perceptions of gender equity.

We conducted 133 individual interviews and 57 focus groups with a total of 228 participants. We conducted some of these interviews with headquarters staff early in our review to help us better understand the topics (e.g., the promotions process or the EEO process) we would be covering in the report. We organized each focus group with employees of the same demographic characteristics (such as gender, supervisory status, position type, and agency) so that participants would feel more comfortable speaking. We randomly selected the employees we invited to participate in the focus groups, and participation was optional. We also conducted individual interviews with staff members who requested to speak with us but did not want to be a part of a focus group.

We deployed an anonymous online survey to all staff members of the four law enforcement components and received 8,140 survey responses, a 15 percent response rate of the total population. Out of the 8,140 responses, 34.4 percent were women, 50.8 percent were men, and 1.5 percent chose "other" or did not select a gender. The survey allowed us to obtain input from a wider population, while the interviews and focus groups allowed us to obtain more thorough and detailed information from staff members (see Appendix 1 for the survey tool). Throughout this report, whenever we refer to issues raised by focus group participants and interviewees, the minimum standard is that multiple staff members from at least two of the four sites we visited and two of the four components discussed the topic (unless otherwise stated). However, most of the issues we discuss were raised by staff in at least three agencies and three locations and the survey data provided further support.

In general, research on gender equity includes an assessment of salary data. However, because the federal government General Schedule (GS) pay system is structured so that employees in the same grade level and step receive the same salary and do not negotiate that salary when hired, an analysis comparing employee salaries would not allow for conclusions about gender equity. Such an analysis would require data for how fast individual employees received step

---

[5] The Equal Employment Opportunity Commission (EEOC) defines "sex discrimination" as unfavorable treatment toward someone based on their sex and "gender discrimination" as discrimination based on a person's gender identity, such as transgender status or sexual orientation. EEOC, "Sex-Based Discrimination," https://www.eeoc.gov/laws/types/sex.cfm (accessed May 30, 2018). In this report, we use the term "gender discrimination" to mean discrimination and treatment toward someone based on his or her sex.

increases and the factors that affected the timing of those step increases. According to the DOJ Employment Factbook, men have the same average grade level but higher average steps than women in some positions in the four law enforcement components. However, the components do not track data that would determine the factors that affect those averages. Appendix 2 is a detailed description of the methodology of our review.

Below, we provide background information on several topics related to our discussion of and findings about the state of gender equity. These include the legal foundation for equal employment protection, the Equal Employment Opportunity (EEO) process that employees can use if they feel they have been discriminated against, the promotion processes used in the four law enforcement components, and the workforce demographics of the four law enforcement components.

*Foundation for Equal Employment Protection*

It is the Department's policy "to provide, ensure, and promote equal opportunity in employment for all persons on the basis of merit."[6] Title VII of the *Civil Rights Act of 1964* established the legal framework for governing equal employment in the workplace.[7] In 1969, E.O. 11478 extended the provision for equal employment to federal employees; 28 C.F.R. Part 42 contains the implementing regulations for equal employment in DOJ.[8] Human Resources (HR) Order DOJ 1200.1, Part 4, directs how the Department handles equal employment protection and complaints and outlines procedures for processing, documenting, and reporting of discrimination complaints as well as developing affirmative employment programs.[9] According to the HR Order, management within every component and at all levels is required to take effective actions to eliminate any internal policy, practice, or procedure that results in discrimination on the basis of a variety of demographics, including gender.[10]

---

[6] Human Resources Order DOJ 1200.1, Part 4:  Equal Employment Opportunity, www.justice.gov/jmd/hr-order-doj-12001, June 15, 2015 (accessed May 30, 2018).

[7] EEOC, established in 1965, is the federal agency responsible for enforcing federal laws that make it illegal to discriminate against job applicants or employees on the basis of a person's race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability, or genetic information.  Jacqueline A. Berrien, Chair, EEOC, "Statement on 50th Anniversary of the Civil Rights Act of 1964," www.eeoc.gov/eeoc/history/cra50th/index.cfm (accessed May 30, 2018).

[8] National Archives, "Executive Order 11478—Equal Employment Opportunity in the Federal Government," www.archives.gov/federal-register/codification/executive-order/11478.html (accessed May 30, 2018).

[9] Affirmative employment programs include the multiyear Affirmative Action Program Plan for minorities and women, the Federal Equal Employment Opportunity Recruitment Program, Disabled Veterans Affirmative Action Plan, Affirmative Action Plan for Persons with Disabilities, and any other initiative or program aimed at providing equal opportunity in employment for the purpose of achieving a representative and diverse workforce.  HR Order DOJ 1200.1, Part 4.

[10] HR Order DOJ 1200.1, Part 4.

COMPLAINANT 00656

*EEO Claims Process*

Federal law gives all employees the right to file an EEO complaint if they believe that they have been discriminated against or denied an equal opportunity in the workplace.[11]  Equal employment protections cover many different personnel decisions, including promotions.  DOJ policy requires that complaints of discrimination and sexual harassment be promptly and thoroughly investigated and resolved without reprisal or threat of reprisal.[12]

The Director of the Equal Employment Opportunity Staff in the Justice Management Division (JMD) oversees the Department's discrimination complaints processing system and provides policy, direction, guidance, and assistance to DOJ components.[13]  Eight components, including the Department's four law enforcement components, have their own EEO offices that have the authority to accept and assign for investigation formal complaints of discrimination filed within the component.[14]  The JMD Equal Employment Opportunity Staff has ultimate authority over dismissal of complaints in accordance with Equal Employment Opportunity Commission (EEOC) regulations for all DOJ components, including the eight that have their own EEO offices.

Each component's EEO office has EEO Counselors who receive and process discrimination complaints, conduct informal inquiries into the allegations, and help set up mediation sessions between the complainant and management officials.  EEO offices employ internal or contract investigators to investigate EEO complaints and produce a final investigative report.  After the investigation, the complainant can request a hearing or ask the Department's Complaint Adjudication Office in the Civil Rights Division for a Final Agency Decision, the Department's final decision on the case.  Appendix 3 outlines the seven stages of the EEO complaint process.

---

[11]  42 U.S.C. §§ 2000d–2000d-7; E.O. 12250 on Leadership and Coordination of Nondiscrimination Laws; 45 Fed. Reg. 72995, 3 C.F.R., 1980 Comp., 298.  EEOC, "Overview of Federal Sector EEO Complaint Process," www.eeoc.gov/federal/fed_employees/complaint_overview.cfm (accessed May 30, 2018).

[12]  HR Order DOJ 1200.1, Part 4.

[13]  HR Order DOJ 1200.1, Part 4.

[14]  The other four components are the Executive Office for Immigration Review, the Executive Office for U.S. Attorneys, the Federal Bureau of Prisons, and the Office of Justice Programs.

COMPLAINANT 00657

*Promotion Processes for the Law Enforcement Components*

In this report, we present several analyses of the promotion selections that result from each of the four law enforcement components' unique promotions process. Each component has its own process for promoting Criminal Investigators, which we define as Special Agents at ATF, DEA, and FBI and as Deputy U.S. Marshals (DUSM) at USMS, and for professional staff, which includes all non-Criminal Investigator positions such as Intelligence Analysts, Information Technology Specialists, and Industry Operations Investigators.[15] The four law enforcement components' promotion processes for Criminal Investigators include the following elements:

- application packages that may include an applicant form, a resume, applicant scores on various job-related examinations, applicant interview ratings, overall applicant rankings, or supervisor recommendations to help determine qualification for a position;

- a list of applicants who are deemed qualified for the position based on established qualifications (also called the certified applicant list); and

- a board made up of various supervisors (referred to as a Local Career Board at FBI, a Merit Promotion Board at ATF, and a Career Board at DEA and USMS). Each board reviews applications for multiple Criminal Investigator positions, higher than the level employees reach non-competitively (career ladder), and makes a recommendation for selection.[16]

The promotions processes also vary for professional staff. ATF and DEA use career or promotion boards for professional staff job series promotions, similar to the promotions process for Criminal Investigators. At FBI and USMS, the promotions process for professional staff is similar to the Delegated Examining Unit hiring process, which is often used to hire individuals into the federal government and generally includes an HR-certified applicant list, interviews with the hiring manager, and selection. See Appendix 4 for more information about the four law enforcement components' merit promotion processes.

*The Department's Law Enforcement Component Workforce*

The four law enforcement components' staffs made up 47.6 percent of the Department at the end of FY 2016. Table 1 below presents the workforce and

---

[15] DUSMs include two job series: 0082 (Deputy U.S. Marshals) and 1811 (Criminal Investigators). The 0082 series is unique to USMS and functions the same as the 1811 series. Both series are considered DUSMs, and 0082 DUSMs can convert to the 1811 series upon reaching GS-11.

DEA makes an additional distinction between types of employees: "core" and "non-core." Core employees include Criminal Investigators, Intelligence Specialists, Chemists, and Diversion Investigators. Non-core employees occupy all other positions.

[16] Non-competitive Criminal Investigator career ladder positions go up to GS-12 at USMS and GS-13 at ATF, DEA, and FBI. The head of each component has the authority to override the career board's recommendation.

COMPLAINANT 00658

female staff in each of the law enforcement components, individually and aggregated.

**Table 1**

**DOJ Law Enforcement Component Workforce Data, FY 2016**

|  | ATF | DEA | FBI | USMS | All Four Components |
|---|---|---|---|---|---|
| **Total Workforce** | 5,195 | 8,936 | 37,029 | 5,229 | 56,389 |
| **Number of Female Staff** | 1,670 | 3,172 | 16,038 | 1,269 | 22,149 |
| **Percentage of Female Staff** | 32.1 | 35.5 | 43.3 | 24.3 | 39.3 |

Source:  DOJ Employment Factbook, FY 2016

COMPLAINANT 00659

# RESULTS OF THE REVIEW

**Women Accounted for Only 16 percent of the Criminal Investigators in DOJ's Law Enforcement Components and Held Few Law Enforcement Executive Leadership Positions, and Components Have Taken Limited Actions to Increase the Number of Women in These Positions**

In FY 2016, women made up 51 percent of the U.S. population and over 57 percent of the professional staff (non-Criminal Investigator) population combined in the Department's four law enforcement components (see Table 2 below). However, women made up only 16 percent of the population of the Department's Criminal Investigators (Special Agents and Deputy U.S. Marshals (DUSM)) and they occupied only a few of the Department's Criminal Investigator executive leadership positions between FY 2011 and FY 2016. Each component's leadership told us that they were striving to increase the diversity, including gender, of staff to better represent the population their component serves. Based on interview and focus group responses, we found that the representation of women forms an important part of staff perceptions about gender equity. We agree with component leaders about the importance of diversity at all levels of the component, but we found that the components' actions to reduce the underrepresentation of women were limited.

*Female Criminal Investigators Made Up 16 percent of the Criminal Investigator Population*

We found that, in FY 2016, women in the Department's four law enforcement components made up about 40 percent of the total workforce, but only 16 percent of the Criminal Investigator population (see Table 2 below).[17]

---

[17] We present the data for FY 2016 to be able to compare various datasets and because percentages of women in the Criminal Investigator population of three of the four law enforcement components remained relatively stable between 2006 and 2016. The percentage of women in the general workforce and in the DUSM/Criminal Investigator population decreased slightly during that time.

COMPLAINANT 00660

**Table 2**

**Percentage of Women in the Workforce at ATF, DEA, FBI, and USMS, FY 2016**

| | ATF | DEA | FBI | USMS | All Four Components |
|---|---|---|---|---|---|
| **Percentage of Female Staff in the Total Population** | 32.1 | 35.5 | 43.3 | 24.3 | 39.3 |
| **Percentage of Female Staff in the Criminal Investigator Population** | 13.6 | 10.2 | 19.8 | 10.2 | 16.0 |
| **Percentage of Female Staff in the Professional Staff Population** | 51.8 | 61.6 | 57.3 | 54.4 | 57.3 |

Source: DOJ Employment Factbook, FY 2016

We also found that women in the Department's law enforcement components were more likely to be employed as Human Resource Specialists, Financial Specialists, or Program Analysts than as Criminal Investigators (see Figure 1).

**Figure 1**

**Percentage of Women in Selected Occupations at ATF, DEA, FBI, and USMS, FY 2016**



Criminal Investigators — 16.0%
Compliance Officers — 40.5%
Intelligence Analysts — 53.3%
Management and Program Analysts — 70.6%
Financial Specialists — 77.8%
Human Resources Specialists — 84.1%

Note: Compliance Officers are Diversion Investigators at DEA and Industry Operations Investigators at ATF.

Source: U.S. Department of Agriculture National Finance Center (NFC) workforce data

We identified two law enforcement populations for comparison purposes to the four DOJ law enforcement component populations, based on the number of employees in these populations and their positions: Special Agents in the U.S.

8

COMPLAINANT 00661

Department of Homeland Security at the federal level and Detectives and Criminal Investigators at the state and local levels.[18] Women composed approximately 13 percent of the Special Agent positions at the Department of Homeland Security and 27 percent of all Criminal Investigator and Detective positions at the state and local police and sheriff departments nationwide.[19]

*Women Held Only a Few of the Law Enforcement Components' Executive Leadership Operational Positions at Headquarters and in the Field between FY 2011 and FY 2016*

We found that there were few women in leadership and supervisory positions across all four law enforcement components at both the field and headquarters levels. Overall, between FY 2011 and FY 2016, women held only a few executive leadership positions over headquarters operational units or divisions.[20] Additionally, during our study period, women held only between 6.3 and 11 percent of the top leadership positions in the field across the four law enforcement components. When they did hold field leadership positions, they were seldom in offices, divisions, or districts with a larger staff size.[21] During FY 2016, none of the components had more than 18 percent women in its GS-15 Criminal Investigator positions. Further, the individual components varied significantly in their percent of

---

[18] DOJ has the highest number of Criminal Investigator, or 1811, positions of all federal agencies. The Department of Homeland Security, with just under half the number of 1811 positions as DOJ, has the second highest number of all federal agencies and is most comparable to DOJ with respect to the size of the agency and number of Criminal Investigator positions. Within state and local law enforcement, Criminal Investigator and Detective positions are most comparable to DOJ Criminal Investigator duties. When aggregated on a national level, these state and local Criminal Investigators and Detectives represent a large number of people.

[19] U.S. Office of Personnel Management (OPM), "FedScope: Federal Human Resources Data," www.fedscope.opm.gov (accessed May 31, 2018). Bureau of Labor Statistics, "Women in the Labor Force: A Databook," April 2017, www.bls.gov/opub/reports/womens-databook/2016/home.htm#table-11 (accessed May 31, 2018).

[20] We identified two types of leadership positions that Criminal Investigators can hold at headquarters. Positions that lead operational units or divisions overseeing criminal investigations or field operations, and positions that lead units providing support or administrative assistance. We heard through our interviews and focus groups that the leadership positions over operational units or divisions were perceived to have a higher status than administrative leadership positions. We acknowledge that administrative leadership positions can provide useful experience about the agency overall; however, staff told us that holding positions in certain operational units or divisions are more likely to contribute to career growth.

[21] We used the number of staff at all field offices, field divisions, and districts and calculated the median and mean of staff size for each component. We then identified the ATF field divisions and DEA and FBI field offices as large if the staff size was higher than the median and small if the staff size was smaller than the median. The median staff size for ATF was 151, for DEA was 293, and for FBI was 264. The USMS districts' staff sizes were so varied that the median or mean did not provide a valid point for separation, so we selected 100-person staff size as the cutoff point. For this analysis, we did not consider the three FBI field offices that are led by an Assistant Director In Charge (ADIC) because those field offices have larger staff sizes and are presented in analysis elsewhere in this section. Therefore, we classified 13 ATF field divisions, 10 DEA field divisions, 29 FBI field offices, and 11 USMS districts as large.

COMPLAINANT 00662

female staff who held Senior Executive Service (SES) positions during FY 2016. See Table 3.

## Table 3

### Percentage of Women in Leadership in the Department's Law Enforcement Components, FY 2016

| | ATF | DEA | FBI | USMS | All Four Components |
|---|---|---|---|---|---|
| **Percentage of Female Staff in GS-15 Positions** | 28.5 | 25.8 | 32.1 | 18.3 | 29.4 |
| **Percentage of Female Staff in GS-15 Criminal Investigator Positions** | 10.7 | 5.8 | 17.7 | 8.8 | 13.3 |
| **Percentage of Female Staff in SES Positions** | 14.6 | 16.6 | 22.9 | 27.8 | 20.9 |

Note:  Female staff in GS-15 and SES positions include 1811 (Criminal Investigation) and non-1811 series.

Sources:  NFC data and DOJ Employment Factbook, FY 2016

We also found that the headquarters executive leadership positions women held were usually in administrative or support rather than operational units.[22] Specifically, women held 81 of the 498 headquarters executive leadership positions that were available over our 6-year study period.[23]  Only 14 of these 81 positions were overseeing operational work.  Women at DEA held two of the agency's headquarters executive leadership positions, including the DEA Administrator, five times over the 6-year study period.  Women at USMS held three of the executive leadership positions, including the USMS Director, eight times during the study period.  At FBI, for 1 year, one woman held one headquarters executive leadership position that was responsible for overseeing operational work.  ATF did not have any women in a headquarters leadership position during this time.

We also examined how many women held Special Agent in Charge (SAC) and Chief DUSM positions, the top leadership positions in the field, during our study

---

[22]  To be able to compare equivalent positions across the four components, we define the headquarters executive leadership positions as Director, Deputy Director, Chief Counsel, and Assistant Director at ATF and USMS and as Director, Deputy Director, Associate Deputy Director, Executive Assistant Director, Chief Counsel, Chief of Staff, and Assistant Director at FBI.  The equivalent positions at DEA are Administrator, Deputy Administrator, Assistant Administrator, Chief Counsel, and Chief.  ATF also considers the Deputy Assistant Director and Deputy Chief Counsel positions to be executive headquarters positions overseeing operational work, and there were no women holding these positions during our study period.

[23]  At ATF, DEA, and USMS, there were 14 headquarters executive leadership positions available each year, from FY 2011 through FY 2016, for a total of 84 positions at each component. FBI had 41 headquarters executive leadership positions available each year, for a total of 246 positions over the same 6-year period.

COMPLAINANT 00663

period.[24]  Three of the FBI field offices are headed by an Assistant Director in Charge (ADIC), with SACs that report to the ADIC.[25]  Over our study period, we found that women held one of the three FBI ADIC positions during 3 fiscal years: 2011, 2013, and 2016.  The percentages of field leadership positions held by women in each of the four law enforcement components from FY 2011 through FY 2016 are in Table 4.  It is important to note that at DEA, the 6.8 percent represented only one female SAC in all fiscal years except FY 2012, when DEA had two female SACs.  Similarly, the 8.7 percent of ATF SAC positions represents just two female SACs in FY 2011, FY 2012, FY 2013, and FY 2015 and three female SACs in FY 2016.  In FY 2014, ATF did not have any female SACs.

### Table 4

#### Percentage of Female SACs or Chief DUSMs, By Component, FY 2011–FY 2016

| Agency | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | Over All Years |
|---|---|---|---|---|---|---|---|
| ATF | 9.1 | 9.1 | 8.7 | 0.0 | 9.1 | 15.8 | 8.7 |
| DEA | 7.1 | 14.3 | 5.9 | 7.1 | 4.5 | 4.5 | 6.8 |
| FBI | 16.7 | 16.9 | 19.7 | 13.4 | 10.8 | 7.1 | 14.2 |
| USMS | 6.4 | 5.3 | 6.4 | 6.4 | 5.3 | 4.3 | 5.7 |

Notes:  We calculated the percentages using the total number of SAC/Chief DUSM positions that were filled each fiscal year and the number that were held by women.  Some positions were held by two different persons or were not filled at all during a fiscal year.  Therefore, the total number of positions are not equal each fiscal year.

Source:  OIG analysis of law enforcement component data

When we analyzed the field offices, field divisions, and districts by size of staff, we found that very few women headed larger offices, in terms of number of staff, between FY 2011 and FY 2016.  Of the field offices, field divisions, and districts we classified as large, one at ATF was led by a woman, one at DEA was led by two different women at different times, and two at USMS were led by women.  Of the 29 FBI field offices we classified as large, 7 were headed by female SACs, but only in 2 of the years of our study period, FY 2011 and FY 2013.  Further, the number of large FBI field offices headed by female SACs steadily decreased, from seven in FY 2013 to one in FY 2016.

*Workforce Diversity Contributes to Staff Perceptions about Gender Equity and Is Important to Component Leadership*

We found that workforce diversity is important to staff and leadership and helps contribute to perceptions about equity in the components.  When we asked

---

[24] ATF has 25 field divisions, DEA has 21 domestic field offices, FBI has 56 field offices, and USMS has 94 districts.

[25] The Washington, D.C.; New York City; and Los Angeles FBI field offices are headed by an ADIC.

COMPLAINANT 00664

interviewees and focus group participants to describe the "state of gender equity" in their component, many men and women immediately mentioned the composition of the workforce by gender or described the population as more male dominated. Interviewees and focus group participants often focused on the representation of women in supervisory and leadership positions and indicated that low or nonexistent representation in these positions affected their perception of gender equity. When we asked leaders and supervisors specifically why diversity is important, they said that diversity brings varied skills, experience, expertise, and perspectives to the component and results in the component reflecting the communities it serves, which can increase the component's credibility. Focus group participants and interviewees also noted that women may bring to law enforcement a different skill set that relies more on communication and can be useful for defusing potentially violent confrontations. For example, a DEA SAC told us he believes that women are able to handle tense and difficult law enforcement situations in different ways than men and as a result are often able to deescalate a situation before it becomes physical.

The acting USMS Director recognized the significance of having women at all levels of the organization, including leadership, noting that he wanted to ensure that all new employees were able to look up the chain of command and see leaders demographically like themselves so they could know that they could advance as well. The acting ATF Director said that it was important to diversify the agency, but he further stated "diversity is not enough; people have to feel they are included" in all aspects of the component.

*The DOJ Law Enforcement Components' Actions to Increase the Number of Women in Criminal Investigator Positions Were Limited*

We identified several factors that may have hindered the law enforcement components' efforts to reduce the underrepresentation of women in Criminal Investigator positions. These factors included lack of awareness of the component-specific barriers to attracting women to law enforcement, limited targeted recruitment of women, lack of hiring authorities, and incomplete hiring data. Effective recruitment efforts are critical for diversifying law enforcement agencies at all levels because supervisors and leaders are almost always drawn from the pool of existing staff members.

### Component Recruitment Efforts May Not Effectively Overcome Barriers to Attracting Women to Law Enforcement

Many interviewees, focus group participants, and heads of human resources divisions expressed their belief that the requirements of a Criminal Investigator position, combined with the overall cultural view of law enforcement and gender roles, are significant barriers to recruiting women. For example, they noted that the inflexible nature of law enforcement work, unpredictable work hours, and the federal law enforcement requirement to periodically move for career advancement may be less attractive to women because they are often their family's main

COMPLAINANT 00665

caregiver.[26]  Additionally, staff members in numerous focus groups and interviews mentioned that the view of law enforcement as aggressive and male dominated was a barrier to recruiting women.  During an interview, representatives from the DEA Female Agents Advisory Board described a recruitment brochure that had pictures of Special Agents in SWAT-type uniforms and equipment.  They believed these types of images could deter some women from applying to DEA because they may not see themselves doing this specific aspect of Criminal Investigator work and may not realize that there are other activities and duties of a DEA Criminal Investigator.

We reviewed each of the four law enforcement components' recruitment activities and identified several weaknesses that may limit their ability to recruit diverse applicants, including women.  First, not all of the components had recruitment plans that included goals or strategies specifically for recruiting women.  Second, the components' outreach and targeted recruitment efforts were not fully developed or implemented.  Further, none of the components had evaluated its efforts to see whether they were effective in increasing the number of women in its workforce.  Finally, Human Resources Directors/Administrators and other staff from each of the law enforcement components identified the same general barriers to recruiting women, as mentioned above, but did not specifically identify which barriers applied to their individual component, even though components' distinct missions and types of work may result in different barriers.  Table 5 below compares and highlights the differences among the diversity recruitment efforts that ATF, DEA, and FBI had in place during our study period.  We did not include the USMS in the table because unlike ATF, DEA, and the FBI, the USMS does not have the excepted service hiring authority that would allow it to address special or critical needs without having to go through the traditional competitive hiring process.

---

[26] Interviewees said that the higher percentage of female staff in non-Criminal Investigator positions, such as Intelligence Analysts, Diversion Investigators, and Inspectors, could mean that these types of positions are more attractive to women.  These positions are considered law enforcement but do not have the same constraints as Criminal Investigator positions.

COMPLAINANT 00666

**Table 5**

**Diversity Recruitment Efforts at ATF, DEA, and FBI**

| | ATF | DEA | FBI |
|---|---|---|---|
| Has a Written Agency Recruitment Plan | Yes | No | No |
| Agency Recruitment Plan Has Goals for Diversity Recruiting | Yes | No | No |
| Agency Recruitment Plan Has Goals for Recruiting Women | Yes | No | No |
| Has Numerical Goals for Diversity Recruiting Outside of a Formal Plan | Yes | Yes | Yes |
| Has Numerical Goals for Recruiting Women Outside of a Formal Plan | No | Yes | Yes |
| Has Goals for the Number of Female Criminal Investigator Applicants | Yes | No | Yes |
| Responsibilities for Recruitment Activities Are Shared between Headquarters and the Field | Yes | No | Yes |
| Attends Outreach Events at Universities or Advocacy Groups for Diversity Recruiting | Yes | Yes | Yes |
| Conducts Diversity Recruitment Events | Yes | Yes | Yes |
| Develops Targeted Recruitment Based on Community Demographics | No | No | Yes |
| Evaluates Recruitment Efforts | No | No | No |

Note: The analysis for the table included a review of documents and interview responses from the three components.

Source: OIG analysis

　　USMS does not have a recruitment plan because it cannot target recruiting to specific populations without excepted service hiring authority. When USMS needs to hire a DUSM, it has to issue the job announcement nationwide. The Office of Personnel Management (OPM) automatically culls the list of applicants using certain criteria, including giving priority to veterans (known as veterans' preference). The USMS Human Resources Division Assistant Director told us that this in effect limits USMS to hiring from the veteran population, which is predominately male. ATF, DEA, and FBI can use excepted service hiring authority for certain positions and issue position announcements in specific locations or cities (based on need), which increases the diversity of the applicant pool. In March 2018, USMS told us that the Attorney General had signed a memorandum to the White House requesting excepted service hiring authority for USMS but had not yet received a response. USMS's Human Resources Division, Equal Employment Opportunity (EEO) Office, and Training Division have begun developing strategies for targeted recruitment in anticipation of obtaining excepted service hiring authority.

COMPLAINANT 00667

After our fieldwork was completed, FBI and DEA told us that they had taken additional steps to increase their diversity recruitment efforts. FBI told us that in FY 2017 each FBI field office implemented its own Field Office Recruitment Plan containing numerical targets and strategies for recruiting women, particularly female Criminal Investigators. The field office plans also have targets and strategies for recruiting in other diversity categories, such as race. FBI said that while it does not have a written component-wide recruitment plan, the Field Office Recruitment Plans align FBI's National Recruiting Priorities with the local goals and characteristics of the field offices to compose an overall strategy for diversity recruiting. Additionally, DEA created an agency-wide recruitment strategy, titled One DEA, for Criminal Investigators. Effective for FYs 2019–2023, One DEA outlines a plan to target recruitment for Criminal Investigators (which could include female investigators or other diverse populations based on the characteristics of the field divisions) and to conduct diversity recruitment events. DEA told us that both the field and headquarters will have roles and responsibilities in the recruitment strategy. DEA does not have a component-level recruitment plan for job series other than 1811 or Criminal Investigators. FBI's and DEA's plans are positive steps forward for diversity recruitment, but they are still in the early stages.

We acknowledge that the Department's law enforcement components have taken some steps to increase the diversity of their workforces through recruiting. However, it is not clear that their efforts have been designed to overcome the barriers to attracting women to federal law enforcement generally or to each component respectively. For efforts to recruit women to be effective, we believe that they must take into account, and offer answers to, the specific reasons women may have for not applying for these positions. As the USMS acting Director told us, "I wish I could survey the women we recruited who decided not to apply to USMS to find out [the reasons] why they made that decision. Then we could [have strategies] to address those reasons."

### Lack of Applicant and Hiring Data Inhibits Evaluation of Recruitment Efforts

As we discussed above, to be effective, recruitment efforts must be targeted and should be evaluated to determine whether the efforts are accomplishing what the components intended. One challenge components may have in doing this is a lack of demographic specifics in applicant and hiring data. In attempting to analyze applicant and hiring data for our review, we found that no component could provide applicant demographic data and only DEA was able to provide hiring data that included demographic information, such as gender, for our study period.[27] Part of the challenge for the components is that the federal government does not require applicants to answer demographic questions, making applicant data incomplete. Further, hiring data could be unreliable because of the same federal government rules—employees are not required to disclose their gender on their onboarding

---

[27] ATF and USMS were unable to consistently and accurately distinguish staff who were newly hired from those who were already employed but filled a vacancy. Due to the technical challenges FBI encountered while transferring to a new information technology system, it could not provide applicant and hiring data until later in our review. We could not analyze hiring data because reliable and comparable data was not available from all components.

Human Resources paperwork. To track a new employee's gender, a component would have to transfer any voluntarily disclosed demographic information from its hiring system to its personnel system or manually input the information into the personnel system. In October 2017, the DEA Human Resource Division Assistant Administrator told us that to help evaluate recruitment efforts, in the future she wants to determine how many of the applicants who attend recruitment events are eventually hired by DEA. The other three law enforcement components indicated they would like to be able to track hiring data to evaluate recruitment efforts. However, if the components cannot analyze applicants or those selected for a position by demographic characteristics, they cannot effectively evaluate the success of their recruitment efforts.

## Women Were Often Underrepresented in Criminal Investigator Promotions, while the Representation of Women and Men in Professional Staff Promotions Varied by Agency

Our analysis of promotions data played a key role in our assessment of gender equity because receiving a promotion is a mark of success and career achievement. For the period of our review, we found that the share of promotions that men and women received did not always match the population of potential applicants in the component.[28] While we identified several areas of disparity within GS-level Criminal Investigator and professional staff promotions, the most substantial area of disparity we identified was in female Criminal Investigator promotions at DEA and ATF. And, although our analysis focused on GS-level promotions, an FBI study identified a concern with an underrepresentation of female Special Agents at the SES level.[29] Additionally, we observed that in each of the four components there were many Criminal Investigator certified applicant lists (certs) that had no women on them. Finally, regarding professional staff, at ATF, DEA, and USMS we found that women and men sometimes did not receive promotions comparable to their population size at the preceding GS level.

Numerous interviewees and focus group participants spoke about perceived inequities in promotion selections when asked how they believed gender inequity manifests in their agency. Their responses led us to conclude that promotion selections strongly influenced their perceptions of equity overall, and gender equity specifically, in their agency. While it was not within the scope of our review to determine whether individual promotion selections were based solely on merit, we believe that regardless of whether a particular selection was objective or not, the

---

[28] We evaluated gender equity in promotion selections based on promotions data provided by the four law enforcement components. We did not review individual promotion selections to evaluate, either individually or systemically, overall fairness in the promotions process.

The components were not able to provide the genders of all applicants to each vacancy, therefore we used the population of the GS level directly below the vacancy as a best estimate for the potential applicant pool. The absence of applicant data limits our ability to determine the exact difference between the percentage of women who applied for each promotion and the percentage of women who were promoted.

[29] FBI, *Leadership Diversity Workforce Study: SES Selection Analysis (FY14–FY16)*, (October 2016). We did not analyze SES promotions data because it was inconsistent across components.

disparities we found in the thousands of promotion selections we analyzed could be contributing to staff perceptions about fairness in personnel decisions and about gender equity. Moreover, as we discuss later in the report, the perception of fairness in promotions is an issue for all of the law enforcement components to consider because of views throughout these components that the promotions processes are biased and unfair. Based on the survey and focus group responses discussed below, we believe that such negative perceptions could result in qualified staff members not applying for promotions and could adversely affect employee morale and, ultimately, diversity in all levels of component leadership.

*Women Were Underrepresented in Criminal Investigator Promotions at ATF, DEA, and FBI*

We analyzed GS-level Criminal Investigator certs, promotion selections, and workforce data at each of the four law enforcement components and identified several disparities indicating that women were underrepresented in promotion selections between FY 2011 and FY 2016. First, at ATF and DEA, female Criminal Investigators were underrepresented in competitive promotions compared to their proportion of the population at the next lower grade level, which is the potential applicant pool. Second, our data analysis may indicate that women encounter difficulty advancing into Criminal Investigator supervisory positions at ATF, DEA, and FBI. Lastly, we observed that each component had a substantial percentage of certs for first- and second-line supervisory positions that contained no women and we note that this may contribute to the underrepresentation we found for women in Criminal Investigator promotions.

### Women Were Underrepresented in ATF and DEA Criminal Investigator Promotions

We found, in general, that the share of promotions men received almost always equaled or exceeded their share of the population at the next lower grade level but that the share of promotions women received was usually less than their share of the population at the next lower grade (see Table 6 below). We used the next lower grade as a best estimate for the potential applicant pool. We noted the largest disparities in DEA promotions to GS-14 and in ATF promotions to GS-15. The lack of GS-15 Criminal Investigator promotions for women was particularly evident at ATF during FY 2014, when only 1 woman was selected for promotion out of 26 selections. In FY 2011 and FY 2016, no women were selected out of 5 and 18 selections, respectively, and from 2011 to 2016 a total of only 6 women were selected for GS-15 Criminal Investigator promotions.

COMPLAINANT 00670

**Table 6**

**Average Percentage of Criminal Investigator Populations and Promotions by Gender and Grade at ATF, DEA, FBI, and USMS, FY 2011–FY 2016**

| Grade Populations and Promotions | ATF | | DEA | | FBI | | USMS | |
|---|---|---|---|---|---|---|---|---|
| | F | M | F | M | F | M | F | M |
| GS-12 Population | | | | | | | 9 | 91 |
| GS-13 Promotions | | | | | | | 10 | 90 |
| GS-13 Population | 13 | 87 | 11 | 89 | 20 | 80 | 12 | 88 |
| GS-14 Promotions | 9 | 91 | 7 | 93 | 17 | 83 | 11 | 89 |
| GS-14 Population | 12 | 88 | 6 | 94 | 17 | 83 | 11 | 89 |
| GS-15 Promotions | 5 | 95 | 6 | 94 | 16 | 84 | 14 | 86 |

Note:  We did not include data for GS-12 and 13 positions at ATF, DEA, and FBI because their competitive promotion process does not begin until the GS-14 level.  The USMS process begins at the GS-13 level.

Source:  OIG analysis of ATF, DEA, FBI, and USMS promotions data and NFC data

Decreasing Numbers of Female Criminal Investigators at Progressively Higher GS Levels May Support Staff Perceptions About a Glass Ceiling at DEA and Potential Issues for Women at ATF, DEA, and FBI to Advance into Supervisory Positions

We examined the distribution of women in the population at the GS-13 through 15 levels in all four law enforcement components to assess whether women may have faced particular difficulty moving into supervisory positions.  We found that at ATF, DEA, and FBI the percentage of females in the Criminal Investigator population generally decreased as the grade level increased, while the percentage of males generally increased.[30]  We also heard from interviewees and focus group respondents at those three components that they believed there was a "glass ceiling" for women that they could not advance past.  Unlike the other components, at USMS, the proportion of women at Grades 13 and 14 were more or less comparable.  Further, USMS was the only component in which the proportion of women actually increased from GS-14 to GS-15 in 5 of the 6 years of our study period.

---

[30]  We analyzed each law enforcement component's workforce data by grade and by gender in the competitive grades, over our 6-year study period, to observe changes in the proportions of men and women.

COMPLAINANT 00671

At DEA, the decrease of the percentage of female Criminal Investigators in the population from the GS-13 to the GS-14 levels was especially pronounced, which may indicate that female DEA Criminal Investigators face impediments to becoming supervisors and may support staff perceptions about a glass ceiling for women. We found that the percentage of female DEA Criminal Investigators decreased by almost half from GS-13 to GS-14 in each year of our study period (FY 2011–2016). There was more consistency in the proportions of women in the GS-14 and GS-15 Criminal Investigator populations, and it appears that once women became first-line supervisors, they were able to move up to the GS-15 positions consistent with their proportion of the GS-14 population, which was similar to their male counterparts.

---

**FBI's Study on SES Promotions**

FBI's Diversity Executive Council, a group of 19 executives who serve as the "Champions" for the FBI's diversity committees, expressed concerns about the lack of women in executive leadership. As a result, in October 2016, the FBI conducted a study on the female representation in its higher ranks. Among other things, the study found that women were not being selected for SES Special Agent promotions. The FBI determined that the inequity in SES promotions was not due to a lack of applicants but appeared to be due to potential selection bias.

Following this study, at the direction of former FBI Director James Comey (and continued by the current FBI Director, Christopher Wray), the FBI launched an SES mentorship program in May 2017 that in part encouraged SES leaders to select a mentee of a different gender, ethnicity, or race. In March 2018, FBI reported that 92 percent of SES employees were serving as mentors. According to the Diversity and Inclusion Section Chief, FBI's goal is 100 percent SES participation.

Source: FBI, *Leadership Diversity Workforce Study*

---

The FY 2011–2016 population data for FBI and ATF indicate that women in these components may be encountering difficulty moving into first-line supervisory positions and, additionally, women at ATF may have difficulty moving from a first-line to a second-line supervisor position. At both FBI and ATF, there was a decrease in the proportion of women in the GS-13 population compared to the GS-14 population, although it was less pronounced than the decrease at DEA discussed above. At FBI, the proportion of female Criminal Investigators slightly increased or remained the same between the GS-14 and GS-15 populations throughout our study period. At ATF, the proportion of women in the population became somewhat smaller as the grades increased in 4 of the 6 years of our study period.

We note that many factors, such as differing rates of men and women applying for promotions or differing qualifications, may contribute to differences in the number of promotions that men and women received, and it was beyond the scope of our review to assess these other factors. However, our analyses, supported by an FBI study on SES promotions (see the text box), indicate that in some components, and at certain levels, women may experience more difficulty than men in receiving competitive service Criminal Investigator promotions. Our review of certs shows that some women applying for GS-14 and GS-15 positions were being rated as qualified, so their underrepresentation in promotions does not

COMPLAINANT 00672

appear to have been due solely to a lack of qualified applications or a lack of interest.[31]

### Each Component had a Substantial Percentage of Certified Applicant Lists for Supervisory Positions That Did Not Contain Any Women

We also analyzed the certs for each of the first- and second-line supervisory vacancies in our study period. Generally, at each of the four components, women were selected when there were more of them on the cert than men, and vice versa. However, we observed that at ATF and DEA there was a higher percentage of GS-14 and GS-15 Criminal Investigator certs that contained no women.[32] The percentages of Criminal Investigator certs without women was lower at FBI and USMS, but it was still around a third of the total number of lists. Table 7 below shows the numbers and percentages of women on the certs in the competitive grades for each component.

---

[31] The promotions data included all applicants who were qualified to make the cert for each open position, but we did not evaluate individual applications to determine whether applicants were more competitive based on specialized experience or assignments.

[32] Certified applicants are individuals who applied for and were considered eligible for a promotion prior to the determination of their qualification status. The qualification status is a category rating such as "well qualified" or "highly qualified" based on certain knowledge, skills, and abilities that could be expected to enhance performance in a position. OPM, "Category Rating Policy," www.opm.gov/policy-data-oversight/human-capital-management/hiring-reform/reference/categoryratingpolicytemplate.pdf (accessed May 31, 2018).

COMPLAINANT 00673

## Table 7

### Distribution of Certified Applicant Lists for First- and Second-Line Criminal Investigator Supervisor Vacancies, by Percentage of Women on the Certs, FY 2011–FY 2015

| | Certs with No Female Applicants | Certs with a Percentage of Female Applicants | | | | | | Total Number of Certs |
|---|---|---|---|---|---|---|---|---|
| | | 1 to 10% | 11 to 20% | 21 to 30% | 31 to 40% | 41 to 50% | 51% or greater | |
| **ATF** | 72.4% (268) | 0.5% (2) | 15.1% (56) | 3.5% (13) | 4.1% (15) | 2.2% (8) | 2.2% (8) | 370 |
| **DEA** | 55.3% (745) | 16.6% (224) | 22.1% (297) | 3.6% (48) | 1.7% (23) | 0.7% (9) | 0.0% (0) | 1,346 |
| **FBI** | 36.8% (1,973) | 7.2% (388) | 22.8% (1,221) | 14.5% (778) | 10.2% (549) | 5.3% (287) | 3.2% (171) | 5,367 |
| **USMS** | 32.5% (314) | 25.5% (238) | 29.6% (276) | 7.5% (70) | 2.4% (22) | 1.1% (10) | 0.4% (4) | 933 |

Notes: The data for this table includes vacancies for the GS-14 through GS-15 positions at ATF, DEA, and FBI and the GS-13 through GS-15 positions at USMS, excluding the Chief DUSM positions. The competitive process begins at GS-14 for ATF, DEA, and FBI and at GS-13 for USMS. We included only lists that clearly identified all applicants' genders. DEA data does not include vacancies that were canceled.

Source: OIG analysis of ATF, DEA, FBI, and USMS promotions data

The number of women on any certified applicant list could have resulted from myriad factors, such as whether women applied to or qualified for the position. While we do not know the reasons why there are so many certs with no women, it could be contributing to the underrepresentation of women at the GS-14, GS-15, and SES levels at all four components. The acting DEA Administrator acknowledged that there was a low number of women in senior leadership and noted that, to address those disparities, DEA needed more women in GS-14 positions. The acting ATF Director also noted that there were not many women in the pipeline to become GS-15s at ATF. Similarly, the FBI Director commented that he could not automatically "have women in leadership." He said that qualified women need to be in the pipelines now to see changes in the future. If the components are not able to determine, and address, the reasons why women are not on the certs for first- and second-line supervisor vacancies, we believe that they will encounter difficulty increasing the diversity of their leadership.

*Male and Female Professional Staff at ATF, DEA, and USMS Did Not Always Receive Promotions Comparable to Their Population Size at the Next Lower GS Level*

We conducted the same analysis on professional staff promotions as we did on the Criminal Investigator promotions. We compared the proportion of women and men selected for promotions with the population size by gender at the next lower grade level. We found that at ATF, DEA, and USMS, both female and male

COMPLAINANT 00674

professional staff did not always receive promotions comparable to their population size at the next lower GS level.[33]  Below, we discuss the four disparities we found.

On average, over our 6-year study period, men at ATF made up only 52 percent of the GS-14 professional staff population but received 68 percent of the GS-15 professional staff promotions. One ATF focus group participant said that the senior tier had been male dominated since she started at the bureau almost 30 years before. Other ATF focus group participants echoed that sentiment and asserted that there should be more women in upper management. While we did not have the data necessary to determine why women were underrepresented in GS-15 professional staff promotions, our analysis of certified applicants confirms that women applied for these positions and made the certs.

We also found disparities among DEA's non-Criminal Investigator promotions, indicating that women were underrepresented in promotions for Intelligence Specialists, Chemists, and Diversion Investigators ("core" positions other than Criminal Investigator) and men were underrepresented in professional staff promotions (professional staff are known as "non-core" positions at DEA).[34] Specifically, from FY 2012 through FY 2016, women made up 54 percent of the GS-13 Intelligence Specialists, Chemists, and Diversion Investigators but received an average of only 47 percent of the GS-14 promotions for those positions.[35]  During FYs 2014, 2015, and 2016 in particular, women received notably low percentages of these promotions—ranging from 38 percent to 41 percent. This suggests that women working at DEA as Intelligence Specialists, Chemists, and Diversion Investigators may have experienced challenges similar to female Criminal Investigators in achieving supervisory positions.

Over the same time at DEA, on average, men made up 31 percent of the professional staff workforce but received only 25 percent of these promotions across all grades. For supervisory promotions, men made up 48 percent of the GS-13 professional staff population but received an average of only 38 percent of the GS-14 promotion selections. We did not hear complaints from men in focus groups and interviews about their lack of ability to advance in the professional staff series, but the certified applicant data was not available to determine the number of men applying for these jobs.[36]

At USMS, men were sometimes underrepresented in professional staff promotions. On average, men at USMS made up about 35 percent of the professional staff workforce from FY 2011 through FY 2016 and received an average

---

[33] We could not fully analyze FBI's professional staff promotions because FBI was able to provide only FY 2016 data for these types of promotions.

[34] Staff at DEA are divided into two categories:  "core" and "non-core." Core positions include Criminal Investigators, Intelligence Specialists, Chemists, and Diversion Investigators. Non-core positions include all other job types. We analyzed Criminal Investigator data separately from the core series analysis.

[35] DEA was not able to provide FY 2011 data for professional staff promotions.

[36] DEA was able to provide only non-Criminal Investigator certified applicant data for FY 2016.

                                                    COMPLAINANT 00675

of 30 percent of the promotions across all professional series, at all grades. Unfortunately, USMS was unable to provide certified applicant data for professional staff promotions, so we were unable to determine the degree to which men were applying for these positions and thus were unable to determine whether gender bias could have played a role in the underrepresentation of men in GS-15 professional staff promotions.

### Female Criminal Investigators Frequently Reported Gender Discrimination, and Both Men and Women Believed that Personnel Decisions, Including Promotions, Were Based on Personal Relationships More than Merit

Fifty-two percent of all survey respondents reported that their agency had a gender equitable culture. However, when we analyzed the responses by gender, we found that men and women had very different responses. While 63 percent of men reported that their agency had a gender equitable culture, only 40 percent of women and, more specifically, only 33 percent of female Criminal Investigators, reported that their agency was gender equitable. Additionally, 22 percent of all female survey respondents and 43 percent of female Criminal Investigators responded that they had experienced some form of gender discrimination during the previous 5 years. Further, many female staff, especially Criminal Investigators, believed that they were treated differently at their office or agency based on their gender.

Throughout our review, we learned that perceptions about gender equity depended largely on a staff member's position type; duty station; and, most important, gender.[37] Because of this wide variation in response patterns, it is difficult to make one broad statement to summarize perceptions about gender equity for all employees across the four components. We present staff perceptions about gender equity to help paint a more complete picture of the components' culture as it contributed to the staff's view of the state of gender equity.[38]

While Criminal Investigators and professional staff of both genders reported witnessing or experiencing differing treatment based on gender at their agency or office, female Criminal Investigators reported directly experiencing more frequent and negative instances of gender-based treatment than all other staff members. And while many men told us that they had never thought of the issue of gender equity and did not believe that women were treated differently, women, especially female Criminal Investigators, often described examples of discrimination and gender bias in ways that demonstrated how important and personal this topic was

---

[37] In focus groups, interviews, and the survey, men of all position types had a more positive outlook on gender equity than women did. An analysis of the survey responses indicates that the disparity in outlook between men and women may be greater for employees in Criminal Investigator positions than for other position types.

[38] Whenever we refer to issues raised by focus group participants and interviewees, the minimum standard is that multiple staff members from at least two of our four sites and two of the four components discussed the topic (unless otherwise stated). However, most of the issues we discuss in this section were raised by staff in at least three agencies and three locations. For information on our four sites, see Appendix 2.

to them. Many female staff members referred to their component as "male dominated" or having a "macho" culture, which they believed negatively affected them. For example, women said they were treated differently and selected less often for promotions and other career-enhancing opportunities as a result of this culture. A female Criminal Investigator from DEA said that she accepted the "male-centered" culture at DEA because she was in her "dream job." However, she felt that the culture made women feel they had to change who they were to be accepted by men and get equal opportunities.

The stark contrast between men's and women's views about treatment based on gender is further evident in the survey responses to questions about which gender was treated more favorably. Female survey respondents believed that men were treated more favorably in a number of career-enhancing opportunities, while most male survey respondents believe that both men and women are treated equally. Appendix 5 includes a series of survey questions and Criminal Investigator responses, by gender, related to differing treatment.

We also identified one negative perception about differing treatment that staff members across agencies, position types, and genders held, which is that personal relationships, or "who you know," at an agency had a greater impact on a staff member's career than merit. According to our interviewees and focus group participants, this often took the form of a component-level "good ol' boys club" (the club), which they believed had a major influence on organizational decisions.

We found that these perceptions of differing treatment based on gender or personal relationships negatively influenced staff's perception of gender equity and equity overall at their agencies or offices. We believe that these perceptions can result in negative consequences to the components and their employees in several ways. First, the perception that personnel decisions are driven more by "who you know" than by merit could negatively affect staff members' trust and belief about equity in their agency and possibly discourage qualified employees from applying for promotions or from taking part in career enhancing activities that could benefit the agency as well as the employee. To the extent that negative perceptions were held by women more than men, this can also impede components' efforts to increase the representation of women at all levels.

Second, according to researchers, gender discrimination—especially when it is in the form of sexual harassment—can have harmful effects on a component's culture, morale, productivity, and staff members' personal well-being, and can result in monetary costs to the component.[39] While the vast majority of both male and female staff we spoke to and surveyed did not perceive sexual harassment to be prevalent, those that did share their, or colleagues', experiences described many negative effects on office or agency culture and perceptions about the component resulting from the harassment. We found that between FY 2011 and FY 2016 the Department paid approximately $4.4 million for EEO cases that resulted in

---

[39] Victor E. Sojo et al., "Harmful Workplace Experiences and Women's Occupational Well-Being: A Meta-Analysis," *Psychology of Women Quarterly* 40, no. 1 (2016): 1, 16.

settlements or findings of gender (or sex-based) discrimination against the four law enforcement components.

## A Significant Number of Women—Especially Female Criminal Investigators— Reported that They Had Experienced Gender Discrimination in Some Form

A significant number of women in interviews and focus groups, and 22 percent (848) of female survey respondents, reported that they had experienced gender discrimination. In nearly all of the 28 female focus groups we conducted, at least 1 woman stated that she had experienced discrimination in her component. We collected and analyzed FYs 2011–2016 EEO complaint data from all four components and found that women were the complainants in 80 percent of the 895 gender discrimination EEO complaints from all four components.

We found that female Criminal Investigators, as compared to all the women who responded to our survey, more frequently reported gender discrimination and often had negative perceptions of gender equity.[40] Specifically, more than double the percentage of female Criminal Investigators, 43 percent, compared with 18 percent of female professional staff survey respondents, reported experiencing gender discrimination at their agency within the previous 5 years. As Table 8 shows, a significant percentage of female Criminal Investigator survey respondents in all of the four components reported experiencing gender discrimination. More than half of USMS female DUSMs surveyed reported having experienced gender discrimination.

### Table 8

**Female Responses to Our Survey Question: "Have you ever experienced discrimination in your agency during the past 5 years that you believe was based on your gender?"**

|  |  | Yes | No | Not Sure | Total Respondents |
|---|---|---|---|---|---|
| **All Women** |  | 22% | 62% | 16% | 3,875 |
| **Female Criminal Investigators** | **ATF** | 33% | 57% | 10% | 70 |
|  | **DEA** | 41% | 44% | 15% | 130 |
|  | **FBI** | 43% | 43% | 14% | 348 |
|  | **USMS** | 51% | 37% | 12% | 103 |

Source: OIG survey

## All Staff—Especially Female Criminal Investigators—Perceive that Personnel Decisions Are Influenced More by Personal Relationships than by Merit

We found that many staff, but especially women, believe that personal relationships at their agency strongly affect career trajectories and, in fact, personal

---

[40] OIG was unable to evaluate EEO complaint data for female Special Agents and DUSMs because this information is not included in the EEO complaint database.

COMPLAINANT 00678

relationships that favor certain employees was among the most frequently cited examples of an overall agency problem reported to us during focus groups and interviews. In our survey, over one-third of female and about one-quarter of male respondents believed that their office or agency considered personal relationships or affiliations more than merit for career advancement. When we examined Criminal Investigator responses specifically, we found that 54 percent of women believed that personal relationships mattered more than merit for career progression while only 27 percent of men reported that perception. Many staff told us that personal relationships can influence nearly every aspect of a person's career, including promotions, details, job assignments, tasks, training opportunities, and informal relationships.

Staff across components, demographic categories, position types, and supervisory statuses reported a specific way that the influence of personal relationships affected them. This was some form of a "good ol' boys club" that they believe improperly influenced or determined various personnel decisions, including promotions.[41] Although definitions of the club varied, the common themes included that the club was a group of individuals, many of whom had known each other from as early as the training academy, who advanced or developed their friends and/or other members of the club; that being a part of the club resulted in access to high level agency officials, the power to affect personnel decisions, and increased opportunity for upward mobility within the agency; and that the club often consisted of individuals from certain high-profile units or divisions. In addition to relationships that had formed at the academy, some staff felt that the club was composed of specific racial or ethnic groups who had influence at different times. Staff also noted that although most members of the clubs were men, some women were included. While staff at all four site visit locations discussed the existence of a version of the club, staff at component headquarters and the Washington, D.C., field divisions more often discussed it as an impediment to merit-based advancement.[42]

Even though staff members reported to us that men and women who were not part of the club were subject to career limitations, we also identified a perception among women that the club had more negative effects on them than on men. For example, women reported that their gender made the consequences of being excluded from the club worse because men who were not part of the club still had better access to opportunities than women. Although some men felt that the

---

[41] All references to the informal network were made during focus groups and interviews. OIG did not specifically ask about a "good ol' boys club" in our survey. However, we did ask about personal relationships and their effect on personnel decisions. We discuss those responses in this section.

[42] We conducted site visits at component headquarters and at field offices, field divisions, and districts in Washington, D.C.; New Orleans, Louisiana; and Seattle, Washington (see Appendix 2). Focus group participants and interviewees at headquarters and Washington, D.C. sites raised the topic of promotions and the promotions process more often in relation to gender equity, possibly because there are a greater number of higher level positions at headquarters. Additionally, staff members told us that employees move to headquarters and the Washington, D.C., offices specifically to seek promotion.

                    COMPLAINANT 00679

club had negatively affected them, men did not feel that their gender had played a role. In general, women perceived that the club facilitated the development of personal connections for its members that resulted in club members having an advantage in being selected for promotions or special assignments.

Whether within or separate from the club, one way that staff members develop personal connections and access to influential networks is through informal mentoring and social relationships. We found that women, especially female Criminal Investigators, perceived that they had less access to informal mentoring and social relationships than their male counterparts. Specifically, 42 percent of female Criminal Investigator survey respondents reported that they believed men were treated more favorably in receiving informal mentoring.

Focus group participants and interviewees offered possible reasons why men could be receiving more informal mentoring than women. Staff often felt that the low number of women in senior leadership meant fewer opportunities for women in lower grades to build relationships and connections with a female leader. While some women told us they wanted a female mentor because they would have a shared experience as women in the agency, many women in focus groups and interviews told us that ultimately they wanted a positive and productive informal mentorship regardless of the gender of their mentor. Additionally, interviewees told us that men might be hesitant about or uninterested in mentoring women because the mentoring relationship could be misperceived by others. A female DUSM gave an example of these misperceptions when she said, "When I am friendly to males during the work day in a professional moment, I am perceived as being flirty to get an advantage, especially if it's a supervisor."

In addition to concerns about a disparity in informal mentoring, a recurring theme among female focus group participants and interviewees was a feeling that the men in their office excluded them from informal social activities. Thirty-five percent of female Criminal Investigator survey respondents, but only 8 percent of males, reported feeling that they were sometimes or often isolated or ostracized at their workplace because of their gender. Similarly, 33 percent of female and 7 percent of male Criminal Investigator survey respondents reported feeling that at least sometimes they had been purposely excluded from activities or meetings because of their gender.

Having less access to informal mentoring and social relationships limits an employee's opportunity to network and build relationships with colleagues and supervisors. People generally establish informal relationships with others who are like them, including having the same gender. Because there are many more men than women in law enforcement, women may not be able to develop these social and professional connections as easily as men and favoritism based on "who you know" may be more detrimental to women's careers. Below, we outline four types of personnel decisions that staff members perceived as being influenced by personal relationships.

COMPLAINANT 00680

### Promotions

Approximately 30 percent of all survey respondents, nearly half of female Criminal Investigator respondents, and many focus group participants and interviewees did not believe that the promotions process was fair to all employees.[43] Men and women most frequently cited unfairness in the promotions process as an example of bias or inequity, with women most often saying that bias was based on gender. Staff often told us, "Promotions [are] about who you know, not what you know." For example, a male focus group participant from DEA stated, "It is hard to make the promotions process totally fair. Word of mouth tends to get you a promotion after you make the best qualified list." A comment more emblematic of female views came from a female Criminal Investigator at FBI, who said, "Inequitable application of procedures contributes to FBI's gender inequities. For promotions, it is the 'who you know' factor that will get you promoted and...gender discrimination [is] a factor in promotions." Further, only 48 percent of female Criminal Investigator survey respondents felt that men and women have equal opportunity to obtain a promotion into a first-line supervisory position, and only 38 percent of female Criminal Investigator respondents believed that men and women have equal opportunity to be promoted beyond first-line supervisor. Comparatively, 70 percent of male Criminal Investigators indicated on the survey that men and women have equal opportunity to be promoted to first-line supervisor, and 67 percent believed that men and women have equal opportunity to be promoted past that level.

Many female Criminal Investigators in focus groups and interviews believed that bias existed in two promotion-related areas: (1) time spent in positions prior to promoting and (2) standards to promote. For example, nearly half of female Criminal Investigator survey respondents believed that males had spent less time in positions than females before being promoted. In comparison, about 20 percent of male Criminal Investigator survey respondents believed that female Criminal Investigators had spent less time in positions prior to being promoted. In focus groups and interviews at component headquarters units, female Criminal Investigators told us that they believed that men not only spent less time in headquarters positions overall, but some men, particularly those who were well connected in the agency, spent less time in positions than what agency policy required.[44] A female supervisory Criminal Investigator at ATF called these individuals "fast trackers" who were given "special rules" regarding the amount of time they were required to spend in a position before being promoted to a higher position. Some male DUSMs felt that women were quickly promoted from mid-level to high level management at USMS.

---

[43] All four components have merit promotions processes for Criminal Investigator positions while only two of the components have these processes for professional staff, and only for higher-level positions. We believe as a result, Criminal Investigators more often expressed their views on and experiences with these processes, so our discussion focuses more on their perceptions.

[44] ATF, DEA, and FBI each have rotation policies that require supervisory staff to complete a specified number of years in a supervisory or higher position at headquarters. USMS does not have this policy. We could not analyze the data because the components do not track this information in aggregate.

COMPLAINANT 00681

Aside from time spent in a position before promotion, many staff believed that there were different work standards for men and women to advance their careers or demonstrate that they were good Criminal Investigators overall. Both men and women, but especially female Criminal Investigators, perceived that double standards negatively impacted their promotion potential. One female DUSM said, "Females are constantly being evaluated because they easily stand out [and are] judged by different standards than males." Two female Criminal Investigators at FBI stated, "Women have to push harder and work three times as hard." Men get promoted just because they want to be; women have to work extremely hard and still might not promote."

Some men also felt that double standards affected them. A male participant from DEA gave an example of a perceived double standard, saying that "females get the benefit of the doubt" and "receive promotions faster than males."

Both male and female staff described multiple ways that they perceived selecting officials manipulated the promotions process to improperly select a candidate based on personal preference instead of merit.[45]   We evaluated two of those perceived selection methods with quantitative promotions data from the components. Interviewees and focus group participants told us that they believed that managers overturned career board decisions to select the candidate they wanted or did not select anyone for an open position to afford another opportunity to fill the position with a handpicked candidate. Contrary to what staff believed, our analysis of quantitative promotions data from the components shows that leadership or managers rarely overturned promotion selections but the percentage of canceled vacancies varied across components.[46]  During our study period, USMS had less than 1 percent, ATF had 2.7 percent, and DEA had 10 percent canceled vacancies or non-selections; from FY 2011 through FY 2015, FBI had 23 percent of its open positions canceled or result in non-selections.[47]  While there may be valid reasons for canceling a vacancy, the number of cancelations, non-selections, and vacancies that are re-advertised may be contributing to the staff members' negative perceptions.[48]

---

[45]  Other perceived methods of manipulating the promotions process that we heard from staff included the improper use of selective placement factors and short vacancy announcement timeframes.

[46]  While our data analysis did not support these two particular perceived methods of handpicking people for positions, data was not available to analyze other perceived promotions-related inequalities.

[47]  The 10 percent represents 341 of 3,345 DEA vacancies from FYs 2011–2016 and the 23 percent represents 1,318 of the 5,723 FBI vacancies from FYs 2011–2015. FBI did not provide canceled vacancies or non-selections for FY 2016.

[48]  Because FBI and DEA had a higher percentage of canceled vacancies than ATF and USMS, we asked them for the reasons this might occur. FBI stated that vacancies could be canceled without a selection because: there were three or fewer applicants, the hiring unit was reorganized, a candidate laterally transferred into the open position, there were budget cuts, the incumbent

(Cont'd)

COMPLAINANT 00682

We believe that lack of transparency in, or lack of agency communication about, the promotions process may have led to some of the negative perceptions, whether founded or not, that staff had about promotions. An October 2017 U.S. Government Accountability Office (GAO) report found that staff at USMS "expressed the view that poor communication and limited transparency about the merit promotion process and certain management decisions further contribute to employees' negative perceptions of the merit promotion process."[49] As the criteria to judge the promotions process, the GAO report referenced the *Standards for Internal Controls in the Federal Government,* which says it is management's job to communicate "quality" information throughout an organization: "down, across, up, and around reporting lines to all levels of the entity."[50] Having a system for open lines of communication that is both regular and accessible to all staff and management at all levels in an agency could increase transparency and improve staff perceptions about promotions in their agencies. During our review, the components initiated some changes that could potentially address these negative perceptions, which we describe in the text box.

---

**Component Initiatives to Improve Negative Perceptions of the Promotions Process**

During the course of our review, ATF, FBI, and USMS said that they had made changes to their respective promotions processes that could potentially address negative perceptions or improve transparency:

- ATF told us in October 2017 that it had developed a new questionnaire with open-ended questions, allowing staff to provide a more robust written narrative of their accomplishments when applying for promotions. ATF also offered a formalized feedback process upon an applicant's request.

- In July 2017, as a part of a renewed emphasis on diversity, FBI designed a new leadership development and selection system for the selection of senior leaders in the field.

- The acting USMS Director told us that, in October 2017, USMS updated its merit promotion plan so that an applicant's promotion package would be rated by an impartial, third party contractor to increase neutrality and address staff concerns about potential conflicts of interest and possible bias of raters.

All of these initiatives are promising, but it is too early for us to know whether they will address employees' concerns.

Source: OIG interviews and document review

---

in the position did not leave, there were dual postings of the same vacancy, or the announcement contained inaccurate information. According to FBI data, 66 percent of the 823 canceled vacancies were re-advertised and could have any of the above listed reasons as to why they were originally canceled.

DEA's reasons were similar:  a candidate laterally transferred into the open position, no candidates qualified as "best qualified," there was a very small applicant pool, or there was a small number of candidates on the "best qualified list."

[49] GAO, *U.S. Marshals Service:  Additional Actions Needed to Improve Oversight of Merit Promotion Process and Address Employee Perceptions of Favoritism,* GAO-18-8 (October 2017), 25, www.gao.gov/assets/690/687759.pdf (accessed June 1, 2018).

[50] GAO, *Standards for Internal Control in the Federal Government,* GAO-14-704G (September 2014), 60, https://www.gao.gov/assets/670/665712.pdf (accessed June 1, 2018).

### Career-enhancing Opportunities

One-quarter of female Criminal Investigator survey respondents believed that men were favored for career enhancing opportunities, such as detail assignments, special assignments, and training opportunities.[51]  Relatedly, in multiple focus groups and interviews, women (in both the Criminal Investigator and professional staff populations) said that they believed that men were given more complex and diverse job assignments.  For example, a female DUSM told us that men were typically selected for the "harder collateral duties."  She believed that this affected women's future opportunities because selection for collateral duties often makes a staff member more competitive for promotion or other advancement opportunities.  An ATF Criminal Investigator told us that a woman's career progress is hindered by the type of work she is given.  She said, "Women don't get the kind of casework [that would] lead to recognition and promotion.  Women have to work harder to get the same recognition."  Women also told us that they believed that men were selected for details and training opportunities more often than women, even when women regularly applied for or expressed interest in these opportunities.

### Performance Evaluations and Performance Bonuses

Female focus group participants and interviewees, especially those at headquarters and the Washington, D.C. sites said that they believed they had to work harder than men to be recognized by supervisors in their performance evaluation or to receive a performance bonus.[52]  Specifically, 53 percent of female Criminal Investigators (compared to 69 percent of male survey respondents) thought that men and women were treated equally in performance evaluations.  Women in a few focus groups and interviews expressed particularly strong opinions that males continued to receive performance bonuses while they were under investigation and women did not.[53]

---

[51]  Unlike promotions, we could not analyze quantitative data for personnel decisions such as details, special assignments, and training.  Thus, our entire analysis of these topics comes from survey responses, interviews, and focus groups.  However, each topic will likely have an effect on a staff member's perception regarding his or her ability to receive a promotion and make the right connections at the component.  Therefore, we believe that overall perceptions about gender equity are largely influenced by these personnel decisions.

[52]  We concluded that this belief did not apply to non-monetary awards because staff rarely raised the issue of non-monetary awards during focus groups and interviews.  When we asked about non-monetary awards, staff members seldom indicated that these awards affected their perceptions about gender equity.

[53]  In a previous report, OIG found that some DEA employees had received a bonus while under a misconduct investigation.  See DOJ OIG, *Bonuses and Other Favorable Personnel Actions for Drug Enforcement Administration Employees Involved in Alleged Sexual Misconduct Incidents Referenced in the OIG's March 2015 Report,* Evaluation and Inspections Report 16-01 (October 2015).  See also DOJ OIG, *The Handling of Sexual Harassment and Misconduct Allegations by the Department's Law Enforcement Components,* Evaluation and Inspections Report 15-04 (March 2015).

COMPLAINANT 00684

Men and women differed more widely in their attitudes about bonuses. Only 40 percent of female and 61 percent of male survey respondents believed that men and women were treated equally in monetary performance bonuses.[54] Moreover, nearly 20 percent of female Criminal Investigator survey respondents, compared to 6 percent of male Criminal Investigators, felt that they received only verbal recognition while their colleagues received bonuses.[55] For many women who perceived inequity in performance bonuses and evaluations, they believed the inequity resulted in women having to work harder and be a more "perfect" employee to receive equal recognition.

*Men and Women Reported Other Types of Differing Treatment That Were Not Influenced by Personal Relationships*

### Work/Life Balance

Staff at all agencies frequently discussed work/life balance, most commonly parenting, in our interviews and focus groups. Staff of both genders specifically discussed perceptions of double standards that affected their career in different ways. While professional staff we spoke to felt they generally had an adequate work/life balance, many Criminal Investigators felt they did not, although they often acknowledged that a lack of work/life balance was an inherent part of their job. Nonetheless, many female Criminal Investigators said during focus groups and interviews that they were more adversely affected by the limited work/life balance of a Criminal Investigator position or that they believed they were perceived more negatively than men when they used flexible work policies. For example, both men and women said that flexible work policies would likely be a greater benefit to female agents because of society's gender roles (such as child-rearing and household responsibilities). One thing we heard from both men and women is that female Criminal Investigators often delayed having children or did not have children at all because having children could have affected both their promotion potential and the type of unit to which they would be assigned.[56] For example, FBI staff members stated that after some women had children they were assigned— sometimes involuntarily—to units that did not handle violent crime and had more traditional work hours.[57] These staff members told us they believed that these

---

[54] Our survey question was worded as follows: "Based on your personal experiences, how do you feel that males and females are treated in the following area in your agency:  monetary performance bonuses." Because of this wording, we cannot unequivocally say whether responses refer to the dollar amount or the receipt of a bonus overall.

[55] The survey question did not refer to the gender of the colleagues who had received performance bonuses. Therefore, we can report that men and women answered the question but we cannot make conclusions about the gender of the colleagues who are perceived to have received bonuses.

[56] We did not hear that men had to make the same choice to delay having or not to have children.

[57] We were told that some of these types of units were pejoratively referred to as "Mommy Squads." Still, some women we spoke to seemed to appreciate being assigned to them because of the work/life balance they offered.

COMPLAINANT 00685

units may offer fewer opportunities to gain experience helpful for promotion eligibility.

Female Criminal Investigators often reported feeling as if they had to choose between having the type of career they wanted to have and being the type of parent they wanted to be. Many interviewees and focus group participants cited the long, sometimes unpredictable, hours of Criminal Investigator work, in addition to the mobility requirements necessary for attaining a supervisory position, to conflict with family responsibilities.[58]  Some women felt that if they wanted a successful career they could not be the "hands-on" parent responsible for daily caregiving. Staff told us that they did not feel that male Criminal Investigators had to make this choice and that they perceived men as having fewer caregiving responsibilities overall. We heard from only a couple of men that they had made career choices to focus on family responsibilities. In an interview, a male supervisory Deputy U.S. Marshal (DUSM) went so far as to call motherhood a "career hazard for women [DUSMs]." Similarly, female Criminal Investigators who were mothers felt that when they needed time off for child-rearing they were perceived as less dedicated than male Criminal Investigators who were fathers. One female DUSM said, "If a female needs to go home to take care of her child, she gets told she's not a team player; while a male doing the same thing is told he is a 'great dad.'"

Although the majority of male and female survey respondents believed that management supported work/life balance and that work/life balance and alternate work schedule options were gender equitable, 6 percent of female and 20 percent of male Criminal Investigator survey respondents felt that management treated women more favorably regarding work/life balance. Additionally, 12 percent of female and 23 percent of male Criminal Investigator survey respondents believed that women were treated more favorably by management for alternate work schedule options.

### Fitness Standards

While most of the perceptions about differing treatment were related to issues that negatively affected women, some staff perceived that men were at a disadvantage because of different fitness standards for male and female Criminal Investigators. Some men, particularly in USMS, reported to us that lower fitness standards for women at the training academy was an example of gender inequity

---

[58]  These feelings were especially salient for women who desired to advance within the component because of the increased duties and responsibilities of a supervisory position. We note that in October 2017 the ATF acting Director told us that 3 or 4 years prior he reduced from 2 years to 1 year the requirement for Criminal Investigators to serve in a headquarters position before becoming a supervisor. He believed this may enable all staff to do a headquarters rotation, because it would be easier for an employee to do a 1-year detail away from his or her family rather than moving the entire family to Washington D.C., for 2 years. He saw this change as being especially helpful for female ATF staff who are interested in advancing to supervisor.

COMPLAINANT 00686

negatively affecting men.[59]  These staff felt that if everyone is required to do the same job, fitness standards should be the same for all.  However, the majority of focus group participants and interviewees said that anyone who graduated from the academy was qualified to do the job, even though the fitness standards were different for men and women.

### Gender Discrimination and Sexual Harassment Have Negative Effects on the Components and Their Staffs

Gender discrimination, especially in the form of sexual harassment, can result in costs to the Department, including reductions in morale and productivity, decreased staff well-being, and monetary costs from EEO settlements or decisions.  A recent report by the House Committee on Oversight and Government Reform noted, "the overwhelming majority of federal employees refrain from sexual misconduct, but even a single instance can create a toxic work environment."[60]  The Committee's conclusion was confirmed by the sexual harassment experiences that focus group participants and interviewees shared with us—staff described how sexual harassment incidents had far-reaching consequences for them and their work environment.

We found through our analysis of focus group, interview, and survey responses that even though sexual harassment was not perceived to be prevalent, when it did occur, the situation and surrounding events could have widespread negative effects on staff and the agency.[61]  For example, we spoke with one woman who alleged that she had been sexually harassed and had experienced retaliation for reporting and one woman who alleged that she had been groped, both by the same supervisor.  The first woman told us that she notified her second-line supervisor of the discrimination but he did not take any action.  We interviewed the Criminal Investigator who conducted the initial internal investigation into the discriminatory behavior.  She told us that she did not believe that the component leadership was taking the case seriously.  We later heard about this supervisor and his discriminatory behavior from a component staff member at another location.  This staff member told us that the case was discussed across the component and

---

[59]  While the fitness standards are different for men and women, both standards ensure that the Criminal Investigator is "fit."  This is an example of differing treatment based on differing abilities that tries to produce equity between genders.  In tactical units, where specialized or different physical standards beyond just being "fit" are required to successfully perform specific duties, men and women have the same standards.

[60]  U.S. House of Representatives Committee on Oversight and Government Reform, Tables of Penalties: Examining Sexual Misconduct in the Federal Workplace and Lax Federal Responses, 115th Congress, 1st sess., October 29, 2017, 6.

[61]  In a report issued in 2016, the Equal Employment Opportunity Commission (EEOC) concluded that many individuals did not label certain forms of unwelcome, sexually based behaviors as "sexual harassment," even if they viewed them as problematic or offensive.  EEOC, Select Task Force on the Study of Harassment in the Workplace (June 2016), 9.

COMPLAINANT 00687

had undermined the staff's confidence that the agency would address harassment.[62]

We also found that women were more likely to report experiencing this form of discrimination. Twenty-seven percent of the survey respondents who reported experiencing gender discrimination within the previous 5 years identified sexual harassment as the most recent type of discrimination they experienced, and women made up over 80 percent of those respondents. Our finding is further supported by EEO complaint data showing that while only 1 out of 10 gender discrimination cases in our EEO complaint dataset included sexual harassment as a claim type, 9 out of 10 sexual harassment cases were filed by women.

Interviewees and focus group participants also described the costs of gender discrimination, sexual harassment, or inequity and the negative effects of the resulting hostile work environment. Women at each of the four law enforcement components told us that they had personally experienced, or felt they were likely to experience, lower morale, a general disappointment in their agency, a reduction in work performance, distrust of colleagues or management, or increased use of personal leave to help them deal with the ramifications of gender discrimination or inequity. Female staff also told us that gender discrimination can make them become ill, more isolated, and fearful of retaliation. One female employee told us that she would become physically sick on her way to work because of how she was treated and that she eventually had to obtain a doctor's note allowing her to telework to alleviate the issue. Similarly, another interviewee stated that she is now on antianxiety medication because of the way she was treated in her office.

The findings of the U.S. Merit Systems Protection Board (MSPB) support the statements of interviewees and focus group participants regarding the costs of sexual harassment.[63] One MSPB report described the personal costs of sexual harassment, saying, "for employees who experience it, sexual harassment takes its toll in the form of mental and emotional stress and even loss of income."[64] Another MSPB report described the numerous monetary costs of sexual harassment: "the cost of job turnover, sick leave that the victims say they used as a result of the

---

[62] We reviewed the Final Agency Decision for the first woman's EEO complaint, in which the Department substantiated discrimination. The Department ordered the component to promote the complainant, pay her attorney's fees, determine compensatory damages, and train the responsible management officials.

[63] We also reviewed an article that summarized results from 88 separate studies of harmful workplace experiences that affect women; altogether, these combined studies included more than 70,000 women. The article concluded that intensely stressful events, such as sexual harassment, or situations causing chronic stress, such as a hostile work environment, can impair a person's well-being and have been associated with depression, anxiety disorders, and post-traumatic stress disorder, among others. Victor Sojo et al., *Harmful Workplace Experiences and Women's Occupational Well-being: A Meta-Analysis* (2016), 1, 16.

[64] MSPB, *Women in the Federal Government: Ambitions and Achievements* (May 2011), 47.

COMPLAINANT 00688

harassment, the cost of the individual productivity decreases reported by victims, and the estimated productivity lost by work groups in which harassment occurs."[65]

In addition, our analysis of 313 EEO cases that resulted in settlements or findings of discrimination against one of the four law enforcement components showed that the components paid approximately $4.4 million between FY 2011 and FY 2016 for gender-based (or sex-based) discrimination complaints. The components made those payments to resolve complaints in which the Department, the EEOC, or a judge had substantiated discrimination or to settle complaints without a substantiation of discrimination. These 115 gender discrimination and sexual harassment cases made up approximately 31 percent of all discrimination complaint payments.[66] Further, almost 80 percent of the complainants in the 115 EEO cases with a basis of gender discrimination were female.

## Dissatisfaction with and Mistrust About the EEO Process and Fear of Retaliation May Limit the Utility of the Process as a Tool to Address Discrimination

We found that staff of all genders, positions, supervisory statuses, and across the law enforcement components had negative perceptions about the EEO process.[67] These perceptions included the stigma of filing an EEO complaint, fear of retaliation, lack of confidence or trust in an EEO office or process, and the significant time commitment involved in the EEO process. Many staff in focus groups, interviews, and in the survey told us that they had experienced but did not report discrimination or that they would not use the EEO process if they experienced discrimination in the future. Staff's reluctance to report is a concern because it could undermine the purpose of the EEO office and process and could result in artificially low numbers of reported discrimination and harassment. Underreporting could also hinder the components' ability to address individual instances of discrimination and harassment and the conditions that allow such behavior to occur.[68]

Our testimonial evidence supports our concern that gender discrimination may often not be reported to the EEO office. In focus groups and interviews, many staff members who told us that they had experienced discrimination said they did not report it. Additionally, of the 14 percent (1,164) of survey respondents who reported experiencing gender discrimination, 43.6 percent (507) indicated that they took no action to address the discrimination, including filing an EEO complaint. When we asked in interviews, focus groups, and the survey why they did not take

---

[65] MSPB, *Sexual Harassment in the Federal Workplace: Trends, Progress, Continuing Challenges* (October 1995), 23.

[66] The EEO cases that resulted in settlement or finding of discrimination against the component that we evaluated may have had more than just "sex" selected as a basis.

[67] See Appendix 3 for more information about the EEO complaint process.

[68] While we looked into gender discrimination specifically, these factors may extend more broadly to other discrimination bases such as race, age, and disability.

action, respondents of both genders most frequently stated that they did not believe it would make a difference, that they were afraid of retaliation, or that they had concerns about confidentiality.

Additionally, a significant number of staff in interviews, focus groups, and the survey told us they would be reluctant to report discrimination if they experienced it in the future.[69]  In our survey, close to 45 percent of respondents said that they would not or were unsure whether they would use the EEO process to resolve discrimination.  This includes 68 percent of female Criminal Investigators, compared to 42 percent of male Criminal Investigators.  Table 9 outlines the responses by women in each component and overall.

### Table 9

### Female Responses to Survey Question:  "Would you go through the EEO process if you experience any type of discrimination in the future?"

|  |  | Yes | No | Not Sure | Total Number of Respondents |
|---|---|---|---|---|---|
| **All Women** |  | 50.4% | 15.1% | 34.5% | 3,851 |
| **All Female Criminal Investigators** |  | 32.3% | 23.8% | 43.8% | 650 |
| **Female Criminal Investigators** | **ATF** | 34.3% | 14.3% | 51.4% | 70 |
|  | **DEA** | 38.8% | 24.0% | 37.2% | 129 |
|  | **FBI** | 30.1% | 24.6% | 45.3% | 349 |
|  | **USMS** | 30.4% | 27.4% | 42.2% | 102 |

Source:  OIG survey

In the survey, the women who said that they would not or were unsure whether they would go through the EEO process frequently chose fear of stigma and retaliation and length of time as the reasons.  We heard most often from focus group participants and interviewees, and some survey respondents, that a lack of confidence in the EEO process would deter them from filing a complaint if they experienced discrimination.  Below, we discuss each of these issues, as well as initiatives to improve the EEO processes within their agencies.

### Stigma Associated with Filing an EEO Complaint

During numerous interviews and focus groups and through our survey, staff members told us that filing an EEO complaint or reporting discrimination often results in stigmatization.  Many indicated that they would never file a complaint because they believed that the stigma would negatively affect their career.  In the survey, 69 percent of female and 45 percent of male Criminal Investigators who

---

[69]  In addition to filing an EEO complaint, employees can report discrimination to a management official, an internal affairs unit, the DOJ OIG, an agency Ombudsman, or the Office of Special Counsel.

COMPLAINANT 00690

would not or were unsure whether they would file an EEO complaint cited the stigma associated with filing as a reason. Notably, 71 percent of female Criminal Investigators at FBI and 74 percent at USMS reported this. Additionally, a few interviewees told us that they had witnessed clearly gender-related discrimination against colleagues and that their colleagues had decided not to file an EEO complaint due to fears that they would be stigmatized and that their careers would be negatively affected. For example, a Chief DUSM we interviewed told us that he recently had sent a female DUSM on a special protection detail assignment and later found out that her Group Supervisor had assigned her to do the laundry. The Chief DUSM felt this was a form of discrimination. He asked the female DUSM whether she wanted to pursue an EEO complaint against the Group Supervisor, but he said she decided not to file a complaint because she thought it could damage her career. He added in the interview that most employees, especially women, would not file an EEO complaint because they are afraid of being stigmatized. In addition, some participants who did file an EEO claim told us that they felt stigmatized for doing so.

During our focus groups and interviews, participants often told us that they heard staff use pejorative terms such as "complainers" and "troublemakers" to refer to people who filed EEO complaints, which shows that EEO complainants can be perceived negatively. For example, some interviewees and focus group participants expressed the view that employees abused the EEO process to "cover up poor performance" and used it as a "crutch" for negative performance ratings or as a "smokescreen for not doing any work." A male DEA Special Agent in Charge (SAC) told us that he had seen some female employees with legitimate discrimination cases not file EEO claims because they were afraid that others would think they filed to counter a bad performance review. Many used terms such as "frequent fliers" or those who "pull the EEO card" to describe employees who they believed took advantage of the EEO process. This in and of itself can further damage the credibility of the EEO process because some feel that it is so "bogged down by false complaints" that it is generally inefficient and ineffective. A common perception we heard from both male and female focus group participants and interviewees was the notion that employees often misused the EEO process to obtain a different position or assignment.

*Fear of Retaliation for Reporting Discrimination or Filing an EEO Complaint*

Another reason that staff members reported being reluctant to file an EEO complaint was that they believed they would be retaliated against and that this retaliation could ruin their professional career. In fact, 42 percent of the survey respondents listed retaliation as a reason for deciding not to go through the EEO process or for being unsure whether they would file an EEO complaint. Of the 1,164 survey respondents who indicated they had experienced gender discrimination, 15 percent (177) of respondents stated that they believed they had been retaliated against for reporting the discrimination.

In one of our focus groups, a female FBI Supervisory Special Agent told us that a male supervisor had told her that no one wanted to work with her because

COMPLAINANT 00691

she was pregnant.  She said that even though she requested to carry on her normal duties as a Special Agent, that supervisor assigned her various administrative responsibilities, such as filing paperwork, and blocked her request to transfer to a different squad.  She said that when she consulted with the EEO office, the EEO staff member told her that she had a clear discrimination case but instructed her not to file if she did not wish to be "blackballed forever."

The EEO complaint dataset that we reviewed showed that complainants frequently reported retaliation in connection with their EEO complaint.[70]  We reviewed 895 open and closed EEO cases at the four law enforcement components with "sex" as one of the bases and found that 40 percent of the cases involved "reprisal" in connection to the EEO complaint.[71]  Figure 2 shows the percent of cases that included reprisal as a basis for each of the four components.

**Figure 2**

**Percentage of Sex-based EEO Cases That Included Reprisal as Another Basis, FYs 2011–2016**



Source:  OIG analysis of EEO complaint data from ATF, DEA, FBI, and USMS

Of those 40 percent of cases that included "reprisal," the top five claims that complainants reported were "non-sexual harassment," "hostile work environment," "performance evaluations/appraisal," "promotion/non-selection," and "assignment

---

[70]  According to the EEOC, retaliation is the most frequently alleged basis of discrimination in the federal sector and the most common discrimination finding in federal sector cases.  EEOC, "Facts About Retaliation," www.eeoc.gov/laws/types/retaliation.cfm (accessed June 1, 2018).

[71]  An employer's actions could be considered retaliation if, because of the employee's EEO activity, the employer reprimands the employee or gives a performance evaluation that is lower than it should be, transfers the employee to less desirable position, engages in verbal or physical abuse, threatens to or actually makes negative reports to authorities (such as reporting immigration status or contacting the police), increases scrutiny, spreads false rumors, treats a family member negatively, or makes the person's work more difficult.  EEOC, "Facts About Retaliation."

of duties," which all suggest some form of negative employment action.[72]  In addition, for all male and female survey respondents who experienced gender discrimination during the previous 5 years, working in a hostile work environment was the most frequently selected type of discrimination.  We also reviewed all closed EEO complaint cases from the four law enforcement components during our study period that resulted in a settlement or a finding of discrimination by the Department, EEOC, or a judge, and we found that gender discrimination and reprisal were closely linked.  Of the 313 cases we reviewed, 141 cases (45 percent) had "reprisal" as a basis and 58 of those 141 cases (41 percent) had both "sex" and "reprisal" as bases.[73]

        The findings of EEOC's *Annual Report on the Federal Work Force* for 2013 closely align with our own finding about retaliation in the Department's law enforcement components.[74]  According to EEOC:

> Nearly half of all complaints filed during FY 2013 [in the federal sector] were retaliation complaints, with 42 percent of findings of discrimination based on retaliation.  In fact, retaliation has been the most frequently alleged basis of discrimination in the federal sector since fiscal year 2008.  In addition, the number of discrimination findings based on a retaliation claim has outpaced other bases of discrimination.[75]

### Long Duration of the EEO Process

        In addition to the fear of stigma and retaliation, we found that the length of time that the EEO process often took deterred staff from reporting discrimination. All types of staff in the focus groups, interviews, and the survey indicated time as a reason they would not file an EEO complaint. In the survey, 25 percent of the respondents who said they would not or were unsure whether they would file an EEO complaint reported length of the time as a reason. The EEO cases during our study period, from filing to closure, on average, lasted 763 days at ATF, 738 days at DEA, 461 days at FBI, and

---

[72]  When filing an EEO complaint, the complainant may indicate the types of discrimination, known as "claim type," which are different from the bases of discrimination.  Claim types include termination; suspension; directed or denied reassignment; sexual or non-sexual harassment; assignment of duties; pay, including overtime; training; performance evaluations/appraisals; duty hours; promotion/non-selection; reprimand; appointment/hire; examination/test; time and attendance; reasonable accommodation disability; terms/conditions of employment; removal; demotion; and hostile work environment.

[73]  We cannot confirm from the data we received whether the allegations of reprisal in these cases were substantiated.

[74]  EEOC Office of Federal Operations, *Annual Report on the Federal Work Force Part 1:  EEO Complaints Processing (Fiscal Year 2013)*, www.eeoc.gov/federal/reports/fsp2013/upload/Final-FY-2013-Annual-Report-Part-I.pdf (accessed June 1, 2018).

[75]  EEOC, "Retaliation–Making It Personal," www.eeoc.gov/laws/types/retaliation_considerations.cfm (accessed June 1, 2018).

COMPLAINANT 00693

633 days at USMS.[76]  There were also numerous extreme cases at each agency, with one of the lengthiest cases taking over 9 years to conclude.

---

**The Benefits of Mediation through the Alternative Dispute Resolution Program**

According to EEOC, all federal agencies are required to have an Alternative Dispute Resolution (ADR) program that is voluntary; confidential; enforceable by the parties if an agreement is reached; and led by a neutral person, like a mediator, who has no personal interest in the dispute.  Mediation through ADR is one option that staff and agencies can use to resolve EEO disputes within a shorter timeframe.  While not every type of EEO case is suitable for ADR, the program offers "both the complainant and the agency the opportunity for a fast and informal settlement of the dispute" in some cases, according to EEOC.

FBI, which manages the DOJ Mediator Corps Program, told us that as of March 2018 the Mediator Corps was made up of about 137 collateral duty mediators, from all components, who provided informal resolution to address and resolve workplace disputes from all federal agencies.  The Mediator Corps serves cases from DOJ components first and, if workload allows, will accept cases from other federal agencies.

Our data showed that only about 17 percent of the open and closed cases at these agencies chose ADR and even fewer cases were resolved in mediation.  The majority of the cases that resolved through ADR were from the FBI.  An EEO official at the FBI told us that the FBI's more frequent use of ADR is one of the agency's strengths.  She stated that they have made a concerted effort to publicize ADR and help staff know that ADR is a good way to resolve an issue.

Sources: EEOC and DOJ Justice Management Division documents; OIG interviews and data analysis

---

Some staff told us that they believed that the EEO process favored the agencies because the agencies had more time and resources.  One male supervisory Special Agent we interviewed stated that he had overheard lawyers from his agency's Office of the General Counsel say that the agency has more time and resources than the complainants, which allows the agency to "wait them out."[77]  One female DUSM told us that her EEO case took 10 years to go to trial and was settled only after she had retired from the agency.  According to her, the agency could have settled with her early on for a low sum of money and a step increase but the agency decided to pursue the case and ended up paying her a much larger settlement.

Some of the EEO Officers we interviewed told us that mediation is one option the agency and complainants have to resolve EEO disputes in a shorter timeframe, as discussed in the text box.

---

[76]  We calculated the overall length of each EEO case by determining the number of days between the "open date" and "close date" the components provided for each case and included all cases that were closed at different stages in the EEO process within our study period.  Each EEO office is responsible for EEO complaint timelines during the counseling, mediation, and investigation steps of the process.  However, after a complainant requests a hearing or an agency decision, the length of the process is controlled by an Administrative Judge, the Department's Complaint Adjudication Office, or the EEOC.

[77]  Pursuing an EEO complaint can be costly.  One EEO complainant we interviewed told us that she had to take a second mortgage on her home in order to pay the legal fees incurred during her EEO case.

COMPLAINANT 00694

*Lack of Confidence in EEO Offices and Staff and Misunderstandings About the EEO Process*

We spoke with staff members who were familiar with the EEO process and found that they generally did not have confidence in their EEO office's ability to professionally, impartially, and effectively handle discrimination cases. They also did not believe that the office would maintain their confidentiality and share information about them only with responsible management officials, as required by policy.[78]  Of the survey respondents who said they would not or were unsure whether they would file an EEO complaint after experiencing discrimination, 26 percent reported that they believed that their agency's EEO office was not effective at handling allegations of discrimination, 21 percent reported that they believed that their agency's EEO office staff "is not impartial or neutral," and 31 percent said that they had concerns about their EEO office's ability to maintain confidentiality.  Together, these beliefs and concerns show that many staff lack confidence in their EEO office to effectively handle discrimination complaints.  Some staff questioned whether their EEO office was able to be objective, given that EEO offices are staffed by agency employees, which could pose an inherent conflict of interest.  Others cast doubt on the EEO staff's ability to handle matters professionally.

Many told us that they thought that the EEO complaint process is generally "broken" and that the EEO process's inability to effectively address discrimination contributes to employees continuing to engage in discriminatory behavior.  For example, one female DEA staff member, whose EEO complaint against her supervisor came to a resolution through the mediation process, told us that she did not receive assistance from the EEO office sufficient for her to understand what to do during the process.  She said that she therefore agreed to the mediation terms but did not feel that she had sufficient knowledge to make a fully informed decision.

We also note that some focus group participants and interviewees did not have a clear understanding of their agency's misconduct reporting and discipline procedures as they related to the EEO complaint process.  Although employees are required to take training on the *Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002* (No FEAR Act), which contains some information about EEO and discrimination, and some agencies present information about the EEO Office and process in new employee orientation training, misperceptions persist.[79]  One EEO official from ATF told us that he believed the EEO office needed to train more employees on the EEO process.  Without additional

---

[78]  Human Resources Order DOJ 1200.1, Part 4:  Equal Employment Opportunity, www.justice.gov/jmd/hr-order-doj-12001, June 15, 2015 (accessed May 30, 2018).

[79]  The No FEAR Act is intended to reduce the incidence of workplace discrimination within the federal government.  It requires federal agencies to "be accountable for violations of antidiscrimination and whistleblower protection laws in part by requiring that each agency post on its public website certain statistical data relating to EEO complaints filed with the agency."  OPM, "Information Management:  No FEAR Act," www.opm.gov/information-management/no-fear-act (accessed June 1, 2018).

COMPLAINANT 00695

training or communication about employees' rights and how the EEO process works, lack of knowledge may deter employees from reporting discrimination.

*Initiatives to Improve the Effectiveness of the EEO Process*

During our review, the FBI and DEA EEO offices instituted changes in training and communication to help alleviate some misperceptions about the EEO process and improve staff knowledge on EEO office roles and responsibilities. For example, the FBI Assistant Director for EEO told us that her office is educating the FBI workforce on exactly what can and cannot be resolved through the EEO process. She said that the FBI EEO office has made a series of changes to improve communication with staff and parties to an EEO complaint. According to the Assistant Director, the FBI EEO office now routinely contacts senior leadership officials and SACs to inform them about trends in EEO cases in their field offices and the agency to help them better understand EEO issues. Additionally, the responsible management official in an EEO complaint receives letters from the EEO Office at different points in the formal complaint process advising him or her to contact the EEO Office with any questions or concerns. The Assistant Director said that EEO office staff can access a case management system to instantly obtain the status of a complaint and can inform responsible management officials of any major changes in a case. She told us that she is using EEO data to drive decision making for improvements to the EEO process and is working on a data visualization tool through which qualitative and quantitative EEO case information can be reviewed and analyzed.

DEA's EEO Officer told us that since 2016, in response to increased EEOC sanctions for outstanding complaints, she has made changes to improve timeliness of EEO investigations. She said that she terminated a contract Investigator who was not meeting timelines or producing high quality investigations and that she reviews open complaints weekly to ensure that they move forward. She also told us that, to address staff feelings of mistrust in the EEO office and process, she was taking steps to address concerns that some SACs were obtaining EEO case information, which the staff believed would allow a SAC to retaliate. She acknowledged that the perception of retaliation could have a chilling effect that would inhibit EEO reporting. She said that to preserve neutrality and address negative perceptions of bias, the EEO office changed to a regional counseling structure so that counselors do not counsel staff from their own region. She also said that DEA has revamped its EEO supervisory training to clarify the supervisor's responsibility to report misconduct and instances of harassment instead of taking no action or "pass[ing] off" the responsibility to the staff to report their allegations to DEA's Office of Professional Responsibility.

COMPLAINANT 00696

## CONCLUSION AND RECOMMENDATIONS

### Conclusion

We found that views about gender equity, bias, and treatment in the four law enforcement components varied by position type and gender and that women in Criminal Investigator positions consistently reported distinctly more negative perceptions and experiences than other types of employees. While overall staff generally believed that their components were gender equitable, when we analyzed survey and focus group responses by gender, we found that women, especially female Criminal Investigators, overwhelmingly did not hold this view. Whereas the majority of men in our focus groups and interviews told us that they had not previously thought about gender equity or discrimination, many women, especially Criminal Investigators, described their experiences with discrimination and gender bias in a manner that showed how significant and personal this topic was to them.

We found that one reason women in the law enforcement components may have negative perceptions of gender equity is that they were underrepresented in the Criminal Investigator workforce overall and even more so in supervisory and leadership positions. During the 6-year scope of our review, there were few women leading field offices, field divisions, or districts and even fewer women in headquarters executive positions leading operational units. Further, we found that the components have taken limited actions to increase the number of women at all levels of the organizations. For example, we identified recruitment as an important way for components to address the underrepresentation of women in their agencies. But although the components are taking steps to develop and implement recruitment plans designed to increase the diversity of their agencies, we found that they have not identified all the barriers to recruiting women that their individual agencies may face. Unless they tailor their efforts specifically to address their component's barriers to recruiting women, these efforts may have limited success.

Our analysis of promotions data plays a key role in our assessment of gender equity because numerous interviewees and focus group participants spoke about bias and inequity in promotion selections when describing equity, and gender equity specifically, in their organization. We identified several areas of disparity within GS-level Criminal Investigator and professional staff promotions, including that female Criminal Investigators were underrepresented in promotions. The most notable disparities we found were in female Criminal Investigator promotions at DEA and ATF. We also found that a substantial number of men and women believed that promotions and other personnel decisions are generally based more on who you know and personal connections than on merit. We believe that, regardless of whether the basis for a particular selection was fair, the disparities we found between the share of population and the number of promotions can contribute to negative perceptions about the promotions process and about gender equity overall.

COMPLAINANT 00697

We find it concerning that 22 percent of all women and 43 percent of female Criminal Investigators reported to us in the survey that they had been discriminated against based on their gender. Additionally, in almost all the interviews and female focus groups we conducted, women reported to us that they had experienced some type of gender discrimination. They identified several types of personnel decisions, such as promotions and career-enhancing assignments, in which this could occur. We also identified a stark contrast between the perceptions of men and women when our survey asked which gender was treated more favorably in different work-related situations and opportunities. Female survey respondents overwhelmingly believed that men were treated more favorably in a number of career opportunities, while most male survey respondents believe that both men and women were treated equally.

We believe that these negative perceptions are important for components to address because such perceptions could discourage qualified staff members from applying for promotions and could lower employee morale. Additionally, components incur costs from discrimination and harassment, including reductions in morale and productivity, decreased staff well-being, and monetary costs from settlements of complaints.

Based on our findings related to the EEO process, we believe that underreporting could be obscuring the scope of discrimination in the law enforcement components. Many staff told us that they would not or were unsure whether they would report discrimination, and some told us that they had experienced discrimination but had not reported it. Staff identified several factors that affected their decision: fear of stigma, fear of retaliation, the length of the EEO process, and a general lack of confidence in the EEO offices. Underreporting and ineffective handling of EEO claims undermines employee trust and confidence that components will address discriminatory behavior.

Senior executive leadership for each of the components told us that they wanted to improve staff diversity to reflect the communities they serve and bring varied perspectives to the work of the component. Component leadership commitment to a diverse and inclusive workforce is critical, but components must also include accountability for promoting this culture at all levels within the organization.

**Recommendations**

To address the concerns and negative perceptions related to gender equity in the law enforcement components, we recommend that each law enforcement component:

1. Assess recruitment, hiring, and retention activities to identify barriers to gender equity in the workforce.

2. Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.

COMPLAINANT 00698

3.   Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.

4.   Identify and take steps to address barriers to advancement for women within the component and among different job types.

5.   Develop and implement methods to improve the objectivity and transparency of the merit promotion process.

6.   Develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.

COMPLAINANT 00699

# THE OIG SURVEY TOOL

## Gender Equity in the Department's Law Enforcement Agencies

**For which agency do you work?**
○ ATF
○ DEA
○ FBI
○ USMS

**Where are you currently assigned?**
○ Headquarters
○ International Field Office/Division
○ Domestic Field Office/Division/District

**What is your Field Division?**
[_____ ▾]

**What is your Field Division?**
[_____ ▾]

**What is your Field Office?**
[_____ ▾]

**What is your District?**
[_____ ▾]

**What is your headquarters division or office?**
[_____ ▾]

**What is your headquarters division or office?**
[_____ ▾]

**How many years have you been at your current agency?**
*For example, 7 years and 5 months = 7 years. If you've been with your agency for less than a year, enter '0'.*
[_____]

**How many years have you been at your current office or division?**
*For example, 7 years and 6 months = 8 years. If you have been at your current office or division for less than a year, enter '0'.*
[_____]

47

COMPLAINANT 00700

**Are you a supervisor?**

○ Yes
○ No

**What is your pay plan?**

[　▾]

**What is your job series?**

[　　　　　　　　　　　　　　　　　　　　　　　　　　　▾]

**With which gender do you most identify?**

○ Male
○ Female
○ Other

**When considering your current office, please indicate how much you agree or disagree with each of the following statements.**

| | Stongly Agree | Agree | Neither Agree Nor Disagree | Disagree | Strongly Disagree | Not Able to Evaluate |
|---|---|---|---|---|---|---|
| My supervisor is willing to talk to me about my career development. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe I am able to obtain a competitive promotion. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe I am able to obtain a promotion into a supervisory position. | ○ | ○ | ○ | ○ | ○ | ○ |
| Job assignments or tasks are given based on gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| I have been given a certain job assignment or task based on my gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| My office excuses discriminatory behavior from employees who are considered to be "high performers". | ○ | ○ | ○ | ○ | ○ | ○ |
| Gender-based discrimination is excused by office leadership. | ○ | ○ | ○ | ○ | ○ | ○ |
| Gender-based discrimination is prevalent. | ○ | ○ | ○ | ○ | ○ | ○ |
| Sexual harassment is prevalent. | ○ | ○ | ○ | ○ | ○ | ○ |
| My office has a gender equitable culture. | ○ | ○ | ○ | ○ | ○ | ○ |
| Training opportunities are provided regardless of gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| I have been denied training opportunities because of my gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| My office considers personal relationships or affiliations more than merit for career advancement. | ○ | ○ | ○ | ○ | ○ | ○ |
| My colleagues treat me differently because of my gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| My managers treat me differently because of my gender. | ○ | ○ | ○ | ○ | ○ | ○ |

COMPLAINANT 00701

**What level of management in your office do you believe treats you differently because of your gender?**

○ First line supervisor          ○ Senior office management          ○ Other

**How supportive are your current office managers of work-life balance?**

○ Unsupportive     ○ Somewhat Supportive     ○ Supportive     ○ Very Supportive     ○ Don't Know

**How has a lack of management support for work-life balance influenced your career decisions?**

*Please check all that apply.*

☐ I did not apply for at least one promotion for which I was qualified.
☐ I applied for other positions within my agency.
☐ I did not seek or accept a detail assignment.
☐ I transferred to another squad or division.
☐ I considered leaving my agency.
☐ It has not influenced my career decisions.
☐ Other

**When considering your agency, please indicate how much you agree or disagree with each of the following statements.**

| | Strongly Agree | Agree | Neither Agree Nor Disagree | Disagree | Strongly Disagree | Not Able to Evaluate |
|---|---|---|---|---|---|---|
| I believe I am able to obtain a competitive promotion. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe I am able to obtain a promotion into a supervisory position. | ○ | ○ | ○ | ○ | ○ | ○ |
| Personal or family obligations are valued. | ○ | ○ | ○ | ○ | ○ | ○ |
| Job assignments or tasks are given based on gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| My agency excuses discriminatory behavior from employees who are considered to be "high performers". | ○ | ○ | ○ | ○ | ○ | ○ |
| Gender-based discrimination is excused by agency leadership. | ○ | ○ | ○ | ○ | ○ | ○ |
| Gender-based discrimination is prevalent. | ○ | ○ | ○ | ○ | ○ | ○ |
| Sexual harassment is prevalent. | ○ | ○ | ○ | ○ | ○ | ○ |
| My agency has a gender equitable culture. | ○ | ○ | ○ | ○ | ○ | ○ |
| Training opportunities are provided regardless of gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| My agency considers personal relationships or affiliations more than merit for career advancement. | ○ | ○ | ○ | ○ | ○ | ○ |
| Agency management treats staff differently because of gender. | ○ | ○ | ○ | ○ | ○ | ○ |

COMPLAINANT 00702

**What level of agency management do you believe treats people differently because of gender?**

○ First line supervisors
○ Field management
○ Headquarters management
○ Headquarters senior management
○ Other

**Based on your personal experiences, how do you feel that males and females are treated in the following areas in your agency?**

| | Males treated favorably | Females treated favorably | Males and Females treated equally | Don't Know |
|---|---|---|---|---|
| Agency-sponsored/formal mentoring | ○ | ○ | ○ | ○ |
| Management support of alternative work schedule options | ○ | ○ | ○ | ○ |
| Management support for work-life balance | ○ | ○ | ○ | ○ |
| Honorary awards | ○ | ○ | ○ | ○ |
| Time-off awards | ○ | ○ | ○ | ○ |
| Informal mentoring | ○ | ○ | ○ | ○ |
| Special assignments that enhance a career | ○ | ○ | ○ | ○ |
| Training opportunities that enhance a career | ○ | ○ | ○ | ○ |
| Hiring into the agency | ○ | ○ | ○ | ○ |
| Detail assignments that enhance a career | ○ | ○ | ○ | ○ |
| Cash awards | ○ | ○ | ○ | ○ |
| Monetary performance bonuses | ○ | ○ | ○ | ○ |
| Promotions past the highest point in a career ladder | ○ | ○ | ○ | ○ |
| Agency recruitment | ○ | ○ | ○ | ○ |
| Performance evaluations | ○ | ○ | ○ | ○ |

**How often do you experience the following situations in your agency because of your gender?**

| | Very Often | Often | Sometimes | Seldom | Never | Don't Know |
|---|---|---|---|---|---|---|
| You are perceived differently than your colleagues. | ○ | ○ | ○ | ○ | ○ | ○ |
| You feel isolated or ostracized in the workplace. | ○ | ○ | ○ | ○ | ○ | ○ |
| Your judgment or ideas are questioned. | ○ | ○ | ○ | ○ | ○ | ○ |
| You receive verbal recognition when your colleagues in comparable situations receive awards or bonuses. | ○ | ○ | ○ | ○ | ○ | ○ |
| You are interrupted or spoken over in meetings. | ○ | ○ | ○ | ○ | ○ | ○ |
| You are purposely excluded from activities or meetings. | ○ | ○ | ○ | ○ | ○ | ○ |

**Have you personally witnessed discrimination of others in your agency based on their gender during the past 5 years?**

○ Yes
○ No
○ Not sure

50

COMPLAINANT 00703

**Please indicate how much you agree or disagree with the following statements about promotions in your agency.**

| | Strongly Agree | Agree | Neither Agree Nor Disagree | Disagree | Strongly Disagree | Not Able to Evaluate |
|---|---|---|---|---|---|---|
| Overall, I feel that the promotions process is fair to all employees. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe males and females have equal opportunity to be promoted to a supervisor position. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe there are equal opportunities for males and females to be promoted. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe males and females have equal opportunity to be promoted into SES positions. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe males and females have equal opportunity to be promoted past the first-line supervisor level. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe females are generally in positions for less time than males before being promoted. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe males are generally in positions for less time than females before being promoted. | ○ | ○ | ○ | ○ | ○ | ○ |

**Do you believe that your career has been negatively affected because of your gender?**

○ Yes
○ No
○ Don't Know

**In what ways does gender inequity or discrimination in your agency personally affect you in the workplace?**

*Please check all that apply.*

☐ I have lower morale.
☐ I am uncomfortable in my work environment.
☐ I feel that I have a hostile work environment.
☑ It negatively affects my mental and/or physical health.
☐ I am less willing to go above and beyond the minimum requirements of my job.
☐ I am less willing to do my work.
☐ I am motivated to work harder.
☐ I have sought employment opportunities outside of my agency.
☐ I have sought other employment opportunities in my agency.
☐ I do not trust my supervisors.
☐ Other
☐ I am not personally affected by gender inequity or discrimination.
☐ I do not believe there is gender inequity or discrimination.

COMPLAINANT 00704

**Please indicate how much you agree or disagree with the following statements about awards in your agency.**

| | Strongly Agree | Agree | Neither Agree Nor Disagree | Disagree | Strongly Disagree | Not Able to Evaluate |
|---|---|---|---|---|---|---|
| I believe that an employee's gender affects the type of award they receive. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe award recipients are selected fairly. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe males and females are awarded equally. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe the dollar amount of awards given to employees in my agency differs based on the gender of the recipient. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe that an employee's gender affects whether they will receive an award. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe that honorary awards hold more value for promotions purposes than do cash and time off awards. | ○ | ○ | ○ | ○ | ○ | ○ |
| My agency regularly uses awards to recognize employees. | ○ | ○ | ○ | ○ | ○ | ○ |

**Please indicate how much you agree or disagree with the following statements about performance evaluations and monetary performance bonuses in your office.**

| | Strongly Agree | Agree | Neither Agree Nor Disagree | Disagree | Strongly Disagree | Not Able to Evaluate |
|---|---|---|---|---|---|---|
| My supervisor evaluates me differently because of my gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe employees operating at the same performance level may receive different performance bonus dollar amounts because of their gender. | ○ | ○ | ○ | ○ | ○ | ○ |
| I believe that an employee's performance alone dictates whether they will receive a monetary performance bonus. | ○ | ○ | ○ | ○ | ○ | ○ |

**Have you experienced discrimination in your agency during the past 5 years that you believe was based on your gender?**

○ Yes
○ No
○ Not sure

52

COMPLAINANT 00705

**What was the most recent type of discrimination?**
*Please check all that apply.*

☑ Sexual harassment
☑ Non-sexual harassment
☐ Denied promotion
☐ Denied assignment or detail
☑ Denied training
☑ Denied reassignment
☐ Reassigned involuntarily
☐ Hostile work environment
☐ Received lower performance evaluation/appraisal
☑ Loss of duties/tasks
☐ Received additional duties/tasks
☐ A punitive change in the terms of my conditions of employment
☐ A punitive review of my time and attendance
☑ Did not receive an award
☐ Disciplinary action
☐ Demotion
☑ Retaliation
☐ Other

**Who discriminated against you in the most recent incident?**
*Please check all that apply.*

☑ Colleague(s)
☐ First-line Supervisor
☐ Second-line supervisor or higher
☐ Individuals I supervise
☐ Individuals from other departments or agencies
☐ Other

**What did you do regarding the most recent incident of discrimination?**
*Please check all that apply.*

☐ I discussed the discrimination with my supervisor or another management official.
☐ I discussed the discrimination with a human resources staff person in my agency.
☑ I discussed the discrimination with my union representative.
☐ I discussed the discrimination with the agency Ombudsman.
☐ I discussed the discrimination with the EEO Office.
☑ I reported the discrimination to the Office of Professional Responsibility or Internal Affairs.
☐ I submitted a complaint with the Office of the Inspector General.
☐ I submitted a complaint to the Office of Special Counsel.
☐ I resolved the matter informally on my own.
☑ I took no action.
☐ Other

COMPLAINANT 00706

## What resulted from your discussions or reporting?
*Please check all that apply*

☐ My allegations were taken seriously and my supervisor or other management official took steps to address them.

☐ My allegations were taken seriously but my supervisor or other management official did not take steps to address them.

☐ My allegations were dismissed and nothing was done.

☐ My allegations were minimized but my supervisor or other management official took steps to address them.

☐ I was advised to report the discrimination to the EEO Office.

☐ The incident was investigated.

☐ I was retaliated against for reporting the discrimination.

☐ I was negatively labeled or stigmatized in my agency for reporting the discrimination.

☐ I filed a grievance.

☐ I filed a formal EEO complaint.

☐ Other

## What contributed to you not taking action?
*Please check all that apply*

☐ I did not think the incident was serious enough.

☐ The behavior stopped.

☐ Management intervened.

☐ I left or changed jobs or the individual that discriminated left or changed jobs.

☐ I was not sure what to do.

☐ I had concerns about the confidentiality of the EEO complaint process.

☐ I had concerns about the length of time of the EEO complaint process.

☐ I was afraid of retaliation.

☐ I did not believe it would make a difference.

☐ Other

## Would you go through the EEO process if you experience any type of discrimination in the future?

○ Yes
○ No
○ Not Sure

## Which of the following would affect your decision not to file an EEO claim?
*Please check all that apply*

☐ I believe my agency's EEO office is not effective at handling allegations of discrimination.

☐ I believe my agency's EEO office staff is not impartial or neutral.

☐ I have concerns about my agency's EEO office's ability to maintain confidentiality.

☐ I believe the EEO process is lengthy.

☐ I believe the EEO process is costly.

☐ I believe that people who file EEO complaints are stigmatized.

☐ I believe that people who file EEO complaints experience retaliation.

☐ I believe people who file EEO complaints become limited in their career growth.

☐ Other

☐ None of the above

## Please indicate how you believe gender equity has changed in your agency within the following time periods.

|  | I feel that gender equity has... | | | |
| --- | --- | --- | --- | --- |
|  | **Improved** | **Gotten Worse** | **Stayed the Same** | **Not Sure** |
| Within the last year | ○ | ○ | ○ | ○ |
| Within the last 3 years | ○ | ○ | ○ | ○ |
| Within the last 10 years | ○ | ○ | ○ | ○ |

COMPLAINANT 00707

**APPENDIX 2**

# METHODOLOGY OF THE OIG REVIEW

## Standards

OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Interviews and Focus Groups

The team conducted 49 interviews with current Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Drug Enforcement Administration (DEA); Federal Bureau of Investigation (FBI); and U.S. Marshals Service (USMS) headquarters personnel in Human Resources, Equal Employment Opportunity (EEO) offices, and diversity and inclusion to gain an understanding of recruitment, hiring, promotions, EEO complaint process, awards, and any programs related to diversity. We also conducted an interview with the Justice Management Division (JMD) Equal Employment Opportunity staff to help us understand the EEO process in the federal government. Additionally, we interviewed members of women's groups and diversity groups at each of the four law enforcement components. We interviewed 43 staff members who had contacted OIG for interviews or were referred to us by other interviewees. We also interviewed the heads of each of the four components to gain their perspectives on issues related to gender equity.

We conducted interviews and focus groups at all four components at headquarters and at field sites in Washington, D.C.; Seattle; and New Orleans. We chose the four sites based on a series of factors, including size, location, and workforce demographics.

We organized the focus groups by different characteristics, including gender, position type, agency, and supervisory status so participants would feel more comfortable speaking. We received from each component staff listings for the four sites and organized them into eight types of focus groups according to demographic category. We randomly selected staff members from the lists and invited a maximum of 20 for each focus group, depending on the number of non-respondents. If fewer than 20 staff members met the demographic characteristics of a focus group, we invited all members of the group to participate. Not all invitees attended the focus group sessions. We conducted interviews with focus group invitees who either could not attend the session or who asked to be interviewed separately by OIG. We also interviewed office leadership from each component at the three field sites. Table 10 below outlines the number and types of focus groups and interviews at the site visits.

COMPLAINANT 00708

**Table 10**

**Number of Interviews, Focus Groups, and Focus Group Participants**

| | Gender | Number of Individual Interviews | Number of Focus Groups | Number of Participants in Focus Groups |
|---|---|---|---|---|
| **ATF** | Male | 15 | 8 | 31 |
| | Female | 18 | 6 | 18 |
| | **Subtotal** | **33** | **14** | **49** |
| **DEA** | Male | 21 | 7 | 22 |
| | Female | 11 | 7 | 23 |
| | **Subtotal** | **32** | **14** | **45** |
| **FBI** | Male | 20 | 7 | 17 |
| | Female | 11 | 10 | 46 |
| | **Subtotal** | **31** | **17** | **63** |
| **USMS** | Male | 21 | 7 | 35 |
| | Female | 16 | 5 | 36 |
| | **Subtotal** | **37** | **12** | **71** |
| **TOTALS** | | **133** | **57** | **228** |

Source:  OIG focus group data

## Survey

We deployed an online survey to the entire population of staff members in the four components.  The online survey included demographic and perception-based questions, and we emailed staff to invite them to participate (see Appendix 1 for the survey tool).  JMD provided us with email addresses for the staff members of all four components.  We received 1,238 undeliverable emails and emails from 307 staff members indicating they were unable to access the survey.  We worked with the components' offices of information technology to attempt to solve the technical issues and fix any incorrect email addresses.  The survey was open for 3 weeks, and we received 8,140 complete responses.  Table 11 below has the survey response rates for all four components by gender and for the 1811 (Criminal Investigation) job series.

COMPLAINANT 00709

## Table 11

### OIG Survey Response Rates by Component

| | Number of Invitations Sent Out | Total | | | 1811 | | |
|---|---|---|---|---|---|---|---|
| | | Response Rate (No. of Responses) | Male | Female | Total 1811 | 1811 Male | 1811 Female |
| **ATF** | 5,151 | 15% (796) | 433 | 348 | 293 | 216 | 70 |
| **DEA** | 8,450 | 27% (2,308) | 1,243 | 1,037 | 845 | 698 | 131 |
| **FBI** | 36,554 | 11% (3,925) | 1,728 | 2,129 | 964 | 598 | 349 |
| **USMS** | 4,877 | 23% (1,111) | 736 | 361 | 701 | 588 | 103 |
| **Total** | **55,032** | **15% (8,140)** | **4,140** | **3,875** | **2,803** | **2,100** | **653** |

Note: The total number of 1811 responses does not equal the sum of male and female 1811 responses because some respondents did not indicate their gender.

Source: OIG survey data

Additionally, 11 staff members sent us emails sharing information and opinions related to the topic of gender equity. We compiled these responses and analyzed them separately.

### Data Analysis

We requested and reviewed datasets from the four law enforcement components, including: hiring, promotions, awards, Senior Executive Service probation, training classes, EEO complaints, and EEO cases that were settled or decided against a component. We determined that the hiring data provided by the components was not complete and that we had not received enough information that would allow us to draw conclusions. Additionally, we did a preliminary analysis of honorary and cash awards by demographic characteristics, including gender. However, based on interviews, focus groups, and survey responses, we learned that staff at all four components were not aware of individual awards that other staff received and staff never brought up awards in our discussions about gender equity. Therefore, we concluded that staff did not consider awards an important contributor to their perception of gender equity. We also analyzed a dataset from JMD, produced from the U.S. Department of Agriculture's National Finance Center (NFC) data, which included demographic and workforce information for the four components. All the datasets included data from fiscal year (FY) 2011 through FY 2016.

We also reviewed the JMD Finance Staff publication, "DOJ Employment Factbook," which summarizes NFC data into a series of tables describing the Department's workforce. Specifically, we reviewed the tables related to female employment and employment of specific job types, from FY 2006 through FY 2016, to identify any changes over the past decade. While each component may have workforce data from its own staffing information technology systems, we used NFC

COMPLAINANT 00710

data and the DOJ Employment Factbook, which is created with NFC data, to ensure the workforce data we analyzed and presented was methodologically consistent and comparable across the four law enforcement components and across all years in our study period.

## Policy and Document Review

We reviewed federal laws, as well as policy, procedures, and guidance related to recruitment, hiring, promotions, career boards, awards, training, EEO, diversity and inclusion, discrimination, and gender equity for the federal government, Department of Justice, and the four law enforcement components. We reviewed a small number of documents related to specific EEO complaints and decisions on discrimination cases.

## Prior Work Related to Gender Equity in Federal Law Enforcement Agencies

OIG and the U.S. Government Accountability Office have not conducted any previous reviews of gender equity in federal law enforcement agencies. To gain a broader understanding of gender equity in the overall workplace and in law enforcement specifically, we reviewed several federal reports and academic articles pertaining to gender, gender-related issues in the workplace, and gender-related issues in law enforcement. This body of work helped to inform our methodological approach, as well as to provide more context for particular aspects of gender equity.

COMPLAINANT 00711

# THE SEVEN STAGES OF THE EQUAL EMPLOYMENT OPPORTUNITY COMPLAINT PROCESS

1. The employee receives counseling from the Equal Employment Opportunity (EEO) office and can enter into Alternative Dispute Resolution, also known as mediation, between management officials and the employee alleging discrimination.

2. The employee alleging discrimination may file a formal complaint against the agency with the EEO office.

3. The agency reviews the complaint and conducts, or contracts for, an investigation, the results of which are provided to the employee.

4. The employee can ask for a decision from the agency, the Department's Complaint Adjudication Office, or a hearing with a U.S. Equal Employment Opportunity Commission (EEOC) administrative judge.

5. Once the agency receives the administrative judge's decision, it issues a final order that informs the employee about whether the agency agrees with the administrative judge and whether the agency will grant any relief that the judge has ordered.

6. The employee can appeal the agency's final order to the EEOC and/or request reconsideration of an unfavorable appeal decision,

7. After the employee completes the administrative complaint process described in first six steps, he or she can file a lawsuit in federal district court if he or she is still dissatisfied with the process and the outcome.

COMPLAINANT 00712

**APPENDIX 4**

# THE MERIT PROMOTION PROCESSES
## OF THE FOUR LAW ENFORCEMENT COMPONENTS

Each of the four components has its own processes for promoting Criminal Investigators and professional staff.  In Table 12, we compare and contrast the basics of each type of promotion process.

**Table 12**

**Promotion Process Elements at ATF, DEA, FBI, and USMS for Criminal Investigators and Professional Staff**

| | ATF[a] | | DEA[b] | | FBI | | USMS | |
|---|---|---|---|---|---|---|---|---|
| | CI | PS | CI | PS and Other Core Staff | CI | PS | CI | PS |
| **Career Ladder Ends** | GS-13 | GS-13 | GS-13 | Varies | GS-13 | Varies | GS-12 | Varies |
| **Exam Required** | No | No | Yes | No | Yes | No | Yes | No |
| **Board Process** | Yes | Yes | Yes | Yes for Core Staff<br><br>No for Other Professional Staff | Yes | No, but may use expert panel to narrow candidate list | Yes | No |
| **Candidate Ranking Process** | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

Note:  CI stands for Criminal Investigator, and PS stands for professional staff.

[a]  While ATF does not require an exam for Criminal Investigators to advance to the GS-13 level, it does require an evaluation process known as the Electronic Promotion Assessment Center.  Each staff member receives a score after completing the evaluation process, and that score is incorporated into the promotion assessment process.

[b]  DEA classifies its core series positions as Special Agent (or Criminal Investigator), Intelligence Analyst, Diversion Investigator, and Chemist.

Source:  FBI, DEA, ATF, and USMS policy documents

COMPLAINANT 00713

**APPENDIX 5**

## OIG SURVEY CRIMINAL INVESTIGATOR RESPONSES RELATED TO DIFFERING TREATMENT

### Table 13

### Survey Questions and Responses about Differing Treatment

| Survey Question | Criminal Investigator Respondents by Gender | Females Treated Favorably | Males And Females Treated Equally | Males Treated Favorably |
|---|---|---|---|---|
| How do you feel males and females are treated in promotions past the highest point in a career ladder? | FEMALE CI | 1% | 19% | 44% |
| | MALE CI | 12% | 55% | 5% |
| How do you feel males and females are treated in informal mentoring? | FEMALE CI | 1% | 34% | 42% |
| | MALE CI | 10% | 64% | 4% |
| How do you feel males and females are treated in special assignments that enhance a career? | FEMALE CI | 0% | 35% | 47% |
| | MALE CI | 11% | 67% | 4% |
| How do you feel males and females are treated in detail assignments that enhance a career? | FEMALE CI | 0% | 36% | 44% |
| | MALE CI | 10% | 69% | 4% |
| How do you feel males and females are treated in training opportunities that enhance a career? | FEMALE CI | 0% | 57% | 29% |
| | MALE CI | 8% | 76% | 3% |
| How do you feel males and females are treated in performance evaluations? | FEMALE CI | 0% | 53% | 26% |
| | MALE CI | 10% | 69% | 2% |
| How do you feel males and females are treated in management support for work/life balance? | FEMALE CI | 6% | 62% | 15% |
| | MALE CI | 20% | 67% | 1% |
| How do you feel males and females are treated in management support of alternative work schedule options? | FEMALE CI | 12% | 44% | 7% |
| | MALE CI | 23% | 52% | 1% |

Source: OIG Survey

COMPLAINANT 00714

**APPENDIX 6**

## ATF'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Assistant Director*

MAY 2 3 2018     Washington, DC 20226

www.atf.gov

500000:PL
8310

MEMORANDUM TO:   Assistant Director
Office of Professional Responsibility and Security Operations

FROM:   Assistant Director
Office of Human Resources and Professional Development

SUBJECT:   OIG Draft Report – Review of Gender Equity in the Department's
Law Enforcement Components.

This memorandum responds to the recommendations contained in the Office of Inspector
General's (OIG) report titled "Review of Gender Equity in the Department's Law Enforcement
Components." We welcome OIG's constructive comments and appreciate the opportunity to
respond.

**Recommendation 1: Assess recruitment, hiring, and retention activities to identify barriers
to gender equity in the workforce.**

ATF concurs with this recommendation. ATF will review and identify policies and practices
that could serve as barriers to recruitment, hiring and retaining a diverse workforce. Once
identified, ATF will modify these policies and practices to ensure a more conscientious approach
is given towards diversity/gender hiring. Through the 25 ATF Diversity and Career Impact
Program (DCIP) recruiters, ATF will implement proactive and targeted recruitment, hiring and
retention strategies. These strategies and the measured results will be shared with each DCIP
member through a newly developed DCIP recruitment newsletter and the annual DCIP
conference. In April 2018, the Diversity and Inclusion Branch acquired a full time management
analyst for the purpose of capturing and analyzing the recruitment data that is derived from the
DCIP recruiters. ATF intends use this data to enhance our recruitment strategies and direct our
targeted recruitment efforts. Furthermore, ATF will implement a Stay Survey to assess

COMPLAINANT 00715

employee perceptions regarding their existing options to remain employed with ATF. These surveys will also be used to facilitate focus groups to determine areas of concerns and suggest improvements.

**Recommendation 2: Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.**

ATF concurs with this recommendation. In May, 2018, ATF convened a DCIP working group that established a formalized training program for all DCIP recruiters with a concentrated focus on innovative strategies to attract ethnic, cultural and gender diversity. In addition, the group developed multi-media and social-media materials with a goal of targeting and attracting a diverse applicant pool. The projected delivery date of the training program and deployment of the multi-media / social-media tools is during FY2019.

ATF has also implemented a number of initiatives to address retention within the workforce. In FY 2018, ATF launched a New Employee Onboarding System (NEOS), which is designed to improve the integration of new employees of all professions into the ATF workforce. In addition, ATF operates a number of Employee Resource Groups (ERGs), including a Black Employees Resource Group (BERG) and a Women Employees Resource Group (WERG). These groups provide important feedback, perspective, and information on the perspectives of minority populations in the ATF workforce across all professions and assist management in formulating hiring and retention strategies.

**Recommendation 3 Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.**

ATF concurs with this recommendation. ATF will compare the data gained from ATF's outreach and recruitment efforts, from the newly acquired management analyst, along with that of Human Resource and Professional Development Dashboard that provides bi-weekly workforce diversity statistics, Special Agent / Industry Operations Investigator hiring data and workforce diversity forecasting. Implementation of the dashboard will be to ATF Executives and increase transparency by allowing each division the ability to see their workforce composition.

**Recommendation 4; Identify and take steps to address barriers to advancement for women within the component and among different job types.**

ATF concurs with this recommendation. ATF will develop partnerships with colleges and universities with an abundant diverse populous to create a recruiting "farm system" of prospective ATF Special Agents by utilizing internships and mentorships programs. Members of the senior executive service, managers, and supervisors participated in the Office of Human Resources and Professional Development (HRPD), Leadership and Professional Development Division (LPDD) Mentoring Program to assist Bureau employees at all grade levels with career development. This mentoring effort aims to connect employees from all series and levels in ATF with experienced leaders and peers who can offer insight and advice to help those employees

COMPLAINANT 00716

achieve their career goals. In FY 2017, ATF had 39 employees participate in the Mentoring Programs.

**Recommendation 5: Develop and implement methods to improve the objectivity and transparency of the merit promotion process.**

ATF concurs with this recommendation. Since the inception of this review, ATF has implemented a number of actions to improve the selection process for managers. ATF revised its Merit Promotion Board (MPB) process for GS-15 supervisory/managerial positions to ensure consistency, accountability and transparency. The MPB is a board comprised of ATF employees who review applications and interview applicants. Specifically, the MPB is now split into 2 "standing" boards – one for special agents, and one for all other job series. The intent behind this process change is to avoid *ad hoc* MPBs. This is important because employees may perceive *ad hoc* MPBs as being convened to "stack the deck" for or against certain applicants. Standing boards make selections for numerous positions, many that become vacant without prior notice, thus neutralizing the possibility of pre-selection. The GS-15 MPB process also includes a "feedback loop," by which unsuccessful applicants may receive a telephone debriefing from an MPB member to find out how they can improve their interview performance. This further increases the transparency of the MPB's deliberative process.

In addition, since this review began ATF also updated its Senior Executive Service (SES) selection process, creating standing rating and ranking (R&R) panels, that score applications using a consistent scoring scheme, and standing executive resources boards (ERBs), that conduct interviews. Separate R&R boards and ERBs are established for Special Agent in Charge (SAC) positions and non-SAC positions. The standing boards foster the same consistency, accountability and transparency as the standing MPBs do, while taking some of the lack of clarity out of the process. Further, the SES selection process includes a feedback loop (similar to the GS-15 MPB process), whereby unsuccessful applicants may receive a telephone debriefing from an ERB member to learn how to improve their interview performance skills.

**Recommendation 6: Develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.**

ATF concurs with this recommendation. ATF will implement the following:

1. *Stigma Associated with Filing an EEO Complaint.* ATF will educate the workforce on the EEO process through employee, manager, and supervisor training sessions. The training will elaborate on EEO officials' neutrality and the employees' rights to confidentiality in the EEO process.

2. *Fear of Retaliation for Reporting Discrimination or Filing an EEO Complaint.*

   a. ATF will continue to hold the workforce accountable for maintaining a workplace free from discrimination and harassment. All ATF executives, managers, supervisors, and employees are accountable for complying with the Bureau's EEO and anti-harassment policies, and any violation of these policies

COMPLAINANT 00717

will result in prompt corrective action, including appropriate disciplinary action. ATF's Deputy Director will issue an EEO Policy Statement to the workforce emphasizing this point in FY 2018.

b. ATF's Associate Deputy Director (ADD) will issue a video message to the workforce expressing the ATF commitment to the principals of EEO and her support of employees' use of the neutral and confidential EEO complaint process. The video message will reiterate ATF's and the Department of Justice's policy of maintaining a zero tolerance work environment that is free from harassment (including sexual harassment) and having a work environment free from all types of discrimination. The ADD will also inform employees that ATF will not tolerate retaliation for participating in protected EEO activity or assisting in any inquiry about such allegations.

c. ATF will develop and issue Anti-Retaliation Guidance for the workforce that provides:
    i. Examples of retaliation that managers may not otherwise realize are actionable;
    ii. Proactive steps for avoiding actual or perceived retaliation;
    iii. A reporting mechanism for employees to express their concerns about retaliation, including access to a mechanism for informal resolution; and
    iv. A clear explanation that employees could be subject to discipline, including termination, if retaliation occurred. *See EEOC Enforcement Guidance on Retaliation and Related Issues*, Number 915.004, Section V., pg. 61-2 (August 25, 2016).

d. After receiving a formal EEO complaint, OEEO will send each named management official an email outlining his or her roles and responsibilities as a responsible management official (RMO). This document will also discuss what actions or negative changes in behavior an employee may perceive as being retaliatory after an employee alleges discrimination or harassment, and how to avoid problematic situations.

e. ATF will train all managers and supervisors on the new Anti-Retaliation Guidance (or what conduct is protected activity and how to avoid problematic situations) on an annual basis through Roll Call Training. *See EEOC Enforcement Guidance on Retaliation and Related Issues*, Section V., pg. 62.

f. ATF will continue to have the Office of Chief Counsel, Management Division review proposed employment actions of consequence to ensure management

65

bases their actions on legitimate, non-discriminatory reasons. *See EEOC Enforcement Guidance on Retaliation and Related Issues*, Section V., pg. 63.

3. ***Long Duration of the EEO Process.*** In an effort to reduce the processing times of EEO complaints. ATF will increase communication to the workforce on the benefits of using mediation during the informal and formal stages of the complaint process. Additionally, the Office of Equal Employment Opportunity (OEEO will send complainants a separate correspondence during the formal stage of the EEO complaint process to remind them that mediation is available to resolve their complaint in a shorter timeframe.

In regards to the untimely issuance of merit final agency decisions, ATF will work with the Department of Justice and Complaints Adjudication Office (CAO) to streamline the process to increase the timely issuance of merit FADs. The OEEO will continue to review reports of investigation to ensure the record is complete for adjudication prior to sending the case file to the CAO for a merit decision. Additionally, the CAO recently increased the number of contractors to augment their staff to decrease the backlog of cases awaiting a merit decision and to improve timeliness.

4. ***Lack of Confidence In EEO Offices and Staff and Misunderstandings about the EEO Process.***

   a. Lack of Confidence in EEO Offices and Staff. To increase employee confidence in OEEO's ability to process complaints in a professional, impartial, and effective manner, the OEEO staff will receive training on "Maintaining Impartiality in the EEO Process, Both in Appearance and in Existence." The training will focus on the need for EEO officials to have the confidence of the Agency and its employees.

   b. Misunderstanding about the EEO Process. To clear up any misunderstanding concerning the EEO process and role of the OEEO staff, ATF will increase training on the EEO process for the workforce.
      i. New Employee Orientation – all new employees will receive training on the EEO complaint process, reasonable accommodation, reprisal, and anti-harassment during the Agency's New Employee Orientation Session (NEOS). NEOS is a three-day class that supplements a new employee's first day orientation experience. ATF will conduct the NEOS periodically throughout the year with the first NEOS held April 17-19, 2018.
      ii. New Supervisors Training – Human Resources and Professional Development Directorate will schedule advanced EEO training for all supervisors appointed to a supervisory position within the first six months of their supervisory position. The training will focus on the supervisor's role and responsibility in the EEO, reasonable accommodation, and anti-harassment processes.
      iii. Visits to Field Offices – OEEO staff members will continue to visit ATF's field offices to conduct EEO training and address employees' concerns regarding matters managed by the OEEO.

COMPLAINANT 00719

iv.  Annual Senior Leaders Meetings/Conferences – Chief, OEEO will continue to brief ATF Senior Executives on any changes to the EEO program areas, trends in complaint data, and assistance needed in helping OEEO become a Model EEO Program as discussed in EEOC Management Directive 715.

Please let me know if I can be of further assistance on this or any other matter.

Kenneth J. Croke

COMPLAINANT 00720

# OIG ANALYSIS OF ATF'S RESPONSE

The Office of the Inspector General provided a draft of this report to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for its comment. ATF's response is included in Appendix 6 to this report. OIG's analysis of ATF's response and the actions necessary to close the recommendations are discussed below. Please provide a status update on the six recommendations by October 18, 2018.

**Recommendation 1:** Assess recruitment, hiring, and retention activities to identify barriers to gender equity in the workforce.

**Status:** Resolved.

**ATF Response:** ATF concurred with the recommendation and stated that it will review and identify policies and practices that could serve as barriers to recruiting, hiring, and retaining a diverse workforce. ATF will then modify policies and practices to ensure a more conscientious approach toward diversity/gender hiring. ATF stated that it will implement proactive and targeted recruitment, hiring, and retention strategies through its 25 Diversity and Career Impact Program (DCIP) recruiters. ATF will share the strategies and results with DCIP members through a newsletter and an annual DCIP conference. In April 2018, ATF's Diversity and Inclusion Branch acquired a full-time Management Analyst to capture and analyze recruitment data derived by DCIP recruiters. ATF said that it will use this data to enhance recruitment strategies and direct targeted recruitment efforts. ATF will also implement a "Stay Survey" to assess employee perceptions on their options to remain employed with ATF and will use the survey to facilitate focus groups to determine other areas of employee concern and solicit suggestions for improvement.

**OIG Analysis:** ATF's actions are responsive to the recommendation. Please provide an update on ATF's review of policies and practices that could serve as barriers to recruitment, hiring, and retaining a diverse workforce. Additionally, provide an update on the work of the Diversity and Inclusion Branch Management Analyst responsible for analyzing recruitment data, as well as how ATF is using the analysis to enhance recruitment strategies and direct targeted recruitment efforts. Finally, please provide an update on the implementation, and results if applicable, of the Stay Survey and the focus groups and how ATF is using or will use the results of the survey and focus groups.

**Recommendation 2:** Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.

**Status:** Resolved.

**ATF Response:** ATF concurred with the recommendation. ATF stated that in May 2018 it convened a DCIP working group that established a formalized training program for all DCIP recruiters. The training program focuses on innovative strategies to attract ethnic, cultural, and gender diversity. ATF said that

COMPLAINANT 00721

the working group also developed multimedia and social media materials to attract and target a diverse applicant pool. ATF expects to deploy the multimedia/social media tools and deliver the training program in FY 2019. ATF said that it had also developed a number of initiatives to address retention in the workplace, including a New Employee Onboarding System to improve integration of new employees of all professions. Additionally, ATF continues to operate a number of Employee Resource Groups to provide important feedback and information on the perspectives of minority populations in ATF and to assist management in formulation hiring and retention strategies.

**OIG Analysis:** ATF's actions are responsive to the recommendation. Please provide information about the training program for DCIP recruiters, including but not limited to the content, number of sessions, and number of attendees. Please provide an update to the development and implementation of the multimedia and social media materials and additional information about how the Employee Resource Groups are providing feedback to ATF to help with hiring and retention strategies.

**Recommendation 3:** Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.

**Status:** Resolved.

**ATF Response:** ATF concurred with the recommendation and stated that it will compare outreach and recruitment effort data collected by the Diversity and Inclusion Branch's newly hired Management Analyst with Human Resource and Professional Development Dashboard data. The Human Resource and Professional Development Dashboard provides biweekly workforce diversity data, Special Agent/Industry Operations Investigator hiring data, and workforce diversity forecasting. ATF stated that the Dashboard will be available to ATF executives and will increase transparency by allowing each division to see its workforce composition.

**OIG Analysis:** ATF's actions are responsive to the recommendation. Please provide an update and additional information on the comparison of outreach and recruitment effort data with the Human Resource and Professional Development Dashboard data, including how ATF is going to use the results of the comparative analysis.

**Recommendation 4:** Identify and take steps to address barriers to advancement for women within the component and among different job types.

**Status:** Resolved.

**ATF Response:** ATF concurred with the recommendation. ATF stated that it will develop partnerships with colleges and universities that have diverse populations to create a "farm system" of recruiting for ATF Special Agent positions by using internships and mentorship programs. ATF also said that members of the

Senior Executive Service (SES), managers, and supervisors participated in a mentoring program operated by the Office of Human Resources and Professional Development, Leadership and Professional Development Division. The mentoring program assists ATF employees at all grade levels with career development and attempts to connect the employees with experienced leaders and peers who can offer insight and advice to help the employees achieve their goals. ATF stated that it had 39 employees participating in its mentoring program during FY 2017.

**OIG Analysis:** ATF's actions are responsive to the recommendation. Please provide an update on the development of partnerships with colleges and universities to create a farm system for recruiting. Additionally, please provide an update on the mentoring program, including the number of participants for FY 2018 and how the program is helping ATF address barriers to advancement for women.

**Recommendation 5:** Develop and implement methods to improve the objectivity and transparency of the merit promotion process.

**Status:** Resolved.

**ATF Response:** ATF concurred with the recommendation and stated that since the inception of this OIG review it has implemented a number of actions to improve the selection process for managers. First, ATF revised its Merit Promotion Board process for GS-15 supervisory positions. To avoid having ad hoc boards, there are now two standing boards: one for Special Agents and one for all other job series. ATF said that it is important to have standing boards because employees may perceive that ad hoc boards are convened to "stack the deck" for or against certain applicants. The new standing boards make selections for numerous positions, including positions that become vacant without prior notice, which ATF said neutralizes the possibility of pre-selection. To improve transparency, the GS-15 board process also includes a feedback component through which an unsuccessful applicant may receive a telephone debriefing from a board member to find out how the applicant can improve his or her interview performance.

Second, ATF stated that it had updated its SES selection process by creating standing rating and ranking panels that score applications using a consistent scoring scheme and standing executive resources boards that interview applicants. There are separate rating and ranking boards and executive resources boards for Special Agent in Charge (SAC) positions and non-SAC positions. ATF said that there is also a feedback component in the SES selection process that is the same as the GS-15 board process.

**OIG Analysis:** ATF's actions are responsive to the recommendation. Please provide information about the two standing Merit Promotion Boards for GS-15 positions and the executive resource board for SES positions, including but not limited to the frequency of meetings, a description of the process for each board, how membership of each board is determined, and the length of the term board members serve. Additionally, please provide a description of how each boards' process ensure objectivity in selection, as well as any feedback ATF has received

COMPLAINANT 00723

about the feedback component to improve transparency.  Also, please provide any other initiatives to improve transparency in the merit promotion process.

**Recommendation 6:**  Develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.

**Status:**  Resolved.

**ATF Response:**  ATF concurred with the recommendation and said that it will implement a series of initiatives described below.

- To address stigma associated with filing an EEO complaint, ATF will conduct training sessions for staff and supervisors educate the workforce on the Equal Employment Opportunity (EEO) process, emphasizing neutrality and employees' rights to confidentiality.

- To address fear of retaliation for reporting discrimination or filing an EEO complaint:
  a. ATF will continue to hold the workforce accountable for a discrimination and harassment free workplace and for complying with the ATF EEO and anti-harassment policies.  The ATF Deputy Director will issue an EEO Policy Statement in FY 2018.
  b. ATF's Associate Deputy Director will issue a video message describing ATF's commitment to EEO principles and support of the process.  The video message will reiterate the zero tolerance policy related to harassment, including sexual harassment, and inform employees that ATF will not tolerate retaliation for participation in EEO activities.
  c. ATF will develop and issue Anti-Retaliation Guidance for the workforce.
  d. The ATF Office of Equal Employment Opportunity (OEEO), after receiving a formal EEO complaint, will send each named management official an email outlining his or her roles and responsibilities in the process, describing what changes or actions could be considered retaliatory, and how to avoid problematic situations.
  e. ATF will annually train all managers and supervisors on the new Anti-Retaliation Guidance.
  f. ATF will continue to have the Office of Chief Counsel, Management Division, review proposed employment actions to ensure that management bases its actions on legitimate, non-discriminatory reasons.

- ATF will increase communication to the workforce on the benefits of mediation.  OEEO will send each complainant a separate correspondence reminding them that mediation is available even during the formal stage of the EEO complaint process.  ATF said that it will also work with the Department's Complaint Adjudication Office to streamline the process for issuing Final Agency Decisions.  OEEO will also continue to review reports of

71                                                      COMPLAINANT 00724

investigation to ensure that the record is complete for adjudication before sending it to the Complaint Adjudication Office.

- OEEO staff will receive training on "Maintaining Impartiality in the EEO Process, Both in Appearance and in Existence" to increase employee confidence in OEEO.

- To address staff misunderstanding of the EEO process and the role of the OEEO staff, ATF will increase training on the EEO process in the New Employee Orientation, New Supervisors Training, and during OEEO training to field offices.

- The Chief of the OEEO will continue to brief ATF senior executives on any changes in the EEO program areas, trends in complaint data, and assistance needed from agency executives.

**OIG Analysis:** ATF's actions are responsive to the recommendation. Please provide the following:

- an update on training sessions on the EEO process for staff and supervisors emphasizing neutrality and rights to confidentiality, including a description of content, number and dates of classes, and number of participants;

- a copy of the Deputy Director's EEO Policy Statement or an update on when it will be issued;

- a script or copy of the Associate Deputy Director's video message or an update on the development of the video message;

- a copy of the Anti-Retaliation Guidance or an update on the development of the guidance;

- sample emails that OEEO has sent to management officials outlining roles and responsibilities;

- an update on the development of staff training on Anti-Retaliation Guidance, including a description of content and plans for implementation;

- an update on communications to the staff on the benefits of mediation, the number of complainants that have chosen mediation since communications were issued, and the number of complaints that were resolved in mediation;

- an update on communication with the Department's Complaint Adjudication Office and any initiative to streamline the process;

- an update on the development of training for OEEO staff, including a description of content and plan for implementation;

- an update on the increase in sessions/content on the EEO process in the New Employee Orientation, New Supervisors Training, and OEEO training to the field, including a description of content and how it was increased from prior sessions; and

COMPLAINANT 00725

- an update on the OEEO Chief's briefing to senior executives on any changes in the EEO program areas, including a description of trends, changes in the program, and assistance needed from executives.

COMPLAINANT 00726

**APPENDIX 8**

## DEA'S RESPONSE TO THE DRAFT REPORT



**U. S. Department of Justice**
Drug Enforcement Administration

www.dea.gov                                    Washington, D.C. 20537

**MAY 2 1 2018**

MEMORANDUM

TO:         Nina Pelletier
            Assistant Inspector General
            For Evaluation and Inspections

FROM:       Mary B. Schaefer
            Chief Compliance Officer
            Office of Compliance

SUBJECT:    DEA Response to the OIG Formal Draft Report "Review of Gender Equity in the
            Law Enforcement Components"

The Drug Enforcement Administration (DEA) has reviewed the Department of Justice (DOJ)
Office of the Inspector General's (OIG), Evaluation and Inspections Division, report entitled
"Review of Gender Equity in the Law Enforcement Components." DEA acknowledges and is
appreciative of the role the OIG played in examining the issue of gender equity in the workplace and
identifying areas for improvement in the law enforcement components.

OIG made six recommendations in this report. DEA provides the following responses to these
recommendations:

**Recommendation 1. Assess recruitment, hiring, and retention activities to identify barriers to
gender equity in the workforce.**

**DEA RESPONSE**

DEA concurs with the recommendation. DEA has formed a working group comprised of
personnel from the Human Resources Division, Equal Opportunity Office, and Office of
Compliance. This working group will spearhead the recommended assessment. Currently, the
group is examining sources of existing data that can be leveraged in the assessment. During the
week of May 21, 2018, DEA will be presenting the results of this OIG review to a group of 80
recruiters from across the country and across job series at DEA's annual Recruiters' Conference.
DEA executive leadership will seek input from these recruiters in order to obtain their
perspectives on barriers that may exist. The group is also planning on interviewing members

from several employee groups (e.g., EEO coordinators, DEA's Diversity Committee, and the Field Advisory Committee) to receive their observations. Once its assessment is complete, the working group will prepare a strategy for approval by executive management.

**Recommendation 2. Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.**

### DEA RESPONSE

DEA concurs with the recommendation.  Please see DEA's response to Recommendation 1. Once the working group's review is complete, it will prepare a strategy (to include goals for addressing identified barriers to gender equity in the workforce) for approval by executive management.

**Recommendation 3. Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.**

### DEA RESPONSE

DEA concurs with the recommendation.  DEA is currently able to track demographic data on some, but not all, applicants.  DEA will evaluate how to collect demographic data for recruitment activities in all series.  From this, DEA will develop a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.

**Recommendation 4: Identify and take steps to address barriers to advancement for women within the component and among different job types.**

### DEA RESPONSE

DEA concurs with the recommendation.  Please see DEA's response to Recommendation 1. DEA will leverage the established working group to conduct an assessment of recruiting as well as advancement barriers for women.  Those activities will include focus groups, surveys, data analysis, and benchmarking.  From this assessment, a strategy will be developed and approved by executive management.

**Recommendation 5. Develop and implement methods to improve the objectivity and transparency of the merit promotion process.**

### DEA RESPONSE

DEA concurs with the recommendation.  DEA is limited in its ability to unilaterally modify the merit promotion process.  DEA will review its current merit promotion process to look for ways

COMPLAINANT 00728

Nina Pelletier, Assistant Inspector General for Evaluation and Inspections                    Page 3

to improve objectivity and transparency. DEA will evaluate strategies to build trust in the merit promotion process for all employees in all series DEA-wide.

**Recommendation 6. Develop and Implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.**

### DEA RESPONSE

DEA concurs with the recommendation. Over the past two years, DEA has placed a renewed emphasis on educating employees about the Equal Employment Opportunity complaint process, to include a renewed focus on education about the process. In response to this recommendation, DEA will ensure that employees are aware of the multiple paths to report gender discrimination and harassment. DEA will also continue to develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process and will report back to the OIG with its progress.

Thank you for the opportunity to respond and address the OIG's concerns. If you have any questions regarding this response, please contact DEA's Audit Liaison Team at 202-307-8200.

76

COMPLAINANT 00729

## OIG ANALYSIS OF DEA'S RESPONSE

The Office of the Inspector General provided a draft of this report to the Drug Enforcement Administration (DEA) for its comment.  DEA's response is included in Appendix 8 to this report.  OIG's analysis of DEA's response and the actions necessary to close the recommendations are discussed below.  Please provide a status update on the six recommendations by October 18, 2018.

**Recommendation 1:**  Assess recruitment, hiring, and retention activities to identify barriers to gender equity in the workforce.

**Status:**  Resolved.

**DEA Response:**  DEA concurred with the recommendation.  DEA stated that it had formed a working group composed of personnel from the Human Resources Division, Equal Employment Opportunity Office, and Office of Compliance to work on assessing recruitment, hiring, and retention activities.  As of May 21, 2018, the working group was examining sources of existing data to use for the assessment.  During the week of May 21, 2018, DEA presented the results of this OIG review to 80 recruiters from across the country and across job series at DEA's annual Recruiters' Conference.  DEA's executive leadership sought input from the 80 recruiters to obtain their perspectives on barriers that may exist.  The working group was also planning to interview members from several employee groups (e.g., Equal Employment Opportunity (EEO) coordinators, DEA's Diversity Committee, and DEA's Field Advisory Committee) to obtain their perspectives on barriers to gender equity.  Once the working group has completed its assessment, it will prepare a strategy for approval by executive management.

**OIG Analysis:**  DEA's actions are responsive to the recommendation.  Please provide an update on the development of the working group's strategy, including a copy of the strategy, the results of the assessment, and any results from the input of recruiters and employee groups.

**Recommendation 2:**  Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.

**Status:**  Resolved.

**DEA Response:**  DEA concurred with the recommendation.  DEA said that once the working group described in its response to Recommendation 1 completes its review, it will prepare a strategy (to include goals for addressing identified barriers to gender equity in the workforce) for approval by executive management.

**OIG Analysis:**  DEA's actions are responsive to the recommendation. Please provide an update on the development of the working group's strategy.  Once the strategy has been completed, please provide a copy and a description of how it will be implemented.

          COMPLAINANT 00730

**Recommendation 3:**  Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.

**Status:**  Resolved.

**DEA Response:**  DEA concurred with the recommendation.  DEA said that it was able to track demographic data on some, but not all, applicants.  DEA will evaluate how to collect demographic data for recruitment activities in all job series and then develop a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.

**OIG Analysis:**  DEA's actions are responsive to the recommendation.  Please provide an update on the evaluation of how to collect demographic data for recruitment and a copy of the evaluation results, if available.  Also please provide an update on the development and implementation of the plan to track and analyze demographic information on newly hired staff and applicants to evaluate DEA's recruitment strategies.

**Recommendation 4:**  Identify and take steps to address barriers to advancement for women within the component and among different job types.

**Status:**  Resolved.

**DEA Response:**  DEA concurred with the recommendation.  DEA stated that it will leverage the working group described in Recommendation 1 to assess recruiting activities, as well advancement barriers for women.  The working group's activities will include focus groups, surveys, data analysis, and benchmarking.

**OIG Analysis:**  DEA's actions are responsive to the recommendation.  Please provide an update on the development of the working group's strategy for addressing barriers to advancement for women, including a copy of the strategy and a description of the barriers to advancement that women may encounter at DEA.

**Recommendation 5:**  Develop and implement methods to improve the objectivity and transparency of the merit promotion process.

**Status:**  Resolved.

**DEA Response:**  DEA concurred with the recommendation.  DEA stated that it was limited in its ability to unilaterally modify the merit promotion process but that it will review its current merit promotion process to look for ways to improve objectivity and transparency and evaluate strategies to build trust in the merit promotion process for all employees in all series DEA-wide.

**OIG Analysis:**  DEA's actions are responsive to the recommendation.  Please provide an update on the status of the merit promotion process review and the steps that DEA will take to improve transparency and objectivity and to build trust in the DEA merit promotion process.

    COMPLAINANT 00731

**Recommendation 6:**  Develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.

**Status:**  Resolved.

**DEA Response:**  DEA concurred with the recommendation.  DEA said that over the previous 2 years it had renewed its emphasis on educating employees about the EEO complaint process, including a renewed focus on education about the process.  In response to this recommendation, DEA will ensure that employees are aware of the multiple paths to report gender discrimination and harassment.  DEA said that it will also continue to develop and implement methods to address perceptions of stigmatization and retaliation associated with the EEO complaint process and will report back to the OIG with its progress.

**OIG Analysis:**  DEA's actions are responsive to the recommendation.  Please provide an update on how DEA is educating the workforce on EEO and describe the methods being used to address perceptions of stigmatization and retaliation associated with the EEO complaint process.

COMPLAINANT 00732

**APPENDIX 10**

# FBI'S RESPONSE TO THE DRAFT REPORT



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D. C. 20535-0001

May 25, 2018

The Honorable Michael E. Horowitz
Inspector General
Office of the Inspector General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Mr. Horowitz:

The Federal Bureau of Investigation (FBI) appreciates the opportunity to review and respond to your office's report entitled, *Review of Gender Equity in the Department's Law Enforcement Components*.

We are pleased that you found, "...the Department's law enforcement components have taken some steps to increase the diversity of their workforce through recruiting."

We agree it is important, in order to address the concerns and negative perceptions related to gender equity within the various DOJ law enforcement components, for the FBI to identify and address any barriers for women in hiring and promotion activities. In that regard, we concur with your six recommendations for the components.

Should you have any questions, feel free to contact me. We greatly appreciate the professionalism of your audit staff throughout this matter.

Sincerely,

Thomas G. Seiler
Acting Section Chief
External Audit and Compliance Section
Inspection Division

Enclosure

80

COMPLAINANT 00733

## OIG REVIEW OF GENDER EQUITY IN THE DEPARTMENT'S LAW ENFORCEMENT COMPONENTS

### FBI's Response to the OIG Recommendations
### May 25, 2018

**Final Draft Report Recommendation #1:** Assess recruitment, hiring, and retention activities to identify barriers to gender equity in the workforce.

**FBI Response to Recommendation #1:** The FBI concurs with this recommendation and will continue to assess recruitment, hiring and retention activities. The FBI has centered women as one of the two main foci of the last three years of national Special Agent recruiting, the position for which gender equity in recruiting is the biggest concern. The FBI's efforts have shown a mild increase in female applicants, but still short of our stated goal. We are also incorporating unconscious bias training into the recruiter training this year.

**Final Draft Report Recommendation #2:** Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.

**FBI Response to Recommendation #2:** The FBI concurs with this recommendation and will develop and implement component-level recruiting, hiring, and retention strategies and goals. The FBI sets a national recruiting plan each year and presents it to national recruiters in an annual conference each summer. Each year includes setting stretch application targets for each recruiter and then each recruiter works with the division's executive management team to determine how to meet those goals. Some examples are focusing recruiting time on building relationships with organizations of professional women in each AOR or holding dedicated female Special Agent recruiting events, both of which will continue in FY19. In addition, we are running targeted social media and advertising campaigns to increase female applicant engagement and are considering pairing with an academic partner for a larger research study to identify additional barriers.

**Final Draft Report Recommendation #3:** Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.

**FBI Response to Recommendation #3:** The FBI concurs with this recommendation and will develop and implement a plan to track and analyze demographic information on newly hired staff and applicants.

**Final Draft Report Recommendation #4:** Identify and take steps to address barriers to advancement for women within the component and among different job types.

**FBI Response to Recommendation #4:** The FBI concurs with this recommendation and will identify and take steps to address barriers to advancement for women.

COMPLAINANT 00734

**Final Draft Report Recommendation #5:** Develop and implement methods to improve the objectivity and transparency of the merit promotion process.

**FBI Response to Recommendation #5:** The FBI concurs with this recommendation and will develop and implement methods to improve the objectivity and transparency of the merit promotion process. To ensure a more consistent experience for all professional staff hires, we are working to develop training for hiring managers, focusing on what to consider before filling a position and how to run an effective career board. In this training, we are weaving in relevant unconscious bias training.

**Final Draft Report Recommendation #6:** Develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.

**FBI Response to Recommendation #6:** The FBI concurs with this recommendation and have taken the following actions. In October 2017, the FBI Office of EEO Affairs developed and launched a 1-hour in person training block entitled: Mythbusters: EEO Edition (ATTACHMENT A). This in depth block discussed commonly held misconceptions regarding the EEO process from not only employee's view but also from the management official's perspective. The training block specifically addressed perceptions of stigmatization and retaliation during the EEO process. During FY 2018, FBI Assistant Director personally provided this training block at Field Office and Headquarters Divisions supervisory and all hands gatherings. In addition, in April of 2018, FBI Assistant Director personally provided this hour long training block to all FBI Field Office Special Agents in Charge (SAC) during the annual SAC Conference.

OEEOA has ensured that 100% of all new SES members and new SACs receive onboarding briefings by the OEEOA AD. OEEOA ensured that new SES members and new SACs were familiar with EEO federal regulations, reporting requirements, services available to the workforce, and the complaint/investigation resolution process, to help prepare them for success in their new roles and ensure they truly understand the EEO process. During the onboarding, the AD or her designee personally goes over the Mythbusters presentation. OEEOA also observes trends and proactively addresses issues where appropriate, reaching out to Division heads to offer individualized training for personnel based on trends observed. OEEOA briefs every FBI Onboarding Course (ONE) and successfully responds to both HQ and Division requests for OEEOA tailored presentations/training, in order to broaden understanding of EEO basics, services available, the EEO complaint process, sexual harassment (ATTACHMENT B), etc., in order to proactively address potential issues. OEEOA also observes trends and proactively addresses issues where appropriate, reaching out to Division heads to offer individualized training for personnel based on trends observed.

COMPLAINANT 00735

**APPENDIX 11**

# OIG ANALYSIS OF FBI'S RESPONSE

The Office of the Inspector General provided a draft of this report to the Federal Bureau of Investigation (FBI) for its comment. FBI's response is included in Appendix 10 to this report. The OIG's analysis of the FBI's response and the actions necessary to close the recommendations are discussed below. Please provide a status update on the six recommendations by October 18, 2018.

**Recommendation 1:** Assess recruitment, hiring, and retention activities to identify barriers to gender equity in the workforce.

**Status:** Resolved.

**FBI Response:** FBI concurred with the recommendation and stated that it will continue to assess recruitment, hiring, and retention activities. FBI reported that women had been one of the two main foci of Special Agent recruiting during the previous 3 years. FBI has seen a small increase in the number of female applicants to the Special Agent position, but the numbers do not meet its goal. FBI is also incorporating unconscious bias into its recruitment training this year.

**OIG Analysis:** FBI's actions are responsive to the recommendation. Please provide an update on FBI's actions to assess recruitment, hiring, and retention activities and information on the identification of barriers to gender equity. Also, please provide the curriculum for the unconscious bias training session content that will be included in recruitment training.

**Recommendation 2:** Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.

**Status:** Resolved.

**FBI Response:** FBI concurred with the recommendation and stated that it sets a national recruiting plan every year that includes setting "stretch application targets" for each recruiter. The recruiters work with their own field division's executive management team to determine how to meet the targets established in the plan. Additionally, FBI reported that it was running targeted social media and advertising campaigns to increase female applicant engagement and was considering pairing with an academic partner to identify additional barriers to recruiting women.

**OIG Analysis:** FBI's actions are responsive to the recommendation. Please provide a copy of the national recruiting plan with the stretch application targets for each recruiter, copies of the targeted social media and advertising campaigns, and updates on the possible partnership with an academic partner to identify additional barriers to recruiting women.

COMPLAINANT 00736

**Recommendation 3:**  Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.

**Status:**  Resolved.

**FBI Response:**  FBI concurred with the recommendation and will develop and implement a plan to track and analyze demographic information on newly hired staff and applicants.

**OIG Analysis:**  FBI's actions are responsive to the recommendation.  Please provide an update to the development and implementation of the plan to track and analyze demographic information on newly hired staff and applicants, including a copy of the plan, if available.

**Recommendation 4:**  Identify and take steps to address barriers to advancement for women within the component and among different job types.

**Status:**  Resolved.

**FBI Response:**  FBI concurred with the recommendation and will identify and take steps to address barriers to advancement for women.

**OIG Analysis:**  FBI's actions are responsive to the recommendation.  Please describe how FBI will identify and take steps to address barriers to advancement for women.

**Recommendation 5:**  Develop and implement methods to improve the objectivity and transparency of the merit promotion process.

**Status:**  Resolved.

**FBI Response:**  FBI concurred with the recommendation and stated that it will develop and implement methods to improve the objectivity and transparency of the merit promotion process.  The FBI also stated that it was developing training for hiring managers focusing on what to consider before filling a professional staff position and how to run a successful career board; FBI will incorporate unconscious bias content into the training.

**OIG Analysis:**  FBI's actions are responsive to the recommendation.  Please provide an update on the development of the training for hiring managers, including the content of the training and plan for implementation.

**Recommendation 6:**  Develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.

**Status:**  Resolved.

COMPLAINANT 00737

**FBI Response:**  FBI concurred with the recommendation and stated that it has taken actions to address it.  In October 2017, the FBI Office of Equal Employment Opportunity Affairs (OEEOA) developed and launched an in-person training titled "Mythbusters:  EEO Edition"; FBI provided OIG with a copy of the training slides.  The training discusses misconceptions that employees and management may have about the EEO process and specifically addresses perceptions of stigmatization and retaliation.  FBI reported that during FY 2018 the Assistant Director of the OEEOA provided this training in the field and at headquarters supervisory and all-hands meetings and in April 2018 provided it to all FBI Special Agents in Charge (SAC) during the annual SAC Conference.  FBI also reported that OEEOA has provided 100 percent of all new Senior Executive Service (SES) members and SACs onboarding briefings about EEO regulations, reporting requirements, the complaint/investigation process, and available services for the workforce.  FBI stated that OEEOA analyzes trends in EEO complaints and addresses any issues when appropriate, reaching out to division heads to offer training.  OEEOA also provides tailored presentations when requested; FBI provided OIG with a copy of presentation slides for the topic of sexual harassment.

**OIG Analysis:**  FBI's actions are responsive to the recommendation.  Please provide an update on the "Mythbusters: EEO Edition" training sessions, including number and dates of classes and number of participants during FY 2018.  Also provide the description or content of the onboarding briefing OEEOA provides to new SES members and SACs.  Finally, provide any reports or memorandums or compilations of trends in EEO complaints that OEEOA has analyzed and descriptions of how OEEOA has assisted division heads in addressing specific issues.

COMPLAINANT 00738

**APPENDIX 12**

## USMS'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

United States Marshals Service

*Office of the Associate Directors*

*Washington, DC 20530-0001*

May 24, 2018

MEMORANDUM TO:     Nina S. Pelletier
                                 Assistant Inspector General
                                 Office of the Inspector General

FROM:               Katherine T. Mohan
                                 Associate Director for Administration

SUBJECT:       Response to Draft Audit Report: Review of Gender Equity in the
                                 Law Enforcement Components, Assignment Number A-2016-001

       This memorandum is in response to correspondence from the Office of the Inspector General (OIG) requesting comment on the recommendations associated with the subject draft audit report. The United States Marshals Service (USMS) appreciates the opportunity to review the report and concurs with the recommendations therein. Actions planned by the USMS with respect to OIG's recommendations are outlined in the attached response.

       Should you have any questions or concerns regarding this response, please contact Audit Liaison Krista Eck, Office of Professional Responsibility, at 202-819-4371.

Attachment

cc:       Erin Lane
           Deputy Assistant Inspector General
           Office of the Inspector General

           Scott Schools
           Associate Deputy Attorney General
           Department of Justice

           Matthew Sheehan
           Counsel to the Deputy Attorney General
           Department of Justice

           Richard P. Theis
           Assistant Director, Audit Liaison Group
           Internal Review and Evaluation Office
           Justice Management Division

COMPLAINANT 00739

Memorandum from Associate Director for Administration Katherine T. Mohan          Page 2
Subject:  Response to Draft Audit Report: Review of Gender Equity in the Law Enforcement
Components, Assignment Number A-2016-001


cc:      John Kilgallon
         Chief of Staff
         United States Marshals Service

COMPLAINANT 00740

USMS Response to OIG Draft Report
Review of Gender Equity in the Department's Law Enforcement Components
Assignment Number A-2016-001

<u>Recommendation 1:</u>  **Assess recruitment, hiring, and retention activities to identify barriers to gender equity in the workforce.**

**USMS Response** (Concur):  The United States Marshals Service (USMS) currently assesses our intake pools to the extent that we can.  Currently, the USMS recruits for its law enforcement positions under the competitive hiring procedures as governed by 5 C.F.R. Chapter 1, Subchapter A, Parts 1 & 2 and Subchapter B, Part 212.  The last time we posted a nationwide Deputy U.S. Marshal announcement, open to the general public, was in 2012.  We received over 30,000 applicants within 24 hours.  Approximately 20 percent of all eligible applicants were preference-eligible veterans – well over the number of applicants needed to fill the respective vacancies.  As a result, the only applicants referred on by the Office of Personnel Management (OPM) were preference-eligibles (to the exclusion of all non-veterans).  Of the over 30,000 applicants, 9 percent identified as female.  This number dropped to 3 percent once the veteran's preference was applied.  Despite that drop, of the 214 employees hired from that certificate before it closed in 2016, 8 percent were women.

As identified in the Office of the Inspector General's (OIG) Formal Draft E&I Report, lack of hiring authorities is listed as one of the possible barriers to attracting women to law enforcement and we concur with that determination.  In fact, the USMS was not included in the report discussion regarding efforts being taken to increase diversity in recruitment specifically because we do not have the excepted service hiring authority that would allow us to address special or critical needs.  The USMS has been actively seeking the authority to hire under excepted service appointment provisions pursuant to 5 C.F.R. Chapter 1, Subpart B, Part 213 (Schedule B) since early fiscal year (FY) 2017.  This authority would allow us to do more targeted recruiting utilizing a more reasonable number of applicants, with a goal of improving the diversity of the applicant pool.

OPM continues to provide us the applicant statistics we need to track the diversity of our applicant pools.  In addition, we will continue to track the effectiveness of our applicant sourcing, how many we hire, and the retention statistics.  If we are successfully granted excepted service hiring authority, the Human Resources Division (HRD) will be partnering with the Office of Equal Employment Opportunity (OEEO) to implement a national recruiting strategy to include specific outreach to women and other minority groups.

<u>Recommendation 2:</u>  **Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.**

**USMS Response** (Concur):  As stated in recommendation #1, the USMS is already seeking the authority to hire our entry-level Deputy U.S. Marshals under excepted service appointment provisions, in hopes that we would be able to target a more diverse applicant pool.  If we are not

1

COMPLAINANT 00741

granted excepted service hiring authority for our law enforcement positions, we will research and consider the use of a bona fide occupational qualification.

If we are approved for excepted service hiring, as stated in our response to recommendation #1, the USMS is planning to implement a national recruiting strategy to include specific outreach to minority groups.

**Recommendation 3:  Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.**

**USMS Response (Concur):**  Demographic information is already tracked on all of our law enforcement applicants and hires.  Applicant demographics are not available until such time as the certificate is closed, but at that time OPM provides the data to the USMS.  As mentioned above, we are working on a national recruiting strategy to track the success of our recruiting efforts on where and how we recruit to continually improve our representation of women and minority groups.

**Recommendation 4:  Identify and take steps to address barriers to advancement for women within the component and among different job types.**

**USMS Response (Concur):**  Women are underrepresented in Criminal Investigator positions in the USMS.  The lack of excepted service hiring authority hinders agency efforts to expeditiously address this critical need.  However, once on-board, no "glass ceiling" or barriers exist that prevent women from advancing in the Criminal Investigator position or other professional series.  The OIG study found that in the USMS, unlike other components, the proportion of female Criminal Investigators at Grades 13 and 14 were more or less comparable and that the proportion of female Criminal Investigators increased from GS-14 to GS-15 during the study period.  Moreover, women made up 65 percent of the professional staff workforce during the study period, and received an average of 70 percent of the promotions across all professional series, in all grades.

The USMS will continue to provide developmental and training opportunities that support the career advancement of female Criminal Investigators, as well as women across all professional series.  By the close of FY 2018, USMS employees will be provided the opportunity to hone their professional skills, network, and build mentoring relationships at the following women-centered national training conferences:

- Women in Federal Law Enforcement;
- Federally Employed Women;
- National Association of Women Law Enforcement Executives; and
- International Association of Women Police.

**Recommendation 5:  Develop and implement methods to improve the objectivity and transparency of the merit promotion process.**

2

COMPLAINANT 00742

**USMS Response** (Concur): The USMS Human Resources Division (HRD) is currently redesigning the operational merit promotion process and replacing the existing experience-based system with a competency-based assessment when evaluating candidates for GS-1811-13, GS-1811-14, and GS-1811-15 positions. This is a significant improvement to objectivity in the redesigned process. This new redesign uses independent third-party raters instead of USMS employees to assess candidate qualifications, removing the subjectivity of the process. The third-party assessors receive customized training on application of the USMS benchmarks which meets the industry-standard assessor rating methodology. In addition, these assessors receive regular refresher training to ensure continued consistency of application. Quality assurance monitoring is conducted, the results of which are shared with the USMS on a prescribed schedule. The GS-1811-13 process has already been completed and is in use. The GS-1811-14 process will be complete by the end of calendar year 2018. The GS-1811-15 process will be complete by the end of 2019.

For transparency, as part of the competency model, the employees receive feedback reports after completing their assessment. The USMS also provides conversion instructions so employees can determine how their competency scores will contribute to their overall promotion application. This feedback is in addition to the anonymous, ranked promotion score register that is currently posted for the candidates on an internal USMS website. This ranked list helps applicants determine their comparative standing for promotion readiness within the candidate pool.

In addition, the USMS Training Division, in partnership with the USMS HRD, has undertaken a Strategic Initiative to implement training plans specifically designed for the new competencies being developed for the GS-1811-13, -14, and -15 positions, so that employees can ensure they are taking the steps needed to develop themselves in preparation for promotional opportunities.

<u>Recommendation 6</u>: **Develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.**

**USMS Response** (Concur): In FY 2017, the USMS OEEO, in partnership with the USMS Training Division, developed and implemented the "Diversity and Harassment Prevention" online training module via LearnUSMS for all employees. The training, which is administered to all employees on a 2-year cycle, highlights employee and management responsibilities for the prevention of harassment/retaliation associated with the EEO complaint process and recommends behavioral tools that support a diverse and cohesive work environment.

In addition, the USMS OEEO is developing strategies to expand "site visit" activities to district offices throughout the nation. District site visits allow OEEO staff to meet one-on-one with employees and managers to discuss their needs, concerns, and perceptions associated with the EEO complaint process. It is our expectation that five or more site visits will be conducted by the close of FY 2019.

3

COMPLAINANT 00743

## OIG ANALYSIS OF USMS'S RESPONSE

The Office of the Inspector General provided a draft of this report to the U.S. Marshals Service (USMS) for its comment. USMS's response is included in Appendix 12 to this report. OIG's analysis of USMS's response and the actions necessary to close the recommendations are discussed below. Please provide a status update on the six recommendations by October 18, 2018.

**Recommendation 1:** Assess recruitment, hiring, and retention activities to identify barriers to gender equity in the workforce.

**Status:** Resolved.

**USMS Response:** USMS concurred with the recommendation and stated that it currently assesses its intake pools to the extent possible. USMS described the challenges it encounters in getting a diverse applicant pool for law enforcement positions because its competitive hiring procedures require the U.S. Office of Personnel Management (OPM) to refer preference-eligible applicants first and then other applicants. USMS concurred with OIG's determination that a lack of hiring authorities was a possible barrier to attracting women to USMS. USMS said that it had been actively seeking the authority to hire under excepted service appointment provisions pursuant to 5 C.F.R. Chapter 1, Subpart B, Part 213 (Schedule B) since early FY 2017. Excepted service hiring authority would allow USMS to do more targeted recruiting using a smaller number of applicants, with a goal of improving the diversity of the applicant pool.

USMS stated that OPM currently provides the applicant statistics needed to track the diversity of USMS's applicant pools. In addition to this, USMS will continue to track the effectiveness of its applicant sourcing, how many staff it hires, and retention statistics. USMS said that if it were granted excepted service hiring authority its Human Resources Division would partner with its Office of Equal Employment Opportunity (OEEO) to implement a national recruiting strategy to include specific outreach to women and other minority groups.

**OIG Analysis:** USMS's actions are responsive to the recommendation. Please provide the status of USMS's excepted service hiring authority request and describe how USMS will track the diversity of applicant pools from OPM statistics and evaluate the effectiveness of its recruitment efforts. Also, describe how USMS will track recruitment, hiring, and retention to identify barriers to gender equity in in the workforce.

**Recommendation 2:** Develop and implement component-level recruiting, hiring, and retention strategies and goals that address the identified barriers to gender equity in the workforce.

**Status:** Resolved.

                                    COMPLAINANT 00744

**USMS Response:**  USMS concurred with the recommendation.  USMS stated that it was seeking the authority to hire its entry-level Deputy U.S. Marshals under excepted service appointment provisions, as referred to in its response to Recommendation 1.  USMS said that if it were approved for excepted service hiring authority, it planned to implement a national recruiting strategy that would include specific outreach to minority groups, as mentioned in its response to Recommendation 1, and that it hopes that excepted service appointments would allow it to target a more diverse applicant pool.  USMS further stated that if it were not granted excepted service hiring authority for its law enforcement positions, it would research and consider the use of a bona fide occupational qualification.

**OIG Analysis:** USMS's actions are responsive to the recommendation.  Please provide an update on USMS's request for excepted service hiring authority and the status of the development or implementation of the national recruiting strategy that would address the barriers to gender equity in recruitment and hiring, including a copy of the strategy.

**Recommendation 3:**  Develop and implement a plan to track and analyze demographic information on newly hired staff and applicants, as appropriate, to evaluate recruitment strategies.

**Status:**  Resolved.

**USMS Response:**  USMS concurred with the recommendation.  USMS stated that it currently tracks demographic information on all of its law enforcement applicants and hires with the data OPM provides.  As USMS mentioned in its responses to Recommendations 1 and 2, it is working on a national recruiting strategy to track the success of its recruiting efforts, focusing on where and how it recruits to improve its representation of women and minority groups.

**OIG Analysis:**  USMS's actions are responsive to the recommendation.  Please provide an update on the development and implementation of the national recruiting strategy to track the success of recruiting efforts, including a copy of the strategy if available.

**Recommendation 4:**  Identify and take steps to address barriers to advancement for women within the component and among different job types.

**Status:**  Resolved.

**USMS Response:**  USMS concurred with the recommendation.  USMS stated that women were underrepresented in Criminal Investigator positions and that it believed that the lack of excepted service hiring authority hindered its efforts to expeditiously address this critical need.  USMS stated that there were no barriers or "glass ceilings" to advancement for women once they were on board, and that it will continue to provide developmental and training opportunities that support the career advancement of female Criminal Investigators, as well as women across all professional series.  USMS said that by

the close of FY 2018 employees would be provided the opportunity to enhance their professional skills, to network, and to build mentoring relationships at the following national training conferences:

- Women in Federal Law Enforcement,
- Federally Employed Women,
- National Association of Women Law Enforcement Executives, and
- International Association of Women Police.

**OIG Analysis:** USMS's actions are partially responsive to the recommendation. While OIG did not conclude that there were issues with women advancing into supervisory positions at USMS based on our analysis of promotions data, there may still be barriers to advancement for women that other data analysis could reveal. We note that we received testimonial evidence from female USMS Criminal Investigators that they believed such barriers exist and many described problems advancing past certain levels. To fully address the recommendation, please describe how USMS will identify and address real and/or perceived barriers to advancement for women in USMS. Further, describe how the training and development opportunities given to female staff members are expected to enhance their professional skills, networking, and mentoring relationships.

**Recommendation 5:** Develop and implement methods to improve the objectivity and transparency of the merit promotion process.

**Status:** Resolved.

**USMS Response:** USMS concurred with the recommendation. USMS stated that its Human Resources Division was redesigning the operational merit promotion process and replacing the existing experience-based system with a competency-based assessment when evaluating candidates for GS-1811 13, 14, and 15 positions. USMS stated that the redesigned merit promotion process is a significant improvement to objectivity because it uses independent third-party raters instead of USMS employees to assess candidate qualifications, removing the subjectivity of the process. The third-party assessors receive customized training on applying the USMS benchmarks, which meets the industry-standard assessor rating methodology, and regular refresher training to ensure continued consistency in applying benchmarks. The process includes quality assurance monitoring, and the results of the monitoring are shared with USMS on a prescribed schedule. USMS reported that the GS-1811-13 process has already been completed and is in use, the GS-1811-14 process will be completed by the end of calendar year 2018, and the GS-1811-15 process will be completed by the end of calendar year 2019.

USMS said that to improve transparency, employees receive a feedback report after completing their assessment. USMS also provides conversion instructions so employees can determine how their competency scores will contribute to their overall promotion application. This specific feedback is in addition to the anonymous, ranked promotion score that USMS currently posts for the candidates on an internal USMS website. This ranked list helps applicants

determine their comparative standing for promotion readiness within the candidate pool. In addition, USMS said that its Training Division, in partnership with its Human Resources Division, has undertaken a strategic initiative to implement training plans specifically designed for the new competencies being developed for the GS-1811 13, 14, and 15 positions, so that employees can ensure they are taking the steps needed to develop themselves in preparation for promotional opportunities.

**OIG Analysis:**  USMS's actions are responsive to the recommendation. Please provide an update on the status of the GS-1811 14 and 15 assessment processes. In addition, please provide an update on the development of the strategic initiative for GS-1811 13, 14, and 15 position competency training plans.

**Recommendation 6:**  Develop and implement methods to address perceptions of stigmatization and retaliation associated with the Equal Employment Opportunity complaint process.

**Status:**  Resolved.

**USMS Response:**  USMS concurred with the recommendation.  USMS stated that in FY 2017 its OEEO, in partnership with its Training Division, developed and implemented a "Diversity and Harassment Prevention" online training module. USMS stated that the training, which is administered to all employees on a 2-year cycle, highlights employee and management responsibilities for prevention of harassment/retaliation associated with the EEO complaint process and recommends behavioral tools that support a diverse and cohesive work environment.  USMS also said that OEEO is developing strategies to expand site visits to district offices throughout the nation.  District site visits allow OEEO staff to meet one on one with employees and managers to discuss their needs, concerns, and perceptions associated with the EEO complaint process.  USMS expects that OEEO will conduct five or more site visits by the close of FY 2019.

**OIG Analysis:**  USMS's actions are responsive to the recommendation. Please provide a copy of the training curriculum and information on how many employees have taken the training since it was implemented in FY 2017.  Also provide an update on the status of OEEO's site visits, including a list of sites visited, dates of visit, and future plans.

COMPLAINANT 00747



The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.

To report allegations of waste, fraud, abuse, or misconduct regarding DOJ programs, employees, contractors, grants, or contracts please visit or call the **DOJ OIG Hotline** at oig.justice.gov/hotline or (800) 869-4499.

**U.S. DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL**
950 Pennsylvania Avenue, Northwest
Suite 4760
Washington, DC 20530 0001

| **Website** | **Twitter** | **YouTube** |
|---|---|---|
| oig.justice.gov | @JusticeOIG | JusticeOIG |

Also at Oversight.gov