1                UNITED STATES OF AMERICA

2        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

3                WASHINGTON FIELD OFFICE

4      - - - - - - - - - - - - - - - x

5      MARCIANN GRZADZINSKI,            :

6            Complainant,               :   EEOC No.

7                v.                     :   570-2017-00720x

8      JEFFERSON B. SESSIONS, III,      :

9      Attorney General,                :   Agency No.

10     Department of Justice,           :   FBI-2015-00176

11           Agency.                    :

12     - - - - - - - - - - - - - - - x

13                                      Washington, D.C.

14                               Tuesday, November 27, 2018

15     Deposition of:

16                      ERNEST BABCOCK,

17     called for examination by counsel for Complainant,

18     pursuant to notice, at the Law Offices of Kator

19     Parks Weiser & Harris, 1200 18th Street, NW, Suite

20     1000, Washington, D.C., commencing at 9:51 a.m.,

21     before Barbara A. Huber, CSR and Notary Public in

22     and for the District of Columbia

EXHIBIT
24

Page 2

1  APPEARANCES:

2    On behalf of Complainant:

3      DAVID A. HART, ESQUIRE

4      Kator Parks Weiser & Harris, PLLC

5      1200 18th Street, NW, Suite 1000

6      Washington, D.C. 20036

7      202.898.4800

8      dhart@katorparks.com

9

10    On behalf of Agency:

11      JULIET E. GRAY, ESQUIRE

12      U.S. Department of Justice

13      Federal Bureau of Investigation

14      935 Pennsylvania Avenue, NW

15      Washington, D.C. 20535

16      202.324.2714

17      juliet.gray@ic.fbi.gov

18

19    Also Present:

20      Marciann Grzadzinski

21      Marrisa Rose, Law Clerk

22              * * * * *

Page 3

1          C O N T E N T S

2  EXAMINATION BY:                    PAGE

3    Mr. Hart                    5

4    Ms. Gray                   157

5    Mr. Hart                   164

6

7

8

9  DEPOSITION EXHIBITS:               PAGE

10  1 - Document Bates GRZ_FBI003841 - FBI003848   19

11  2 - Document Bates GRZ_FBI002320 - FBI002321   20

12  3 - Document Bates GRZ_FBI002559              23

13  4 - Document Bates GRZ_FBI003705 - FBI003706   28

14  5 - Document Bates GRZ_FBI003722 - FBI003723   37

15  6 - Document Bates GRZ_FBI002308 - FBI002312   44

16  7 - Document Bates GRZ_FBI002921 - FBI002923   54

17  8 - Document Bates GRZ_FBI000861 - FBI000862   56

18  9 - Document Bates GRZ_FBI003077 - FBI003090   61

19  10 - Document Bates GRZ_FBI003435 - FBI003437   73

20  11 - Document Bates GRZ_FBI003438 - FBI003440   77

21  12 - Document Bates GRZ_FBI003486 - FBI003487   94

22  13 - Document Bates GRZ_FBI002542 - FBI002543   96

Page 4

1  DEPOSITION EXHIBITS (continued):        PAGE

2  14 - Document Bates GRZ_FBI002843 - FBI002357   102

3  15 - Document Bates GRZ_FBI000564 - FBI000565   103

4  16 - Document Bates GRZ_FBI003322              105

5  17 - Document Bates GRZ_FBI000769 - FBI000771   108

6  18 - Document Bates GRZ_FBI002829 - FBI002830   115

7  19 - Document Bates GRZ_FBI003282 - FBI003283   116

8  20 - Document Bates GRZ_FBI000166 - FBI000244   119

9  21 - Document Bates GRZ_FBI000813              123

10  22 - Document Bates GRZ_FBI000762 - FBI000766   125

11  23 - Document Bates GRZ_FBI00478 - FBI000482    133

12  24 - Document Bates GRZ_FBI003459              139

13

14

15

16

17

18

19

20

21

22

Page 5

1          P R O C E E D I N G S

2      MR. HART:  So good morning, Mr. Babcock.

3  My name is David Hart.  I'm an attorney for

4  Marciann Grzadzinski.  Also with me is our law

5  clerk, Marissa Rose.  And Ms. Grzadzinski is here

6  as well.

7      So we're here to take your deposition

8  today.  And we met before.

9      Could you, just to start with, just state

10  and spell your name for the record.

11      MR. BABCOCK:  My name is Ernest Babcock,

12  E-R-N-E-S-T, Babcock, B-A-B-C-O-C-K.

13  Whereupon,

14          ERNEST BABCOCK,

15  was called as a witness, and having been first duly

16  sworn, was examined and testified as follows:

17      EXAMINATION BY COUNSEL FOR COMPLAINANT

18  BY MR. HART:

19      Q    And, again, just for the record, who is

20  your current employer?

21      A    The Federal Bureau of Investigation.

22      Q    Okay.  And have you ever been deposed

Page 6

1   before?

2       A   Yes.

3       Q   All right.  So I'm going to go through

4   some ground rules.  Since you've been deposed

5   before, a lot of this is probably -- it's going

6   to -- probably going to sound very familiar.  And I

7   know you've been an attorney for many years, so

8   again, it's kind of just for the formality of it.

9           So we're here to take your deposition

10  today.  It's a question and answer format.  I'll be

11  asking questions.  You'll be giving answers.  The

12  testimony that you give today is under oath, so

13  it's just like you were in a courtroom.  It's made

14  under penalty of perjury.  It's just that a judge

15  or a jury is not here.

16          Periodically throughout the deposition

17  the Agency counsel may be making objections for the

18  record.  Those objections are largely made just for

19  the record.  Unless the Agency counsel instructs

20  you otherwise, you're still expected to answer,

21  notwithstanding the Agency's objection.

22          So other than that, so have you -- are

Page 7

1   you currently taking any medications that may

2   impact your ability to testify truthfully today?

3       A   No.

4       Q   Is there -- are you -- is there any other

5   reason that you would not be able to testify

6   truthfully today?

7       A   No.

8       Q   Okay.  So what is your current position

9   with the FBI?

10      A   I am the chief of staff to the general

11  counsel.

12      Q   When did you become the chief of staff?

13      A   July 23rd.

14      Q   Of what year?

15      A   This year.

16      Q   And before that position, were you

17  working?

18      A   Yes.

19      Q   Where?

20      A   I was a senior counsel in a law firm in

21  Portland, Maine, known as Eaton Peabody, E-A-T-O-N

22  Peabody.

Page 8

1       Q   And was there any gap in your employment

2   in between serving for that law firm and as chief

3   of staff?

4       A   No.

5       Q   So when did you first work for that stint

6   with Eaton Peabody?

7       A   January of 2017.

8       Q   So prior to working for that law firm

9   where were you working?

10      A   I was working for the Federal Bureau of

11  Investigation as a deputy general counsel.

12      Q   And was there any gap in your employment

13  between serving as deputy general counsel and

14  joining Eaton Peabody?

15      A   No.

16      Q   Prior to serving as deputy general

17  counsel where were you employed?

18      A   General Dynamics Corporation.

19      Q   And when did your employment with General

20  Dynamics end?

21      A   In March of 2013.

22      Q   Was there any gap in your employment

Page 9

1   between General Dynamics and becoming deputy

2   general counsel?

3       A   The answer is yes, while waiting for the

4   background check and polygraph to be scheduled.

5       Q   Approximately how long was that gap?

6       A   From March of 2013 till January of 2014.

7       Q   And for that window from March to

8   January, were you considered an FBI employee, or

9   was your -- or were you considered unemployed at

10  that time?

11          Or how would you consider yourself during

12  that time?

13      A   I would say unemployed.

14      Q   Okay.  So prior to working for General

15  Dynamics where did you work?

16      A   There were three positions at General

17  Dynamics, the last was deputy general counsel.

18  Prior to that was general counsel for General

19  Dynamics Land Systems.  Prior to that was general

20  counsel for Bath Iron Works, which is also a

21  General Dynamics company.

22      Q   Just a quick question regarding your

Page 10

1  background.

2      So when you worked for Bath Iron Works,

3  did you have any interaction with someone named

4  Douglas Hart?

5      He was a civil engineer.

6  A  I don't recall.

7  Q  Okay.  So how long did you serve as

8  General Dynamics's deputy general counsel?

9  A  From January of 2010 to March of 2013.

10  Q  And what were some of your duties as

11  deputy general counsel of General Dynamics?

12  A  General Dynamics has thirteen business

13  units, each of whom has a general counsel.  Because

14  I had previously been the general counsel for two

15  of those business units, I was the primary contact

16  for those general counsels, with the corporate

17  headquarters.  In addition to that, I was

18  responsible for most of the litigation, most of the

19  environmental work.

20      I also interfaced with the associate

21  general counsel with regard to labor and employment

22  matters.  I also handled administrative matters

Page 11

1  such as FCPA, government investigations, and also

2  government contracts work.

3  Q  Okay.  So -- and then what was the

4  position that was prior to deputy general -- or

5  prior to becoming deputy general counsel again?

6  A  I was the general counsel and a vice

7  president of General Dynamics Land Systems in

8  Sterling Heights, Michigan.

9  Q  And when did you start in that position?

10  A  July of 2002.

11  Q  Okay.  And was there any gap in your

12  employment between that position and becoming

13  deputy general counsel?

14  A  No.

15  Q  And when -- so the position that you held

16  before that is deputy general counsel for Bath Iron

17  Works?

18  A  Correct.

19  Q  When did you start that position?

20  A  July of 2000.

21  Q  And was there any gap in your employment

22  in that position until you became the general

Page 12

1  counsel and vice president?

2  A  No.

3  Q  So before that Bath Iron Works position

4  where were you employed?

5  A  At a law firm Friedman & Babcock, in

6  Portland, Maine.

7  Q  And when did you start working for that

8  law firm?

9  A  I think it was October of '85, although

10  I'm not positive about that.

11  Q  And are you the Babcock in the Friedman &

12  Babcock?

13  A  Correct.

14  Q  And was there any gap in your employment

15  between working for that firm and joining General

16  Dynamics?

17  A  No.

18  Q  So prior to joining Friedman & Babcock

19  where were you employed?

20  A  At a law firm in Portland, Maine, Pierce

21  Atwood.

22  Q  And when did you join that firm?

Page 13

1  A  In -- I actually started as a law clerk;

2  but as a lawyer, in September of 1973.

3  Q  And so other than those employers that we

4  just went over, were you employed with anybody else

5  after finishing law school?

6  A  No.

7  Q  So did you go to law school?

8  A  Yes.

9  Q  Where?

10  A  Boston University.

11  Q  Sorry?

12  A  Boston University.

13  Q  When did you graduate?

14  A  1973.

15  Q  And you said before that you were serving

16  at Pierce Atwood as a law clerk.

17      Were you working in that job while you

18  were in law school?

19  A  No.  I worked in it from graduation until

20  receiving the bar results.

21  Q  And when did you receive -- that's okay.

22      When did you receive your bar results?

Case 1:20-cv-01411-JEB   Document 27-26   Filed 01/18/22   Page 5 of 61

Page 14

1    A   I believe it was September of '73.

2    Q   Okay.  Where did you go to college?

3    A   Dartmouth College.

4    Q   When did you graduate?

5    A   1970.

6    Q   Did you -- what was your degree?

7    A   An AB.

8    Q   What does that stand for?

9    A   I couldn't tell you.  It's a bachelor's

10   degree.

11   Q   What general subject matter did you

12   study?

13   A   I was an English major.

14   Q   So did you work at all in between getting

15   your college degree and starting law school?

16   A   Yes.

17   Q   Where?

18   A   For the Dallas Cowboys.

19   Q   Just because I'm curious, what did you do

20   for the Dallas Cowboys?

21   A   I was signed as a free agent.

22   Q   So --

Page 15

1    A   And so in case I misheard you, that's

2    between undergraduate graduation and the beginning

3    of law school?

4    Q   Right.

5    A   Okay.  Right.

6    Q   So prior to undergrad, did you have any

7    work history?

8    A   Yes.

9    Q   What, just generally?

10   A   Started washing dishes in the summer camp

11   at the age of 13.

12   Q   Okay.  So are you a current member of any

13   state bar?

14   A   Yes.

15   Q   Which?

16   A   Maine and Michigan.

17   Q   Okay.  And I think we -- so when were you

18   admitted in Maine?

19   A   1973.

20   Q   And when were you admitted in Michigan?

21   A   Either 2002 -- I think 2002, although

22   it's -- conceivably it was 2003.

Page 16

1    Q   At any time since 1973 did you go into an

2    inactive status for your Maine bar membership?

3    A   Yes.  My Maine bar membership was

4    inactive after I left Bath Iron Works, until I

5    returned in December of 2016.

6    Q   And when you say you returned, returned

7    to?

8    A   Active bar status, when I returned to

9    Peabody in January of '17.

10   Q   Okay.  So while you served as deputy

11   general counsel, you did not have an active bar

12   status?

13   A   I was active in Michigan from 2002 until

14   today.

15   Q   Okay.  So -- and the -- have you had --

16   for Michigan, have you had any gap in your active

17   bar status?

18   A   No.

19   Q   Have you ever had a bar complaint filed

20   against you?

21   A   No.

22   Q   When you first applied for the deputy

Page 17

1    general -- when you first became deputy general

2    counsel for the FBI, who selected you?

3    A   Complicated answer.  It was originally

4    Andrew Weissman and Director Mueller.  However,

5    because of a Government hiring freeze and DoJ not

6    approving anyone and the independent action of HRD

7    putting my application on hold until the new

8    director arrived, then I was actually offered a

9    position, which I think would have been by Jim

10   Baker -- even though he wasn't even hired at the

11   time -- and Director Comey.

12   Q   Were you interviewed as part of becoming

13   deputy general counsel?

14   A   Yes.

15   Q   Who interviewed you?

16   A   Elaine Lemert, Nancy Wiegand, Jason

17   Herring, Julie Katzman.  And there may have been

18   one other person, but those are the ones that I

19   remember.

20   Q   Okay.  And ultimately you left your

21   position as deputy general counsel, right?

22   A   Correct.

Page 18

1    Q   Why did you leave?

2    A   I had 16 years of commuting to Maine on

3 weekends from either Michigan or Virginia or

4 Washington, D.C., and I was tired of it.

5    Q   Did anyone at the Bureau encourage you to

6 leave?

7    A   No.

8    Q   Did you receive any indication that

9 someone at the Bureau wanted you to leave?

10   A   No.

11   Q   When did you first meet Ms. Grzadzinski?

12   A   I believe it was at her interview.

13   Q   And that was sometime in late 2014?

14   A   I'm not positive.  But you probably have

15 the dates, and I don't recall.

16   Q   Okay.  So how did you first become aware

17 of Ms. Grzadzinski then?

18   A   I don't specifically recall.

19   Q   Okay.

20   A   I need to ask a clarification.

21   Q   Sure.

22   A   Do you mean with regard to her subsequent

Page 19

1 employment as a deputy general counsel, or

2 otherwise?

3    Q   Just generally, in any fashion.

4    A   She was the CDC at the Washington field

5 office.  And I became aware of her when there was

6 an issue with respect to the payment of parking

7 tickets for FBI agents.

8    Q   Okay.

9    A   I did not meet her, but I was aware of

10 who she was.

11   Q   Did you communicate with her at all

12 before she became deputy general counsel?

13   A   I don't recall.

14      MR. HART:  If you could mark this as

15 Exhibit 1.

16      (Deposition Exhibit No. 1 marked for

17      identification.)

18 BY MR. HART:

19   Q   So just take a minute to look at it.  And

20 let me know whenever you're ready.

21   A   (Witness looked at document).  Okay.

22   Q   Okay.  So do you recognize this email?

Page 20

1    A   I recognize it is an email that was

2 addressed to me, but I do not recall it.

3    Q   Okay.  Do you recall discussing

4 Ms. Grzadzinski's application with Mr. Schoolmaster

5 either in this email or otherwise?

6    A   Not specifically, but I'm -- I'm sure I

7 did.

8    Q   Okay.  Did you have an opinion as to

9 whether or not Ms. Grzadzinski should be

10 interviewed?

11   A   I don't remember having an opinion.

12   Q   Okay.

13      MR. HART:  Would you mark this as 2.

14      (Deposition Exhibit No. 2 marked for

15      identification.)

16      THE WITNESS:  (Witness looked at

17 document).

18 BY MR. HART:

19   Q   So take a minute to review that.  And

20 just let me know whenever you're ready.

21   A   Done it.

22   Q   So does this refresh your recollection as

Page 21

1 to whether or not you had an opinion as to whether

2 or not Ms. Grzadzinski should be interviewed?

3    A   It, in -- in fact, does not refresh my

4 recollection because I don't have one.  But this is

5 an email from me which says, I think we should

6 interview, so --

7    Q   Okay.

8    A   -- I'm happy with that.

9    Q   Sitting here today, do you remember the

10 reasons why you believe Ms. Grzadzinski should be

11 interviewed?

12   A   No.

13   Q   Were you eventually in the interview for

14 Ms. Grzadzinski?

15   A   Yes.

16   Q   Do you recall the questions that you

17 asked in that interview?

18   A   I do not.

19   Q   Do you recall any of Ms. Grzadzinski's

20 answers given in that interview?

21   A   No.

22   Q   Do you recall whether you took notes

Page 22

1  during that interview?

2    A  I am confident I didn't, but I -- I may

3  have.

4    Q  Why are you confident that you didn't?

5    A  Because I usually do not take notes

6  during interviews.  And if I do take notes, I

7  destroy them after the interviews after the

8  decisions are made.

9    Q  So if you did take notes, they would have

10  been destroyed?

11    A  Correct.

12    Q  Do you recall who else was in the

13  interview panel with you?

14    A  James Baker and Tom Bondy.

15    Q  Do you recall whether James Baker took

16  notes during that interview?

17    A  I do not.

18    Q  Do you recall whether Mr. Bondy took

19  notes during that interview?

20    A  I do not.

21    Q  Do you recall any questions that

22  Mr. Baker asked during that interview?

Page 23

1    A  I do not specifically.

2    Q  Do you recall any questions that

3  Mr. Bondy asked during that interview?

4    A  I do not.

5    Q  Do you recall whether that you were

6  interviewing Ms. Grzadzinski for a specific deputy

7  general counsel position?

8    A  My memory is that two of the four deputy

9  positions were open.  And I believe we were

10  interviewing her for both.

11    Q  Okay.

12      MR. HART:  Could you mark this as 3.

13      (Deposition Exhibit No. 3 marked for

14      identification.)

15      THE WITNESS:  (Witness looked at

16  document).  Okay.

17  BY MR. HART:

18    Q  So do you -- so the -- do you recognize

19  this email?

20    A  I don't recall it, but I can read it and

21  I understand what it says.

22    Q  Okay.  So the -- where Mr. Schoolmaster

Page 24

1  references the NSLB DGC position --

2    A  Right.

3    Q  -- is that one of the two positions that

4  you were referencing --

5    A  Yes, it --

6    Q  -- just then?

7    A  -- yes, it is.

8    Q  But that was not the position

9  Ms. Grzadzinski was ultimately selected for?

10    A  That is correct.

11    Q  What position was Ms. Grzadzinski

12  selected for?

13    A  She was selected for the -- I may not get

14  the name correct.  It was the investigative and

15  training law section, I be -- branch, I believe.

16    Q  That's better than I could guess, too,

17  so --

18    A  Okay.

19    Q  So do you have any recollection as to why

20  Mr. Schoolmaster wanted to interview

21  Ms. Grzadzinski for the NSLB position?

22      MS. GRAY:  Object to form.  Calls for

Page 25

1  speculation.

2      THE WITNESS:  I don't know.

3  BY MR. HART:

4    Q  Do you recall why -- did you have an

5  opinion as to whether or not Ms. Grzadzinski should

6  be interviewed for that specific position?

7    A  I don't believe I had an opinion prior to

8  the interview.

9    Q  Okay.  Did you have an opinion after that

10  interview as to whether or not Ms. Grzadzinski

11  should be selected for that position at the time?

12    A  It is -- it was -- it is my memory that

13  my opinion at the time was she was very much

14  qualified for the investigative and training law

15  section, and far less qualified for the national

16  security position.

17    Q  Did you believe that although she was

18  less qualified, she was still qualified to some

19  extent?

20    A  No.

21    Q  Then why was she interviewed for the

22  position?

Page 26

1    A   Well, you -- because her background
2  indicated a certain degree of experience in the
3  area.  But my memory coming out of the interview
4  was that her skills were much more heavily weighted
5  in the other area.
6    Q   Okay.  But I thought you said before that
7  you couldn't recall any of her answers during the
8  interview?
9    A   I don't --
10   MS. GRAY:  Objection.  Form.
11   THE WITNESS:  I don't --
12   MS. GRAY:  -- misstates prior testimony.
13   THE WITNESS:  I don't recall her answers,
14  but I remember what my thought was when I came out
15  of the interview.
16  BY MR. HART:
17   Q   Okay.  Do you remember in any way what
18  formed the basis of that opinion?
19   A   Her answers during the interview.
20   Q   But you don't recall her answers?
21   A   Correct.
22   Q   So eventually Ms. Grzadzinski was

Page 27

1  selected for the investigative law and training
2  branch position --
3    A   Correct.
4    Q   -- is that right?
5        Do you remember who was involved in
6  ultimately making that decision?
7    A   Jim Baker.
8    Q   Okay.  And was Mr. Baker the person who
9  made the final decision on that?
10   A   Yes.
11   Q   Other than yourself, did anybody provide
12  input to Mr. Baker regarding that decision, to your
13  knowledge?
14   A   Tom Bondy and I were both in the
15  interview, but the decision was made by Mr. Baker.
16   Q   But did either of you provide input?
17   A   I do not remember.
18   Q   Okay.  And other than yourself and
19  Mr. Bondy, are you aware of any other individual
20  providing input on whether to select
21  Ms. Grzadzinski?
22   A   No.

Page 28

1    Q   Do you recall when you first began
2  working with Ms. Grzadzinski?
3    A   Not specifically.
4        MR. HART:  Can you mark this.  We're up
5  to 4.
6        (Deposition Exhibit No. 4 marked for
7        identification.)
8        THE WITNESS:  (Witness looked at
9  document).  Yes.
10  BY MR. HART:
11   Q   So do you recall this email exchange with
12  Ms. Grzadzinski?
13   A   I do not.
14   Q   Do you recall why you were looking
15  forward to working with Ms. Grzadzinski?
16   A   Specifically, no.
17   Q   Were you, in fact, looking forward to
18  working with her?
19   A   Yes.
20   Q   Sitting here today, do you have any
21  reason to believe why you -- any reason -- sitting
22  here today, do you have any recollection as to why

Page 29

1  you would want to be working with her?
2    A   One of the stated goals of Jim Baker and
3  the OGC was to solidify the relationship with the
4  CDC community.  Marcy was a prominent member of the
5  CDC community.  And to bring her on board as a
6  deputy would fit perfectly into the plan of
7  bridging that gap, and would accomplish one of the
8  goals of OGC.
9    Q   Do you recall why Mr. Baker wanted to
10  bridge that gap?
11   A   I believe that both her and the director
12  felt that there was not sufficient coordination
13  with regard to the representation of the Bureau
14  among the lawyers who were in OGC and the lawyers
15  who were CDCs or ADCs.
16   Q   In what way was that representation not
17  sufficient?
18   A   I believe it was the observation of the
19  director and Mr. Baker there was not sufficient
20  coordination.  And so you could get in -- I don't
21  have specific examples, but the concern was in --
22  the inconsistent delivery of legal advice to the

Page 30

1  FBI.

2    Q   How did -- what about Ms. Grzadzinski's
3  experience led you to believe that she would be
4  able to have an effect on that?

5    A   She was an experienced and prominent
6  member of the CDC community, and so she would bring
7  to OGC the experience of the CDC community.  So if
8  there needed to be coordination, if there needed to
9  be outreach, she would be uniquely positioned to do
10  that.  That is especially true since neither
11  Mr. Bondy, Mr. Baker, or I had any of those
12  connections.

13    Q   Okay.  And was it your understanding that
14  Mr. Baker wanted that perspective?

15    A   Absolutely.

16    Q   Okay.  So -- and I know OGC eventually
17  restructured, so just to clarify my next question.
18  So I'm talking about before that restructuring
19  happened.

20        So just generally, how many branches
21  within OGC were there?

22    A   Four.

Page 31

1    Q   Do you recall who the deputy general
2  counsels were in charge of those branches?

3    A   The acting deputy general counsel in the
4  national security law branch was Rick McNally.  Tom
5  Bondy was litigation.  And I was the deputy in what
6  was then the general law branch.

7    Q   Okay.  And within OGC structure at that
8  time, who were you responsible for supervising?

9    A   The general law branch was -- my
10  supervision was the fiscal and contract law unit,
11  privacy and civil liberties law unit, the terrorist
12  screening center law unit, and the criminal justice
13  information services law unit.

14    Q   Okay.  And there -- did there come a time
15  that the discovery management unit was under your
16  supervision as well?

17    A   Yes.  For a period of about six months.

18    Q   Do you recall what that period was?

19    A   I do not.  Sort of in the middle of
20  tenure, but I don't remember exactly when.

21    Q   So within that hierarchy, so what kind of
22  tier of employee reported directly to you, either

Page 32

1  section chiefs, unit chiefs, or --

2    A   Of the four law units, they were all unit
3  chiefs.  And it -- discovery management, it was the
4  section chief.

5    Q   Okay.  So what is the difference between
6  a unit chief and a section chief, as far as you
7  understood it?

8    A   The unit chiefs essentially report to the
9  section chief.  And the section chief reports to
10  the deputy.

11    Q   As a practical matter, is there a
12  difference in their authority, between a unit chief
13  and a section chief?

14    A   Practically speaking, I -- I think the
15  answer is yes; in those areas where there is a
16  section chief.

17    Q   Okay.

18    A   But I had four units who reported to me
19  who were unit chiefs directly reporting to
20  deputies.  So, essentially, in that respect, they
21  were on parallel planes.

22    Q   Okay.  And are you aware of, within the

Page 33

1  bureaus, just in terms of who has authority to take
2  certain actions?

3        Is there any substantive difference that
4  where a certain action requires a section chief or
5  above, or anything like that?

6    A   I am not sufficiently familiar with it,
7  other than to say that the section chiefs are
8  usually an SES position, so there are certain
9  things that go with SES positions that don't go
10  with other positions.

11    Q   Okay.  And can you describe for me the
12  difference between a section chief and a deputy
13  general counsel?

14    A   Section chiefs report to deputy general
15  counsels.  And the deputy general counsel reports
16  directly to the general counsel.

17    Q   And as a practical matter, how does that
18  affect their -- their work?

19        Or do they have different authority to
20  take certain actions or --

21    A   From the standpoint of chain of command,
22  if there was an issue that needed to be raised to

Page 34

1 the general counsel, it would be appropriate for
2 the section chief to bring that to the attention of
3 the deputy rather than going directly to the
4 general counsel.
5    Q   Okay.  And they were generally expected
6 to follow that order, going through the deputy and
7 then --
8    A   That's what the hierarchy is.  But it --
9 it -- it was not that formal then and it's not that
10 formal now.
11    Q   Okay.  So for -- you worked -- for some
12 time you were Ms. Grzadzinski's peer, correct?
13    A   Correct.
14    Q   Do you recall how long you were her peer?
15    A   I do not specifically.
16    Q   During the time that Ms. Grzadzinski
17 worked as a deputy general counsel, do you recall
18 working with her on any projects?
19        Just generally.
20    A   I do not.
21    Q   Do you recall discussing with
22 Ms. Grzadzinski a question of whether or not CDCs

Page 35

1 should maintain active bar status?
2    A   Yes.
3    Q   Do you recall when you first began
4 discussing that with Ms. Grzadzinski?
5    A   It was after a meeting that Justin
6 Schoolmaster and I had with Jamilia Frone, the
7 director of OARM.  We had requested the meeting
8 because OARM was being exceptionally slow in
9 processing the approval of lawyers to be hired to
10 OGC.  That was the purpose of the meeting.
11        However, at the end of the meeting, she
12 and her compatriots said to us that we had a
13 serious problem.  And I said, Well, what is that
14 problem?  And she said, For many years there has
15 been an effort to be sure that CDCs and ADCs have
16 active bar licenses.  This is now coming to a head
17 and we need to address it.
18        And so after that meeting, I reported
19 back to the general counsel and to other deputies
20 about that meeting.  I can't tell you exactly when
21 it was, but that was the chain of events.
22    Q   Do you recall what issue caused it to

Page 36

1 come to a head?
2    A   I do not.
3    Q   Do you recall how long this discussion
4 had been going on prior to your involvement?
5    A   A long time.  Once the general counsel
6 asked me to investigate and find out what was going
7 on, I was able to determine that the discussion had
8 been going on for years, and that when Elaine
9 Lemert was the principal deputy and/or Andrew
10 Weissman, she and the unit chief from the legal
11 instruction unit -- who I think was Lisa Baker --
12 had put forth a multiple page memorandum on that
13 topic, which they shared with DoJ and OARM.
14    Q   Okay.  Was the result of that memorandum
15 that they continued to not have required an active
16 bar license?
17    A   I cannot tell you that that memorandum
18 was the reason why, or whether it was just people
19 not thinking it was a big issue anymore.  But the
20 fact of the matter is CDCs and ADCs, after that
21 memorandum, continued not to be required by the FBI
22 to have an active bar license.

Page 37

1    Q   Okay.  And do you recall what Ms. Frone's
2 concerns were, such that the situation had come to
3 a head and needed to be changed, during your
4 tenure?
5    A   I do not know what the precipitating
6 event was, but I know what her concerns and DoJ's
7 concerns were.  And that is that the FBI had
8 lawyers practicing law without licenses.  And
9 that's illegal.  And contrary to DoJ policy.
10    Q   Do you recall when you first started
11 discussing that with Ms. Grzadzinski?
12    A   I believe I told the general counsel and
13 I told the other deputies after that meeting that I
14 just reported to you on.
15        MR. HART:  Can you mark this as -- I
16 think we're at 5.
17        (Deposition Exhibit No. 5 marked for
18        identification.)
19        THE WITNESS:  (Witness looked at
20 document).  Okay.
21 BY MR. HART:
22    Q   So does this refresh your recollection at

Page 38

1  all as to when you started discussing bar statuses
2  with Ms. Grzadzinski?
3      A   No.
4      Q   So if you could look at -- it's on the
5  second page, in the lower right-hand corner.  It
6  says -- it's Bates number 3723.  At the very top is
7  your email.
8          So you're responding to Ms. Grzadzinski
9  and you say, You are terrific?
10     A   Right.
11     Q   Sitting here today, do you recall why you
12 referred to Ms. Grzadzinski as "terrific" in this
13 context?
14     A   Based upon the email that is below that,
15 that's the reason why.  Because -- she -- everyone
16 was on active status, according to her report,
17 except for Brian Earle.
18     Q   Okay.  And --
19     A   That's good news.
20     Q   And if you turn to the next page, do you
21 see Ms. Grzadzinski's response?
22         Oh, you tell all the DGCs that.

Page 39

1      A   Correct.
2      Q   And you said -- and your response was,
3  Believe me, I do not?
4      A   Right.
5      Q   So who are the DGCs that you did not tell
6  that to?
7      A   That's an impossible question to answer.
8      Q   Why is that an impossible question to
9  answer?
10     A   Because you -- you would have to put it
11 in the context of having circumstances which were
12 equally laudable as this one.  And I can't recall
13 that any of the other deputies did anything as --
14 as Marcy had done, which seemed to be an uphill
15 battle.
16     Q   Okay.
17     A   It's not denigrating them.  It's
18 complimenting her.
19     Q   Okay.  Do you recall how this question of
20 whether to require CDC bar statuses was eventually
21 resolved, one way or the other?
22     A   Yes.  The answer was to require it

Page 40

1  absolutely for all CDCs and ADCs.
2      Q   Oh, so other than yourself, Ms. Frone,
3  and Ms. Grzadzinski, do you recall who was involved
4  in that decision?
5      A   Yes.  The other deputies, the deputy
6  director of the FBI, I believe the director of the
7  FBI.  And we also had exchanges with various
8  offices in DoJ.  And I can't give you the names of
9  the people.
10     Q   Okay.  Do you recall whether Mr. Bondy
11 expressed an opinion as to whether the -- they
12 should maintain active bar licenses?
13     A   I do not specifically recall.
14     Q   Do you recall whether Mr. McNally
15 expressed an opinion as to whether or not they
16 should maintain active bar licenses?
17     A   Do not.
18     Q   Do you recall whether Justin Schoolmaster
19 expressed an opinion as to whether they should
20 maintain active bar licenses?
21     A   I do not recall.
22     Q   Approximately, to the best of your

Page 41

1  recollection, approximately how long did it take to
2  resolve this question after this --
3      A   I don't recall.
4      Q   -- email exchange?
5          Other than the legal question -- or,
6  sorry, the ethical question of whether or not they
7  should maintain active bar licenses, were there any
8  practical concerns raised about requiring the
9  active bar license?
10     A   Well, I think it is both an ethical
11 problem and a legal problem, to begin with.  But
12 other problems?  The answer is problems for the
13 individual lawyers.  I mean those lawyers providing
14 legal advice can be subject to both ethical and
15 criminal charges in the states in which they're
16 doing it.  In addition, by violating DoJ policy,
17 they can be subject to dismissal.
18     Q   Okay.  Do you recall whether there were
19 any concerns about the expense of requiring the
20 active bar license?
21     A   Many of the CDCs, for reasons that are
22 completely confusing to me, had allowed their bar

Page 42

1 status to lapse. And in order for them to be
2 reinstated in certain jurisdictions, they would be
3 required to pay their bar dues for that entire
4 period of time, as well as make up CLE
5 requirements. There were certain individuals for
6 whom -- I don't have a specific number, but I
7 believe it may have been as high as 5 or $6,000 to
8 be reinstated.
9   Q  Okay. And did the Bureau reach any
10 conclusion as to how to address those expenses?
11   A  We had lengthy discussions about whether
12 or not we could either ask DoJ, or for the FBI
13 itself to make those payments. And the answer is
14 it would -- it would be absolutely wrong to do so,
15 because we would then be discriminating against all
16 of those people -- CDCs, ADCs, or OGC lawyers --
17 who had paid their own fees and CLE requirements.
18 So it would unfairly treat the people who had done
19 what they were supposed to have done.
20   Q  Okay. And, ultimately, the Bureau did
21 not pay their back bar dues?
22   A  As far as I know.

Page 43

1   Q  Other than Ms. Grzadzinski, do you recall
2 any other employees expressing disagreement with
3 that -- oh, and the CDCs, do you recall any other
4 employee expressing disagreement with the decision
5 to require active bar licenses?
6   A  There were a number of CDCs. And I don't
7 have the names, but it -- it was not a small number
8 of people.
9   Q  Other than the CDCs?
10   A  I do not recall anyone else.
11   Q  Is it that you do not recall any specific
12 person, or you don't recall anybody just generally
13 expressing --
14   A  I don't recall anyone generally
15 expressing a contrary opinion other than
16 Ms. Grzadzinski, Elaine Lemert, Lisa Baker, and a
17 group of CDCs.
18   Q  Okay. Do you recall a discussion as to
19 who should prepare the analysis of whether the
20 CDC -- the CDC should have the active bar licenses?
21   A  I recall that there was a discussion, but
22 I -- I -- and I know what the result was, but I

Page 44

1 don't know what took place in the discussion.
2      MR. HART: Could you mark that as 6.
3      (Deposition Exhibit No. 6 marked for
4      identification.)
5      THE WITNESS: (Witness looked at
6 document). Yeah.
7 BY MR. HART:
8   Q  Do you recall why Ms. Chen did not want
9 ILU to do the data analysis?
10   A  I do not recall specifically what's
11 beyond this email.
12   Q  Okay. Do you recall whether a decision
13 was made to have ILU or Ms. Chen do the analysis?
14   A  The decision was made to have Ms. Chen do
15 the analysis.
16   Q  Who made that decision?
17   A  Mr. Baker.
18   Q  Do you recall any recollection as to why
19 Mr. Baker made that decision?
20   A  I believe he had supreme confidence in
21 the legal ability of Catherine Chen.
22   Q  Okay. If you could turn to the -- so

Page 45

1 it's the last and second to last page. So the
2 email starts at -- it's 2311 in the lower
3 right-hand corner.
4   A  Right.
5   Q  It's an email to Marcy from Bryan
6 Underwood.
7      So just as background, do you know who
8 Bryan Underwood is?
9   A  I do not recall.
10   Q  But do you see that he's transmitting
11 comments from other individuals, in this email
12 exchange?
13   A  I do see that.
14   Q  So do you re -- so could you just take a
15 minute and review these comments. And let me know
16 when you're ready.
17   A  (Witness looked at document). I've read
18 it.
19   Q  Okay. So looking at the first comment on
20 2312, do you recall whether Mr. Baker expressed any
21 opinion regarding a comment that the legal --
22 the -- I'm just reading from the document -- that,

Page 46

1 The legal analysis done to determine that CDCs are
2 practicing government lawyers was lacking?
3      Do you recall having -- expressing an
4 opinion at all as to that comment?
5      A  I do not specifically recall.
6      Q  Okay.  So turning to the next comment, so
7 do you see where it says, Short-sighted and
8 probably designed to begin eliminating the Agent
9 CDC?
10      Do you recall Mr. Baker expressing any
11 opinion as to that particular comment?
12      A  No.  But that -- that comment is
13 completely outrageous.  And it was not anyone's
14 idea to do that.
15      Q  Okay.  And so turning towards the last
16 comment in there, so where it says at the very end,
17 We will have 0 SAs available as relief, do you know
18 what SA stands for?
19      It's at the very, at the -- in the last
20 sentence in the last comment.
21      A  I assume that means "special agent," but
22 I don't know.

Page 47

1      Q  Do you recall Mr. Baker expressing any
2 opinion as to whether or not -- as to the effect
3 this will have on having special agents available
4 for relief?
5      A  No.  His -- he -- he absolutely wanted to
6 have the best lawyers possible anywhere in the FBI,
7 whether there be CDCs or ADCs or legal advisors or
8 anyone else who was providing legal advice.  And it
9 was not the idea to eliminate anybody.  It was just
10 make them obey the law.
11      Q  After this decision was made to require
12 active bar licenses, what, if anything, did the
13 Bureau do to address the -- the concern that there
14 would not be special agents available to serve as
15 relief?
16      A  I disagree with the premise that there
17 would not be special agents available.
18      Q  Okay.  Did you have any discussion with
19 Mr. Baker regarding Ms. Grzadzinski's input on this
20 issue about CDCs?
21      A  Yes.
22      Q  Do you recall when you had those

Page 48

1 discussions?
2      A  Specific dates and conversations, no.
3      Q  Do you remember the general time period
4 at all?
5      A  It -- it was whenever she first expressed
6 her opinion that they did not need to be licensed.
7      Q  Do you remember what the substance of
8 those conversations were?
9      A  I can give you sort of the summary.  I
10 can't give you specific times, dates, and words.
11      Q  Summary's fine.
12      A  The summary was that her legal analysis
13 was flat out wrong.
14      Q  Okay.  And do you recall any specifics as
15 to why the -- so was that your opinion, or was that
16 Mr. Baker's opinion?
17      A  Both.
18      Q  Do you recall why you reached that
19 conclusion?
20      A  Because these people are practicing law
21 and giving legal advice; therefore, they need to be
22 licensed.

Page 49

1      Q  Okay.  And after you reached that
2 decision, did either you or Mr. Baker relay that
3 opinion to Ms. Grzadzinski?
4      A  Many times.
5      Q  On approximately how many occasions?
6      A  I don't recall.
7      Q  So in these discussions with Mr. Baker,
8 did you have them in-person?
9      A  I am sure that there were in-person
10 discussions, yes.
11      Q  Do you recall whether you exchanged
12 emails with him about this?
13      A  I do not.
14      Q  So when you say you don't -- you do not,
15 do you mean you don't recall having email
16 discussions at all, or you just don't have any
17 recollection of whether --
18      A  There could have been emails or not, I
19 have no memory.
20      Q  Other than with Mr. Baker, did you
21 discuss the -- Ms. Grzadzinski's input on this
22 issue with anybody else?

Page 50

1    A   I am sure at some point I spoke with
2  Catherine Chen, and perhaps the other deputies,
3  although I don't have a specific recollection of
4  either of those discussions.
5    Q   Do you recall what you discussed with
6  Ms. Chen about Ms. Grzadzinski's input?
7    A   My question was whether or not Marcy's
8  legal position was supportable.
9    Q   Okay.  In your experience as a deputy
10  general counsel, have you ever encountered another
11  employee who would -- directly reported to you
12  whose legal analysis you found lacking?
13    A   I do not.
14    Q   Okay.  In your experience as deputy
15  general counsel, did you ever encounter a circum --
16  a circumstance where, other than with this instance
17  with Ms. Grzadzinski, where you found another
18  deputy general counsel's legal analysis lacking?
19    A   The answer is no, as far as strictly
20  legal analysis is concerned.  But the answer is
21  yes, many times, as concerning the strategic
22  approach to legal questions.

Page 51

1    Q   Regarding that latter category that you
2  described, did you ever have those concerns
3  regarding Tom Bondy?
4    A   The answer is yes.
5    Q   What were those concerns?
6    A   I'm -- I'm try -- I specifically recall
7  that we -- we had a -- this may be Tom Bondy or it
8  may be Nancy Wiegand, I am not positive.
9        But the issue was whether or not legal
10  hold orders would be signed by lawyers in the
11  litigation branch or by paralegals in the discovery
12  management section.  And I absolutely had that
13  dispute.  And I do not know if that was still while
14  Tom Bondy was responsible for that section, or if
15  it was after I became responsible for that and my
16  dispute was with the acting person in that branch
17  at that point, which may have been Cecilia Bessee,
18  but I don't recall.
19    Q   Okay.
20    A   And I have a vague recollection of
21  another issue with Tom Bondy strategically handling
22  a legal issue, but I can't -- I can't remember what

Page 52

1  it was.
2    Q   And for these issues, did you report them
3  to Mr. Baker -- or did you express your concerns to
4  Mr. Baker?
5    A   I believe they came up during our morning
6  deputies's meetings.  And that's when I said what I
7  said.
8    Q   Did you ever express concerns regard --
9  in that general realm regarding Rick McNally's
10  work?
11    A   While he was the acting deputy general
12  counsel?
13    Q   Yes.
14    A   I do not recall that.
15    Q   What about when he was a section chief
16  afterwards?
17    A   I -- Rick is a good lawyer.  He, in his
18  section chief position, I think became more of an
19  advocate for OTD than acting as an independent
20  counsel to try to get them to do what they wanted
21  to do in the right fashion.  And so it wasn't
22  illegal; but, strategically, I don't think he was

Page 53

1  following the right path.
2    Q   Did you express those concerns to
3  Mr. Baker?
4    A   Maybe not in so many words, but yes.
5    Q   Do you recall generally how senior
6  executives service employees within the Bureau are
7  rated for their performance?
8        Are you familiar at all with that
9  process?
10    A   I am familiar with the PAR process that
11  was in place when I was there, which included the
12  rating of SES employees.  But I'm not familiar with
13  any separate rating beyond that.
14    Q   Okay.  Can you describe for me your
15  understanding of how that PAR process works?
16    A   The employee is supposed to put together
17  a performance plan, review that with his or her
18  supervisor.  There is then supposed to be a midyear
19  review of that.  And then there is supposed to be,
20  at the end of the rating period, a rating by the
21  supervising attorney, to go over with the employee.
22  And then the employee either agrees or disagrees.

Page 54

1  Q   And the supervising attorney, is that
2  usually the person's first-line supervisor?
3  A   Yes.
4  Q   So the best that you can recall -- strike
5  that.
6      Do you recall there being an issue in
7  March 2015 regarding whether employees have had --
8  SES employees had completed required training?
9  A   I do not recall that.
10  Q   Okay.
11     MR. HART:  Would you mark this as 7.
12     (Deposition Exhibit No. 7 marked for
13     identification.)
14     THE WITNESS:  (Witness looked at
15  document).  Okay.
16  BY MR. HART:
17  Q   If you can turn to -- it's page 2922, on
18  the second page.
19     Do you recall receiving this email from
20  Mr. Schoolmaster?
21  A   No.
22  Q   So if you could look at the training

Page 55

1  modules that he lists in his email -- or sorry,
2  that is -- it's in Mr. Walsh's email below, that
3  Mr. Schoolmaster is forwarding.
4      Do you see where I'm referring to there?
5  A   Yes.
6  Q   Do you recall taking those trainings?
7  A   Yes.
8  Q   Do you recall whether there was ever an
9  issue regarding other employees completing those
10  trainings?
11     Other than this email itself.
12  A   I -- I do not.  This -- this email is the
13  only thing that is helping me on this topic.
14  Q   Okay.  Do you ever recall discussing with
15  Mr. Schoolmaster or with Mr. Baker whether other
16  SES employees within OGC were not completing
17  required training?
18  A   I have no specific memory, but that's
19  what Mr. Schoolmaster's memo says.
20  Q   Okay.
21     MR. HART:  So if you could mark this as
22  8.

Page 56

1      (Deposition Exhibit No. 8 marked for
2      identification.)
3      THE WITNESS:  (Witness looked at
4  document).  Yes.
5  BY MR. HART:
6  Q   So if you could turn to -- so it's the
7  first email in this chain.  It's Bates number 862,
8  in the lower right-hand corner.  So it's your first
9  email.
10     You say, Since there are some vacancies.
11     And then you give the current totals.
12     What were those vacancies for?
13  A   There were unfilled CDC, ADC positions.
14  Q   And when you say 78 active and 37
15  inactive, is that referring to their bar status?
16  A   Correct.
17  Q   Do you recall who did that survey?
18  A   I think Carl Benoit, who was the unit
19  chief head of the legal instruction unit, but I'm
20  not positive.
21  Q   So if you could look at Ms. Frone's
22  question.  So it starts on 8 -- Bates number 861

Page 57

1  and then goes on to Bates number 862.
2      So if you look at her second question,
3  she says, You noted that the list may not be
4  completely accurate because some CDCs are members
5  of multiple bars.
6      Have you been able to determine the
7  specific state bars at issue?
8  A   Right.
9  Q   Do you recall whether there was ever a
10  resolution to that question?
11  A   I do not.
12  Q   So for her next question, whether the
13  CDCs and ADCs are covered under a collective
14  bargaining agreement, do you recall whether the --
15  the answer to that question?
16  A   The answer's no.
17  Q   And then in her final question she said,
18  In speaking with PRAO, they inquired about whether
19  the FBI is considered not only -- is considering
20  not only requiring active bar membership, but also
21  changing CDCs from 1811 investigator to attorneys
22  in the 905 series.

Page 58

1      Do you know if that change was ever made?

2    A   It was not.

3    Q   Okay.  Do you recall whether that --

4  making that change was discussed?

5    A   Yes.

6    Q   With who?

7    A   It was a part of the general discussion

8  involving this whole topic.  Many people.

9    Q   Okay.  Do you recall why the decision was

10  made to not convert them to the 905 series?

11    A   I believe the CDCs made a case that

12  because of the method by which they are

13  compensated, they would be penalized if they were

14  moved to 905.

15    Q   Okay.  Do you recall what it was that

16  would have caused that?

17    A   No.

18    Q   So --

19    A   I'm sure I knew at the time, but I don't

20  know it today.

21    Q   Okay.  From your understanding of the CDC

22  position, are they required to provide legal

Page 59

1  analysis as part of their positions?

2    A   Yes.

3    Q   In 2015 were they required to provide

4  legal analysis as part of their positions?

5    A   Yes.

6    Q   Were they allowed to defer to the U.S.

7  Attorney's Office at all?

8    A   Sure.  They could defer to the U.S.

9  Attorney's Office.  They could defer to OGC.  But

10  if they're asked a legal question and they answer

11  it, they're providing legal advice.

12    Q   Okay.  But they were allowed to defer to

13  those offices?

14    A   Sure.  But that does -- being allowed to

15  run for President doesn't mean you're gonna be

16  President.  The answer is if they answer legal

17  questions, they're providing legal advice.

18    Q   Okay.  So turning back to the question of

19  the PAR process.

20      So approximately how many times have you

21  personally been through the process for conducting

22  your own evaluation, or someone else doing their

Page 60

1  evaluation of you, I mean?

2    A   You mean --

3    Q   Yeah, how many --

4    A   -- for me?

5    Q   Yes.

6    A   Okay.  Well, I was employed in the Bureau

7  for three years.

8    Q   Okay.  And did you receive a PAR all

9  three years?

10    A   I don't remember.

11    Q   Who would have been responsible for

12  completing your PAR for those three years?

13    A   Mr. Baker.

14    Q   And do you recall what his evaluations of

15  you were for that first year that you were --

16    A   No.

17    Q   Do you recall what his evaluations of you

18  were for the second year?

19    A   No.

20    Q   And do you recall what his evaluations of

21  you were for the third year?

22    A   No.

Page 61

1    Q   When you first joined the Bureau, did you

2  complete a probationary period?

3    A   I assume I did, but I don't know.

4    Q   Do you have any recollection of going

5  through the probation -- just probation --

6  probationary period process for evaluating an

7  employee within that -- in a probationary period?

8    A   No memory.

9    Q   Okay.

10      MR. HART:  If you could mark this as 9.

11      (Deposition Exhibit No. 9 marked for

12      identification.)

13      THE WITNESS:  (Witness looked at

14  document).  Yes.

15  BY MR. HART:

16    Q   So do you recall receiving Mr. Baker's

17  SES plan that's here?

18    A   I do not have a memory of it, but I'm

19  sure I did.

20    Q   Do you recall preparing your own SES plan

21  based off of Mr. Baker's?

22    A   I don't have a specific memory of it, but

Page 62

1  I assume I did.

2      Q    Do you recall what you were required to

3  include in your SES plan as part of preparing it?

4      A    My memory is there was a dropdown menu on

5  the form, which had required sections in it.  I

6  can't tell you what they all were, but I believe

7  that's how the process worked.

8      Q    Okay.  Was this some sort of system that

9  they used at the Agency that it was automated

10  through that process?

11     A    Correct.

12     Q    What was that system called?

13     A    I don't recall.

14     Q    Was this the same system you used just

15  generally for dealing with performance evaluations;

16  for example, did you use the same system to

17  evaluate your own employees?

18     A    Yes.

19          Most of Mr. Baker's plan, which is here,

20  is generated by that system.  And then you add to

21  it your specific measures and objectives for

22  yourself.

Page 63

1      Q    Okay.  And your understanding was that

2  you were supposed to prepare your own plan?

3      A    Correct.

4      Q    And -- but you don't have any specific

5  recollection of whether you actually did personally

6  prepare that?

7      A    I do not have a specific recollection,

8  although I am reasonably certain I did.

9      Q    So do you recall why it was that you had

10  to wait until you received Mr. Baker's plan to

11  prepare your own?

12     A    Because the -- the theory behind it is

13  that the senior executive would set the goals for

14  the division.  And they would then cascade down to

15  the subordinates.  And so to the extent applicable

16  to them, they would be incorporated in their plans.

17     Q    Okay.  So from your understanding, would

18  you, as a deputy general counsel, have been able to

19  prepare your plan prior to receiving Mr. Baker's

20  plan?

21     A    The answer is you -- you would have the

22  ability to go online and look at what the required

Page 64

1  elements would be for all of -- all of the SES

2  participants.

3          But you wouldn't necessarily be able to

4  look at the Office of Inspector General things,

5  other than the fact most of those cascaded from

6  many meetings that we had in which we discussed

7  what OGC's goals and objectives would be.  So I

8  think most people would have a pretty good idea of

9  what was going to be in his plan, although I

10  wouldn't necessarily have to select everything.

11     Q    Okay.  And what meetings did you discuss

12  that in?

13     A    There were meetings that involved the

14  deputies; and I think they involved the section

15  chiefs; and there may have even been some that

16  involved the unit chiefs, to go over the OGC's

17  strategic plan, including the goals and objectives.

18          I mean these specific measures and so

19  forth, Alyssa Flocco, who wrote the memo, was the

20  secretary for all of these meetings.  And was

21  charged with keeping all of the information

22  together.  And it was -- it was a process

Page 65

1  throughout the year.  I mean it didn't happen the

2  day before the plans were there.

3      Q    Okay.  So when you said Ms. Flocco was in

4  those meetings, what was she doing in them?  Was

5  she adding input, taking notes, or --

6      A    She -- she -- she was the recording

7  secretary.  Okay.  I mean there were a lot of

8  people in those meetings with lots of ideas.  And

9  her job was to keep them in the appropriate format,

10  which eventually ends up in the things you're

11  looking at in Mr. Baker's plan where it says OGC

12  SMS's objective P3, or measure P3.  And so those

13  things were all part of a profession.

14     Q    Okay.

15     A    And SMS was the plan, which was

16  Bureau-wide.

17     Q    Okay.  So -- and eventually in June --

18  actually, what time is it?  I think we're --

19          MS. GRAY:  11:05.

20          MR. HART:  I was going to get into a

21  relatively long subject matter, if anybody needs a

22  break.

Page 66

1    THE WITNESS: Break's a great idea.
2    MR. HART: Then off the record.
3    (Recess)
4    MR. HART: Okay.  So we are back on the
5  record.
6  BY MR. HART:
7    Q    So do you know who Trisha Anderson is?
8    A    Yes.
9    Q    How do you know her -- or know of her,
10  rather?
11   A    She became the deputy general counsel in
12  the national security law branch at the FBI.
13   Q    Do you recall when she became deputy
14  general counsel?
15   A    I do not.
16   Q    Was that the first time you met
17  Ms. Anderson?
18   A    I did not know her prior to her contact
19  with the FBI.
20   Q    Okay.
21   A    If that's what your question is.
22   Q    Did you know of her prior to her contact

Page 67

1  with the FBI?
2    A    My first knowledge of her was Mr. Baker
3  mentioning her name.
4    Q    Okay.  In what context did Mr. Baker
5  mention her name?
6    A    As a candidate to be the deputy general
7  counsel of the national security law branch.
8    Q    Do you recall approximately when that
9  was?
10   A    I do not.
11   Q    What involvement, if any, did you have in
12  Ms. Anderson's selection as deputy general counsel?
13   A    I don't believe any.
14   Q    Did anyone at any time ask you for your
15  opinion as to whether Ms. Anderson should be
16  selected?
17   A    I don't recall.
18   Q    Did you at some point develop an opinion
19  as to whether Ms. Anderson should be selected as
20  deputy general counsel?
21   A    My memory -- which could flat out be
22  wrong -- is that she was a direct hire, and the

Page 68

1  decision was made by Mr. Baker.  If -- if there had
2  been an interview, I would have been in it, but I
3  don't recall there being one.
4    Q    Okay.  Do you have -- but did you
5  personally develop an opinion as to the merits of
6  her selection?
7    A    After she was selected, the answer is
8  absolutely yes.
9    Q    Okay.  And how did you reach that
10  conclusion?
11   A    I worked with her.  She was an incredibly
12  bright and intelligent lawyer.  She had an
13  outstanding background.  She had a very good
14  relationship with DoJ, which was fantastically
15  important as far as being successful in that area
16  of OGC.  She had a very good demeanor.  And she
17  cared about the FBI.
18   Q    Are you aware of anyone other than
19  Ms. Anderson and Ms. Grzadzinski that applied for
20  that NSLB position?
21   A    I have no idea.
22   Q    Was there anyone that you believe was

Page 69

1  qualified, other than Ms. Grzadzinski and
2  Ms. Anderson, that you're aware of?
3    MS. GRAY:  Objection to form.  It
4  misstates --
5    THE WITNESS:  I --
6    MS. GRAY:  -- prior testimony.
7    THE WITNESS:  -- I -- I do not know who
8  applied.
9  BY MR. HART:
10   Q    But in your opinion, in interacting with
11  other attorneys, as deputy general counsel within
12  OGC, were there any attorneys that you interacted
13  with that you believed would have also been
14  qualified for that position?
15   A    Jason Herring, the former deputy, was
16  eminently qualified.
17   Q    Any other individuals?
18   A    I can't think of anyone else.
19   Q    Do you have an opinion as to whether or
20  not Nancy Wiegand would have been qualified to
21  occupy that position?
22   A    I think the answer is yes, I have an

Page 70

1  opinion.

2      Q   What is that opinion?

3      A   The answer is no.

4      Q   Why not?

5      A   First of all, she is a very poor manager.

6  And that -- that organization was in want of

7  serious management.  And, secondly, I do not recall

8  her having any national security background.

9      Q   Did you have any opinion as to whether or

10  not Lisa Matsumoto was qualified for that position?

11      A   Lisa Matsumoto, in my view, was a very

12  solid lawyer.  She was a very good manager of her

13  people.  But I -- I personally do not know anything

14  about her national security background.

15      Q   Okay.  But sitting here today, do you

16  have any opinion as to whether or not she would be

17  qualified for that position?

18      A   I -- I don't have that opinion, because I

19  don't know what her national security background.

20  I think Lisa is a terrific lawyer and a good

21  manager.

22      Q   And sitting here today, do you have any

Page 71

1  opinion as to whether or not Rick McNally was

2  qualified for that position?

3      A   Rick McNally is qualified for that

4  position by virtue of experience; but the problem

5  is he is not a particularly good manager and,

6  frankly, was not successful when he was the acting

7  deputy general counsel at NSLB.

8      Q   Okay.  In what way was he not successful?

9      A   He did not manage the process well.  He

10  did not do a good job of getting products delivered

11  on time.

12      Q   What do you mean when you say he did not

13  manage the process well?

14      A   There were -- there were meetings when he

15  was in that position and I was in my position in

16  which Mr. Baker would ask him more than once for

17  the same information, and couldn't seem to get the

18  products delivered on time.

19      Q   On approximately how many occasions do

20  you recall that happening?

21      A   I don't know.

22      Q   Was it more than five?

Page 72

1      A   I don't know.

2      Q   Were there any specific negative results

3  from these delays, that you can recall?

4      A   No.

5      Q   Did you express to Mr. Baker your

6  concerns about his management of the process?

7      A   No.

8      Q   Why not?

9      A   Because Mr. Baker made it clear to

10  Mr. McNally when he was not happy with his

11  management of the process.

12      Q   And do you recall any instances where

13  Mr. Baker did make -- did express that?

14      A   Yes.

15      Q   What instances?

16      A   Oh, I -- no, I do not recall the

17  specifics but I have a specific memory of Mr. Baker

18  saying to Mr. McNally, I had asked you for A, B, C

19  in a meeting two days ago.  What's the progress on

20  that?  And if there was no progress, he expressed

21  his displeasure.

22      Q   Do you recall any other concerns with

Page 73

1  Mr. McNally's management?

2      A   No.

3      Q   As acting?

4      A   Not specifically.

5      Q   Generally, do you recall any?

6      A   No.

7      Q   Do you recall Mr. Baker expressing any

8  other concerns regarding Mr. McNally's handling

9  of -- as acting deputy general counsel?

10      A   I do not.

11      Q   Okay.  Eventually OGC conducted a

12  reorganization; is that right?

13      A   Yes.

14      Q   Do you recall when that reorganization

15  was?

16      A   I do not.

17          MR. HART:  Why don't you mark this as --

18  I believe we are at 10.

19          (Deposition Exhibit No. 10 marked for

20          identification.)

21          THE WITNESS:  (Witness looked at

22  document).

Page 74

BY MR. HART:

2    Q    And I believe there may be two copies of
3  the same email stapled together in here.
4         Yeah, it does look like it's the same
5  email.
6         MS. GRAY:  Although, just to point out
7  that this second email has an additional email on
8  the top.
9         MR. HART:  Oh, it does?  Oh, if you could
10  pull that back email off, that'll separate it out.
11  Because I did not mean to make that as the --
12        MS. GRAY:  Is that starting at page 3438?
13        MR. HART:  Yes.
14        THE WITNESS:  (Handing document).
15  BY MR. HART:
16    Q    Actually -- (Counsel separated
17  documents).
18        Here you go (Handing document).
19        And just so we're clear for the record,
20  what we've marked as Exhibit 10 is the Agency's
21  Bates number 3435 through 3437.
22        So if you could read the email.  And let

Page 75

1  me know when you're ready.
2    A    (Witness looked at document).  Yes.
3    Q    Okay.  So if you see Mr. Baker's initial
4  interview, where he's listing -- so he lists
5  Goals/Vision, Problems.  So actually where I'm
6  looking at is -- what I want to draw your attention
7  to is above that, at the very top of page 3436.
8         It says that, This is a follow-up to
9  several conversation we have been having.
10        Do you recall what those conversations
11  were?
12    A    I remember that there were conversations
13  around the topics which resulted in this document,
14  but specifically, no.
15    Q    Okay.  Do you remember if those were in
16  the meetings you described earlier with the
17  deputies and section chiefs, or some other
18  meetings?
19    A    I suspect they were in those meetings,
20  although I don't specifically recall.
21    Q    Okay.  So what was your understanding of
22  what you needed to do in response to Mr. Baker's

Page 76

1  request to prepare branch plans?
2    A    As represented by this email, I believe
3  Mr. Schoolmaster and I were responding to the email
4  from Mr. Baker as to whether he had captured what
5  it is that we'd discussed.  I think this is in the
6  middle of a process.
7    Q    Okay.  And there was -- if you see on the
8  first page, 3435, so there's a jump from March 2nd,
9  2015, from Mr. Baker's email to another email from
10  Mr. Baker dated April 7th, 2015.
11        Do you recall what work, if any, you did
12  on these branch plans in between March 2nd and
13  April 7th?
14    A    I do not.
15    Q    Is it that you don't recall what work you
16  did, or you just don't recall generally whether you
17  did work at all?
18    A    I do not recall whether I did anything
19  with regard to this between those two dates.
20    Q    Okay.  And if you see your response, you
21  say, Justin does not think that we are properly
22  understanding the assignment.

Page 77

1         How did you come to the conclusion that
2  that's what Justin was thinking?
3    A    I assume from a conversation with him,
4  but I don't remember.
5    Q    When did you have that conversation with
6  him?
7    A    Don't know.
8    Q    Do you recall what in that conversation
9  led you to that conclusion?
10    A    No.
11    Q    Do you recall how this was resolved after
12  your email exchange with Mr. Baker?
13    A    I do not.
14    Q    Other than this email exchange, do you
15  recall Mr. Baker ever expressing concerns about
16  these branch plans?
17    A    I have no memory of it one way or the
18  other.
19    Q    Okay.
20        MR. HART:  If you could mark this as 11.
21        (Deposition Exhibit No. 11 marked for
22        identification.)

Page 78

1      THE WITNESS:  (Witness looked at

2  document).  Okay.

3  BY MR. HART:

4      Q    So do you see where Mr. Schoolmaster

5  stated, It's a tough assignment to do on paper?

6      A    Yes.

7      Q    Did you agree with that assessment?

8      A    Don't recall.

9      Q    And then after that he says, You

10  definitely have enough topical prompts for a very

11  good in-person discussion.

12         Do you recall whether that in-person

13  discussion ever happened?

14     A    I do not.

15     Q    Do you recall ever actually completing a

16  branch plan?

17     A    I do not.  And by that, I mean I don't

18  think they were completed.

19     Q    Okay.  Do you have a recollection as to

20  why they were completed -- were not completed,

21  rather?

22     A    Specifically, I do not.  But I think

Page 79

1  Mr. Schoolmaster's suggestion was probably

2  followed, that it resulted in more discussions,

3  rather than putting something down on paper.  But I

4  do not have a specific recollection of it.

5      Q    And returning to what we were starting to

6  talk about earlier for the reorganization.

7         Were you involved at all in that

8  reorganization?

9      A    Yes.

10     Q    What was your role?

11     A    I had many, many discussions, starting at

12  the time that Elaine Lemert was still the principal

13  deputy, with Mr. Baker on his -- and others -- on

14  his view that the organization of OGC needed to be

15  changed.

16     Q    Do you recall generally when those

17  discussions started?

18     A    Well, they started when Elaine was still

19  there, so had to be fairly early on in my tenure.

20     Q    Okay.  Do you have an understanding of

21  why you were included in those discussions?

22     A    Because I was one of the deputies.

Page 80

1      Q    Did you have an understanding of why that

2  mattered, you being a deputy, to be included in the

3  conversation?

4      A    Because in looking -- in literally

5  looking at the organizational chart, it was

6  Mr. Baker's impression early on that there should

7  be three branches as opposed to four, because the

8  span of control for the -- for the two smaller

9  branches was not appropriate to be run by a deputy,

10  in his view.

11     Q    Other than yourself or any other deputy

12  general counsels involved in those -- other than

13  yourself and Ms. Lemert, were any other deputy

14  general counsels involved in those discussions?

15     A    I don't recall specifically.

16         And at -- at some point I will say that

17  Mr. Schoolmaster was involved in those discussions.

18  And all the participants, I'm not sure.

19     Q    Was there anyone else that you can

20  specifically recall that was involved other than

21  those individuals that you just listed?

22     A    I cannot think of anyone else.

Page 81

1      Q    Did you have understanding of why the

2  reorganization was conducted in 2015 instead of

3  earlier?

4      A    I don't think there was any specific

5  reason.  I think it was just slow progress in

6  getting a reorganization underway.

7      Q    Okay.  Do you recall what it was that was

8  causing the slow progress?

9      A    I -- I can't identify any -- anything

10  specifically.  I will tell you that early on Elaine

11  Lemert was vehemently opposed to it, even as she

12  was going out the door.  And so I think that caused

13  there to be a delay in executing the plan.

14     Q    Did you have an understanding of why

15  Ms. Lemert was vehemently opposed to it?

16     A    First order of business is that she did

17  not think I was capable of handling the job, if I

18  was the person to end up being the deputy in charge

19  of both of those branches.

20     Q    And what did she mean by that?

21         I'm just -- I don't --

22     A    I wasn't --

Page 82

1    Q    -- understand.

2    A    -- Elaine Lemert.  I wasn't an agent.  I

3  didn't know as much as she did.  I came from

4  private practice in corporate America.  And I

5  didn't know what I was doing.

6    Q    Okay.  And how did you know that was

7  Ms. Lemert's opinion?

8    A    She made it clear.

9    Q    In what way?

10    A    By saying it.

11    Q    Who did she say that to?

12    A    Mr. Baker.

13    Q    On approximately how many occasions?

14    A    Don't know.  He relayed it to me.

15    Q    In what context did he relay it to you?

16    A    In his asking me whether or not I thought

17  I was capable of handling the job if I got the job.

18    Q    Okay.  At what point in the process was

19  the decision made to -- or I apologize if this is

20  not the right terminology; correct me for whatever

21  term -- terminology you use -- but to subsume the

22  investigative law and training branch and the

Page 83

1  general law branch?

2    A    I -- I can't tell you what the date was,

3  but that was sort of Jim Baker's idea from the very

4  beginning.

5    Q    Okay.  And how did you come to that

6  understanding?

7    A    From conversations with him.

8    Q    And did you also discuss with him what

9  would happen to the deputy general counsel for that

10  branch once that transition was made?

11    A    Jim Baker, if he said it one time, said

12  it a hundred times, whether it pertained to the

13  reorganization of OGC or the reorganization of

14  NSLB, which is a comparably long process, was:  We

15  will not have this conversation revolving around

16  people.  This is a conversation involving the

17  management of a group of people in an

18  organizational construct.  We are not going to talk

19  about people.

20         And he started literally every discussion

21  on that topic in that fashion.

22    Q    Did you agree with that approach?

Page 84

1    A    I think that that is a reasonable

2  management approach.  However, I think at some

3  point you have to deal with the people because

4  that's their livelihood; it's their job; and you

5  gotta deal with it.

6    Q    Did you express that opinion to

7  Mr. Baker?

8    A    I don't think I said it in so many words,

9  but I'm sure he knew how I felt about it.

10    Q    From what you recall about the

11  reorganization process, did Mr. Baker ever

12  eventually take steps to address that individual

13  aspect of it?

14    A    I don't recall.

15    Q    Did there ever -- from what you can

16  recall, did there ever come a time that his opinion

17  on that changed?

18         MS. GRAY:  Object to form.  Calls for

19  speculation.

20         THE WITNESS:  I -- no, I -- in any

21  conversation I ever had with him on the topic of

22  reorganization, whether it was OGC as a whole or

Page 85

1  whether it was NSLB, he began the conversation

2  with:  We're not gonna talk about people.  We're

3  gonna talk about what's best for the organization.

4         So I -- I saw no evidence of the fact

5  that his opinion changed, or his -- his approach to

6  reorganization changed.

7  BY MR. HART:

8    Q    Okay.  And when the reorganization

9  eventually happened, did you discuss with Mr. Baker

10  where to move the employees that were affected by

11  the reorganization?

12    A    I imagine I did, but I have no specific

13  memory of it.

14    Q    Okay.  Do you recall any discussions

15  regarding where to place Ms. Grzadzinski after the

16  organization?

17    A    I think we must have discussed it, but I

18  do not recall it.

19    Q    Okay.  Do you recall at all what

20  positions you considered placing Ms. Grzadzinski in

21  after the reorganization?

22    A    I'm not certain of the chronology,

Page 86

1  meaning -- you said the -- but the only position
2  that I think was discussed was section chief.
3      Q   Okay.  Do you have any recollection of
4  discussing any other positions?
5      A   No.
6      Q   Do you remember when the decision was
7  made to place Ms. Grzadzinski in that section chief
8  position?
9      A   I do not.
10     Q   Do you recall why the decision was made
11 to place Ms. Grzadzinski in that section chief
12 position?
13     A   Yes.
14     Q   Why was that decision made?
15     A   Well, her background and the area in
16 which she had been successful was the area in which
17 she became the section chief.  From the standpoint
18 of her being a deputy general counsel, that was not
19 discussed because she had not been successful in
20 being a deputy general counsel.
21     Q   And that was your opinion at the time of
22 the reorganization?

Page 87

1      A   Yes.
2      Q   How did you reach that opinion?
3      A   From my observations of what it is that
4  she failed to contribute to the management of OGC
5  in the morning meetings, from her inability to
6  interact with the other deputies, from her failure
7  to keep the general counsel informed of things that
8  were going on in her unit.  And she -- she has
9  skills, but they are not at the level of a deputy
10 general counsel.
11     Q   Can you recall any specific instances?
12     A   The -- the instances that I recall that
13 lead me to that judgment are, number one, the thing
14 we talked about with regard to the active bar
15 membership question.  I mean it was a stated
16 purpose known to everyone that Jim Baker wanted to
17 solidify the relationship between OGC and the CDC
18 community.
19         And it was -- it was -- he was not the
20 person who was the reason why we had to have active
21 bar memberships.  That was the law.  That's what
22 OARM said.  That's what DoJ said.  So, therefore, a

Page 88

1  deputy general counsel with responsibility in that
2  area should say, yes, sir, we understand what the
3  message is; and we're going to do everything we can
4  to make this transition as smoothly as we can.
5         Marcy did completely the opposite.  She
6  went out and rallied the troops to object to what
7  was going on, and to come as close to having a
8  revolt as possible, which was completely contrary
9  to the reason why she was hired.  So that's number
10 one.
11         Number two is she never participated as
12 part of the senior management.  She would come to
13 the morning meetings.  And every time she was asked
14 what's going on, she would say "nothing"; meaning
15 she wouldn't say nothing, she would say, "I have
16 nothing to report."  It is impossible to be a
17 deputy general counsel at the FBI day after day
18 after day and have nothing to inform the general
19 counsel about what's going on.
20         The role of the deputy is to avoid
21 problems for the general counsel, who goes to two
22 meetings a day with the senior management in the

Page 89

1  FBI.  He can't be going into those meetings and
2  say, hey, I heard this was going on; what do you
3  know about it?  And for him to say, I have no idea
4  what you're talking about.  So that was a failure
5  of communication in that respect, and a failure to
6  manage risk and to keep him informed about what was
7  going on.
8         The other piece of the complete
9  separation from what's going on is that rather than
10 taking an office which was located where her people
11 were located, she chose to take a fancier office
12 three floors away.  And that just demonstrates an
13 inability of a manager to relate to their people,
14 whether or not they go up and down stairs to see
15 them or not.  And it puts them on a pedestal, so
16 that their employees feel that they are
17 inaccessible.
18     Q   Okay.  Were you aware that some of
19 Ms. Grzadzinski's employees had suggested that she
20 take that office?
21     A   Absolutely not.  But what -- her role as
22 a deputy would have been:  No, thank you.  I need

Page 90

1 to be where you are.

2     Q    And you, personally, had two different

3 offices at OGC for some time, right?

4     A    I had one office on the seventh floor.

5 And I had an interior office in the discovery

6 management section.

7     Q    Why did you have those two offices?

8     A    Because I, for six months, was managing

9 the discovery management section.

10    Q    So which of those was your primary office

11 unrelated to the --

12    A    The one on the seventh floor, which was

13 my primary job.

14    Q    So what units were on the seventh floor

15 that you were responsible for supervising?

16    A    On the seventh floor?

17    Q    On the seventh floor.

18    A    Okay.  The fiscal and contract law unit,

19 privacy and civil liberties unit, the investigative

20 law unit were -- were -- all of the headquarters

21 units that I was responsible for were all on the

22 seventh floor.

Page 91

1     Q    Okay.

2     A    Except when I was asked to go to

3 discovery management.  And I didn't ask them to

4 move; I took an interior office when I was there.

5     Q    How often would you use the tenth floor

6 office?

7     A    Daily.  Multiple times a day.

8     Q    When you were on the tenth floor, did you

9 not supervise your employees that were on the

10 seventh floor?

11    A    Of course I did.

12    Q    And you were able to do that on the tenth

13 floor?

14    A    Yes.  But -- but it is -- it is not

15 anywhere near as effective as a manager when you're

16 managing from a distance.  And I can tell you that

17 because part of my responsibilities as a deputy

18 included managing the -- the criminal justice

19 information services which is at West Virginia,

20 which is a hard thing to do.  Also, eventually

21 managing OTD, the forensic sciences unit, and the

22 legal instruction unit, which are in Quantico, and

Page 92

1 the legal forfeiture unit, which is in the Woodies

2 Building.  So, I mean, I know how to manage at a

3 distance, but the answer is, it is nowhere near as

4 good as being on the floor with people.

5     Q    Okay.  And were you aware that

6 Ms. Grzadzinski would go down to the seventh floor

7 to be with her people, from her tenth floor office?

8     A    Yes.

9     Q    Okay.  And why was that not sufficient?

10    A    She needed to be there.  And she needed

11 to not act like she was better than her people by

12 being on a different floor and having a bigger

13 office.  The size of the office doesn't make any

14 difference.  It's how you relate to what your job

15 is.

16    Q    Okay.  Were you aware of any other SES

17 employees that were not physically close to the

18 employees they supervised?

19        MS. GRAY:  Object to form.  Vague.

20        THE WITNESS:  In NSLB, TSC is not located

21 in headquarters.  And there is another group that's

22 located at LX.

Page 93

1 BY MR. HART:

2     Q    Were you aware that Ms. Grzadzinski

3 supervised herself as DGC, supervised employees

4 that were also not located at headquarters?

5     A    Yes.

6     Q    What were some of those units that she

7 supervised?

8     A    The legal instruction unit and the legal

9 forfeiture unit.

10    Q    And were you aware that Ms. Grzadzinski

11 maintained an off-site desk at those sites in order

12 to supervise her employees there?

13    A    I know that she spent a lot of time at

14 Quantico.

15    Q    Were you aware that she specifically

16 chose a desk on the floor of those units?

17    A    I know she spent time there.  I do not

18 know physically where she was.

19    Q    Okay.  Were you aware that she

20 specific -- that she opted to not take office space

21 and instead chose a desk space in order to be

22 closer to her employees?

Page 94

1    A    No.
2    Q    Do you recall discussing this issue
3  regarding Ms. Grzadzinski's selecting the tenth
4  floor office with Mr. Baker?
5    A    Yes.
6    Q    And what were those discussions?
7    A    I do not recall them specifically.  I can
8  say generally we both thought it was inappropriate
9  for her to do that.
10    Q    And at any point did you or Mr. Baker
11  instruct Ms. Grzadzinski not to take that office?
12    A    It was not my position.  It was his.  And
13  I don't know whether he did or not.
14    Q    But you don't have any personal
15  recollection of him instructing her not to do that?
16    A    No.
17    Q    And when you arrived as deputy general
18  counsel, did you receive any specific instruction
19  to occupy a particular office?
20    A    I was told where to go by Elaine Lemert.
21    MR. HART:  If you could mark this as 12.
22    (Deposition Exhibit No. 12 marked for

Page 95

1    identification.)
2    THE WITNESS:  (Witness looked at
3  document).  Okay.
4  BY MR. HART:
5    Q    So does this refresh your recollection at
6  all as to when the decision was made to move
7  Ms. Grzadzinski out of the deputy general counsel
8  position?
9    A    It does not refresh my recollection, but
10  the document suggests that it was around that time,
11  in May of 2015.
12    Q    Okay.  So if you could look at your email
13  that's at the bottom of page 3486.
14    You're asking, Will Jim have had the
15  organizational discussion with her before that?
16    Is that referring to the discussion to
17  inform Ms. Grzadzinski of the reorganization?
18    A    That is -- that is what I would conclude
19  from reading the email, yes.
20    Q    Okay.  And why were -- do you have any
21  recollection as to why you were concerned about the
22  timing of when that conversation was going to

Page 96

1  occur?
2    A    I do not, other than -- other than what
3  the email says.
4    Q    Okay.  And if you turn to your first --
5  I'm sorry, it's the last email chronologically, but
6  it's all the way at the top of the first page.  So
7  your May 26, 2015, email.
8    So you say, Just want to be prepared.
9    A    Correct.
10    Q    Do you recall what you wanted to be
11  prepared for?
12    A    I do not.
13    Q    Okay.
14    MR. HART:  Actually, if you could mark
15  this as 13.
16    (Deposition Exhibit No. 13 marked for
17    identification.)
18    THE WITNESS:  (Witness looked at
19  document).  Yes, sir.
20  BY MR. HART:
21    Q    Okay.  So do you recall sending this
22  email to Mr. Schoolmaster?

Page 97

1    A    I do not.
2    Q    Do you recall why you sent him -- sorry.
3  Strike that.
4    Do you recall what aspect of this that
5  led you to believe that this -- that this totally
6  failed to thank Rick for acting, what aspect of
7  this announcement?
8    A    I don't have a specific recollection of
9  it, but based upon what the email says and what the
10  email was that Mr. Baker sent out, I -- it was my
11  opinion then and it's my opinion now that if there
12  has been an acting person in a particular position
13  when someone comes into the permanent position, it
14  would be appropriate to thank them for their
15  service.
16    Q    Okay.  And did you express that opinion
17  to Mr. Baker?
18    A    I don't recall.
19    Q    Do you recall whether after this, to your
20  personal knowledge, Mr. Baker did actually thank
21  Mr. McNally for acting?
22    A    No memory.

Page 98

1    Q    So after the reorganization occurred,

2  several women in OGC filed EEO complaints; is that

3  correct?

4    A    I do not know that.

5    Q    Were you aware that Ms. Grzadzinski filed

6  an EEO complaint after that reorganization?

7    A    I am aware of that now.

8    Q    Okay.  When did you first become aware of

9  that?

10   A    Do not recall.

11   Q    Do you recall if it was before or after

12  Ms. Grzadzinski was removed from the SES?

13   A    I -- I have no idea.

14   Q    Okay.  Were you aware that Nancy Wiegand

15  filed an EEO complaint after the reorganization?

16   A    No.

17        Let me say this.  People talk about these

18  things.  But I have not seen any documents about

19  anybody filing anything except for this complaint.

20   Q    Okay.  Why do you say people talk about

21  things?  What do you mean by that?

22   A    Because people among coworkers talk about

Page 99

1  things.  Okay.  And so rum -- there are rumors.

2  And those rumors could have been that other people

3  filed complaints.  But I have no knowledge of it,

4  and -- and had no conversations with anybody

5  involving any of them.

6    Q    Okay.  How did you learn of these rumors?

7    A    I don't -- I don't recall.

8    Q    Okay.  Do you recall what the substance

9  of these rumors were?

10   A    No.

11   Q    Do you recall approximately the time

12  period that you became aware of these rumors?

13   A    I do not.

14   Q    Did you ever discuss these rumors with

15  Mr. Baker?

16   A    No.

17   Q    Did Mr. Baker -- from what you can

18  recall, did Mr. Baker ever bring up these rumors?

19   A    No.

20   Q    After the reorganization, you became

21  Ms. Grzadzinski's immediate supervisor, right?

22   A    Correct.

Page 100

1    Q    Approximately how long did you serve as

2  Ms. Grzadzinski's immediate supervisor?

3    A    I do not recall.

4    Q    Was it until she was removed from the

5  SES?

6    A    Yes.

7    Q    After she was removed from the SES, do

8  you know where she was reassigned to?

9    A    I am not positive, but I think it was

10  TSC.

11   Q    All right.  And just for the record, what

12  does TSC stand for?

13   A    Terrorist screening center.

14   Q    Do you know what her new position at TSC

15  was?

16   A    I do not know the answer, but I think it

17  was as a unit chief, with no change in pay.

18   Q    Okay.

19   A    But I do not know that.

20   Q    Okay.  For the time period that you were

21  Ms. Grzadzinski's supervisor, what were your

22  responsibilities in relation to her?

Page 101

1    A    I think you'll have to be more specific

2  than that.

3    Q    So what role did you have in supervising

4  her?

5        Did you do her performance evaluations?

6  Did you work with her in her day-to-day?  Things

7  like that.

8    A    I did her performance evaluation, and

9  participated with Mr. Baker in enumerable meetings

10  to try to help her be more successful.  And I

11  provided feedback to her after those meetings and

12  at other times.

13   Q    Okay.  And returning to the PAR process.

14        So did you understand that in becoming

15  her immediate supervisor, that the PAR process for

16  Ms. Grzadzinski changed insofar as she no longer

17  built her plan off of Mr. Baker's but rather built

18  it off of yours?

19   A    I understand in a perfect world that's

20  how that would have happened.  But I think because

21  of the timing of the change in her position, that

22  became somewhat difficult.

Page 102

1    Q   Okay.  What do you recall of it becoming
2  somewhat difficult?
3    A   I think it was hard for her to sort of
4  switch plans in midstream, which is somewhat
5  understandable.  And I also think that there was
6  somewhat of a delay in Mr. Baker responding to her
7  PAR evaluation.
8    Q   Okay.  And her PAR evaluations, that's --
9  that's the performance appraisal that occurs at the
10  end of the year?
11    A   Correct.
12    MR. HART:  Can you mark this -- I think
13  we're at 14.
14    (Deposition Exhibit No. 14 marked for
15    identification.)
16    THE WITNESS:  (Witness looked at
17  document).  Okay.
18  BY MR. HART:
19    Q   Okay.  So do you recall receiving this
20  email from Mr. Schoolmaster?
21    A   No.
22    Q   So do you recall that in or -- in or

Page 103

1  around July of 2015 you were still working on
2  their -- or individuals were still working on their
3  SES plans?
4    A   I am sure that's true.
5    Q   And do you recall having a conversation
6  with Ms. Grzadzinski after this email regarding how
7  she should handle it?
8    A   I believe there was such a conversation.
9  I can't recall exactly what it was.
10    Q   Okay.
11    MR. HART:  Would you mark this as 15.
12    (Deposition Exhibit No. 15 marked for
13    identification.)
14    THE WITNESS:  (Witness looked at
15  document).  Okay.
16  BY MR. HART:
17    Q   Okay.  So does this refresh your
18  recollection at all as to your conversations with
19  Ms. Grzadzinski?
20    A   It does.
21    Q   So do you recall ever discussing this
22  confusion with Mr. Baker?

Page 104

1    A   Not specifically.
2    Q   Okay.  Generally do you recall discussing
3  this issue with him?
4    A   We had conversations about her PAR review
5  and plan at some point, but I can't tell you when
6  or what the substance was other than the fact that
7  we did talk about it.
8    Q   Okay.  And do you recall whether you
9  actually forwarded your plan to her?
10    A   I do not.
11    Q   Do you recall whether there was an
12  expectation that these SES plans be completed by a
13  certain date?
14    A   I am sure.
15    Q   Do you recall what that expectation was?
16    A   I do not.
17    Q   Do you recall ever having conversations
18  with Mr. Baker about that expectation?
19    A   Not specifically.
20    Q   Okay.  Generally do you?
21    A   Well, I mean there is a -- at the
22  beginning of the plan year, there -- there is a

Page 105

1  schedule that is sent out which involves when plans
2  are supposed to be completed, when the midyear is
3  supposed to take place, and when the PAR is
4  supposed to happen.  There are dates that are set
5  for a long period of time.  And I'm confident there
6  was communication concerning meeting those
7  deadlines.
8    Q   Is there any particular individual or
9  office who is expected to help you as a manager go
10  through that process?
11    A   There may be, but I do not recall.
12    Q   Do you know who Michael J. Harding is?
13    A   I believe he was in some branch of HRD.
14  And he was the -- the SES program person.  I think,
15  if -- I can't give his exact title, but I think
16  that's what his job was.  And he is the -- probably
17  the one who sent out saying this is your deadline,
18  and don't screw up.
19    Q   Okay.
20    MR. HART:  So can you mark this as 16.
21    (Deposition Exhibit No. 16 marked for
22    identification.)

---

**Page 106**

1    THE WITNESS:  (Witness looked at

2  document).  Yes.

3  BY MR. HART:

4    Q    So does this refresh your recollection at

5  all as to Mr. Harding's involvement in the process?

6    A    It confirms that he was a human resources

7  specialist in the senior executive service unit.

8    Q    Okay.  And so do you see in this email

9  where he indicated they must receive a plan dated

10  7/2/2015 or earlier?

11    A    Yes.

12    Q    So if you could compare that with the

13  email that we marked as Exhibit 15.

14       So -- so this is -- you indicate this is

15  a July 7th email -- and I'm looking at Exhibit

16  15 -- a July 7th email from you to Ms. Grzadzinski

17  saying that you're going to send along your plan?

18    A    Right.

19    Q    So that -- that was after the July 1st

20  deadline?

21    A    That is correct.

22    Q    Also, just to clarify, in Exhibit 15 you

---

**Page 107**

1  say, Which, of course, is largely OBE.

2       What does OBE stand for?

3    A    Overcome by events.

4    Q    Okay.  And what did you mean by that?

5    A    I do not recall.

6    Q    Do you recall if any other employee was

7  not able to submit their SES plan by that July 1st

8  deadline?

9    A    I do not.

10    Q    Do you remember any discussions with

11  Mr. Baker regarding employees not meeting that July

12  1st deadline?

13    A    I do not.

14    Q    So just mechanically, to understand how

15  the process works, so these SES plans, how do they

16  relate to the ultimate PAR, P-A-R, for individuals?

17    A    You are graded on that plan.

18    Q    Okay.

19    A    And -- you are accomplishing it or

20  not.

21    Q    Okay.  So the performance expectations

22  were based off of that SES plan?

---

**Page 108**

1    A    Right.  Now, in -- in the PAR, there are

2  specific categories and numbers that are assigned

3  to those for grading.  So there is not what I would

4  call a one-to-one correlation between the SES plan

5  and that review.  It is how it is in meeting the

6  SES plan that you fall within those categories and

7  succeed.

8    Q    Okay.  And is that your understanding of

9  the process for all SES employees?

10    A    Yes.

11    MR. HART:  Could you mark this as 17.

12    (Deposition Exhibit No. 17 marked for

13    identification.)

14    THE WITNESS:  (Witness looked at

15  document).  Okay.

16    MR. HART:  Also, I think we're about to

17  get into another lengthy line of questioning, if

18  anybody needs a break or if we want to take an

19  early lunch or --

20    THE WITNESS:  I'm -- I'm good but --

21    MR. HART:  Okay.

22    THE WITNESS:  -- if anybody else needs a

---

**Page 109**

1  break, that's fine with me.

2    (Witness looked at document).  Okay.

3  BY MR. HART:

4    Q    So if you could turn to -- so it's

5  Ms. Grzadzinski's email.  It starts on the first

6  page and it runs onto the third page.

7    A    Right.

8    Q    Do -- actually, do you recall why

9  Ms. Grzadinski was sending this email?

10    A    I -- I can't answer it specifically but I

11  can answer it generally.

12    Q    Okay.  In what way?

13    A    That in the efforts that Mr. Baker and I

14  made to try to have her be successful in her new

15  position, we wanted to do everything we could to

16  sort of break her out of "I have nothing to report

17  as a deputy general counsel," to set forth a new

18  method of doing business.

19       And that was perhaps as a result of this

20  or perhaps as a result of conversations I had with

21  her in which she should report what it was that her

22  units were doing; indicate what legal problems were

Page 110

1 being faced; if they were addressed, how they were
2 addressed; if there were legal problems that needed
3 to be sent through other parts of OGC to coordinate
4 a solid legal effort, that should be done; and then
5 to look forward and to say: We anticipate the
6 following is coming, or we need to be prepared for
7 whatever.
8       And that's a conversation I had with her
9 many times. And this appears to be a response to
10 one of those or a similar conversation from
11 Mr. Baker.
12    Q   And was this type of email consistent
13 with what you expected of her in providing those
14 updates?
15    A   Generally, yes.
16    Q   Okay. And just -- so just as general
17 background, so if you could turn to the second
18 page. It's 770 in the bottom right-hand corner.
19    A   Yes.
20    Q   So it says ILU (sic)?
21    A   Yes.
22    Q   What division is that?

Page 111

1    A   Legal instruction unit.
2    Q   So was that Ms. Grzadzinski -- at the
3 time she was a section chief, was she responsible
4 for supervising that unit?
5    A   I believe the answer's yes.
6    Q   And at the time that she was a deputy
7 general counsel, was she in charge of that unit?
8    A   I believe the answer's yes.
9       MS. GRAY: I just want to clarify for the
10 record. Because I think you said "ILU"?
11       MR. HART: Yes.
12       MS. GRAY: And I think the response was
13 for -- was for "LIU."
14       MR. HART: Oh, my mistake.
15 BY MR. HART:
16    Q   So yeah, to clarify, we're talking about
17 "ILU" at the top.
18    A   I'm sorry. I was at the bottom, with
19 legal instruction unit.
20    Q   Oh, that's all right. We can clear it
21 up.
22    A   Okay. So ILU is the investigative law

Page 112

1 unit.
2    Q   Okay. And was your understanding that
3 she was in charge of that unit as section chief?
4    A   Yes.
5    Q   And what about as deputy general counsel?
6    A   Yes.
7    Q   Okay. And now LIU.
8    A   Same answer.
9    Q   Okay. And just to be clear, what is
10 the -- what does that stand for?
11    A   Legal instruction unit.
12    Q   Okay. And turning to the third page,
13 LFU, what does that stand?
14    A   Legal forfeiture unit.
15    Q   And as section chief, she was responsible
16 for overseeing that?
17    A   Correct.
18    Q   And as deputy general counsel, she was
19 responsible for overseeing --
20    A   Correct.
21    Q   So in overseeing these units, was
22 Ms. Grzadzinski responsible for ensuring that they

Page 113

1 succeeded?
2    A   Yes.
3    Q   Okay. And was that the expectation for
4 all deputy general counsels and section chiefs?
5    A   Yes.
6    Q   And was your understanding that that was
7 Mr. Baker's expectation as well?
8    A   Yes.
9    Q   What is your understanding of how the
10 performance appraisal process -- how that is
11 supposed to operate, just in -- in terms of the
12 general timeline of how that goes?
13       MS. GRAY: Object to form. Vague.
14       THE WITNESS: In the performance
15 appraisal process, the employee provides a
16 self-assessment. And then the supervisor looks at
17 that self-assessment and makes his or her
18 determination as to whether that self-assessment is
19 accurate, and add whatever comments they have to go
20 into the overall rating.
21 BY MR. HART:
22    Q   Okay. And if you feel that that

Page 114

1  self-assessment is inaccurate, what -- what is the
2  supervisor's responsibility?
3      A   I do not know what the responsibility is.
4  I know what the options are.
5      Q   What are the options?
6      A   The options are to simply ignore it and
7  go ahead and proceed with your rating.  A second
8  option is to go back to the individual and say this
9  is flat out wrong, would you please change it.  And
10 the third option is to address it specifically in
11 the rating.
12     Q   Okay.  And do you recall, other than for
13 Ms. Grzadzinski, ever doing that for an employee,
14 going back and either ignoring it, changing --
15 having them change it, or addressing it
16 specifically?
17     A   I specifically recall ignoring it.  I
18 don't ever recall going back and asking someone to
19 change it.
20     Q   Okay.
21     A   And I -- rather than say ignoring it, I
22 should say it is always taken into consideration.

Page 115

1  Whether or not it is accepted or not is the rating
2  process.
3      Q   Okay.
4      MR. HART:  Could you mark this as 18.
5      (Deposition Exhibit No. 18 marked for
6      identification.)
7      THE WITNESS:  (Witness looked at
8  document).  Okay.
9  BY MR. HART:
10     Q   So does this refresh your recollection at
11 all as to whether you've ever made changes to an
12 individual's narrative?
13     A   It does not refresh my recollection, but
14 the email says that I have some edits, so --
15     Q   Okay.  Do you recall what those edits
16 were?
17     A   No.
18     Q   So in this email you indicate, I am back
19 and have read through your performance rating.
20     So Mr. McNally's prior email was dated
21 October 9th.  And your email is dated October 26.
22     Do you recall what was happening in the

Page 116

1  intervening period?
2      A   I do not.
3      MR. HART:  Mark this as 19.
4      (Deposition Exhibit No. 19 marked for
5      identification.)
6      THE WITNESS:  (Witness looked at
7  document).  Okay.
8  BY MR. HART:
9      Q   Okay.  So if you could turn to the second
10 page.  So it's an email from Mr. Schoolmaster where
11 he's saying a reminder to get -- for getting your
12 PAR submitted has passed.
13     Do you recall whether your PAR was
14 submitted by that date?
15     A   I do not.
16     Q   Do you recall whether Ms. Grzadzinski's
17 PAR was submitted by that date?
18     A   I do not.
19     Q   Do you recall whether Mr. McNally's PAR
20 was submitted by that date?
21     A   I do not.
22     Q   And just to clarify, so after Mr. McNally

Page 117

1  stopped being acting deputy general counsel, what
2  position did he move into?
3      A   Section chief.
4      Q   Did you have any supervisory authority
5  over him as a section chief?
6      A   Yes.
7      Q   What section was he section chief for?
8      A   Science and technology.
9      Q   Okay.  And do you see the first email?
10     So it's the most -- chronologically, it's
11 the most -- it's the last email, but it's the first
12 email on the first page, from Mr. Harding at 9:56
13 a.m.
14     A   I see that.
15     MS. GRAY:  Just object to the extent that
16 Mr. Babcock is neither the author nor recipient of
17 this email.
18 BY MR. HART:
19     Q   Okay.  So do you see where he says, If he
20 meant the appraisal, it -- if he meant the
21 appraisal, they are due to us on 10/5 and as long
22 as you submitted your accomplishments to the rating

Page 118

1  official, you should be fine?

2  A  That's what it says.

3  Q  Okay.  Is that consistent with your

4  understanding of how that process works?

5  A  I have no idea.

6  Q  Do you recall eventually receiving from

7  Ms. Grzadzinski her description of her

8  accomplishments for the year?

9  A  Yes.

10  Q  Do you have any reason to dispute the

11  accuracy of those comments, from the best of your

12  recollection?

13  A  I do not recall anything specific that I

14  disagreed with.

15  Q  And you understood that Ms. Grzadzinski

16  was in a probationary period, right?

17  A  I -- I understood that, at the time, that

18  her SES position was terminated.  I do not believe

19  I understood it at the time.

20  Q  At the time you completed the evaluation?

21  A  Correct.

22  Q  Okay.

Page 119

1  A  I may have, but I -- the probationary

2  period was not something that I, frankly, was

3  familiar with.

4  Q  Okay.  So eventually there came a time

5  that Ms. Grzadzinski was removed as part of that

6  probationary period?

7  A  Correct.

8  Q  Do you recall reviewing the Agency policy

9  as part of going through that removal process?

10  A  No.

11  Q  Is it that you did not review it, or you

12  just don't recall?

13  A  I have no memory of it.

14  Q  Okay.

15  A  I may have, but I don't recall.

16  MR. HART:  Okay.  Could you mark this as

17  20.

18  (Deposition Exhibit No. 20 marked for

19  identification.)

20  THE WITNESS:  (Witness looked at

21  document).  Okay.

22  BY MR. HART:

Page 120

1  Q  So have you ever seen this policy before?

2  A  I do not recall.

3  Q  If you could turn to page 28 of the

4  Agency policy.  So it's Agency Bates number 202.

5  A  Right.

6  Q  So if you could briefly review.  So the

7  pertinent part is -- so it says, Removal During

8  Probationary Period.  There's two paragraphs.  And

9  there's three bullets.  If you could review those

10  two paragraphs and three bullets for me.

11  A  (Witness looked at document).  Okay.

12  Q  So in the process of removing

13  Ms. Grzadzinski as part of her probationary period,

14  do you recall ever discussing this process

15  described in these paragraphs --

16  A  No.

17  Q  -- with anyone?

18  Do you recall anybody informing you that

19  you should review this policy?

20  A  They may have.  I do not recall.

21  Q  Do you believe a supervisor who is

22  undergoing the process of removing an employee from

Page 121

1  their -- during their probationary period should

2  review the relevant policy on doing so?

3  MS. GRAY:  Objection.  Calls for

4  speculation.

5  THE WITNESS:  I have no idea what the

6  responsibility is.

7  BY MR. HART:

8  Q  Okay.  If you could turn to page 29 of

9  this policy.

10  So at the time Ms. Grzadzinski was

11  removed from the probationary -- from her

12  probationary period, you were her rating official,

13  correct?

14  A  Correct.

15  Q  So if you look at the second bullet that

16  is on page 29.  It's Agency Bates number 203.

17  It says, Thirty days prior to the end of

18  the probationary period, the rating official will

19  prepare documentation summarizing the totality of

20  the probationary period.

21  Do you recall going through that process?

22  A  I do not.  Mr. Baker did that.

Page 122

1   Q   Okay.  If you were the rating official,
2   why did Mr. Baker do that?
3   A   I do not have an answer for that.
4   Mr. Baker handled the entire SES process.
5   Q   Okay.  But that's not consistent with
6   what this says.
7   A   I have no opinion about that.
8   Q   Okay.  Did you have any involvement in
9   preparing that documentation?
10   A   I read it, but I did not prepare it.
11   Q   Okay.  Did you provide any edits to that
12   document?
13   A   I believe I provided a comment about it.
14   I don't believe I provided an edit.
15   Q   Okay.  And did you discuss what should go
16   into it, with Mr. Baker?
17   A   Other than my rating on the PAR, the
18   answer's no.
19   Q   Okay.  To your knowledge, did Mr. Baker
20   review this policy?
21   A   No idea.
22   Q   To your knowledge, did anyone advise

Page 123

1   Mr. Baker to review this policy?
2   A   I -- I can't answer what other people
3   told Mr. Baker; but it's absolutely clear, based
4   upon the performance report he prepared, that he
5   knew about it.
6   Q   Okay.  To your knowledge, did Mr. Baker
7   consult with anybody -- either Mr. Harding that we
8   discussed before or anybody else in the Agency's
9   human resources department -- regarding removing
10   Ms. Grzadzinski from -- during her probationary
11   period?
12   A   I do not have specific knowledge.
13   Q   Okay.  Do you have general knowledge of
14   that, those kinds of discussions occurring?
15   A   I suspect he went over it with James
16   Turgal, but I don't know whether he did or he
17   didn't.
18   Q   Okay.
19       MR. HART:  Could you mark this as 21.
20       (Deposition Exhibit No. 21 marked for
21       identification.)
22       THE WITNESS:  (Witness looked at

Page 124

1   document).  Okay.
2   BY MR. HART:
3   Q   Okay.  So do you recall on or after
4   October 24th, 2015, either Mr. Schoolmaster or
5   Mr. Baker discussing Ms. Grzadzinski's PAR with
6   you?
7   A   I provided Ms. Grzadzinski's PAR to
8   Mr. Baker, and so the answer is yes.
9   Q   Okay.  Why did you provide her PAR to
10   Mr. Baker?
11   A   Because that's what the chain of command
12   does.
13   Q   Okay.  Was it after you completed the
14   PAR?
15   A   Yes.
16   Q   Okay.  Prior to your completion of that
17   PAR evaluation, did you provide it to Mr. Baker at
18   all?
19   A   Not that I recall.
20   Q   Did you discuss the substance of that PAR
21   at all with --
22   A   No, I --

Page 125

1   Q   -- Mr. Baker?
2   A   -- that PAR was for me and me alone.  No
3   one influenced me one bit.
4   Q   But did you discuss it with him?
5   A   No.
6   Q   Okay.  Did you discuss it at all with
7   Mr. Schoolmaster?
8   A   No.
9       MR. HART:  Would you mark this as 22.
10       (Deposition Exhibit No. 22 marked for
11       identification.)
12       THE WITNESS:  (Witness looked at
13   document).  Okay.
14   BY MR. HART:
15   Q   Okay.  So if you could look at the
16   attachment to this email.
17   A   Yes.
18   Q   Was this the ultimate PAR that you issued
19   to Ms. Grzadzinski?
20   A   Yes.
21   Q   Okay.  And that's your signature on the
22   first page, the first page of the attachment, Bates

Page 126

1 number 764?

2    A    In two places.

3    Q    Okay.  And consistent with what we were

4 talking about earlier, you were the rating

5 official, right?

6    A    Correct.

7    Q    Okay.  If you turn to -- so it's Bates

8 number 763.  It's Ms. Grzadzinski's email to you.

9        It says Ernie just sent it high side?

10   A    Right.

11   Q    Do you know what high side means?

12   A    Yes.

13   Q    What does it mean?

14   A    That means the secret system of the two

15 computer systems at the FBI.

16   Q    Okay.  And then if you turn to the

17 next -- the preceding page, Bates number 762, your

18 response to her email.

19       It says Alyssa is working on it.

20       Do you recall is -- and is that

21 referencing Alyssa Flocco?

22   A    Yes.

Page 127

1    Q    Do you recall what she was working on?

2    A    Well, it says, We'll email the signature

3 page and hope you can sign it and email it back --

4 meaning if the document was sent without being

5 signed, in order to complete the process it had to

6 be signed.

7    Q    Okay.

8    A    At least that's what I conclude from what

9 the email says.

10   Q    Okay.  And if you turn to -- so it's

11 Bates number 756.  There's a summary rating

12 narrative.

13   A    Right.

14   Q    So is that -- the description in that

15 box, is that the description that you added?

16   A    (Witness looked at document).  Yes.

17   Q    Okay.  So prior -- so as part of the PAR,

18 specifically -- not part of the process of removing

19 Ms. Grzadzinski from -- during her probationary

20 period, so specifically as part of the PAR -- did

21 you prepare any other writeup describing -- or any

22 other document describing Ms. Grzadzinski's

Page 128

1 performance, that you can recall?

2    A    Prior to this?

3    Q    So either as -- as part of the PAR

4 process generally, not as part of the probationary

5 period process.

6    A    Not that I recall.

7    Q    Okay.  And those three issues that we

8 discussed earlier in relation to why

9 Ms. Grzadinski was removed as deputy general

10 counsel, the -- we were discussing the CDC

11 conference, the issues regarding her communicating

12 at meetings, and the issue with her choosing a

13 different office.

14       MS. GRAY:  Object to form.  Misstates

15 prior testimony.

16 BY MR. HART:

17   Q    Why did you not describe any of those

18 incidents in that summary rating?

19   A    I think I did.

20   Q    In what way?

21   A    I indicated, She has not been an active

22 or positive participant in the deputy section

Page 129

1 chief's management meetings.

2        That means she did not keep management

3 informed.  And she didn't tell people what was

4 going on, and how she was handling it, how she was

5 involving the other part of OGC, and whether things

6 were coming in the future.

7        And:  She has been reluctant to keep her

8 leadership informed of the matters that she and her

9 units have been addressing.  Her focus from the

10 perspective of the formis (sic) chief division

11 counsel has not improved the relationship between

12 the CDC community and the Office of the General

13 Counsel.

14       That is the same issue concerning the --

15 her legal opinion with regard to the active bar

16 membership.

17   Q    Okay.  But you don't say that here, do

18 you, that that's referring --

19   A    I don't --

20   Q    -- specifically --

21   A    -- say the --

22   Q    -- to the --

Page 130

1     A   -- specific words, but the answer is the
2  concepts are totally captured by those words.
3     Q   Okay.  And members of the SES are
4  entitled to further challenge their performance
5  appraisal rating --
6     A   Right.
7     Q   -- afterwards?
8     A   And she did.
9     Q   Yes.
10        And so don't you think it would be
11  important to include those kinds of specifics in
12  here, so that she would know what she has to
13  challenge?
14     A   I think I did a fine job of summarizing
15  what her performance was.
16     Q   Okay.  But do you think it would be
17  necessary for that description to be in her
18  performance appraisal rating to --
19     A   I think --
20     Q   -- challenge --
21     A   -- that I --
22     Q   -- that so --

Page 131

1     A   -- did everything required to do.
2     Q   So just to state my question very
3  clearly, so do you think it would be important for
4  Ms. Grzadzinski to have access to the specific
5  written description of the reasons for your
6  performance appraisal rating in order to further
7  challenge it through the Agency's procedure?
8     A   I -- I believe what I put down in my
9  rating was very clear.  And she knew exactly what
10  the words meant.  And she had plenty ability to
11  contest it.
12     Q   That was not my question.
13     MR. HART:  So could you read back the
14  question, please.
15     (The reporter read the record.)
16     MS. GRAY:  Object to form.  Asked and
17  answered.
18  BY MR. HART:
19     Q   So I'll ask the question again.
20        So do you believe it would be important
21  for Ms. Grzadzinski to have, through this
22  performance appraisal rating process, a description

Page 132

1  of the specific reasons why she received the rating
2  so that she would be able to change those specific
3  ratings later on in the process?
4     MS. GRAY:  Object to form.  Asked and
5  answered.
6     THE WITNESS:  What I think is important
7  that I think makes no difference, I think what's
8  important to this process is to put down something
9  clear so the employee understands the reason for
10  the rating.  And I did it.
11  BY MR. HART:
12     Q   Okay.  And you think it's clear, even
13  though it doesn't list those specific reasons that
14  we discussed earlier?
15     A   Yes --
16     MS. GRAY:  Object --
17     THE WITNESS:  -- I do.
18     MS. GRAY:  -- to form.  Argumentative.
19  BY MR. HART:
20     Q   And after this performance appraisal
21  rating was when the process to remove
22  Ms. Grzadzinski from the SES began, sometime

Page 133

1  thereafter; is that correct?
2     A   I do not know the answer to that.
3     Q   Okay.
4     MR. HART:  Would you mark this as 23.
5     (Deposition Exhibit No. 23 marked for
6        identification.)
7     THE WITNESS:  (Witness looked at
8  document.)
9  BY MR. HART:
10     Q   Okay.  And if you could keep 22 in front
11  of you, because we'll need both of them.
12     A   Okay.  Ready.
13     Q   So the narrative that you referenced
14  earlier that Mr. Baker was preparing, is this that
15  narrative?
16     A   Yes, it is.  Exhibit 23.
17     Q   What was your understanding of why
18  Mr. Baker prepared this?
19     A   It is -- my understanding is that that is
20  what is required to make a submission with respect
21  to the SES probationary period.
22     Q   Okay.  And do you understand who was

Page 134

1  responsible for reviewing this after the document
2  was prepared?
3      A   I do not.
4      Q   Are you familiar at all with the SES
5  career board?
6      A   I know there is such a thing.
7      Q   Okay.  Do you know who the individuals
8  that comprise it are?
9      A   I do not.
10     Q   Did you have -- I believe we asked this
11 before, so I apologize if I'm asking you it again,
12 but did you have any input in the preparation of
13 this document?
14     A   I did not, other than through the PAR.
15     Q   Okay.  So this document is far longer
16 than the summary rating you prepared as part of
17 Exhibit 22; is that --
18     A   Correct.
19     Q   So why did you not include all of this
20 information in the PAR rating?
21     A   I did not think it was required.  And I
22 am not the author of Exhibit 23.  It's Mr. Baker.

Page 135

1      Q   Okay.  But you -- so -- and you can
2  review Exhibit 23 if you'd like.
3          But were you aware of all the issues that
4  Mr. Baker describes in Exhibit 23?
5      A   I'd have to go through them piece by
6  piece, but I think the answer is probably yes.
7      Q   Okay.  So if these were specific -- a
8  larger list of issues that you are aware of, why
9  did you not feel that you needed to include that in
10 her performance appraisal rating?
11     A   I think I've answered this question at
12 least four times.  I put in there what I thought
13 was appropriate.
14     Q   Okay.  And you didn't think it was
15 appropriate to include this additional --
16     A   I'm not --
17     Q   -- information --
18     A   -- gonna answer --
19     Q   -- in --
20     A   -- that question.
21     MS. GRAY:  Object to form.  Asked and
22 answered.

Page 136

1  BY MR. HART:
2      Q   Did you ever express an opinion as to the
3  sufficiency of Mr. Baker's description in Exhibit
4  23?
5      A   Yes.
6      Q   And what was that opinion?
7      A   I sent him an email.  And I believe that
8  I said it was well written and accurate, but I was
9  not convinced it would be successful.
10     Q   Why were you not convinced that it would
11 be successful?
12     A   Because I think there was -- there was
13 plenty -- there were plenty of areas in which he
14 was fundamentally complimentary.
15     Q   He was fundamentally what?  I just didn't
16 hear.
17     A   Complimentary.
18     Q   Well, why do you think that would be
19 problematic?
20     A   I don't pretend to be familiar with the
21 board that you referred to.  But having done
22 employment work in the past and being somewhat

Page 137

1  familiar with what the standards are, if the
2  summary is sort of half one way and half the other
3  way, very frequently the employee is successful and
4  the employer is not.
5      Q   Okay.  And why is that, in your
6  experience?
7      A   It's because that's what boards do.  I
8  don't -- I can't tell you why they do it, but it's
9  what they do.
10     Q   So -- but do you believe that would be
11 appropriate to be excluding positive information?
12     A   I -- I don't have a value judgment on
13 whether it's appropriate or not.  I was asked to
14 comment on it, and that was my comment.
15     Q   Okay.  And if you -- but you recall, that
16 policy that we were discussing earlier, it was --
17 the responsibility to prepare this was the rating
18 official's.  Do you recall that?
19     MS. GRAY:  Objection.  Asked and
20 answered.
21 BY MR. HART:
22     Q   We can revisit the policy if you would

Page 138

1  like.
2      A   I don't need to revisit it. I know what
3  the policy says.
4      Q   Okay. So but the responsibility did fall
5  on the rating official?
6      A   Whatever the policy says, is what the
7  answer is.
8      Q   Okay. And in the preparation of this
9  document, you as the rating official were the one
10 that was ultimately responsible for its contents,
11 right?
12     A   I have no answer for that.
13     Q   You just don't know or --
14     A   I'm not going to answer the question.
15     MS. GRAY:  Object --
16     THE WITNESS:  The document --
17     MS. GRAY:  -- to form --
18     THE WITNESS:  -- is the document --
19     MS. GRAY:  -- the document --
20     THE WITNESS:  -- and what I --
21     MS. GRAY:  -- speaks for --
22     THE WITNESS:  -- think the --

Page 139

1      MS. GRAY:  -- itself.
2      THE WITNESS:  -- document says is
3  irrelevant.
4      MS. GRAY:  I just want to make sure my
5  objection that the document speaks for itself is on
6  the record.
7      MR. HART:  If you could mark this as --
8  so running into another stapling problem -- as
9  Exhibit 24.
10     (Deposition Exhibit No. 24 marked for
11     identification.)
12     THE WITNESS:  (Witness looked at
13 document). Yes.
14 BY MR. HART:
15     Q   So was this the discussions that you were
16 describing earlier regarding the concern you
17 expressed to Mr. Baker?
18     A   Correct.
19     Q   Do you know why Mr. Baker had you review
20 the document?
21     MS. GRAY:  Object to form. Calls for
22 speculation.

Page 140

1      THE WITNESS:  I do not know why.
2  BY MR. HART:
3      Q   Did you ever discuss with him your role
4  in preparing that document?
5      A   I had no role in preparing that document.
6      Q   Well, did you ever discuss with him your
7  role, or lack thereof, in preparing that document?
8      A   I do not recall.
9      Q   Okay. So if you turn to Mr. Baker's
10 description and his response at 9:08 a.m. to you
11 where he says, There is marginal improvement and
12 expressions of a willingness to change.
13     Do you know what marginal improvement
14 he's referring to?
15     A   I do not know specifically, but I would
16 refer you back to the document that this references
17 in which there are some comments which, as I said
18 before, are complimentary.
19     Q   Okay. And do you know what he was
20 referring to when he says "expressions of a
21 willingness to change"?
22     A   Specifically, no.

Page 141

1      Q   Was that -- was it your understanding
2  that Ms. Grzadzinski was working to improve her
3  performance?
4      A   She would periodically do things that
5  were better, such as the email we looked at
6  summarizing the things that her unit was doing.
7  But, generally, she was not on a positive
8  trajectory as far as I was concerned.
9      Q   Okay. And in your discussions with
10 Mr. Baker -- if you had them -- did he ever express
11 an opinion that she was trying to improve?
12     A   Not that I recall.
13     Q   So and then if you turn towards your --
14 to your response and to Mr. Baker's email it says,
15 I am working on some tweaks right now which will
16 still be accurate and fair.
17     A   That is Mr. Schoolmaster's --
18     Q   Oh.
19     A   -- response, not mine.
20     Q   My apologies.
21     So do you know what Mr. Schoolmaster's
22 tweaks were?

Page 142

1    A    No idea.

2    Q    So did you discuss the need to be -- the

3  need to exclude positive information with

4  Mr. Schoolmaster?

5    A    I didn't discuss the need to exclude

6  positive information with anybody.

7    Q    Okay.  So in reference to what you were

8  describing before, how you need to be consistent on

9  one side of this issue -- I'm not trying to put

10  words in your mouth.  If you have a different way

11  to phrase it, that's fine.

12        But what you were describing earlier

13  about how that it was problematic that it gave to

14  both sides of the issue, did you express that to

15  Mr. Schoolmaster?

16    A    The words I used to Mr. Baker, with a

17  copy to Mr. Schoolmaster, was the narrative can be

18  read to demonstrate gradual improvement and a

19  willingness to change.  So both of those people had

20  that information.

21    Q    Okay.  Do you recall when the decision

22  was made to actually remove Ms. Grzadzinski from

Page 143

1  the SES?

2    A    No.

3    Q    Do you recall when the decision was made

4  to attempt to remove Ms. Grzadzinski from the SES?

5    A    No.

6    Q    Do you recall having any discussions

7  about initiating that process to remove her from

8  the SES?

9    A    I don't believe I ever did.

10    Q    Okay.  Do you have an idea of why you

11  were not part of that conversations?

12        MS. GRAY:  Object to form.  It calls --

13        THE WITNESS:  I --

14        MS. GRAY:  -- for --

15        THE WITNESS:  -- I --

16        MS. GRAY:  -- speculation.

17        THE WITNESS:  -- don't understand your

18  question.

19  BY MR. HART:

20    Q    Sorry.

21        Do you have an understanding as to why

22  you were not part of those conversations to decide

Page 144

1  init -- to decide -- to decide whether to initiate

2  the process to remove Ms. Grzadzinski from the SES?

3    A    No.

4        MS. GRAY:  Object to form.  Assumes facts

5  not in evidence.

6  BY MR. HART:

7    Q    Do you believe, as the first-line

8  supervisor of Ms. Grzadzinski, you should have been

9  involved in those discussions?

10    A    I have no opinion.

11    Q    At the time that process was underway to

12  remove Ms. Grzadzinski from the SES, did you ever

13  express to Mr. Baker what you felt your role should

14  be in that process?

15    A    I have no memory.

16    Q    Okay.  After Ms. Grzadzinski was removed

17  from the SES and made a unit chief, did you have

18  any further interactions with her at work?

19    A    I do not believe so.

20    Q    So not specific to Ms. Grzadzinski, did

21  you have -- so for the position she occupied, that

22  unit chief position in the TSC, as your role as

Page 145

1  deputy general counsel would you, in the normal

2  course of business, have had interactions with that

3  position?

4    A    No.

5    Q    Okay.

6    A    Part of the reorganization was to move

7  TSC to NSLB, which is an area for which I was not

8  responsible.

9    Q    Okay.

10        MR. HART:  I think this would be a good

11  point to stop and break for lunch, if that makes

12  sense to you guys.

13        MS. GRAY:  Okay.

14        MR. HART:  All right.  Off the record.

15        (Whereupon, at 12:47 p.m., a

16        luncheon recess was taken.)

17        A F T E R N O O N   S E S S I O N

18        (1:34 p.m.)

19  Whereupon,

20        ERNEST BABCOCK,

21  was recalled as the witness and, having been

22  previously sworn, was examined and testified

Page 146

1 further as follows:
2      EXAMINATION BY COUNSEL FOR COMPLAINANT
3      CONTINUED
4      MR. HART:  So we are back on the record.
5      And we were discussing the matter of
6 putting the -- putting a portion of the record
7 under a protective order.  If you want to --
8      MS. GRAY:  Yes.  So I would just like to
9 designate -- we can either just designate the whole
10 transcript subject to the protective order, or just
11 the portion around the discussion of LX.
12      MR. HART:  And just LX as?
13      MS. GRAY:  It was a location that
14 Mr. Babcock mentioned.
15      MR. HART:  Okay.  All right.  So we are
16 fine with applying the protective order to that
17 portion of the deposition.
18 BY MR. HART:
19   Q   Okay.  So -- and, again, I apologize if I
20 asked you this very early on in the day.
21      So when did you first meet Tom Bondy?
22   A   Probably at the first deputy's meeting

Page 147

1 that I attended after I was hired.
2   Q   Okay.  But it was during -- some --
3 somewhere during your tenure at the FBI?
4   A   Correct.
5   Q   So either as chief of staff or as deputy
6 general counsel, have you become aware of
7 allegations that Tom Bondy inappropriately touched
8 women?
9   A   No.
10   Q   Have you become aware of allegations that
11 Tom Bondy behaved inappropriately towards women?
12   A   No.
13   Q   Have you become aware that individuals
14 within -- within the Office of General Counsel
15 specifically raised concerns about Tom Bondy's
16 behavior towards women?
17   A   No.
18   Q   Are you aware of at any time Mr. Baker
19 referencing the existence of either of those
20 topics, any of those topics that we -- I just
21 listed?
22   A   I am not.

Page 148

1   Q   Okay.  And in the rumors that we were
2 discussing earlier, have you ever heard rumors of
3 such allegations?
4   A   Regarding Mr. Bondy, no.
5   Q   Among any other individual within OGC
6 senior leadership, are you aware of any allegations
7 of a member of senior leadership behaving
8 inappropriately towards women?
9   A   No.
10      You -- excuse me, you said OGC senior
11 leadership, right?
12   Q   Within OGC senior leadership.
13   A   The answer's no.
14   Q   And I apologize.  We're going to be
15 jumping around a little bit, just --
16   A   Okay.
17   Q   -- to cover all the bases.  So the --
18 going back to our discussion about -- of the PAR
19 earlier.
20      Do you recall Ms. Grzadzinski requested
21 higher level review?
22   A   Yes.

Page 149

1   Q   And eventually that document was reviewed
2 initially by Mr. Baker; was that right?  He was the
3 reviewing official?
4   A   I believe the answer's yes.
5   Q   Okay.  And while Mr. Baker was reviewing
6 your evaluation of Ms. Grzadzinski, did you discuss
7 the merits of that review with him?
8   A   I don't remember having done so.
9   Q   And after -- do you recall that after
10 Mr. Baker reviewed the evaluation, former FBI
11 director James Comey also reviewed that evaluation?
12   A   I know that because that was the process,
13 but I don't know that he did it.
14   Q   Okay.  And just to follow up on that, do
15 you -- did you have -- while that process was
16 ongoing, did you have any discussions with former
17 Director Comey regarding the -- the merits of your
18 appraisal?
19   A   Did not.
20   Q   Okay.  So after Ms. Grzadzinski was
21 removed as deputy general counsel as part of the
22 reorganization, did you become aware that employees

Page 150

1 complained -- sorry. Strike that. Just to phrase
2 it better.
3        After that reorganization was conducted,
4 former direct -- former General Counsel Baker held
5 an all-hands meeting to discuss the reorganization.
6        Do you recall that?
7    A   Yes.
8    Q   And do you recall him addressing, during
9 in that -- during that all-hands meeting, a concern
10 from other individuals regarding the nature of the
11 reorganization, insofar as it was taken on --
12 whether or not it was taken based on individual's
13 performance?
14    A   I do not recall that.
15    Q   Okay.
16    A   But it may have happened. I just don't
17 remember it.
18    Q   Okay. And just to follow up again.
19        Do you recall at all him referencing or
20 making a statement during that all-hands meeting
21 that the reorganization had nothing to do with
22 anyone's performance?

Page 151

1    A   I do not recall that. He may have said
2 it. Don't remember.
3    Q   Okay. So other than Ms. Grzadzinski's
4 complaint, have you been named as a responsible
5 management official in any other EEO complaints
6 that you're aware of?
7        MS. GRAY: Objection. Misstates the
8 record.
9        THE WITNESS: The answer's no.
10 BY MR. HART:
11    Q   Okay. Other than Ms. Grzadzinski's
12 complaint, have you been named as a witness in any
13 other EEO complaint, as far as you're aware of?
14    A   No.
15    Q   Prior to your -- or outside of your
16 service with the FBI, have you ever been named
17 in -- as a responsible management official in any
18 discrimination complaint?
19    A   No.
20    Q   Other than outside of your service with
21 the FBI, have you been named as a witness as a part
22 of any discrimination complaint?

Page 152

1    A   No.
2    Q   Other -- other than -- sorry, I believe
3 we went over before prior depositions.
4        So other than this deposition here today,
5 have you been deposed before?
6    A   Yes.
7    Q   In what context?
8    A   An associate in the law firm of Friedman
9 & Babcock was trying a case and reached a
10 settlement agreement, agreed to by the client. And
11 sometime after the trial, the client rejected the
12 idea that he had agreed, and filed a lawsuit. And
13 I testified in that as a witness because I was at
14 home recovering from back surgery and had a phone
15 call from the associate about what was going on
16 with the settlement.
17    Q   Okay. Did discussions of discrimination
18 come up at all in that matter?
19    A   Oh, no. Oh, no, no, no.
20    Q   Okay.
21    A   No.
22    Q   So other than that matter, have you been

Page 153

1 deposed -- have you deposed in any matter (sic)?
2    A   No.
3    Q   So have you ever testified as a witness
4 in court?
5    A   No.
6    Q   Have you ever testified as a witness in
7 an administrative body?
8    A   No.
9    Q   To the best of your recollection, have
10 you ever provided any other oral testimony under
11 oath?
12    A   Oral testimony under oath. The answer's
13 no.
14    Q   Other than this matter, have you provided
15 any written statements under oath related to
16 discrimination complaints?
17    A   No.
18    Q   At what time did you, to the best of your
19 recollection, did you first become aware of
20 Ms. Grzadzinski's EEO complaint?
21        Either through the rumors we discussed
22 before, or directly.

Page 154

1    A   I can't -- I -- there were rumors about
2  EEO complaints that I heard before I left in
3  December of '16, so I don't know when.  But as far
4  as a formal complaint, the first time I was aware
5  of it was when FBI counsel contacted me and --
6    Q   Okay.
7    A   -- asked me to assist in discovery --
8    Q   Okay.  I don't --
9    A   -- responses.
10    Q   I'm sorry.  I don't want to -- your
11  conversations with --
12    A   No, but that's --
13    Q   -- counsel is --
14    A   -- that's the time.  Yeah.
15    Q   Okay.
16    A   Yeah.
17    Q   So have you -- in your time as deputy
18  general counsel, did you have any interactions with
19  Kevin Walker, the former -- former director of the
20  EEO office?
21    A   The answer is only insofar as he and I
22  were both at the morning meetings, the executive

Page 155

1  meetings with the director and the deputy.
2    Q   Okay.  At any time did you discuss
3  Ms. Grzadzinski's EEO complaint with Mr. Walker?
4    A   No.
5    Q   Okay.  At any time did you discuss Nancy
6  Wiegand's EEO complaint with Mr. Walker?
7    A   No.
8        MS. GRAY:  Objection.  Misstates the
9  record.
10  BY MR. HART:
11    Q   At any time did you discuss Sherry
12  Sabol's EEO complaint with Mr. Walker?
13    A   No.
14        MS. GRAY:  Objection.  Misstates the
15  record.
16  BY MS. GRAY:
17    Q   At any time did you discuss Catherine
18  Bruno's EEO complaint with Mr. Walker?
19        MS. GRAY:  Objection.  Misstates the
20  record.
21        THE WITNESS:  No.
22  BY MS. GRAY:

Page 156

1    Q   And at any time did you discuss Karen
2  Davis-Miller's EEO complaint with Mr. Walker?
3        MS. GRAY:  Objection.  Misstates the
4  record.
5        THE WITNESS:  No.
6  BY MS. GRAY:
7    Q   Regarding -- unfortunately, I'm going to
8  have to go through that list one more time.
9        So at any point did you discuss
10  Ms. Grzadzinski's EEO complaint with James Baker?
11    A   I don't -- I don't think so, but I don't
12  remember.
13    Q   Okay.  At any time did you discuss Nancy
14  Wiegand's EEO complaint with James Baker?
15    A   No.
16    Q   At any time did you discuss Sherry
17  Sabol's EEO complaint with James Baker?
18    A   No.
19    Q   At any time did you discuss Catherine
20  Bruno's EEO complaint with James Baker?
21    A   No.
22    Q   And at any time did you discuss Karen

Page 157

1  Davis-Miller's EEO complaint with James Baker?
2    A   No.
3        MR. HART:  Just brief one minute to step
4  outside, and I think I'll be done.
5        (Discussion off the record)
6        (Short recess)
7        MR. HART:  I have no more questions.
8        MS. GRAY:  I just have a few follow-up
9  questions.
10        EXAMINATION BY COUNSEL FOR THE AGENCY
11  BY MS. GRAY:
12    Q   Mr. Babcock, during your testimony you
13  discussed an issue involving payment of parking
14  tickets at WFO.
15        Can you describe that circumstance?
16    A   It came to our attention that there were
17  a serious number of FBI employee parking tickets,
18  folks parking at WFO.  My memory, it was in the
19  thousands of dollars.  And the question that came
20  in from WFO, include -- including CDC Grzadzinski,
21  was whether or not they could pay those tickets.
22  And our fiscal and contracts folks did the research

Page 158

1  and said, no, you can't pay them.  And it is my

2  understanding that they paid them anyway.

3      Q    And was it your understanding that that

4  was Ms. Grzadzinski's decision?

5          MR. HART:  Objection.  Form.

6          THE WITNESS:  All I know is she was

7  involved in making the decision.  I don't know

8  whether she made it on her own or with others.

9  BY MS. GRAY:

10     Q    During your testimony you referenced a

11 memorandum that had been authored by possibly Lisa

12 Baker and Elaine Lemert, involving whether CDCs and

13 ADCs had to have a bar license.

14         Do you recall that testimony?

15     A    I do.

16     Q    Okay.  Did you ever read that memorandum?

17     A    Yes, I did.

18     Q    What was your opinion of it?

19     A    My opinion was, as I'd mentioned before

20 on this topic, that the legal reasoning was flat

21 out wrong, and that the CDCs were practicing law.

22         And the separate question as to whether

Page 159

1  they need to be actively licensed is based upon DoJ

2  policy and protecting those people.  But the focus

3  of the memo was that they were now practicing law,

4  which I think is incorrect.

5      Q    You testified concerning a discussion you

6  had with Catherine Chen concerning whether

7  Ms. Grzadzinski's legal position concerning the CDC

8  bar license issue was supportable.

9          Do you recall what Ms. Chen's response

10 was during that discussion?

11     A    I do not recall during the discussion.

12 But as a result of that, that discussion was part

13 of the predicate to her preparing the memorandum.

14 And the memorandum indicated that Ms. Grzadzinski

15 was incorrect, and her position was not supportable

16 legally.

17     Q    Mr. Hart asked you whether CDCs and ADCs

18 were allowed to defer to AUSAs or OGC attorneys.

19         Do you recall that testimony?

20     A    Yes, I -- yes, I do.

21     Q    What did you mean by that?

22     A    Well, they are not prohibited from

Page 160

1  seeking other help in making legal decisions,

2  whether it's from an AUSA or from OGC.

3          But they can't do their job if all they

4  do is ask other people what the answer is.  They

5  have to make day-to-day decisions on whether or not

6  a certain warrant's gonna be issued or how people

7  are gonna address a particular bust.  And they're

8  involved in making legal decisions, separate and

9  apart from whatever advice they get from OGC or

10 AUSAs.

11     Q    Okay.  You testified that you believe

12 that Jason Herring, the former DGC of NSLB, would

13 have been qualified to be the DGC of NSLB.

14         Do you recall that?

15     A    Yes, I do.

16     Q    Do you whether or not he had actually

17 applied to be the DGC of NSLB at the time that the

18 opening -- the opening that was filled by Patricia

19 Anderson was -- at the time that that position was

20 open?

21     A    I do not know, but I doubt seriously,

22 because he had made it known loud and clear that he

Page 161

1  didn't want the job anymore, so -- I -- I doubt

2  seriously that he was part of the pool.

3      Q    You were asked whether you had any

4  discussions about where to move employees who were

5  affected by the reassignment.

6          Do you recall that line of questioning?

7      A    I do.

8      Q    Okay.  And in your understanding, which

9  employees were affected by the reorganization or

10 the realignment of --

11     A    As far as --

12     Q    -- OGC?

13     A    -- moving is concerned?

14     Q    Right.

15     A    Ms. Grzadzinski I think was the only one.

16     Q    Is it your understanding that Nancy

17 Wiegand was affected by the realignment?

18         MR. HART:  Objection.  Form.

19         THE WITNESS:  Not at all.

20 BY MS. GRAY:

21     Q    Was it your -- what was her position

22 prior to the OGC organization?

Page 162

1    A   She was section chief in charge of
2  discovery management section.  And that's where she
3  stayed.
4    Q   Is it your understanding that Karen
5  Miller was affected by the OGC reorganization?
6    A   No.  She was the section chief in NSLB,
7  and remained in that position.
8    Q   Was it your understanding that Catherine
9  Bruno was affected by the OGC reorganization?
10    A   No, the -- Catherine Bruno's movement
11  took place because Mark Giuliano decided that the
12  response to O -- to IG inquiries would be handled
13  by the inspection division, as opposed to OGC.  And
14  when it was handled by OGC, that was Catherine
15  Bruno's job.  And so her moving from that job
16  elsewhere had nothing to do with the OGC
17  reorganization.
18    Q   You testified about having an office in
19  the litigation suite for a period of time.
20        And do you recall what time period you
21  had an office on the tenth floor in the litigation
22  suite?

Page 163

1    A   It was approximately six months that that
2  discovery management section was assigned to my
3  responsibility.
4    Q   And you described the office as an
5  interior office.
6        What do you mean by that?
7    A   As small an office as there is that's not
8  a cubicle, that doesn't have windows, that is on --
9  faces an interior corridor.
10    Q   Was it an SES office?
11    A   Oh, absolutely not.  It was formerly the
12  place that the fax machine was before I went to the
13  office.
14    Q   There was some testimony concerning your
15  performance rating of Ms. Grzadzinski.
16        Do you recall how much time you had to
17  turn around Ms. Grzadzinski's performance rating
18  after receiving her self-evaluation?
19    A   I believe it was what could be called a
20  fire drill.  I mean we had a specific time limit
21  within which it had to be done.  And we earlier saw
22  some of the emails back and forth about getting the

Page 164

1  signature page and getting it done on time.
2        MS. GRAY:  I have no further questions.
3        MR. HART:  Just brief follow-up.
4        EXAMINATION BY COUNSEL FOR COMPLAINANT
5  BY MR. HART:
6    Q   So regarding the -- you were discussing
7  before the question of Catherine Chen's involvement
8  and the CDCs.
9        So you've never served as CDC --
10    A   Correct.
11    Q   -- for the FBI?
12        How often -- in your day-to-day work as
13  deputy general counsel, how often did you interact
14  with CDCs?
15    A   The -- the answer is that most -- when I
16  was in -- you asked me as a deputy general counsel?
17    Q   As deputy general counsel.
18    A   We had weekly meetings with the CDC
19  advisory committee, Mr. Baker and I.  And I would
20  have -- I would say maybe once a week I would have
21  either a phone call or an email from one of the
22  CDCs asking me a question.

Page 165

1    Q   Okay.  In your day-to-day work as a
2  deputy general counsel, did you typically go to
3  CDCs asking for their legal advice?
4    A   No.
5    Q   Okay.  And moving on to the question of
6  the interior office.
7        So during the time that you were
8  overseeing the discovery management unit, were you
9  in that interior office the entire time?
10    A   Absolutely not.  I was in it portions of
11  every day.
12    Q   Oh, so to clarify a little bit.
13        So when Ms. Grzadzinski joined the FBI
14  when -- and she selected an office on the tenth
15  floor, was -- weren't -- weren't you originally
16  occupying that office at the time as well on the
17  tenth floor?
18    A   No, I don't think so.  Because I don't
19  think I was even responsible for the discovery
20  management section at that time.
21        MR. HART:  Okay.  No more questions.
22        (Discussion off the record)

Page 166

1     MR. HART:  So just we'd ask you that you

2  not discuss your testimony with anybody else today.

3     THE WITNESS:  No problem.

4     MR. HART:  Thank you.

5

6

7     (Whereupon at 1:54 p.m., the deposition

8     of ERNEST BABCOCK concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 167

1     CERTIFICATE OF NOTARY PUBLIC

2     I, BARBARA A. HUBER, CSR, the officer

3  before whom the foregoing deposition was taken,

4  do hereby certify that the witness whose

5  testimony appears in the foregoing deposition

6  was duly sworn by me; that the testimony of

7  said witness was taken by me in stenotypy and

8  thereafter reduced to print under my direction;

9  that said deposition is a true record of the

10  testimony given by said witness; that I am

11  neither counsel for, related to, nor employed

12  by any of the parties to the action in which

13  this deposition was taken; and, furthermore,

14  that I am not a relative or employee of any

15  attorney or counsel employed by the parties

16  hereto, nor financially or otherwise interested

17  in the outcome of this action.

18

19

20  _____
    BARBARA A. HUBER, CSR
    Notary Public, in and for
21  the District of Columbia

22  My Commission Expires:  March 14, 2022

Notice Date: 12/07/2018

Deposition Date: 11/27/2018

Deponent: Ernest Babcock

Case Name: Grzadzinski v. Sessions

Page:Line            Now Reads              Should Read

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this \_\_\_\_\_ day of _____,

2018, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

**WORD INDEX**

**< $ >**
**$6,000** 42:7

**< 0 >**
**0** 46:17

**< 1 >**
**1** 3:10 19:15, 16
**1:34** 145:18
**1:54** 166:7
**10** 3:19 73:18,
19 74:20 117:21
**1000** 1:20 2:5
**102** 4:2
**103** 4:3
**105** 4:4
**108** 4:5
**11** 3:20 77:20,
21
**11:05** 65:19
**115** 4:6
**116** 4:7
**119** 4:8
**12** 3:21 94:21,
22
**12:47** 145:15
**1200** 1:19 2:5
**123** 4:9
**125** 4:10
**13** 3:22 15:11
96:15, 16
**133** 4:11
**139** 4:12
**14** 4:2 102:13,
14 167:22
**15** 4:3 103:11,
12 106:13, 16, 22
**157** 3:4
**16** 4:4 18:2
105:20, 21 154:3
**164** 3:5
**17** 4:5 16:9
108:11, 12
**18** 4:6 115:4, 5
**1811** 57:21
**18th** 1:19 2:5
**19** 3:10 4:7
116:3, 4
**1970** 14:5
**1973** 13:2, 14
15:19 16:1
**1st** 106:19
107:7, 12

**< 2 >**
**2** 3:11 20:13, 14
106:10
**20** 3:11 4:8

**119**:17, 18
**2000** 11:20
**2002** 11:10
15:21, 21 16:13
**2003** 15:22
**20036** 2:6
**2010** 10:9
**2013** 8:21 9:6
10:9
**2014** 9:6 18:13
**2015** 54:7 59:3
76:9, 10 81:2
95:11 96:7
103:1 106:10
124:4
**2016** 16:5
**2017** 8:7
**2018** 1:14
**202** 120:4
**202.324.2714**
2:16
**202.898.4800** 2:7
**2022** 167:22
**203** 121:16
**20535** 2:15
**21** 4:9 123:19,
20
**22** 4:10 125:9,
10 133:10
134:17
**23** 3:12 4:11
133:4, 5, 16
134:22 135:2, 4
136:4
**2311** 45:2
**2312** 45:20
**23rd** 7:13
**24** 4:12 139:9,
10
**24th** 124:4
**26** 96:7 115:21
**27** 1:14
**28** 3:13 120:3
**29** 121:8, 16
**2922** 54:17
**2nd** 76:8, 12

**< 3 >**
**3** 3:12 23:12, 13
140:10
**3435** 74:21 76:8
**3436** 75:7
**3437** 74:21
**3438** 74:12
**3486** 95:13
**37** 3:14 56:14
**3723** 38:6

**< 4 >**
**4** 3:13 28:5, 6
**44** 3:15

**< 5 >**
**5** 3:3, 14 37:16,
17 42:7 117:21
**54** 3:16
**56** 3:17
**570-2017-00720x**
1:7

**< 6 >**
**6** 3:15 44:2, 3
**61** 3:18

**< 7 >**
**7** 3:16 54:11, 12
106:10
**73** 3:19 14:1
**756** 127:11
**762** 126:17
**763** 126:8
**764** 126:1
**77** 3:20
**770** 110:18
**78** 56:14
**7th** 76:10, 13
106:15, 16

**< 8 >**
**8** 3:17 55:22
56:1, 22
**85** 12:9
**861** 56:22
**862** 56:7 57:1

**< 9 >**
**9** 3:18 61:10, 11
**9:08** 140:10
**9:51** 1:20
**9:56** 117:12
**905** 57:22 58:10,
14
**935** 2:14
**94** 3:21
**96** 3:22
**9th** 115:21

**< A >**
**a.m** 1:20 117:13
**AB** 14:7
**ability** 7:2
44:21 63:22
131:10
**able** 7:5 30:4
36:7 57:6 63:18
64:3 91:12
107:7 132:2
**Absolutely** 30:15
40:1 42:14 47:5
51:12 68:8

**89**:21 123:3
163:11 165:10
**accepted** 115:1
**access** 131:4
**accomplish** 29:7
**accomplishing**
107:19
**accomplishments**
117:22 118:8
**accuracy** 118:11
**accurate** 57:4
113:19 136:8
141:16
**act** 92:11
**acting** 31:3
51:16 52:11, 19
71:6 73:3, 9
97:6, 12, 21
117:1
**action** 17:6
33:4 167:12, 17
**actions** 33:2, 20
**Active** 16:8, 11,
13, 16 35:1, 16
36:15, 22 38:16
40:12, 16, 20
41:7, 9, 20 43:5,
20 47:12 56:14
57:20 87:14, 20
128:21 129:15
**actively** 159:1
**ADC** 56:13
**ADCs** 29:15
35:15 36:20
40:1 42:16 47:7
57:13 158:13
159:17
**add** 62:20
113:19
**added** 127:15
**adding** 65:5
**addition** 10:17
41:16
**additional** 74:7
135:15
**address** 35:17
42:10 47:13
84:12 114:10
160:7
**addressed** 20:2
110:1, 2
**addressing**
114:15 129:9
150:8
**administrative**
10:22 153:7
**admitted** 15:18,
20
**advice** 29:22
41:14 47:8

**48**:21 59:11, 17
160:9 165:3
**advise** 122:22
**advisors** 47:7
**advisory** 164:19
**advocate** 52:19
**affect** 33:18
**age** 15:11
**Agency** 1:9, 11
2:10 6:17, 19
62:9 119:8
120:4, 4 121:16
157:10
**Agency's** 6:21
74:20 123:8
131:7
**agent** 14:21
46:8 82:2
**agent,** 46:21
**agents** 19:7
47:3, 14, 17
**ago** 72:19
**agree** 78:7 83:22
**agreed** 152:10,
12
**agreement** 57:14
152:10
**agrees** 53:22
**ahead** 114:7
**allegations** 147:7,
10 148:3, 6
**all-hands** 150:5,
9, 20
**allowed** 41:22
59:6, 12, 14
159:18
**Alyssa** 64:19
126:19, 21
**AMERICA** 1:1
82:4
**analysis** 43:19
44:9, 13, 15 46:1
48:12 50:12, 18,
20 59:1, 4
**Anderson** 66:7,
17 67:15, 19
68:19 69:2
160:19
**Anderson's** 67:12
**Andrew** 17:4
36:9
**announcement**
97:7
**answer** 6:10, 20
9:3 17:3 32:15
39:7, 9, 22 41:12
42:13 50:19, 20
51:4 57:15
59:10, 16, 16
63:21 68:7
69:22 70:3 92:3

100:*16* 109:*10, 11* 112:*8* 122:*3* 123:*2* 124:*8* 130:*1* 133:*2* 135:*6, 18* 138:*7, 12, 14* 154:*21* 160:*4* 164:*15*

answered 131:*17* 132:*5* 135:*11, 22* 137:*20*

answers 6:*11* 21:*20* 26:*7, 13, 19, 20*

answer's 57:*16* 111:*5, 8* 122:*18* 148:*13* 149:*4* 151:*9* 153:*12*

anticipate 110:*5*

anybody 13:*4* 27:*11* 43:*12* 47:*9* 49:*22* 65:*21* 98:*19* 99:*4* 108:*18, 22* 120:*18* 123:*7, 8* 142:*6* 166:*2*

anymore 36:*19* 161:*1*

anyone's 46:*13* 150:*22*

anyway 158:*2*

apart 160:*9*

apologies 141:*20*

apologize 82:*19* 134:*11* 146:*19* 148:*14*

APPEARANCES 2:*1*

appears 110:*9* 167:*5*

applicable 63:*15*

application 17:*7* 20:*4*

applied 16:*22* 68:*19* 69:*8* 160:*17*

applying 146:*16*

appraisal 102:*9* 113:*10, 15* 117:*20, 21* 130:*5, 18* 131:*6, 22* 132:*20* 135:*10* 149:*18*

approach 50:*22* 83:*22* 84:*2* 85:*5*

appropriate 34:*1* 65:*9* 80:*9* 97:*14* 135:*13, 15* 137:*11, 13*

approval 35:*9*

approving 17:*6*

Approximately 9:*5* 40:*22* 41:*1* 49:*5* 59:*20* 67:*8* 71:*19* 82:*13* 99:*11* 100:*1* 163:*1*

April 76:*10, 13*

area 26:*3, 5* 68:*15* 86:*15, 16* 88:*2* 145:*7*

areas 32:*15* 136:*13*

Argumentative 132:*18*

arrived 17:*8* 94:*17*

asked 21:*17* 22:*22* 23:*3* 36:*6* 59:*10* 72:*18* 88:*13* 91:*2* 131:*16* 132:*4* 134:*10* 135:*21* 137:*13, 19* 146:*20* 154:*7* 159:*17* 161:*3* 164:*16*

asking 6:*11* 82:*16* 95:*14* 114:*18* 134:*11* 164:*22* 165:*3*

aspect 84:*13* 97:*4, 6*

assessment 78:*7*

assigned 108:*2* 163:*2*

assignment 76:*22* 78:*5*

assist 154:*7*

associate 10:*20* 152:*8, 15*

assume 46:*21* 61:*3* 62:*1* 77:*3*

Assumes 144:*4*

attachment 125:*16, 22*

attempt 143:*4*

attended 147:*1*

attention 34:*2* 75:*6* 157:*16*

Attorney 1:*9* 5:*3* 6:*7* 53:*21* 54:*1* 167:*15*

attorneys 57:*21* 69:*11, 12* 159:*18*

Attorney's 59:*7, 9*

Atwood 12:*21* 13:*16*

AUSA 160:*2*

AUSAs 159:*18* 160:*10*

author 117:*16* 134:*22*

authored 158:*11*

authority 32:*12* 33:*1, 19* 117:*4*

automated 62:*9*

available 46:*17* 47:*3, 14, 17*

Avenue 2:*14*

avoid 88:*20*

aware 18:*16* 19:*5, 9* 27:*19* 32:*22* 68:*18* 69:*2* 89:*18* 92:*5, 16* 93:*2, 10, 15, 19* 98:*5, 7, 8, 14* 99:*12* 135:*3, 8* 147:*6, 10, 13, 18* 148:*6* 149:*22* 151:*6, 13* 153:*19* 154:*4*

**< B >**

BABCOCK 1:*16* 5:*2, 11, 11, 12, 14* 12:*5, 11, 12, 18* 117:*16* 145:*20* 146:*14* 152:*9* 157:*12* 166:*8*

B-A-B-C-O-C-K 5:*12*

bachelor's 14:*9*

back 35:*19* 42:*21* 59:*18* 66:*4* 74:*10* 114:*8, 14, 18* 115:*18* 127:*3* 131:*13* 140:*16* 146:*4* 148:*18* 152:*14* 163:*22*

background 9:*4* 10:*1* 26:*1* 45:*7* 68:*13* 70:*8, 14, 19* 86:*15* 110:*17*

Baker 17:*10* 22:*14, 15, 22* 27:*7, 8, 12, 15* 29:*2, 9, 19* 30:*11, 14* 36:*11* 43:*16* 44:*17, 19* 45:*20* 46:*10* 47:*1, 19* 49:*2, 7, 20* 52:*3, 4* 53:*3* 55:*15* 60:*13* 67:*2, 4* 68:*1* 71:*16* 72:*5, 9, 13, 17* 73:*7* 76:*4, 10* 77:*12, 15* 79:*13* 82:*12* 83:*11* 84:*7, 11* 85:*9* 87:*16* 94:*4, 10* 97:*10, 17, 20*

99:*15, 17, 18* 101:*9* 102:*6* 103:*22* 104:*18* 107:*11* 109:*13* 110:*11* 121:*22* 122:*2, 4, 16, 19* 123:*1, 3, 6* 124:*5, 8, 10, 17* 125:*1* 133:*14, 18* 134:*22* 135:*4* 139:*17, 19* 141:*10* 142:*16* 144:*13* 147:*18* 149:*2, 5, 10* 150:*4* 156:*10, 14, 17, 20* 157:*1* 158:*12* 164:*19*

Baker's 48:*16* 61:*16, 21* 62:*19* 63:*10, 19* 65:*11* 75:*3, 22* 76:*9* 80:*6* 83:*3* 101:*17* 113:*7* 136:*3* 140:*9* 141:*14*

bar 13:*20, 22* 15:*13* 16:*2, 3, 8, 11, 17, 19* 35:*1, 16* 36:*16, 22* 38:*1* 39:*20* 40:*12, 16, 20* 41:*7, 9, 20, 22* 42:*3, 21* 43:*5, 20* 47:*12* 56:*15* 57:*20* 87:*14, 21* 129:*15* 158:*13* 159:*8*

Barbara 1:*21* 167:*2, 20*

bargaining 57:*14*

bars 57:*5, 7*

Based 38:*14* 61:*21* 97:*9* 107:*22* 123:*3* 150:*12* 159:*1*

bases 148:*17*

basis 26:*18*

Bates 3:*10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22* 4:*2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12* 38:*6* 56:*7, 22* 57:*1* 74:*21* 120:*4* 121:*16* 125:*22* 126:*7, 17* 127:*11*

Bath 9:*20* 10:*2* 11:*16* 12:*3* 16:*4*

battle 39:*15*

becoming 9:*1* 11:*5, 12* 17:*12* 101:*14* 102:*1*

began 28:*1* 35:*3* 85:*1* 132:*22*

beginning 15:*2* 83:*4* 104:*22*

behalf 2:*2, 10*

behaved 147:*11*

behaving 148:*7*

behavior 147:*16*

believe 14:*1* 18:*12* 21:*10* 23:*9* 24:*15* 25:*7, 17* 28:*21* 29:*11, 18* 30:*3* 37:*12* 39:*3* 40:*6* 42:*7* 44:*20* 52:*5* 58:*11* 62:*6* 67:*13* 68:*22* 73:*18* 74:*2* 76:*2* 97:*5* 103:*8* 105:*13* 111:*5, 8* 118:*18* 120:*21* 122:*13, 14* 131:*8, 20* 134:*10* 136:*7* 137:*10* 143:*9* 144:*7, 19* 149:*4* 152:*2* 160:*11* 163:*19*

believed 69:*13*

Benoit 56:*18*

Bessee 51:*17*

best 40:*22* 47:*6* 54:*4* 85:*3* 118:*11* 153:*9, 18*

better 24:*16* 92:*11* 141:*5* 150:*2*

beyond 44:*11* 53:*13*

big 36:*19*

bigger 92:*12*

bit 125:*3* 148:*15* 165:*12*

board 29:*5* 134:*5* 136:*21*

boards 137:*7*

body 153:*7*

Bondy 22:*14, 18* 23:*3* 27:*14, 19* 30:*11* 31:*5* 40:*10* 51:*3, 7, 14, 21* 146:*21* 147:*7, 11* 148:*4*

Bondy's 147:*15*

Boston 13:*10, 12*

bottom 95:*13* 110:*18* 111:*18*

box 127:*15*

branch 24:*15*
27:2 31:*4, 6, 9*
51:*11, 16* 66:12
67:7 76:*1, 12*
77:*16* 78:*16*
82:22 83:*1, 10*
105:*13*
branches 30:*20*
31:2 80:7, *9*
81:*19*
break 65:*22*
108:*18* 109:*1, 16*
145:*11*
Break's 66:*1*
Brian 38:*17*
bridge 29:*10*
bridging 29:7
brief 157:*3*
164:*3*
briefly 120:6
bright 68:*12*
bring 29:*5* 30:6
34:2 99:*18*
Bruno 162:*9*
Bruno's 155:*18*
156:*20* 162:*10,*
*15*
Bryan 45:*5, 8*
Building 92:2
built 101:*17, 17*
bullet 121:*15*
bullets 120:9, *10*
Bureau 2:*13*
5:*21* 8:*10* 18:*5,*
*9* 29:*13* 42:*9, 20*
47:*13* 53:6 60:6
61:*1*
bureaus 33:*1*
Bureau-wide
65:*16*
business 10:*12,*
*15* 81:*16* 109:*18*
145:2
bust 160:7

< C >
call 108:*4*
152:*15* 164:*21*
called 1:*17* 5:*15*
62:*12* 163:*19*
Calls 24:*22*
84:*18* 121:*3*
139:*21* 143:*12*
camp 15:*10*
candidate 67:6
capable 81:*17*
82:*17*
captured 76:*4*
130:2
cared 68:*17*

career 134:*5*
Carl 56:*18*
cascade 63:*14*
cascaded 64:*5*
case 15:*1* 58:*11*
152:*9*
categories 108:*2,*
*6*
category 51:*1*
Catherine 44:*21*
50:2 155:*17*
156:*19* 159:6
162:*8, 10, 14*
164:7
caused 35:*22*
58:*16* 81:*12*
causing 81:8
CDC 19:*4* 29:*4,*
*5* 30:*6, 7* 39:*20*
43:*20, 20* 46:*9*
56:*13* 58:*21*
87:*17* 128:*10*
129:*12* 157:*20*
159:7 164:*9, 18*
CDCs 29:*15*
34:*22* 35:*15*
36:*20* 40:*1*
41:*21* 42:*16*
43:*3, 6, 9, 17*
46:*1* 47:*7, 20*
57:*4, 13, 21*
58:*11* 158:*12, 21*
159:*17* 164:*8, 14,*
*22* 165:*3*
Cecilia 51:*17*
center 31:*12*
100:*13*
certain 26:2
33:*2, 4, 8, 20*
42:*2, 5* 63:8
85:*22* 104:*13*
160:6
CERTIFICATE
167:*1*
certify 167:*4*
chain 33:*21*
35:*21* 56:7
124:*11*
challenge 130:*4,*
*13, 20* 131:7
change 58:*1, 4*
100:*17* 101:*21*
114:9, *15, 19*
132:2 140:*12, 21*
142:*19*
changed 37:*3*
79:*15* 84:*17*
85:*5, 6* 101:*16*
changes 115:*11*
changing 57:*21*
114:*14*

charge 31:2
81:*18* 111:7
112:*3* 162:*1*
charged 64:*21*
charges 41:*15*
chart 80:*5*
check 9:*4*
Chen 44:*8, 13,*
*14, 21* 50:*2, 6*
159:6
Chen's 159:*9*
164:7
chief 7:*10, 12*
8:2 32:*4, 6, 6, 9,*
*9, 12, 13, 16* 33:*4,*
*12* 34:2 36:*10*
52:*15, 18* 56:*19*
86:*2, 7, 11, 17*
100:*17* 111:*3*
112:*3, 15* 117:*3,*
*5, 7* 129:*10*
144:*17, 22* 147:*5*
162:*1, 6*
chiefs 32:*1, 1, 3,*
*8, 19* 33:*7, 14*
64:*15, 16* 75:*17*
113:*4*
chief's 129:*1*
choosing 128:*12*
chose 89:*11*
93:*16, 21*
chronologically
96:*5* 117:*10*
chronology 85:22
circum 50:*15*
circumstance
50:*16* 157:*15*
circumstances
39:*11*
civil 10:*5* 31:*11*
90:*19*
clarification
18:*20*
clarify 30:*17*
106:*22* 111:9, *16*
116:*22* 165:*12*
CLE 42:*4, 17*
clear 72:*9*
74:*19* 82:8
111:*20* 112:9
123:*3* 131:9
132:9, *12* 160:22
clearly 131:*3*
Clerk 2:*21* 5:*5*
13:*1, 16*
client 152:*10, 11*
close 88:7 92:*17*
closer 93:22
collective 57:*13*
college 14:*2, 3,*
*15*

Columbia 1:*22*
167:*21*
come 31:*14*
36:*1* 37:2 77:*1*
83:*5* 84:*16* 88:*7,*
*12* 152:*18*
comes 97:*13*
Comey 17:*11*
149:*11, 17*
coming 26:*3*
35:*16* 110:6
129:6
command 33:*21*
124:*11*
commencing
1:*20*
comment 45:*19,*
*21* 46:*4, 6, 11, 12,*
*16, 20* 122:*13*
137:*14, 14*
comments 45:*11,*
*15* 113:*19*
118:*11* 140:*17*
COMMISSION
1:2 167:*22*
committee
164:*19*
communicate
19:*11*
communicating
128:*11*
communication
89:*5* 105:6
commuting 18:2
company 9:*21*
comparably
83:*14*
compare 106:*12*
compatriots
35:*12*
compensated
58:*13*
Complainant 1:*6,*
*17* 2:2 5:*17*
146:2 164:*4*
complained
150:*1*
complaint 16:*19*
98:6, *15, 19*
151:*4, 12, 13, 18,*
*22* 153:*20* 154:*4*
155:*3, 6, 12, 18*
156:*2, 10, 14, 17,*
*20* 157:*1*
complaints 98:2
99:*3* 151:*5*
153:*16* 154:2

complete 61:2
89:*8* 127:*5*
completed 54:*8*
78:*18, 20, 20*
104:*12* 105:2
118:*20* 124:*13*
completely 41:*22*
46:*13* 57:*4* 88:*5,*
*8*
completing 55:*9,*
*16* 60:*12* 78:*15*
completion
124:*16*
Complicated
17:*3*
complimentary
136:*14, 17*
140:*18*
complimenting
39:*18*
comprise 134:*8*
computer 126:*15*
conceivably
15:22
concepts 130:2
concern 29:*21*
47:*13* 139:*16*
150:*9*
concerned 50:*20*
95:*21* 141:*8*
161:*13*
concerning
50:*21* 105:6
129:*14* 159:*5, 6,*
*7* 163:*14*
concerns 37:*2, 6,*
*7* 41:*8, 19* 51:*2,*
*5* 52:*3, 8* 53:2
72:*6, 22* 73:*8*
77:*15* 147:*15*
conclude 95:*18*
127:*8*
concluded 166:*8*
conclusion 42:*10*
48:*19* 68:*10*
77:*1, 9*
conducted 73:*11*
81:2 150:*3*
conducting 59:*21*
conference
128:*11*
confidence 44:*20*
confident 22:*2, 4*
105:*5*
confirms 106:6
confusing 41:22
confusion 103:22
connections
30:*12*
consider 9:*11*

consideration 114:22
considered 9:8, 9 57:19 85:20
considering 57:19
consistent 110:12 118:3 122:5 126:3 142:8
construct 83:18
consult 123:7
contact 10:15 66:18, 22
contacted 154:5
contents 138:10
contest 131:11
context 38:13 39:11 67:4 82:15 152:7
continued 4:1 36:15, 21 146:3
contract 31:10 90:18
contracts 11:2 157:22
contrary 37:9 43:15 88:8
contribute 87:4
control 80:8
conversation 75:9 77:3, 5, 8 80:3 83:15, 16 84:21 85:1 95:22 103:5, 8 110:8, 10
conversations 48:2, 8 75:10, 12 83:7 99:4 103:18 104:4, 17 109:20 143:11, 22 154:11
convert 58:10
convinced 136:9, 10
coordinate 110:3
coordination 29:12, 20 30:8
copies 74:2
copy 142:17
corner 38:5 45:3 56:8 110:18
corporate 10:16 82:4
Corporation 8:18
Correct 11:18 12:13 17:22 22:11 24:10, 14 26:21 27:3 34:12, 13 39:1

56:16 62:11 63:3 82:20 96:9 98:3 99:22 102:11 106:21 112:17, 20 118:21 119:7 121:13, 14 126:6 133:1 134:18 139:18 147:4 164:10
correlation 108:4
corridor 163:9
counsel 1:17 5:17 6:17, 19 7:11, 20 8:11, 13, 17 9:2, 17, 18, 20 10:8, 11, 13, 14, 21 11:5, 6, 13, 16 12:1 16:11 17:2, 13, 21 19:1, 12 23:7 31:3 33:13, 15, 16 34:1, 4, 17 35:19 36:5 37:12 50:10, 15 52:12, 20 63:18 66:11, 14 67:7, 12, 20 69:11 71:7 73:9 74:16 83:9 86:18, 20 87:7, 10 88:1, 17, 19, 21 94:18 95:7 111:7 112:5, 18 117:1 128:10 129:11, 13 145:1 146:2 147:6, 14 149:21 150:4 154:5, 13, 18 157:10 164:4, 13, 16, 17 165:2 167:11, 15
counsel, 109:17
counsels 10:16 31:2 33:15 80:12, 14 113:4
counsel's 50:18
course 91:11 107:1 145:2
court 153:4
courtroom 6:13
cover 148:17
covered 57:13
Cowboys 14:18, 20
coworkers 98:22
criminal 31:12 41:15 91:18
CSR 1:21 167:2, 20
cubicle 163:8
curious 14:19

current 5:20 7:8 15:12 56:11
currently 7:1

< D >
D.C 1:13, 20 2:6, 15 18:4
Daily 91:7
Dallas 14:18, 20
Dartmouth 14:3
data 44:9
date 83:2 104:13 116:14, 17, 20
dated 76:10 106:9 115:20, 21
dates 18:15 48:2, 10 76:19 105:4
DAVID 2:3 5:3
Davis-Miller's 156:2 157:1
day 65:2 88:17, 17, 18, 22 91:7 146:20 165:11
days 72:19 121:17
day-to-day 101:6 160:5 164:12 165:1
deadline 105:17 106:20 107:8, 12
deadlines 105:7
deal 84:3, 5
dealing 62:15
December 16:5 154:3
decide 143:22 144:1, 1
decided 162:11
decision 27:6, 9, 12, 15 40:4 43:4 44:12, 14, 16, 19 47:11 49:2 58:9 68:1 82:19 86:6, 10, 14 95:6 142:21 143:3 158:4, 7
decisions 22:8 160:1, 5, 8
defer 59:6, 8, 9, 12 159:18
definitely 78:10
degree 14:6, 10, 15 26:2
delay 81:13 102:6
delays 72:3
delivered 71:10, 18

delivery 29:22
demeanor 68:16
demonstrate 142:18
demonstrates 89:12
denigrating 39:17
Department 1:10 2:12 123:9 6:4 152:5 153:1, 1
Deposition 1:15 3:9 4:1 5:7 6:9, 16 19:16 20:14 23:13 28:6 37:17 44:3 54:12 56:1 61:11 73:19 77:21 94:22 96:16 102:14 103:12 105:21 108:12 115:5 116:4 119:18 123:20 125:10 133:5 139:10 146:17 152:4 166:7 167:3, 5, 9, 13
depositions 152:3
deputies 32:20 35:19 37:13 39:13 40:5 50:2 64:14 75:17 79:22 87:6
deputies's 52:6
deputy 8:11, 13, 16 9:1, 17 10:8, 11 11:4, 5, 13, 16 16:10, 22 17:1, 13, 21 19:1, 12 23:6, 8 29:6 31:1, 3, 5 32:10 33:12, 14, 15 34:3, 6, 17 36:9 40:5 50:9, 14, 18 52:11 63:18 66:11, 13 67:6, 12, 20 69:11, 15 71:7 73:9 79:13 80:2, 9, 11, 13 81:18 83:9 86:18, 20 87:9 88:1, 17, 20 89:22 91:17 94:17 95:7 109:17 111:6 112:5, 18 113:4 117:1 128:9, 22 145:1 147:5

149:21 154:17 155:1 164:13, 16, 17 165:2
deputy's 146:22
describe 33:11 53:14 128:17 157:15
described 51:2 75:16 120:15 163:4
describes 135:4
describing 127:21, 22 139:16 142:8, 12
description 118:7 127:14, 15 130:17 131:5, 22 136:3 140:10
designate 146:9, 9
designed 46:8
desk 93:11, 16, 21
destroy 22:7
destroyed 22:10
determination 113:18
determine 36:7 46:1 57:6
develop 67:18 68:5
DGC 24:1 93:3 160:12, 13, 17
DGCs 38:22 39:5
dhart@katorparks.com 2:8
difference 32:5, 12 33:3, 12 92:14 132:7
different 33:19 90:2 92:12 128:13 142:10
difficult 101:22 102:2
direct 67:22 150:4
direction 167:8
directly 31:22 32:19 33:16 34:3 50:11 153:22
Director 17:4, 8, 11 29:11, 19 35:7 40:6, 6 149:11, 17 154:19 155:1
disagree 47:16
disagreed 118:14
disagreement

43:2, *4*
**disagrees** 53:*22*
**discovery** 31:*15*
32:*3* 51:*11* 90:*5*,
*9* 91:*3* 154:*7*
162:2 163:2
165:8, *19*
**discriminating**
42:*15*
**discrimination**
151:*18, 22*
152:*17* 153:*16*
**discuss** 49:*21*
64:*11* 83:8 85:9
99:*14* 122:*15*
124:20 125:*4, 6*
140:*3, 6* 142:2, *5*
149:6 150:*5*
155:*2, 5, 11, 17*
156:*1, 9, 13, 16,*
*19, 22* 166:2
**discussed** 50:*5*
58:4 64:6 76:*5*
85:*17* 86:2, *19*
123:8 128:8
132:*14* 153:*21*
157:*13*
**discussing** 20:*3*
34:*21* 35:*4*
37:*11* 38:*1*
55:*14* 86:4 94:2
103:*21* 104:2
120:*14* 124:*5*
128:*10* 137:*16*
146:*5* 148:2
164:6
**discussion** 36:*3,*
*7* 43:*18, 21* 44:*1*
47:*18* 58:7
78:*11, 13* 83:*20*
95:*15, 16* 146:*11*
148:*18* 157:*5*
159:*5, 10, 11, 12*
165:*22*
**discussions**
42:*11* 48:*1* 49:*7,*
*10, 16* 50:*4* 79:2,
*11, 17, 21* 80:*14,*
*17* 85:*14* 94:6
107:*10* 123:*14*
139:*15* 141:9
143:6 144:9
149:*16* 152:*17*
161:*4*
**dishes** 15:*10*
**dismissal** 41:*17*
**displeasure** 72:*21*
**dispute** 51:*13, 16*
118:*10*
**distance** 91:*16*
92:*3*

**District** 1:*22*
167:*21*
**division** 63:*14*
110:22 129:*10*
162:*13*
**Document** 3:*10,*
*11, 12, 13, 14, 15,*
*16, 17, 18, 19, 20,*
*21, 22* 4:2, *3, 4, 5,*
*6, 7, 8, 9, 10, 11,*
*12* 19:*21* 20:*17*
23:*16* 28:9
37:20 44:6
45:*17, 22* 54:*15*
56:4 61:*14*
73:*22* 74:*14, 18*
75:2, *13* 78:2
95:*3, 10* 96:*19*
102:*17* 103:*15*
106:2 108:*15*
109:2 115:8
116:7 119:*21*
120:*11* 122:*12*
124:*1* 125:*13*
127:*4, 16, 22*
133:8 134:*1, 13,*
*15* 138:*9, 16, 18,*
*19* 139:2, *5, 13,*
*20* 140:*4, 5, 7, 16*
149:*1*
**documentation**
121:*19* 122:9
**documents** 74:*17*
98:*18*
**doing** 41:*16*
59:22 65:4 82:*5*
109:*18, 22*
114:*13* 121:2
141:6
**DoJ** 17:*5* 36:*13*
37:9 40:8 41:*16*
42:*12* 68:*14*
87:22 159:*1*
**DoJ's** 37:6
**dollars** 157:*19*
**door** 81:*12*
**doubt** 160:*21*
161:*1*
**Douglas** 10:*4*
**draw** 75:6
**drill** 163:*20*
**dropdown** 62:*4*
**due** 117:*21*
**dues** 42:*3, 21*
**duly** 5:*15* 167:6
**duties** 10:*10*
**Dynamics** 8:*18,*
*20* 9:*1, 15, 17, 19,*
*20* 10:*11, 12*
11:*7* 12:*16*

**Dynamics's** 10:*8*

**< E >**
**Earle** 38:*17*
**earlier** 75:*16*
79:6 81:*3*
106:*10* 126:*4*
128:8 132:*14*
133:*14* 137:*16*
139:*16* 142:*12*
148:2, *19* 163:*21*
**early** 79:*19*
80:6 81:*10*
108:*19* 146:*20*
**Eaton** 7:*21* 8:6,
*14*
**E-A-T-O-N** 7:*21*
**edit** 122:*14*
**edits** 115:*14, 15*
122:*11*
**EEO** 98:2, 6, *15*
151:*5, 13* 153:*20*
154:2, *20* 155:*3,*
*6, 12, 18* 156:2,
*10, 14, 17, 20*
157:*1*
**EEOC** 1:6
**effect** 30:*4* 47:2
**effective** 91:*15*
**effort** 35:*15*
110:*4*
**efforts** 109:*13*
**Either** 15:*21*
18:*3* 20:*5* 27:*16*
31:22 42:*12*
49:2 50:*4* 53:22
114:*14* 123:*7*
124:*4* 128:*3*
146:9 147:*5, 19*
153:*21* 164:*21*
**Elaine** 17:*16*
36:8 43:*16*
79:*12, 18* 81:*10*
82:*2* 94:20
158:*12*
**elements** 64:*1*
**eliminate** 47:9
**eliminating** 46:8
**email** 19:22
20:*1, 5* 21:*5*
23:*19* 28:*11*
38:*7, 14* 41:*4*
44:*11* 45:2, *5, 11*
49:*15* 54:*19*
55:*1, 2, 11, 12*
56:*7, 9* 74:*3, 5, 7,*
*7, 10, 22* 76:2, *3,*
*9, 9* 77:*12, 14*
95:*12, 19* 96:*3, 5,*
*7, 22* 97:*9, 10*
102:*20* 103:6

106:*8, 13, 15, 16*
109:*5, 9* 110:*12*
115:*14, 18, 20, 21*
116:*10* 117:*9, 11,*
*12, 17* 125:*16*
126:*8, 18* 127:2,
*3, 9* 136:*7* 141:*5,*
*14* 164:*21*
**emails** 49:*12, 18*
163:22
**eminently** 69:*16*
**employed** 8:*17*
12:*4, 19* 13:*4*
60:6 167:*11, 15*
**employee** 9:*8*
31:22 43:*4*
50:*11* 53:*16, 21,*
*22* 61:*7* 107:6
113:*15* 114:*13*
120:22 132:*9*
137:*3* 157:*17*
167:*14*
**employees** 43:2
53:6, *12* 54:*7, 8*
55:*9, 16* 62:*17*
85:*10* 89:*16, 19*
91:9 92:*17, 18*
93:*3, 12, 22*
107:*11* 108:*9*
149:22 161:*4, 9*
**employer** 5:20
137:*4*
**employers** 13:*3*
**EMPLOYMENT**
1:2 8:*1, 12, 19,*
*22* 10:*21* 11:*12,*
*21* 12:*14* 19:*1*
136:22
**encounter** 50:*15*
**encountered**
50:*10*
**encourage** 18:*5*
**ends** 65:*10*
**engineer** 10:*5*
**English** 14:*13*
**ensuring** 112:22
**entire** 42:*3*
122:*4* 165:*9*
**entitled** 130:*4*
**enumerable**
101:*9*
**environmental**
10:*19*
**EQUAL** 1:2
**equally** 39:*12*
**ERNEST** 1:*16*
5:*11, 14* 145:*20*
166:8
**E-R-N-E-S-T**
5:*12*

**Ernie** 126:*9*
**especially** 30:*10*
**ESQUIRE** 2:*3,*
*11*
**essentially** 32:*8,*
*20*
**ethical** 41:6, *10,*
*14*
**evaluate** 62:*17*
**evaluating** 61:6
**evaluation** 59:22
60:*1* 101:8
102:*7* 118:20
124:*17* 149:6, *10,*
*11*
**evaluations**
60:*14, 17, 20*
62:*15* 101:*5*
102:8
**event** 37:6
**events** 35:*21*
107:*3*
**eventually** 21:*13*
26:22 30:*16*
39:20 65:*10, 17*
73:*11* 84:*12*
85:9 91:20
118:6 119:*4*
149:*1*
**evidence** 85:*4*
144:*5*
**exact** 105:*15*
**exactly** 31:20
35:20 103:9
131:9
**examination**
1:*17* 3:2 5:*17*
146:2 157:*10*
164:*4*
**examined** 5:*16*
145:22
**example** 62:*16*
**examples** 29:*21*
**exceptionally**
35:8
**exchange** 28:*11*
41:*4* 45:*12*
77:*12, 14*
**exchanged** 49:*11*
**exchanges** 40:*7*
**exclude** 142:*3, 5*
**excluding** 137:*11*
**excuse** 148:*10*
**executing** 81:*13*
**executive** 63:*13*
106:*7* 154:22
**executives** 53:6
**Exhibit** 19:*15,*
*16* 20:*14* 23:*13*
28:6 37:*17* 44:*3*
54:*12* 56:*1*

61:*11*  73:*19*
74:*20*  77:*21*
94:*22*  96:*16*
102:*14*  103:*12*
105:*21*  106:*13*,
*15, 22*  108:*12*
115:*5*  116:*4*
119:*18*  123:*20*
125:*10*  133:*5, 16*
134:*17, 22*  135:*2,
4*  136:*3*  139:*9,
10*
**EXHIBITS**  3:*9*
4:*1*
**existence**  147:*19*
**expectation**
104:*12, 15, 18*
113:*3, 7*
**expectations**
107:*21*
**expected**  6:*20*
34:*5*  105:*9*
110:*13*
**expense**  41:*19*
**expenses**  42:*10*
**experience**  26:*2*
30:*3, 7*  50:*9, 14*
71:*4*  137:*6*
**experienced**  30:*5*
**Expires**  167:*22*
**express**  52:*3, 8*
53:*2*  72:*5, 13*
84:*6*  97:*16*
136:*2*  141:*10*
142:*14*  144:*13*
**expressed**  40:*11,
15, 19*  45:*20*
48:*5*  72:*20*
139:*17*
**expressing**  43:*2,
4, 13, 15*  46:*3, 10*
47:*1*  73:*7*  77:*15*
**expressions**
140:*12, 20*
**extent**  25:*19*
63:*15*  117:*15*

**< F >**
**faced**  110:*1*
**faces**  163:*9*
**fact**  21:*3*  28:*17*
36:*20*  64:*5*  85:*4*
104:*6*
**facts**  144:*4*
**failed**  87:*4*  97:*6*
**failure**  87:*6*
89:*4, 5*
**fair**  141:*16*
**fairly**  79:*19*
**fall**  108:*6*  138:*4*

**familiar**  6:*6*
33:*6*  53:*8, 10, 12*
119:*3*  134:*4*
136:*20*  137:*1*
**fancier**  89:*11*
**fantastically**
68:*14*
**far**  25:*15*  32:*6*
42:*22*  50:*19*
68:*15*  134:*15*
141:*8*  151:*13*
154:*3*  161:*11*
**fashion**  19:*3*
52:*21*  83:*21*
**fax**  163:*12*
**FBI**  7:*9*  9:*8*
17:*2*  19:*7*  30:*1*
36:*21*  37:*7*  40:*6,
7*  42:*12*  47:*6*
57:*19*  66:*12, 19*
67:*1*  68:*17*
88:*17*  89:*1*
126:*15*  147:*3*
149:*10*  151:*16,
21*  154:*5*  157:*17*
164:*11*  165:*13*
**FBI000166**  4:*8*
**FBI000244**  4:*8*
**FBI000482**  4:*11*
**FBI000564**  4:*3*
**FBI000565**  4:*3*
**FBI000762**  4:*10*
**FBI000766**  4:*10*
**FBI000769**  4:*5*
**FBI000771**  4:*5*
**FBI000813**  4:*9*
**FBI000861**  3:*17*
**FBI000862**  3:*17*
**FBI002308**  3:*15*
**FBI002312**  3:*15*
**FBI002320**  3:*11*
**FBI002321**  3:*11*
**FBI002357**  4:*2*
**FBI002542**  3:*22*
**FBI002543**  3:*22*
**FBI002559**  3:*12*
**FBI002829**  4:*6*
**FBI002830**  4:*6*
**FBI002843**  4:*2*
**FBI002921**  3:*16*
**FBI002923**  3:*16*
**FBI003077**  3:*18*
**FBI003090**  3:*18*
**FBI003282**  4:*7*
**FBI003283**  4:*7*
**FBI003322**  4:*4*
**FBI003435**  3:*19*
**FBI003437**  3:*19*
**FBI003438**  3:*20*
**FBI003440**  3:*20*

**FBI003459**  4:*12*
**FBI003486**  3:*21*
**FBI003487**  3:*21*
**FBI003705**  3:*13*
**FBI003706**  3:*13*
**FBI003722**  3:*14*
**FBI003723**  3:*14*
**FBI003841**  3:*10*
**FBI003848**  3:*10*
**FBI00478**  4:*11*
**FBI-2015-00176**
1:*10*
**FCPA**  11:*1*
**Federal**  2:*13*
5:*21*  8:*10*
**feedback**  101:*11*
**feel**  89:*16*
113:*22*  135:*9*
**fees**  42:*17*
**felt**  29:*12*  84:*9*
144:*13*
**FIELD**  1:*3*  19:*4*
**filed**  16:*19*  98:*2,
5, 15*  99:*3*
152:*12*
**filing**  98:*19*
**filled**  160:*18*
**final**  27:*9*  57:*17*
**financially**
167:*16*
**find**  36:*6*
**fine**  48:*11*
109:*1*  118:*1*
130:*14*  142:*11*
146:*16*
**finishing**  13:*5*
**fire**  163:*20*
**firm**  7:*20*  8:*2, 8*
12:*5, 8, 15, 20, 22*
152:*8*
**first**  5:*15*  8:*5*
16:*22*  17:*1*
18:*11, 16*  28:*1*
35:*3*  37:*10*
45:*19*  48:*5*  56:*7,
8*  60:*15*  61:*1*
66:*16*  67:*2*  70:*5*
76:*8*  81:*16*  96:*4,
6*  98:*8*  109:*5*
117:*9, 11, 12*
125:*22, 22*
146:*21, 22*
153:*19*  154:*4*
**first-line**  54:*2*
144:*7*
**fiscal**  31:*10*
90:*18*  157:*22*
**fit**  29:*6*
**five**  71:*22*
**flat**  48:*13*  67:*21*
114:*9*  158:*20*

**Flocco**  64:*19*
65:*3*  126:*21*
**floor**  90:*4, 12, 14,
16, 17, 22*  91:*5, 8,
10, 13*  92:*4, 6, 7,
12*  93:*16*  94:*4*
162:*21*  165:*15,
17*
**floors**  89:*12*
**focus**  129:*9*
159:*2*
**folks**  157:*18, 22*
**follow**  34:*6*
149:*14*  150:*18*
**followed**  79:*2*
**following**  53:*1*
110:*6*
**follows**  5:*16*
146:*1*
**follow-up**  75:*8*
157:*8*  164:*3*
**foregoing**  167:*3,
5*
**forensic**  91:*21*
**forfeiture**  92:*1*
93:*9*  112:*14*
**form**  24:*22*
26:*10*  62:*5*  69:*3*
84:*18*  92:*19*
113:*13*  128:*14*
131:*16*  132:*4, 18*
135:*21*  138:*17*
139:*21*  143:*12*
144:*4*  158:*5*
161:*18*
**formal**  34:*9, 10*
154:*4*
**formality**  6:*8*
**format**  6:*10*
65:*9*
**formed**  26:*18*
**former**  69:*15*
149:*10, 16*  150:*4,
4*  154:*19, 19*
160:*12*
**formerly**  163:*11*
**formis**  129:*10*
**forth**  36:*12*
64:*19*  109:*17*
163:*22*
**forward**  28:*15,
17*  110:*5*
**forwarded**  104:*9*
**forwarding**  55:*3*
**found**  50:*12, 17*
**four**  23:*8*  30:*22*
32:*2, 18*  80:*7*
135:*12*
**frankly**  71:*6*
119:*2*

**free**  14:*21*
**freeze**  17:*5*
**frequently**  137:*3*
**Friedman**  12:*5,
11, 18*  152:*8*
**Frone**  35:*6*  40:*2*
**Frone's**  37:*1*
56:*21*
**front**  133:*10*
**fundamentally**
136:*14, 15*
**further**  130:*4*
131:*6*  144:*18*
146:*1*  164:*2*
**furthermore**
167:*3*
**future**  129:*6*

**< G >**
**gap**  8:*1, 12, 22*
9:*5*  11:*11, 21*
12:*14*  16:*16*
29:*7, 10*
**General**  1:*9*
7:*10*  8:*11, 13, 16,
18, 19*  9:*1, 2, 14,
16, 17, 18, 18, 19,
21*  10:*8, 8, 11, 11,
12, 13, 14, 16, 21*
11:*4, 5, 6, 7, 13,
16, 22*  12:*15*
14:*11*  16:*11*
17:*1, 1, 13, 21*
19:*1, 12*  23:*7*
31:*1, 3, 6, 9*
33:*13, 14, 15, 16*
34:*1, 4, 17*  35:*19*
36:*5*  37:*12*  48:*3*
50:*10, 15, 18*
52:*9, 11*  58:*7*
63:*18*  64:*4*
66:*11, 14*  67:*6,
12, 20*  69:*11*
71:*7*  73:*9*  80:*12,
14*  83:*1, 9*  86:*18,
20*  87:*7, 10*  88:*1,
17, 18, 21*  94:*17*
95:*7*  109:*17*
110:*16*  111:*7*
112:*5, 18*  113:*4,
12*  117:*1*  123:*13*
128:*9*  129:*12*
145:*1*  147:*6, 14*
149:*21*  150:*4*
154:*18*  164:*13,
16, 17*  165:*2*
**generally**  15:*9*
19:*3*  30:*20*  34:*5,
19*  43:*12, 14*
53:*5*  62:*15*  73:*5*
76:*16*  79:*16*

94:8  104:2, 20
109:11  110:15
128:4  141:7
**generated**  62:20
**getting**  14:14
71:10  81:6
116:11  163:22
164:1
**Giuliano**  162:11
**give**  6:12  40:8
48:9, 10  56:11
105:15
**given**  21:20
167:10
**giving**  6:11
48:21
**go**  6:3  13:7
14:2  16:1  33:9,
9  53:21  63:22
64:16  74:18
89:14  91:2  92:6
94:20  105:9
113:19  114:7, 8
122:15  135:5
156:8  165:2
**goals**  29:2, 8
63:13  64:7, 17
75:5
**goes**  57:1  88:21
113:12
**going**  6:3, 5, 6
34:3, 6  36:4, 6, 8
61:4  64:9  65:20
81:12  83:18
87:8  88:3, 7, 14,
19  89:1, 2, 7, 9
95:22  106:17
114:14, 18  119:9
121:21  129:4
138:14  148:14,
18  152:15  156:7
**gonna**  59:15
85:2, 3  135:18
160:6, 7
**good**  5:2  38:19
52:17  64:8
68:13, 16  70:12,
20  71:5, 10
78:11  92:4
108:20  145:10
**gotta**  84:5
**government**  11:1,
2  17:5  46:2
**graded**  107:17
**grading**  108:3
**gradual**  142:18
**graduate**  13:13
14:4
**graduation**
13:19  15:2

**GRAY**  2:11  3:4
24:22  26:10, 12
65:19  69:3, 6
74:6, 12  84:18
92:19  111:9, 12
113:13  117:15
121:3  128:14
131:16  132:4, 16,
18  135:21
137:19  138:15,
17, 19, 21  139:1,
4, 21  143:12, 14,
16  144:4  145:13
146:8, 13  151:7
155:8, 14, 16, 19,
22  156:3, 6
157:8, 11  158:9
161:20  164:2
**great**  66:1
**ground**  6:4
**group**  43:17
83:17  92:21
**GRZ**  3:10, 11,
12, 13, 14, 15, 16,
17, 18, 19, 20, 21,
22  4:2, 3, 4, 5, 6,
7, 8, 9, 10, 11, 12
**GRZADZINSKI**
1:5  2:20  5:4, 5
18:11, 17  20:9
21:2, 10, 14  23:6
24:9, 11, 21  25:5,
10  26:22  27:21
28:2, 12, 15
34:16, 22  35:4
37:11  38:2, 8, 12
40:3  43:1, 16
49:3  50:17
68:19  69:1
85:15, 20  86:7,
11  92:6  93:2, 10
94:11  95:7, 17
98:5, 12  101:16
103:6, 19  106:16
109:9  111:2
112:22  114:13
118:7, 15  119:5
120:13  121:10
123:10  125:19
127:19  128:9
131:4, 21  132:22
141:2  142:22
143:4  144:2, 8,
12, 16, 20  148:20
149:6, 20  157:20
159:14  161:15
163:15  165:13
**Grzadzinski's**
20:4  21:19  30:2
34:12  38:21
47:19  49:21

50:6  89:19  94:3
99:21  100:2, 21
109:5  116:16
124:5, 7  126:8
127:22  151:3, 11
153:20  155:3
156:10  158:4
159:7  163:17
**guess**  24:16
**guys**  145:12

< H >
**half**  137:2, 2
**Handing**  74:14,
18
**handle**  103:7
**handled**  10:22
122:4  162:12, 14
**handling**  51:21
73:8  81:17
82:17  129:4
**happen**  65:1
83:9  105:4
**happened**  30:19
78:13  85:9
101:20  150:16
**happening**  71:20
115:22
**happy**  21:8
72:10
**hard**  91:20
102:3
**Harding**  105:12
117:12  123:7
**Harding's**  106:5
**Harris**  1:19  2:4
**HART**  2:3  3:3,
5  5:2, 3, 18  10:4
19:14, 18  20:13,
18  23:12, 17
25:3  26:16  28:4,
10  37:15, 21
44:2, 7  54:11, 16
55:21  56:5
61:10, 15  65:20
66:2, 4, 6  69:9
73:17  74:1, 9, 13,
15  77:20  78:3
85:7  93:1  94:21
95:4  96:14, 20
102:12, 18
103:11, 16
105:20  106:3
108:11, 16, 21
109:3  111:11, 14,
15  113:21  115:4,
9  116:3, 8
117:18  119:16,
22  121:7  123:19
124:2  125:9, 14
128:16  131:13,

18  132:11, 19
133:4, 9  136:1
137:21  139:7, 14
140:2  143:19
144:6  145:10, 14
146:4, 12, 15, 18
151:10  155:10
157:3, 7  158:5
159:17  161:18
164:3, 5  165:21
166:1, 4
**head**  35:16  36:1
37:3  56:19
**headquarters**
10:17  90:20
92:21  93:4
**hear**  136:16
**heard**  89:2
148:2  154:2
**heavily**  26:4
**Heights**  11:8
**held**  11:15  150:4
**help**  101:10
105:9  160:1
**helping**  55:13
**hereto**  167:16
**Herring**  17:17
69:15  160:12
**hey**  89:2
**hierarchy**  31:21
34:8
**high**  42:7  126:9,
11
**higher**  148:21
**hire**  67:22
**hired**  17:10
35:9  88:9  147:1
**hiring**  17:5
**history**  15:7
**hold**  17:7  51:10
**home**  152:14
**hope**  127:3
**HRD**  17:6
105:13
**Huber**  1:21
167:2, 20
**human**  106:6
123:9
**hundred**  83:12

< I >
**idea**  46:14  47:9
64:8  66:1  68:21
83:3  89:3  98:13
118:5  121:5
122:21  142:1
143:10  152:12
**ideas**  65:8
**identification**
19:17  20:15
23:14  28:7

37:18  44:4
54:13  56:2
61:12  73:20
77:22  95:1
96:17  102:15
103:13  105:22
108:13  115:6
116:5  119:19
123:21  125:11
133:6  139:11
**identify**  81:9
**IG**  162:12
**ignore**  114:6
**ignoring**  114:14,
17, 21
**III**  1:8
**illegal**  37:9
52:22
**ILU**  44:9, 13
110:20  111:10,
17, 22
**imagine**  85:12
**immediate**  99:21
100:2  101:15
**impact**  7:2
**important**  68:15
130:11  131:3, 20
132:6, 8
**impossible**  39:7,
8  88:16
**impression**  80:6
**improve**  141:2,
11
**improved**  129:11
**improvement**
140:11, 13
142:18
**inability**  87:5
89:13
**inaccessible**
89:17
**inaccurate**  114:1
**inactive**  16:2, 4
56:15
**inappropriate**
94:8
**inappropriately**
147:7, 11  148:8
**incidents**  128:18
**include**  62:3
130:11  134:19
135:9, 15  157:20
**included**  53:11
79:21  80:2
91:18
**including**  64:17
157:20
**inconsistent**
29:22
**incorporated**
63:16

incorrect 159:4, 15
incredibly 68:11
independent 17:6 52:19
indicate 106:14 109:22 115:18
indicated 26:2 106:9 128:21 159:14
indication 18:8
individual 27:19 41:13 84:12 105:8 114:8 148:5
individuals 42:5 45:11 69:17 80:21 103:2 107:16 134:7 147:13 150:10
individual's 115:12 150:12
influenced 125:3
inform 88:18 95:17
information 31:13 64:21 71:17 91:19 134:20 135:17 137:11 142:3, 6, 20
informed 87:7 89:6 129:3, 8
informing 120:18
init 144:1
initial 75:3
initially 149:2
initiate 144:1
initiating 143:7
in-person 49:8, 9 78:11, 12
input 27:12, 16, 20 47:19 49:21 50:6 65:5 134:12
inquired 57:18
inquiries 162:12
insofar 101:16 150:11 154:21
inspection 162:13
Inspector 64:4
instance 50:16
instances 72:12, 15 87:11, 12
instruct 94:11
instructing 94:15
instruction 36:11 56:19 91:22 93:8 94:18 111:1, 19

112:11
instructs 6:19
intelligent 68:12
interact 87:6 164:13
interacted 69:12
interacting 69:10
interaction 10:3
interactions 144:18 145:2 154:18
interested 167:16
interfaced 10:20
interior 90:5 91:4 163:5, 9 165:6, 9
intervening 116:1
interview 18:12 21:6, 13, 17, 20 22:1, 13, 16, 19, 22 23:3 24:20 25:8, 10 26:3, 8, 15, 19 27:15 68:2 75:4
interviewed 17:12, 15 20:10 21:2, 11 25:6, 21
interviewing 23:6, 10
interviews 22:6, 7
investigate 36:6
Investigation 2:13 5:21 8:11
investigations 11:1
investigative 24:14 25:14 27:1 82:22 90:19 111:22
investigator 57:21
involved 27:5 40:3 64:13, 14, 16 79:7 80:12, 14, 17, 20 144:9 158:7 160:8
involvement 36:4 67:11 106:5 122:8 164:7
involves 105:1
involving 58:8 83:16 99:5 129:5 157:13 158:12
Iron 9:20 10:2 11:16 12:3 16:4
irrelevant 139:3

issue 19:6 33:22 35:22 36:19 47:20 49:22 51:9, 21, 22 54:6 55:9 57:7 94:2 104:3 128:12 129:14 142:9, 14 157:13 159:8
issued 125:18 160:6
issues 52:2 128:7, 11 135:3, 8
its 138:10

< J >
James 22:14, 15 123:15 149:11 156:10, 14, 17, 20 157:1
Jamilia 35:6
January 1:8 9:6, 8 10:9 16:9
Jason 17:16 69:15 160:12
JEFFERSON 1:8
Jim 17:9 27:7 29:2 83:3, 11 87:16 95:14
job 13:17 65:9 71:10 81:17 82:17, 17 84:4 90:13 92:14 105:16 130:14 160:3 161:1 162:15, 15
join 12:22
joined 61:1 165:13
joining 8:14 12:15, 18
judge 6:14
judgment 87:13 137:12
Julie 17:17
JULIET 2:11
juliet.gray@ic.fbi. gov 2:17
July 7:13 11:10, 20 103:1 106:15, 16, 19 107:7, 11
jump 76:8
jumping 148:15
June 65:17
jurisdictions 42:2
jury 6:15
Justice 1:10 2:12 31:12 91:18

Justin 35:5 40:18 76:21 77:2

< K >
Karen 156:1, 22 162:4
Kator 1:18 2:4
Katzman 17:17
keep 65:9 87:7 89:6 129:2, 7 133:10
keeping 64:21
Kevin 154:19
kind 6:8 31:21
kinds 123:14 130:11
knew 58:19 84:9 123:5 131:9
know 6:7 19:20 20:20 25:2 30:16 37:5, 6 42:22 43:22 44:1 45:7, 15 46:17, 22 51:13 58:1, 20 61:3 66:7, 9, 9, 18, 22 69:7 70:13, 19 71:21 72:1 75:1 77:7 82:3, 5, 6, 14 89:3 92:2 93:13, 17, 18 94:13 98:4 100:8, 14, 16, 19 105:12 114:3, 4 123:16 126:11 130:12 133:2 134:6, 7 138:2, 13 139:19 140:1, 13, 15, 19 141:21 149:12, 13 154:3 158:6, 7 160:21
knowledge 27:13 67:2 97:20 99:3 122:19, 22 123:6, 12, 13
known 7:21 87:16 160:22

< L >
labor 10:21
lack 140:7
lacking 46:2 50:12, 18
Land 9:19 11:7
lapse 42:1
largely 6:18 107:1
larger 135:8

late 18:13
laudable 39:12
Law 1:18 2:21 5:4 7:20 8:2, 8 12:5, 8, 20 13:1, 5, 7, 16, 18 14:15 15:3 24:15 25:14 27:1 31:4, 6, 9, 10, 11, 12, 13 32:2 37:8 47:10 48:20 66:12 67:7 82:22 83:1 87:21 90:18, 20 111:22 152:8 158:21 159:3
lawsuit 152:12
lawyer 13:2 52:17 68:12 70:12, 20
lawyers 29:14, 14 35:9 37:8 41:13, 13 42:16 46:2 47:6 51:10
lead 87:13
leadership 129:8 148:6, 7, 11, 12
learn 99:6
leave 18:1, 6, 9
led 30:3 77:9 97:5
left 16:4 17:20 154:2
legal 29:22 36:10 41:5, 11, 14 44:21 45:21 46:1 47:7, 8 48:12, 21 50:8, 12, 18, 20, 22 51:9, 22 56:19 58:22 59:4, 10, 11, 16, 17 91:22 92:1 93:8, 8 109:22 110:2, 4 111:1, 19 112:11, 14 129:15 158:20 159:7 160:1, 8 165:3
legally 159:16
Lemert 17:16 36:9 43:16 79:12 80:13 81:11, 15 82:2 94:20 158:12
Lemert's 82:7
lengthy 42:11 108:17
level 87:9 148:21
LFU 112:13
liberties 31:11 90:19

license 36:*16*, *22*
41:9, *20* 158:*13*
159:*8*
licensed 48:*6*, *22*
159:*1*
licenses 35:*16*
37:8 40:*12*, *16*,
*20* 41:*7* 43:*5*, *20*
47:*12*
limit 163:*20*
line 108:*17*
161:*6*
Lisa 36:*11*
43:*16* 70:*10*, *11*,
*20* 158:*11*
list 57:*3* 132:*13*
135:*8* 156:*8*
listed 80:*21*
147:*21*
listing 75:*4*
lists 55:*1* 75:*4*
literally 80:*4*
83:*20*
litigation 10:*18*
31:*5* 51:*11*
162:*19*, *21*
little 148:*15*
165:*12*
LIU 111:*13*
112:*7*
livelihood 84:*4*
located 89:*10*, *11*
92:*20*, *22* 93:*4*
location 146:*13*
long 9:*5* 10:*7*
34:*14* 36:*3*, *5*
41:*1* 65:*21*
83:*14* 100:*1*
105:*5* 117:*21*
longer 101:*16*
134:*15*
look 19:*19* 38:*4*
54:*22* 56:*21*
57:*2* 63:*22* 64:*4*
74:*4* 95:*12*
110:*5* 121:*15*
125:*15*
looked 19:*21*
20:*16* 23:*15*
28:*8* 37:*19* 44:*5*
45:*17* 54:*14*
56:*3* 61:*13*
73:*21* 75:*2* 78:*1*
95:*2* 96:*18*
102:*16* 103:*14*
106:*1* 108:*14*
109:*2* 115:*7*
116:*6* 119:*20*
120:*11* 123:*22*
125:*12* 127:*16*

133:*7* 139:*12*
141:*5*
looking 28:*14*,
*17* 45:*19* 65:*11*
75:*6* 80:*4*, *5*
106:*15*
looks 113:*16*
lot 6:*5* 65:*7*
93:*13*
lots 65:*8*
loud 160:*22*
lower 38:*5* 45:*2*
56:*8*
lunch 108:*19*
145:*11*
luncheon 145:*16*
LX 92:*22*
146:*11*, *12*

< M >
machine 163:*12*
Maine 7:*21*
12:*6*, *20* 15:*16*,
*18* 16:*2*, *3* 18:*2*
maintain 35:*1*
40:*12*, *16*, *20*
41:*7*
maintained 93:*11*
major 14:*13*
making 6:*17*
27:*6* 58:*4*
150:*20* 158:*7*
160:*1*, *8*
manage 71:*9*, *13*
89:*6* 92:*2*
management
31:*15* 32:*3*
51:*12* 70:*7* 72:*6*,
*11* 73:*1* 83:*17*
84:*2* 87:*4* 88:*12*,
*22* 90:*6*, *9* 91:*3*
129:*1*, *2* 151:*5*,
*17* 162:*2* 163:*2*
165:*8*, *20*
manager 70:*5*,
*12*, *21* 71:*5*
89:*13* 91:*15*
105:*9*
managing 90:*8*
91:*16*, *18*, *21*
March 8:*21* 9:*6*,
*7* 10:*9* 54:*7*
76:*8*, *12* 167:*22*
MARCIANN
1:*5* 2:*20* 5:*4*
Marcy 29:*4*
39:*14* 45:*5* 88:*5*
Marcy's 50:*7*
marginal 140:*11*,
*13*
Marissa 5:*5*

mark 19:*14*
20:*13* 23:*12*
28:*4* 37:*15* 44:*2*
54:*11* 55:*21*
61:*10* 73:*17*
77:*20* 94:*21*
96:*14* 102:*12*
103:*11* 105:*20*
108:*11* 115:*4*
116:*3* 119:*16*
123:*19* 125:*9*
133:*4* 139:*7*
162:*11*
marked 19:*16*
20:*14* 23:*13*
28:*6* 37:*17* 44:*3*
54:*12* 56:*1*
61:*11* 73:*19*
74:*20* 77:*21*
94:*22* 96:*16*
102:*14* 103:*12*
105:*21* 106:*13*
108:*12* 115:*5*
116:*4* 119:*18*
123:*20* 125:*10*
133:*5* 139:*10*
Marrisa 2:*21*
Matsumoto
70:*10*, *11*
matter 14:*11*
32:*11* 33:*17*
36:*20* 65:*21*
146:*5* 152:*18*, *22*
153:*1*, *14*
mattered 80:*2*
matters 10:*22*,
*22* 129:*8*
McNally 31:*4*
40:*14* 71:*1*, *3*
72:*10*, *18* 97:*21*
116:*22*
McNally's 52:*9*
73:*1*, *8* 115:*20*
116:*19*
mean 18:*22*
41:*13* 49:*15*
59:*15* 60:*1*, *2*
64:*18* 65:*1*, *7*
71:*12* 74:*11*
78:*17* 81:*20*
87:*15* 92:*2*
98:*21* 104:*21*
107:*4* 126:*13*
159:*21* 163:*6*, *20*
meaning 86:*1*
88:*14* 127:*4*
means 46:*21*
126:*11*, *14* 129:*2*
meant 117:*20*,
*20* 131:*10*
measure 65:*12*

measures 62:*21*
64:*18*
mechanically
107:*14*
medications 7:*1*
meet 18:*11* 19:*9*
146:*21*
meeting 35:*5*, *7*,
*10*, *11*, *18*, *20*
37:*13* 72:*19*
105:*6* 107:*11*
108:*5* 146:*22*
150:*5*, *9*, *20*
meetings 52:*6*
64:*6*, *11*, *13*, *20*
65:*4*, *8* 71:*14*
75:*16*, *18*, *19*
87:*5* 88:*13*, *22*
89:*1* 101:*9*, *11*
128:*12* 129:*1*
154:*22* 155:*1*
164:*18*
member 15:*12*
29:*4* 30:*6* 148:*7*
members 57:*4*
130:*3*
membership
16:*2*, *3* 57:*20*
87:*15* 129:*16*
memberships
87:*21*
memo 55:*19*
64:*19* 159:*3*
memorandum
36:*12*, *14*, *17*, *21*
158:*11*, *16*
159:*13*, *14*
memory 23:*8*
25:*12* 26:*3*
49:*19* 55:*18*
61:*8*, *18*, *22* 62:*4*
67:*21* 72:*17*
77:*17* 85:*13*
97:*22* 119:*13*
144:*15* 157:*18*
mention 67:*5*
mentioned
146:*14* 158:*19*
mentioning 67:*3*
menu 62:*4*
merits 68:*5*
149:*7*, *17*
message 88:*3*
met 5:*8* 66:*16*
method 58:*12*
109:*18*
Michael 105:*12*
Michigan 11:*8*
15:*16*, *20* 16:*13*,
*16* 18:*3*

middle 31:*19*
76:*6*
midstream 102:*4*
midyear 53:*18*
105:*2*
Miller 162:*5*
mine 141:*19*
minute 19:*19*
20:*19* 45:*15*
157:*3*
misheard 15:*1*
misstates 26:*12*
69:*4* 128:*14*
151:*7* 155:*8*, *14*,
*19* 156:*3*
mistake 111:*14*
modules 55:*1*
months 31:*17*
90:*8* 163:*1*
morning 5:*2*
52:*5* 87:*5* 88:*13*
154:*22*
mouth 142:*10*
move 85:*10*
91:*4* 95:*6* 117:*2*
145:*6* 161:*4*
moved 58:*14*
movement
162:*10*
moving 161:*13*
162:*15* 165:*5*
Mueller 17:*4*
multiple 36:*12*
57:*5* 91:*7*

< N >
name 5:*3*, *10*, *11*
24:*14* 67:*3*, *5*
named 10:*3*
151:*4*, *12*, *16*, *21*
names 40:*8* 43:*7*
Nancy 17:*16*
51:*8* 69:*20*
98:*14* 155:*5*
156:*13* 161:*16*
narrative 115:*12*
127:*12* 133:*13*,
*15* 142:*17*
national 25:*15*
31:*4* 66:*12* 67:*7*
70:*8*, *14*, *19*
nature 150:*10*
near 91:*15* 92:*3*
necessarily 64:*3*,
*10*
necessary 130:*17*
need 18:*20*
35:*17* 48:*6*, *21*
89:*22* 110:*6*
133:*11* 138:*2*

142:2, *3*, *5*, *8*
159:*1*
**needed** 30:*8*, *8*
33:22  37:*3*
75:22  79:*14*
92:*10*, *10*  110:2
135:*9*
**needs** 65:*21*
108:*18*, 22
**negative** 72:2
**neither** 30:*10*
117:*16*  167:*11*
**never** 88:*11*
164:*9*
**new** 17:7
100:*14*  109:*14*,
*17*
**news** 38:*19*
**normal** 145:*1*
**Notary** 1:*21*
167:*1*, 20
**noted** 57:*3*
**notes** 21:22
22:5, *6*, *9*, *16*, *19*
65:*5*
**notice** 1:*18*
**notwithstanding**
6:*21*
**November** 1:*14*
**NSLB** 24:*1*, *21*
68:20  71:7
83:*14*  85:*1*
92:20  145:7
160:*12*, *13*, *17*
162:6
**number** 38:6
42:6  43:6, *7*
56:7, 22  57:*1*
74:*21*  87:*13*
88:9, *11*  120:4
121:*16*  126:*1*, *8*,
*17*  127:*11*
157:*17*
**numbers** 108:2
**NW** 1:*19*  2:5, *14*

**< O >**
**OARM** 35:7, *8*
36:*13*  87:22
**oath** 6:*12*
153:*11*, *12*, *15*
**OBE** 107:*1*, *2*
**obey** 47:*10*
**Object** 24:22
84:*18*  88:6
92:*19*  113:*13*
117:*15*  128:*14*
131:*16*  132:*4*, *16*
135:*21*  138:*15*
139:*21*  143:*12*
144:*4*

**objection** 6:*21*
26:*10*  69:*3*
121:*3*  137:*19*
139:*5*  151:7
155:*8*, *14*, *19*
156:*3*  158:*5*
161:*18*
**objections** 6:*17*,
*18*
**objective** 65:*12*
**objectives** 62:*21*
64:*7*, *17*
**observation**
29:*18*
**observations**
87:*3*
**occasions** 49:*5*
71:*19*  82:*13*
**occupied** 144:*21*
**occupy** 69:*21*
94:*19*
**occupying** 165:*16*
**occur** 96:*1*
**occurred** 98:*1*
**occurring** 123:*14*
**occurs** 102:*9*
**October** 12:*9*
115:*21*, *21*  124:*4*
**offered** 17:*8*
**OFFICE** 1:*3*
19:*5*  59:7, *9*
64:*4*  89:*10*, *11*,
*20*  90:*4*, *5*, *10*
91:*4*, *6*  92:*7*, *13*,
*13*  93:20  94:*4*,
*11*, *19*  105:*9*
128:*13*  129:*12*
147:*14*  154:*20*
162:*18*, *21*  163:*4*,
*5*, *7*, *10*, *13*  165:*6*,
*9*, *14*, *16*
**officer** 167:*2*
**Offices** 1:*18*
40:*8*  59:*13*  90:*3*,
*7*
**official** 118:*1*
121:*12*, *18*  122:*1*
126:*5*  138:*5*, *9*
149:*3*  151:*5*, *17*
**official's** 137:*18*
**off-site** 93:*11*
**OGC** 29:*3*, *8*, *14*
30:*7*, *16*, *21*  31:7
35:*10*  42:*16*
55:*16*  59:*9*
65:*11*  68:*16*
69:*12*  73:*11*
79:*14*  83:*13*
84:22  87:*4*, *17*
90:*3*  98:*2*  110:*3*
129:*5*  148:*5*, *10*,

*12*  159:*18*  160:*2*,
*9*  161:*12*, 22
162:*5*, *9*, *13*, *14*,
*16*
**OGC's** 64:*7*, *16*
**Oh** 38:22  40:2
43:*3*  72:*16*  74:*9*,
*9*  111:*14*, *20*
141:*18*  152:*19*,
*19*  163:*11*
165:*12*
**Okay** 5:22  7:8
9:*14*  10:7  11:*3*,
*11*  13:*21*  14:2
15:*5*, *12*, *17*
16:*10*, *15*  17:20
18:*16*, *19*  19:*8*,
*21*, 22  20:*3*, *8*, *12*
21:7  23:*11*, *16*,
22  24:*18*  25:9
26:*6*, *17*  27:*8*, *18*
30:*13*, *16*  31:*7*,
*14*  32:*5*, *17*, 22
33:*11*  34:*5*, *11*
36:*14*  37:*1*, 20
38:*18*  39:*16*, *19*
40:*10*  41:*18*
42:*9*, *20*  43:*18*
44:*12*, 22  45:*19*
46:*6*, *15*  47:*18*
48:*14*  49:*1*  50:*9*,
*14*  51:*19*  53:*14*
54:*10*, *15*  55:*14*,
*20*  58:*3*, *9*, *15*, *21*
59:*12*, *18*  60:*6*, *8*
61:*9*  62:*8*  63:*1*,
*17*  64:*11*  65:*3*, *7*,
*14*, *17*  66:*4*, *20*
67:*4*  68:*4*, *9*
70:*15*  71:*8*
73:*11*  75:*3*, *15*,
*21*  76:*7*, *20*
77:*19*  78:*2*, *19*
79:20  81:7  82:*6*,
*18*  83:*5*  85:*8*, *14*,
*19*  86:*3*  89:*18*
90:*18*  91:*1*  92:*5*,
*9*, *16*  93:*19*  95:*3*,
*12*, *20*  96:*4*, *13*,
*21*  97:*16*  98:*8*,
*14*, *20*  99:*1*, *6*, *8*
100:*18*, *20*
101:*13*  102:*1*, *8*,
*17*, *19*  103:*10*, *15*,
*17*  104:*2*, *8*, *20*
105:*19*  106:*8*
107:*4*, *18*, *21*
108:*8*, *15*, *21*
109:*2*, *12*  110:*16*
111:22  112:*2*, *7*,
*9*, *12*  113:*3*, 22

114:*12*, *20*  115:*3*,
*8*, *15*  116:*7*, *9*
117:*9*, *19*  118:*3*,
22  119:*4*, *14*, *16*,
*21*  120:*11*  121:*8*
122:*1*, *5*, *8*, *11*, *15*,
*19*  123:*6*, *13*, *18*
124:*1*, *3*, *9*, *13*, *16*
125:*6*, *13*, *15*, *21*
126:*3*, *7*, *16*
127:*7*, *10*, *17*
128:*7*  129:*17*
130:*3*, *16*  132:*12*
133:*3*, *10*, *12*, 22
134:*7*, *15*  135:*1*,
*7*, *14*  137:*5*, *15*
138:*4*, *8*  140:*9*,
*19*  141:*9*  142:*7*,
*21*  143:*10*
144:*16*  145:*5*, *9*,
*13*  146:*15*, *19*
147:*2*  148:*1*, *16*
149:*5*, *14*, *20*
150:*15*, *18*  151:*3*,
*11*  152:*17*, *20*
154:*6*, *8*, *15*
155:*2*, *5*  156:*13*
158:*16*  160:*11*
161:*8*  165:*1*, *5*,
*21*
**Once** 36:*5*
71:*16*  83:*10*
164:*20*
**ones** 17:*18*
**one-to-one** 108:*4*
**ongoing** 149:*16*
**online** 63:22
**open** 23:*9*
160:*20*
**opening** 160:*18*,
*18*
**operate** 113:*11*
**opinion** 20:*8*, *11*
21:*1*  25:*5*, *7*, *9*,
*13*  26:*18*  40:*11*,
*15*, *19*  43:*15*
45:*21*  46:*4*, *11*
47:*2*  48:*6*, *15*, *16*
49:*3*  67:*15*, *18*
68:*5*  69:*10*, *19*
70:*1*, *2*, *9*, *16*, *18*
71:*1*  82:*7*  84:*6*,
*16*  85:*5*  86:*21*
87:*2*  97:*11*, *11*,
*16*  122:*7*  129:*15*
136:*2*, *6*  141:*11*
144:*10*  158:*18*,
*19*
**OPPORTUNITY**
1:*2*

**opposed** 80:*7*
81:*11*, *15*  162:*13*
**opposite** 88:*5*
**opted** 93:*20*
**option** 114:*8*, *10*
**options** 114:*4*, *5*,
*6*
**oral** 153:*10*, *12*
**order** 34:6  42:*1*
81:*16*  93:*11*, *21*
127:*5*  131:6
146:*7*, *10*, *16*
**orders** 51:*10*
**organization**
70:6  79:*14*  85:*3*,
*16*  161:22
**organizational**
80:*5*  83:*18*
95:*15*
**originally** 17:*3*
165:*15*
**OTD** 52:*19*
91:*21*
**outcome** 167:*17*
**outrageous** 46:*13*
**outreach** 30:*9*
**outside** 151:*15*,
*20*  157:*4*
**outstanding**
68:*13*
**overall** 113:*20*
**Overcome** 107:*3*
**overseeing**
112:*16*, *19*, *21*
165:*8*

**< P >**
**p.m** 145:*15*, *18*
166:*7*
**P3** 65:*12*, *12*
**PAGE** 3:*2*, *9*
4:*1*  36:*12*  38:*5*,
*20*  45:*1*  54:*17*,
*18*  74:*12*  75:*7*
76:*8*  95:*13*  96:*6*
109:*6*, *6*  110:*18*
112:*12*  116:*10*
117:*12*  120:*3*
121:*8*, *16*  125:22,
22  126:*17*  127:*3*
164:*1*
**paid** 42:*17*
158:*2*
**panel** 22:*13*
**paper** 78:*5*  79:*3*
**PAR** 53:*10*, *15*
59:*19*  60:*8*, *12*
101:*13*, *15*  102:*7*,
*8*  104:*4*  105:*3*
107:*16*  108:*1*
116:*12*, *13*, *17*, *19*

122:17  124:5, 7,
9, 14, 17, 20
125:2, 18  127:17,
20  128:3  134:14,
20  148:18
P-A-R  107:16
paragraphs
120:8, 10, 15
paralegals  51:11
parallel  32:21
parking  19:6
157:13, 17, 18
Parks  1:19  2:4
part  17:12  58:7
59:1, 4  62:3
65:13  88:12
91:17  119:5, 9
120:7, 13  127:17,
18, 20  128:3, 4
129:5  134:16
143:11, 22  145:6
149:21  151:21
159:12  161:2
participant
128:22
participants
64:2  80:18
participated
88:11  101:9
particular  46:11
94:19  97:12
105:8  160:7
particularly  71:5
parties  167:12,
15
parts  110:3
passed  116:12
path  53:1
Patricia  160:18
pay  42:3, 21
100:17  157:21
158:1
payment  19:6
157:13
payments  42:13
Peabody  7:21,
22  8:6, 14  16:9
pedestal  89:15
peer  34:12, 14
penalized  58:13
penalty  6:14
Pennsylvania
2:14
people  36:18
40:9  42:16, 18
43:8  48:20  58:8
64:8  65:8  70:13
83:16, 17, 19
84:3  85:2  89:10,
13  92:4, 7, 11
98:17, 20, 22

99:2  123:2
129:3  142:19
159:2  160:4, 6
perfect  101:19
perfectly  29:6
performance
53:7, 17  62:15
101:5, 8  102:9
107:21  113:10,
14  115:19  123:4
128:1  130:4, 15,
18  131:6, 22
132:20  135:10
141:3  150:13, 22
163:15, 17
period  31:17, 18
42:4  48:3  53:20
61:2, 6, 7  99:12
100:20  105:5
116:1  118:16
119:2, 6  120:8,
13  121:1, 12, 18,
20  123:11
127:20  128:5
133:21  162:19,
20
Periodically  6:16
141:4
perjury  6:14
permanent  97:13
person  17:18
27:8  43:12
51:16  81:18
87:20  97:12
105:14
personal  94:14
97:20
personally  59:21
63:5  68:5  70:13
90:2
person's  54:2
perspective
30:14  129:10
pertained  83:12
pertinent  120:7
phone  152:14
164:21
phrase  142:11
150:1
physically  92:17
93:18
piece  89:8
135:5, 6
Pierce  12:20
13:16
place  44:1
53:11  85:15
86:7, 11  105:3
162:11  163:12
places  126:2
placing  85:20

plan  29:6  53:17
61:17, 20  62:3,
19  63:2, 10, 19,
20  64:9, 17
65:11, 15  78:16
81:13  101:17
104:5, 9, 22
106:9, 17  107:7,
17, 22  108:4, 6
planes  32:21
plans  63:16
65:2  76:1, 12
77:16  102:4
103:3  104:12
105:1  107:15
please  114:9
131:14
plenty  131:10
136:13, 13
PLLC  2:4
point  50:1
51:17  67:18
74:6  80:16
82:18  84:3
94:10  104:5
145:11  156:9
policy  37:9
41:16  119:8
120:1, 4, 19
121:2, 9  122:20
123:1  137:16, 22
138:3, 6  159:2
polygraph  9:4
pool  161:2
poor  70:5
portion  146:6,
11, 17
portions  165:10
Portland  7:21
12:6, 20
position  7:8, 16
11:4, 9, 12, 15, 19,
22  12:3  17:9, 21
23:7  24:1, 8, 11,
21  25:6, 11, 16,
22  27:2  33:8
50:8  52:18
58:22  68:20
69:14, 21  70:10,
17  71:2, 4, 15, 15
86:1, 8, 12  94:12
95:8  97:12, 13
100:14  101:21
109:15  117:2
118:18  144:21,
22  145:3  159:7,
15  160:19
161:21  162:7
positioned  30:9
positions  9:16
23:9  24:3  33:9,

10  56:13  59:1, 4
85:20  86:4
positive  12:10
18:14  51:8
56:20  100:9
128:22  137:11
141:7  142:3, 6
possible  47:6
88:8
possibly  158:11
practical  32:11
33:17  41:8
Practically  32:14
practice  82:4
practicing  37:8
46:2  48:20
158:21  159:3
PRAO  57:18
preceding  126:17
precipitating
37:5
predicate  159:13
premise  47:16
preparation
134:12  138:8
prepare  43:19
63:2, 6, 11, 19
76:1  121:19
122:10  127:21
137:17
prepared  96:8,
11  110:6  123:4
133:18  134:2, 16
preparing  61:20
62:3  122:9
133:14  140:4, 5,
7  159:13
Present  2:19
president  11:7
12:1  59:15, 16
pretend  136:20
pretty  64:8
previously  10:14
145:22
primary  10:15
90:10, 13
principal  36:9
79:12
print  167:8
prior  8:8, 16
9:14, 18, 19  11:4,
5  12:18  15:6
25:7  26:12  36:4
63:19  66:18, 22
69:6  115:20
121:17  124:16
127:17  128:2, 15
151:15  152:3
161:22
privacy  31:11

90:19
private  82:4
probably  6:5, 6
18:14  46:8  79:1
105:16  135:6
146:22
probation  61:5, 5
probationary
61:2, 6, 7  118:16
119:1, 6  120:8,
13  121:1, 11, 12,
18, 20  123:10
127:19  128:4
133:21
problem  35:13,
14  41:11, 11
71:4  139:8
166:3
problematic
136:19  142:13
problems  41:12,
12  75:5  88:21
109:22  110:2
procedure  131:7
proceed  114:7
process  53:9, 10,
15  59:19, 21
61:6  62:7, 10
64:22  71:9, 13
72:6, 11  76:6
82:18  83:14
84:11  101:13, 15
105:10  106:5
107:15  108:9
113:10, 15  115:2
118:4  119:9
120:12, 14, 22
121:21  122:4
127:5, 18  128:4,
5  131:22  132:3,
8, 21  143:7
144:2, 11, 14
149:12, 15
processing  35:9
products  71:10,
18
profession  65:13
program  105:14
progress  72:19,
20  81:5, 8
prohibited
159:22
projects  34:18
prominent  29:4
30:5
prompts  78:10
properly  76:21
protecting  159:2
protective  146:7,
10, 16

provide 27:11,
16 58:22 59:3
122:11 124:9, 17
provided 101:11
122:13, 14 124:7
153:10, 14
provides 113:15
providing 27:20
41:13 47:8
59:11, 17 110:13
Public 1:21
167:1, 20
pull 74:10
purpose 35:10
87:16
pursuant 1:18
put 36:12 39:10
53:16 131:8
132:8 135:12
142:9
puts 89:15
putting 17:7
79:3 146:6, 6

< Q >
qualified 25:14,
15, 18, 18 69:1,
14, 16, 20 70:10,
17 71:2, 3
160:13
Quantico 91:22
93:14
question 6:10
9:22 30:17
34:22 39:7, 8, 19
41:2, 5, 6 50:7
56:22 57:2, 10,
12, 15, 17 59:10,
18 66:21 87:15
131:2, 12, 14, 19
135:11, 20
138:14 143:18
157:19 158:22
164:7, 22 165:5
questioning
108:17 161:6
questions 6:11
21:16 22:21
23:2 50:22
59:17 157:7, 9
164:2 165:21
quick 9:22

< R >
raised 33:22
41:8 147:15
rallied 88:6
rated 53:7
rating 53:12, 13,
20, 20 113:20
114:7, 11 115:1,

19 117:22
121:12, 18 122:1,
17 126:4 127:11
128:18 130:5, 18
131:6, 9, 22
132:1, 10, 21
134:16, 20
135:10 137:17
138:5, 9 163:15,
17
ratings 132:3
reach 42:9 68:9
87:2
reached 48:18
49:1 152:9
read 23:20
45:17 74:22
115:19 122:10
131:13, 15
142:18 158:16
reading 45:22
95:19
ready 19:20
20:20 45:16
75:1 133:12
realignment
161:10, 17
realm 52:9
reason 7:5
28:21, 21 36:18
38:15 81:5
87:20 88:9
118:10 132:9
reasonable 84:1
reasonably 63:8
reasoning 158:20
reasons 21:10
41:21 131:5
132:1, 13
reassigned 100:8
reassignment
161:5
recall 10:6
18:15, 18 19:13
20:2, 3 21:16, 19,
22 22:12, 15, 18,
21 23:2, 5, 20
25:4 26:7, 13, 20
28:1, 11, 14 29:9
31:1, 18 34:14,
17, 21 35:3, 22
36:3 37:1, 10
38:11 39:12, 19
40:3, 10, 13, 14,
18, 21 41:3, 18
43:1, 3, 10, 11, 12,
14, 18, 21 44:8,
10, 13, 18 45:9,
20 46:3, 5, 10
47:1, 22 48:14,
18 49:6, 11, 15

50:5 51:6, 18
52:14 53:5 54:4,
6, 9, 19 55:6, 8,
14 56:17 57:9,
14 58:3, 9, 15
60:14, 17, 20
61:16, 20 62:2,
13 63:9 66:13
67:8, 17 68:3
70:7 71:20 72:3,
12, 16, 22 73:5, 7,
14 75:10, 20
76:11, 15, 16, 18
77:8, 11, 15 78:8,
12, 15 79:16
80:15, 20 81:7
84:10, 14, 16
85:14, 18, 19
86:10 87:11, 12
94:2, 7 96:10, 21
97:2, 4, 18, 19
98:10, 11 99:7, 8,
11, 18 100:3
102:1, 19, 22
103:5, 9, 21
104:2, 8, 11, 15,
17 105:11 107:5,
6 109:8 114:12,
17, 18 115:15, 22
116:13, 16, 19
118:6, 13 119:8,
12, 15 120:2, 14,
18, 20 121:21
124:3, 19 126:20
127:1 128:1, 6
137:15, 18 140:8
141:12 142:21
143:3, 6 148:20
149:9 150:6, 8,
14, 19 151:1
158:14 159:9, 11,
19 160:14 161:6
162:20 163:16
recalled 145:21
receive 13:21, 22
18:8 60:8 94:18
106:9
received 63:10
132:1
receiving 13:20
54:19 61:16
63:19 102:19
118:6 163:18
Recess 66:3
145:16 157:6
recipient 117:16
recognize 19:22
20:1 23:18
recollection
20:22 21:4
24:19 28:22

37:22 41:1
44:18 49:17
50:3 51:20 61:4
63:5, 7 78:19
79:4 86:3 94:15
95:5, 9, 21 97:8
103:18 106:4
115:10, 13
118:12 153:9, 19
record 5:10, 19
6:18, 19 66:2, 5
74:19 100:11
111:10 131:15
139:6 145:14
146:4, 6 151:8
155:9, 15, 20
156:4 157:5
165:22 167:9
recording 65:6
recovering
152:14
reduced 167:8
refer 140:16
reference 142:7
referenced
133:13 158:10
references 24:1
140:16
referencing 24:4
126:21 147:19
150:19
referred 38:12
136:21
referring 55:4
56:15 95:16
129:18 140:14,
20
refresh 20:22
21:3 37:22 95:5,
9 103:17 106:4
115:10, 13
regard 10:21
18:22 29:13
52:8 76:19
87:14 129:15
regarding 9:22
27:12 45:21
47:19 51:1, 3
52:9 54:7 55:9
73:8 85:15 94:3
103:6 107:11
123:9 128:11
139:16 148:4
149:17 150:10
156:7 164:6
reinstated 42:2, 8
rejected 152:11
relate 89:13
92:14 107:16
related 153:15
167:11

relation 100:22
128:8
relationship 29:3
68:14 87:17
129:11
relative 167:14
relatively 65:21
relay 49:2 82:15
relayed 82:14
relevant 121:2
relief 46:17
47:4, 15
reluctant 129:7
remained 162:7
remember 17:19
20:11 21:9
26:14, 17 27:5,
17 31:20 48:3, 7
51:22 60:10
75:12, 15 77:4
86:6 107:10
149:8 150:17
151:2 156:12
reminder 116:11
removal 119:9
120:7
remove 132:21
142:22 143:4, 7
144:2, 12
removed 98:12
100:4, 7 119:5
121:11 128:9
144:16 149:21
removing 120:12,
22 123:9 127:18
reorganization
73:12, 14 79:6, 8
81:2, 6 83:13, 13
84:11, 22 85:6, 8,
11, 21 86:22
95:17 98:1, 6, 15
99:20 145:6
149:22 150:3, 5,
11, 21 161:9
162:5, 9, 17
report 32:8
33:14 38:16
52:2 88:16
109:16, 21 123:4
reported 31:22
32:18 35:18
37:14 50:11
reporter 131:15
reporting 32:19
32:9
reports 32:9
33:15
representation
29:13, 16
represented 76:2
request 76:1

requested 35:7
148:20
require 39:20,
22 43:5 47:11
required 36:15,
21 42:3 54:8
55:17 58:22
59:3 62:2, 5
63:22 131:1
133:20 134:21
requirements
42:5, 17
requires 33:4
requiring 41:8,
19 57:20
research 157:22
resolution 57:10
resolve 41:2
resolved 39:21
77:11
resources 106:6
123:9
respect 19:6
32:20 89:5
133:20
responding 38:8
76:3 102:6
response 38:21
39:2 75:22
76:20 110:9
111:12 126:18
140:10 141:14,
19 159:9 162:12
responses 154:9
responsibilities
91:17 100:22
responsibility
88:1 114:2, 3
121:6 137:17
138:4 163:3
responsible
10:18 31:8
51:14, 15 60:11
90:15, 21 111:3
112:15, 19, 22
134:1 138:10
145:8 151:4, 17
165:19
restructured
30:17
restructuring
30:18
result 36:14
43:22 109:19, 20
159:12
resulted 75:13
79:2
results 13:20, 22
72:2
returned 16:5, 6,
6, 8

returning 79:5
101:13
review 20:19
45:15 53:17, 19
104:4 108:5
119:11 120:6, 9,
19 121:2 122:20
123:1 135:2
139:19 148:21
149:7
reviewed 149:1,
10, 11
reviewing 119:8
134:1 149:3, 5
revisit 137:22
138:2
revolt 88:8
revolving 83:15
Rick 31:4 52:9,
17 71:1, 3 97:6
right 6:3 15:4,
5 17:21 24:2
27:4 38:10 39:4
45:4 52:21 53:1
57:8 73:12
82:20 90:3
99:21 100:11
106:18 108:1
109:7 111:20
118:16 120:5
126:5, 10 127:13
130:6 138:11
141:15 145:14
146:15 148:11
149:2 161:14
right-hand 38:5
45:3 56:8
110:18
risk 89:6
role 79:10
88:20 89:21
101:3 140:3, 5, 7
144:13, 22
Rose 2:21 5:5
rules 6:4
rum 99:1
rumors 99:1, 2,
6, 9, 12, 14, 18
148:1, 2 153:21
154:1
run 59:15 80:9
running 139:8
runs 109:6

< S >
SA 46:18
Sabol's 155:12
156:17
SAs 46:17
saw 85:4 163:21

saying 72:18
82:10 105:17
106:17 116:11
says 21:5 23:21
38:6 46:7, 16
55:19 57:3
65:11 75:8 78:9
96:3 97:9
110:20 115:14
117:19 118:2
120:7 121:17
122:6 126:9, 19
127:2, 9 138:3, 6
139:2 140:11, 20
141:14
schedule 105:1
scheduled 9:4
school 13:5, 7,
18 14:15 15:3
Schoolmaster
20:4 23:22
24:20 35:6
40:18 54:20
55:3, 15 76:3
78:4 80:17
96:22 102:20
116:10 124:4
125:7 142:4, 15,
17
Schoolmaster's
55:19 79:1
141:17, 21
Science 117:8
sciences 91:21
screening 31:12
100:13
screw 105:18
second 38:5
45:1 54:18 57:2
60:18 74:7
110:17 114:7
116:9 121:15
secondly 70:7
secret 126:14
secretary 64:20
65:7
section 24:15
25:15 32:1, 4, 6,
9, 9, 13, 16 33:4,
7, 12, 14 34:2
51:12, 14 52:15,
18 64:14 75:17
86:2, 7, 11, 17
90:6, 9 111:3
112:3, 15 113:4
117:3, 5, 7, 7
128:22 162:1, 2,
6 163:2 165:20
sections 62:5

security 25:16
31:4 66:12 67:7
70:8, 14, 19
see 38:21 45:10,
13 46:7 55:4
75:3 76:7, 20
78:4 89:14
106:8 117:9, 14,
19
seeking 160:1
seen 98:18 120:1
select 27:20
64:10
selected 17:2
24:9, 12, 13
25:11 27:1
67:16, 19 68:7
165:14
selecting 94:3
selection 67:12
68:6
self-assessment
113:16, 17, 18
114:1
self-evaluation
163:18
send 106:17
sending 96:21
109:9
senior 7:20
53:5 63:13
88:12, 22 106:7
148:6, 7, 10, 12
sense 145:12
sent 97:2, 10
105:1, 17 110:3
126:9 127:4
136:7
sentence 46:20
separate 53:13
74:10 158:22
160:8
separated 74:16
separation 89:9
September 13:2
14:1
series 57:22
58:10
serious 35:13
70:7 157:17
seriously 160:21
161:2
serve 10:7
47:14 100:1
served 16:10
164:9
service 53:6
97:15 106:7
151:16, 20
services 31:13
91:19

serving 8:2, 13,
16 13:15
SES 33:8, 9
53:12 54:8
55:16 61:17, 20
62:3 64:1 92:16
98:12 100:5, 7
103:3 104:12
105:14 107:7, 15,
22 108:4, 6, 9
118:18 122:4
130:3 132:22
133:21 134:4
143:1, 4, 8 144:2,
12, 17 163:10
SESSIONS 1:8
set 63:13 105:4
109:17
settlement
152:10, 16
seventh 90:4, 12,
14, 16, 17, 22
91:10 92:6
shared 36:13
Sherry 155:11
156:16
Short 157:6
Short-sighted
46:7
sic 110:20
129:10 153:1
side 126:9, 11
142:9
sides 142:14
sign 127:3
signature 125:21
127:2 164:1
signed 14:21
51:10 127:5, 6
similar 110:10
simply 114:6
sir 88:2 96:19
sites 93:11
Sitting 21:9
28:20, 21 38:11
70:15, 22
situation 37:2
six 31:17 90:8
163:1
size 92:13
skills 26:4 87:9
slow 35:8 81:5,
8
small 43:7 163:7
smaller 80:8
smoothly 88:4
SMS 65:15
SMS's 65:12
solid 70:12
110:4

**solidify** 29:3
87:17
**somewhat**
101:22 102:2, 4,
6 136:22
**Sorry** 13:11
41:6 55:1 96:5
97:2 111:18
143:20 150:1
152:2 154:10
**Sort** 31:19 48:9
62:8 83:3 102:3
109:16 137:2
**sound** 6:6
**space** 93:20, 21
**span** 80:8
**speaking** 32:14
57:18
**speaks** 138:21
139:5
**special** 46:21
47:3, 14, 17
**specialist** 106:7
**specific** 23:6
25:6 29:21 42:6
43:11 48:2, 10
50:3 55:18 57:7
61:22 62:21
63:4, 7 64:18
72:2, 17 79:4
81:4 85:12
87:11 93:20
94:18 97:8
101:1 108:2
118:13 123:12
130:1 131:4
132:1, 2, 13
135:7 144:20
163:20
**specifically**
18:18 20:6 23:1
28:3, 16 34:15
40:13 44:10
46:5 51:6 73:4
75:14, 20 78:22
80:15, 20 81:10
93:15 94:7
104:1, 19 109:10
114:10, 16, 17
127:18, 20
129:20 140:15,
22 147:15
**specifics** 48:14
72:17 130:11
**speculation** 25:1
84:19 121:4
139:22 143:16
**spell** 5:10
**spent** 93:13, 17
**spoke** 50:1

**staff** 7:10, 12
8:3 147:5
**stairs** 89:14
**stand** 14:8
100:12 107:2
112:10, 13
**standards** 137:1
**standpoint** 33:21
86:17
**stands** 46:18
**stapled** 74:3
**stapling** 139:8
**start** 5:9 11:9,
19 12:7
**started** 13:1
15:10 37:10
38:1 79:17, 18
83:20
**starting** 14:15
74:12 79:5, 11
**starts** 45:2
52:10 109:5
**state** 5:9 15:13
57:7 131:2
**stated** 29:2 78:5
87:15
**statement** 150:20
**statements**
153:15
**STATES** 1:1
41:15
**status** 16:2, 8, 12,
17 35:1 38:16
42:1 56:15
**statuses** 38:1
39:20
**stayed** 162:3
**stenotypy** 167:7
**step** 157:3
**steps** 84:12
**Sterling** 11:8
**stint** 8:5
**stop** 145:11
**stopped** 117:1
**strategic** 50:21
64:17
**strategically**
51:21 52:22
**Street** 1:19 2:5
**strictly** 50:19
**strike** 54:4 97:3
150:1
**structure** 31:7
**study** 14:12
**subject** 14:11
41:14, 17 65:21
146:10
**submission**
133:20
**submit** 107:7

**submitted**
116:12, 14, 17, 20
117:22
**subordinates**
63:15
**subsequent** 18:22
**substance** 48:7
99:8 104:6
124:20
**substantive** 33:3
**subsume** 82:21
**succeed** 108:7
**succeeded** 113:1
**successful** 68:15
71:6, 8 86:16, 19
101:10 109:14
136:9, 11 137:3
**sufficiency** 136:3
**sufficient** 29:12,
17, 19 92:9
**sufficiently** 33:6
**suggested** 89:19
**suggestion** 79:1
**suggests** 95:10
**Suite** 1:19 2:5
162:19, 22
**summarizing**
121:19 130:14
141:6
**summary** 48:9,
12 127:11
128:18 134:16
137:2
**Summary's**
48:11
**summer** 15:10
**supervise** 91:9
93:12
**supervised** 92:18
93:3, 3, 7
**supervising** 31:8
53:21 54:1
90:15 101:3
111:4
**supervision**
31:10, 16
**supervisor** 53:18
54:2 99:21
100:2, 21 101:15
113:16 120:21
144:8
**supervisor's**
114:2
**supervisory**
117:4
**supportable** 50:8
159:8, 15
**supposed** 42:19
53:16, 18, 19
63:2 105:2, 3, 4

113:11
**supreme** 44:20
100:13
**Sure** 18:21 20:6
35:15 49:9 50:1
58:19 59:8, 14
61:19 80:18
84:9 103:4
104:14 139:4
**surgery** 152:14
**survey** 56:17
**suspect** 75:19
123:15
**switch** 102:4
**sworn** 5:16
145:22 167:6
**system** 62:8, 12,
14, 16, 20 126:14
**Systems** 9:19
11:7 126:15

< T >
**take** 5:7 6:9
19:19 20:19
22:5, 6, 9 33:1,
20 41:1 45:14
84:12 89:11, 20
93:20 94:11
105:3 108:18
**taken** 114:22
145:16 150:11,
12 167:3, 7, 13
**talk** 79:6 83:18
85:2, 3 98:17, 20,
22 104:7
**talked** 87:14
**talking** 30:18
89:4 111:16
126:4
**technology** 117:8
**tell** 14:9 35:20
36:17 38:22
39:5 62:6 81:10
83:2 91:16
104:5 129:3
137:8
**tenth** 91:5, 8, 12
92:7 94:3
162:21 165:14,
17
**tenure** 31:20
37:4 79:19
147:3
**term** 82:21
**terminated**
118:18
**terminology**
82:20, 21
**terms** 33:1
113:11
**terrific** 38:9, 12
70:20

**terrorist** 31:11
100:13
**testified** 5:16
145:22 152:13
153:3, 6 159:5
160:11 162:18
**testify** 7:2, 5
**testimony** 6:12
26:12 69:6
128:15 153:10,
12 157:12
158:10, 14
159:19 163:14
166:2 167:5, 6,
10
**thank** 89:22
97:6, 14, 20
166:4
**theory** 63:12
**thereof** 140:7
**thing** 55:13
87:13 91:20
134:6
**things** 33:9
64:4 65:10, 13
87:7 98:18, 21
99:1 101:6
129:5 141:4, 6
**think** 12:9
15:17, 21 17:9
21:5 32:14
36:11 37:16
41:10 52:18, 22
56:18 64:8, 14
65:18 69:18, 22
70:20 76:5, 21
78:18, 22 80:22
81:4, 5, 12, 17
84:1, 2, 8 85:17
86:2 100:9, 16
101:1, 20 102:3,
5, 12 105:14, 15
108:16 111:10,
12 128:19
130:10, 14, 16, 19
131:3 132:6, 7, 7,
12 134:21 135:6,
11, 14 136:12, 18
138:22 145:10
156:11 157:4
159:4 161:15
165:18, 19
**thinking** 36:19
77:2
**third** 60:21
109:6 112:12
114:10
**thirteen** 10:12
**Thirty** 121:17

**thought** 26:6, 14
82:16  94:8
135:12
**thousands** 157:19
**three** 9:16  60:7,
9, 12  80:7  89:12
120:9, 10  128:7
**tickets** 19:7
157:14, 17, 21
**tier** 31:22
**till** 9:6
**time** 9:10, 12
16:1  17:11
25:11, 13  31:8,
14  34:12, 16
36:5  42:4  48:3
58:19  65:18
66:16  67:14
71:11, 18  79:12
83:11  84:16
86:21  88:13
90:3  93:13, 17
95:10  99:11
100:20  105:5
111:3, 6  118:17,
19, 20  119:4
121:10  144:11
147:18  153:18
154:4, 14, 17
155:2, 5, 11, 17
156:1, 8, 13, 16,
19, 22  160:17, 19
162:19, 20
163:16, 20  164:1
165:7, 9, 16, 20
**timeline** 113:12
**times** 48:10
49:4  50:21
59:20  83:12
91:7  101:12
110:9  135:12
**timing** 95:22
101:21
**tired** 18:4
**title** 105:15
**today** 5:8  6:10,
12  7:2, 6  16:14
21:9  28:20, 22
38:11  58:20
70:15, 22  152:4
166:2
**told** 37:12, 13
94:20  123:3
**Tom** 22:14
27:14  31:4  51:3,
7, 14, 21  146:21
147:7, 11, 15
**top** 38:6  74:8
75:7  96:6
111:17

**topic** 36:13
55:13  58:8
83:21  84:21
158:20
**topical** 78:10
**topics** 75:13
147:20, 20
**totality** 121:19
**totally** 97:5
130:2
**totals** 56:11
**touched** 147:7
**tough** 78:5
**training** 24:15
25:14  27:1  54:8,
22  55:17  82:22
**trainings** 55:6, 10
**trajectory** 141:8
**transcript** 146:10
**transition** 83:10
88:4
**transmitting**
45:10
**treat** 42:18
**trial** 152:11
**Trisha** 66:7
**troops** 88:6
**true** 30:10
103:4  167:9
**truthfully** 7:2, 6
**try** 51:6  52:20
101:10  109:14
**trying** 141:11
142:9  152:9
**TSC** 92:20
100:10, 12, 14
144:22  145:7
**Tuesday** 1:14
**Turgal** 123:16
**turn** 38:20
44:22  54:17
56:6  96:4  109:4
110:17  116:9
120:3  121:8
126:7, 16  127:10
140:9  141:13
163:17
**turning** 46:6, 15
59:18  112:12
**tweaks** 141:15,
22
**two** 10:14  23:8
24:3  72:19  74:2
76:19  80:8
88:11, 21  90:2, 7
120:8, 10  126:2,
14
**type** 110:12
**typically** 165:2

**< U >**

**U.S** 1:2  2:12
59:6, 8
**ultimate** 107:16
125:18
**ultimately** 17:20
24:9  27:6  42:20
138:10
**undergoing**
120:22
**undergrad** 15:6
**undergraduate**
15:2
**understand**
23:21  82:1  88:2
101:14, 19
107:14  133:22
143:17
**understandable**
102:5
**understanding**
30:13  53:15
58:21  63:1, 17
75:21  76:22
79:20  80:1  81:1,
14  83:6  108:8
112:2  113:6, 9
118:4  133:17, 19
141:1  143:21
158:2, 3  161:8,
16  162:4, 8
**understands**
132:9
**understood** 32:7
118:15, 17, 19
**underway** 81:6
144:11
**Underwood** 45:6,
8
**unemployed** 9:9,
13
**unfairly** 42:18
**unfilled** 56:13
**unfortunately**
156:7
**uniquely** 30:9
**unit** 31:10, 11,
12, 13, 15  32:1, 2,
6, 8, 12, 19  36:10,
11  56:18, 19
64:16  87:8
90:18, 19, 20
91:21, 22  92:1
93:8, 9  100:17
106:7  111:1, 4, 7,
19  112:1, 3, 11,
14  141:6  144:17,
22  165:8
**UNITED** 1:1
**units** 10:13, 15
32:2, 18  90:14,
21  93:6, 16

109:22  112:21
129:9
**University** 13:10,
12
**unrelated** 90:11
**updates** 110:14
**uphill** 39:14
**use** 62:16  82:21
91:5
**usually** 22:5
33:8  54:2

**< V >**

**vacancies** 56:10,
12
**vague** 51:20
92:19  113:13
**value** 137:12
**various** 40:7
**vehemently**
81:11, 15
**vice** 11:6  12:1
**view** 70:11
79:14  80:10
**violating** 41:16
**Virginia** 18:3
91:19
**virtue** 71:4
**Vision** 75:5

**< W >**

**wait** 63:10
**waiting** 9:3
**Walker** 154:19
155:3, 6, 12, 18
156:2
**Walsh's** 55:2
**want** 29:1  44:8
70:6  75:6  96:8
108:18  111:9
139:4  146:7
154:10  161:1
**wanted** 18:9
24:20  29:9
30:14  47:5
52:20  87:16
96:10  109:15
**warrant's** 160:6
**washing** 15:10
**WASHINGTON**
1:3, 13, 20  2:6,
15  18:4  19:4
**way** 26:17
29:16  39:21
71:8  77:17  82:9
96:6  109:12
128:20  137:2, 3
142:10
**week** 164:20
**weekends** 18:3

**weekly** 164:18
**weighted** 26:4
**Weiser** 1:19  2:4
**Weissman** 17:4
36:10
**well** 5:6  26:1
31:16  35:13
41:10  42:4  60:6
71:9, 13  79:18
86:15  104:21
113:7  127:2
136:8, 18  140:6
159:22  165:16
**went** 13:4  88:6
123:15  152:3
163:12
**we're** 5:7  6:9
28:4  37:16
65:18  74:19
85:2, 2  88:3
102:13  108:16
111:16  148:14
**West** 91:19
**we've** 74:20
**WFO** 157:14, 18,
20
**Wiegand** 17:16
51:8  69:20
98:14  161:17
**Wiegand's** 155:6
156:14
**willingness**
140:12, 21
142:19
**window** 9:7
**windows** 163:8
**witness** 5:15
19:21  20:16, 16
23:15, 15  25:2
26:11, 13  28:8, 8
37:19, 19  44:5, 5
45:17  54:14, 14
56:3, 3  61:13, 13
66:1  69:5, 7
73:21, 21  74:14
75:2  78:1, 1
84:20  92:20
95:2, 2  96:18, 18
102:16, 16
103:14, 14  106:1,
1  108:14, 14, 20,
22  109:2  113:14
115:7, 7  116:6, 6
119:20, 20
120:11  121:5
123:22, 22
125:12, 12
127:16  132:6, 17
133:7, 7  138:16,
18, 20, 22  139:2,
12, 12  140:1

143:*13, 15, 17*
145:*21*  151:*9, 12,
21*  152:*13*  153:*3,
6*  155:*21*  156:*5*
158:*6*  161:*19*
166:*3*  167:*4, 7,
10*
**women**  98:*2*
147:*8, 11, 16*
148:*8*
**Woodies**  92:*1*
**words**  48:*10*
53:*4*  84:*8*  130:*1,
2*  131:*10*  142:*10,
16*
**work**  8:*5*  9:*15*
10:*19*  11:*2*
14:*14*  15:*7*
33:*18*  52:*10*
76:*11, 15, 17*
101:*6*  136:*22*
144:*18*  164:*12*
165:*1*
**worked**  10:*2*
13:*19*  34:*11, 17*
62:*7*  68:*11*
**working**  7:*17*
8:*8, 9, 10*  9:*14*
12:*7, 15*  13:*17*
28:*2, 15, 18*  29:*1*
34:*18*  103:*1, 2*
126:*19*  127:*1*
141:*2, 15*
**Works**  9:*20*
10:*2*  11:*17*  12:*3*
16:*4*  53:*15*
107:*15*  118:*4*
**world**  101:*19*
**writeup**  127:*21*
**written**  131:*5*
136:*8*  153:*15*
**wrong**  42:*14*
48:*13*  67:*22*
114:*9*  158:*21*
**wrote**  64:*19*

**< Y >**
**Yeah**  44:*6*  60:*3*
74:*4*  111:*16*
154:*14, 16*
**year**  7:*14, 15*
60:*15, 18, 21*
65:*1*  102:*10*
104:*22*  118:*8*
**years**  6:*7*  18:*2*
35:*14*  36:*8*  60:*7,
9, 12*