## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARCIANN M. GRZADZINSKI,**<br><br>　　**Plaintiff,**<br><br>　　　　v.<br><br>**MERRICK GARLAND, in his official capacity as Attorney General of the United States,**<br><br>　　**Defendant.** | **Civil Action No. 20-1411 (JEB)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Marciann Grzadzinski worked for the Federal Bureau of Investigation for many years, eventually attaining the position of Deputy General Counsel of the Investigative Law and Legal Training (ILLT) Branch.  In that position, she reported directly to James Baker, General Counsel of the FBI.  Several months into Grzadzinski's tenure, Baker reorganized the Office of the General Counsel, eliminating her position and reassigning her to a role reporting to one of her former peers.  Not long after that, Baker recommended removing Grzadzinski from the Special Executive Service, thus returning her to the lower employment grade she had held before assuming the DGC position.

Plaintiff believes that these removal decisions, as well as an earlier determination not to hire her for the DGC position in the FBI's National Security Law (NSL) Branch, were driven by Baker's animus towards women — specifically older women who did not conform to Baker's idea of how a woman should act.  She thus filed this lawsuit alleging violations of Title VII and the Age Discrimination in Employment Act arising out of her non-selection for the NSL Branch

1

DGC position, her removal as ILLT Branch DGC, and her demotion from the SES.  Defendant

now moves for summary judgment, contending that Baker had legitimate, non-discriminatory

reasons for each decision, and that, in any event, Plaintiff's non-selection claim does not involve

an adverse employment action and is time-barred.  Although Grzadzinski's removal and

demotion claims are hardy robust, the Court believes that they just clear the bar.  As a result, it

will deny the Motion as to those while granting it as to non-selection.

I.     **Background**

   A.  <u>Factual Background</u>

   Because the Court is considering Defendant's Motion for Summary Judgment, it will

construe the facts in the light most favorable to Plaintiff.  <u>See</u> <u>Talavera v. Shah</u>, 638 F.3d 303,

308 (D.C. Cir. 2011).  As additional facts relevant to Grzadzinski's specific claims are discussed

later in the Opinion, the Court provides here only an overview of her employment with the

Bureau.

   Having joined the FBI in 1996 as a Special Agent, Grzadzinski served for nearly two

decades in a number of positions and then found herself the Chief Division Counsel of the

Washington Field Office, a GS-15 position.  <u>See</u> ECF No. 27-2 (Pl. Resp. to Def. SMF), ¶¶ 1–4.

She held that role for seven years, from January 2008 to January 2015.  <u>Id.</u>, ¶ 4.

   In June 2014, when Grzadzinski was in her mid-fifties, the FBI's Office of General

Counsel posted job announcements for two Deputy General Counsel positions: one in the NSL

Branch and the second in the ILLT Branch.  <u>Id.</u>, ¶¶ 5–6.  Those constituted two of four branches

of the OGC, each of which was led by a DGC who reported directly to General Counsel Baker.

<u>Id.</u>, ¶ 7.  Plaintiff applied for both open DGC positions and "would have been equally happy to

get either job."  <u>Id.</u>, ¶ 10; ECF No. 27-3 (Deposition of Marciann Grzadzinski) at 17:22–18:7.  In

October, Plaintiff was interviewed by Baker and the DGCs of the other two branches.  See Pl.
Resp. to Def. SMF, ¶ 13.  Although Grzadzinski contends that the interview was "primarily
intended" to consider her for the NSL Branch position, Defendant understood that the interview
was for both spots.  Id., ¶ 14.  That interview apparently went well, as Baker recommended that
Plaintiff be hired as ILLT Branch DGC.  Id., ¶ 18.  She was notified of her selection in
November 2014.  Id., ¶ 20.  Trisha Anderson, a female employee from elsewhere in the
Department of Justice, was later selected for the other role to which Plaintiff had applied — the
NSL DGC.  Id., ¶ 21.  Anderson's selection was announced in an email to the OGC on May 5,
2015, although she did not start until June; Plaintiff did not receive that email, however, and
learned of the appointment only when a colleague forwarded the email to her the following day.
Id., ¶¶ 29–30.  This NSL non-selection forms the basis of her first count.

Plaintiff began her work as ILLT DGC in late January 2015.  Id., ¶ 32.  Like all
employees in their first Senior Executive Service role, she was subject to a one-year probationary
period.  Id., ¶ 33.  By March, Baker was expressing dissatisfaction with Grzadzinski's
performance, lamenting that he had expected her to "hit the ground running."  Id., ¶ 36 (citing
ECF No. 26-4 (Declaration of Marciann Grzadzinski) at 3)).  At the end of May, Baker informed
Plaintiff that he was merging the ILLT and General Law Branches of the OGC, and that she
would be removed from her DGC position.  Id., ¶¶ 38–39.  At the time of the reorganization,
Grzadzinski was the only DGC in a probationary period.  Id., ¶ 43.  The new DGC position,
overseeing the new merged Investigative and General Law (IGL) Branch, was filled by Ernest
Babcock, who had previously been DGC of the General Law Branch.  Id., ¶ 39.

Following her removal from the DGC position, Plaintiff was appointed Section Chief of
the Investigative Law and Training Section of the new IGL Branch, reporting to Babcock.  Id.,

¶ 41.  Although her salary and office remained the same, and Grzadzinski retained her SES-level status, this alleged demotion constitutes her second count.  Id., ¶ 42.  Also unchanged was Baker's impression of Plaintiff's performance — at the end of her probationary period, in October 2015, he prepared a review that rated her at Level 2, one level below that which is required to remain in an SES role.  Id., ¶¶ 44–46.  Babcock also rated her performance as "Minimally Satisfactory."  Id., ¶ 49.  DOJ's Senior Executive Review Board and FBI Director James Comey upheld these performance ratings over Grzadzinski's request for an upgrade.  Id., ¶ 50.

Deemed to have failed to complete her probationary period successfully, Plaintiff was removed from the SES.  Id., ¶ 51.  Such an action meant that she was "effectively removed" from her position as Section Chief.  Id., ¶ 52.  In March 2016, accordingly, she took on a new position as Unit Chief of the Terrorist Screening Center.  Id., ¶ 53.  This SES removal underlies Count III. The following December, Plaintiff retired from the FBI.  Id., ¶ 3.

B.  Procedural History

Grzadzinski's first allegation that her removal from the DGC position was the result of Baker's discriminatory behavior came on June 24, 2015, when she contacted an EEO counselor. Id., ¶ 31.  Following the completion of an EEO administrative process, she filed this lawsuit on May 28, 2020.  See ECF No. 4 (Compl.).  She amended her Complaint in January 2021.  See ECF No. 19 (Am. Compl.).  That pleading — the operative one here — alleges three counts of sex, age, and sex-plus-age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634: 1) Plaintiff's non-selection as NSL Branch DGC; 2) her demotion from the ILLT DGC position; and 3) her removal from the SES.  See Am. Compl., ¶¶ 79–103.  As

discussed below, Grzadzinski makes age-based arguments only in regard to Count I.  Defendant

now moves for summary judgment on all counts.  See ECF No. 26 (Def. MSJ).

## II.      Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S.

372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion" by "citing to particular parts of materials in the

record" or "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.

R. Civ. P. 56(c)(1)(B).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S.

at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington

Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  The Court must "eschew

making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360,

363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than

mere unsupported allegations or denials and must be supported by affidavits, declarations, or

other competent evidence, setting forth specific facts showing that there is a genuine issue for

trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.    Analysis

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the section of the ADEA governing federal agencies states that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).

 "[I]n the absence of direct evidence of discrimination," the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973), governs both Title VII claims and "disparate-treatment claims under the ADEA."  Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1155 (D.C. Cir. 2004).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by demonstrating that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (internal quotation marks and citation omitted).

A defendant may rebut a *prima facie* showing with evidence of a "legitimate, nondiscriminatory reason" for its choices.  Stoe v. Barr, 960 F.3d 627, 639 (D.C. Cir. 2020) (quoting Holcomb, 433 F.3d at 896).  If the employer succeeds, the burden then returns to the plaintiff, who must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. 133, 143 (2000) (quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas."  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).  The Court's sole task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  Id.; see Evans v. Sebelius, 716 F.3d 617, 620 (D.C. Cir. 2013) (explaining that courts evaluate this question "in light of the total circumstances of the case," including "the plaintiff's *prima facie* case") (quoting Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012)).

To defeat summary judgment, the plaintiff must "present[] enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence."  Desmond v. Mukasey, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  This may be done in a variety of ways, including by presenting "evidence suggesting that the employer treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual circumstances" or that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision."  Brady, 520 F.3d at 495.

Defendant here moves for summary judgment on each of Plaintiff's claims.  As to the non-selection count, it points out a couple of threshold infirmities; it also maintains that the

removal and demotion decisions were made for legitimate, non-discriminatory reasons.  The Court will analyze the counts in order.

   A.  Non-Selection for NSL Branch DGC Role

The Government assails Plaintiff's first count on multiple grounds — namely, that her complaint was not timely raised with an EEO counselor, that her non-selection does not constitute an adverse action, that there was no sex discrimination since a woman was selected for the NSL role, and that the FBI had a legitimate, non-discriminatory reason for not selecting her. See Def. MSJ at 5–14.  Given that the DGC role did, in fact, go to a woman — Trisha Anderson — the Court is skeptical that Grzadzinski could succeed on a sex-based discrimination claim.  It need not reach that question nor Defendant's last ground, however, since it will agree with the Bureau's first two contentions.  The Court similarly notes that to the extent Plaintiff is asserting an age or "sex-plus-age" claim here, it would stumble on the same threshold issues.

   1.  *Timeliness*

Before filing suit, a federal employee alleging a Title VII violation must timely exhaust her administrative remedies or be barred from judicial relief.  See Harris v. Gonzales, 488 F.3d 442, 443 (D.C. Cir. 2007); Hill v. Kempthorne, 577 F. Supp. 2d 58, 64 (D.D.C. 2008).  The same is true for plaintiffs seeking relief under the ADEA.  See Gilbert v. Napolitano, 958 F. Supp. 2d 9, 12 (D.D.C. 2013) (collecting cases).  To satisfy this requirement, "[a]n aggrieved person must initiate contact with a[n EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).  Failure to do so renders a claim untimely and the administrative remedies unexhausted.

The parties agree that Plaintiff is bound by these requirements, but they diverge on whether she has satisfied them; such disagreement stems from their different views on when the 45-day period began to run.  See Def. MSJ at 5–7; ECF No. 27 (Pl. Opp.) at 23–24.  In Defendant's view, the allegedly discriminatory action — *i.e.*, Plaintiff's non-selection for the NSL Branch DGC position — occurred on the November 2014 date she was notified of her selection as ILLT Branch DGC.  See Def. MSJ at 5.  In other words, when she gained one job, she necessarily lost the other.  If that date is not the relevant one, the Government continues, there are at least two others on which the non-selection could be said to have occurred: January 12, 2015, when the NSL Branch DGC vacancy announcement was canceled, id. at 5; see also ECF No. 26-3 (Declaration of Melanie Glickson), Exh. 6 (Jan. 12., 2015, email to Plaintiff informing her of NSL position cancellation), or May 6, 2015, when Plaintiff received an email from her colleague forwarding the announcement of Anderson's selection.  See Def. MSJ at 6 & 6 n.1; Glickson Decl., Exh. 4.  No matter which of these three dates the Court considers as the trigger, Defendant notes, Plaintiff's initial contact with an EEO counselor on June 24, 2015, falls outside the requisite 45-day timeframe.  See Def. MSJ at 5–6, 6 n.1.

Grzadzinski rejoins that the relevant date is none of the three Defendant identifies, but rather June 15, 2015, when Anderson started in the NSL role.  See Pl. Opp. at 23.  That is because, according to Plaintiff, "whether Ms. Anderson or Ms. Grzadzinski would actually encumber the [NSL Branch DGC] position was unclear until the June 2015 reorganization was finalized."  Id.  Since Plaintiff had been removed by that time as ILLT Branch DGC and was actively seeking other positions, she contends that she could have garnered the NSL Branch DGC position to which she had applied up to the date on which Anderson took her seat.  Id.

While such an argument is chronologically creative, the Court is not convinced. Although it is true that the NSL role was not formally occupied until Anderson started there in mid-June, it had been filled long before — at the latest, by May 5, 2015, when her selection was announced to the OGC.  See Pl. Resp. to Def. SMF, ¶ 29.  Grzadzinski's opportunity to obtain the job had thus been eliminated by early May.  Indeed, her non-selection had probably been solidified the prior November; having applied for both roles, Plaintiff should have known that winning one meant losing the other.  Id., ¶ 20.  But even accepting the latest possible date on which Grzadzinski learned of Anderson's selection for the NSL role — May 6, 2015 — her June 24 contact with the EEO counselor still fell outside of the 45-day window set by EEOC regulations.  See 29 C.F.R. § 1614.105(a)(1).  Her non-selection claim, consequently, is time-barred.  See Hill, 577 F. Supp. 2d at 65.

### 2. *Adverse Action*

Even if Plaintiff's claim had been timely filed, it still would not survive Defendant's Motion because she has not demonstrated that she suffered an adverse action.  In other words, because she did obtain the ILLT job, she cannot complain about not being chosen for the NSL spot; after all, she could not have done both.

To make out a *prima facie* case of discrimination, Grzadzinski must show that she suffered an "adverse employment action."  Douglas v. Donovan, 559 F.3d 549, 551–52 (D.C. Cir. 2009) (citing Ginger v. District of Columbia, 527 F.3d 1340, 1343 (D.C. Cir. 2008)).  That is "a significant change in employment status" that causes an employee to "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  Id. at 552 (quoting Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003), and Forkkio

v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).  Most often, this action "inflicts <u>direct</u>

economic harm."  <u>Id.</u> (quoting <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 762 (1998)).

      Plaintiff nevertheless contends that her non-selection for the NSL Branch DGC role was

indeed an adverse employment action, and the fact that she was selected for the ILLT role is

irrelevant.  <u>See</u> Pl. Opp. at 25.  Echoing her earlier arguments, she maintains that the NSL spot

was open — and thus could possibly have been given to her — until Anderson started in the

position in June 2015.  <u>Id.</u>  At that point, Grzadzinski asserts, she had been removed from the

ILLT role, and so her selection for that job cannot be the reason she lost out on the NSL role.  <u>Id.</u>

Defendant rejoins that this version of events is misguided: although Anderson did not start at the

NSL until June, she was selected in February 2015, at which point any window for Plaintiff to be

chosen had closed.  <u>See</u> ECF No. 32 (Def. Reply) at 5–6.  As a result, her non-selection cannot

constitute an adverse action.  <u>See</u> Def. MSJ at 7–8 (citing <u>Jenkins v. City of San Antonio Fire</u>

<u>Department</u>, 784 F.3d 263, 268–69 (3d Cir. 2015) (holding that non-selection for position with

equivalent pay, benefits, responsibilities, and prestige was not adverse action)).

      To start, just as it did in the Timeliness section above, the Court rejects Plaintiff's

contention that the NSL position was open and available at the time she was removed from her

ILLT job.  She is correct that her May 22, 2015, removal predated Anderson's mid-June start,

but, as the Court previously explained, the record establishes that Anderson was tapped in

February and that her selection was announced in early May — weeks before Baker told Plaintiff

her position was to be eliminated.  <u>See</u> Pl. Resp. to Def. SMF, ¶¶ 28–29; ECF No. 26-2

(Declaration of James Baker), ¶ 6 (Baker "had hired" NSL DGC when he determined

reorganization would be beneficial).  There was thus no second chance for Plaintiff to be selected

for the NSL role after her dismissal from ILLT, and so the relevant non-selection occurred when she applied to both roles and was picked only for ILLT.

As a result, Grzadzinski's selection for the ILLT Branch instead of the corresponding role in the NSL Branch was not the cause of "objectively tangible harm" because the positions were functionally equivalent.  Douglas, 559 F.3d at 552.  Recall that Plaintiff applied for both positions and, by her own account, "would have been equally happy to get either job" and even "enjoy[ed] the investigative law side a bit more."  Grzadzinski Depo. at 17:12–18:7.  Although Plaintiff now contends that the two jobs are not "equivalent," she does not dispute that they were both SES-level positions reporting to the FBI GC, each overseeing one of four branches of the OGC.  See Pl. Opp. at 24.  She does not, in other words, offer any evidence that her selection for one and not the other "affected her grade or salary," Taylor, 350 F.3d at 1293, led to "a significant change in h[er] job responsibilities," Forkkio, 306 F.3d at 1131, or otherwise caused her to "experience[] materially adverse consequences."  Douglas, 559 F.3d at 552.  Especially where, as here, the employee was not even "unhappy" with the job for which she was chosen, selection for one of two seemingly equivalent posts cannot constitute "an actionable adverse action."  Cf. Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

Plaintiff has not, accordingly, established a *prima facie* case of discrimination, and Defendant is entitled to summary judgment on her first count.  Douglas, 559 F.3d at 556 (affirming grant of summary judgment to defendant where no adverse employment action).

B.  Removal from ILLT Branch DGC Role

Grzadzinski's second count alleges that the reason behind her removal from the DGC role was Defendant's discriminatory motive.  See Am. Compl., ¶¶ 87–96.  Recall that GC Baker

informed her in May 2015 that he intended to reorganize the OGC, combining the ILLT Branch

Plaintiff led with the General Law Branch, which was helmed by Ernest Babcock.  See Pl. Resp.

to Def. SMF, ¶ 38.  That reorganization reduced from four to three the number of DGCs, and

Baker selected Babcock to fill the DGC position atop the newly created branch, leaving

Grzadzinski the odd woman out.  Id., ¶ 39.  She was thus assigned to the role of Section Chief in

the new branch, reporting to Babcock.  Id., ¶ 41.  Although her title and line of command

changed, Plaintiff received the same salary and remained a member of the SES.  Id., ¶ 42.

The parties wisely waste no ink debating whether Grzadzinski has established a *prima*

*facie* case of discrimination.  Instead, Defendant submits that its decision to remove her from the

DGC role was motivated by "legitimate, non-discriminatory reason[s]."  Brady, 520 F.3d at 494;

see Def. MSJ at 14–17.  Specifically, the Government maintains that Baker removed Plaintiff

because 1) her position had been eliminated during the OGC reorganization, which Baker had

determined was in the best interest of his department irrespective of implications for specific

personnel; 2) Babcock, who received the remaining DGC job, was more experienced than

Grzadzinski, who was a probationary employee at the time and had been in her position for only

a few months; and 3) Baker "had concerns about Plaintiff's performance."  Def. MSJ at 14–15;

Def. Rep. at 16.  It also argues that any suggestion of discrimination is undercut by Baker's

previous decision to hire Plaintiff for the very same role.  See Def. MSJ at 14–15 (citing Vatel v.

Alliance of Automobile Manufacturers, 627 F.3d 1245, 1247 (D.C. Cir. 2011)).

When a defendant has asserted legitimate, non-discriminatory reasons for the adverse

employment action in dispute, "the sole remaining issue [i]s discrimination *vel non*."  Teneyck,

365 F.3d at 1151 (quoting Reeves, 530 U.S. at 142–43).  At this stage, the plaintiff is "given an

opportunity to prove that the employer's professed reason[s] for its actions [are], in fact, []

pretext for discrimination." Id. "The ultimate question," then, "is whether intentional discrimination may be inferred from all the evidence[, which] . . . includes '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" Id. (quoting Dunaway v. International Brotherhood of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002)).

Plaintiff objects to each of Defendant's proposed demotion rationales and further alleges that Baker has exhibited a general bias towards women. See Pl. Opp. at 8–23. If convincing, both are appropriate methods of surviving summary judgment. See Morgan v. Federal Home Loan Mortgage Corp., 328 F.3d 647, 654 (D.C. Cir. 2003) (citing Reeves, 530 U.S. at 148–49) ("In addition to showing that an employer's proffered explanation is unworthy of belief, a plaintiff may submit other evidence of the employer's unlawful animus in a bid to avoid summary judgment."). The Court examines both issues in turn, finding the second considerably stronger for Plaintiff than the first.

### 1. Challenges to proffered rationales

Responding to Defendant's first demotion rationale — i.e., that the reorganization had nothing to do with her — Plaintiff submits that a jury could determine that the elimination of her position was not a neutral business decision and that the reorganization was indeed motivated by a desire to remove her. See Pl. Opp. at 13–14, 19–20. In support of this contention, she asserts that "Baker shifted continually his explanations of the reasons for the reorganization and the decision to demote Ms. Grzadzinski that followed." Id. at 19. By her telling, Baker provided at least five explanations for his decision to reorganize the OGC; these range from that the decision

"was based purely on the needs of the office" and was "not performance-related," ECF No. 27-16 (Deposition of Sherry Sabol) at 25:8–12, to "Ms. Grzadzinski's [lack of] success in her position was a 'number one' reason." Pl. Opp. at 20 (citing ECF No. 27-4 (Deposition of James Baker) at 57:4–12).

As Defendant points out, however, Plaintiff's depiction of the record evidence on this point is not entirely accurate. See Def. Rep. at 21–22. In particular, her assertion that Baker identified Grzadzinski's performance as the "number one" reason for the reorganization is belied by the transcript of his deposition, which reveals that this answer was given in response to an inquiry about why he had removed Plaintiff from her role, not as an explanation for the reorganization itself. See Baker Depo. at 57:4–12. Indeed, the available evidence supports the inference that Baker's decision to reorganize the OGC was made without considering any concerns with Grzadzinski's performance. See Baker Depo. at 46:2–20 ("I was trying to come up with a design that would make sense over a long period of time, without regard to personalities."); Sabol Depo. at 25:8–12; Grzadzinski Depo. at 96:12–17; ECF No. 26-27 (Deposition of Ernest Babcock) at 80:1–10; 83:11–85:6. It appears undisputed, furthermore, that Baker was considering the reorganization long before Plaintiff assumed the DGC role, undermining her contention that the reorganization targeted her. See Baker Depo. at 39:12–40:19; Babcock Depo. at 79:11–19; Grzadzinski Depo. at 94:20–95:2. The decision leading to the elimination of Plaintiff's position thus appears to have been untainted by any animus towards her. Her attack on Defendant's first proffered rationale, consequently, does little to dent its case.

She next challenges the Government's explanation for Baker's decision to assign Babcock, rather than Plaintiff, to the DGC position that remained after the reorganization. Defendant asserts that Baker's decision was based on Plaintiff's comparative lack of experience

15

in the DGC role and her probationary status.  See Pl. Opp. at 13–14, 16–17.  Plaintiff does not

buy this, arguing that "Grzadzinksi was not the most junior DGC at the time," as Defendant

contends.  Id. at 16 (internal quotation marks omitted).  Rather, she says, Plaintiff had seniority

over then-Acting DGC of the NSL Branch, Rick McNally, and the incoming permanent DGC of

that branch, Anderson.  Id. at 16–17.  Baker, Plaintiff continues, had a means of retaining her —

namely, by moving Babcock to the DGC role in another of the remaining three branches, which

was being vacated by the retirement of Tom Bondy.  Id. at 14.

Defendant responds that Plaintiff was indeed the most junior DGC, since she was a

probationary SES while McNally had been at the SES level since 2008 and Anderson was

already a non-probationary SES.  See Def. Rep. at 17 (citing ECF No. 32-2 (Declaration of Lori

Lee Holland), ¶ 4; Pl. Resp. to Def. SMF, ¶¶ 25, 43).  The portion of the record cited supports

that contention.  Grzadzinski does not dispute, furthermore, that she was the only DGC in a

probationary period when she was removed.  See Pl. Resp. to Def. SMF, ¶ 43.

As to Plaintiff's argument that she could have retained her job if Baker had simply

shuffled the DGCs around, Defendant submits that the other DGCs were not equally qualified for

all of the positions, and that Grzadzinski herself lacked the required federal-court-litigation

experience to fill the role vacated by Bondy.  See Def. Rep. at 18–19.  The Government does not

respond directly to Plaintiff's suggestion that Babcock could have been moved to Bondy's

position (thus leaving the new DGC role open for Plaintiff) but instead asserts that, because

Babcock and Grzadzinski headed the two branches that were merged, Baker's choice was

reasonably between the two of them.  Id. at 19.  And between the two, it is undisputed that

Plaintiff was the more junior.  See Pl. Opp. at 16–17 (disputing only that Plaintiff was junior to

McNally and Anderson).

Since Grzadzinski has cited no evidence to support her contention that Babcock was qualified for and could have been placed in Bondy's position, she has not established a genuine dispute of fact on the matter of Baker's decision not to make this move.  The D.C. Circuit has, furthermore, admonished courts not to act as "super-personnel department[s] that reexamine[] an entity's business decisions," Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation marks and citation omitted); without further evidence to suggest that this personnel decision was motivated by discrimination, this Court is in no position to infer a malicious motive.

The bulk of Plaintiff's arrows are aimed at Defendant's third rationale: that concerns about her performance in her role drove her removal from the DGC position.  See Pl. Opp. at 16–19, 20–23.  Defendant's Motion cites two issues that fed into Baker's decision.  First, "[he] did not feel that Plaintiff kept him sufficiently informed of what was going on in her units, an impression also shared by Mr. Babcock."  Def. MSJ at 15–16 (citing Baker Depo. at 190:13–192:12 and Babcock Depo. at 88:11–89:7).  Second, Baker strongly disagreed with Plaintiff's conclusion that Chief Division Counsels should not be required to maintain active bar licenses, describing her analysis as "flat out wrong."  Id. (citing Baker Depo. at 195:21–196:6 and Babcock Depo. at 87:12–88:10).  The Government also reiterates its argument that Baker is unlikely to have been motivated by discrimination given that he made the decision to hire Plaintiff several months earlier.  Id. at 16 (citing Vatel, 627 F.3d at 1247).

Grzadzinski rejoins that Defendant's performance concerns are merely "high-level, vague, and conclusory statements," and that Baker "was consistently unable to provide specific explanations despite repeated requests before and during litigation of this matter."  Pl. Opp. at 16.  In response to his first criticism, Plaintiff asserts that any disappointment Baker felt about

her communication skills was his own fault, as he had a "discriminatory practice of ignoring input from women with strong personalities, such as Ms. Grzadzinski." Id. at 17 (citing Grzadzinski Depo. at 56:5–12 and Sabol Depo. at 13:12–14:6 (describing Baker's discriminatory treatment of women)).  She also identifies as an example of her successful communication with Baker an incident that led to the reassignment of two employees.  Id. at 18.  Defendant responds that Baker "testified without contradiction in the record that he did not think Plaintiff was succeeding as a deputy" and that any lack of specificity is attributable to the three years that have passed since the relevant events occurred.  See Def. Rep. at 17 & n.11 (citing Baker Depo. at 57:10–12 and Baker Decl., ¶¶ 7–8).  Because this issue more properly dovetails with evidence of a generally discriminatory motive, the Court explores it further below.

As to the CDC bar-licensing question, Grzadzinski argues that she never provided an opinion on this matter, that Defendant's characterization of her position as "flat out wrong" is erroneous since these attorneys had not been required to maintain bar licenses in the past, and that, in any event, the issue arose after Plaintiff had been removed from the DGC position.  See Pl. Opp. at 20–22.  The Government answers that Grzadzinski has introduced no evidence tending to show that she did not provide an opinion on the CDC question, but rather has offered support only for the proposition that she wrote no formal memo on the subject, a point with which Defendant agrees.  See Def. Rep. at 19–20.  Plaintiff's own deposition, in fact, reveals that she did provide Baker with her opinion on the matter.  See Grzadzinski Depo. at 90:17–21. While the record does not make clear the time at which she offered that opinion, Defendant proffers an email exchange on which Plaintiff is copied showing that the CDC bar-licensing question was at least under discussion as of April 23, 2015, thus undermining Grzadzinski's

contention that the issue did not arise until after her May removal.  See Def. Rep. at 20 (citing ECF No. 28-18 (Email Exchanges) at 1–2).

Here, as elsewhere, Defendant's responses erode to some extent Plaintiff's challenge to its legitimate rationales and offer little for a jury to base a verdict on.  On the other hand, her contention that her performance on the CDC bar-licensing analysis was satisfactory and that any deficit in her communication skills was Baker's fault or attributable to his discriminatory motive may be enough to create a genuine issue of fact as to her performance.  See George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005) (plaintiff survived summary judgment based on credible insistence of satisfactory performance and accusation that conduct issues were fault of coworkers even when evidence was largely her own testimony).  Fortunately for Grzadzinski, she has other ammunition in her arsenal: general evidence of a discriminatory motive.

### 2. *Other evidence of discriminatory motive*

In addition to assailing each non-discriminatory reason offered to explain her removal, Plaintiff introduces evidence to demonstrate that Baker exhibited a pattern of discriminatory behavior towards women generally.  See Pl. Opp. at 8–15.  That evidence purports to show that he repeatedly disadvantaged women, causing several others to file EEO complaints against him, and allowed his male employees to get away with behavior for which he punished women.  Id. Plaintiff largely relies on her own deposition testimony and that of several other female employees of the OGC to establish this purported pattern of discriminatory behavior.  To the extent the Government challenges the admissibility of other evidence — *e.g.*, third-party EEO complaints — the Court need not resolve this as it does not rely on such evidence in its analysis.

In her deposition, Grzadzinski testified that she "would routinely see Mr. Baker cut women off in meetings, oftentimes skip over the women, [and] would routinely go to a

subordinate male to ask the question as opposed to the female that was sitting directly next to him."  Grzadzinski Depo. at 56:7–11.  That sentiment was echoed by Sherry Sabol, an OGC employee, who observed that "Baker would not acknowledge" women who made recommendations in staff meetings but would praise male employees who offered the same.  See ECF No. 27-38 (Declaration of Sherry Sabol) at 6; Sabol Depo. at 57:14–59:6.  Catherine Bruno, another OGC employee, described how Baker would "back away" and "seemed uncomfortable around any woman who was try[ing] to assert an argument around him."  ECF No. 27-14 (Deposition of Catherine Bruno) at 32:20–34:3.

Several women, including Plaintiff, described how they perceived the OGC reorganization to be motivated by Baker's desire to disadvantage female employees.  Sabol recounted being called into his office and told about the reorganization, with Baker noting that several women "didn't fit" while describing his male employees as "good guys" he wanted to protect.  See Sabol Depo. at 13:12–17:14.  During that conversation, Sabol testified, "the adverse impact [of the reorganization] on every woman in the office, every female executive in the office, was pretty obvious, as were the remarks he made about each of the individual women as he went through this reorganization and the good guys he wanted to work with."  Id. at 13:12–14:1.  McNally apparently shared that perception, as he "offered to help [Sabol] write an affidavit if [she] wanted to file an EEO complaint because he felt that the whole reorganization was pretty clearly directed against women."  Id. at 19:7–11.

Plaintiff also highlights that Sabol and several others — including Bruno, Nancy Wiegand, and Karen Miller, all of whom were deposed in this case — did, in fact, file EEO complaints against Baker.  See Pl. Opp. at 11–12.  Miller, for example, filed a complaint after Baker told her that she would have to recompete for her position as section chief following the

OGC reorganization.  See ECF No. 27-21 (Deposition of Karen Miller) at 11:2–12.  Because she "could not figure out why [Baker] was doing what he was doing" and she "looked around and saw he was doing the same thing to others," Miller attributed this decision to sex discrimination.  Id. at 19:12–18.  Wiegand filed a complaint after being told by Baker that she was underperforming; when pressed to explain why, however, Baker retracted his criticism.  See ECF No. 27-20 (Deposition of Nancy Wiegand) at 12:21–14:11; 15:1–17:19.  Bruno also filed an EEO complaint after a change in her performance ratings and Baker's stated intention to remove her from the SES, something she did not see happening to men.  See Bruno Depo. at 14:11–19:21; 22:19–23:9.  Sabol filed her own complaint after the OGC reorganization resulted in her removal from the section chief position into "an undefined job for an undefined period of time."  Sabol Depo. at 20:2–10.

In contrast, Plaintiff asserts, Baker rewarded male employees, including those who exhibited problematic behavior, underperformed, or were assertive — in other words, those who exhibited the same behaviors for which he punished female employees.  See Pl. Opp. at 12–13.  She names Bondy and McNally as examples.  Id.  Bondy, Plaintiff notes, "was known to be generally failing as a manager, did not communicate appropriately, and sexually harassed at least two employees."  Id. at 12 (citing Baker Depo. at 57:18–59:1; 141:13–142:10 and Wiegand Depo. at 32:12–34:11).  Indeed, Baker himself admitted that Bondy was not "succeeding as a manager" and that he was "actively considering moving him."  Baker Depo. at 58:1–9.  Despite this, Plaintiff contends, Baker took no action against Bondy, instead reducing his responsibilities "to help inflate Mr. Bondy's apparent successes."  Pl. Opp. at 12.

McNally was similarly permitted to get away with poor performance and inappropriate behavior, in Plaintiff's view.  Specifically, he demonstrated a temper — on one occasion

"bec[oming so] very animated [and] red in the face" that he nearly caused an agent to draw a firearm — and had "a reputation for throwing chairs in the workplace." Id. (citing Baker Depo. at 66:8–67:9; 180:11–190:17). He also had communication issues similar to those that contributed to Plaintiff's removal. See Baker Depo. at 68:2–18. Although she was removed from her DGC role for performance issues, Plaintiff observes, these men did not experience adverse consequences for their misdeeds, thus providing further evidence of discriminatory motive.

Defendant rebuts this evidence by criticizing her speculations about Baker's attitudes towards women and her reliance on "vague, generalized perceptions that fail to provide any context that allows for an inference of discriminatory treatment." Def. Rep. at 12–14. The Government, furthermore, specifically attacks Plaintiff's assertions about Bondy and McNally. Id. at 14–15. Bondy, according to Defendant, was not similarly situated to her because he was a non-probationary employee, and Baker did take action against him, counseling him and reporting allegations against him to the Inspection Division. Id. (citing Baker Depo. at 53:2–5; 57:19–58:9; 143:5–144:6–21). Had he not announced his retirement before Baker decided on a course of action, Defendant asserts, Baker might have removed him from his position. Id. As to McNally, the Government argues that Baker's treatment of him actually demonstrated favorable treatment of women, since Baker selected Anderson to fill the DGC role in the NSL Branch instead of McNally, who had held the role in an acting capacity. Id. at 15.

Having trudged through the detailed record, as well as the parties' explanations, attacks, and counterattacks, the Court returns to the "ultimate question" of "whether intentional discrimination may be inferred from all the evidence." Teneyck, 365 F.3d at 1151. While it agrees that some of Plaintiff's evidence is speculative and while it has doubts about Plaintiff's

ability to convince a jury that her removal from the DGC position was the result of a discriminatory motive, the Court is constrained to acknowledge that it cannot "conclude that no reasonable jury could reach a verdict in [Plaintiff's] favor." Hamilton, 666 F.3d at 1351. Plaintiff's case is far from a slam dunk, but she has presented evidence, primarily in the form of deposition testimony, on which a jury could conclude that her removal from the DGC position was the result of sex discrimination rather than one of Defendant's proffered legitimate reasons. This count, consequently, may proceed to trial.

  C. Removal from the SES

   Plaintiff's third count follows the last. As both sides recognize, the arguments concerning her removal from the SES are substantially the same as those relating to her demotion from DGC. See Pl. Opp. at 28–29, 30; see also Def. Rep. at 23 (recognizing the same). Indeed, the relevant difference between this claim and the prior one is that Defendant has additional data points supporting its only relevant non-discriminatory rationale: concerns with Plaintiff's performance. See Def. MSJ at 17–20; Def. Rep. at 23–25. That is not enough, however, to overcome the fact that Grzadzinski has produced sufficient evidence of a broader bias against women to be entitled to present her case to a jury. Her SES-removal claim, too, survives summary judgment.

**IV.** **Conclusion**

   For the foregoing reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment. A separate Order so stating will issue this day.

         /s/ *James E. Boasberg*
         JAMES E. BOASBERG
         United States District Judge

Date: April 19, 2022