UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARCIANN M. GRZADZINSKI,

    Plaintiff,

    v.

MERRICK GARLAND, Attorney General
of the United States,

    Defendant.

Civil Action No. 20-1411 (JEB)

**MEMORANDUM OPINION**

    Plaintiff Marciann Grzadzinski was previously a Deputy General Counsel at the Federal Bureau of Investigation. She was also a member of the Senior Executive Service, which is a civil-service classification for high-level managerial and supervisory roles. She alleges that during her tenure at the FBI, her supervisor and then-General Counsel James Baker made a series of decisions — *e.g.*, eliminating her DGC position pursuant to a departmental reorganization, demoting her, and eventually removing her from the SES — based on his animus towards women. Her suit challenges those decisions as discriminatory and in violation of Title VII. With trial set for February 27, 2023, the Government has filed a Motion *in Limine* to exclude large swaths of the testimony Grzadzinski planned to present at trial. The Court will grant the Motion in part and deny it in part.

**I.    Legal Standard**

    "[M]otions *in limine* are a means for arguing why 'evidence should or should not, for evidentiary reasons, be introduced at trial.'" Graves v. Dist. of Columbia, 850 F. Supp. 2d 6, 11 (D.D.C. 2011) (emphasis omitted) (quoting Williams v. Johnson, 747 F. Supp. 2d 10, 18 (D.D.C.

1

2010)). They "are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'" Id. at 10 (quoting Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1069 (3d Cir. 1990)). The court has "broad discretion in rendering evidentiary rulings, . . . which extends . . . to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial." Barnes v. Dist. of Columbia, 924 F. Supp. 2d 74, 79 (D.D.C. 2013).

The "general rule" is that relevant evidence is admissible, unless otherwise prohibited. United States v. Foster, 986 F.2d 541, 545 (D.C. Cir. 1993) (paraphrasing Fed. R. Evid. 402). Under Federal Rule of Evidence 401, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." A court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**II.     Analysis**

The Government moves to exclude various categories of evidence, which the Court will address in turn.

   A.  Former Female Colleagues

Defendant devotes much of its Motion to arguing that the testimony of Plaintiff's former female colleagues should be precluded or at least substantially limited. Those witnesses include four FBI employees who worked in the OGC under Baker and "who experienced similar [allegedly discriminatory] treatment at [his] hands" (Catherine Bruno, Karen Miller, Sherry Sabol, and Nancy Wiegand), and one FBI employee "who observed [that treatment] first-hand"

(Lisa Matsumoto). See ECF Nos. 48, 51 (Pl. Opp.) at 2–9. Each witness had a distinct experience with Baker. For purposes of analyzing admissibility, the witnesses' planned testimony can be grouped into four buckets: (1) testimony about adverse actions Baker took against each witness (the so-called "me too" testimony); (2) testimony concerning Baker's general treatment of or attitude towards women; (3) testimony about Plaintiff's reactions to the reorganization, her demotion, and her removal; and (4) evidence of the witnesses' Equal Employment Opportunity and other informal complaints. Rather than perform a witness-by-witness analysis, the Court will provide admissibility guidelines for each of those categories.

   1. *Adverse Actions by Baker*

Start with alleged adverse actions Baker took, or tried to take, against the various witnesses. Specifically, Bruno will testify that in 2015, he threatened to remove her from the SES, see Pl. Opp. at 3; Miller will testify that in 2014, Baker gave her a lower performance rating than in previous years, and in 2015, he told her that she would have to recompete for her Section Chief position and possibly be removed from the SES, id. at 4–5; Sabol will testify that in connection with the 2015 reorganization, he removed her from her Section Chief position and replaced her with a male employee, id. at 6–7; ECF Nos. 39, 40 (Gov't MIL) at 11; and Wiegand will testify that around May 2015, Baker threatened to lower her performance rating. See Pl. Opp. at 7; Gov't MIL at 12.

"Evidence of an employer's past discriminatory . . . behavior toward other employees — so-called 'me too' testimony — may, depending on the circumstances, be relevant to whether an employer discriminated . . . against a plaintiff." Nuskey v. Hochberg, 723 F. Supp. 2d 229, 233 (D.D.C. 2010) (citing Sprint v. Mendelsohn, 552 U.S. 379, 385–88 (2008)). The inquiry is extremely contextual and multifactorial. Id. Courts in this district consider, for example: "[1]

3

whether such past discriminatory behavior by the employer is close in time to the events at issue in the case, [2] whether the same decisionmakers were involved, [3] whether the witness and the plaintiff were treated in a similar manner, and [4] whether the witness and the plaintiff were otherwise similarly situated." Id.; see also Stoe v. Garland, No. 16-1618, 2021 WL 4169313, at *6 (D.D.C. Sept. 14, 2021).

The first (close in time), second (same decisionmaker), and fourth (otherwise similarly situated) factors tip in favor of admitting all four of the witnesses' adverse-action testimony. The aforementioned incidents occurred extremely close in time to the events at issue in this case — that is, in and around 2015, when Baker undertook the reorganization that precipitated Plaintiff's demotion. Baker was also the decisionmaker for the actions that the witnesses complain of, just as he was in this case. To be sure, unlike Grzadzinski, these women did not report directly to Baker. See Gov't MIL at 17. But they were similarly situated to her in other important ways: all were SES-level employees in the OGC under Baker, and all were working there at the time of the reorganization. Id. at 9–13. In arguing otherwise, the Government appears to have improperly conflated the standard for similarly situated comparators in Title VII cases with the standard for assessing similarity of situation in the context of "me too" evidence. See, e.g., id. at 16; Pl. Opp. at 13 (making this point). Because Grzadzinski does not seek to introduce these women as comparators — after all, a typical comparator in a gender-discrimination case brought by a woman would be a similarly situated man, see, e.g., Brown v. Dist. of Columbia, 798 F. App'x 677, 679 (D.C. Cir. 2020) — Defendant's invocation of the law governing comparators is irrelevant here.

The third factor (similar treatment) points in different directions depending on the nature of the adverse action that the witness would discuss. Specifically, Baker's decision to give (or

threaten to give) lower performance ratings to Miller and Wiegand is so dissimilar from the acts at issue in this suit — demotion and removal from the SES — as to have extremely limited probative value. See Gov't MIL at 20. Indeed, a discussion of these would likely necessitate lengthy digressions involving male comparators as the parties debate the justifications for the ratings. Plaintiff, for her part, does not specifically defend the relevance of that portion of their testimony. The Court therefore finds that it should be excluded.

The remainder of the testimony, however, concerns adverse actions sufficiently similar to the ones suffered by Plaintiff — that is, removal or threat of removal from the SES, or removal from a current position — and is therefore admissible. While none of the women was subjected to precisely the same adverse actions as Plaintiff, a jury could still find their testimony corroborative of her theory that Baker treated female employees as more dispensable during the reorganization. Herbert v. Architect of the Capitol, No. 09-1719, 2013 WL 12399109, at *2 (D.D.C. July 23, 2013) ("While the victim of the alleged discriminatory conduct that is the subject of the 'me too' testimony most often shares with Plaintiff membership in the same protected class, the exact conduct allegedly endured need not be identical.").

Finally, the Court cautions that while the witnesses may testify about what they themselves experienced and observed of Baker's actions, they may not speculate about his motivations. Barnett v. PA Consulting Grp., Inc., 35 F. Supp. 3d 11, 21 (D.D.C. 2014) ("[I]n an employment discrimination action, as is the case here, Rule 701 bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision.").

### 2. *Baker's Attitude Towards Women*

Grzadzinski also seeks to admit testimony from all five female witnesses about Baker's generally discriminatory attitude towards women. See, e.g., Gov't MIL at 25 (citing testimony that his body language around women was standoffish, he would ignore women's comments in meetings, and he would listen "more readily" to men). Defendant contends that such testimony should be excluded as "pure opinion by individuals who are not experts in reading . . . human gestures or behavior," as well as "conclusory and speculative." Id. at 26–27.

The Court disagrees and will admit the testimony so long as it is based on the witnesses' own personal experience or direct observation. To establish a defendant's generally discriminatory attitude, witnesses in a discrimination case may typically "testify fully as to their own observations of [his] interactions with . . . other employees." Barnett, 35 F. Supp. 3d at 21. Here, evidence of Baker's attitude towards women in the OGC — as manifested in his body language, comments, or general demeanor — is highly relevant to Grzadzinski's claims because it is probative of his motives for demoting and eventually removing her from the SES. Czekalski v. Peters, 475 F.3d 360, 368 (D.C. Cir. 2007) (describing, in gender-discrimination case, testimony about employer's treatment of women in the office generally and finding it relevant to assessing defendant's intent with respect to plaintiff); Stoe, 2021 WL 4169313, at *6–7 (admitting, in gender-discrimination case, testimony from female witness about employer's lack of respect for her and tendency to dismiss or belittle her opinions, even though she would testify about events that occurred years after events involving plaintiff). That probative value outweighs any danger of unfair prejudice, particularly given that Defendant may cross-examine the witnesses to attempt to show that their testimony is contradictory, speculative, or

insufficiently specific.  See, e.g., Gov't MIL at 25 (citing Wiegand's testimony that Baker occasionally praised her comments in meetings).

The Court reiterates, however, that here, too, it will preclude the witnesses from speculating about Baker's motivations; their testimony must be limited to their personal observations and experiences.

### 3. *Plaintiff's Reactions to Demotion and Removal*

The Government next seeks to exclude the witnesses' testimony relating to Plaintiff's damages — namely, her distress and other reactions to being demoted and removed from the SES.  See Pl. Opp. at 4–8; Gov't MIL at 26.  The Court will admit the evidence, but subject to limitations similar to those just discussed.  The witnesses may testify only about their personal and specific observations of Grzadzinski's reactions to her demotion and eventual removal.  Such testimony is relevant because it would provide corroborative, eyewitness accounts of Plaintiff's description of her own distress.  Her former colleagues may not, however, speculate about the cause of that distress or diagnose Grzadzinski based on their lay opinions.  See, e.g., Gov't MIL at 26 (suggesting that Sabol would testify that Plaintiff was "clinically depressed"). By placing such limits, the Court believes that it is striking the right balance between admitting relevant testimony and excluding that which is potentially prejudicial.  The Court also notes that based on its Motion *in Limine* and the cases cited therein, the Government appears to agree with the propriety of drawing this particular line.  Id. at 27 (citing case for proposition that witness "might be able to testify as to what she saw and heard," even if she may not speculate about why employer acted certain way).

4. *EEO Complaints*

Some of the aforementioned witnesses filed EEO complaints in response to Baker's actions. Plaintiff's exhibit list includes copies of those complaints, as well as documents reflecting various informal complaints filed with the OGC. See Gov't MIL at 24. Defendant asks that those documents, as well as testimony related to them, be excluded because they are "riddled with hearsay, . . . lack probative value, are unduly prejudicial, and would create a substantial risk of jury confusion." Id. The Court agrees. The witnesses' EEO and informal complaints not only contain inadmissible hearsay, see Fed. R. Evid. 802, but they also risk creating separate mini-trials about collateral questions that would distract from Plaintiff's case. Their probative value, by contrast, is substantially limited, especially considering the other testimony the witnesses plan to provide. What is significant is what happened to the women, not whether they filed complaints or how such were adjudicated. It is possible that parts of the documents may represent prior consistent or inconsistent statements, but the Court can cross that bridge if and when it arrives. The Court will therefore bar for now evidence and testimony about those complaints and what came of them.

B. Lenient Treatment of Men

Defendant next turns to testimony about Plaintiff's former male colleagues. It argues that she should be precluded from offering evidence of Baker's "allegedly lenient response" to accusations of misconduct by two OGC employees, Rick McNally and Tom Bondy. See Gov't MIL at 27. Both men were DGCs at the time of the 2015 reorganization. The Government contends that evidence of Baker's reaction to their misconduct is irrelevant to Grzadzinski's discrimination claims because she does not allege that "she engaged in similar misconduct but was unfairly disciplined relative" to them. Id. at 28.

8

It is not clear exactly how Plaintiff plans to use this category of testimony. See Pl. Opp. at 16–17. To the extent that she wishes to invoke McNally and Bondy as comparators to herself, the Court would agree with Defendant. It is true that Grzadzinski nowhere suggests that she engaged in misconduct for which she was disproportionately sanctioned. She therefore has no reason to use McNally and Bondy as comparators in a disciplinary context. Cf., e.g., Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1115–19 (D.C. Cir. 2016) (discussing use of comparators where plaintiff was disproportionately punished relative to employees outside her protected class for misconduct of "comparable seriousness").

On the other hand, if she seeks to compare Baker's treatment of McNally and Bondy to his treatment of female employees who did commit similar sorts of misconduct, such testimony would be relevant and admissible. Cf. id. at 1119–20 (relying on analogous evidence in race-discrimination case to deny summary judgment to defendant). The Government in its Motion does not appear to disagree with this latter conclusion. It objects to testimony about McNally and Bondy primarily on the ground that Plaintiff herself did not engage in the same sort of misconduct as her male colleagues. See Gov't MIL at 27. As a result, the Court will address this question in the context of the evidence presented at trial.

C. Dismissed Claims

Defendant next seeks to exclude evidence about any claims dismissed at the summary-judgment stage. Id. at 28–30. There being no dispute about that issue, see Pl. Opp. at 17, the Court will grant this part of the Motion.

D. Sexual Harassment

The Government also contends that any evidence of Plaintiff's previous experiences of sexual harassment at the agency should be excluded as irrelevant. See Gov't MIL at 30. This is

9

correct. The two incidents about which Grzadzinski would like to testify occurred decades ago — one in 1997, the other in 2002–03 — in Detroit and Saudi Arabia, respectively. Id. Neither incident involved Baker. Plaintiff, for her part, does not explain how these incidents are relevant to her allegations; instead, she states only that they are an important "part of her background." Pl. Opp. at 17. That may well be the case, but it does not make them relevant for evidentiary purposes. See Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). The Court will therefore grant this part of the Motion.

### E. Statistics

The Government also takes issue with Plaintiff's statistical evidence. First, it argues that two studies on her exhibit list — the Inspector General Report on gender equity, which includes data about the FBI and several other agencies, and the "FBI Gender Analysis Overview" — are irrelevant. See Gov't MIL at 31. Plaintiff disagrees, maintaining that the studies "demonstrate the relative paucity of females in higher level positions at the FBI." Pl. Opp. at 19. The Court believes that Defendant has the better of this argument. The studies, which respectively span six and twelve years, and which treat with the demographics of the FBI as a whole, are far too general to be probative of Grzadzinski's allegations of discrimination, which pertain to the gender-based animus of a single individual — Baker — and his actions in his capacity as the head of a particular office in the agency. Their limited probative value is outweighed by the risk of confusion, particularly given that Grzadzinski has not pointed to a witness who could provide context or an explanation for the statistics and their significance. Cf. Thomas v. Chao, 65 F. App'x 321, 324 (D.C. Cir. 2003) (affirming district-court decision to exclude evidence in employment-discrimination case "in the absence of an expert who could testify that the alleged

underrepresentation was statistically significant"). The Court will therefore exclude these exhibits from trial.

Second, Defendant objects to the admission of a chart showing various breakdowns of SES employees who underwent a probationary period between 2013 and 2015. The chart shows that of the 139 SES employees on probation during that time, 24 were female, and two failed probation, one man and one woman. See Gov't MIL at 33. The Court agrees with the Government that the chart, at least as is, has no probative value. The rare incidence of SES employees' failing probation from 2013 to 2015 is not at all relevant to Grzadzinski's allegations of discrimination by Baker during his tenure at OGC. And for the reasons stated above, the danger of confusion is substantial.

If, however, Plaintiff were to produce a subset of these figures — namely, for the OGC during the period when Baker was a decisionmaker — the Court would find those admissible. Baker is the relevant decisionmaker in this case. It would be probative of Plaintiff's claim if, under his tenure, only one or two of a substantial number of probationary employees failed probation. The rarity of such occurrences could support Grzadzinski's theory that her alleged shortcomings at work were not significant enough to render her one of the unusual employees deserving to fail probation, and it would support the inference that Baker was motivated by other factors.

Finally, the Government asks the Court to preclude the introduction of an email from Sabol and the attached article, which is called "Women in Leadership: The State of Play." Gov't MIL at 34. As Plaintiff does not defend the admissibility of those documents, and because Defendant makes persuasive arguments that neither is relevant, the Court will grant the Motion.

11

F. <u>Damages</u>

The Government's next two arguments relate to Plaintiff's non-economic damages.

1. *Spoliation*

Understanding the first of those requires a bit of background. <u>See</u> Gov't MIL at 35. Around the time of the events at issue here, Grzadzinski was seeing a therapist, Dr. Tonya Fridy, for issues related to her marriage, family, and mental-health conditions that predated her professional grievances. <u>Id.</u> at 6, 35. Defendant contends that Plaintiff had a duty to preserve medical records related to those therapy sessions because she knew that they would be "essential to any evaluation of whether the non-economic damages [she] asserts and any alleged medical expenses" were caused by her issues at work or stemmed instead from her pre-existing health conditions. <u>Id.</u> at 35. Grzadzinski, however, failed to preserve the records, and when the Government subpoenaed them, it learned that they had been destroyed by water damage in 2020. <u>Id.</u> at 7. As a sanction for the spoliation of the documents, Defendant suggests that Plaintiff be barred from presenting any evidence or argument in support of her non-economic damages claim and any associated medical expenses or uses of leave. <u>Id.</u> at 39. It asks for an adverse-inference instruction in the alternative. <u>Id.</u> Grzadzinski disputes that she had any such duty to preserve the records, particularly given that they were apparently about issues "wholly unrelated" to her work. <u>See</u> Pl. Opp. at 21–22.

The Court need not wade into the particulars of the preservation issue. As it noted in its Order on Plaintiff's Motion *in Limine*, Fridy's "testimony is highly relevant on the issue of Grzadzinski's non-economic damages, particularly given that her patient records no longer exist." ECF No. 57 (Order on Pl. MIL) at 1–2. The fairest course as it pertains to this issue is thus the one outlined in that Order: the Government may call Fridy as a witness, and the Court

will give it "wide latitude" to examine her about Plaintiff's earlier diagnoses and about the extent to which she discussed work-related problems — if at all — during her therapy sessions. Id. at 2. Such testimony will be highly relevant to the question of causation, and the Court believes that it will adequately address the Government's concerns that without the missing evidence, a jury would too easily infer that work was the single source of Plaintiff's emotional distress.

2. *Expert Testimony*

The Government contends that Plaintiff should be barred from testifying about non-economic damages for a second reason: she has not identified an expert witness who could reliably address the cause of her various ailments. See Gov't MIL at 40. Grzadzinski denies any need for such a witness because she believes that her claims are "straightforward and easily within the jury's comprehension." Pl. Opp. at 22. The Court will carve a middle path between the two parties' positions.

"Whereas testimony from lay witnesses may be sufficient to establish that an individual is 'distressed' in some fashion, it may not be sufficient to establish that an individual suffers from a particular medical condition[,] . . . which only professional medical care providers may be qualified to diagnose. Moreover, lay witness testimony may not be sufficient to demonstrate that particular conduct caused these complex medical conditions." Jefferson v. MilVets Sys. Tech., Inc., 172 F.3d 919 (D.C. Cir. 1999). The Court will therefore permit Plaintiff to testify about how her treatment in the workplace made her feel — that is, the distress it caused her. She may also testify about her weight gain, her appetite fluctuations, and the colds and other minor illnesses she contracted after her removal from the DGC. Grzadzinski's first-hand experience equips her to reliably discuss those physiological changes, though Defendant may of course cross-examine her about non-work-related causes of those issues. See Gov't MIL at 44 (arguing

that Plaintiff's weight or appetite changes could have been caused by non-work-related stressors).

The Court will preclude her, however, from testifying or making any arguments about: (1) the chest pain she experienced on September 15, 2015, which she vaguely attributes to an interaction with Baker; and (2) changes in her blood pressure following her demotion and removal from the SES. Id. at 41–43. Grzadzinski is not qualified to opine on the causes of those medical conditions, and she offers no expert testimony linking them to her workplace woes. She would thus be left to speculate about causation, as would a jury. The danger of jury speculation in the absence of testimony from a medical professional is particularly pronounced here because Plaintiff's complex medical history and pre-existing stressors provide equally plausible alternative explanations for the symptoms of which she complains. Id.; see, e.g., Halcomb v. Woods, 610 F. Supp. 2d 77, 85–86 (D.D.C. 2009) (noting that plaintiff was required to offer expert testimony of causation of her distress because it was complex and multifactorial).

So long as Plaintiff's testimony is limited in the ways outlined by the Court, however, she may argue and claim non-economic damages, reimbursement of medical expenses, and use of leave.

### III.  Conclusion

For the foregoing reasons, the Court will grant the Motion *in Limine* in part and deny it in part. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: February 8, 2023